# EXHIBIT
# A

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
ICDR CASE NO. 01-15-0004-8503

Vantage Deepwater Company
Vantage Deepwater Drilling, Inc.

Claimants

v.

Petrobras America Inc.
Petrobras Venezuela Investments & Services, BV
Petróleo Brasileiro S.A. (Petrobras Brazil)

Respondents

FINAL AWARD

# Table of Contents

I.   Introduction ............................................................................................................... 1
     A.   The Parties and Counsel ...................................................................................... 1
     B.   Constitution of the Tribunal ............................................................................... 3
II.  Overview of the Dispute ........................................................................................... 4
     A.   The Arbitration Provisions .................................................................................. 4
     B.   Nature of the Controversy ................................................................................... 6
     C.   Procedural Rules .................................................................................................. 7
     D.   Language .............................................................................................................. 8
     E.   Key Contract Provisions ...................................................................................... 8
III. Procedural History .................................................................................................. 23
     A.   Initial Communication ....................................................................................... 23
     B.   Applicable Arbitration Rules ............................................................................. 23
     C.   Jurisdiction of Tribunal over PVIS and PAI ..................................................... 24
     D.   Challenge to and Replacement of Arbitrator Keltner ....................................... 24
     E.   Demand for Arbitration and Subsequent Briefs ................................................ 25
     F.   Document Production ......................................................................................... 26
     G.   Third Party Subpoenas ...................................................................................... 32
     H.   Claimants' Change of Counsel ........................................................................... 32
     I.   Submissions ....................................................................................................... 33
     J.   Evidentiary Hearings ......................................................................................... 38
     K.   Post-Hearing Submissions ................................................................................ 39
     L.   Deliberations and Award Drafting ..................................................................... 39
     M.   Close of Hearing ................................................................................................ 39
     N.   Final Iterations of Parties' Positions ................................................................. 40
     O.   SEC Filing of 4 May 2018 ................................................................................ 41
     P.   Claimants' Withdrawn Tort Claims ................................................................... 42
IV.  Jurisdiction .............................................................................................................. 43
     A.   Claims ................................................................................................................ 43
     B.   Counterclaims .................................................................................................... 47
V.   Analysis of Vantage's Claims ................................................................................. 48
     A.   Breach of Contract ............................................................................................. 48
     B.   Bribery and Corruption ...................................................................................... 54
     C.   Respondents' Breach of the Duty of Good Faith and Fair Dealing .................. 60
     D.   "Limitation of Liability" Clause 19.9 of the DSA ............................................ 61
     E.   Unpaid Invoices: Chinook 6 Lien ..................................................................... 65
VI.  Analysis of Respondents' Counterclaims ............................................................... 67
     A.   Overview ............................................................................................................ 67
     B.   Bribery and Corruption ...................................................................................... 69
     C.   Contract as Void, Voidable, and Unconscionable ............................................. 72
     D.   Common Law Fraud and Fraudulent Inducement ............................................. 74
     E.   Assisting in Breach of Fiduciary Duty .............................................................. 77
     F.   Civil RICO Violations ....................................................................................... 78
     G.   Civil Conspiracy ................................................................................................ 79

| | | |
|---|---|---|
| H. | Negligent Misrepresentation | 80 |
| I. | Unjust Enrichment (Money Had and Received) | 81 |
| J. | Constructive Trust | 82 |
| K. | Exemplary Damages for Alleged Fraud | 83 |
| L. | Conclusion | 84 |
| VII. | Damages Analysis | 85 |
| A. | Quantum | 85 |
| B. | Interest | 90 |
| C. | Bareboat Charter | 92 |
| D. | Offset (Profits, Fees and Costs) | 95 |
| VIII. | Costs and Attorneys' Fees | 95 |
| A. | Overview | 95 |
| B. | Respondents' Position | 97 |
| C. | Claimants' Position | 98 |
| D. | Tribunal Analysis | 99 |
| IX. | Majority Comment on the Objection and Dissent | 100 |
| X. | Disposition | 100 |
| A. | Jurisdiction | 100 |
| B. | Claims | 101 |
| C. | Counterclaims | 101 |
| D. | Costs and Attorneys' Fees | 101 |
| Signatures | | 102 |
| Annexes: Parties' Summaries of Claims | | 103 |

We the undersigned arbitrators, having been designated in accordance with the arbitration agreement entered into between the above-named parties, contained in the Third Novation of the Agreement for the Provision of Drilling Services, dated 27 October 2014, having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows.

I.   Introduction

1.   Pursuant to the Commercial Rules of the American Arbitration Association (the "AAA Commercial Rules"), the Arbitral Tribunal constituted in this present case (the "Tribunal") hereby renders this Award.

2.   Except where context requires otherwise, conclusions of the "Majority" or the "Tribunal" in respect to jurisdiction, liability, and quantum, represent views of Messrs. Brower and Park.

3.   The terms "Claimants" and "Vantage" will be used interchangeably, as will the terms "Respondents" and "Petrobras."

4.   Claimants and Respondents are collectively referred to as the "Parties."

A.   The Parties and Counsel

1.   Claimants

5.   Claimants in this arbitration are Vantage Deepwater Company and Vantage Deepwater Drilling, Inc. (collectively, "Claimants" or "Vantage").

6.   Unless otherwise indicated or as required by context, reference to "Vantage" in the singular indicates Claimants in these proceedings.

7.   Vantage Deepwater Company is a company organized and established under the laws of the Cayman Islands, with its registered office at c/o Maples Corporate Services Limited, P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

8.   Vantage Deepwater Drilling, Inc. is a Delaware corporation with its registered office at 777 Post Oak Boulevard, Suite 800, Houston, Texas 77056, United States of America.

9.   Claimants are represented by:

Karl Stern, Esq.
Charles Eskridge, Esq.
Kate Kaufmann Shih, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002

karlstern@quinnemanuel.com
charleseskridge@quinnemanuel.com
kateshih@quinnemanuel.com
Tel: +1 (713) 221-7000

Tai-Heng Cheng, Es.
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor,
New York, New York 10010
taihengcheng@quinnemanuel.com
Tel: +1 (212) 849-7000

Paul J. Dobrowski, Esq.
Danielle N. Andrasek, Esq.
Dobrowski, Larkin & Johnson
4601 Washington Ave. #300
Houston, Texas 77007
pjd@doblaw.com
dna@doblaw.com
Tel: + 1 (713) 659-2900

2. Respondents

10. Respondents in this arbitration are Petrobras America Inc., Petrobras Venezuela Investments & Services, BV, and Petróleo Brasileiro S.A. (collectively, "Respondents" or "Petrobras").

11. Unless otherwise indicated or as required by context, reference to "Petrobras" in the singular indicates Respondents in these proceedings.

12. Petrobras America Inc. is a Delaware corporation with its registered office at 10350 Richmond Avenue, Suite 1400, Houston, Texas, 77042, USA.

13. Petrobras Venezuela Investments & Services B.V. is a company organized and established under the laws of the Netherlands with its registered office at Prins Bernhardplein 200, 1097 JB, Amsterdam, Netherlands.

14. Petróleo Brasileiro S.A (Petrobras Brazil) is a company organized and established under the laws of Brazil with its registered office at Avenida Republica do Chile, 330, Rio de Janeiro – RJ, 20031-170, Brazil.

15. Respondents are represented by:

Andrew B. Derman, Esq.
William M. Katz, Jr., Esq.
Catherine W. Clemons, Esq.
Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201

Andrew.Derman@tklaw.com
William.Katz@tklaw.com
Catherine.Clemons@tklaw.com
Telephone: + 1 (214) 969-1700

Fernando Gama, Esq.
Petrobras America, Inc.
10350 Richmond Avenue
Suite 1400
Houston, TX 77042
f.gama@petrobras.com

B.    Constitution of the Tribunal

16. On 31 August 2015, Claimants filed their Notice of Arbitration against Respondents and nominated David Keltner, Esq. as their party-nominated arbitrator. Judge Keltner was subsequently removed as arbitrator and replaced by Judge Brower, as noted below.

17. Respondents nominated James M. Gaitis, Esq. as their party-nominated arbitrator, with the appointment confirmed by the IDCR/AAA on 9 December 2015.

18. On 24 March 2016, following a preliminary telephone call with counsel for both sides, the AAA confirmed appointment of Professor William W. Park as the presiding arbitrator (Chairman) in these proceedings.

19. To fill the vacancy created by removal of Judge David Keltner, the AAA on 30 September 2016 confirmed the appointment of Judge Charles N. Brower as Claimants' party-nominated arbitrator.

| VDEEP | Vantage Deepwater Company |
|---|---|
| VDDI | Vantage Deepwater Drilling, Inc. |
| PAI | Petrobras America Inc. |
| PVIS | Petrobras Venezuela Investments & Services, BV |
| Petrobras Brazil | Petróleo Brasileiro S.A. |
| Contract, Parties' Agreement, DSA or Drilling Services Agreement | Agreement for the Provision of Drilling Services (4 February 2009), the original contract entered into by PVIS and VDDI, subsequently amended by Novation including First (2012), Second (2013), and Third (2014) Novation Agreements, and First (2009), Second (2012), and Third (2013) Amendment Agreements |
| First Novation | First Novation of the DSA, 18 April 2012 |

| Second Novation | Second Novation of the DSA, 20 December 2013 |
|---|---|
| Third Novation | Third Novation of the DSA, 27 October 2014 |
| WACC | Weighted Average Cost of Capital, for use in damages calculation |
| BSEE | Bureau of Safety and Environmental Enforcement |
| FCPA | United States Foreign Corrupt Practices Act |
| BCA | Bareboat Charter Agreement |
| SEC | United States Securities and Exchange Commission |

## II. Overview of the Dispute

### A. The Arbitration Provisions

20. This arbitration arises from an instrument which, in the proceedings, has been alternatively described as (i) the Contract, (ii) the DSA, (iii) the Drilling Services Agreement, and/or (iv) the Parties' Agreement.

21. The Tribunal considers those various labels as referring to the operative parts of the same commitments between the two sides to this proceeding. Such commitments derive from the Agreement for the Provision of Drilling Services between Petrobras Venezuela Investments & Services B.V. and Vantage Deepwater Company dated 4 February 2009, including relevant amendments, novations and associated guarantees, as described in the First Procedural Order of 4 May 2016, revised on 3 June 2016, 8 June 2016, 1 July 2016 and 17 October 2016.

22. The applicable dispute resolution provision is set forth below, as contained in paragraph 8.1 of the Third Novation, amending Clause 24.2 of the Drilling Services Agreement, referred to as "the Contract" in paragraph 8.1 of the Third Novation:

> Resolution of Disputes. The parties shall exclusively and finally resolve any dispute or controversy ("Dispute") between them arising out of this Contract, including any claim, liability, loss, demand, damages, lien, or cause of action, ("Claim") using direct negotiations and arbitration as set out in this article 24.2. A Party who violates this Article 24.2 shall pay all legal and consulting fees and costs incurred by the other Party in any suit, action or proceeding to enforce Article 24.2. While the procedures in this Article 24.2 are pending, each Party shall continue to perform its obligations under this Agreement and Contract, unless to do so would be impossible or impracticable under the circumstances.

> Arbitration. If the Dispute is not resolved by direct negotiations in good faith between the parties in dispute, then the Dispute shall be finally settled by binding arbitration and either Party may at any time initiate such arbitration by

giving notice to the other Party. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the International Center for Dispute Resolution of the American Arbitration Association ("AAA"). To the extent of any conflicts between the applicable Arbitration Act or the AAA Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail. The AAA is the appointing authority. The place of the arbitration shall be Houston, Texas and the language of the arbitration shall be English.

The number of arbitrators shall be three, one indicated by each Party and the third indicated by the two arbitrators previously selected.

The following provisions shall apply to any arbitration proceedings commenced pursuant to this Section:

(A) The number of arbitrators shall be one if the Parties in dispute agree to a single arbitrator. Otherwise, the number of Arbitrators shall be three.

(B) The arbitrator or arbitrators must remain neutral, impartial and independent regarding the Dispute and the Parties.

(C) The Parties shall submit true copies of all documents considered relevant with their respective statements of claim or defense and any counterclaim or reply. Neither Party may compel the other to produce additional documents. However, the arbitrator or arbitrators may decide to require the submission of additional documents limited to specific, narrow and well-defined classes of documents that the arbitrator considers or arbitrators consider necessary for the arbitrator's or arbitrators' understanding and resolution of the Dispute.

(D) The Parties waive any Claim for, and the arbitrator has or arbitrators have no power to award, the damages waived and released. The arbitrator has or arbitrators have no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator has or arbitrators have the power to rule on objections concerning jurisdiction, including the existence or validity of this arbitration clause and the existence or the validity of this Agreement.

(E) All arbitration fees and costs shall be borne equally regardless of which Party prevails. Each Party shall bear its own costs of legal representation and witness expenses.

(F) The arbitrator is or arbitrators are authorized to take any interim measures as the arbitrator considers or arbitrators consider necessary, including the making of interim orders or awards or partial final awards. An interim order or award may be enforced in the same manner as a final award using the procedures specified below. Further, the arbitrator is or arbitrators are authorized to make pre- or post-award interest at applicable statutory interest rates during the relevant period.

(G) The arbitrator or arbitrators must render a reasoned award in writing. The award is final and binding.

(H) The Dispute will be resolved as quickly as possible.

Enforceability.

(I) The Parties waive irrevocably their right to any form of appeal, review or recourse to any court or other judicial authority, to the extent that such waiver may be validly made.

(J) Proceedings towards granting injunctive relief measures may be brought in any court having jurisdiction over the person or assets of the non-prevailing Party.

(K) Proceedings to enforce judgment entered on an award may be brought in any court having jurisdiction over the person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

(L) The foregoing arbitration provisions shall be governed by and construed in accordance with the laws of Texas, USA.

Confidentiality.

(M) The Parties agree that any Dispute and any negotiations and arbitration proceedings between the Parties in relation to any Dispute shall be confidential and will not be disclosed to any third party.

(N) The Parties further agree that any information, documents or materials produced for the purposes of, or used in, negotiations, mediation or arbitration of any Dispute shall be confidential and will not be disclosed to any third party.

(O) Without prejudice to the foregoing, the Parties agree that disclosure may be made:

(1) In order to enforce any of the provisions of this Agreement including without limitation, the Parties agreement to arbitrate, any arbitration order or award and any court judgment.

(2) To the auditors, legal advisers, insurers and Affiliates of that Party to whom the confidentiality obligations set out in this Agreement shall extend.

(3) Where that Party is under a legal or regulatory obligation to make such disclosure, but limited to the extent of that legal obligation.

(4) With the prior written consent of the other Party.

B.    Nature of the Controversy

23. The Parties' difference relates to an oil drilling rig (also called a deep-water drilling ship) leased by Vantage to Petrobras for a period of eight (8) years, delivered on 7 December 2012 with an expected lease period until 7 December 2020.

24. The rental arrangement was cancelled on 31 August 2015, leaving a term to run of approximately five years and three months.

25. The rental was concluded at a rate of US$ 490,000 per day with a 12.5% bonus.

26. Claimants seek compensation for the alleged breach of contract through early termination.

27. Respondents deny liability and also seek damages through multiple counterclaims, many related to alleged fraudulent inducement of the DSA.

C.   Procedural Rules

28. Although an ambiguity in the DSA (discussed below) triggered some initial uncertainty, both sides ultimately agreed on application of the American Arbitration Association's Commercial Arbitration Rules.

29. The applicable rules for this proceeding thus include the following: (i) the AAA's Commercial Arbitration Rules; (ii) the ICDR Guidelines for Arbitrators Concerning Exchanges of Information; and (iii) the AAA's Accelerated Exchange Program.

30. The above-mentioned ambiguity derived from Clause 24.2 of the Drilling Services Agreement as amended by the Third Novation (Clause 8.1.1), which cited "Commercial Arbitration Rules of the International Center for Dispute Resolution."

31. The provision has been interpreted to apply the AAA Commercial Rules, which, in Rule 7, provide as follows, with the singular "arbitrator" construed to include a three-member tribunal:

> (a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

> (b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

> (c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.[1]

32. Despite their mention in earlier iterations of the Parties' agreements, it is clear that the LCIA Rules do not apply.

---

[1] AAA Commercial Rule 7.  See Procedural Order of 1 July 2016 at ¶ 11 (reciting the Parties' agreement to the applicable AAA procedural rules).

33. The First Procedural Order (i) designated the language of the hearing to be English and (ii) assigned the duty of arranging any required interpretation of oral testimony to the Parties.

E.   Key Contract Provisions

34. For convenience, the following key provisions of the DSA and related documents have been set forth below, given their frequent consultation by the Tribunal, without any suggestion that other relevant contract language has not been considered. The arbitration provisions from which the Tribunal derives its jurisdiction have been set forth *supra*.

35. The Tribunal notes that the DSA and related documents often vary in connection with use of "Article" and "Clause" as referenced in the various contract documents. The DSA generally uses the term "Article" for the main titles, but internally refers to provisions as "Clauses". Similar variations occur among the DSA and the Novation agreements.

36. For example, the Third Novation "Clause 8.1" speaks in the same provision, concerning arbitration, of both "Clause 24.2" and "Article 24.2". The provision on "Reimbursements and Other Charges" is given the heading "Article 16" but later in Clause/Article 9.1.1.1 reference is made to "Clause 16" concerning unpaid invoices. The Guarantee generally uses the term "Article".

37. In this Award, unless context requires some other reading, no significance will be given to the two terms, which will on occasion be used interchangeably. As a general matter, the label "Article" will be given to an overall heading, with "Clause" reserved for subdivisions.

1.   Original DSA

Clause 4.1 Term

4.1.1 This Contract shall be valid from the Effective Date. The Term of this Contract shall commence on the Commencement Date and shall be valid and in force for:

4.1.1.1 a period of eight (8) years from such Commencement Date (the "Initial Term"); and

4.1.1.2 an additional period of up to two (2) years at the sole discretion of the COMPANY on the same terms and conditions of this Contract provided that the Parties may negotiate a revision of the Operational Daily Rate.

4.1.2 If, at the end of the Term, Drilling Operations for a Well are ongoing, the Term shall be extended so that CONTRACTOR shall conclude such operations,

and any such extension shall be on the same terms and conditions as otherwise apply under this Contract.[2]

Clause 9.1 Termination

This Contract shall terminate without notice at the end of the Term or any extension thereof. In addition to the foregoing, and notwithstanding any other provision of this Contract, this Contract may only be terminated:

9.1.1 By COMPANY, for the following reasons:

....

9.1.1.2

if any relevant CONTRACTOR item suffers substantial structural damage or major breakdown not caused by Company, (a "Material Breakdown"), unless CONTRACTOR has sent written notice to COMPANY within five (5) days following occurrence of the Material Breakdown that it elects to remedy such Material Breakdown, and such remedy, in the reasonable opinion of COMPANY, can be effected within a period of one hundred and eighty (180) days from the date of such notice, (each a "Material Breakdown Suspension Period"); provided, however, that COMPANY may terminate this Contract at any time following the expiration of the Material Breakdown Suspension Period if the Material Breakdown is not cured to the satisfaction of COMPANY prior to such expiration. For avoidance of doubt, the remedy of such Material Breakdown shall not be considered as a repair of the Drilling Unit and CONTRACTOR shall not be entitled to receive any Daily Rate or reimbursement for the period commencing upon the date of such Material Breakdown and ending upon the date such Material Breakdown is remedied to the satisfaction of COMPANY;

9.1.1.3

if CONTRACTOR commits a material breach of its obligations under this Contract.

....

9.1.1.7

if CONTRACTOR repeatedly fails to conduct the Services in accordance with Good Oil and Gas Field Practices; or

....

9.1.3

By either Party:

...

---

[2] J-001 Agreement for the Provision of Drilling Services, Cl. 4, at 9.

### 9.1.3.2

if any of the other Party's representations and warranties are false in any material respect; provided however, CONTRACTOR shall not have the right to terminate the Contract under this Clause for COMPANY's inability to secure COMPANY's Authorizations in which case COMPANY shall nominate an alternative Country of operation.[3]

### Clause 9.2: Termination for convenience

9.2.1 COMPANY shall not be entitled to terminate this Contract for convenience.[4]

### Clause 9.3 Cure

With respect to each of the items of default identified in Clauses 9.1., items 9.1.1.3 to 9.1 1.8, and 9.1.3, the right of COMPANY or CONTRACTOR to terminate this Contract shall be suspended if, after the defaulting Party has been provided Notice of such default, it has, within five (5) days of such Notice, advised the other Party in writing that it elects to remedy such default. If within thirty (30) days of receipt of the original Notice of default the defaulting Party has failed to cure such default or to commence to cure (in the event the remedy will take longer than the cure period) to the non-defaulting Party's reasonable satisfaction, the non-defaulting Party shall be entitled to terminate this Contract. No Daily Rate shall be due during such thirty (30) day cure period or any other period to cure the CONTRACTOR's default, if such default prevents the Drilling Unit to properly perform the Drilling Operations.[5]

### Clause 10.1 Basic Obligations

10.1.1 CONTRACTOR shall perform the Services without undue delays or interruptions, and in so doing, shall comply with Applicable Law, this Contract, the respective Drilling Programs and Good Oil and Gas Field Practices.[6]

### Clause 10.2 Drilling Operations

---

[3] J-001 Agreement for the Provision of Drilling Services, Cl. 9.1, at 14-6.

[4] J-001 Agreement for the Provision of Drilling Services, Cl. 9.2, at 16.

[5] J-001 Agreement for the Provision of Drilling Services, Cl. 9.3, at 16.

[6] J-001 Agreement for the Provision of Drilling Services, Cl. 10.1, at 17.

CONTRACTOR shall perform all Drilling Operations and related services in strict accordance with the Drilling Program and in full compliance with Applicable Law and Good Oil and Gas Field Practices.[7]

## Clause 10.4 CONTRACTOR Personnel

10.4.1 CONTRACTOR shall provide CONTRACTOR Personnel in the numbers and with the classifications set forth in APPENDIX G, in order to allow the Drilling Unit to achieve full performance of the Services, including offline capability.

10.4.2 CONTRACTOR shall at all times enforce strict discipline and good order among CONTRACTOR Personnel and CONTRACTOR Subcontractors to abide by the rules and regulations set forth onboard the Drilling Unit.

10.4.3 CONTRACTOR shall, at its own expense and as soon as possible, replace any CONTRACTOR Personnel as may be reasonably requested by writing.

10.4.4 CONTRACTOR may not replace any CONTRACTOR Key Personnel or change any of their duties, even on a temporary basis, without the prior consent of COMPANY, which shall not be unreasonably withheld or delayed. All CONTRACTOR Key Personnel shall be fluent in spoken and written English.

10.4.5 CONTRACTOR Personnel shall be skilled, experienced, competent and efficient and shall meet or surpass any qualifications that are required under this Contract or by Applicable Law and CONTRACTOR's training and experience standards. CONTRACTOR shall deliver curriculum vitae (i) for CONTRACTOR Key Personnel according to appendix G at least thirty (30) days prior to Mobilization Initial Date and such personnel shall be subject to the approval of COMPANY which should not be unreasonably withheld; and (ii) for CONTRACTOR Personnel or any CONTRACTOR Subcontractor as and when required by COMPANY.

10.4.6 Subject to Clauses 10.4.3 and 10.4.4, the selection, replacement, hours of labor, shifts, remuneration and all other aspects and matters concerning CONTRACTOR Personnel and employees shall be determined solely by CONTRACTOR, in accordance with Applicable Law, it being understood that such personnel shall be the employees solely of CONTRACTOR and not of COMPANY.

10.4.7 CONTRACTOR shall observe all employment-related Applicable Law in each of the Countries and the country of origin of CONTRACTOR.

10.4.8 Whenever CONTRACTOR has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of the Services, CONTRACTOR shall immediately give written notice thereof, including all relevant information regarding the cause and nature of such

---

[7] J-001 Agreement for the Provision of Drilling Services, Cl. 10.2, at 17.

dispute, to COMPANY.

10.4.9 CONTRACTOR shall be solely responsible for the administration of any and all costs, expenses or liabilities connected with CONTRACTOR Personnel, including:

10.4.9.1 the payment of wages, salaries, overtime, social security contributions, vacation pay, bonuses and living allowances, if any, including payment of applicable Taxes, expenses, indemnities, insurance premiums and benefits required by CONTRACTOR's employment policies or by Applicable Law;

10.4.9.2 the cost of accommodation, traveling and transport, subsistence and medical treatment, except as expressly set forth in this Contract; and

10.4.9.3 the provision of all required Authorizations, including but not limited to, passports, visas, work permits, driving licenses, health certificates and all licenses and permits related to CONTRACTOR Personnel or required to operate CONTRACTOR Items in the applicable Country.[8]

Clause 10.14 Ethics

10.14.1 CONTRACTOR agrees to follow the United States Foreign Corrupt Practices Act and any similar Applicable Law adopted in the Countries or by the Parties. Notwithstanding the foregoing, CONTRACTOR shall immediately notify COMPANY of any request CONTRACTOR receives to take any action that might constitute a violation against what is set forth in this Clause.

10.14.2 CONTRACTOR represents that it has not paid or granted, and shall not offer or grant or agree to give to any person acting or to be nominated or on behalf of the foregoing as a government officer or employee in the services of federal and municipal government or any government official or public international organization or any agency, department or instrumentality thereof, any gift or fee or gratuity or rebate of any kind, directly or indirectly, or consideration of any kind as an inducement or reward for doing forbearing to do or for having done or forborne to do any act in relation to the obtaining or execution of this Contract or for showing or forbearing to show favor or disfavor to any person in relation to this Contract or to COMPANY.

10.14.3 CONTRACTOR represents that it has not paid or granted and shall not offer or grant or agree to give to any person in the services of COMPANY any gift or fee or gratuity or rebate of any kind, directly or indirectly, or consideration of any kind as inducement or reward for doing or forbearing to do or for having done or forborne to do any act in relation to the obtaining or execution of this or any other contract for COMPANY or for showing or forbearing to show favor or disfavor to any person in relation to this or any other contract with COMPANY.

---

[8] J-001 Agreement for the Provision of Drilling Services, Cl. 10.4, at 19.

10.14.4 CONTRACTOR represents that no owner, partner, officer, director or employee of CONTRACTOR is a government officer or employee in the services of federal and municipal government or any government official or public international organization or any agency, department, or instrumentality thereof. In case such owner, partner, officer, director or employee becomes a government official during the Term, CONTRACTOR shall notify COMPANY as soon as possible.[9]

Clause 10.15 Compliance with Law

CONTRACTOR acknowledges and agrees that it will be transporting the Drilling Unit between the Countries and conducting Drilling Operations in each of the Countries. CONTRACTOR shall comply with all Applicable Law, including all Applicable Law in each of the Countries, in connection with the Services performed by CONTRACTOR. CONTRACTOR shall, at its sole cost and expense, obtain all Authorizations (including drilling permits) needed to conduct the Services within the Countries, which by their nature or under Applicable Law are required to be applied for or supplied by or issued in the name of CONTRACTOR, except as otherwise set forth in Clause 11.2 herein. COMPANY and/or the relevant Permitted Assignee shall, whenever reasonably requested by CONTRACTOR, assist CONTRACTOR in obtaining such Authorizations; provided that compliance with this Clause shall remain the sole responsibility of CONTRACTOR. CONTRACTOR shall establish and register an office in the Countries (and any applicable political subdivision thereof), qualify as an organization operating and doing business therein, and register and file such notices and tax returns with the relevant Governmental Authorities as may be required by Applicable Law. The cost of any fees or Taxes which may arise as a result of CONTRACTOR's negligence or failure to comply with Applicable Law shall be borne by CONTRACTOR.[10]

Clause 10.19 Independent Contractor

CONTRACTOR shall be an independent contractor and in no event shall any member of CONTRACTOR Group be considered an agent or employee of COMPANY. Therefore, CONTRACTOR shall be in complete charge of CONTRACTOR Items, CONTRACTOR Personnel and CONTRACTOR Subcontractors, with the right, duties and responsibilities to control, manage and direct the detailed manner and means of performance and the Services to be carried out under this Contract, subject to COMPANY's right to give instructions as to the scope and program of the Services and general powers to inspect, monitor or to suspend the Services in order to ensure that the Services

---

[9] J-001 Agreement for the Provision of Drilling Services, Cl. 10.14, at 25-6.

[10] J-001 Agreement for the Provision of Drilling Services, Cl. 10.15, at 26.

are being carried out with due care, diligence, efficiency, in a safe and workmanlike manner, without undue delays or interruptions, observing at all times Good Oil and Gas Field Practices and the terms and conditions of this Contract.[11]

Clause 10.20 Business Practices

10.20.1 COMPANY and CONTRACTOR are aware of a practice where consultants (termed "Illegal Information Brokers") approach contractors and offer them confidential information or illicit influence to obtain business through corruption of the competitive bidding process.

10.20.2 CONTRACTOR recognizes that the practice of "Illegal Information Brokering" or any other corruption of the contract award process is not permitted by COMPANY and CONTRACTOR warrants and represents that it has not and will not utilize "Illegal Information Brokering" in connection with this Contract.

10.20.3 CONTRACTOR agrees that if an Illegal Information Broker approaches CONTRACTOR concerning this Contract, CONTRACTOR will promptly contact COMPANY. COMPANY undertakes that the information will be treated with the utmost confidentiality and also that COMPANY will handle this Contract with extra security measures in order to prevent any competitor from gaining any unfair advantage.

10.20.4 CONTRACTOR Group shall:

10.20.4.1 take no action on behalf of COMPANY, in the performance of the Services, that would subject any Party to liability or penalty under any and all laws, rules, regulations, or decrees of any Governmental Authority;

10.20.4.2 ensure that all invoices, financial settlements, reports and billings by CONTRACTOR under this Contract reflect properly the facts about all activities and transactions handled for its account hereunder; and

10.20.4.3 notify COMPANY promptly upon discovery of any instance where CONTRACTOR has not complied with the requirements of Subsection (i); or (ii) above.

10.20.5 CONTRACTOR Group shall not without the prior written consent of COMPANY: (a) use the name or any trade name or registered trademark of COMPANY or of any of its Affiliates in any advertising or communications to the public in a format except as necessary to perform the Services; or (b) make publicity releases or announcements, except as required by Applicable Law, regarding this Contract or any related activities.[12]

---

[11] J-001 Agreement for the Provision of Drilling Services, Cl. 10.19, at 27.

[12] J-001 Agreement for the Provision of Drilling Services, Cl. 10.20, at 27-8.

Clause 10.21 Conflict Of Interest

CONTRACTOR shall exercise reasonable care and diligence to prevent any actions or conditions which could result in a conflict with COMPANY's interests. This obligation shall apply to the activities of CONTRACTOR's employees and agents in their relations with COMPANY's employees and their families, representatives, vendors, subcontractors, and Third Parties. CONTRACTOR's efforts shall include establishing precautions to prevent its employees or agents from making, receiving, providing or offering gifts or entertainment of more than nominal value, payments, loans, or other consideration.[13]

Clause 10.23 Background Checks

CONTRACTOR shall, to the extent as permitted by law, obtain background checks on such employees and agents and in such manner as is specified in APPENDIX J.[14]

Clause 13.2 Safety Measures

CONTRACTOR shall take all necessary measures by acting to preserve or to protect the environment and the Well from adverse effects of CONTRACTOR's activities and to minimize any nuisance which may arise from performance of the Services and to avoid and control Kicks, Blow Outs and reservoir damages and spills or seepages. CONTRACTOR shall provide, operate, and maintain, in good working condition, all necessary gas detectors, spark arresters, automatic shutdown devices and proper safety devices and guards on CONTRACTOR Items. Whenever oil or gas is encountered in sufficient quantities to jeopardize CONTRACTOR items or the Well, CONTRACTOR shall shut down any heaters, fires, or other equipment and appurtenances that might constitute a hazard.[15]

Clause 13.6 CONTRACTOR Personnel

13.6.1 CONTRACTOR shall ensure that all CONTRACTOR Personnel and CONTRACTOR Subcontractors shall comply with all Applicable Law regarding safety, environmental protection, pollution control and the HSE Requirements.[16]

Clause 13.7 CONTRACTOR's Environmental Policy

13.7.1 At least thirty (30) days prior to the Commencement Date CONTRACTOR shall prepare and submit to COMPANY an environmental

---

[13] J-001 Agreement for the Provision of Drilling Services, Cl. 10.21, at 28.

[14] J-001 Agreement for the Provision of Drilling Services, Cl. 10.23, at 29.

[15] J-001 Agreement for the Provision of Drilling Services, Cl. 13.2, at 36.

[16] J-001 Agreement for the Provision of Drilling Services, Cl. 13.6, at 39-40.

protection work plan specific to the Services. This plan shall describe the environmental protection issues and risks associated with, and the management system that will be used in, the execution of the Services, and CONTRACTOR's programs in place to address these issues. CONTRACTOR shall provide and maintain at each location where the Services are being carried out or provided a copy of such plan together with documentation evidencing compliance therewith.

13.7.2 CONTRACTOR shall perform this Contract in such a way as to prevent or avoid environmental damage or pollution.

13.7.3 CONTRACTOR shall maintain each site free and clear from any and all obstructions which are caused by CONTRACTOR, CONTRACTOR Personnel or CONTRACTOR Subcontractors. CONTRACTOR shall have cleared any debris which CONTRACTOR may have caused and restored each site to the reasonable satisfaction of COMPANY and in accordance with Applicable Law prior to demobilization of the Drilling Unit from each site.[17]

Clause 15.3 Operational Daily Rate

Except as otherwise set forth in this Contract, COMPANY shall pay CONTRACTOR the Operational Daily Rate during the Term. The Operational Daily Rate will be in the amount stated in the APPENDIX F per day (pro rata for partial days) for each Country.[18]

Clause 19.9 Consequential Damages

Neither COMPANY on one hand, nor the CONTRACTOR on the other hand (nor its respective Affiliates) shall be liable to the other party for any indirect, incidental, special, punitive, consequential or exemplary Damages, whether any claim for such losses or damages is based on contract, warranty, tort (including negligence, joint, concurrent or several, in any amount), strict liability or otherwise, or other fault of any of the other Party . . . including, without limitation, loss of revenue, loss of profits, loss of production, business interruptions, use of capital, reservoir loss or damage, however same may be caused (collectively "Consequential Damages").[19]

Clause 24.1 Governing Law

This Contract shall be construed, enforced and governed in accordance with the

---

[17] J-001 Agreement for the Provision of Drilling Services, Cl. 13.7, at 40.

[18] J-001 Agreement for the Provision of Drilling Services, Cl. 15.3, at 42.

[19] J-001 Agreement for the Provision of Drilling Services, Cl. 19.9, at 55.

laws of England and Wales, excluding, however, any provision thereof which would refer to the application of the laws of any other jurisdiction.[20]


Clause 24.2 Disputes

CONTRACTOR, on the one hand and COMPANY on the other hand (each a "Disputing Party") agree to negotiate or to settle in good faith any and all claims, controversies, differences and/or disputes (each a "Dispute"), at any time, arising out of or in connection with this Contract, including any questions regarding its existence, interpretation, validity, termination or any breach thereof, following the giving of notice in writing to the other Disputing Party specifying the cause thereof.[21]


Clause 27.1 Contractor Representations

CONTRACTOR represents and warrants to COMPANY as to it itself that:

27.1.1 It is duly organized, validly existing and in good standing under the laws of the Cayman Islands.

27.1.2 It has all necessary power and authority to execute, deliver and perform its obligations under this Contract (including its Appendices), and each of the execution, delivery and performance by it of this Contract (including its Appendices) has been duly authorized by all necessary action on its part.

27.1.3 Neither the execution and delivery by it of this Contract, nor the consummation by it of any of the transactions contemplated hereby, requires any Authorizations (i) except such as are not yet required (as to which it has no reason to believe that the same will not be readily obtainable in the ordinary course of business upon due application thereof); or (ii) which have been duly obtained and are in full force and effect.

27.1.4 It has duly and validly executed and delivered this Contract and this Contract constitutes a legal, valid and binding obligation of it enforceable against it in accordance with its terms.

27.1.5 It has all of the required skills and capacity (including any capacity in terms or means, expertise, human resources and technical capability) necessary to perform, or cause to be performed, the Services in accordance with the terms of this Contract.

27.1.6 It has knowledge of all Applicable Law and business practices that must be followed in performing the Services.

---

[20] J-001 Agreement for the Provision of Drilling Services, Cl. 24.1, at 62.

[21] J-001 Agreement for the Provision of Drilling Services, Cl. 24.2, at 62.

27.1.7 It is financially solvent, able to pay its debts as they mature and possessed of sufficient working capital to complete its obligations under this Contract.

27.1.8 It owns or has the right to use all the patents, trademarks, service marks, trade names, copyrights, licenses, franchises, permits or rights with respect to the foregoing necessary to perform the Services and to carry on its business as presently conducted and presently planned to be conducted without conflict with the rights of others.

27.1.9 The execution of this Contract does not contravene any other contract executed with a Third Party.

27.1.10 Without prejudice to any other rights or remedies that COMPANY may have, CONTRACTOR acknowledges and agrees that Damages alone would not be an adequate remedy for any breach of the terms of this Contract by the CONTRACTOR. Accordingly,

COMPANY shall be entitled, without proof of special damages, to the remedies of injunction, specific performance or other equitable relief for any threatened or actual breach of the terms of this agreement.

27.1.11 Nothing in this Contract is intended to, or shall be deemed to establish any partnership or joint venture between any of the Parties, constitute any Party the agent of another Party, nor authorize any Party to make or enter into any commitments on or behalf of any other Party.

27.1.12 Each Party shall and shall use all reasonable endeavors to procure that any necessary Third Party shall execute, acknowledge and deliver such further documents or instruments, and do all further similar acts, as may reasonably be required for the purpose of giving full effect to this Contract.[22]

Clause 27.5. No Waiver

No Party shall be deemed to have waived, released or otherwise reduced any of its rights under this Contract unless such Party has expressly stated its intention to do so in a written instrument duly executed by such Party; provided further that any such instrument shall relate only to such matter, non-compliance or breach as it expressly refers to, and therefore shall not apply to any subsequent or other matter, non-compliance or breach whatever.[23]

2. Novations

a)   First Novation

Clause 3.6

---

[22] J-001 Agreement for the Provision of Drilling Services, Cl. 27.1, at 65-6.

[23] J-001 Agreement for the Provision of Drilling Services, Cl. 27.5, at 67-8.

The Parties acknowledge and agree that in relation to their respective obligations, duties and liabilities (whether in contract, tort or delict including negligence or for breach of duty, statutory or otherwise) under the Contract:

(a) any obligations, duties and liabilities of PVIS owed to VANTAGE under the Contract in respect of the period prior to the Novation Date which remain undischarged at the Novation Date shall not be deemed to be waived by VANTAGE by virtue of this Novation Agreement;

(b) any obligations, duties and liabilities of VANTAGE owed to PVIS under the Contract in respect of the period prior to the Novation Date which remain undischarged at the Novation Date shall not be deemed to be waived by PVIS by virtue of this Novation Agreement;

(c) any obligations, duties and liabilities of PAI owed to VANTAGE US under the Contract incurred during the Novation Term which remain undischarged at the end of the Novation Term shall not be deemed to be waived by VANTAGE US by virtue of the reassignment of the Contract to PVIS and VANTAGE (or another Affiliate); and

(d) any obligations, duties and liabilities of VANTAGE US owed to PAI under the Contract incurred during the Novation Term which remain undischarged at the end of the Novation Term shall not be deemed to be waived by PAI by virtue of the reassignment of the Contract to PVIS and VANTAGE (or another Affiliate).[24]

b) Second Novation

Clause 3.6

The Parties acknowledge and agree that in relation to their respective obligations, duties and liabilities (whether in contract, tort or delict including negligence or for breach of duty, statutory or otherwise) under the DSA:

(a) any obligations, duties and liabilities of ASSIGNOR owed to VANTAGE under the DSA in respect of the period prior to the Transfer Date which remain undischarged at the Transfer Date shall not be deemed to be waived by VANTAGE by virtue of this Agreement;

(b) any obligations, duties and liabilities of VANTAGE owed to ASSIGNOR under the DSA in respect of the period prior to the Transfer Date which remain undischarged at the Transfer Date shall not be deemed to be waived by ASSIGNOR by virtue of this Agreement;

(c) any obligations, duties and liabilities of ASSIGNEE owed to VDDI and VDVIC, respectively, under the DSA incurred during the Committed Programme and the Contingent Programme (if exercised pursuant to Section 2.12 of this Agreement) which remain undischarged at the end of the Committed Programme shall not be deemed to be waived by VDDI and

---

[24] J-005 Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services, Cl. 3.6, at 4-5.

VDVIC, respectively, by virtue of the reassignment of the DSA to ASSIGNOR and VANTAGE (or another Affiliate); and

(d) any obligations, duties and liabilities of VDDI and VDVIC, respectively, owed to ASSIGNEE under the DSA incurred during the Committed Programme and the Contingent Programme (if exercised pursuant to Section 2.12 of this Agreement) which remain undischarged at the end of the Committed Programme and the Contingent Programme (if exercised pursuant to Section 2.12 of this Agreement) shall not be deemed to be waived by ASSIGNEE by virtue of the reassignment of the DSA to ASSIGNOR and VANTAGE (or another Affiliate).[25]

c) Third Novation

Clause 3.6

The Parties acknowledge and agree that in relation to their respective obligations, duties and liabilities (whether in contract, tort or delict including negligence or for breach of duty, statutory or otherwise) under the Contract:

a) any obligations, duties and liabilities of each of the Parties owed to the other Parties under the Contract shall not be deemed to be waived by any of the Parties by virtue of the novation, assignment or reassignment of the Contract pursuant to this Third Novation Agreement.[26]

Clause 3.7

PVIS and PAI hereby expressly agree to be jointly and severally liable to the Vantage Parties for each of the obligations and liabilities of PAI or PVIS under and pursuant to the Contract from the Effective Date until the remainder of the Third Novation Period.[27]

Clause 8.1

The Parties agree that during only that period of time from the Effective Date until the remainder of the Third Novation Period, the Contract shall be amended as follows:

8.1.1        Clause 24.1, 24.2 and 24.3 of the Contract shall be deemed entirely deleted and replaced by the following wording:

24.1 GOVERING LAW

---

[25] J-008 Second Agreement to the Agreement for the Provision of Drilling Services, Cl. 3.6, at 14.

[26] J-010 Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services, Cl. 3.6, at 6.

[27] J-010 Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services, Cl. 3.7, at 6.

This Contract shall be governed by, interpreted, enforced and construed in accordance with the general maritime law of the United States of America, not including, however, any of its conflicts of law rules which would direct or refer the Parties to the laws of any other jurisdiction. If, for any reason, the general maritime law of the United States of America is not applicable, then the Contract will be governed by the laws of the State of Texas, not including, however, any of its conflicts of law rules which would direct or refer the Parties to the laws of any other jurisdiction.

## 24.2 RESOLUTION OF DISPUTES

Resolution of Disputes. The parties shall exclusively and finally resolve any dispute or controversy ("Dispute") between them arising out of this Contract, including any claim, liability, loss, demand, damages, lien, or cause of action, ("Claim") using direct negotiations and arbitration as set out in this Article 24.2. A Party who violates this Article 24.2 shall pay all legal and consulting fees and costs incurred by the other Party in any suit, action or proceeding to enforce Article 24.2. While the procedures in this Article 24.2 are pending, each Party shall continue to perform its obligations under this Agreement and Contract, unless to do so would be impossible or impracticable under the circumstances.

Arbitration. If the Dispute is not resolved by direct negotiations in good faith between the parties in dispute, then the Dispute shall be finally settled by binding arbitration and either Party may at any time initiate such arbitration by giving notice to the other Party. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the International Center for Dispute Resolution of the American Arbitration Association ("AAA"). To the extent of any conflicts between the applicable Arbitration Act or the AAA Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail. The AAA is the appointing authority. The place of the arbitration shall be Houston, Texas and the language of the arbitration shall be English.

The number of arbitrators shall be three, one indicated by each Party and the third indicated by the two arbitrators previously selected.

The following provisions shall apply to any arbitration proceedings commenced pursuant to this Section:

(A)     The number of arbitrators shall be one if the Parties in dispute agree to a single arbitrator. Otherwise, the number of Arbitrators shall be three.

(B)     The arbitrator or arbitrators must remain neutral, impartial and independent regarding the Dispute and the Parties.

(C)     The Parties shall submit true copies of all documents considered relevant with their respective statements of claim or defense and any counterclaim or reply. Neither Party may compel the other to produce additional documents. However, the arbitrator or arbitrators may decide to require

the submission of additional documents limited to specific, narrow and well-defined classes of documents that the arbitrator considers or arbitrators consider necessary for the arbitrator's or arbitrators' understanding and resolution of the Dispute.

(D) The Parties waive any Claim for, and the arbitrator has or arbitrators have no power to award, the damages waived and released. The arbitrator has or arbitrators have no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator has or arbitrators have the power to rule on objections concerning jurisdiction, including the existence or validity of this arbitration clause and the existence or the validity of this Agreement.

(E) All arbitration fees and costs shall be borne equally regardless of which Party prevails. Each Party shall bear its own costs of legal representation and witness expenses.

(F) The arbitrator is or arbitrators are authorized to take any interim measures as the arbitrator considers or arbitrators consider necessary, including the making of interim orders or awards or partial final awards. An interim order or award may be enforced in the same manner as a final award using the procedures specified below. Further, the arbitrator is or arbitrators are authorized to make pre- or post-award interest at applicable statutory interest rates during the relevant period.

(G) The arbitrator or arbitrators must render a reasoned award in writing. The award is final and binding.

(H) The Dispute will be resolved as quickly as possible.

Enforceability.

(I) The Parties waive irrevocably their right to any form of appeal, review or recourse to any court or other judicial authority, to the extent that such waiver may be validly made.

(J) Proceedings towards granting injunctive relief measures may be brought in any court having jurisdiction over the person or assets of the non-prevailing Party.

(K) Proceedings to enforce judgment entered on an award may be brought in any court having jurisdiction over the person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

(L) The foregoing arbitration provisions shall be governed by and construed in accordance with the laws of Texas, USA.

Confidentiality.

(M) The Parties agree that any Dispute and any negotiations and arbitration proceedings between the Parties in relation to any Dispute shall be confidential and will not be disclosed to any third party.

(N) The Parties further agree that any information, documents or materials produced for the purposes of, or used in, negotiations, mediation or

arbitration of any Dispute shall be confidential and will not be disclosed to any third party.

(O) Without prejudice to the foregoing, the Parties agree that disclosure may be made:

    (1) In order to enforce any of the provisions of this Agreement including without limitation, the Parties agreement to arbitrate, any arbitration order or award and any court judgment.

    (2) To the auditors, legal advisers, insurers and Affiliates of that Party to whom the confidentiality obligations set out in this Agreement shall extend.

    (3) Where that Party is under a legal or regulatory obligation to make such disclosure, but limited to the extent of that legal obligation.

    (4) With the prior written consent of the other Party.[28]

Clause 10.5

All other terms and conditions of the Contract, any subsequent amendments, purchase orders and change orders not specifically modified in this Third Novation Agreement shall remain in force and binding on the Parties.[29]

## III. Procedural History

### A. Initial Communication

38. On 31 August 2015, Claimants filed their Notice of Arbitration.

39. On 5 April 2016 and 27 April 2016, the Tribunal consulted with the Parties through telephone conferences and evaluated written exchanges between the two sides in anticipation of issuing the First Procedural Order.

40. On 4 May 2016, the Tribunal issued the First Procedural Order, addressing matters related to the timetable and applicable arbitration rules.

41. Following consultation with the Parties, the Tribunal adjusted the First Procedural Order on 3 June 2016, 8 June 2016, 1 July 2016 and 17 October 2016.

### B. Applicable Arbitration Rules

42. On 17 November 2015, Respondents in Respondents' First Amended Answering Statement and Counterclaim requested that the Tribunal apply the International Rules of the International Center for Dispute Resolution (the "International Rules") to this arbitration.

---

[28] J-010 Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services, Cl. 8.1, at 9-12.

[29] J-010 Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services, Cl. 10.5, at 15.

43. Respondents also noted the "Commercial Arbitration Rules of the International Center for Dispute Resolution" (detailed in the Article 24.2 within Clause 8.1 of the Third Novation) do not exist.

44. In the First Procedural Order, the Tribunal found that all Parties agreed that (i) the applicable rules for this proceeding are the AAA's Commercial Arbitration Rules; (ii) the ICDR Guidelines for Arbitrators Concerning Exchanges of Information shall provide guidance in this proceeding; and (iii) that the AAA's Accelerated Exchange Program shall apply to this proceeding.

C.     Jurisdiction of Tribunal over PVIS and PAI

45. Claimants have asserted breach of contract and breach of the duty of good faith and fair dealing claims against all Respondents.

46. Respondents contend PVIS and PAI are not proper parties to this arbitration.

47. This Tribunal has noted in the First Procedural Order that, subject to and without waiving the jurisdictional arguments raised by two of the Respondents, the Parties represent to the Tribunal:  (i) that all related entities necessary to award any relief on Claimants' claims or Respondents' counterclaims are already named parties to this proceeding, and (ii) that no other parent or affiliated company or other form of entity must be joined as a party to this proceeding for the Tribunal to award full and complete relief among the Parties on their respective claims and counterclaims.

D.     Challenge to and Replacement of Arbitrator Keltner

48. On 11 July 2016, the ICDR/AAA informed Messrs. Gaitis and Park that Mr. David E. Keltner had been removed as arbitrator in this proceeding.

49. Through email exchanges and during a teleconference held on 13 July 2016, the Tribunal requested the Parties' views on whether to continue with conducting the 19 July 2016 hearing (originally set for 22 July 2016, but moved for a scheduling conflict).

50. Claimants requested to reschedule the hearing, with any determination on motions to compel, or objections relating to the scope of disclosure, adjourned until confirmation of the successor arbitrator.

51. Respondents requested to maintain the 19 July 2016 hearing date.  Respondents were concerned that rescheduling the hearing would adversely impact receipt of documents under outstanding non-party subpoenas with a response date of 19 July 2016, issued pursuant to Section 7 of the Federal Arbitration Act.

52. In Procedural Order of 13 July 2016, the Tribunal concluded, in the interest of efficiency, to proceed with the 19 July 2016 hearing.  The Tribunal noted maintaining the hearing date for 19 July 2016 would reduce the risk of the arbitration timetable sliding and jeopardizing the three weeks of evidentiary hearings fixed for May and June of 2017.

53. Additionally, the Tribunal concluded that the 19 July 2016 hearing would be held only for the purpose of receiving documents presented pursuant to any subpoena

duces tecum executed by the Tribunal Chairman on 1 June 2016 and signed by all three arbitrators sitting at that time.

54. The Tribunal also concluded that the telephone hearings between counsel and all initially appointed arbitrators, held on 5 April 2016, 27 April 2016 and 19 May 2016, constituted commencement of hearings under Article 20(b) of the AAA Commercial Arbitration Rules, applicable to these proceedings.

55. As a result, absent an agreement otherwise by all Parties and the remaining two arbitrators, the Tribunal emphasized no decision would be made at the 19 July 2016 hearing, which was maintained only for the purpose of receiving documents presented pursuant to a subpoena duces tecum.

56. On 11 August 2016, Vantage submitted a request for withdrawal and change of counsel, substituting the Quinn Emmanuel firm for the lawyers at the Jackson Walker firm who had initially represented Vantage.

57. On 30 September 2016, the ICDR/AAA confirmed that all steps had been taken to permit Judge Charles N. Brower to be appointed as successor arbitrator to Judge Keltner on the present Tribunal.

E.     Demand for Arbitration and Subsequent Briefs

58. On 2 December 2016, Claimants filed their Third Amended Demand for Arbitration. Respondents filed Respondents' Second Amended Answering Statement and Counterclaim.

59. On 16 December 2016, Claimants filed their Response to Respondents' Second Amended Answering Statement and Counterclaim. Respondents filed their Response to Claimants' Third Amended Demand for Arbitration. The Tribunal acknowledged receipt of all submissions to that date.

60. On 22 December 2016, Respondents filed a letter on the question of third-party funding, i.e., Letter Concerning Claimants' Lenders Having a Financial Interest in this Arbitration.

61. On 23 December 2016, the Tribunal acknowledged receipt of the communication on third-party funding. The Tribunal took notice that Vantage confirmed that (i) no third-party funder is financing these proceedings, (ii) none of Claimants' lenders have a right to the award, and (iii) Claimants' lenders did not require this arbitration to be filed.

62. On 3 January 2017, the Tribunal concluded that there was no third-party funder with an interest in this arbitration.

63. On 6 January 2017, Respondents filed Respondents' Dispositive Motion and Brief in Support seeking rulings on the following issues: (i) whether the contract was obtained by bribery; (ii) whether Claimants were bound by their agents' knowledge and participation, if any, in the bribery scheme that obtained the Drilling Services Agreement; (iii) whether the alleged fraud was to vitiate the Drilling Services Agreement; (iv) whether the Novations waive any of Respondents' rights; and (v)

whether Claimants are unable to recover most, if not all, of the damages it is seeking in this arbitration, assuming the Drilling Services Agreement is enforceable.

64. On 10 January 2017, Claimants filed an Application to Strike Respondents' Dispositive Motion.

65. On 16 January 2017, Respondents filed a Response to Claimants' Application to Strike Respondents' Dispositive Motion.

66. On 17 January 2017, Claimants filed a Reply to Respondents' Response to Claimants' Application to Strike Respondents' Dispositive Motion

67. On 25 January 2017, the Tribunal issued an order that found no basis in the AAA Rules or its prior orders to preclude Claimants' Application to Strike Respondents' Dispositive Motion.

68. On 27 January 2017, Claimants filed their Opposition to Respondents' Dispositive Motion, along with the following documents in support: (i) the Witness Statement of Douglas Halkett; (ii) the Expert Report of E. Allen Jacobs; and (iii) the Expert Report of Stephen Schwebel.

69. On 16 February 2017, the Tribunal issued an order declining to grant Respondents' Dispositive Motion.

70. On 17 February 2017, both Parties filed their Pre-Hearing Briefs. Claimants subsequently submitted Amended Annex A to their Pre-Hearing Brief to correct a clerical error.

F.   Document Production

71. On 13 May 2016, both Parties submitted their respective Redfern Requests for Document Production.

72. On 10 October 2016, Claimants submitted their objections to Respondents' Redfern Requests. Respondents also submitted their objections to Claimants' Redfern Requests on the same date.

73. On 12 October 2016, the Tribunal revised the First Procedural Order to set new deadlines for the remainder of the proceedings and a new venue for the hearing.

74. On 14 October 2016, both Parties moved the Tribunal to grant their respective document requests.

75. On the morning of 17 October 2016, the Parties met to discuss their document requests, at which time Vantage agreed to voluntarily produce documents responsive to Petrobras's Redfern Requests Nos. 5 and 6, which production Petrobras had sought to compel in their 14 October 2016 motion.

76. Vantage later clarified that such voluntary production was conditional. As reflected in the third column of Claimants' Objections to Respondents' amended Redfern Schedule, Claimants agreed subject to either the Tribunal's order or Respondents' agreement or to "a reciprocal production by Respondents." Claimants confirmed this conditionality during the telephone conference of 25 October 2016 (see pages 22-23 of Transcript) and the letter of 4 November 2016 sent by Ms. Kate Shih on

behalf of Claimants. According to Mr. Stern, counsel for Claimants, if the Tribunal denied Claimants' requests there would be no "equivalence" and thus no reason for Claimants to offer the documents (see pages 22-23 of Transcript to the Telephone Conference of 25 October 2016).

77. Following that conference of 17 October 2016, Vantage submitted its Amended Reply in Support of Redfern Requests and Motion to Compel, which narrowed the scope of Vantage's initial Redfern Requests and reiterated Vantage's concern that Petrobras's internal organization personnel had gathered documents for production without the supervision of counsel.

78. Vantage suggested that since Petrobras would seek to compel production only of its Redfern Requests Nos. 5 and 6, "[Petrobras's] motion [to compel] is moot."

79. In reply, Petrobras submitted that (i) Vantage has "refused to narrow their wide-ranging requests" and thus requested the Tribunal to resolve a dispute over the scope of Document Exchange as provided in Section 25 of the First Procedural Order, and (ii) that Petrobras's motion to compel was not moot because a third requested category of documents required reciprocal production from Vantage for "corresponding document requests" in Petrobras's Redfern Schedule.

80. For the proposition of reciprocal exchange, Petrobras cited the following: AAA-R 22(a) (The Tribunal should "manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute, while at the same time promoting equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses"); ICDR Guidelines for Arbitrators Concerning Exchanges of Information at 1(a) (The Tribunal "should endeavor to avoid unnecessary delay and expense while at the same time balancing the goals of avoiding surprise, promoting equality of treatment, and safeguarding each party's opportunity to present its claims and defenses fairly").

81. On 19 October 2016, Vantage objected to Petrobras's interpretation of the scope of discovery, voicing concern that "Petrobras have made no similar effort to narrow their original broad Requests" and arguing that "in response to [Vantage's] narrowed requests, equality of treatment does not require the Panel to compel production in response to Petrobras's broad requests. In fact, doing so would constitute improper, unequal treatment of [Vantage.]"

82. With the agreement of both sides, on 25 October 2016 the Parties participated in a "Chairman only" telephone conference with Professor Park, with a transcript provided to Messrs. Brower and Gaitis to permit them to review the points raised during the conference. During the conference, the Parties debated whether Vantage's Requests Nos. 5 and 6 would trigger a broadened scope of discovery under the alleged "reciprocity" standard. The Parties also discussed treatment of claims of privilege, in terms of both applicable privileges and a possible privilege log requirement. Since the Parties came to no conclusion on these issues during the hearing, the Tribunal (i) requested a joint submission to summarize the issues contested between the Parties and (ii) invited further submissions on the issues of reciprocity and claims of privilege.

83. On 27 October 2016, both Parties met to confer regarding (i) how the "reciprocity" argument the Parties have identified should operate; and (ii) how the Tribunal should deal with claims of privilege. The same day, Petrobras submitted Revised Redfern Requests with narrowed document requests from Vantage which Petrobras contended were reciprocal to Vantage's requests.

84. On 28 October 2016, the Tribunal received (i) a revised version of the 26 October hearing transcript; and (ii) a letter from Vantage concerning its views of reciprocity and claims of privilege.

85. On 1 November 2016, Vantage noted that Petrobras did not include in its updated Redfern Requests of 27 October any statement about the necessity or relevance to the Tribunal's understanding of the dispute as required by Section 25 of the First Procedural Order. Vantage also conditionally narrowed its requests by (i) abandoning Vantage Requests Nos. 1–13 on the condition that production is not compelled under either of Petrobras's original broad Requests or updated 27 October Requests Nos. 1 –13; and (ii) abandoning Vantage's Requests Nos. 23–27 on the condition that production is not compelled under Petrobras's original broad Requests or 27 October Requests Nos. 23–27. Vantage also contested the reciprocity of some of Petrobras's newly narrowed Requests from 27 October. In summary, Vantage conditioned its narrowed production on Petrobras abandoning its original broad Requests.

86. On 2 November 2016, the Parties made a joint submission summarizing the issues contested between them.

87. On 5 November 2016, Petrobras reiterated its concern that Vantage's voluntary production of documents was incomplete and applied for a ruling accordingly.

88. On 7 November 2016, the Tribunal invited Vantage to comment on Petrobras's allegations of 5 November 2016.

89. On 7 November 2016, the Tribunal directed the Parties to file their respective lists of definitive document requests, to be made "without any conditions of circularity, contingency, reciprocity, or equivalence." The Tribunal set 9 November 2016 (18:00) Houston time as the deadline for all definitive lists and final filings pertaining to document production.

90. On 9 November 2016, the Tribunal received each Party's final, definitive lists of Requests.

91. On 10 November 2016, the Tribunal acknowledged receipt of the Parties' emails concerning the final lists of document production requests and invited counsel to submit brief letters commenting on those lists, including observations on the critiques articulated by the other side.

92. In response to the Tribunal's invitation, the Parties filed their observations at 15:00 Houston Time on Friday 11 November 2016.

93. On 17 November 2016, the Tribunal issued a Procedural Order that (i) ruled on the final, definitive list of specific Document Requests from both Parties; (ii) ordered supervision by each side's outside named counsel to verify the proper function of the

production process; (iii) ordered objections to production based on privilege to be made within five calendar days; (iv) set the deadline for production of documents by 18 November, as required by the First Procedural Order of 17 October 2016, but invited the Parties to propose a new deadline within 48 hours from the Order; and (v) invited Respondents to confirm Claimants' corrections to the Transcript of the 25 October 2016 telephone conference. On 18 November 2016, the Tribunal issued an order declining to compel "all documents considered relevant" to be attached to amended pleadings on 2 December 2016.

94. On 14 December 2016, Claimants filed their Letter on Applicable Privilege Law alongside Claimants' Privilege Log.

95. On 16 December 2016, Respondents confirmed they were not withholding documents based on privilege. The Tribunal acknowledged receipt of all submissions to date on document production.

96. On 19 December 2016, Respondents filed their Response to Claimants' Privilege Claims. Respondents argued that the crime-fraud exception applies to negate many of Claimants' privilege claims.

97. On 23 December 2016, the Tribunal acknowledged receipt of further communications on (i) privilege claims and (ii) third-party funding. With respect to privilege claims, the Tribunal notified the Parties it would come to a conclusion on the matter as soon as possible.

98. On 3 January 2017, the Tribunal issued an order: (i) confirming that there is no third-party funding in this arbitration; (ii) inviting the filing of an affidavit on Claimants' privilege claims; and (iii) inviting submissions on the crime-fraud exception.

99. On 6 January 2017, Claimants submitted (i) the Affidavit of Kate Kaufmann Shih in Support of Privilege Log and (ii) a proposed schedule of submissions on the crime-fraud exception. Respondents approved the submission schedule the same day.

100. On 9 January 2017, Claimants submitted their Letter on Deficiencies in Respondents' Production, alleging that Respondents were withholding documents that were subject to the Tribunal's document exchange order.

101. Also, on 9 January 2017, Claimants and Respondents came to an agreement regarding the crime-fraud briefing. Claimants agreed to produce drafts of the First, Second, and Third Novations in exchange for Respondents agreeing to moot the matter of the crime-fraud exception raised in their 19 December 2016 Letter.

102. On 17 January 2017, Respondents filed their Response to Claimants' 9 January 2017 Letter Regarding Respondents' Production.

103. On 19 January 2017, Claimants filed their Letter on Deficiencies in Respondents' Production.

104. On 23 January 2017, Respondents filed (i) Respondents' Application for Depositions of Paul Bragg, Christopher Declaire and John O'Leary; and (ii) Response to Claimants' 19 January 2017 Letter Regarding Respondents' Document Production.

105. On 26 January 2017, the Tribunal issued a Procedural Order ruling that a majority of the Tribunal considered the Affidavit supplied by Ms. Kate Shih adequate to sustain Claimants' assertions of privilege, both under Texas law and under the Tribunal's Order of 3 January 2017.

106. On 28 January 2017, the Tribunal ordered Respondents to complete its review and make any remaining production by 2 February 2017 and that all parties remain subject to ongoing obligations to produce responsive documents.

107. On 2 March 2017, Claimants filed the letter on Respondents' Supplemental Production, alleging that Respondents were still deficient in their document production, and requesting that the Tribunal make adverse inferences.

108. On 7 March 2017, Respondents submitted their Response to Claimants' 2 March 2017 Letter that (i) responded to Claimants' allegations of deficient document production and (ii) requested a show-cause hearing because Claimants had requested documents from a government agency through the Freedom of Information Act after the deadlines for Document Requests as set forth in the First Procedural Order.

109. On 9 March 2017, Claimants filed their Reply Regarding Document Deficiencies and Response to Respondents' New Allegations.

110. On 13 March 2017, Respondents filed their Response to Claimants' 9 March 2017 Letter.

111. On 16 March 2017, the Tribunal issued a Procedural Order which (i) reserved the Tribunal's discretion to draw adverse inferences if subsequent developments were to show documents had been wrongfully withheld, but declining to make a ruling at that time; (ii) declined to hold a show-cause hearing because the deadlines in the First Procedural Order were intended to cover requests for Tribunal's orders and assistance, but not Freedom of Information Act requests to government agencies; and (iii) reminded counsel that its Procedural Order of 28 January 2017 imposed an ongoing obligation to produce responsive documents however late they may be found.

112. On 11 April 2017, Respondents filed a Motion to Compel Claimants to produce additional documents containing facts or data considered by Claimants' damages expert, Dr. E. Allen Jacobs.

113. On 14 April 2017, Claimants replied in their Response to Respondents' Motion to Compel. The same day, Respondents filed a Supplemental Expert Report of Dr. Robert Maness.

114. On 19 April 2017, Claimants filed their Surreply Regarding Respondents' Motion to Compel.

115. On 24 April 2017, the Tribunal issued its Procedural Order declining to grant Respondents' Motion to Compel of 11 April 2017.

116. On 22 May 2017, Claimants submitted their Application to Admit Evidence and Authorities and Regarding Expert Direct Testimony, listing as evidence: (i) the Bareboat Charter (C-1005); (ii) the Purchase and Sale Agreement for the Titanium Explorer (C-1006); (iii) a spreadsheet showing all intercompany transfers made by

Claimants pursuant to the Charter (C-1007); (iv) an email exchange in October 2013 between Claimants and Respondents regarding ownership of the Titanium Explorer and Tax Structures concerning the DSA (C-1008); (v) IRS Notice 88-123, 1988-2 CB 458, A Study of Intercompany Pricing under Section 482 of the Code (CL-293); and (vi) Accounting Review Bulletin 51, Consolidated Financial Statements §6 (CL-294).  In addition, Claimants applied to extend the time for the direct testimony of Dr. Jacobs and Dr. Maness from 15 to 30 minutes so as to enable Dr. Jacobs to address the damages arguments of Dr. Maness and Respondents.  Claimants requested, in the alternative, that the Tribunal strike and decline to consider Respondents' damages arguments concerning Claimants' transfer pricing and bankruptcy restructuring, depreciation, and tax liabilities.

117.   On 23 May 2017, Claimants submitted the Slides of Judge Schwebel's Testimony on the Applicable Law on the Merits and the Applicable Evidentiary Standards.

118.   On 23 May 2017, Respondents submitted a letter to (i) oppose Claimants' 22 May 2017 application to admit certain evidence and (ii) extend the time for the direct testimony of each respective Party's damages experts, claiming that Claimants' application conflicted with the First Procedural Order and should be denied in its entirety.

119.   On 23 May 2017, Respondents provided a list of Respondents, including name, specific address, and place of incorporation.  On the same day, Claimants provided a list of their entities with name, abbreviation, place of incorporation, address, and role of each entity.

120.   On 24 May 2017, Claimants wrote to correct a clerical error in their letter of 23 May 2017, in which they mistakenly named Vantage Drilling Company as the current corporate parent when in fact the current corporate parent was Vantage Drilling International.  Claimants submitted a corrected chart of Vantage entities.

121.   On 30 May 2017, Respondents wrote to request permission to submit supplemental evidence regarding damages produced by Claimants on 20 May 2017 and admitted into evidence during the 26 May 2017 session.

122.   On 31 May 2017, Claimants opposed Respondents' application to submit supplemental expert evidence from Dr. Maness to address (i) Claimants' exclusion from their damages quantum of transfer of profits offshore for tax reasons; and (ii) documents related to this transfer of profits offshore through a charter because Respondents had a fair opportunity to address this issue at the hearing.

123.   On 1 June 2017, Claimants and Respondents submitted their respective closing decks of slides.

124.   On 1 June 2017, Respondents submitted a letter confirming both Parties' consent that the Tribunal not be bound to issue an award within 30 days of the last post-hearing submission pursuant to AAA Commercial Rule 45.

125.   On 2 June 2017, Respondents submitted the Second Supplemental Expert Report of Dr. Maness.

126.   On 9 June 2017, Claimants submitted the Second Rebuttal Report of Dr. Jacobs.

127.  On 9 June 2017, Claimants objected to paragraphs 19–23 of the Second Supplemental Expert Report of Dr. Maness for the reason that the new arguments were beyond the scope of what the Tribunal had granted on 26 May 2017. Claimants asserted Dr. Maness's arguments were "entirely new" and had "nothing to do with Exhibits 1005-1008." Claimants requested that the Tribunal ignore these arguments and provided a response in the Second Supplemental Rebuttal Report of Dr. Jacobs.

128.  On 14 June 2017, Respondents submitted a response to Vantage's objection to the Second Supplemental Expert Report of Dr. Maness. Dr. Maness was permitted by the Tribunal to submit a supplemental expert report so long as the report provided "new insights" and did not "rehash old testimony" in relation to Exhibits C-1005 to C-1008. Respondents' argued in their response letter that he had done so. Respondents requested the Tribunal to overrule Claimants' Objection because Dr. Maness's new report provided new insights on Exhibits C-1005 through C-1008.

129.  On 14 June 2017, the Tribunal acknowledged receipt of Respondents' 14 June 2017 letter concerning paragraphs 19–23 of the Second Supplemental Export Report of Dr. Maness.

130.  On 16 June 2017, the Tribunal ruled to admit both the entire 2 June 2017 Report of Dr. Maness and the 9 June 2017 Supplemental Rebuttal Report of Dr. Jacobs.

G.  Third Party Subpoenas

131.  On 19 July 2016, the Tribunal held a hearing to (i) take and receive evidence subpoenaed from non-parties, (ii) hear any disputes related to the production of such non-party evidence, and (iii) hear any disputes between the Parties presented by the Redfern Schedule.

132.  Arbitrators James Gaitis and William W. Park attended the hearing, but no witnesses appeared. The hearing did not result in the receipt of any evidence.

H.  Claimants' Change of Counsel

133.  On 11 August 2016, Claimants submitted Notice of Withdrawal and Substitution of Counsel notifying this Tribunal that Charles L. "Chip" Babcock, Kent Sullivan, Kathy Silver and Luke Gilman of Jackson Walker LLP would withdraw the same day as counsel for Claimants, Vantage Deepwater Company and Vantage Deepwater Drilling, Inc., in this proceeding.

134.  Effective the same day, Claimants substituted as counsel of record Karl Stern, Charles Eskridge, Tai-Heng Cheng, and Kate Kaufmann Shih of Quinn Emmanuel Urquhart & Sullivan LLP.

135.  On 12 August and 13 August 2016, arbitrators William W. Park and James M. Gaitis wrote to the ICDR/AAA disclosing that Claimants' selection of Quinn Emmanuel as counsel would not create circumstances as to call into question the independence of their impartiality, respectively.

136. On 30 September 2016, the ICDR/AAA confirmed the completed appointment of arbitrator Judge Charles N. Brower.

137. On 5 October 2016, the Parties jointly submitted the Stipulated Extension of Confidentiality Provisions, a joint stipulation facilitating the Parties' confidential communications with their respective clients, consultants, and litigation support vendors, and allowing third parties to produce documents in connection with the arbitration to avail themselves of the confidentiality provisions.

138. On 20 April 2017, Claimants notified the Tribunal that Paul J. Dobrowski and Danielle N. Andrasek of Dobrowski, Larkin & Johnson LLP would also be appearing as additional counsel for Claimants.

I. Submissions

139. Set forth below are the submissions filed with the Tribunal following its full constitution on 24 March 2016 through AAA's confirmation of Professor Park as Tribunal Chairman.

| Date | Party | Document |
|------|-------|----------|
| 13 May 2016 | Vantage | Claimants' Requests for Disclosure of Documents |
| 13 May 2016 | Petrobras | Respondents' Request for Documents |
| 10 Oct. 2016 | Vantage | Claimants' Objections to Respondents' Redfern Requests |
| 10 Oct. 2016 | Petrobras | Respondents' Objections to Claimants' First Request for Disclosure of Documents |
| 14 Oct. 2016 | Vantage | Claimants' Reply in Support of Redfern Requests and Motion to Compel |
| 12 Oct. 2016 | Petrobras | Respondents' Motion to Compel Production of Documents |
| 17 Oct. 2016 | Vantage | Claimants' Amended Reply in Support of Redfern Requests and Motion to Compel |
| 17 Oct. 2016 | Vantage & Petrobras | Agreement to Produce Respondents' Request Nos. 5 and 6 |
| 20 Oct. 2016 | Petrobras | Respondents' Reply in Support of Redfern Requests |
| 25 Oct. 2016 | Vantage | Conference Call Hearing Transcript |
| 28 Oct. 2016 | Vantage | Revisions to Arbitration Hearing Transcript |
| 28 Oct. 2016 | Vantage | Report on 27 October Meet and Confer |
| 1 Nov. 2016 | Vantage | Claimants' Second Amended Reply in Support of Redfern Requests and Motion to Compel |
| 2 Nov. 2016 | Vantage & Petrobras | Joint Submission Summarizing Issues Currently Contested Between The Parties |

| 3 Nov. 2016 | Petrobras | Respondents' First Amended Reply in Support of Redfern Requests |
|---|---|---|
| 5 Nov. 2016 | Petrobras | Application to Tribunal on "Issues 1 and 2" |
| 9 Nov. 2016 | Petrobras | Respondents' List of Definitive Document Requests |
| 9 Nov. 2016 | Vantage | Letter Re: Issues 1 and 2 and List of Definitive Document Requests |
| 9 Nov. 2016 | Vantage | Letter on Amended Pleadings |
| 10 Nov. 2016 | Vantage | Application to Object to Respondents' 9 November Final Document Requests |
| 11 Nov. 2016 | Vantage | Response to Respondents' 9 November Submission |
| 11 Nov. 2016 | Petrobras | Letter Response to Claimants' 11 November Objection |
| 11 Nov. 2016 | Petrobras | Letter on Amended Pleadings and Documentary Exhibits |
| 18 Nov. 2016 | Respondents | Confirmation of Claimants' Corrections to The 25 October 2016 Transcript |
| 19 Nov. 2016 | Vantage & Petrobras | Letter on Agreed Document Production Deadline, Privilege Claim Deadline, and Clarifying Gas Sensor Date |
| 2 Dec. 2016 | Vantage | Third Amended Demand for Arbitration |
| 2 Dec. 2016 | Petrobras | Respondents' Second Amended Answering Statement and Counterclaim |
| 2 Dec. 2016 | Petrobras | PAI 22646-52 |
| 14 Dec. 2016 | Vantage | Letter on Applicable Privilege Law |
| 14 Dec. 2016 | Vantage | Claimants' Privilege Log |
| 15 Dec. 2016 | Vantage | Response to Footnote 1 of Respondents' Second Amended Answering Statement and Counterclaim |
| 16 Dec. 2016 | Vantage | Response to Second Amended Answering Statement and Counterclaim |
| 16 Dec. 2016 | Petrobras | Response to Claimants' Third Amended Demand for Arbitration |
| 16 Dec. 2016 | Petrobras | Confirmation That Respondents Are Not Withholding Documents Based on Privilege and Offering Comment on Claimants' Position on Applicable Law |
| 19 Dec. 2016 | Petrobras | Respondents' Response to Claimants' Privilege Claims |
| 22 Dec. 2016 | Petrobras | Response to Claimants' 15 December 2016 Letter Concerning Claimants' Lenders Having A Financial Interest in this Arbitration |

| 22 Dec. 2016 | Vantage | Request Permission to Respond to Respondents' Letter Dated 22 December 2016 Regarding Claimants' Lenders |
|---|---|---|
| 23 Dec. 2016 | Vantage | Letter on Privilege Claims and Request to Deny In Camera Inspection |
| 24 Dec. 2016 | Petrobras | Request to Submit Supplemental Response on Privilege Matters of Claimants' 23 December Letter |
| 27 Dec. 2016 | Petrobras | Respondents' Response to Claimants' Privilege Claims |
| 6 Jan. 2017 | Vantage | Joint Agreement on Schedule for Crime-Fraud Issue Submissions |
| 6 Jan. 2017 | Petrobras | Respondents' Dispositive Motion and Brief in Support |
| 6 Jan. 2017 | Vantage | Affidavit of Kate Kaufmann Shih in Support of Privilege Log |
| 9 Jan. 2017 | Vantage | Letter on Deficiencies in Respondents' Production |
| 9 Jan. 2017 | Vantage & Petrobras | Agreement Regarding Crime-Fraud Briefing |
| 10 Jan. 2017 | Vantage | Application to Strike Respondents' Dispositive Motion |
| 12 Jan. 2017 | Petrobras | Application to Respond to Claimants' Motion to Strike |
| 16 Jan. 2017 | Petrobras | Respondents' Response to Claimants' Application to Strike Respondents' Dispositive Motion |
| 17 Jan. 2017 | Vantage | Application to Respond to Respondents' Letter Regarding Production Deficiencies |
| 17 Jan. 2017 | Petrobras | Response to Claimants' 9 January 2017 Letter Regarding Respondents' Production |
| 18 Jan. 2017 | Petrobras | Respondents' Response to Claimants' Privilege Affidavit |
| 19 Jan. 2017 | Vantage | Letter on Deficiencies in Respondents' Production |
| 23 Jan. 2017 | Petrobras | Response to Claimants' 19 January 2017 Letter Regarding Respondents' Document Production |
| 23 Jan. 2017 | Petrobras | Respondents' Application for Depositions of Paul Bragg, Christopher Declaire, and John O'Leary |
| 24 Jan. 2017 | Vantage | Application to Respond to Respondents' Application for Depositions |
| 27 Jan. 2017 | Vantage | Claimants' Opposition to Respondents' Dispositive Motion |

| 27 Jan. 2017 | Vantage | Witness Statement of Douglas Halkett |
|---|---|---|
| 27 Jan. 2017 | Vantage | Expert Report of E. Allen Jacobs |
| 27 Jan. 2017 | Vantage | Expert Report of Stephen Schwebel |
| 30 Jan. 2017 | Vantage | Claimants' Response to Application for Depositions of Paul Bragg, Christopher Declaire, and John O'Leary |
| 31 Jan. 2017 | Petrobras | Application to Respond to Claimants' Comments on Respondents' Application for Depositions |
| 17 Feb. 2017 | Petrobras | Respondents' Pre-Hearing Brief |
| 17 Feb. 2017 | Vantage | Claimants' Pre-Hearing Brief |
| 17 Feb. 2017 | Vantage | Amended Annex A |
| 2 Mar. 2017 | Vantage | Respondents' Supplemental Production |
| 7 Mar. 2017 | Petrobras | Response to Claimants' 2 March 2017 Letter |
| 9 Mar. 2017 | Vantage | Reply Regarding Document Deficiencies and Response to Respondents' New Allegations |
| 13 Mar. 2017 | Petrobras | Response to Claimants' 9 March 2017 Letter |
| 16 Mar. 2017 | Vantage | Letter Notifying Tribunal of Applicable Paris Cour d'appel Decision |
| 17 Mar. 2017 | Petrobras | Respondents' Pre-Hearing Response Brief |
| 17 Mar. 2017 | Vantage | Claimants' Response to Respondents' Pre-Hearing Brief |
| 11 Apr. 2017 | Petrobras | Respondents' Motion to Compel |
| 14 Apr. 2017 | Vantage | Response to Respondents' Motion to Compel |
| 14 Apr. 2017 | Petrobras | Supplemental Expert Report of Robert Maness, Ph.D. |
| 14 Apr. 2017 | Vantage | Claimants' Reply Pre-Hearing Brief |
| 14 Apr. 2017 | Petrobras | Respondents' Pre-Hearing Reply Brief |
| 19 Apr. 2017 | Vantage | Surreply Regarding Respondents' Motion to Compel |
| 2 May 2017 | Vantage | Request to Call Witnesses Adversely |
| 9 May 2017 | Vantage | Joint Exhibits and Claimants' Exhibits |
| 9 May 2017 | Petrobras | Respondents' Exhibit List |
| 12 May 2017 | Vantage | Agreement on Expert Witness Grouping |
| 12 May 2017 | Petrobras | Email on Padilha's Counsel and Scheduled Testimony from Rio |
| 22 May 2017 | Vantage | Application to Admit Evidence and Authorities and Regarding Expert Direct Testimony |

| 23 May 2017 | Vantage | Response to Claimants' 22 May 2017 Application to Admit Evidence and Authorities and Regarding Expert Direct Testimony |
|---|---|---|
| 23 May 2017 | Petrobras | List of Respondents, Specific Address, Place of Incorporation |
| 23 May 2017 | Vantage | Chart of Vantage Entities, with error corrected on 24 May 2017 |
| 23 May 2017 | Vantage | Testimony of Stephen M. Schwebel (Slides) |
| 24 May 2017 | Vantage | Corrected Chart of Vantage Entities |
| 30 May 2017 | Petrobras | Respondents' Application to Submit Supplemental Evidence Regarding Damages |
| 31 May 2017 | Petrobras | (Slides) Testimony by Expert Labiche |
| 31 May 2017 | Vantage | (Slides) Testimony by Expert Danenberger |
| 31 May 2017 | Vantage | Opposition to Respondents' Application to Submit Supplemental Expert Evidence |
| 1 June 2017 | Petrobras | Closing Slides |
| 1 June 2017 | Vantage | Closing Slides |
| 1 June 2017 | Petrobras | Letter confirming the consent of both Parties that Tribunal not be bound to Issue an award within 30 days of the last post-hearing submission pursuant to AAA Commercial Rule 45 |
| 2 June 2017 | Petrobras | Second Supplemental Expert Report of Robert Maness, Ph.D. |
| 9 June 2017 | Vantage | Supplemental Rebuttal Expert Report of E. Allen Jacobs |
| 9 June 2017 | Vantage | Claimants' Objection to Maness's Testimony |
| 14 June 2017 | Petrobras | Respondents' Comments on Claimants' Objection to the Second Supplemental Expert Report of Robert Maness, Ph.D. |
| 17 July 2017 | Vantage | Claimants' Post-Hearing Brief |
| 17 July 2017 | Petrobras | Respondents' Post-Hearing Brief |
| 17 July 2017 | Vantage & Petrobras | Revised Exhibit Lists, one organized chronologically and the other by exhibit number |
| 18 Aug. 2017 | Vantage | Claimants' Post-Hearing Response Brief |
| 18 Aug. 2017 | Petrobras | Respondents' Post-Hearing Response Brief |
| 8 Sept. 2017 | Petrobras | Affidavit of William M. Katz, Jr. in Support of Respondents' Request for Legal Fees and Expenses |

| | | |
|---|---|---|
| As discussed in the body of this Award, only Respondents made a request for costs. Claimants maintain that the terms of the DSA preclude such recovery from either side. | | |
| 27 Sept. 2017 | Vantage | Claimants' Objections to Respondents' Fees Affidavit |
| 8 Dec. 2017 | Vantage | Claimants' Summary of Claims and Defenses |
| 8 Dec. 2017 | Petrobras | Respondents' Review of Claims and Defenses Remaining for Decision |
| 22 May 2018 | Vantage | Claimants' Comments on Submission of Exhibit R-2076 |
| 22 May 2018 | Petrobras | Respondents' Comments on Submission of Exhibit R-2076 |

J.    Evidentiary Hearings

140.   Evidentiary hearings took place in Houston, Texas from Tuesday 16 May 2017 through Thursday 1 June 2017.

141.   On 1 May 2017, the Tribunal invited counsel to confer on any open procedural protocols, including time allocation, and to file a joint status report by Wednesday 10 May 2017 in preparation for the hearings scheduled for Tuesday 16 May 2017 in Houston.

142.   On 11 May 2017, the Tribunal issued a Procedural Order setting forth the hearing protocol as follows:

a.   After opening statements (up to 2.5 hours each) Claimants' fact witnesses will testify, followed by Respondents' fact witnesses.

b.   On 22 May 2017 Mr. Padilha will testify in English via videoconference from Rio, with attorneys from both sides present.

c.   Experts will be heard following fact witnesses, grouped according to expert disciplines, presented back-to-back within each discipline, with Claimants' experts testifying first.  The Tribunal reserves discretion to recall experts for conferencing as it deems appropriate after hearing their testimony.

d.   The Parties shall present closing oral arguments of up to 2.5 hours each.

e.   Time for witness examination and cross-examination will be allocated according to a principle of parity on a 50/50 basis, subject to appropriate adjustment during hearings to ensure the case is heard properly.  The Parties shall calculate the hours available for each side based on a hearing day from 09:30 to 17:30, with an hour for lunch and two 15-minute stretch breaks. Each side shall designate a time-keeper, the two of whom shall confer daily as to time used.  Arbitrator questions will normally be charged to the side conducting the examination or cross-examination, except that exchanges over five minutes will be allocated on a 50/50 basis.  Time spent on procedural objections will normally be charged to the side conducting the examination or cross-examination, except if more than five minutes, in which event time will be charged to the side against which a ruling is made.

143.   On 12 May 2017, Respondents notified the Tribunal that Mr. Padilha would be represented by Morrison & Foerster, as well as by Monica Bity, Rafael Guetta, and João Filipe Lima of Eskanazi Pernidji Advogados and by Rodrigo Brocchi of Barbuda Brocchi, Napolitano Advogados.

144.   On the same day, Claimants notified the Tribunal that both Parties agreed on the following grouping of expert witnesses:

> Operations: Dr. Eric Van Oort, Dr. Alvaro Felippe Negrao
> International Law: Judge Stephen Schwebel
> Regulatory: Elmer Danenberger, Lance Labiche
> Damages: Dr. E. Allen Jacobs, Dr. Robert Maness

## K.   Post-Hearing Submissions

145.   By letter of 7 June 2017, sent by Quinn Emmanuel on behalf of both sides, the Parties agreed to the following Post-Hearing Brief schedule:

> 17 July 2017: Deadline for simultaneous Post-Hearing Briefs;
>
> 18 August 2017: Deadline for simultaneous responsive Post-Hearing Briefs;
>
> 8 September 2017: Deadline to submit simultaneously by affidavit and supporting evidence any request for attorneys' fees and costs;
>
> 6 October 2017: Deadline for simultaneous objections to affidavits and evidence submitted in support of any request for attorneys' fees and costs.

146.   Claimants submitted their objections concerning costs on 27 September 2017.  In light of Claimants' position that the DSA precluded cost recovery, Vantage made no request for costs, and thus Petrobras filed no objection.

## L.   Deliberations and Award Drafting

147.   The Tribunal deliberated during face-to-face meetings in Boston at the offices of the ICDR/AAA, as well as through email and telephone exchanges.

148.   The Tribunal addressed procedural questions in person during the May 2017 hearings and through telephone and email exchanges at other times.

149.   Arbitrator Gaitis ultimately declined to participate in the award drafting process, notwithstanding invitations from the Chairman, copied to the American Arbitration Association.

## M.   Close of Hearing

150.   By letter of 12 June 2017, the ICDR noted that the last receipt of the final submission from the Parties would represent the date of closing of the hearings, absent a Tribunal direction or agreement otherwise.

151.　The ICDR also confirmed that the Parties, by letter dated 1 June 2017, provided consent that the Tribunal need not be bound to issue an award within thirty (30) days of the last post-hearing submission pursuant to AAA Commercial Rule 45.

152.　On 27 April 2018, the ICDR wrote to the Parties that it had received notice from the Tribunal that no additional evidence was to be submitted, and that hearings were declared closed as of 25 April 2018.  The Parties were instructed not to transmit any further communications or documentation directly to the Tribunal.

153.　On 10 May 2018, Respondents applied to reopen the hearings, as elaborated more fully *infra* in connection with the United States Securities and Exchange Commission ("SEC") Filing of 4 May 2018.

154.　On 20 May 2018, having considered the Parties' respective communications on Respondents' application of 10 May 2018, the Tribunal ruled that hearings would d be reopened for the limited purpose of admitting and considering Form 10-Q filed with the SEC on 4 May 2018 by Vantage Drilling International, now labelled as Exhibit R-2076.

155.　The ruling to re-open the hearings was issued by a majority of the Tribunal, Judge Brower and Chairman Park, as permitted by AAA Rule 44-B, with Arbitrator Gaitis stating that he abstained from deciding whether to reopen the record.

156.　The Parties were directed to submit any final comments on the effect and weight to be given to Exhibit R-2076, to be filed simultaneously, forty-eight (48) hours from issuance of this ruling, after which the hearings were to be closed to permit the Tribunal to consider the effect of Exhibit R-2076 on this arbitration.

157.　To ensure simultaneity in submissions, the Parties were directed to send comments only to Ms. Quiroz at the ICDR, who on receipt of observations from both sides will forward them to the Tribunal.

158.　On 22 May 2018, the Parties submitted final comments on the effect and weight to be given to that Exhibit R-2076, filed simultaneously through the ICDR/AAA.

N.　Final Iterations of Parties' Positions

159.　On 27 November 2017, the Tribunal requested a reiteration from each side of their currently applicable requests for relief, given that a number of changes had occurred since the proceedings began.  For example, on 15 May 2017 Claimants had withdrawn, and decided not to pursue, their claims for fraudulent inducement, negligent misrepresentation, and promissory estoppel, as well as their claims for reliance damages.

160.　These summaries were received on 8 December 2017 and have been inserted below as Annexes to this Award.

161.　The Tribunal has included these summaries as Annexes, to permit each side's positions to maintain their original style and format, one being in table, and the other in narrative.  The location has no bearing on the status of the summaries, which the Tribunal includes as integral elements of the Award.

## O.    SEC Filing of 4 May 2018

162.    Respondents on 10 May 2018 applied to reopen the hearings to consider a document labeled "Exhibit R-2076."  Respondents argued that the document was not available when the Parties were notified that the hearings had been closed.

163.    The exhibit in question is Form 10-Q, filed by Claimants with the SEC on 4 May 2018 ("SEC Report").  According to Respondents, the filing discloses an agreement in principle between Claimants and the SEC staff to settle Claimants' alleged violations of the FCPA, including a payment of US$ 5 million.

164.    The Tribunal acknowledged receipt of Respondents' application that same day.

165.    Claimants commented on 11 May 2018, contending that the hearings should not be reopened as the information contained in the Form 10-Q was available to Respondents since 31 December 2017.  Moreover, Claimants argued that evidence of the settlement would not be admissible under Rule 408 of the Federal Rules of Evidence and similar rules adopted by most state courts.

166.    Respondents commented again on 13 May 2018, arguing that their request was timely under ICDR Rule 40, which allows the Tribunal to reopen the hearings before an award is issued.  Respondents contended further that the settlement agreement would be relevant if the Department of Justice decision not to prosecute Claimants for bribery and corruption was relevant.

167.    On 14 May 2018 Claimants commented again, to the effect that they had cited the Department of Justice decision not to prosecute Claimants only in response to Respondents' argument that Claimants had admitted liability through submissions to the Department of Justice.  Claimants cited their Post-Hearing Response Brief at ¶ 81.

168.    Following the Tribunal's decision to reopen the hearings to admit Exhibit R-2076, the Parties submitted further views on the effect of that SEC Report.

169.    As directed by the Tribunal on Sunday 20 May 2018, further comments were filed by each side simultaneously on 22 May 2018.

170.    On 22 May 2018, Respondents submitted, *inter alia*, that they had proven that Claimants obtained the Contract through bribery and corruption, and that Exhibit R-2076 disclosed an agreement in principle to settle claims for violation of the Federal Corrupt Practices Act.  Respondents further submitted that the Department of Justice decision not to prosecute Claimants criminally does not disprove that Claimants engaged in bribery and corruption and has no bearing on liability in this arbitration.  Additionally, Respondents contended that the Tribunal should give Exhibit R-2076 the same weight as Exhibit C-1009 (11 August 2017 DOJ letter).  Respondents stated further that Exhibit R-2076 should be admissible under standards of evidence allowed for AAA Commercial Arbitration Rules rather than Rule 408 of the Federal Rules of Evidence.

171.    On 22 May 2018, Claimants submitted that the Tribunal should not accord any weight or effect to Exhibit R-2076, which describes a settlement offer by Vantage.  Claimants cited AAA Commercial Rule 34(b), which gives the Tribunal broad

discretion on admissibility and relevance of evidence, permitting exclusion of evidence that is cumulative or irrelevant. Claimants contend that Exhibit R-2076 is not relevant because Vantage has not admitted to any FCPA violations, and the Form 10-Q simply recounts the offer of a settlement that the SEC staff expects to finalize if accepted by the Commission. The DSA generally uses the term "Article" for the main titles, but internally refers to provisions as "Clauses". Similar variations occur among the DSA and its novations. Claimants continue that in the United States, evidence of settlement and an offer of settlement are generally not admissible on the merits of a disputed claim. Claimants commented on Rule 408 of the Federal Rules of Evidence and its underlying policies, including the promotion of settlement, which encourage voluntary resolution of disputes, sometimes phased as efforts to "buy peace."

172. The Tribunal notes that Respondents carry the burden of proving corruption by Claimants. Moreover, the information in the Form 10-Q appears to have been available months before the hearings were closed.

173. Having carefully considered the Parties' submissions, the Tribunal concludes that it cannot give any weight to Exhibit R-2076. First, that document describes an offer of settlement, not a confession or proof with respect to violation of the FCPA or the commission of bribery and corruption. Second, consideration of that settlement offer would be contrary to a long-standing public policy at the arbitral seat (the United States) which aims to promote voluntary resolution of disputes. This present analysis hereby incorporates itself into the Tribunal's reasoning on the merits at Part V-B *infra*.

P.   Claimants' Withdrawn Tort Claims

174. With respect to Vantage's tort claims for fraudulent inducement, negligent misrepresentation, and promissory estoppel, Vantage has withdrawn the claims "without prejudice" (see 15 May 2017 letter to Tribunal from Mr. Karl Stern).

175. Respondents argue that these tort claims should be included in items for decision by the Tribunal, notwithstanding Vantage's withdrawal of the claims (see Respondents' filing of 8 December 2017 at pages 6-7).

176. According to Respondents, these claims should be dismissed with prejudice as voluntarily withdrawn and deemed to fail as a matter of law for reasons identified by Respondents in their various briefs.

177. The Tribunal must dismiss the tort claims without prejudice. Claimants do not continue to press the allegations, obviating the need to consider those matters. Indeed, deciding issues not submitted to the Tribunal would, absent exceptional circumstances not present here, normally be considered an excess of jurisdiction.

IV.  Jurisdiction

A.  Claims

178.   Claimants VDEEP and VDDI contend that jurisdiction exists over all named Respondents, including (i) Petrobras Venezuela Investments & Services ("PVIS"), (ii) Petrobras American Inc. ("PAI"), and (iii) Petróleo Brasileiro S.A. (also referred to as "Petrobras Brazil").[30]

179.   In response, Respondents argue that only PAI and VDDI are the proper parties to this arbitration.

1.  Claimants' Position

180.   Claimants look to the Third Novation to the DSA to support jurisdiction over VDEEP, VDDI, PVIS, and PAI.  All four of these entities are signatories and labeled as "Parties" to the Third Novation.  Clause 12.1 of the Third Novation provides that "[a]ny dispute arising under or by virtue of [the] Third Novation shall be resolved in accordance with the newly amended Article 24.2 of the [DSA]."  Article 24.2 of the newly amended DSA contains the arbitration clause that allows the "Parties" to submit their dispute to arbitration:

> Arbitration. If the Dispute is not resolved by direct negotiations in good faith between the parties in dispute, then the Dispute shall be finally settled by binding arbitration and either Party may at any time initiate such arbitration by giving notice to the other Party. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the International Center for Dispute Resolution of the American Arbitration Association ("AAA"). To the extent of any conflicts between the applicable Arbitration Act or the AAA Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail. The AAA is the appointing authority. The place of arbitration shall be Houston, Texas and the language of the arbitration shall be English.[31]

181.   Second, Claimants argue that the Guaranty (to the DSA) supports jurisdiction over VDEEP, VDDI, and Petrobras Brazil.

---

[30]  The Tribunal attaches no significance to the fact that some references are occasionally made to Petrobras Brazil with an "s" and sometimes with a "z."

[31]  J-010 Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services, § 8.1 (amending Article 24.2).

182.   VDEEP and Petrobras Brazil were the original signatories to what has been called "the Guaranty" (Exhibit J-002) with full title "Form of Payment and Performance Guaranty—Company Guaranty."[32]

183.   Claimants assert that Article 3.5 of that Guaranty provides for jurisdiction over VDEEP and Petrobras Brazil, stating "[a]ny and all disputes arising out of, relating to or in connection with this Guaranty shall be subject to the provisions set forth in Article 24 of the Contract."[33]

184.   The "Contract" in the Guaranty refers to the DSA,[34] which in turn states that it "may be amended in writing and signed by both parties from time to time."[35]  Thus amendments to the DSA automatically get incorporated into the Guaranty.

185.   In this connection, Claimants assert the Tribunal possesses jurisdiction over VDDI by reason of the Third Novation, where VDDI replaced VDEEP as the successor and assignee to the DSA under the following language:

> 2.10. As from the Effective Date, the defined term "Company" shall be read PAI under the Contract and PAI shall assume all PVIS's rights and obligations under the Contract. From the Effective Date until VDVI Termination Date, the defined term "Contractor" shall be read as VDVI under the Contract and VDVI shall assume all VDEEP's rights and obligations under the Contract. From the VDVI Termination Date until VDDI Commencement Date, the defined term "Contractor" shall be read as VDEEP under the Contract and VDEEP shall assume all rights and obligations under the Contract. From the VDDI Commencement Date and continuing for the remainder of the Third Novation Period, the defined term "Contractor" shall be read as VDDI under the Contract and VDDI shall assume all VDEEP's rights and obligations under the Contract.[36]

186.   Claimants assert Article 1.4(iv) of the Guaranty also provides jurisdiction over VDDI as a successor of the DSA, specifically stating that the obligations of Petrobras Brazil apply to the Guaranty's successors:

> 1.4 Continuing Guaranty. This Guaranty is a continuing guaranty and shall (i) remain in full force and effect until the indefeasible payment of the Payment Obligations and the complete performance of the Performance

---

[32] For the avoidance of confusion, the Tribunal notes that the contract documents also include a similar document subtitled "Contractor Guaranty" which imposes obligations on Vantage Drilling.

[33] J-002 Guaranty Article 3.5.

[34] J-002 Guaranty, Preamble (defining the "Agreement for Provision for Drilling Services" as the "Contract").

[35] J-001 Agreement for the Provision of Drilling Services, Article 1.1 (defining "Contract").

[36] J-010 Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services, § 2.10.

Obligations, (ii) be binding upon the Guarantor and its respective successors and assigns, (iii) apply to the Payment Obligations and Performance Obligations of any assignee or transferee of CONTRACTOR to the same extent as applicable to those Payment Obligations and Performance Obligations of CONTRACT and (iv) inure to the benefit of and be enforceable by the Beneficiary and its respective successors, transferees, and assigns; provided, however that the obligations of the Guarantor hereunder may not be assigned, transferred, or delegated unless the Guarantor remains liable hereunder.[37]

187.   Thus, Claimants assert Petrobras Brazil's obligation to honor the Guaranty (and its arbitration clause) inure to VDDI, as successor and assignee of the DSA under the Third Novation.

### 2. Respondents' Position

188.   Respondents contend that PAI and VDDI are the only proper parties to this arbitration because PAI and VDDI were the only parties to the DSA when the DSA was terminated.  Respondents take issue with jurisdiction over VDEEP, PVIS, and Petrobras Brazil.

189.   Respondents argue that VDEEP and PVIS do not fall under the jurisdiction of this arbitration because VDDI and PAI were their successors to the Third Novation to the DSA.  Moreover, VDDI and PAI were the only remaining parties to the DSA at its termination.

190.   Next, Respondents argue that the Guaranty does not grant this Tribunal jurisdiction over the Guaranty's two signatories, VDEEP and Petrobras Brazil.  To support excluding VDEEP and Petrobras Brazil from this arbitration, Respondents note that the Guaranty refers to the original Article 24 of the DSA, not Article 24 of the DSA as amended and novated in the Third Novation.[38]

191.   Originally, Article 24 of the DSA called for arbitration under the LCIA Rules, seated in London, having the governing law be the law of England and Wales.[39]

192.   Article 3.5 of the Guaranty refers to Article 24 of the "Contract" (the DSA), not any amendment, modification, or novation to the DSA:

> 3.5 Dispute Resolution. Any and all disputes arising out of, relating to or in connection with this guaranty shall be subject to the provisions set forth in Article 24 of the Contract.[40]

---

[37] J-001. Guaranty Article 1.4(iv).

[38] See J-020. Guaranty Article 3.5.

[39] J-001 Agreement for the Provision of Drilling Services, Cl. 24.

[40] J-020. Guaranty Article 3.5.

193. In contrast, the original DSA affirmatively included "as amended" language in the definition of "Contract" (the DSA).

> "Contract" means this Contract for the provision of Drilling Operations and related services, as the same may be amended in writing and signed by both Parties from time to time.[41]

194. Thus, Respondents contend that the inclusion of "as amended" language in the Contract confirms that the parties knew how to reference amendments and novations, and that they intentionally chose not to do so in the Guaranty. Simply put, Petrobras Brazil only agreed to arbitrate under the original Article 24 of the DSA, not 24's subsequent amendments or novations.

195. Moreover, Article 3.7 of the Guaranty required "writing by all the parties" for any "supplement, modification, or amendment" to the Guaranty.[42] Because Petrobras Brazil never signed any documents to change its dispute resolution procedure, Respondents assert that Article 24 of the DSA, as it originally stood, governs the dispute resolution process.

### 3. Tribunal analysis

196. Respondents concede that PAI and VDDI are proper parties to this arbitration, which leaves VDEEP, PVIS, and Petrobras Brazil open for debate.

197. On balance, Claimants make the more compelling argument to include VDEEP, PVIS, and Petrobras Brazil in this arbitration.

198. VDEEP and Petrobras Brazil should be in this arbitration because they are signatories to the Guaranty. The plain language of the Guaranty (Article 3.5) refers to the dispute resolution of Section 24 of the DSA:

> 3.5 Dispute Resolution. Any and all disputes arising out of, relating to or in connection with this guaranty shall be subject to the provisions set forth in Article 24 of the Contract.[43]

199. The DSA itself contemplates the amendment and novation of the DSA (Article 1.1). The lack of "as amended" language in one form or another in Article 3.5 of the Guaranty does little to inform the Tribunal about the intent of the Parties to arbitrate.

200. Respondents read the omission of "as amended" language as proof that the Parties intended the dispute resolution process of Article 24 of the original DSA to apply.

201. Such an argument could also be made to justify the opposite of Respondents' position. As an example, the drafters could have just as easily modified the language of "the Contract" to be "the Contract, as it appears on the date of the Guaranty."

---

[41] J-001 Agreement for the Provision of Drilling Services, Cl. 1.1 (defining "Contract").

[42] J-002. Guaranty Article 3.7.

[43] J-002. Guaranty Article 3.5.

Including this language would give clear indication that the Parties intended to limit themselves to Article 24 of the original DSA. However, omission of such language would suggest that the Parties did intend the dispute resolution process of Article 24 of the DSA, as amended and novated, to apply.[44]

202. The language of the Guaranty is plain. The Tribunal must consider the Guaranty's direction to look at the DSA for a dispute resolution process. The DSA mentions the possibility of amendments and novations. Indeed, the DSA (including its arbitration clause) was amended and novated.

203. The Tribunal cannot read out of its mandate the impact on this arbitration of the Guaranty and its dispute resolution procedure. Thus, Petrobras Brazil and VDEEP fall under this Tribunal's jurisdiction through the Guaranty.

204. This leaves PVIS to be considered. PVIS, through its agent, is a signatory to the Third Novation.[45] The Third Novation includes the operative arbitration clause giving rise to this Tribunal.[46] Because this dispute falls within the arbitration clause of the Third Novation, which PVIS signed, PVIS is within the jurisdiction of this Tribunal.

205. Consequently, the Tribunal concludes, with respect to Claimants' claims, that jurisdiction exists over all five named parties: VDDI, VDEEP, PAI, PVIS and Petrobras Brazil.

B. Counterclaims

206. In their counterclaims, Respondents argue that PAI and PVIS are proper counter-claimants and that VDEEP and VDDI are proper counter-defendants.

1. Respondents' Position

207. Respondents argue that PAI and PVIS are proper counter-claimants because their claims arise from their time as the operative entities under the DSA. PAI's claims arise from it being party to the Third Novation in 2014. PVIS's claims arise from it being an original party to the DSA in 2009.

---

[44] As Claimants note, "[i]f the parties had intended to fix the forum for dispute resolution regardless of any amendment or novation to the DSA, they could easily have done so, but they did not." (see Claimants' Post-Hearing Brief, ¶ 198).

[45] J-010 Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services.

[46] J-010 Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services, § 8.1.1 (amending Article 24).

## 2. Claimants' Position

208. Claimants argue that PAI and PVIS failed to establish any right to recover on their counterclaims. In this connection, the Tribunal considers disagreement between the two sides to relate to the merits of the case, not to jurisdiction. Nevertheless, for good order the Tribunal will confirm its competence to decide these matters.

## 3. Tribunal analysis

209. PAI's counterclaims arise from the Third Novation, over which the Tribunal possesses jurisdiction.

210. Counterclaims by PVIS originally arose from the 2009 DSA, the dispute resolution clause of which called for arbitration under LCIA Rules in London. However, PVIS's counterclaims in this present arbitration arise under the Third Novation, subject to proceedings pursuant to the AAA Commercial Rules.

211. The present arbitration proceedings pursuant to the Third Novation thus grant jurisdiction to the Tribunal over PAI and PVIS, as well as their counterclaims against VDDI and VDEEP.

## V. Analysis of Vantage's Claims

### A. Breach of Contract

#### 1. Overview

212. Claimants assert that Respondents materially breached the DSA, as amended and novated by the Third Novation, pointing specifically to purported violations of Clauses 4, 9, 15, and 24.2 of the DSA, and Sections 3.7, 8.1, and 10.5 of the Third Novation.

213. According to Claimants, Respondents terminated the Contract for convenience as a response to deteriorating market conditions and failed to negotiate in good faith.

214. As a result of these alleged material breaches, Claimants assert total of US$ 560.2 million for benefit-of-the-bargain damages plus pre-award and post-award interest. In the alternative, Claimants seek US$ 749.3 million, plus pre-award and post-award interest, in the event that the Bareboat Charter mechanism will be considered in calculating damages.

215. In addition, Claimants request US$ 6.4 million in unpaid invoices with pre-and post-award interest of 15.2% per annum.

216. The relevant Clauses and Sections of the DSA, including in particular the Third Novation, provided for an eight-year contract with day rates payable for the entire term.

217.  Claimants acknowledge that under federal maritime law they bear the burden of proving not only the validity of the Contract, but also (i) Respondents' material breach (i.e., unjustly terminating the Contract) and (ii) quantum of damages.[47]

218.  Claimants assert they have proven the validity of the Parties' Agreement. In this connection, Claimants state:

> In fact, both in the DSA and in the four amendments and three novations, the parties expressly affirmed that the DSA, as amended and novated, was a valid and binding contract.[48]

219.  Claimants argue that Respondents terminated the DSA early, only 2 years and 9 months into the eight-year term and refused to pay the day rate due them for the remaining term.

220.  Clause 9 of the DSA and Sections 3.7 and 10.5 of the Third Novation disallow termination for convenience, which Claimants argue Respondents did, so as to cut costs after the deterioration of market conditions.

221.  Clause 9.3 of the DSA specifically disallows unreasonable refusal of cures, and Claimants assert Respondents unreasonably refused to accept their implemented and proposed cures regarding the operational issues which Respondents say were the basis for their termination of the Contract.

222.  Claimants also allege Respondents breached Clause 24.2 of the DSA, as amended by Section 8.1 of the Third Novation, by failing to negotiate in good faith with Claimants and refusing to provide notice.

2. Respondents' Defenses on Material Breach by Termination

223.  The DSA permits Respondents to terminate the Contract if Claimants commit "a material breach of its obligations under this Contract."[49] Respondents allege they properly terminated the Contract under Clauses 9.1.1.3 and 9.1.1.7 of the DSA.

224.  Clause 9.1.1.3 of the DSA provides "Contract may only be terminated: By COMPANY [Petrobras], for the following reasons... if CONTRACTOR [Vantage] commits a material breach of its obligations under this Contract."[50]

225.  Clause 9.1.1.7 of the DSA provides "Contract may only be terminated: By COMPANY [Petrobras], for the following reasons...if CONTRACTOR [Vantage]

---

[47] Claimants' Post-Hearing Brief, ¶ 206 (citing F.W.F. Inc., 494 F. Supp. 2d at 1360 (CL-116); B&W Supply Inc. v. Beckman, 305 S.W.3d 10 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

[48] Claimants' Post-Hearing Brief, ¶ 209.

[49] Claimants' Post-Hearing Brief, ¶ 221.

[50] J-001 Agreement for the Provision of Drilling Services, Cl. 9.1.1.3.

repeatedly fails to conduct the Services in accordance with Good Oil and Gas Field Practices."[51]

226. Respondents assert that they "properly terminated the Contract under Clauses 9.1.1.3, 9.1.1.7, and 9.1.3.2 for operational reasons on two grounds: (a) Vantage's material breaches of Clauses 10.4, 10.19, 13.2, 13.6, 13.7, and 27.1, and (b) Vantage's repeated failure to comply with Good Oil and Gas Field Practices under Clauses 10.1.1 and 10.2."[52]

227. Respondents assert that Claimants materially breached the DSA by repeated violations of Good Oil and Gas Field Practices, principally through the incidents of 19 May and 19 July 2015. Respondents believe these incidents were material breaches under 9.1.1.3 and under Clause 9.1.1.7 of the DSA. As argued by Respondents:

> Vantage violated Good Oil and Gas Field Practices on May 19 and July 19, 2015, in at least three ways: (a) by failing to properly monitor fluid volumes, detect losses, and give proper notice; (b) by violating Applicable Law, which is both a component of Good Oil and Gas Field Practices and an independent basis for materially breaching the Contract, as explained below; and (c) by failing to follow its own policies and procedures, which allegedly comport with Good Oil and Gas Field Practices.[53]

228. Respondents maintain that "[i]t takes only one material breach of the Contract to justify termination, and the evidence here proves that Vantage materially breached the Contract on May 19 and July 19, and repeatedly violated Good Oil and Gas Field Practices."[54] As such, Respondents assert that those events provide sufficient justification for termination of the Contract.

229. Respondents also assert "non-bribery" and "non-operational" material breaches by Claimants. These include: (i) making misrepresentations about Vantage's ownership of the Titanium Explorer, (ii) failing to disclose its use of an "Illegal Information Broker," and (iii) failing to perform an adequate background check on Mr. Padilha as required by the Contract.[55] These breaches are discussed in more detail in the section on Respondents' Counterclaims.

230. Although Claimants did have a right to cure breaches of the Contract under Clause 9.3, Respondents maintain that Vantage's proposed cure was "insufficient and ineffective" and that Respondents "properly rejected it."[56]

---

[51] J-001 Agreement for the Provision of Drilling Services, Cl. 9.1.1.7.

[52] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 17.

[53] Respondents' Post-Hearing Brief and Appendices, ¶ 241.

[54] Respondents' Post-Hearing Response Brief, ¶ 155.

[55] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 16.

[56] Respondents' Post-Hearing Response Brief, ¶ 269.

231.   Respondents assert the burden of proof, to prove that Respondents wrongfully terminated the Contract or breached the Contract's obligations, rests with Claimants. Respondents assert that Claimants have failed to meet that burden.

232.   Thus, Respondents assert that Claimants' claims are barred, and Claimants are liable to Respondents for their material breaches of the Contract, including "failure to satisfy its obligations under Clauses 10.1.1, 10.14.1–4, 10.15, 10.20.1–4, 10.21, and 10.23 of the Contract."[57]

### 3.   Claimants' Response to Allegations of Material Breach

233.   In reply, Claimants say that Respondents have the burden of proof to justify termination of the DSA based on a material breach, and that they did not satisfy their burden of proving a material breach.[58]

234.   As a component of proving material breach, Claimants assert that Respondents had to prove that Claimants had not implemented or proposed cures after being provided proper notice, and that Respondents reasonably rejected these cures. Claimants assert Respondents did not satisfy their burden of proof with regard to these components of material breach.

235.   Claimants assert that the alleged "material breaches" asserted by Respondents, including the fluid loss events, were not sufficient to trigger a termination right. While "material breach" is not defined in the DSA, Claimants use the definition of "material breakdown" in Clause 9.1.1.2 of the DSA to define "material" as something "substantial" and "major."

236.   Additionally, Claimants assert that the operational incidents Respondents rely upon as material breaches were not material breaches of Clauses 10.4.5, 13.2, 13.6.1,13.7.2, and 27.1.5.  Claimants assert that the incidents are in fact attributable to Respondents.  In this connection, Claimants state:

> (i) the fluid loss events were the result of Respondents' inadequate cementation job, which Respondents did not disclose to Claimants, coupled with Respondents' deviations from approved plans of action and ordering multiple operations that made fluid losses inevitable and difficult to detect; (ii) Claimants had an outstanding record of detecting fluid losses; (iii) the fluid loss events were not well control events; (iv) neither Respondents nor the regulators at BSEE viewed the fluid loss events as serious at the time; (v) the gas sensor INC was an isolated incident that was not viewed by BSEE as serious and did not indicate

---

[57] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 9.

[58] Claimants cite Howell v. Kelly, 534 S.W.2d 737 (Tex. App.—Houston [1st Dist.] 1976), no writ) (CL- 316) to support their argument; for a full list of cases, see Claimants Post-Hearing Brief, footnote 34, at 76.

any systemic problems; and (v) Claimants implemented and proposed cures that would have been acceptable to Respondents had they been acting reasonably.[59]

237.  As mentioned, Claimants assert that the fluid loss events of 19 May 2015 and 19 July 2015 were principally caused by the actions of Respondents, meaning these were not violations of Good Oil and Gas Field Practices committed by Claimants.  In this connection, Claimants argue:

> [T]he evidence shows that the fluid losses occurred in the first place because Petrobras did not properly cement the well and did not inform Vantage about the top of cement. With that information, Vantage would have known that increased flowrates and pressure in the well would cause fluid losses. Petrobras then ordered an increased flow and pressure within the well that had not been vetted in the approved [Plan of Action] for the day or vetted through [Management of Change], as required by the DSA. To make matters worse, Petrobras ordered multiple operations at the same time that were expected to, and did, trigger multiple alarms for reasons other than actual loss, masking the fact that fluid losses were occurring. Given this evidentiary record, Vantage did not fall short of Good Oil and Gas Field Practices. Responsibility for the losses and failure to detect them lies principally with Petrobras.[60]

238.  Even if these fluid loss events were attributable to Claimants, Claimants argue the events were not material or substantial within the meaning of the Contract.

239.  With regard to any incidents during the Chinook 5 campaign, Claimants assert these incidents are irrelevant because "the evidence established that Respondents were satisfied with Claimants' performance on that campaign and the incidents were not used as a basis for the termination of the DSA."  Similarly, with regards to incidents on the Chinook 6 campaign, Claimants assert these are irrelevant as well.  The sheared sub saver was caused by a manufacturing defect and was not the fault of Claimants, nor was the incident the subject of any notice of default.  Other "near-miss incidents" were not subject of a notice of a default and were cured to Respondents' apparent satisfaction.  Claimants note that Respondents "appeared to have abandoned them at the merits hearing and in their post-hearing briefing."[61]

240.  In this connection, Claimants assert that Respondents have not demonstrated they provided Claimants an opportunity to cure, or that Claimants failed to cure, the alleged breaches.  As noted by Claimants:

> Vantage proposed reasonable cures that were designed to prevent recurrence of incidents similar to the untimely gas sensor recalibration and the fluid loss incidents. Petrobras rejected these out of hand, without engaging in substantive, good faith discussions with Vantage. And Petrobras refused to acknowledge or address its role in causing the events.

---

[59] Claimants' Summary of Claims and Defenses, at 3.

[60] Claimants' Post-Hearing Brief, ¶ 130.

[61] Claimants' Summary of Claims and Defenses, at 4.

Petrobras cannot show that Vantage's cures were insufficient to satisfy a reasonable operator. To the contrary, the evidence demonstrates that Petrobras's rejection was unreasonable.[62]

241.   Claimants argue they did not violate the Contract, and Respondents' termination of the Contract was unjust and unwarranted under Clauses 9.1.1.3 and 9.1.1.7 of the DSA.  Instead, Claimants argue:

> [T]he evidence established that: (i) by every objective metric, Claimants' performance was excellent; (ii) as Claimants' experts testified, Respondents could not reasonably expect to locate and engage a safer contractor; (iii) for the reasons indicated above with respect to Clauses 10.4.5, 13.2, 13.6.1, 13.7.2, and 27.1.5, the events at issue were not material; (iv) the cited incidents did not reflect systemic issues; and (v) Claimants implemented and proposed cures that would have been acceptable to Respondents had they been acting reasonably.[63]

### 4.  Tribunal Analysis

242.   The Tribunal sets forth below its principal analysis on breach of contract, reserving to later sections its discussion of (i) bribery, (ii) breach of good faith, (iii) limitation of liability and (iv) the Chinook 6 invoices.

243.   The Tribunal has not found that Respondents have met their burden in proving a material breach.

244.   As an initial matter, Respondents have not demonstrated that Claimants failed to implement or propose cures after being provided proper notice following the alleged material breaches.

245.   Even assuming the fluid loss events (19 May 2015 and 19 July 2015) were the fault of Claimants, they were not sufficient to trigger a right of termination.  In this connection, while "material breach" is not defined in the DSA, the notion of "material breakdown" in DSA Clause 9.1.1.2 provides some assistance to the Tribunal, defining "material" in that context as implicating something "substantial" and "major."

246.   The Tribunal considers it more likely than not that the events of 19 May and 19 July were principally caused by the actions of Respondents, rather than as violations of Good Oil and Gas Field Practices committed by Claimants.

247.   In this connection, the Tribunal has been convinced that Petrobras did not properly cement the well.  With that information, Vantage would have known that increased flowrates and pressure in the well might cause fluid losses and could have taken precautions.

---

[62] Claimants' Post-Hearing Brief, ¶ 239.

[63] Claimants' Summary of Claims and Defenses, at 3.

248. In addition to the undisclosed inadequate cementation, Respondents contributed to the loss by deviations from approved plans of action and the ordering of multiple operations that made fluid losses inevitable.

249. It is significant to note that neither Respondents nor the regulators at BSEE viewed the fluid loss events as serious at the time. Rather, they seem to have become the focus of Respondents' complaints after the decision to terminate the Contract.

250. Similarly, the gas sensor incident was an isolated event that was not viewed by BSEE as serious and did not indicate any systemic problems.

251. Neither can the incidents during the Chinook 5 campaign or the Chinook 6 campaign be seen as serious enough to justify termination. In the Chinook 6 campaign, the sheared sub saver was caused by a manufacturing defect not the fault of Claimants. Moreover, the incident was not the subject of any notice of default.

252. Finally, Respondents did not provide Claimants any meaningful opportunity to cure. Vantage proposed cures, designed to prevent recurrence of incidents similar to the gas sensor recalibration and the fluid loss incidents, which were rejected by Petrobras without good faith discussions.

253. In summary, there is no evidence that Respondents considered any of the controverted breaches as material when they occurred, or as rising to the level of materiality that would allow termination of the Contract. Nor did Respondents give Claimants a reasonable opportunity to cure.

254. Consequently, the Tribunal finds that Respondents committed a material breach under the Contract, through early termination and refusal to pay the day rate due Claimants for the remainder of the Contract's term without justification.

B. Bribery and Corruption

1. Claimants' Position

255. Claimants argue that the DSA was a valid contract, and that Respondents seek to void the DSA via common law and contractual defenses based on bribery and corruption allegations. Claimants believe the burden of proof is on Respondents to assert the following: (i) illegal payments were made or offered to Petrobras's officials; (ii) with Vantage's knowledge; (iii) unbeknownst to Petrobras; and (iv) for the purpose of inducing, and in fact inducing, the Contract at issue.[64] Claimants argue Respondents have not met this burden of proof.

256. With respect to the common law defenses of Respondents, Claimants assert that Respondents (i) failed to show illicit payments were made, and that (ii) Claimants knew of any illicit payments. Claimants assert Respondents did not establish Claimants' knowledge of bribery through imputed knowledge of Mr. Padilha or Mr. Su. Claimants assert Respondents failed to show their own unawareness of any

---

[64] Claimants' Post-Hearing Brief, ¶ 264.

illicit payments. Lastly, Claimants assert that Respondents failed to establish that any illicit payments actually induced the DSA, "much less on terms to which Respondents would not have otherwise agreed."[65]

257. Claimants assert that Respondents knowingly ratified the DSA, waiving any right to avoid the DSA based on bribery. According to Claimants:

> A contract is ratified, and any bribery defense waived, if the innocent party acts in a manner that affirms the contract after obtaining knowledge as to the defect in its formation that would give the party a right to avoid the contract. This includes the failure to act promptly and continuing to accept the benefits of the contract...A party is estopped from avoiding a contract where, with knowledge of the fraud, it delays in avoiding the contract and its counterparty relies on that conduct to its detriment.[66]

258. Claimants argue that Respondents' willingness to reaffirm the DSA and ratify the subsequent novations and amendments means that Respondents waived any defense based on bribery, and are now equitably estopped from asserting such a defense.[67] Claimants assert that Respondents repeatedly affirmed the "valid and binding nature of the DSA" and insisted that Claimants continue to perform under the DSA after Respondents "had sufficient knowledge of the alleged bribery on which they have based their defense."[68]

259. Furthermore, Claimants contend that through subsequent novations and amendments, Respondents reaffirmed the Contract and created new agreements, both untainted by bribery and with Respondents having knowledge of the alleged bribery surrounding the original DSA.

260. Claimants assert the Second Amendment and the First Novation formed a new agreement untainted by bribery and "thoroughly vetted by PVIS and PAI employees."[69] None of the actors accused of bribery who were involved in the formation of the original DSA took part in the formation of this new agreement. Therefore, Claimants argue that the Second Amendment and First Novation would be a "fully enforceable contract even if the original DSA were not."

261. Claimants also argue that the Second Novation and Third Amendment of 20 December 2013 were signed by Respondents when Respondents were fully aware of

---

[65] Claimants' Summary of Claims and Defenses, at 4.

[66] Claimants' Post-Hearing Brief, ¶ 328. Claimants cite Restatement (Third) Agency § 4.01 and § 4.06 & cmt. D; Standard Oil Co. of Tex. v. Manley, 178 F.2d 136, 138 (5th Cir. 1949); City of Findlay, 66 F. at 437 (CL-10).

[67] Claimants' Post-Hearing Brief, ¶ 316.

[68] Claimants' Summary of Claims and Defenses, at 5.

[69] Claimants' Post-Hearing Brief, ¶ 339.

any alleged bribery, as Respondents had completed an internal audit in October 2013 after the publication of the Época article.

262.   In particular, Claimants contend that, assuming Respondents had sufficient knowledge to enable them to end the Contract, they "failed to act promptly and instead chose to maintain the DSA and continue to accept the benefits of the DSA" and "insisted on Claimants' continued performance for nearly two years."  Claimants argue these actions of Respondents prejudiced Claimants, as Respondents only pursued termination after "market conditions deteriorated and Claimants lost any opportunity to profitably redeploy the rig."[70]

263.   With respect to Respondents' contractual defenses based on bribery, Claimants assert that Respondents did not meet their burden of proof.  Claimants assert that Respondents did not establish the alleged breach of Clauses 10.14.1, 10.14.2, or 10.14.3.  Claimants assert there is no evidence that Claimants "ever made any payments, violated the FCPA, received any request to violate the FCPA, or had knowledge of the alleged bribery scheme before press reports to which Respondents had equal access."[71]

264.   Claimants assert that Respondents did not establish the alleged breach of Clauses 10.20.1, 10.20.2, or 10.20.3.  Claimants assert there is no evidence that Claimants "themselves were ever approached by an Illegal Information Broker or that Hamylton Padilha ever acted as an Illegal Information Broker in his dealings with Claimants."[72]

265.   Claimants assert that Respondents did not establish the alleged breach of Clauses 10.20.4 or 10.15.  Claimants assert that the evidence does not show Claimants failed to comply with laws related to corruption in performing under the DSA.

266.   Claimants assert that Respondents did not establish the alleged breach of clause 10.21.  Claimants assert that the evidence does not establish that Claimants failed to exercise "reasonable care and diligence to avoid conflicts of interest."[73]

267.   In response to Respondents' argument that the anti-waiver clause in the DSA preserves Respondents' right to void the Contract based on bribery, Claimants assert that said clause can itself be waived, which Respondents "have done here by their repeated affirmations of the DSA and insistence on performance."[74]  Thus, Claimants believed principles of ratification, waiver and estoppel nonetheless defeat Respondents' contractual defenses.

---

[70] Claimants' Summary of Claims and Defenses, at 5.

[71] Claimants' Summary of Claims and Defenses, at 5.

[72] Claimants' Summary of Claims and Defenses, at 5.

[73] Claimants' Summary of Claims and Defenses, at 5.

[74] Claimants' Summary of Claims and Defenses, at 5.

268.  Claimants argue the question of whether the DSA is void or voidable if obtained by bribery, and subject to ratification, waiver, and estoppel, is governed by English law "because it was the governing law of the DSA when bribery allegedly induced the contract [in 2009] and it was also the governing law when Petrobras affirmed the DSA [in 2013 and 2014] under the Second Novation after the completion of its 2013 Época audit."[75]

269.  As English law governs, Claimants argue that under relevant caselaw[76] the DSA would be at most voidable, and not *per se* void, if obtained by bribery. A voidable contract remains subject to ratification by an "innocent" party. Here, Petrobras retained the capacity to ratify the DSA if the DSA had been procured by bribery.

270.  Claimants argue that considerations of this issue under federal maritime law are irrelevant. If ratification were governed by maritime law, the DSA, if procured by bribery, would be at most, voidable, and still subject to ratification, waiver, and estoppel.[77]

271.  Claimants assert that they were not aware of the alleged bribery, and that Respondents have not proven Claimants' awareness. Claimants assert that Mr. Padilha is Respondents' only witness on the matter, and is not reliable, as he "readily admitted that he lied about the DSA and the circumstances surrounding its negotiation and execution when it served his interests, and that he had a strong incentive to do so in this arbitration in order to reduce his sentence in Brazil and avoid prosecution in the United States."[78]

2.  Respondents' Position

272.  Respondents claim there is "overwhelming evidence" that the DSA was procured through bribery, which taints the Contract and renders it unenforceable, as well as void, voidable, and unconscionable.[79]

273.  Respondents allege both defenses and counterclaims in connection with Claimants' alleged bribery and corruption in securing the Contract. Respondents assert that these claims "operate as both affirmative claims and defenses, entitling

---

[75] Claimants' Post-Hearing Brief, ¶ 318. To support their argument under English law, Claimants cite, *inter alia*, World Duty Free Company v. Republic of Kenya, ICSID Case No. ARB/00/7, ¶ 164 (CL-83).

[76] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 76 (citing U.S. ex rel. Siewick v. Jamieson, 214 F.3d 1372, 1377 (D.C. Cir. 2000)) (CL-74).

[77] For the support of Claimants' assertion about Federal Maritime law, Claimants cite, *inter alia*, Standard Oil Co. of Tex. v. Manley, 178 F.2d 136, 138 (5th Cir. 1949).

[78] Claimants' Post-Hearing Brief, ¶ 20.

[79] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 17.

Respondents to over US$100 million in damages or, alternatively, to a complete dismissal of Vantage's claims in this Arbitration."[80]

274.   Respondents also allege charges of (i) common law fraud and fraudulent inducement via material misrepresentations regarding bribery which allowed Claimants to obtain, execute, and continue the Contract, (ii) negligent misrepresentation, (iii) violations of Civil RICO 18 U.S.C. § 1962(c) through bribery by Claimants' officers, directors, shareholders, vice-principals, and agents, and (iv) conspiracy to obtain the Contract through bribery through Vantage and its officers, directors, shareholders, vice-principals, and agents.

275.   Respondents put the burden of proof on Claimants to prove the Contract's validity.  Respondents assert Claimants did not meet this burden, and until this burden is met, Respondents believe they do not have to prove anything.  For this reason, Respondents are not asserting a "bribery defense."  Instead, Respondents argue that "Vantage procured the Contract through an illegal bribery scheme, which renders the Contract void ab initio."[81]

276.   Respondents rely upon a Brazilian Federal Court judgment, which they say is conclusive evidence of Claimants' bribery.[82]

277.   Respondents believe that the principles of estoppel and ratification bar Claimants from "accepting the benefits of the contract without also accepting its burdens,"[83] meaning that in attempting to enforce the Contract, Claimants ratify the fraud and bribery used to secure the Contract.  Respondents say this result is "barred by both governing law and principles of equity."[84]

278.   Thus, Respondents believe Claimants' claims are barred and/or Claimants are in fact liable to Respondents for their (above) alleged material breaches of the Contract.

279.   Respondents argue that Claimants, through the figures Nobu Su, Paul Bragg, Hamylton Padilha, and John O'Leary, "knowingly or with conscious avoidance assisted, aided, or facilitated breaches of fiduciary duty by Jorge Zelada and Eduardo Musa by bribing them to allow Vantage to obtain the Contract and continue it through the Third Novation."[85]  In this connection, Respondents argue that Claimants fraudulently induced the Contract's formation and continuation.

280.   Respondents argue that the fraudulent inducement of the Contract bars all of Claimants' claims.  According to Respondents, Claimants have not proven the

---

[80] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 3.

[81] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 36.

[82] Respondents rely, *inter alia*, upon Telenor Mobile Comms. AS v. Storm LLC, 584 F.3d 396, 408 (2d Cir. 2009).

[83] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 13.

[84] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 13.

[85] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 4.

Contract was ratified, and the Third Novation reserved all potential claims without any waiver. Respondents argue:

> As with every other novation of the Contract, the Third Novation expressly reserved all existing claims without any waiver. (See J-5, Art. 3.6; J-8, Art. 3.6; J-10, Art. 3.6.) This non-waiver language is also found in the Contract, which provides that no waiver can occur unless a party "has expressly stated its intention to do so in a written instrument duly executed by such Party." (J-1, Art. 27.5.)[86]

281. Based on the above express reservation, Respondents object to Claimants' assertions of ratification, waiver, acquiescence, unclean hands, and equitable estoppel, and claim all such assertions fail as a matter of law.

282. Respondents argue that maritime law (as supplemented by Texas law) governs, and that under maritime law, the Contract is both void and voidable.[87] Respondents assert that the relevant evidentiary standard is preponderance of the evidence under governing maritime and Texas law.[88]

283. Respondents assert that even if Claimants were correct, and English law would be applied, Claimants have never "alleged that the Contract is ambiguous, and thus English law cannot apply to determine the parties' mutual intent."[89]

284. Ultimately, Respondents argue that the "Contract is void, voidable, unconscionable, and must be rescinded because it was procured through bribery,"[90] and Claimants' charges should be dismissed.

285. Even if the Contract were to be enforceable, Respondents assert Vantage materially breached the Contract, justifying termination.

### 3. Tribunal Analysis

286. The Tribunal has given serious consideration to the charges that Mr. Su, Mr. Padilha and Mr. Bragg, among others, were involved in bribery to obtain the DSA. As to Messrs. Su and Padilha, no convincing evidence shows that Claimants were aware of the bribery. With respect to Mr. Bragg, the situation is less clear.

287. Whatever the situation with respect to Mr. Bragg, subsequent novations and amendments formed new contracts, untainted by bribery, if any.

---

[86] Respondents' Post-Hearing Brief and Appendices, ¶ 169.

[87] Respondents rely upon, *inter alia*, S.E.L. Maduro (Fla.), Inc. v. M/V Santa Lucia, 116 F.R.D. 289 (D. Mass. 1987).

[88] Respondents cite, *inter alia*, Herman & MacLean v. Huddleston, 459 U.S. 375, 387 (1983).

[89] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 34.

[90] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 12.

288.  The Second Novation and Third Amendment, occurring two months after Respondents completed a bribery audit in October 2013, shows Respondents were aware of bribery allegations, and yet continued with the Parties' Agreement.

289.  Just as significantly, the Second Amendment and First Novation were formed without the involvement of any actors alleged to have been involved in bribery.[91]

290.  Thus, Respondents knowingly ratified the DSA in its current form, and now find themselves estopped from claiming the Contract is void or voidable.[92]

291.  The Tribunal need not decide whether the matter of bribery is governed by English law (as provided in the DSA) or by federal maritime law (as provided in the Third Novation), given that the outcome would be the same under either system.[93]

292.  Finally, the Tribunal has earlier addressed Exhibit R-2076 (the SEC Report of 4 May 2018), which cannot be considered in determining the existence of bribery and corruption.  As discussed *supra* at Section III-O of this Award, that Report relates to settlement, not an admission of guilt.  A long-standing public policy at the arbitral seat (the United States) would generally exclude consideration of such offers, which promote voluntary resolution of disputes.

C.  Respondents' Breach of the Duty of Good Faith and Fair Dealing

1.  Claimants' Position

293.  Claimants allege a breach of duty of good faith and fair dealing on the part of Respondents.

294.  Claimants assert Respondents breached this duty by terminating the DSA on pre-textual grounds.

295.  Claimants say their cause of action under this breach is "recognized under maritime law and federal common law generally, and is viable regardless of whether Texas law implies such a duty."

296.  As evidence of their claim, Claimants say Respondents made "fluid losses inevitable and difficult to detect, and thereby set up the incidents on which they purported to base the termination of the DSA."  Similarly, Claimants assert that Respondents breached their duty by unreasonably rejecting Claimants' proposed cures.

---

[91] "The Second Amendment and the First Novation formed a new agreement that was thoroughly vetted by PVIS and PAI employees, including Mr. Gama, none of whom are alleged to have participated in any bribery scheme." (see Claimants' Post-Hearing Brief, ¶ 339).

[92] Claimants cite Hughes v. Metropolitan Ry., (1877) 2 App. Cas. 439 (CL-317).

[93] "Under federal maritime law, a contract procured by bribery is voidable, not void, and is subject to ratification, waiver, and estoppel." (see Claimants' Post-Hearing Brief, ¶ 324).

2. Respondents' Position

297. Respondents argue that Claimants' Good Faith and Fair Dealing claim fails as a matter of law. Respondents believe that Claimants' claim is barred by governing law, and additionally, lacks any basis in fact.

298. Regardless, Respondents argue they properly terminated the Contract as a result of Vantage's material breaches, and Claimants have the burden of proof in this regard, which they have not met.

3. Tribunal Analysis

299. The Tribunal has noted Claimants' argument of Respondents' breach of their duty of good faith. The argument essentially runs that Respondents terminated the DSA early upon pre-textual grounds, as a result of deteriorating marketing conditions, and made it impossible for Claimants to comply with the DSA through unreasonably rejecting cures, failing to negotiate in good faith, and through the actions of Petrobras employees upon the Titanium Explorer.

300. Having determined that Respondents breached the Contract through early termination, the Tribunal finds no need to make any declaration about violation of the duty of good faith and fair dealing by Respondents.

301. In this connection, the Tribunal has not found any reason to consider that additional compensation would have been due to Claimants by reason of a finding of Respondents' breach in regard to good faith and fair dealing.

D.   "Limitation of Liability" Clause 19.9 of the DSA

302. The Tribunal has carefully considered the text of DSA Clause 19.9 which provides as follows:

> Consequential Damages
>
> Neither COMPANY on one hand, nor the CONTRACTOR on the other hand (nor its respective Affiliates) shall be liable to the other party for any indirect, incidental, special, punitive, consequential or exemplary Damages, whether any claim for such losses or damages is based on contract, warranty, tort (including negligence, joint, concurrent or several, in any amount), strict liability or otherwise, or other fault of any of the other Party the unseaworthiness or unairworthiness of any vessel of craft, or a pre-existing condition, including, without limitation, loss of revenue, loss of profits, loss of production, business interruptions, use of capital, reservoir loss or damage, however same may be caused (collectively "Consequential Damages").[94]

303. As revealed by the Transcript for Day 7, 23 May 2017 (e.g., at 1820-1823) considerable attention was given to this provision during the oral hearings, including

---

[94] J-001 Agreement for the Provision of Drilling Services, Cl. 19.9.

oral argument by counsel, questions and debate by Tribunal members, and even examination of Judge Schwebel, although the Tribunal notes that the question of consequential damages was not the focus of his testimony.

### 1. Respondents' Position

304. Respondents argue that Clause 19.9 of the Contract prevents Claimants from recovering any damages, either direct or indirect. Respondents point to the "however they were caused" language in Clause 19.9, saying that language "would be rendered meaningless under Vantage's construction of the provision [i.e. that direct damages are allowed to be recovered] and would violate the governing law chosen by the parties."[95]

305. Respondents claim that Claimants are aware their reading of Clause 19.9 is incorrect, and for this reason they have chosen English law to apply. Respondents argue instead that maritime law, supplemented by Texas law, governs:

> [T]he law of novation precludes any reference to English law when interpreting Article 19.9. Both sides agree that the Third Novation novated the Contract; that the Third Novation incorporates Article 19.9 of the Contract; and that the Third Novation is governed by maritime law, as supplemented by Texas law. Because the Third Novation is a new contract that replaces the Contract, Article 19.9 must be interpreted in light of the parties' intent at the time they executed the Third Novation, not at the time they executed the original Contract.[96]

306. Respondents argue that if accepted, Claimants' construction of Clause 19.9 does not explain why the listed losses are defined collectively under the term "Consequential Damages." If in fact Claimants were correct, and the list merely contained examples of indirect consequential damages, this collective definition would be rendered unnecessary. Additionally, Respondents argue that if the parties intended to allow for the recovery of direct lost revenue or profits, the parties could have done so.

### 2. Claimants' Position

307. Claimants argue that Clause 19.9 of the DSA permits recovery of direct, benefit-of-the-bargain losses, such as Claimants'. Claimants say the language of Clause 19.9 is "clear and unambiguous,"[97] and while it excludes consequential damages, it does not exclude direct damages. Claimants focus on the fact that the word "direct" is lacking from Clause 19.9 of the DSA. Claimants assert:

---

[95] Respondents' Post-Hearing Brief and Appendices, ¶ 215. Respondents cite, *inter alia*, Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238, 256 (Tex. 2008).

[96] Respondents' Post-Hearing Response Brief, ¶ 164.

[97] Claimants' Summary of Claims and Defenses, at 8.

The law recognizes that "[l]ost profits may be classified as either direct or consequential damages, depending on their nature. . . . [P]rofits on the contract itself—such as the amount a party would have received on the contract minus its saved expenses—are direct damages." As the result, courts routinely construe clauses like Clause 19.9 as permitting recovery of lost profits as direct damages.[98]

308. Claimants believe that English law governs this issue, as it was the operative law at the signing of the DSA. Claimants assert English law recognizes the distinction of indirect versus direct damages.

309. Respondents utilize Quicksilver Resources Inc. v. Eagle Drilling, L.L.C. to support their argument. In return, Claimants say that the Quicksilver case does not support a different construction of Clause 19.9, given that:

> (i) it is not binding authority; (ii) it applies Oklahoma law that does not apply here; (iii) it does not address whether lost profits are characterized as direct or consequential damages; (iv) the contact language in Quicksilver appears nowhere in Clause 19.9; and (v) the court's reasoning has been rejected by numerous courts that have considered it.[99]

310. Lastly, Claimants say that allocation of risk, another argument advanced by Respondents, does not support a different construction of Clause 19.9. Claimants did assume substantial risk under the DSA, including potential damage to the drillship worth US$ 800 million, and are thus entitled to damages for breach by Respondents.

### 3. Tribunal Analysis

311. The Tribunal cannot find that Clause 19.9 of the DSA bars recovery of Vantage's direct, benefit-of-the-bargain damages. In this connection, the lack of the word "direct" plays a significant role. The Tribunal reads the Contract for its plain meaning, finding that Claimants are correct in their interpretation.

312. The Tribunal must read Clause 19.9 as drafted, which in pertinent part states: "Neither side shall be liable for indirect, special, punitive, consequential or exemplary damages...."[100]

313. The damages claimed by Vantage clearly do not fall within that category, as they are not consequential. Vantage seeks not to punish Petrobras, nor to extract anything in the nature of exemplary, or indirect, or special returns. Rather Vantage looks to

---

[98] Claimants' Post-Hearing Brief, ¶ 415 (quoting Cherokee County Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade, 305 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (CL-9)).

[99] Claimants' Summary of Claims and Defenses, at 8.

[100] J-001 Agreement for the Provision of Drilling Services, Cl. 19.9.

recover the benefit of their bargain, which under classic Anglo-American contract law constitutes the core of damages aimed at compensation for a breach.

314. The Tribunal has considered the argument by Petrobras based on a phrase at the end of the clause, excluding damages "however same may be caused." That qualification must be read in the context of the entire clause, which relates to losses or damages based on contract, warranty and tort, summarized at the end of Clause 19.9 as "collectively Consequential Damages." In other words, consequential damages remain consequential, regardless of whether derived from contract or tort or warranty.

315. In construing that proviso, the Tribunal must consider its place in the complete text of Clause 19.9, excluding "consequential damages, however such consequential damages may be caused." Direct damages would not be excluded under the "however same may be caused" provision, which as explained above relates only to consequential damages.

316. In pertinent part, the main elements of the Clause might be diagrammed as follows:

> (a) no liability for consequential damages;
>
> (b) amplification that exclusion of consequential damages applies regardless of their basis, whether contract, warranty, or tort;
>
> (c) further amplification that exclusion of consequential damages applies regardless of whether related to loss of revenue or loss of profits.

317. This interpretation reinforces itself by the way the provision adds, for the avoidance of doubt, that punitive and exemplary damages must be excluded even if related to matters such as unseaworthiness, lost profits, lost production and business interruption.

318. The Clause prevents a party from transforming excluded damages (consequential) into something else simply by saying that the punitive damages includes items such as production or profits. The qualifications in the later part of the Clause in no way obviate the plain meaning given at the outset: the limitation applies only to consequential (rather than direct) damages.

319. By way of illustration, the Tribunal considers the drafters to have constructed a paragraph analogous to the following:

> When traveling for hearings, an arbitrator's reimbursable expenses will not include the costs of an accompanying spouse, whether any claim for air fare or railway ticket, including without limitation travel inside or outside the United States.

320. Reimbursement of tickets must be excluded only for an accompanying husband or wife, traveling with the arbitrator. Travel by the spouse must be excluded whether inside or outside the United States, and whether by rail to Canada or by air to Paris. Such language, however, does not bar arbitrators themselves from travel by rail and air, inside or outside the United States.

321.    The Tribunal has considered the argument that "loss of production" and "loss of revenue" arise from direct failure of performance, making those categories into "direct damages" in all instances. In some instances, however, lost revenue or lost production might be so indirect as to be excludable. While the clause drafting does not represent a paragon of clarity, the proper construction limits only consequential damages.

322.    Finally, the Tribunal notes that Petrobras's interpretation of Clause 19.9 would make the DSA illusory. The Contract relates to production. If Petrobras were correct, Vantage would hardly if ever be able to recover for any damages, no matter how egregious Respondents' behavior, since the argument could always be made that the recovery related in some way to production.

323.    The Tribunal has been comforted in its interpretation of the DSA by reading the initial text of Clause 24.3, which excludes only "punitive, indirect or consequential damages." Although the arbitration provision itself has been replaced by new wording in the Third Novation, the language of Clause 19.9 (still in effect) tracks the initial intent of the two sides to exclude only "punitive, indirect or consequential damages" (not compensatory damages).[101]

324.    The Tribunal has considered the cases Respondents use to support their argument, including Quicksilver Resources Inc. v. Eagle Drilling, L.L.C., No. H-08-868, 2009 WL 1312598 (S.D. Tex. 2009). That case, unpublished, applies Oklahoma law, and does not present applicable law in the present proceedings.

325.    Having considered the authorities put forth by both sides, the Tribunal concludes that Clause 19.9 of the DSA bars only consequential damages. Given that Vantage claims only the benefit of its bargain, the provisions of Clause 19.9 in the DSA do not apply.

E.    Unpaid Invoices: Chinook 6 Lien

326.    The Tribunal considers here the alleged US$ 6.4 million in unpaid invoices related to the Chinook 6 well, of which Claimants seek recovery in addition to their direct benefit-of-the-bargain damages.

327.    Claimants have made claims related to services, goods, and equipment supplied to Respondents in connection with drilling the Chinook 6 well, submitted between 1 August 2015 and 10 September 2015. The "Confirmation of Deliverables" Forms are included in Claimants' Chinook 6 Lien, Exhibit J-654.

328.    These US$ 6.4 million in invoices were discussed at various points in the proceedings.

---

[101] For the sake of good order, the Tribunal notes that its conclusion does not derive from the title of Clause 19.9 of the DSA which mentions "Consequential Damages." The Tribunal has noted that Clause 27.10 of the DSA provides that headings are used in the contract for convenience only, and accordingly shall be disregarded or ignored for the purpose of construing, interpreting, or understanding the parties' right and obligations.

329. In particular, debate centered on the invoices during Day 9 of the hearings (25 May 2017) and again on Day 12 (1 June 2017) (see exchanges between Mr. Katz (Petrobras) and Mr. Cheng (Vantage), Transcript of Day 9, at 2179-2182; see also Claimants' confirmation that such amounts do not include damages initially referred to by Mr. Cheng as "the five hundred thousand or so" for unpaid invoices from the abandoned Benin campaign under the Second Novation. Mr. Cheng, Transcript of Day 12 (1 June 2017) at 2867-2868.

330. Mr. Katz, on behalf of Respondents, argued on Day 9 (25 May 2017) that such claims were "new" in the sense of not being included in the pre-hearing briefs. Thus, Respondents argue that the claims must be dismissed in accordance with Article 24 of the First Pre-hearing Order, which provides as follows:

> Each Party's prehearing brief shall contain a list of each and every claim, counterclaim, or defense (including defenses relating to the Tribunal's jurisdiction or the arbitrability of any claim or counterclaim) that it asserts in this proceeding. Any claim, counterclaim, or defense that is not referenced in the prehearing brief of the Party that asserted such claim, counterclaim, or defense shall be deemed waived and abandoned.

331. The Tribunal has noted that the general language in Claimants' pre-hearing submissions includes no details on the invoices, but rather speaks at paragraph 146 of "further relief as the Tribunal may deem just and proper."

332. Moreover, and significantly, discussion of the Chinook 6 expenses made its way into the witness statement of Dallas Bozeman (17 February 2017, at 36, ¶ 118). Mr. Bozeman discussed the expenses under the header "Submitted with Claimants' Pre-Hearing Brief for Resolution on the Merits." The Bozeman Statement, at ¶ 118, states:

> Vantage provided services to Petrobras between August 1, 2015 and September 10, 2015 in connection with the Chinook #6 well. See CE-355 at 17555-58. To date, the invoices for those services remain unpaid.

333. An email of 25 September 2015 from David Matlock (Vantage) to Fernando Gama (Petrobras) referred to aspects of the invoice process subject to dispute resolution (see Exhibit J-646).

334. On balance, the Tribunal finds that Claimants preserved their request concerning the unpaid invoices. Claimants' Pre-Hearing Brief references the Bozeman Statement, which must be considered in resolving the merits of this case, and which explicitly puts forth the claim for the unpaid invoices. The successive mentions of the unpaid invoices at various points in the proceedings, as noted above preclude the Tribunal from disregarding the claim.

335. Respondents have not asserted payment of the invoices. Rather, they simply argue that "defects in Vantage's damages methodology bar any recovery of unpaid invoices at issue under the lien." (see Respondents' Review of Claims and Defenses Remaining for Decision (8 December 2017) at page 10). Such a general reference to methodology cannot serve as a basis for denial of the claim.

336. Respondents have expressed concerns about duplicative payment through the filing of its Chinook 6 lien (see Respondents' Pre-Hearing Response Brief at page 34, ¶ 79).

337. In this connection, the Tribunal confirms that its award for the unpaid invoices rests on an assumption that no double recovery will be sought by Claimants for this item.

338. Consequently, the Tribunal finds that Claimants are due US$ 6.4 million in addition to their benefit-of-the-bargain claims.

## VI. Analysis of Respondents' Counterclaims

### A. Overview

339. The Second Respondent and the Third Respondent make counterclaims totaling US$ 101,829,302.00 based on Vantage's alleged misconduct, including fraud, bribery, aiding and abetting of alleged breaches of fiduciary duties by Messrs. Zelada and Musa, negligent misrepresentation, civil RICO violations, and "money had and received."[102] As a result, Respondents seek damages, disgorgement of Vantage's allegedly ill-gotten profits, and prevention of unjust enrichment through a constructive trust.[103] Respondents state that, "if the Tribunal finds that Vantage earned any profits under the Contract, those profits should be awarded to PAI and PVIS as damages on their counterclaims."[104]

340. The counterclaims depend principally on the assumption that Vantage or its affiliates, personnel or agents committed (or at least benefited from) acts of bribery or corruption to procure the Agreement for the Provision of Drilling Services dated 4 February 2009. However, as detailed in the Tribunal's analysis of the principal claims, Respondents have not proved that Vantage is liable (either directly or by imputation) for acts of bribery or corruption.[105]

341. As affirmative defenses, Claimants additionally assert that Respondents have waived, or are estopped from bringing, the counterclaims because Petrobras executed the Second Novation, Third Novation, and amendments, which ratified the

---

[102] Respondents' Post-Hearing Response Brief, ¶¶ 184-204.

[103] Respondents' Post-Hearing Response Brief, ¶¶ 184-186, 198-204.

[104] Respondents' Post-Hearing Brief, ¶ 4.

[105] Respondents' Post-Hearing Brief, ¶¶ 202-203. Two components of the counterclaim alleging breach of contract appear unrelated to the alleged bribery: claims that Vantage misrepresented that it possessed the Titanium Explore and that it failed to conduct a background check on Mr. Padilha.

DSA, after allegations about the alleged bribery became public and Petrobras had conducted an internal investigation regarding such allegations.[106]

342. Finally, Claimants assert that Respondents presented no evidence to establish the quantum of damages pertaining to the counterclaims.[107] Claimants note that Respondents' damages expert at the hearing focused on the quantum of Claimants' principal claims and did not attempt to quantify their damages until the last day of the hearing.[108]

343. While it is clear that Respondents seek disgorgement of profits Vantage earned from operating the Titanium Explorer in the Gulf of Mexico, Claimants argue that such profits were neither unjust nor excessive, did not result from bribery, cannot be traced to any of Respondents' counterclaims, and were in any case "dwarfed" by the losses Vantage suffered upon termination of the DSA.[109]

344. Indeed, Respondents did not provide any breakdown of damages with respect to individual counterclaims and thus it appears Respondents may intend that the quantum would be the same whether the Tribunal grants all, some, or even just one of the counterclaims.

345. The DSA's clause on Consequential Damages (Clause 19.9) is relevant not only to Claimants' requested damages, but also to certain aspects of Respondents' counterclaims, such as Respondents' request for exemplary damages.

346. For ease of analysis, the Tribunal has noted the following categories of counterclaims, according to whether they assume or deny the DSA's validity

- Those which assume the DSA's invalidity;
- Those which assume that the DSA is valid; and
- Those independent of the DSA's validity or invalidity.

347. Falling within the first group is Respondents' counterclaim that the DSA is void or voidable. In the second group, the counterclaims for breach of contract and fraudulent inducement rest on the assumption of validity. Under the third group, the counterclaim that Vantage assisted or participated in a breach of fiduciary duty by Messrs. Musa and Zelada appears to be an extra-contractual claim independent of whether the DSA was valid or invalid. The RICO counterclaim also apparently falls within this third group.

348. As further explained below, the Tribunal denies all counterclaims: Respondents have not proven Vantage's liability with respect to alleged corruption and bribery;

---

[106] Claimants' Post-Hearing Brief, ¶ 470.

[107] Claimants' Post-Hearing Brief, ¶ 458.

[108] Claimants' Post-Hearing Brief, ¶ 459.

[109] Claimants' Post-Hearing Brief, ¶¶ 459, 461.

Respondents have ratified the Contract; and by reason of their own subsequent conduct, Respondents cannot raise those counterclaims.

B.    Bribery and Corruption

   1.   Respondents' Position

349.   Respondents claim that Vantage materially breached the DSA due to alleged bribery and corruption, thus providing Respondents with grounds to terminate the DSA under Clause 9.1.1.3 thereof.[110]   The purported material breaches were as follows:

- non-compliance with the FCPA (DSA Art. 10.14.1);
- making illicit payments to government employees or to persons working for Petrobras (DSA Arts. 10.14.2, and 10.14.3);
- failing to comply with "applicable law" by committing bribery (DSA Art. 10.15);
- use of an Illegal Information Broker (allegedly, Mr. Padilha) and not informing PVIS of this fact (DSA Arts. 10.20.1, 10.20.2, 10.20.3);
- creating a conflict of interest with PVIS by paying bribes to procure the DSA (DSA Art. 10.21);
- falsely claiming to possess the Titanium Explorer and have the necessary resources and equipment to perform the services under the DSA; and
- failure to perform a background check on Mr. Padilha (DSA cArt. 10.23).[111]

350.   Respondents also assert a right to terminate the DSA under Clause 9.1.3.2, due to the material falsity of the following representations and warranties by Vantage:

- that Vantage had not and would not make illicit payments to government employees or to persons working for Petrobras (DSA Arts. 10.14.2, and 10.14.3); and
- that Vantage had not and would not utilize an "Illegal Information Broker" to corruptly affect the competitive bidding process for the DSA (DSA Art. 10.20).[112]

---

[110] Respondents' Post-Hearing Brief, ¶ 196.

[111] Respondents' Post-Hearing Brief, ¶¶ 196-204; Respondents' Post-Hearing Response Brief, ¶ 193.

[112] Respondents' Post-Hearing Brief, ¶¶ 205-208; Respondents' Post-Hearing Response Brief, ¶ 193.

### 2. Claimants' Position

351. In the main, Vantage argues that Respondents' counterclaim for breach of contract fails because Respondents neither provided evidence of the alleged breaches nor proved any damages.[113] Furthermore, Vantage asserts that Respondents waived any breaches, ratified the DSA and is estopped from asserting its counterclaim.[114] More specifically, Vantage makes the following arguments:

352. Regarding an alleged breach of Clause 10.14.1, Vantage denies violating the FCPA or failing to notify Petrobras of a request that Vantage take action violating the FCPA. Vantage asserts there is no evidence that VDEEP or VDDI made any illicit payments. On the other hand, payments by Mr. Su or his company, Valencia, would not violate Clause 10.14.1 because Mr. Su and Valencia did not fall within the meaning of "Contractor" under the DSA. Also, there is no evidence that VDEEP or VDDI were aware of such payments, that Petrobras was unaware of those payments, or that the payments induced PVIS to sign the DSA.[115] Vantage also denies that VDEEP's or VDDI's duty to notify Petrobras under Clause 10.14.1 was triggered, as there is no evidence that they were requested to commit an FCPA violation. Instead, Vantage became aware of the alleged bribery in 2014 through public reports of Petrobras's findings, so there was nothing to notify to Respondents.[116]

353. Regarding alleged breaches of Clauses 10.14.2 and 10.14.3, Vantage denies that either VDEEP or VDDI made any such payment or offer and asserts that payments by Mr. Su would not be covered by those provisions. According to Claimants, even if payments by Mr. Su were covered by the provisions. Respondents have not proved that his payments were received by Petrobras or government officials.[117]

354. Regarding alleged breaches of Clauses 10.20.1, 10.20.2, and 10.20.3 (Illegal Information Broker clauses), Claimants argue that there is no evidence that Mr. Padilha was an Illegal Information Broker, that he provided "confidential information" to Vantage, that he performed anything other than legitimate services for Vantage, or that he offered to corrupt the competitive bidding process for VDEEP or VDDI. According to Claimants, alleged approaches to Mr. Su by Mr. Padilha are not relevant, as Mr. Su does not fall within the definition of "Contractor" under the DSA.[118]

355. Regarding the alleged creation of conflicts of interest with PVIS by Claimants in breach of Clause 10.21, Claimants argue that Petrobras has not provided evidence

---

[113] Claimants' Post-Hearing Brief, ¶ 454.

[114] Claimants' Post-Hearing Brief, ¶ 470.

[115] Claimants' Post-Hearing Brief, ¶¶ 341-344.

[116] Claimants' Post-Hearing Brief, ¶¶ 345-346.

[117] Claimants' Post-Hearing Brief, ¶¶ 348-350.

[118] Claimants' Post-Hearing Brief, ¶¶ 351-353.

that Vantage failed to exercise "reasonable care and diligence," the standard stipulated in Clause 10.21.[119]  Claimants allege that Vantage had anti-corruption policies in place since early 2008, trained its employees, vetted its agents and required them to affirm compliance with anti-corruption laws.[120]

356.   Regarding the alleged breach of Clause 10.15, Claimants assert it is irrelevant because its application is limited to the performance of "Services."[121]

### 3.  Tribunal Analysis

357.   Respondents have not provided sufficient evidence to show that VDEEP or VDDI violated the FCPA, and thus breached Clause 10.14.1 of the DSA.  Even if Vantage had committed such violations, the alleged breach of Clause 10.14.1 of the DSA was waived or ratified by Petrobras entering into the Second Novation and Third Novation.

358.   Further, the Tribunal need not make a finding as to whether VDEEP or VDDI paid bribes and thus breached Clauses 10.14.2 or 10.14.3 of the DSA, as such alleged breaches were waived or ratified by Petrobras entering into the Second Novation and Third Novation.

359.   Regarding Illegal Information Brokering, the Tribunal need not make a finding of whether Illegal Information Brokering occurred, because any breaches of Clauses 10.20.1, 10.20.2, and 10.20.3 were waived or ratified by Petrobras entering into the Second Novation and Third Novation.

360.   Regarding conflicts of interest with PVIS under Clause 10.21, the Tribunal finds no evidence that VDEEP or VDDI failed to exercise "reasonable care and diligence."

361.   In regard to Respondents' allegations that Vantage did not comply with Clause 10.15 (concerning Applicable Law), the Tribunal interprets that provision as applying to the performance of the Services, which does not relate to the allegation that Vantage engaged in bribery in procuring the DSA.  The Tribunal also interprets DSA Clause 10.20.4 as applying to the performance of the Services.  Accordingly, the Tribunal concludes that Respondents' counterclaims invoking DSA Clause 10.15 or Clause 10.20.4 (whether for breach of contract or fraudulent misrepresentation counterclaims) must be denied.

362.   The Tribunal has already determined that no convincing evidence shows Claimants were aware of the alleged bribery.[122]  The Tribunal also determines that

---

[119] Claimants' Post-Hearing Brief, ¶¶ 340-356.

[120] Claimants' Post-Hearing Brief, ¶¶ 354-355.

[121] Claimants' Post-Hearing Brief, ¶ 356.

[122] *Supra* paragraph 286.

no convincing evidence shows that the Titanium Explorer lacked resources or equipment to perform services under the DSA.[123]

363.   Finally, the Tribunal confirms its earlier conclusion about Exhibit R-2076 (the SEC Report of 4 May 2018), which cannot be considered in determining the existence of bribery and corruption.  As discussed *supra* at Section III-O of this Award, that Report relates to settlement, not an admission of guilt.  A long-standing public policy at the arbitral seat (the United States) would generally exclude consideration of such offers, which promote voluntary resolution of disputes.

## C.   Contract as Void, Voidable, and Unconscionable

### 1.   Respondents' Position

364.   Respondents argue that the DSA is void because it was allegedly procured by commercial bribery, which is a criminal act under U.S. law (e.g., the FCPA), Texas law, and Louisiana law.  Respondents refer to caselaw which they argue supports the view that a contract procured by commercial bribery cannot be enforced.[124]

365.   Respondents argue that the DSA is voidable for the same reasons as why it is allegedly void.  As further support for their argument, Respondents refer to "anti-waiver" clauses of the DSA and the Novations, providing that the parties do not waive any obligations, duties or liabilities that are not properly discharged, and that no waiver occurs where a party has not expressly done so in a written instrument.[125]

### 2.   Claimants' Position

366.   Claimants assert that a contract procured by bribery is not within the narrow category of contracts that are illegal *per se*, under relevant caselaw.[126]  Instead, they argue, the weight of authority confirms that a contract procured by bribery is merely voidable, but not void.  A voidable contract remains subject to ratification by an "innocent" party.  Here, Petrobras retained the capacity to ratify the DSA if the DSA had been procured by bribery.

367.   Next, Claimants assert that since no bribes were paid by Vantage, the DSA was not voidable.  Furthermore, argue Claimants, even if the DSA was previously voidable, due to alleged bribery, it is no longer voidable, because Petrobras – with

---

[123] *Infra* paragraph 421.

[124] Respondents' Pre-Hearing Brief, ¶¶ 48-50.

[125] Respondents' Pre-Hearing Brief, ¶ 52.

[126] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 76 (citing U.S. ex rel. Siewick v. Jamieson, 214 F.3d 1372, 1377 (D.C. Cir. 2000)) (CL-74).

full knowledge of the 2013 Audit Report – negotiated and signed Novations and amendments to the DSA, thereby ratifying it.[127]

368. According to Claimants, Respondents' argument that the "anti-waiver" clauses in the DSA[128] and Novations preclude ratification fails, because the Novations, which were made after Petrobras became aware of the alleged bribery, contain the wording that the DSA "remained in force and binding on the parties."[129] Furthermore, anti-waiver clauses themselves can be waived by a party's silence and inaction over a lengthy period of time, which Claimants assert to have occurred here.[130]

369. According to Claimants, since the DSA is neither void nor voidable, Respondents have no right to rescission.[131] Rescission is a remedy that presupposes that the DSA is voidable.[132]

370. Finally, regarding unconscionability, Claimants contend that the DSA was neither unenforceable on public policy grounds nor "grossly one-sided." Accordingly, the DSA was not unconscionable. Claimants take the view that the DSA was not contrary to public policy, because the DSA did not call for the performance of an illegal act and, even if the DSA had been procured by bribery, a contract that has been ratified by the non-bribing party may still be enforced. Furthermore, as Petrobras negotiated and drafted the DSA and the DSA does not contain any terms that are "oppressive" or "unreasonable" with respect to Petrobras's interests, it is not "grossly one-sided."[133]

### 3. Tribunal Analysis

371. The Tribunal finds that Claimants have the more persuasive arguments with respect to whether the DSA was void, voidable, unconscionable or otherwise subject to rescission.

---

[127] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 79.

[128] DSA, § 27.5; First Novation, Cl. 3.6; Second Novation, Cl. 3.6; Third Novation, Cl. 3.6.

[129] DSA, § 10.5.

[130] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 81.

[131] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 93.

[132] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 93 (citing Kennebrew v. Harris, 425 S.W.3d 588, 596 (Tex. App. – Houston [14th Dist.] 2014, pet. Denied) (CL-186) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 54 cmt. A) (CL-209).

[133] Claimants' Response to Respondents' Pre-Hearing Brief, ¶¶ 82-83.

372. A contract procured by bribery is not within the narrow category of contracts that are illegal *per se*, under relevant case law,[134] but rather such a contract is merely voidable, but not void, and thus subject to ratification by an innocent party.

373. Petrobras ratified the DSA when it entered into the Second Novation and the Third Novation. Therefore, Respondents' counterclaim must be denied.

374. With full knowledge of the 2013 Audit Report – Respondents negotiated and signed novations and amendments to the DSA. Novations were made after Petrobras became aware of the alleged bribery. The anti-waiver clauses can be waived by a party's silence and inaction over a lengthy period of time, which certainly occurred here.[135]

375. Regarding unconscionability, for reasons outlined by Claimants, the DSA was neither unenforceable on public policy grounds nor grossly one-sided. Nor was the DSA contrary to public policy. No illegal act was called for by that Contract, which – even if it had been procured by bribery -- was ratified by the "non-bribing" party.

376. Finally, the Tribunal cannot ignore that Petrobras negotiated and drafted the DSA, which contains no terms that are "oppressive" or "unreasonable" with respect to the interests of Petrobras.

D. Common Law Fraud and Fraudulent Inducement

1. Respondents' Position

377. Respondents assert that if the DSA was not valid, a fraudulent inducement claim cannot be made. However, if the Tribunal finds that the DSA was valid, then Respondents argue, in the alternative, that PVIS and PAI were fraudulently induced to sign it.[136]

378. Similar to their arguments regarding breach of contract above, Respondents argue that Vantage, knowingly or "recklessly," made false representations in the DSA, the Third Novation, and the transactions contemplated therein, including the following:

- Vantage had complied and would comply with the FCPA and notify Petrobras of violations thereof (DSA Art. 10.14.1)
- Vantage had not made and would not make illicit payments to government employees or to persons working for Petrobras (DSA Arts. 10.14.2, and 10.14.3);

---

[134] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 76 (citing U.S. ex rel. Siewick v. Jamieson, 214 F.3d 1372, 1377 (D.C. Cir. 2000) (CL-74)).

[135] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 81.

[136] Respondents' Pre-Hearing Brief, ¶ 38.

- Vantage had complied and would comply with all applicable laws in connection with services under the DSA (DSA Art. 10.15); and
- Vantage had not utilized and would not utilize "Illegal Information Brokers" to corruptly affect the competitive bidding process for the DSA (DSA Art. 10.20).

379. Respondents assert that Vantage's alleged participation in bribes to procure the DSA made the foregoing representations false.[137]

380. Respondents also assert that the non-disclosure by Vantage's CEO (Mr. Bragg) of what he allegedly knew about the bribery scheme in 2011 and 2012 also constituted fraud and fraudulent inducement (citing DSA Arts. 10.20.4 and 10.21).[138]

381. According to Respondents, there is "direct and circumstantial evidence" proving that Vantage knew its representations were false, that Vantage knew PVIS (and later PAI) would rely on them, and that PVIS (later PAI) entered into or maintained the DSA in reliance on them.[139] Respondents state that "the record reflects" that PVIS and PAI suffered damage as a result of Vantage's fraud and are entitled, at a minimum, to Vantage's illegally obtained profits.[140] As a result, Respondents argue they are entitled to forfeiture of Vantage's profits, under Texas law.

2. Claimants' Position

382. Claimants contend that Respondents' fraudulent misrepresentation claim fails because Respondents cannot establish that a misrepresentation was made, that Respondents relied on it, or that Respondents suffered damages as a result.[141]

383. As to the alleged misrepresentations, Claimants contend that the representations described in Clauses 10.14.1, 10.15, 10.14.2, 10.14.3, and 10.20.2 of the DSA were not false. Specifically, Claimants argue that Respondents did not prove that Vantage violated the FCPA, that Vantage made illicit payments to government officers or employers or to Petrobras employees, or that Vantage utilized "illegal information brokering."[142]

384. As to the element of reliance, Claimants argue that PVIS and PAI had "imputed if not actual knowledge" of the alleged bribery at the times of entering into the DSA and the Second Novation and Third Novation, because such bribery would have

---

[137] Respondents' Pre-Hearing Brief, ¶¶ 39-41; Respondents' Post-Hearing Response Brief, ¶ 190.

[138] Respondents' Post-Hearing Response Brief, ¶ 191.

[139] Respondents' Post-Hearing Response Brief, ¶ 192.

[140] Respondents' Post-Hearing Response Brief, ¶ 192.

[141] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 85.

[142] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 85.

been known to Messrs. Zelada and Musa or to Petrobras. Thus, that reliance cannot be established.[143]

385. Additionally, Claimants argue that some of the provisions cited by Respondents are irrelevant, even if corruption had occurred. Specifically, Claimants assert that, according to the text of Clauses 10.20.4 and 10.15 (relating to compliance with Applicable Law), their application is limited to circumstances relating to the performance of "Services" by VDEEP or VDDI.[144]

386. Finally, Claimants assert that Respondents did not provide any quantification of their damages, nor were there any damages from Petrobras's executing the DSA at or below market rates.[145]

### 3. Tribunal Analysis

387. The applicable legal test for fraudulent inducement is not contested, since Claimants and Respondents both cited the same Texas Supreme Court decision setting forth the elements of the claim, namely:

> (i) a material representation was made, which
>
> (ii) was false;
>
> (iii) when it was made, the speaker knew it was false or made it recklessly without any knowledge of the truth;
>
> (iv) the representation was made with the intent that the other party would act upon it;
>
> (v) the other party acted in reliance upon it; and
>
> (vi) the other party thereby suffered injury.[146]

388. The Tribunal concludes that Respondents' counterclaim for fraudulent misrepresentation must be denied because Respondents have not proven the first and second elements of the claim under the applicable legal standard, for reasons outlined above.

---

[143] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 86.

[144] Claimants' Post-Hearing Brief, ¶ 356.

[145] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 87.

[146] Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323, 337 (Tex. 2011) (CL-183) (cited in Respondents' Pre-Hearing Brief, ¶ 37; Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 85).

389.   Furthermore, the Tribunal interprets DSA Clauses 10.20.4 and 10.15 as pertaining to the performance of "Services" by VDEEP or VDDI, and not as relevant to allegations of procuring the DSA by means of bribery or corruption.[147]

E.   Assisting in Breach of Fiduciary Duty

1.   Respondents' Position

390.   Respondents contend that Messrs. Zelada and Musa, as PVIS's agents, each owed fiduciary duties to PVIS, and breached their duties by soliciting and accepting bribes from Vantage in exchange for enabling Vantage to successfully bid for the DSA.[148] They further argue that Vantage, through Messrs. Su, Bragg, O'Leary, and Padilha, "knowingly or with conscious avoidance," assisted, aided, and facilitated the alleged bribery scheme by paying or facilitating bribes.[149]  Respondents conclude that Vantage is liable as a "joint tortfeasor" for assisting and participating in the breaches of fiduciary duty, citing a Texas decision.[150]

2.   Claimants' Position

391.   Claimants contend that a claim for assisting and participating in a breach of fiduciary duty would require Respondents to prove both that Claimants had "actual knowledge" of the alleged breach of fiduciary duty and that Claimants "substantially assisted in its commission," which Claimants deny.[151]

392.   Claimants also argue that Petrobras ratified the DSA and waived and is estopped from raising this counterclaim, and that Petrobras has not identified any damages arising from the alleged malfeasance.[152]

3.   Tribunal Analysis

393.   The Tribunal finds that no evidence demonstrates Vantage itself substantially assisted in committing bribery.

---

[147] Claimants' Post-Hearing Brief, ¶ 356.

[148] Respondents' Pre-Hearing Brief, ¶¶ 34-35.

[149] Respondents' Pre-Hearing Brief, ¶ 36; Respondents' Post-Hearing Response Brief, ¶¶ 188-189.

[150] Respondents' Pre-Hearing Brief, ¶ 33; Respondents' Post-Hearing Response Brief, ¶ 189 (citing Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 574 (Tex. 1942)).

[151] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 84. (citing Kinzbach, and Federal District Court decisions from Washington and Texas).

[152] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 84.

394. Such a finding would require Respondents to prove both that Claimants had "actual knowledge" of the alleged breach of fiduciary duty and that Claimants "substantially assisted in its commission," both of which elements Claimants deny.[153] No such proof has been provided.

395. Moreover, Petrobras ratified the DSA and waived and is estopped from raising this counterclaim, and Petrobras has not identified any damages arising from the alleged malfeasance.[154]

396. Accordingly, the Tribunal concludes that this counterclaim must be denied.

F. Civil RICO Violations

1. Respondents' Position

397. Respondents argue that the alleged corrupt activities, including acts of bribery, mail fraud, and wire fraud, of Vantage and of Messrs. Bragg, O'Leary, Su, and Padilha, both before and after execution of the DSA, formed "a pattern and practice of racketeering activity in violation of 18 U.S.C. § 1962(c)."[155]

2. Claimants' Position

398. Claimants argue that, even if there were predicate acts of bribery, a "bribe allegedly paid in two installments in 2009 does not amount to a 'pattern' of activity" and does not constitute a specific threat of repetition extending into the future.[156] Claimants also argue that Respondents waived taking any action on the predicate acts (i.e., alleged bribery) and are now estopped from asserting them.[157] Claimants further argue that Respondents have failed to specify any injury from the alleged RICO violations.[158]

---

[153] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 84. (citing Kinzbach, and Federal District Court decisions from Washington and Texas).

[154] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 84.

[155] Respondents' Post-Hearing Response Brief, ¶ 195; Respondents' Pre-Hearing Brief, ¶¶ 59-60.

[156] Claimants' Post-Hearing Brief, ¶ 446.

[157] Claimants' Post-Hearing Brief, ¶ 447.

[158] Claimants' Post-Hearing Brief, ¶ 446.

3. Tribunal Analysis

399.    As Respondents and Claimants agree, a successful RICO claim requires proof of "a pattern of racketeering activity" and some specific threat of repetition or ongoing practice in the future.[159]

400.    Here, the evidence weighs in favor of the position that the alleged acts of bribery constituted one activity in relation to one contract, not a "pattern" of activity, and that the elements of a RICO claim have not been established.

401.    The Tribunal also notes that Respondents appear not to have specified any injury due to the alleged RICO violation.[160]

402.    In conclusion, the Tribunal finds that Respondents have not carried their burden of demonstrating that Vantage was guilty of bribery on the evidence presented.

403.    For the foregoing reasons, Respondents' RICO counterclaim must be denied.

G.    Civil Conspiracy

1. Respondents' Position

404.    Respondents claim that Vantage conspired with Oresta, TMT, and Messrs. Su, Bragg, O'Leary and Padilha to procure the DSA, the Third Novation, and the transactions contemplated therein through bribery and corruption, asserting that this constitutes an "actionable civil conspiracy" under Texas law.[161] They cite to Texas case law for the elements of civil conspiracy, namely, "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result."[162] The object must, Respondents assert, be either "an unlawful purpose or a lawful purpose by unlawful means."

2. Claimants' Position

405.    Claimants concur with Respondents on the elements of a civil conspiracy claim under Texas law.[163] Claimants disagree, however, that Vantage, Mr. Bragg, or Mr. O'Leary could be found to have conspired, because Respondents have not proved that there was a "knowing meeting of the minds" among them, and because proof of

---

[159] Respondents' Pre-Hearing Brief, ¶ 59; Claimants' Post-Hearing Brief, ¶ 446.

[160] Claimants' Post-Hearing Brief, ¶ 448.

[161] Respondents' Pre-Hearing Brief, ¶ 62.

[162] Respondents' Pre-Hearing Brief, ¶ 61 (citing Backes v. Misko, 486 S.W.3d 7, 27 (Tex. App.—Dallas 2015, pet. Denied).

[163] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 89.

recklessness is not sufficient.[164]  Claimants also assert that Respondents have not identified any damages resulting from the alleged conspiracy.[165]  Finally, according to Claimants, Respondents have ratified the DSA, and have waived and are estopped from asserting the counterclaim, for the same reasons as mentioned regarding other counterclaims.[166]

### 3. Tribunal Analysis

406.  Respondents have neither alleged nor proven how elements of a civil conspiracy claim against Vantage have been satisfied.

407.  As already noted, Respondents have not met their burden to show that Vantage possessed "knowledge" of the alleged bribery.[167]

408.  Additionally, Respondents have not specified any damages resulting from the alleged conspiracy.

409.  Finally, the Tribunal concludes that, as with the other counterclaims, Respondents waived this counterclaim claim by ratifying the DSA through the Second Novation and Third Novation.  Accordingly, the counterclaim must be denied.

## H.  Negligent Misrepresentation

### 1. Respondents' Position

410.  Respondents assert that Vantage committed negligent misrepresentation by making false representations in the DSA, due to a failure to exercise reasonable care in obtaining or communicating information.  In consequence, Respondents have suffered damages.

411.  Rather than identifying specific representations as being false, Respondents instead referred to Section G.2 of their Post-Hearing Brief, which cites to DSA Clause 10.14.1 (FCPA compliance), Clauses 10.14.2 and 10.14.3 (illicit payment to government or Petrobras employees), Clause 10.15 (compliance with applicable laws), Clause 10.20 (use of Illegal Information Brokers), Clause 10.20.4 (actions that subject a party to liability), and Clause 10.21 (conflicts of interest).[168]

412.  Respondents apparently refer to the same alleged misrepresentations as under their breach of contract and fraudulent misrepresentation counterclaims.

---

[164] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 89.

[165] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 89.

[166] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 89.

[167] Respondents' Post-Hearing Response Brief, ¶ 196.

[168] Respondents' Post-Hearing Response Brief, ¶¶ 190-191, 197.

2. Claimants' Position

413. Claimants argue that Respondents failed to identify any specific misrepresentations or any resulting damages.

414. Claimants also argue that Respondents have waived any claim for negligent misrepresentation by ratifying the DSA by entering into multiple novations and amendments after Respondents had become aware of the public allegations of illicit payments.[169]

3. Tribunal Analysis

415. The Tribunal finds that Respondents have not satisfied their burden to prove that Vantage made false, material misrepresentations relevant to the provisions of the DSA cited by Respondents.

416. Respondents have also failed to prove any damages resulting from the alleged misrepresentations. Accordingly, the Tribunal concludes that the counterclaim for negligent misrepresentation must be denied.

417. Finally, as mentioned already with respect to the fraudulent misrepresentation counterclaim, the Tribunal notes here that Clauses 10.20.4 and 10.15 pertain to compliance with Applicable Law only concerning the performance of "Services" by Vantage, not to the act of entering into the DSA.

I. Unjust Enrichment (Money Had and Received)

1. Respondents' Position

418. Respondents claim that Vantage has been unjustly enriched as a result of bribery and corruption and that it would be fundamentally unfair to allow Vantage to retain funds and benefits improperly obtained in connection with the DSA and Third Novation.[170] According to Respondents, even if Vantage had not engaged in wrongful conduct (but others engaged in the misconduct leading Vantage to receive benefits), recovery for unjust enrichment or "money had and received" is still appropriate. Respondents assert that unjust enrichment is a theory of recovery, not a cause of action, and that the claim for relief is "money had and received," citing Texas case law.[171]

---

[169] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 91; Claimants' Post-Hearing Brief, ¶¶ 450-452.

[170] Respondents' Pre-Hearing Brief, ¶¶ 67-69; Respondents' Post-Hearing Response Brief, ¶¶ 198-200.

[171] Respondents' Pre-Hearing Brief, ¶¶ 67-69; Respondents' Post-Hearing Response Brief, ¶¶ 198-200.

### 2. Claimants' Position

419.    Claimants make several arguments in response.  First, Claimants assert that "unjust enrichment" is not recognized under maritime law as a standalone claim.[172] Next, from a factual standpoint, Claimants assert that Petrobras fails to identify the manner in which Vantage has been unjustly enriched under the DSA.  On the contrary, assert Claimants, Vantage has rendered valuable services for years under the DSA, guaranteed debt of over US$ 775 million to obtain the Titanium Explorer, and has been forced into bankruptcy because the Titanium Explorer could no longer be used.  Lastly, Claimants argue that Petrobras has ratified and waived any acts that might otherwise justify a theory of unjust enrichment.[173]

### 3. Tribunal Analysis

420.    Respondents raise the argument that Vantage itself need not have engaged in misconduct for the unjust enrichment theory to apply, and that the misconduct of others (and receipt of gains by Vantage) might tend to show that Vantage was unjustly enriched.  That being said, considering the facts and circumstances, Respondents' unjust enrichment theory is not well placed.

421.    In considering whether Claimants were unjustly enriched, relevant factors include the facts that Vantage seems to have performed adequately under the DSA for a number of years, that Vantage incurred risk and debt in acquiring the Titanium Explorer, and that Respondents' termination of the DSA led to Vantage's bankruptcy.

422.    Furthermore, considering that Petrobras had become aware of (and conducted internal investigations regarding) issues concerning alleged corruption by the time it novated the DSA through the Second Novation and Third Novation, Respondents are estopped from asserting an unjust enrichment theory because they ratified any acts that otherwise might have given rise to a claim.  Accordingly, the Tribunal concludes that Respondents' counterclaim for unjust enrichment or "money had and received" must be denied.

## J.    Constructive Trust

### 1. Respondents' Position

423.    According to Respondents, entitlement to a constructive trust requires proof of "(1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust

---

[172] Claimants' Post-Hearing Brief, ¶ 455.

[173] Claimants' Post-Hearing Brief, ¶ 455.

enrichment of the wrongdoer; (3) and tracing to an identifiable res."[174]  Respondents argue they are entitled to the equitable remedy of a constructive trust because of Vantage's alleged fraud, unjust enrichment, and "traceable gain" from the DSA.[175]

### 2. Claimants' Position

424.  Claimants agree with Respondents on the applicable legal standard for a constructive trust, but Claimants note that Respondents have not identified any property held by Vantage that Respondents are entitled to receive.  Claimants also assert that Respondents have not shown that Claimants engaged in actual fraud.  Thus, according to Claimants, there are no grounds for a constructive trust.[176]

### 3. Tribunal Analysis

425.  Respondents' constructive trust argument depends, as Respondents themselves assert, on a finding of unjust enrichment.

426.  Respondents have not proven unjust enrichment, hence one of the necessary elements for imposing a constructive trust is lacking.

427.  Accordingly, the Tribunal concludes that Respondents' request that a constructive trust be imposed must be denied.

## K.  Exemplary Damages for Alleged Fraud

### 1. Respondents' Position

428.  Respondents claim a right to receive exemplary damages based on Vantage's alleged fraud, arguing that the fraud must be proved by "clear and convincing evidence" in order to justify exemplary damages.[177]  Respondents argue that, in their view, the DSA is not valid, so Clause 19.9 of the DSA does not preclude their right to receive exemplary damages.[178]

---

[174] Respondents' Pre-Hearing Brief, ¶ 70 (citing Nwokedi v. Unlimited Restoration Specialists, Inc., 428 S.W.3d 191, 210 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citing Hahn v. Love, 321 S.W.3d 517, 533 (Tex. App.—Houston [1st Dist.] 2009, pet. denied))).

[175] Respondents' Pre-Hearing Brief, ¶¶ 70-71.

[176] Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 94; Claimants' Post-Hearing Brief, ¶ 457.

[177] Respondents' Pre-Hearing Brief, ¶¶ 72-73.

[178] Respondents' Pre-Hearing Brief, ¶ 73.

2. Claimants' Position

429.   Claimants argue that Respondents have not proven a basis for exemplary damages, have received the full value to which they were entitled under the DSA and have not specified any losses.  Furthermore, assert Claimants, Clause 19.9 of the DSA precludes Respondents' claim for exemplary damages.[179]

3. Tribunal Analysis

430.   Although Respondents requested exemplary damages in their Pre-Hearing Briefs but did not mention exemplary damages in their Post-Hearing Briefs, Respondents appear to continue to seek exemplary damages, based on their 8 December 2017 submission.[180]

431.   Respondents' submissions provide scant basis for this request.  Respondents refer to portions of their Post-Hearing Brief and Post-Hearing Response Brief that refer only to disgorgement of profits, if any.[181]

432.   On the evidence submitted, Respondents have failed to prove that Vantage engaged in or was complicit in fraud, let alone have they proved fraud by "clear and convincing" evidence (the standard which Respondents consider applicable).  Furthermore, Respondents have not identified the exemplary damages that they appear to be requesting.  Accordingly, the Tribunal concludes that Respondents' request for exemplary damages must be denied.

L.   Conclusion

433.   In addition to finding that Respondents ratified the DSA pursuant to the Second Novation and the Third Novation, thus waiving objections related to bribery, the Tribunal concludes that each counterclaim fails for the following reasons:

   i.   The Tribunal denies Respondents' counterclaim alleging that the DSA is void, voidable, unconscionable, and must be rescinded, because Respondents have not established that Vantage knew of or participated in any bribery.

   ii.   The Tribunal denies Respondents' counterclaim for breach of contract based on alleged bribery, corruption, and other charges.  Respondents failed to establish that Claimants breached DSA Clauses 10.14.1, 10.14.2, 10.14.3, 10.20.1, 10.20.2, 10.20.3, 10.20.4, 10.21, or 10.15.

   iii.   The Tribunal denies Respondents' counterclaim for common law fraud and fraudulent inducement, as Respondents failed to prove that Claimants made false, material misrepresentations in regard to DSA Clauses 10.14.1, 10.14.2, 10.14.3, 10.20.1, 10.20.2, 10.20.3, 10.20.4, 10.21, or 10.15.

[179] Claimants' Post-Hearing Brief, ¶ 464.

[180] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 28.

[181] Respondents' Post-Hearing Brief, ¶¶ 292-294; Respondents' Post-Hearing Response Brief, ¶¶ 184-186.

<ol type="i" start="4">
<li>The Tribunal denies Respondents' counterclaim for assisting and participating in breaches of fiduciary duty by Messrs. Zelada and Musa, because Respondents have not proven that Vantage itself substantially assisted in their alleged acts of corruption or bribery.</li>
<li>The Tribunal denies Respondents' counterclaim for civil RICO violation, as Respondents failed to demonstrate a "pattern of racketeering activity" but have only alleged and have not proven one instance of such activity, namely, the alleged bribery in procuring the DSA.</li>
<li>The Tribunal denies Respondents' counterclaim for civil conspiracy due to Respondents' failure to prove any of the elements of such a claim, or the damages allegedly resulting therefrom.</li>
<li>The Tribunal denies Respondents' counterclaim for negligent misrepresentation because Respondents have not met their burden to prove that Vantage made false, material misrepresentations in any of the DSA's provisions, and have not proven any resulting damages.</li>
<li>The Tribunal denies Respondents' counterclaim for unjust enrichment, or for money had and received, because the relevant factors, on balance, do not establish that Claimants were unjustly enriched by entering into the DSA. The evidence establishes that the Claimants performed adequately under the DSA for a significant period of time and that Respondents wrongfully terminated the DSA, which resulted in financial hardship for Claimants.</li>
<li>The Tribunal denies Respondents' counterclaim for a constructive trust, which relies upon a finding of unjust enrichment, which the Tribunal has rejected. Further, Respondents failed to identify any property on which a constructive trust could be imposed.</li>
<li>The Tribunal denies Respondents' request for exemplary damages because Respondents failed to specify the damages they are requesting, did not meet the burden of "clear and convincing evidence" for fraud they have argued is applicable, and also failed to establish that DSA Clause 19.9 does not preclude such a claim.</li>
</ol>

434. The Tribunal addresses below, in the next section, Respondents' offset claim against damages awarded to Claimants.

## VII. Damages Analysis

### A. Quantum

#### 1. Overview

435. As a result of the alleged material breach of the DSA, Claimants request an award of US$ 560.2 million for benefit-of-the-bargain damages, plus pre-award and post-award interest.[182]

---

[182] Claimants' Post-Hearing Brief, ¶ 471(7).

436. A higher amount of US$ 749.3 million in damages plus pre-award and post-interest interest should, according to Claimants, be awarded if the Tribunal accepts Respondents' contention that the Bareboat Charter mechanism should be treated as a cost to be deducted from Vantage's day rates for purposes of calculating Vantage's benefit-of-the-bargain damages.[183]

437. Having considered all arguments as to the Bareboat Charter mechanism, the Tribunal has determined that the Bareboat Charter mechanism should not be reflected in Claimants' benefit-of-the-bargain damages.

438. Accordingly, the alternative calculation of US$ 749.3 million in damages that Claimants request will be rejected.

Claimants and Respondents put forward views from Dr. E. Allen Jacobs and Dr. Robert Maness as their respective experts on quantum. Each expert was examined over the course of two days of hearings on 25 and 26 May 2017. The Tribunal has carefully evaluated both experts' views in relation to damages, including the supplemental expert reports submitted after the hearings.[184]

### 2. Claimants' Position

439. Claimants assert that benefit-of-the-bargain damages are the appropriate measure of their direct damages in a breach of contract case, refraining from asserting claims to incidental or consequential losses due to DSA Clause 19.9.[185]

440. Regarding the basic concept of benefit-of-the-bargain damages, Claimants and Respondents concur that these are calculated by taking what the non-breaching party would have received if the contract had not been breached, then subtracting costs that the non-breaching party has avoided by not having to perform, as well as backing out from the final sum any amounts the non-breaching party would have earned after the breach through steps at mitigation.[186]

441. To quantify such damages, Claimants considered the payments received and costs incurred in an eight-month period running from 1 January 2015 to 31 August 2015 during the DSA's term before the breach, suggesting this serves as a "reasonable proxy" of the amounts Claimants would have received and the costs they would have incurred during the remainder of the DSA's term but for the contract breach and termination.[187]

---

[183] Claimants' Post-Hearing Brief, ¶ 471(8).

[184] J-901 (Maness Rpt. 3); J-902 (Jacobs Rpt. 4).

[185] Claimants' Post-Hearing Brief, ¶ 362 and n. 109.

[186] Claimants' Post-Hearing Brief, ¶ 362 (quoting Respondents' expert, Dr. Maness (Transcript, Day 10, at 2449)).

[187] Claimants' Post-Hearing Brief, ¶ 363 (citing J-860 (Jacobs Rpt. 2), ¶¶ 20-36 and J-868 (Jacobs Rpt. 3), ¶¶ 81-84).

442.　Claimants compared the "but-for" numbers to their actual and projected revenue and costs due to the DSA's termination, including mitigation,[188] arriving at a figure of US$ 600.1 million benefit-of-the-bargain damages as the difference between the actual number and the but-for number.[189]

443.　Claimants discounted that figure to the date of the breach, 31 August 2015, using Claimants' WACC (Weighted Average Cost of Capital), arriving at a discounted number of US$ 427 million as of 31 August 2015.[190]

444.　With pre-award interest, Claimants used the WACC, compounded monthly up to an assumed award date of 1 August 2017, resulting in a figure of US$ 560.2 million (or US$ 536.5 million assuming discounting at 15.2% cost of capital and accrual at 5.0%).[191]

445.　At the hearing, Claimants' expert also submitted updated calculations with pre-award interest for prospective award dates through 1 July 2018, including, in particular, the calculation of US$ 615.62 million as of 1 April 2018 on the same basis as he had calculated US$ 560.2 million as of 1 August 2017 (see discussion *infra* of the helpful calculations provided by Dr. Jacobs).

### 3.　Respondents' Position

446.　Respondents raised objections to Claimants' damages claims and assumptions. One broad objection was that Claimants (VDDI and VDEEP) seek damages "for the entire family of Vantage entities," including those of Vantage Drilling International and ROCO, not specifically for the two Claimants themselves.[192]　Respondents assert that this is improper and "invites the Tribunal to exceed its authority."[193]

447.　Additionally, Respondents' expert disagreed with Dr. Jacobs's assumptions in calculating the benefit-of-the-bargain damages, arguing that (i) revenue in the but-for case should be lower than what Dr. Jacobs testified, (ii) relative costs should be lower due to the bankruptcy, (iii) mitigation revenue should be higher than what Dr. Jacobs testified, and (iv) the accrual or pre-judgment interest rate should be much lower than the rate Dr. Jacobs applied.

448.　With respect of the assumption concerning revenue in the but-for scenario, Dr. Maness calculated a lower average daily revenue rate for 2015 than Dr. Jacobs,

---

[188] Claimants' Post-Hearing Brief, ¶ 363.

[189] Claimants' Post-Hearing Brief, ¶ 363 (citing J-868 (Jacobs Rpt. 3), ¶ 83).

[190] Claimants' Post-Hearing Brief, ¶ 364.

[191] J-868 (Jacobs Rpt. 3), ¶ 83.

[192] Respondents' Post-Hearing Response Brief, ¶ 166.

[193] Respondents' Post-Hearing Response Brief, ¶ 169.

providing a figure of US$ 497,230.[194]  Dr. Jacobs, after making a correction, considered the appropriate average daily revenue rate to be US$ 508,000.[195]

449.    Regarding Vantage's bankruptcy, Respondents argued that Claimants ignored the impact of the bankruptcy in their but-for case, and as a result of this Claimants overstated their damages by approximately US$ 310 million.[196]  According to Respondents, Dr. Jacobs failed to account for the fact that Vantage's bankruptcy allowed Vantage to lower and delay payment on its debt, thus reducing its costs.[197]

450.    As to mitigation, Dr. Maness asserted that the drillship rates applied by Dr. Jacobs were too low, suggesting that Vantage's mitigation efforts would have yielded higher returns.[198]  Additionally, Dr. Maness suggested that Dr. Jacobs was "overly pessimistic" about prospects of re-deploying the Titanium Explorer and that Vantage did not make sufficient efforts to do so.[199]

451.    With regard to the accrual rate, Dr. Maness asserted that the rate posited by Dr. Jacobs, 15.2%, was too high.  Dr. Maness asserted that since a damages award is not uncertain, "a risk-free accrual rate is the appropriate prejudgment interest to apply to expected value of future damages," proposing a rate of 3.32%.[200]

### 4.  Tribunal Analysis

452.    As an initial matter, the Tribunal is not persuaded by Respondents' assertion that awarding damages to Claimants here is the same as awarding damages to the "collective family of Vantage entities."[201]

453.    Claimants seek fees payable under the DSA.  The Tribunal has jurisdiction over both VDDI and VDEEP, who are or have been parties to the DSA.  No excess of authority occurs in assessing damages.

454.    Although as an economic matter profits from the DSA might be allocated to other entities in the Vantage group, the damages themselves stem directly from the day rates under the DSA and the actual costs that Claimants incurred.

---

[194] J-884, (Maness Rpt. 1), ¶ 12.

[195] J-884, (Maness Rpt. 1), ¶ 9.

[196] Respondents' Post-Hearing Brief, ¶ 310.

[197] Respondents' Post-Hearing Response Brief, ¶ 181; J-888 (Maness Rpt. 2), ¶¶ 3-11.

[198] J-884 (Maness Rpt. 1), ¶¶ 41-42.

[199] J-884 (Maness Rpt. 1), ¶ 69.

[200] J-888 (Maness Rpt. 2), ¶ 23.

[201] Respondents' Post-Hearing Response Brief, ¶ 169.

455.  Accordingly, the Tribunal is persuaded by the opinion of Dr. Jacobs that the benefit-of-the-bargain damages sought here are Claimants' own damages, and not those of third parties.[202]

456.  Specific assumptions of Dr. Jacobs have been criticized by Dr. Maness: (i) revenue in the but-for case, (ii) impact of the bankruptcy on costs, (iii) projected mitigation, and (iv) the accrual rate.

457.  In this connection, the Tribunal notes as follows:

A. Dr. Jacobs explained that the difference between his computation of the average daily revenue rate of US$ 508,000 (originally computed at US$ 529,997 but later revised downward) and Dr. Maness' suggested rate was that Dr. Jacobs used the last eight months of the DSA, namely, January through August 2015 whereas Dr. Maness included in his calculation the revenues and costs for September 2015.  The Tribunal agrees with Dr. Jacobs' opinion that September 2015 should not be included in the calculation, considering that the DSA was then terminated.[203]  For example, Dr. Maness's calculation included costs for "disconnection of the well" during September 2015 after the DSA's termination, which the Tribunal does not consider one of Vantage's costs of performance under the DSA in the but-for case.[204]

B. Regarding bankruptcy, the Tribunal notes that Respondents provided no legal authority for asserting that the reduced debt payments of Vantage's parent company due to bankruptcy can be considered as "costs avoided by not having to perform" the DSA.  Further, as a matter of policy, the Tribunal considers it would be inappropriate for Respondents to derive a benefit from Vantage's economic losses due to the bankruptcy.  Accordingly, the Tribunal concurs with Dr. Jacobs' position that it does not make sense that "bankruptcy enables you to avoid paying for the harm you cause the enterprise.[205]

C. Concerning mitigation, the Tribunal finds that Respondent provided no evidence that Claimants failed to make an effort to mitigate their damages.  On the contrary, the evidence shows that Vantage sought to redeploy the Titanium Explorer, participating in three tenders, albeit unsuccessfully, since 31 August 2015.  Furthermore, Dr. Jacobs testified that Vantage had been active in trying to mitigate.[206]  The Tribunal concludes that Respondents neither met their burden of proving a failure to mitigate, nor did they

---

[202] Transcript, Day 9, at 2228-2230 (Jacobs).

[203] Transcript, Day 9, at 2188 (Jacobs).

[204] Transcript, Day 10, at 2444:13-2445:16 (Maness).

[205] Transcript, Day 9, at 2195:7-12 (Jacobs).

[206] Transcript, Day 9, at 2196-2197 (Jacobs); J-868 (Jacobs Rpt. 3), ¶ 74.

establish a basis to challenge the drillship day rate figures Dr. Jacobs relied upon.

D. Concerning the rate of pre-judgment interest, or accrual rate, the Tribunal has been persuaded by Dr. Jacobs' explanation of why the rate of 15.2% is the appropriate rate to be applied, in light of Vantage's cost of capital.[207]

458.  Accordingly, the Tribunal finds Dr. Jacobs's calculations of Vantage's benefit-of-the-bargain damages to be persuasive and is not swayed by Dr. Maness's critiques.

459.  The amount due in damages for breach of the DSA will be US$ 615.62 million as of 1 April 2018, to bear interest compounded monthly as discussed *infra*.

460.  In addition, the Tribunal awards damages of US$ 6.4 million in relation to the claim for Chinook 6 invoices.

B.  Interest

1.  Damages on Early Termination

461.  As a preliminary matter, the Tribunal notes that paragraph 8.1 of the Third Novation, setting forth Article 24.2(F) of the DSA, authorizes the Tribunal to grant pre- or post-award interest at applicable statutory interest rates during the relevant period.[208]  This provision accords with the AAA Commercial Arbitration Rules at R-47(d)(i) which allows "interest at such rate and from such date as the arbitrator(s) may deem appropriate."

462.  Each side's quantum expert argued for a different interest rate not based on any statute.  Accordingly, the Tribunal has considered those rates which the Parties have proposed.

463.  The Tribunal has been convinced by the analysis provided through the expert reports and testimony of Dr. Jacobs, to the effect that pre-award and post-award interest should accrue at 15.2% compounded monthly.  The rate proposed by Dr. Maness, a "risk free rate" of only 3.32%,[209] would not suffice to make Claimants whole.

464.  The same rate of 15.2% was used by Dr. Jacobs in the WACC for discounting the benefit-of-the-bargain damages to the date of the breach on 31 August 2015, which yielded a sum of US$ 427 million with interest added through 1 August 2017 for a total of US$ 560.2 million.

465.  As to whether simple or compound interest should be applied (and if compound, the frequency thereof), Dr. Jacobs testified that interest compounded monthly, rather

---

[207] Transcript, Day 9, at 2190-2191 (Jacobs).

[208] J-010 Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services, Cl. 8.1.

[209] J-888 (Maness Rpt. 2), ¶ 23.

than simple interest, was appropriate.[210] Dr. Maness seemed to have followed this approach, stating on day 10 of the evidentiary hearings, "I need to check my spreadsheets, but my guess is that's what we did."[211] Respondents' post-hearing submissions and Dr. Maness's Second Supplementary Expert Report dated 2 June 2017 did not mention this topic. Nor did Mr. Jacobs's Supplemental Rebuttal Expert Report dated 9 June 2017.

466.    In this connection, the Tribunal Chairman engaged in direct exchanges with both economic experts, Dr. Maness and Dr. Jacobs while appearing together on Day 10 of the hearings, on 26 May 2018. See Transcript pages 2432 through 2433, set forth below, in an exchange with both experts seeming to acknowledge that monthly compounding was the better approach.

> THE PRESIDENT: What was it you did in your calculation?
> DR. JACOBS: I compounded it on a monthly basis. If it's compounded, you could compound it on an annual basis.
> THE PRESIDENT: You said that you did compound it on a monthly basis?
> DR. JACOBS: Yes.
> THE PRESIDENT: But you were about to say something like you didn't feel strongly on that or….
> DR. JACOBS: Well, we may be talking millions of dollars, but percentage-wise it's not a huge difference.
> THE PRESIDENT: Dr. Maness, you were about to say.
> DR. MANESS: Subject to checking my spreadsheets, I think we adopted the same compounding mechanism that he used. But as I said --
> THE PRESIDENT: Which would have been monthly then?
> DR. MANESS: I need to check my spreadsheets, but my guess is that's what we did.
> THE PRESIDENT: Thank you very much.[212]

467.    In this connection, the Tribunal has also been assisted *inter alia* by the Expert Report of Dr. Maness submitted on 17 March 2017 (J-884), the illustrative calculations, and by the interest figures in the demonstrative slides prepared by Dr. Jacobs and contained in Exhibit J-908. The calculations of Dr. Jacobs in that Exhibit J-908 provide in pertinent part that with interest compounded monthly the amount due as of 1 April 2018 would be US$ 615.62 million.[213]

---

[210] Transcript, Day 10, at 2432:4-11.

[211] Transcript, Day 10, at 2433:2-8.

[212] Transcript, Day 10, at 2432:7-2433:10.

[213] At slide 23, Dr. Jacobs provides helpful calculations of how interest on the award would run through the 1st of July 2018, using both a simple and a compound methodology. In passing the Tribunal notes that page 23 most likely was mis-numbered and would have been page 22 but for skipped numbering on the slide deck, jumping from page 21 to page 23.

468. Respondents' Post-Hearing Briefs do not seem to address interest rates as such, but rather rely on DSA Clause 19.9 as a bar to any damages for Claimants, without providing an alternative analysis of rates.

469. In consequence, for pre-award and post-award interest, the Tribunal hereby adopts the rate proposed by Dr. Jacobs of 15.2%, compounded monthly, as considered appropriate by both experts.

### 2. Chinook 6 Invoices

470. Joint Exhibit 655 includes a Service of Process for the Chinook 6 lien in an amount of US$ 6.403. Attached to the Exhibit are "Confirmation of Deliverable" Forms for US$ 5.203 million (August 2015) and US$ 1.2 million (September 2015).

471. DSA Clause 17.1 provides that invoices shall be delivered by the 20th day of each month for the preceding month's work. DSA Clause 17.4 provides for payment within thirty (30) days of the invoices.

472. Accordingly, interest should begin on the payment due dates of 20 October 2015 (August invoice) and 19 November 2015 (September invoice).

473. Interest will thus run from 20 October 2015 on US$ 5.2 million and from 19 November 2015 on US$ 1.2 million

474. For reasons discussed above, interest will accrue at 15.2%, compounded monthly.

## C. Bareboat Charter

475. Claimants utilized a Bareboat Charter in their acquisition and use of the Titanium Explorer, to minimize taxes. Respondents' damages expert, Dr. Maness, criticized Dr. Jacobs's damages calculation for its lack of consideration of this charter, and for not reducing damages to account for Vantage's transfer of DSA profits to affiliates within the consolidated Vantage group of companies through the Bareboat Charter arrangement.

### 1. Respondents' Position

476. Respondents argue that Claimants wrongly calculated damages, and that Claimants in doing so should have considered the costs of the BCA.

477. Respondents believe the lack of accounting for costs under the BCA means that Claimants' damages are overstated, if they exist at all. Respondents argue that if Claimants' damages methodology were to include the payments to use the Titanium Explorer, Claimants' damages would be reduced "to a range between US$ 0 and US$ 98.9 million, depending on whether there was a markup under the BCA and which discount rate is used to calculate the present value of Vantage's damages."[214]

---

[214] Respondents' Post-Hearing Brief and Appendices, ¶ 288.

478. Dr. Maness explained that the Bareboat Charter is a "variable cost" which "varies between the actual and but-for worlds and must be considered when calculating Vantage's alleged damages" (see Maness Second Supplemental Report at ¶ 9).

2. Claimants' Position

479. Claimants argue they properly excluded the profits transferred to Vantage affiliates under the BCA from the costs used in calculating damages.

480. Claimants assert the Bareboat Charter is part of Vantage's capital structure, which "merely apportions the gains and losses of entities such as Vantage,"[215] meaning it should not be used to calculate gains and losses. It was a mechanism for allocating profits between Vantage and its affiliates under common ownership and control.[216]

481. Claimants emphasize the Bareboat Charter tax structure is "utilized by virtually every other contractor in the offshore drilling business" and that the DSA actually mandated the use of such a structure, requiring that Claimants "shall use reasonable endeavors to minimize Taxes with respect to this Contract."[217]

482. Claimants state that Respondents are arguing that "the party to the contract cannot recover its damages because it transfers its profits to an affiliated entity, while at the same time the affiliated entity cannot recover damages because it is not a party to the contract,"[218] a win-win situation for Respondents, in which Petrobras would have no liability to any Party, a situation which cannot be.

483. Claimants point out that if Respondents' argument were accepted, that would mean that "virtually every company in the offshore drilling industry [would be deprived] of meaningful recovery in breach of contract cases."[219]

484. Claimants argue that the damages calculations of their expert, Dr. Jacobs, would in fact be significantly higher with the charter's use in calculations, as there would have been a higher day rate imposed under the DSA. Claimants say that Dr. Maness admitted as such:

> Q. And if there had been no bareboat charter—assume with me that the bareboat charter did decrease the tax burden with respect to the Titanium Explorer after it reentered the Gulf of Mexico. If Vantage had not entered into that bareboat charter, the day rate would have been increased to compensate Vantage for that increased tax burden?
>
> A. Well, yeah, although Clause 18.1.3 suggests it would have gone down as

---

[215] Claimants' Post-Hearing Brief, ¶ 388.

[216] Claimants' Post-Hearing Brief, ¶ 393.

[217] Claimants' Post-Hearing Brief, ¶ 379.

[218] Claimants' Post-Hearing Brief, ¶ 410.

[219] Claimants' Post-Hearing Brief, Subheading VI. B. 3. (h), at 156.

of the time they entered into the bareboat charter as well, assuming you're right. [220]

485.  Claimants argue that "[b]ecause payments by Vantage under the Bareboat Charter are calculated based on Vantage operating profit, Vantage must first earn an operating profit before it can shift those profits under the Bareboat Charter arrangement."[221]  Similarly, the payments to Vantage ROCO would only come from Vantage's profit.  Thus, the reduced profits are the proper basis for assessing economic damages.

### 3.  Tribunal Analysis

486.  The Tribunal finds no evidence that the Bareboat Charter tax structure, common in the offshore drilling industry, should alter damages.

487.  As noted in the Supplemental Report of Dr. Jacobs (9 June 2017), industry practice and sound financial analysis require damages based on lost revenue or lost profit without reference to tax or capital structures.

488.  As a matter of logic, loss to Claimants caused by the DSA termination occurred before calculation of payments under the Bareboat Charter.

489.  Consequently, Claimants were correct in excluding the Bareboat Charter from their damages calculation.

490.  The Tribunal also notes that the terms of the DSA itself mandated the use of such a structure, requiring that Claimants to "use reasonable endeavors to minimize Taxes with respect to this Contract."[222]

491.  In passing the Tribunal also notes that without the Bareboat Charter (and thus contrary to offshore drilling industry practice) Dr. Jacobs would have provided for significantly higher damages, given a higher day rate imposed under the DSA.

492.  In short, Vantage cannot transfer any profit under a charter arrangement until it has first earned an operating profit itself.  Thus, the Bareboat Charter cannot be relevant to the calculation of damages.

---

[220] Transcript, Day 10, at 2513:15-2514:1.

[221] Claimants' Post-Hearing Brief, ¶ 408.

[222] Claimants' Post-Hearing Brief, ¶ 379 (citing J-001 Agreement for the Provision of Drilling Services, Cl. 18.1.1).

D.    Offset (Profits, Fees and Costs)

1. Respondents' Position

493.   Respondents state that "any alleged amount owned [sic] to Vantage for work performed but unpaid must be offset by (a) disgorgement of Vantage's ill-gotten profits, and (b) any damages, fees, or costs awarded to Respondents."[223]

494.   The foregoing argument implicates also Respondents' argument that Respondents are entitled to attorneys' fees and costs for alleged breach of DSA Article 24.2, by commencing arbitration without first holding "direct negotiations in good faith."[224]

2. Claimants' Position

495.   Claimants contend that there can be no offset, because Respondents have not proven any recoverable damages.  Additionally, Claimants refer to new Article 24.2(E) of the DSA, as amended by the Third Novation, providing that, "[a]ll arbitration fees and costs shall be borne equally regardless of which Party prevails. Each Party shall bear its own costs of legal representation and witness expenses."[225]

496.   Claimants assert that they complied with Article 24.2 by making multiple attempts to engage in negotiations with Petrobras after Petrobras gave notice of default on 22 July 2015.

3. Tribunal Analysis

497.   Respondents have not met their burden to prove the asserted counterclaims. Consequently, the Tribunal must deny any damages or disgorgement of Vantage's profits, and/or Respondents' request for an offset against any damages awarded to Claimants.

498.   For the reasons set out in detail in the next section, the clear language of DSA Article 24.2(E) mandates that each side must bear its own fees and costs, with the arbitration costs being borne equally by Claimants and Respondents.

## VIII. Costs and Attorneys' Fees

### A. Overview

499.   The AAA Commercial Arbitration Rules provide for the Tribunal to assess arbitration costs in the final award, giving broad discretion to apportion among the

---

[223] Respondents' Review of Claims and Defenses Remaining for Decision, ¶¶ 27, 29.

[224] Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 29.

[225] Claimants' Post-Hearing Brief, ¶¶ 465-469 (citing J-010, § 8.1, adding new Article 24.2(E)).

Parties the ICDR/AAA's administrative fees along with the arbitrators' compensation and expenses, hereinafter called "Costs" unless otherwise noted.

500.    The Tribunal's discretion to award attorneys' fees is more circumscribed. Rules R-47(c) and (d)(ii) of the Commercial Arbitration Rules provide as follows:

> (c)  In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

> (d)  The award of the arbitrator(s) may include:

> [. . .]

> ii. an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

501.    The Tribunal has considered the Parties' positions regarding the interpretation of the DSA arbitration clause and its effect on the allocation of both arbitration costs and attorneys' fees, doing so in light of all relevant considerations, including Rule R-54 of the Commercial Arbitration Rules, which states that certain expenses shall be borne equally by the parties.

502.    Claimants assert that they paid US$ 766,578.63 in Costs as of 27 September 2017,[226] while Respondents assert that they paid US$ 695,128.63 as of 8 September 2017.[227]  Disregarding any changes in those Costs at a later moment, the total amount of Costs seems to be US$ 1,461,707.26.  In this connection, the affidavit from Attorney Karl Stern on 27 September 2017 referred to a total sum of US$ 1,461,705.26, or US$ 2.00 less than the amounts calculated by the Tribunal. Claimants thus paid approximately 52% of the Costs while Respondents paid 48%.[228]

503.    Regarding attorneys' fees, Respondents assert that they incurred legal fees for Thompson & Knight LLP's services in the arbitration in the amount of US$ 2,869,987.10, fixed in October 2017.[229]  Additionally, Respondents assert that they incurred other expenses of US$ 510,502.96, which included fees from other law

---

[226] Affidavit of Karl S. Stern in support of Claimants' Objections to Respondents' Attorneys' Fees Affidavit ("Stern Affidavit"), ¶ 2.

[227] Affidavit of William M. Katz, Jr. in Support of Respondents' Request for Legal Fees and Expenses, ¶ 16 ("Katz Affidavit")

[228] Stern Affidavit, ¶ 3.

[229] Katz Affidavit, ¶¶ 10-11 (This amount is said to include estimated fees, thus Respondents have not given a finalized amount).

firms.[230]  Respondents also noted US$ 695,128.63 paid in Costs to the ICDR.  See William Katz Affidavit of 8 September 2017.

504.    Claimants, in light of their position on recovery of costs and fees, did not disclose the attorneys' fees incurred in this arbitration.  Nor did Claimants request an award of fees or costs, except to the extent of a ruling by the Tribunal that "[e]ach party shall bear its own attorney's fees and costs, and shall bear in equal shares the Tribunal fees and costs and the costs of the ICDR."[231]

B.    Respondents' Position

505.    In essence, Respondents argue that Claimants must pay Respondents' Costs because Claimants breached Article 24.2 of the DSA, as amended by Clause 8.1 of the Third Novation, by commencing this arbitration without first holding "direct negotiations in good faith" to resolve the dispute.[232]

506.    Article 24.2 of the DSA provides in its introductory sentences that the parties must resolve any dispute by using direct negotiations and arbitration.  In pertinent part, that provision continues as follows:

> A Party who violates this Article 24.2 [which provides for negotiations and arbitration] shall pay all legal and consulting fees and costs incurred by the other Party in any suit, action, or proceeding to enforce Article 24.2.  [….] If the Dispute is not resolved by direct negotiations in good faith between the parties in dispute, then the Dispute shall be finally settled by binding arbitration and either Party may at any time initiate such arbitration by giving notice to the other Party.

507.    Respondents argue that Claimants must engage in "direct negotiations in good faith" with Respondents before initiating arbitration.[233]  They assert that when PAI sent Claimants a notice of termination of the DSA on 31 August 2015, Claimants initiated arbitration that same day, or perhaps the next day.[234]  Respondents assert that Claimants did not engage in direct negotiations in good faith before filing the arbitration.[235]  Therefore, argue Respondents, Claimants violated Article 24.2 and

---

[230] Katz Affidavit, ¶ 15.

[231] Claimants' Post-Hearing Brief, ¶ 471.

[232] Katz Affidavit, ¶¶ 4-5; Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 29; Respondents' Second Amended Answering Statement and Counterclaim, ¶¶ 169-170.  Respondents' Pre-Hearing Briefs and Post-Hearing Briefs did not expressly make this argument.

[233] Katz Affidavit, ¶ 5; Respondents' Review of Claims and Defenses Remaining for Decision, ¶ 29; Respondents' Second Amended Answering Statement and Counterclaim, ¶ 168.

[234] Katz Affidavit, ¶ 5.

[235] Respondents' Second Amended Answering Statement and Counterclaim, ¶ 170.

are accordingly liable for all legal and consulting fees and costs incurred by Respondents in this proceeding.[236]

C.   Claimants' Position

508.   Claimants propose a different interpretation of the Parties' Agreement.  They note Article 24.2(E) of the DSA, which, as amended by the Third Novation, provides as follows:

> All arbitration fees and costs shall be borne equally regardless of which Party prevails.  Each Party shall bear its own costs of legal representation and witness expenses.[237]

509.   Claimants conclude that this express wording of the arbitration clause precludes an award of attorneys' fees and costs.

510.   Claimants deny any violation of the so-called "enforcement exception" in the introductory sentences of DSA which says that a party violating that provision "shall pay all legal and consulting fees and costs incurred by the other Party in any suit, action, or proceeding to enforce Article 24.2."

511.   According to Claimants, there has been no lawsuit which would trigger the obligation to pay legal and consulting fees incurred "in any suit, action, or proceeding to enforce Article 24.2."[238]

512.   According to Claimants, the event required to occur in order to create an obligation never occurred, because Respondents did not institute an action to enforce Article 24.2.  Respondents never incurred any fees or costs in a lawsuit to enforce the duty to negotiation or arbitrate.[239]  Second, Claimants argue that they never breached the enforcement exception in Article 24.2, because they made multiple attempts to hold good faith negotiations after Petrobras issued a notice of default, and Claimants found those attempts to be futile.[240]

513.   As a separate argument, Claimants assert that Article 24.2 does not mention any time frame or process for the good faith negotiations to occur.  Accordingly, argue

---

[236] Katz Affidavit, ¶ 5; Respondents' Second Amended Answering Statement and Counterclaim, ¶ 170.

[237] Claimants' Objections to Respondents' Attorneys' Fees Affidavit, ¶ 2; Claimants' Post-Hearing Brief, ¶ 466; Claimants' Response to Respondents' Pre-Hearing Brief, ¶ 96 (all citing to J-010 §8.1 (adding new Clause 24.2(E) to the DSA)).

[238] Claimants' Objections to Respondents' Attorneys' Fees Affidavit, ¶ 3 (quoting Article 24.2(E)).

[239] Claimants' Objections to Respondents' Attorneys' Fees Affidavit, ¶ 4.

[240] Claimants' Objections to Respondents' Attorneys' Fees Affidavit, ¶ 5 (citing Anderson Stmt. 1 (J-863)).

Claimants, initiating the arbitration at the time when they did so was not a violation of Article 24.2.[241]

514.   Further, according to Claimants, even if Respondents may legitimately claim costs in this arbitration, which Claimants have denied, some of the legal fees for which Respondents seek reimbursement were not actually incurred in this proceeding but were instead incurred in other matters.

515.   Lastly, Claimants say that Respondents did not explain how their costs were reasonable or necessary.[242]

D.   Tribunal Analysis

516.   In determining whether to award costs and/or attorneys' fees, the Tribunal takes into consideration a number of factors, including the place of arbitration and *lex arbitri* (in this case, the United States and the FAA) and the applicable provisions of the relevant arbitration rules (in the present instance, the AAA Commercial Arbitration Rules).  The Tribunal also considers the Parties' agreement, submissions, and conduct.

1.   Attorneys' Fees

517.   With respect to attorneys' fees, the presumption that each side bears its own legal expenses has long been established within the United States.  No evidence suggests any different practice in Houston, the seat of proceedings.  As discussed below, neither side has provided any reason to overturn that presumption in this case.

518.   Rule R-47(d)(ii) of the Commercial Arbitration Rules authorizes the Tribunal to award attorneys' fees "if all parties have requested such an award or it is authorized by law or their arbitration agreement."  Applying this Rule to the facts at hand, only Respondents requested attorneys' fees.

519.   Respondents did not present any applicable law authorizing attorneys' fees.

520.   Finally, the Tribunal turns to the provisions of DSA Article 24.2 to consider whether the Parties' agreement justifies deviation from the above principles.

521.   DSA Article 24.2(E) clearly states that each party shall "bear its own costs of legal representation …."

522.   The DSA's so-called "enforcement exception" contained in the introductory part of Article 24.2 does not apply in the instant case.  That exception provides that a party violating that provision "shall pay all legal and consulting fees and costs incurred by the other Party in any suit, action, or proceeding to enforce Article 24.2."

---

[241] Claimants' Objections to Respondents' Attorneys' Fees Affidavit, ¶ 5.

[242] Claimants' Objections to Respondents' Attorneys' Fees Affidavit, ¶ 6.

523.  No evidence has been presented of any proceeding brought by Respondents to enforce Article 24.2 of the DSA which would have triggered the "enforcement exception" allowing recovery of costs.

2. Costs of the Arbitration

524.  Regarding the Costs of this arbitration, the Tribunal finds that Article 24.2(E) precludes any allocation other than an equal share among the parties. That provisions says that "[a]ll arbitration fees and costs shall be borne equally regardless of which Party prevails."

525.  In their Post-Hearing Brief of 17 July 2017, Claimants at paragraph 471 (page 177) have argued that each Party "shall bear in equal shares the Tribunal fees and costs and the costs of the ICDR."

526.  Rule R-54 of the AAA's Commercial Arbitration Rules lends further support to this position, stating that certain expenses of the arbitration "shall be borne equally by the parties."

IX.  Majority Comment on the Objection and Dissent

527.  The Majority have carefully considered the Objection to, and Dissent from, the Majority's Final Award, initially provided by Arbitrator Gaitis to his Tribunal colleagues and the AAA immediately following the Chairman's communication of proposed tentative conclusions on jurisdiction, liability and limitation of damages.

528.  Arbitrator Gaitis subsequently confirmed and supplemented that Objection and Dissent, indicating to his Tribunal colleagues, and to the ICDR/AAA, an intention not to sign the Award.

529.  The Chairman and Judge Brower each confirms that he has remained independent and impartial throughout the proceedings. The Chairman and Judge Brower each confirms that the pre-hearing, hearing, and post-hearing processes leading to the issuance of this Final Award have been conducted with full respect for all Parties' rights to fundamental fairness and due process protections meant to be provided to arbitrating parties by Chapters 1, 2 and 3 of the Federal Arbitration Act. Neither the Chairman nor Judge Brower has noted any evidence that these proceedings denied the Parties fundamental fairness and due process protections.

X.  Disposition

A.  Jurisdiction

530.  The Tribunal possesses jurisdiction over all named Parties in this arbitration: Claimant Vantage Deepwater Company, Claimant Vantage Deepwater Drilling, Inc., Respondent Petrobras America Inc., Respondent Petrobras Venezuela Investments & Services, BV, and Respondent Petróleo Brasileiro S.A. (also referred to as Petrobras Brazil). For the avoidance of doubt, the Tribunal confirms its jurisdiction

over Petroleo Brasileiro, which as primary obligor under the DSA and the Guaranty remains responsible for the breaches of that Contract.

B.   Claims

### 1.   Liability

531.   The Tribunal finds Respondents liable for US$ 615.62 million by reason of early termination of the DSA without justification or payment of the amount due for the rest of the Contract term.

532.   The Tribunal awards the US$ 6.4 million sought by Claimants for invoices related to the Chinook 6 well.

533.   The Tribunal considers dismissed without prejudice the tort claims withdrawn by Vantage on 15 May 2017.

### 2.   Quantum and Interest

534.   The amount due in damages for early termination will be US$ 615.62 million as of 1 April 2018, to bear interest compounded monthly at a rate of 15.2% and running from 1 April 2018 and through final payment of this Award.

535.   The award of US$ 6.4 million for invoices related to Chinook 6 will bear interest from 20 October 2015 on US$ 5.2 million, and from 19 November 2015 on US$ 1.2 million.  Such interest shall be calculated at 15.2% compounded monthly, running until final payment of the awarded sums.

C.   Counterclaims

536.   The Tribunal dismisses with prejudice all Petrobras's counterclaims.

D.   Costs and Attorneys' Fees

537.   Each side shall bear their own attorneys' fees and costs incurred in connection with this arbitration.

538.   The administrative fees and expenses of the International Centre for Dispute Resolution totaling US$99,608.82 shall be borne equally by the two sides, as shall the compensation and expenses of the arbitrators, totaling US$ 1,410,602.82. Respondents shall reimburse Claimants for the excess of what should have been paid, in an amount of US$ 32,800.02 upon demonstration by Claimants that these amounts have been paid.

539.   This Award is in full settlement of all claims and counterclaims submitted in this arbitration.

**SIGNATURES**
**ICDR Case No. 01-15-0004-8503**

For the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, we certify that this Final Award was made in Houston, Texas, USA.

_Charles N. Brower_
Charles N. Brower, Arbitrator

District of Columbia: SS

Subscribed and sworn to before me, in my presence, this 28th day of JUNE, 2018

_Ahdia P. Bavari_
Ahdia Pareen Bavari, Notary Public, D.C.
My commission expires June 14, 2022.

_____
James M. Gaitis, Arbitrator, Declining to Sign the Award, Filing an Objection and Dissent

_William W. Park_
William W. Park, Chairman (Presiding Arbitrator)
Date: 29 June 2018

I, William W Park, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_William W. Park_
William W. Park, Chairman (Presiding Arbitrator)
Date 29 June 2018

On this 29th day of June 2018, before me personally came and appeared William W. Park, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public
State of Massachusetts )
) SS:
County of Norfolk
USA

KAREN A. DWYER-WHITE
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 12, 2024

## ANNEXES: PARTIES' SUMMARIES OF CLAIMS

Annex A.  Claimants

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Prehearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| I. JURISDICTION | ¶¶10-15 | ¶¶71-76 | 28, 124, Annex 1 (corrected) | | —— | ¶¶190-199, 471 | ¶¶9-28 |
| A. The Tribunal has authority to decide its own jurisdiction | — | — | — | | | ¶190 | —— |
| B. The Tribunal has jurisdiction over VDEEP, VDDI, PVIS, and PAI under the DSA, as amended and novated under the Third Novation | ¶¶10-12 | ¶¶71-76 | 28, 124, Annex 1 (corrected) | | —— | ¶¶191-192, 471 | ¶¶10-22 |
| This dispute is falls within the scope of the arbitration provision in Clause 24.2 of the DSA, as amended by the Third Novation. | ¶14 | ¶71 | ¶¶28, 38, 42, 109, 124 | | | ¶191 | ¶¶12, 18-19, 26 |
| VDEEP, VDDI, PVIS and PAI are signatories to and defined parties in the Third Novation, and are therefore bound by the arbitration clause. | ¶¶10-13 | ¶¶71-76 | 28, 124, Annex 1 (corrected) | | —— | ¶¶191-192 | ¶¶11, 18, 28 |
| Respondents' contention that by the Third Novation, VDDI replaced VDEEP under the DSA is wrong because i) Section 3.7 of the Third Novation confirms that both PVIS and PAI remain liable to both VDDI and VDEEP; ii) Respondents' argument goes to merits and not to jurisdiction. | | | 28, 124, Annex 1 (corrected) | —— | —— | ¶193 | ¶¶18-22 |
| Respondents' contention that PVIS has no liability because PAI assumed PVIS's obligation is wrong because i) it does not negate jurisdiction over PVIS; ii) Section 3.7 of the Third Novation confirms PVIS remains jointly and severally liable; iii) PVIS has conceded jurisdiction by bringing counterclaims. | —— | —— | 28, 124, Annex 1 (corrected) | | —— | ¶193 | ¶¶11-17 |
| C. The Tribunal has jurisdiction over VDEEP, VDDI, and Petroleo Brasileiro under the Guaranty | ¶¶13, 15 | ¶¶71-76 | ¶¶28, 79-81, 124, Annex 1 (corrected) | | | ¶¶196-199, 471 | ¶¶22-28 |
| The broadly worded arbitration clause in the Guaranty (Clause 3.5) covers the dispute. | ¶13, 15 | ¶76 | ¶¶79-80, 124, Annex 1 (corrected) | | —— | ¶196 | ¶26 |
| VDEEP and Petroleo Brasileiro are bound to the Guaranty's arbitration clause because they are signatories to the Guaranty. | ¶15 | ¶74 | ¶¶28, 80, 124, Annex 1 (corrected) | | —— | ¶197 | ¶¶27-28 |
| The Tribunal has jurisdiction over VDDI because it is a successor and assign of VDEEP under the Third Novation, and Section 1.4(iv) of the Guaranty provides that the obligations of Petroleo Brasileiro inure to the benefit of VDEEP and its successors. | ¶10 | ¶¶71-76 | ¶¶28, 80, 124, Annex 1 (corrected) | | —— | ¶197 | ¶¶22, 25, 28 |

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Pre-Hearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| Respondents' argument that Petroleo Brasileiro is bound only by the original version of the DSA's arbitration clause fails because i) the Guaranty refers to the DSA and the DSA expressly provides that it may be amended from time to time; ii) there is no restriction in the Guaranty that provides the DSA's arbitration clause may not change; iii) in contrast the Guaranty does fix the governing law as England and Wales independently of the DSA's governing law. | —— | ¶¶116-117 | ¶¶28, 42, 79-80, 124, Annex 1 (corrected) | —— | —— | ¶198 | ¶¶23-27 |
| Respondents' argument that the Guaranty prohibits amending its provisions without the signature of all parties does not negate jurisdiction because i) the amendment of the arbitration clause was to the DSA not the Guaranty; ii) the Guaranty specifically provided that the DSA could be novated and amended; iii) Petroleo Brasileiro was the principal negotiator of all novations and amendments to the DSA. | —— | ¶¶116-117 | ¶¶28, 42, 79-80, 124, Annex 1 (corrected) | —— | —— | ¶199 | ¶¶23-27 |
| II. GOVERNING LAW | ¶¶14-18 | ¶¶116-117 | ¶¶42, 44, 66, 77, 81-82, 101-107, 118-119 | —— | —— | ¶¶198, 200-205, 471 | ¶29 |
| Because Claimants' claims arose during the Third Novation, the general maritime law of the U.S. governs pursuant to Clause 24.1 of the DSA, as amended by Section 8.1 of the Third Novation. | ¶¶14-17 | ¶¶11, 71 | ¶¶42, 44, 66, 77, 81-82, 101-107, 118-119 | —— | ¶30 | ¶¶200-205 | ¶29 |
| The law of England and Wales governs the question of whether the DSA is void or voidable and subject to ratification, waiver, and estoppel if it were obtained by bribery, because the law of England and Wales was the governing law at the time the DSA was entered in 2009 and when PVIS affirmed the DSA in 2013 and 2014 (through the execution of the Second Novation, Third Amendment, and Fourth Amendment) with sufficient knowledge of the alleged bribery. | ¶18 | —— | ¶¶81, 101-107 | —— | ¶¶30-32 | ¶¶203-205 | ¶29 |
| Claimants' cause of action against Petroleo Brasileiro for breach of the Guaranty is governed by the law of England and Wales under Section 3.4 of the Guaranty. | ¶18 | ¶¶75-76 | ¶81 | —— | —— | ¶198 | ¶29 |
| III. BREACH OF CONTRACT | ¶¶1-126, 133-134, 146-148 | —— | ¶¶65-76 | ¶¶1-37 | ¶¶69-72 | ¶¶359, 209-214, 471 | ¶¶30-99 |
| A. Respondents materially breached the DSA, as amended and novated by the Third Novation | ¶¶1-8,56-94, 133-134, 146-148 | —— | ¶¶44-78 | ¶¶1-37 | ¶¶69-73 | ¶¶210-219, 227-231, 244, 258, 262-263, 340, 345 | ¶¶30-31 |
| Respondents breached Clauses 4 and 15 of the DSA and Sections 3.7 and 10.5 of the Third Novation, which provide for an 8-yr term and required day rates to be paid for the entire term, by terminating the DSA only 2 years 9 months into the 8-yr term and refusing to pay the day rate for the remaining term. | ¶¶133-134, 146-148 | —— | ¶¶44-68 | ¶¶1-37 | ¶70 | ¶¶206-207, 210-211 | ¶102 |

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Pre-Hearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| Respondents breached Clause 9 of the DSA and Sections 3.7 and 10.5 of the Third Novation, which prohibits termination for convenience, by terminating the DSA only 2 years and 9 months into the 8-yr term for the purpose of cutting costs in Respondents' oil and gas exploration business after the deterioration of market conditions. | ¶¶133-134, 146-148 | —— | ¶¶44-68 | ¶1-37 | ¶70 | ¶¶211, 227 | ¶¶2, 102 |
| Respondents breached Clause 24.2 of the DSA as amended by Section 8.1 of the Third Novation by refusing to provide required notice and to negotiate in good faith. | ¶¶133-134, 146-148 | —— | ¶¶66-78 | ¶¶32-37 | ¶¶9-10, 70 | ¶¶211-214 | —— |
| Respondents breached Clause 9.3 of the DSA as amended by the Third Novation by unreasonably refusing to accept Claimants' implemented and proposed cures for the operational issues that Respondents used as their basis for terminating the DSA. | ¶¶133-134, 146-148 | —— | ¶65 | ¶¶32-37 | ¶48 | ¶¶218-219, 227-231, 244, 258, 262-263, 340, 345 | ¶¶1-2, 29-31, 90-95 |
| B. Respondents failed to satisfy their burden to establish that they properly exercised their termination rights under the DSA based on Claimants' performance under the contract | ¶56-94 | ¶¶48-70 | ¶¶14-26, 33-68 | ¶1-37 | ¶¶1-22 | ¶¶218-219 | ¶¶91-98 |
| Respondents had the burden to prove Claimants' material breach of performance requirements and that after proper notice Claimants had not implemented or proposed cures that Respondents acted reasonably in rejecting. Respondents failed to satisfy this burden. | ¶56-94 | ¶¶48-70 | ¶¶32, 47, 49, 65, 68, 71, 75, 78 | ¶¶32-37 | ¶¶7-22 | ¶7, 13-15, 114, 145-151, 172-175, 199, 207, 211, 214, 227-231, 239, 258, 262-263, 340 | ¶¶91-98 |
| Respondents failed to demonstrate that the operational incidents on which Respondents based the termination constituted material breaches of the DSA provisions, including Clauses 10.4.5, 13.2, 13.6.1, 13.7.2, and 27.1.5. Rather, the evidence demonstrated that: (i) the fluid loss events were the result of Respondents' inadequate cementation job, which Respondents did not disclose to Claimants, coupled with Respondents' deviations from approved plans of action and ordering multiple operations that made fluid losses inevitable and difficult to detect; (ii) Claimants had an outstanding record of detecting fluid losses; (iii) the fluid loss events were not well control events; (iv) neither Respondents nor the regulators at BSEE viewed the fluid loss events as serious at the time; (v) the gas sensor INC was an isolated incident that was not viewed by BSEE as serious and did not indicate any systemic problems; and (v) Claimants implemented and proposed cures that would have been acceptable to Respondents had they been acting reasonably. | ¶56-94 | ¶¶48-70 | ¶¶3, 43, 49-64, 69-71, 78 | ¶1-37 | ¶¶1-3, 7-22 | ¶¶6, 8-13, 99, 105-106, 118-120, 212, 218-219, 233, 241-258 | —— |

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Pre-Hearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| Respondents have not established a right to terminate the DSA under Clause 9.1.3 based on a repeated failure by Claimants to perform in accordance with Good Oil and Gas Field Practices. Rather, the evidence established that: (i) by every objective metric, Claimants' performance was excellent; (ii) as Claimants' experts testified, Respondents could not reasonably expect to locate and engage a safer contractor; (iii) for the reasons indicated above with respect to Articles 10.4.5, 13.2, 13.6.1, 13.7.2, and 27.1.5, the events at issue were not material; (iv) the incidents at issue did not reflect systemic issues; and (v) Claimants implemented and proposed cures that would have been acceptable to Respondents had they been acting reasonably. | ¶¶56-94 | ¶¶48-70 | ¶¶3, 31-32, 67-71 | ¶¶25-35 | ¶¶1-3, 7-22 | ¶¶12, 220-226, 227 231, 232-239 | ¶¶91-98 |
| Incidents during the Chinook 5 campaign are irrelevant because the evidence established that Respondents were satisfied with Claimants' performance on that campaign and the incidents were not used as a basis for the termination of the DSA. | ____ | ¶¶53-55 | ¶¶43, 47 | ¶12-19 | ¶1-2, 4 | ¶¶259-260 | ___ |
| The sheared sub saver on the Chinook 6 campaign is irrelevant because it was caused by a manufacturing defect and not subpar performance by Claimants, and the incident was not the subject of any notice of default. | ____ | ¶¶116-117 | ¶¶43, 47, 66 | ¶12-19 | ¶9-11 | ¶¶261-262 | ___ |
| Near-miss incidents in the Chinook 6 campaign are irrelevant to termination because none of the incidents was the subject of a notice of default, they were all cured to Respondents' apparent satisfaction, and Respondents appeared to have abandoned them at the merits hearing and in their post-hearing briefing. | ____ | ¶¶116-117 | ¶¶43, 47, 66 | ¶12-19 | ¶9-11 | ¶263 | ___ |
| C. Respondents failed to satisfy their burden of proof with respect to their common law defenses based on alleged bribery and corruption | ¶¶19-43, 95-128 | ¶¶9-39 | ¶¶4-5, 72-74, 82-96 | ¶¶38-73 | ¶23-68 | ¶¶264-315 | ¶¶3, 6, 32-90 |
| Respondents had the burden to prove, with clear and convincing evidence, the following elements to establish their common law bribery defense: (i) that payments were made to Petrobras officials; (ii) with Claimants' knowledge; (iii) unbeknownst to Respondents; and (iv) for the purpose of inducing, and in fact inducing, the DSA. | ____ | ¶¶9-39 | ¶¶4-5, 82 | ¶¶38-66 | ¶¶33-64 | ¶264 | ¶¶51-57 |
| Respondents failed to show that illicit payments were made. | ____ | ¶¶18-31 | ¶¶83-85 | ¶¶61-65 | ¶¶58-64 | ¶¶265-273 | ¶¶53, 64-68 |
| Respondents' evidence did not establish that Claimants knew of any illicit payments. | ____ | ¶¶21-31 | ¶¶83, 86-90 | ¶¶51-54 | ¶¶43-57 | ¶¶274-287 | ¶¶54-55, 64-68 |
| Respondents failed to established Claimants' knowledge through the imputation of Mr. Padilha's or Mr. Su's knowledge. | ____ | ¶¶21-31 | ¶¶72-74, 83-84, 86-90 | ¶¶51-54 | ¶¶54-57 | ¶¶288-292 | ¶55 |
| Respondents failed to show that they were unaware of any payments. | ____ | ¶¶32-35 | ¶¶91-95 | ¶¶55-60 | ¶¶36-37 | ¶¶293-300 | ¶¶3, 37-38, 53 |
| Respondents failed to establish that any illicit payments induced the DSA, much less on terms to which Respondents would not have otherwise agreed. | ____ | ¶¶36-39 | ¶96 | ¶¶38-66 | ¶¶38-42 | ¶¶301-315 | ¶¶6, 45, 51-52, 65-69 |
| D. Respondents failed to satisfy their burden of proof with respect to their contractual defenses based on alleged bribery and corruption | ¶¶35-126 | ¶¶45-47 | ¶¶7-27, 72-75 | ¶¶33-64 | ____ | ¶¶340-356 | ¶¶3, 6, 32-90 |

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Pre-Hearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| Respondents have not established a breach of Clauses 10.14.1, 10.14.2, or 10.14.3, because there is no evidence that Claimants themselves ever made any payments, violated the FCPA, received any request to violate the FCPA, or had knowledge of the alleged bribery scheme before press reports to which Respondents had equal access. | ¶¶19-43, 95-128 | ¶¶45-47 | ¶¶7-27, 72-75 | ¶¶85-87 | —— | ¶¶341-350 | ¶¶53-55, 64-68 |
| Respondents have not established a breach of Clauses 10.20.1, 10.20.2, or 10.20.3, because there is no evidence that Claimants themselves were ever approached by an Illegal Information Broker or that Hamilton Padilha ever acted as an Illegal Information Broker in his dealings with Claimants. | —— | ¶¶45-47 | ¶¶72-75 | ¶¶85-87 | —— | ¶¶351-353 | ¶55 |
| Respondents have not established a breach of Clauses 10.20.4 or 10.15, because the evidence does not show that Claimants failed to comply with laws related to corruption in performing their obligations under the DSA. | —— | ¶¶45-47 | ¶¶7-27, 72-75 | ¶¶85-87 | —— | ¶356 | ¶¶51-57 |
| Respondents have not established a breach of Clause 10.21, because the evidence does not establish a failure by Claimants to exercise reasonable care and diligence to avoid conflicts of interest. | —— | ¶¶45-47 | ¶¶72-75 | ¶90 | —— | ¶354 | —— |
| E. Respondents' bribery defense fails because Respondents knowingly ratified the DSA, waived any right they would have had to avoid, and are estopped from avoiding the DSA on the basis of bribery by repeatedly affirming the valid and binding nature of the DSA and insisting on Claimants' continued performance under the DSA after Respondents had sufficient knowledge of the alleged bribery on which they have based their defense. | ¶¶119-126 | ¶¶16-47, 105-107, 116-117 | ¶¶76, 101-110 | ¶¶67-73 | ¶¶4, 23-29, 36-37 | ¶¶316-338; 357-358 | ¶¶3, 31, 33-37, 40-44, 53 |
| Under applicable law, if the DSA had been procured through bribery, the DSA would be, at most, voidable, not void. Because the first event constituting ratification, waiver and estoppel occurred with the execution of the Second Novation, which is governed by English law, the void vs. voidable issue is governed by English law; however, even if the federal maritime law governing the Third Novation were to apply, the result would be the same--the DSA is at most voidable, not void. | —— | ¶16 | ¶¶101-107 | ¶¶74-81 | ¶¶30-32 | ¶¶318-330 | ¶¶41-44 |
| Respondents ratified, waived, and are estopped from asserting their bribery defenses because, with sufficient knowledge after the publication of the Epoca article and their subsequent audit of the allegations in the article: (i) they failed to act promptly and instead chose to maintain the DSA and continue to accept the benefits of the DSA; (ii) repeatedly affirmed the valid and binding nature of the DSA in novations and amendments; (iii) insisted on Claimants' continued performance for nearly two years; and (iv) prejudiced Claimants by waiting to pursue termination until market conditions deteriorated and Claimants lost any opportunity to profitably redeploy the rig. | ¶¶119-126 | ¶¶40-47 | ¶¶108-110 | ¶¶67-69 | ¶¶36-37 | ¶¶331-338 | ¶¶33-37, 53 |
| Ratification, waiver and estoppel defeat Respondents' contractual defenses based on alleged bribery despite the anti-waiver clause in the DSA because such clauses themselves can be waived, which Respondents have done here by their repeated affirmations of the DSA and insistence on performance. | —— | ¶¶40-47 | ¶76 | ¶¶80-81 | ¶25 | ¶358 | ¶¶3, 31, 40 |

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Pre-Hearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| F. Respondents' bribery defense also fails because the Second Amendment and First Novation formed a new agreement, untainted by bribery, for additional consideration. | —— | ¶¶116-117 | ¶¶38, 122 | ¶59 | ¶32 | ¶339 | ¶52 |
| IV. BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING | ¶¶1-126, 135-136, 146-148 | —— | ¶¶45-65, 77-78 | ¶¶4-19 | ¶71 | ¶¶13-15, 145-151, 172-175, 202, 212-214, 219, 227-231, 239, 471 | ¶¶2, 91-98 |
| Claimants' cause of action for the breach of the duty of good faith and fair dealing is recognized under maritime law and federal common law generally, and is viable regardless of whether Texas law implies such a duty. | ¶¶135-136 | | ¶77 | | —— | ¶202 | —— |
| Respondents breached the duty by terminating the DSA on pretextual grounds. | ¶¶1-95, 135-136, 146-148 | —— | ¶¶45-48, 78 | ¶¶1-2, 12-19, 20-37 | ¶¶12-22 | ¶¶212-214 | ¶¶2, 91-98 |
| Respondents breached the duty by making fluid losses inevitable and difficult to detect, and thereby set up the incidents on which they purported to based the termination of the DSA. | ¶¶1-95, 135-136, 146-148 | —— | ¶¶49-65 | ¶¶1-2, 23-24 | ¶¶3, 14-21 | ¶¶131-132, 214 | ¶¶91-95 |
| Respondents breached the duty by unreasonably rejecting Claimants' proposed cures. | ¶¶1-95, 135-136, 146-148 | —— | ¶¶77-78 | ¶¶1-2, 32-37 | ¶11 | ¶¶13-15, 145-151, 172-175, 214, 219, 227-231, 239 | ¶¶92-95 |
| V. PETROLEO BRASILEIRO BREACHED THE GUARANTY | ¶¶1-8, 132, 146-148 | —— | ¶¶79-81 | —— | —— | ¶¶215-217, 471 | ¶¶1-8 |
| Petroleo Brasileiro is a primary obligor under the DSA and is responsible for the breaches of the DSA. | ¶¶132, 146-148 | —— | ¶80 | —— | —— | ¶¶215-217 | ¶¶23-28 |
| VI. CLAIMANTS' DAMAGES | ¶¶133-148 | ¶¶116-117 | ¶¶77-78, 115-118, 124 | ¶99 | ¶¶80-88 | ¶¶316-338, 362-433, 471 | ¶¶99-112 |
| A. Claimants are entitled to an award of benefit-of-the-bargain damages of $560.2 million (plus pre- and post-award interest) | ¶¶133-136, 146-148 | ¶¶116-117 | ¶¶77-78, 115-118, 124 | ¶99 | ¶¶80-81 | ¶¶316-338, 362-427, 471 | ¶¶99-112 |
| Dr. Jacobs reasonably estimated Claimants' benefit-of-the-bargain damages by projecting their profits for the remainder of the DSA term based on actual past profits and discounting using Claimants' actual WACC and corroborating his calculation with sensitivity analyses. | —— | —— | ¶¶115-118, 124 | | ¶¶80-81 | ¶¶362-367 | —— |
| Respondents improperly calculated profits during the proxy period used to project future profits for damages purposes. | —— | —— | ¶¶115-118, 124 | | | ¶369 | —— |

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Pre-Hearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| Respondents' argument that profit projections should assume that Respondents would have negotiated lower rates is unreasonable because Respondents did not in fact attempt to renegotiate rates when the market declined and instead terminated the contract. | | | ¶¶115-118, 124 | _____ | _____ | ¶370 | — |
| Respondents' argument that Claimants' bankruptcy should reduce Claimants' real world costs used in benefit of the bargain calculations should be rejected because i) the reduced debt is a consequence of the economic impact of Respondents' breach and is not a cost associated with the performance of the contract; ii) restructuring transferred losses within Claimants' capital structure and are not costs in the benefit-of-the-bargain analysis. | | | ¶¶115-118, 124 | _____ | _____ | ¶371 | ¶¶109-110 |
| Respondents' argument that Claimants should have mitigated losses by re-leasing the Titanium Explorer is contradicted by the economic evidence that there is massive market overcapacity for years to come and testimony that Claimants did take reasonable steps to try to re-lease the drill ship but to no avail. | | | ¶¶115-118, 124 | — | _____ | ¶374 | — |
| Respondents' argument that Claimants improperly included stacking costs in their real world calculations is contradicted by Claimants' contemporaneous business records that included stacking costs as operating costs and, in any event, Claimants' model understates damages because it assumed the drill ship would have continued to operate under a cost structure much higher than the stacking costs of an idle rig. | | | ¶¶115-118, 124 | _____ | _____ | ¶375 | ¶¶105-106 |
| Respondents argument that Claimants' damages should be reduced by the profits Claimants transferred through a bareboat charter should be rejected because: i) profit transfers are not costs that should be considered in benefit of the bargain damages; ii) purely intercompany arrangements within a consolidated entity for tax compliance purposes are not economic costs for calculating damages; iii) the charter arrangement was contemplated in the DSA, which required Claimants to minimize taxes and benefit Respondents by correspondingly lowering the rate they paid; iv) imputing a cost to Claimants for the use of the Titanium Explorer is inappropriate because it would be a cost in both the actual and but for worlds; v) payments by Claimants under the bareboat charter occur only if Claimants earn a profit, therefore damages are calculated based on their loss of profits before they are required to make any payments under the charter; vi) Respondents' argument would deprive virtually every company in the offshore drilling industry of meaningful damages for breach because transferring profits to affiliates a widely used tax management tool. | | | ¶¶115-118, 124 | _____ | _____ | ¶¶376-412 | ¶108 |

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Pre-Hearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| Alternatively and with respect to arguments Respondents raised for the first time at the hearing, should the Tribunal determine that the charter tax mechanism should be considered in calculating damages, Claimants are entitled to direct benefit-of-the-bargain damages of $749.3 million, plus pre- and post- award interest, because Respondents would have been paying higher day-rates as a result of Claimants' increased tax liability. | | | | | | ¶¶403, 471 | |
| B. Clause 19.9 of the DSA does not bar recovery of Claimants' direct, benefit-of-the-bargain damages | ____ | ____ | ¶¶116-118, 124 | ____ | ¶¶86-88 | ¶¶413-427 | ¶¶99-102 |
| The clear and unambiguous language of Clause 19.9 excludes consequential damages but does not exclude direct damages, such as the direct damages sought by Claimants in this arbitration. | ____ | ____ | ¶¶116-118, 124 | ____ | ¶¶86-88 | ¶¶413-418 | ¶¶99-102 |
| The *Quicksilver* case does not support a different construction of Clause 19.9's clear and unambiguous language because: i) it is not binding authority; ii) it applies Oklahoma law that does not apply here; iii) it does not address whether lost profits are characterized as direct or consequential damages; iv) the contact language in *Quicksilver* appears no where in Clause 19.9; and v) the court's reasoning has been rejected by numerous courts that have considered it. | ____ | ____ | ____ | ____ | ____ | ¶¶419-424 | |
| Allocation of risk under the DSA does not support a different construction of Clause 19.9. Claimants assumed substantial risk under the DSA, such as loss or damage to the $800 million drillship, and correspondingly are entitled to direct lost profits damages where Respondents breached the DSA. | ____ | ____ | ¶117, 124 | ____ | ____ | ¶¶425-427 | ¶¶7, 101-102 |
| C. Claimants are entitled to $6.4 million (plus pre- and post-award interest) for unpaid invoices for work performed | ¶¶146-148 | ¶¶116-117 | p. 2; Bozeman Stmt. (J-____)¶118; CE-355 at 1755-58 | ¶99 | ¶72 | ¶¶428-429 | ____ |
| Claimants have established with documentary and testimonial evidence that Respondents failed to pay $6.4 million in invoices for work performed before Respondents wrongfully terminated the DSA on August 31, 2015. | ¶¶146-148 | ¶¶116-117 | p. 2; Bozeman Stmt. (J-____)¶118; CE-355 at 1755-58 | ____ | ¶72 | ¶¶428-429 | ____ |
| D. Claimants are entitled to pre- and post- award interest based on Claimants' weighted average cost of capital (WACC) | ¶¶146-148 | ¶¶116-117 | ¶¶123-124 | ¶99 | ____ | ¶¶430-433 | ____ |
| Claimants are entitled to interest at their WACC of 15.2% because it reflects the time value of money to the corporation. In addition, Respondents' expert Dr. Mannes testified that WACC represents the interest on profits lost from not operating. | ¶¶146-148 | ¶¶116-117 | ¶¶123-124 | | ____ | ¶¶430-433 | ____ |
| VII. RESPONDENTS HAVE FAILED TO ESTABLISH ANY RIGHT TO RECOVER ON THEIR COUNTERCLAIMS | ____ | ¶¶77-104, 116-117 | ¶¶66-68, 14-26, 33-65, 114 | ¶¶82-98 | ____ | ¶¶434-469 | ¶111 |

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Pre-Hearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| The DSA is not unconscionable because it is not grossly one-sided or unenforceable on policy grounds. | | ¶¶116-117 | ¶114 | ¶¶82-83 | ____ | ¶¶435-437 | ___ |
| Respondents failed to prove that Claimants knowingly assisted and substantially participated in a breach of fiduciary duty. | | ¶¶78-79 | ¶114 | ¶84 | | ¶¶438-441 | ___ |
| Respondents failed to prove common-law fraud or fraudulent inducement because the evidence does not establish a misrepresentation or reasonable reliance by Respondents. | | ¶¶80-81 | ¶114 | ¶¶85-87 | ____ | ¶¶442-443 | ___ |
| Respondents failed to prove its RICO claim because the evidence does not establish conduct of an enterprise through a pattern of racketeering activity nor any resulting injury to Respondents. | | ¶¶88-89 | ¶114 | ¶¶88-89 | ¶65-66 | ¶446 | |
| Respndents failed to prove negligent misrepresentation for the same reasons Respondents have failed to establish a fraud claim. | | ¶¶82-83 | ¶114 | ¶91 | — | ¶¶450-451 | |
| Respondents failed to prove a conspiracy because the evidence does not establish Claimants' knowing participation in any of the activity on which Respondents base the claim and because or that Claimants participated in any unlawful, overt acts. | | ¶¶90-91 | ¶114 | ¶89 | ¶65-66 | ¶453 | ___ |
| Respondents failed to prove a breach of contract for the same reasons Respondents have failed to establish that a material breach of the DSA supported their termination of the contract. | | ¶¶84-87 | ¶114 | ¶¶1-37 | ¶¶7-22 | ¶454 | ___ |
| Respondents failed to prove unjust enrichment or money had and received because the claim is not recognized as a stand-alone claim and because Claimants have suffered substantial losses and have not been enriched through the DSA because of its premature and improper termination. | | ¶¶92-93 | ¶114 | ¶92 | ¶65-66 | ¶455 | ___ |
| Respondents failed to prove any right to rescission for the same reasons its contractual defenses fail. | | ¶¶99-100 | ¶114 | ¶93 | ¶79 | ¶456 | |
| Respondents failed to prove any right to a constructive trust because Respondents have not established any fraud or breach of special trust or fiduciary relationship by Claimants. | | ¶¶94-95 | ¶114 | ¶94 | ¶65-66 | ¶457 | |
| Respondents failed to prove damages because the evidence actually established that the DSA was at market and, according to Respondents' own audit findings, did not cause Respondents any injury. Moreover, contrary to Respondents' suggestion, there is no evidence that the alleged payment of bribes had any impact on the commercial terms of the DSA. Finally, to the extent Respondents seek disgorgement, the evidence shows that Claimants have not been enriched through the DSA because of its premature and improper termination. | | ¶¶1-47, 38, 96-98, 115-117 | ¶114 | ¶98 | ____ | ¶¶458-463 | ¶111 |
| Respondents have failed to prove any entitlement to exemplary damages and in fact, the DSA bars recovery of such damages. | | ¶¶96-98 | ¶114 | ¶95 | | ¶464 | ___ |
| Respondents have failed to prove any right to an offset because it has not established any recoverable damages. | | ¶¶116-117 | ¶114 | ¶97 | ____ | ¶465 | ___ |

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Pre-Hearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| Respondents have failed to establish any right to recover fees or costs because the DSA expressly provides that each party shall bear its own fees and costs. | ‒‒‒‒ | ¶¶102-104 | ¶114 | ¶96 | ‒‒‒‒ | ¶457 | ‒‒‒ |
| VIII. DECLARATORY RELIEF | ¶¶1-132, 146-148 | ‒‒‒‒ | ¶¶2-6, 36-76, 79-110, 113, 124 | ‒‒‒ | ¶69-72 | ¶¶82-84, 145-151, 172-175, 209-217, 264, 316-361, 471 | ¶¶23-27, 30, 32-98, 112 |
| The DSA is valid and enforceable. | ¶¶127-128 | ‒‒‒‒ | ¶¶2, 4, 124 | ¶¶38-65, 74-83 | ¶69 | ¶¶145-151, 172-175, 209-217, 264, 359-361 | ¶30 |
| Respondents are estopped from denying enforceability of DSA, novations, and amendments. | ¶129 | ‒‒‒‒ | ¶¶2, 5, 36-42, 91-95, 108-110, 113 | ¶¶67-73, 84 | ¶¶4, 2, 14-15, 23-29, 36-37 | ¶¶82-84, 316-358 | ¶¶32-44 |
| PVIS and PAI breached Clauses 9.2, 4.1, and 15 of the DSA and Sections 2.7 and 10.5 of the Thrid Novation. | ¶130-131 | ‒‒‒‒ | ¶¶2-4, 6, 43-76, 82-110 | ¶¶1-35 | ¶¶7, 8, 12-22 | ¶¶145-151, 172-175, 209-211, 264, 359, 471 | ¶¶45-98 |
| PVIS and PAI breached the duty of good faith and fair dealing.. | | | | | | ¶¶145-151, 172-175, 212-214, 264, 360, 471 | |
| Petroleo Brasileiro is a proper party to the arbitration and liable under the Guaranty | ¶132 | ‒‒‒‒ | ¶¶79-81 | ‒‒‒ | ‒‒‒ | ¶¶196-199, 215-217, 361, 471 | ¶¶23-27 |
| IX. CLAIMANTS' AFFIRMATIVE DEFENSES TO RESPONDENTS' COUNTERCLAIMS | ¶¶119-126, 137-138, 146-148 | ¶¶105-117 | ¶¶36-42, 67, 72-76, 90-96, 103-110, 114-115, Annex 1 (corrected) | ¶¶79-81 | ‒‒‒ | ¶¶76, 108-110, 136 137, 168-172, 175-176, 307-338 | ¶¶29-39 |
| Waiver - Respondents, with knowledge of the alleged corruption, for years affirmatively chose to perform under, and demanded Claimants' performance under, the DSA. | ¶119-126 | ¶106 | ¶¶67, 72-76, 108 -110, 114-115 | ¶¶79-81 | ¶¶23-29 | ¶¶76, 108-110, 136 137, 168-172, 175-176, 293-338, 443-454, 458-69 | ¶¶29-39 |
| Ratification - In each novation and amendment, Respondents, with knowledge of the alleged corruption, reaffirmed to Claimants that the DSA was a legal, valid, and enforceable contract. Through words and conduct, Respondents ratified any defects in the formation of the DSA. | ¶119-126 | ¶107 | ¶¶103-110, 114-115 | ¶¶79-81 | ¶¶23-29 | ¶¶168-172, 175-176, 316-338 | ¶¶29-39 |

| Issue for Decision | Third Amended Demand for Arbitration 12.02.16 | Response to Second Amended Answering Statement and Counterclaim 12.16.16 | Pre-Hearing Brief 02.17.17 | Pre-Hearing Response Brief 03.17.17 | Pre-Hearing Reply Brief 04.14.17 | Post-Hearing Brief 07.17.17 | Post-Hearing Response Brief 08.18.17 |
|---|---|---|---|---|---|---|---|
| Estoppel - Through words and conduct, Respondents failed to promptly exercise any right they now claim they had to avoid the contract and repeatedly affirmed that the DSA was valid and binding and insistent on Claimants' continued performance. Claimants reasonably relied on Respondents affirmations of the DSA to their detriment by performing under the DSA and refraining from pursuing other opportunities when the market was booming. | ¶¶119-126 | ¶109 | 108-110, ¶¶114-115 | ¶¶79-81 | ⎯⎯ | ¶¶168-169, 171, 175-176, 307-338 | ¶¶29-39 |
| Novation - Respondents, with knowledge of the alleged corruption, subsequently entered into multiple novations of the DSA and each of the novations was a new contract, untainted by any defects in the formation of the DSA. | ¶¶119-126 | ¶108 | ¶¶114-115 | ⎯⎯ | ⎯⎯ | ¶¶443-454 | ¶¶29-39 |
| Acquiescence - For years, notwithstanding knowledge of the alleged corruption, Respondents made implicit and explicit representations that the DSA and subsequent novations and amendments were legal, valid, and enforceable contracts. | ¶¶119-126 | ¶113 | ¶¶90-96, 114-115 | ⎯⎯ | ⎯⎯ | ¶¶320, 327-329 | ⎯⎯ |
| Unclean Hands - Respondents condoned, if not outright directed, corruption within their organization and were aware of the alleged illicit payments for years before asserting the equitable relief they now seek. Respondents' conduct has been unconscientious, unjust, marked by a lack of good faith, and has violated principles of equity and fair dealing. | ¶¶119-126 | ¶114 | ¶¶114-115 | ⎯⎯ | ⎯⎯ | ¶¶293-317 | ⎯⎯ |

Annex B.  Respondents

On 8 December 2017,  Respondents submitted the following Summary of claims and defenses, along with a PDF of "Awarding Language" which has not been included below.

## I. INTRODUCTION

1.     In accordance with the Tribunal's November 28, 2017 request, Respondents submit the following summary of its claims and defenses that remain for decision in this matter, as well as the supporting argument, evidence, and authorities from Respondents' pre- and post-hearing briefing.  Respondents expressly incorporate herein by reference their pre- and post-hearing briefing and are not waiving any claim or defense stated therein.  Respondents also note that their Prehearing Brief fully incorporates Respondents' Dispositive Motion. *See* J-850, R's Prehearing Br. ¶ 2.

2.     Respondents welcome the opportunity to answer any questions or provide any additional briefing that the Tribunal might find helpful to its deliberations.

## II. RESPONDENTS' CLAIMS AND DEFENSES

### A. Claims and Defenses Arising from Vantage's Bribery and Corruption

3.     PAI and PVIS have alleged and proven a variety of counterclaims and defenses arising from Vantage's bribery and corruption in securing the Contract.[243]  As explained in Appendix A to Respondents' Prehearing Brief, attached hereto, these claims operate as both affirmative claims and defenses, entitling Respondents to over $100 million in damages or, alternatively, to a complete dismissal of Vantage's claims in this Arbitration. *See* R's Posthearing Br. ¶¶ 292–94; R's Posthearing Resp. Br. ¶¶ 202–04.

4.     **Assisting and Participating in a Breach of Fiduciary Duty**.  Through its various officers, directors, and agents—including Nobu Su, Paul Bragg, Hamylton Padilha, and John O'Leary—Vantage knowingly or with conscious avoidance assisted, aided, or facilitated breaches of fiduciary duty by Jorge Zelada and Eduardo Musa by bribing them to allow Vantage to obtain the Contract and continue it through the Third Novation.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. ¶¶ 33–36; App'x A ¶ 2. | • J-847, R's Dispositive Mot. ¶¶ 4–71.<br>• J-850, R's Prehearing Br. ¶¶ 2–32; 33–36.<br>• J-852, R's Prehearing Resp. Br. ¶¶ 3–28; 46–63.<br>• J-854, R's Prehearing Reply Br. ¶¶ 1–60. | • R's Posthearing Br. ¶¶ 22–189; App'x A & B.<br>• R's Posthearing Resp. Br. ¶¶ 46–87; 101–11; 188–89. |

5.     **Common-Law Fraud and Fraudulent Inducement**.  Through various material misrepresentations regarding its bribery and corruption. Vantage fraudulently induced Respondents to execute the Contract and continue it through the Third Novation.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. ¶¶ 37–46; App'x A ¶ 3. | • J-847, R's Dispositive Mot. ¶¶ 4–71. | • R's Posthearing Br. ¶¶ 22–189; App'x A & B. |

---

[243]     Capitalized terms used but not defined herein shall have the meaning given to them in Respondents' Second Amended Answering Statement and Counterclaim.

| | • J-850, R's Prehearing Br. ¶¶ 2–32; 37–50.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 3–28; 46–63.<br><br>• J-854, R's Prehearing Reply Br. ¶¶ 1–60. | • R's Posthearing Resp. Br. ¶¶ 46–95; 101–11; 190–93. |

6.      **Negligent Misrepresentation**. Vantage made various false and material representations regarding the bribery and corruption used to obtain the Contract.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
| --- | --- | --- |
| • J-850, R's Prehearing Br. ¶¶ 65–66; App'x A ¶ 4. | • J-847, R's Dispositive Mot. ¶¶ 4–71.<br><br>• J-850, R's Prehearing Br. ¶¶ 2–32; 65–66.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 3–28; 46–63.<br><br>• J-854, R's Prehearing Reply Br. ¶¶ 1–60. | • R's Posthearing Br. ¶¶ 22–189; App'x A & B.<br><br>• R's Posthearing Resp. Br. ¶¶ 46–95; 101–11; 197. |

7.      **Violations of Civil RICO, 18 U.S.C. § 1962(c)**.  Through their multiple acts of bribery, Vantage and its officers, directors, shareholders, vice-principals, and agents violated the civil RICO statute.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
| --- | --- | --- |
| • J-850, R's Prehearing Br. ¶¶ 59–60; App'x A ¶ 5. | • J-847, R's Dispositive Mot. ¶¶ 4–71.<br><br>• J-850, R's Prehearing Br. ¶¶ 2–32; 59–60.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 3–28; 46–63.<br><br>• J-854, R's Prehearing Reply Br. ¶¶ 1–60. | • R's Posthearing Br. ¶¶ 22–189; App'x A & B.<br><br>• R's Posthearing Resp. Br. ¶¶ 46–95; 101–11; 195. |

8.      **Conspiracy**.  Vantage and its officers, directors, shareholders, vice-principals, and agents conspired to obtain the Contract through bribery and corruption.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
| --- | --- | --- |
| • J-850, R's Prehearing Br. ¶¶ 61–62; App'x A ¶ 6. | • J-847, R's Dispositive Mot. ¶¶ 4–71.<br><br>• J-850, R's Prehearing Br. ¶¶ 2–32; 61–62.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 3–28; 46–63.<br><br>• J-854, R's Prehearing Reply Br. ¶¶ 1–60. | • R's Posthearing Br. ¶¶ 22–189; App'x A & B.<br><br>• R's Posthearing Resp. Br. ¶¶ 46–95; 101–11; 196. |

9.      **Breach of Contract Arising from Vantage's Bribery and Corruption**.  Vantage's claims are barred and/or Vantage is liable to Respondents based on Vantage's multiple material breaches and prior material breaches of the Contract, including failure to satisfy its obligations under Articles 10.1.1, 10.14.1–4, 10.15, 10.20.1–4, 10.21, and 10.23 of the Contract.  Among other things, these material breaches entitled PAI to terminate the Contract under Articles 9.1.1.3 and 9.1.3.2.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • R-850, R's Prehearing Br. ¶¶ 39–42; 63–64; App'x A ¶¶ 7; 14; 29. | • J-847, R's Dispositive Mot. ¶¶ 4–71.<br><br>• J-850, R's Prehearing Br. ¶¶ 2–32; 39–42; 63–64; 116.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 3–28; 46–63.<br><br>• J-854, R's Prehearing Reply Br. ¶¶ 1–60. | • R's Posthearing Br. ¶¶ 22–189; 196–208; App'x A & B.<br><br>• R's Posthearing Resp. Br. ¶¶ 46–95; 101–11; 190–93. |

10.     **Unjust Enrichment/Money Had and Received**.  Alternatively, if Vantage's conduct was not fraudulent (which it was), Vantage's conduct led to its unjust enrichment and it would be fundamentally unfair to allow it to retain benefits improperly obtained through its fraud and corruption.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • R-850, R's Prehearing Br. ¶¶ 67–69; App'x A ¶ 8. | • J-847, R's Dispositive Mot. ¶¶ 4–71.<br><br>• J-850, R's Prehearing Br. ¶¶ 2–32; 67–69.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 3–28; 46–63.<br><br>• J-854, R's Prehearing Reply Br. ¶¶ 1–60. | • R's Posthearing Br. ¶¶ 22–189; App'x A & B.<br><br>• R's Posthearing Resp. Br. ¶¶ 46–95; 101–11; 198–200. |

11.     **Constructive Trust**.  Vantage's actual fraud and unjust enrichment arising from the Contract entitle Respondents to a constructive trust.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • R-850, R's Prehearing Br. ¶¶ 70–71; App'x A ¶ 9. | • J-847, R's Dispositive Mot. ¶¶ 4–71.<br><br>• J-850, R's Prehearing Br. ¶¶ 2–32; 70–71.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 3–28; 46–63.<br><br>• J-854, R's Prehearing Reply Br. ¶¶ 1–60. | • R's Posthearing Br. ¶¶ 22–189; App'x A & B.<br><br>• R's Posthearing Resp. Br. ¶¶ 46–95; 101–11; 201. |

12.     **The Contract is Void, Voidable, Unconscionable, and Must be Rescinded**.  Alternatively, Respondents are entitled to dismissal of Vantage's claims because the Contract is void, voidable, unconscionable, and must be rescinded because it was procured through bribery.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • R-850, R's Prehearing Br. ¶¶ 47–58; App'x A ¶¶ 10; 12. | • J-847, R's Dispositive Mot. ¶¶ 4–71.<br><br>• J-850, R's Prehearing Br. ¶¶ 2–32; 47–58.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 3–28; 46–63.<br><br>• J-854, R's Prehearing Reply Br. ¶¶ 1–60. | • R's Posthearing Br. ¶¶ 22–189; App'x A & B.<br><br>• R's Posthearing Resp. Br. ¶¶ 46–95; 101–11; 194. |

13.    **The Principals of Estoppel and Ratification Bar Vantage from Accepting the Benefits of the Contract Without Also Accepting its Burdens**.  Vantage cannot enforce the Contract without also ratifying the fraud and bribery used to secure the Contract, a result barred by both governing law and principles of equity.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. App'x A ¶ 17. | • J-850, R's Prehearing Br. App'x A ¶ 17. <br><br> • J-852, R's Prehearing Resp. Br. ¶¶ 29–30. <br><br> • J-854, R's Prehearing Reply Br. ¶¶ 59–60. | • R's Posthearing Br. ¶¶ 22–194; App'x A & B. <br><br> • R's Posthearing Resp. Br. ¶¶ 50–95. |

14.    **Alternatively, Vantage's Allegations of Ratification, Waiver, Acquiescence, Unclean Hands, and Equitable Estoppel Fail as a Matter of Law**.  PAI and/or PVIS did not ratify Vantage's bribery and corruption, and their claims based on Vantage's illegal conduct are not waived or otherwise equitably estopped.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. App'x A ¶¶ 12–13. | • J-847, R's Dispositive Mot. ¶ 73. <br><br> • J-850, R's Prehearing Br. App'x A ¶¶ 12–13. <br><br> • J-852, R's Prehearing Resp. Br. ¶¶ 21–23; 60–63. <br><br> • J-854, R's Prehearing Reply Br. ¶¶ 42–60. | • R's Posthearing Br. ¶¶ 52–56; 158–82; 195. <br><br> • R's Posthearing Resp. Br. ¶¶ 101–11. |

15.    **Vantage's Tort Claims Should be Dismissed with Prejudice**.  Vantage sought to withdraw its claims for fraudulent inducement, negligent misrepresentation, and promissory estoppel "without prejudice" the night before the merits hearing.  *See* K. Stern's May 15, 2017 Letter to the Tribunal.  Notwithstanding Vantage's eleventh-hour withdrawal, these tort claims were included in Claimants' Prehearing Brief, *see* J-849 ¶¶ 111–13, and are thus subject to the Tribunal's authority and *res judicata* dismissal.  *See* First Procedural Order ¶ 24.  The Tribunal should dismiss these claims with prejudice as (a) voluntarily withdrawn, and (b) because these claims fail as a matter of law for the many reasons Respondents identified in their pre- and post-briefing.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. App'x A ¶ 17. | • J-850, R's Prehearing Br. App'x A ¶ 17. <br><br> • J-852, R's Prehearing Resp. Br. ¶¶ 44–45. | • R's Posthearing Br. ¶¶ 22–194; App'x A & B. <br><br> • R's Posthearing Resp. Br. ¶¶ 50–95. |

**B. <u>Non-Bribery and Non-Operational Breaches of the Contract</u>**

16.    Vantage materially breached the Contract by making misrepresentations about its ownership of the Titanium Explorer (Preamble), failing to disclose its use of an Illegal Information Broker (Article 10.20.1–4), and failing to perform an adequate background check on Padilha as required by the Contract (Article 10.23).

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. ¶¶ 63–64, 113–16, 120; App'x A ¶¶ 7, 45, 51–52. | • J-850, R's Prehearing Br. ¶¶ 63–64, 113–16, 120; App'x A ¶¶ 7, 45, 51–52. | • R's Posthearing Br. ¶¶ 66 –68; 80–81; 101–09; 167–68; 200; 202–03. |

### C. Claims and Defenses Arising from Vantage's Operational Failures

17.     **PAI's Termination of the Contract was Valid and Proper**.  If Respondents are not granted relief because of Vantage's bribery and corruption, Vantage's claims still fail because PAI properly terminated the Contract.  Vantage—not Respondents—have the burden to prove that PAI wrongfully terminated the Contract and/or breached the Contract's negotiation obligations.  *See* R's Posthearing Response Br. ¶¶ 42–45.  Vantage failed to carry its burden on these issues.  Indeed, Respondents proved that PAI undertook all negotiations required by the Contract and properly terminated the Contract under Articles 9.1.1.3, 9.1.1.7, and 9.1.3.2 for operational reasons on two grounds: (a) Vantage's material breaches of Articles 10.4, 10.19, 13.2, 13.6, 13.7, and 27.1, and (b) Vantage's repeated failure to comply with Good Oil and Gas Field Practices under Articles 10.1.1 and 10.2.[244]

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. ¶¶ 113–20; App'x A ¶¶ 7; 14; 29. | • J-850, R's Prehearing Br. ¶¶ 74–120.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 31–43.<br><br>• J-854, R's Prehearing Reply Br. ¶¶ 61–98. | • R's Posthearing Br. ¶¶ 238–76.<br><br>• R's Posthearing Resp. Br. ¶¶ 112–55. |

18.     **Vantage's Good-Faith-and-Fair-Dealing Claim Fails as a Matter of Law**.  To the extent Vantage still seeks an award based on its good-faith-and-fair dealing claim, that claim fails because it is (a) barred by governing law, and (b) lacks any basis in fact.  PAI validly terminated the Contract due to Vantage's bribery and repeated failure to comply with Good Oil and Gas Field Practices.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. App'x A ¶ 20. | • J-850, R's Prehearing Br. App'x A ¶ 20.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 42–43. | • R's Posthearing Br. ¶¶ 36–194; 238–76.<br><br>• R's Posthearing Resp. Br. ¶¶ 50–95; 112–55. |

### C. Remedies and Defenses Relating to Damages

19.     **Vantage Failed to Offer a Valid Damages Model**.  Vantage has the burden to submit a valid damages methodology to satisfy an essential element of its breach-of-contract claim.  Vantage failed to satisfy this burden, a fact highlighted by its decision to wholly jettison *over $1.3 billion* in alleged reliance damages the day before the merits hearing began.  *See* K. Stern's May 15, 2017 Letter to the Tribunal.

---

[244]     As noted above, PAI also had valid grounds for termination arising from Vantage's bribery and corruption (see Respondent's Post-Hearing Brief, ¶¶ 196-208).

20.     Respondents have consistently urged the Tribunal to dismiss Vantage's claims because the two Claimants named in this Arbitration "suffered no compensable damages or injury" and cannot "identify any damages incurred and proximately caused by the conduct about which [they] claim[ed]." *See* R's Prehearing Br., App'x A ¶ 19.  Respondents cited multiple grounds for such a dismissal.

21.     *First*, Article 19.9 prevents Vantage from recovering the damages it seeks. *Id.* at ¶ 19.

22.     *Second*, Vantage failed to submit a damages methodology focusing only on the two named Claimants. *Id.* at ¶¶ 19, 61. Vantage's Prehearing Brief identifies only two specific Claimants, not a collective group of unnamed Vantage affiliates who were not signatories to the Contract and bound by its arbitration agreement.  J-849 at 1.  Further, the Claimants did not allege recoverable losses for any alleged duties owed to Vantage entities that are not parties to this Arbitration (and any such losses would be consequential losses barred by Article 19.9). Moreover, VDEEP cannot be awarded *any* damages because it is not an operative party to the Contract, as novated.  *See, e.g.*, R's Posthearing Br. ¶¶ 5–13.

23.     *Third*, Vantage's damages methodology omits the cost to use the Titanium Explorer, overstating its alleged lost profits.  J-850, R's Prehearing Br. App'x A ¶¶ 19, 42, 61.

24.     *Fourth*, Vantage fails to account for the impact of its bankruptcy filing on its alleged damages.  *Id.*

25.     *Finally*, in the event the Tribunal determines the named Claimants earned any profits under the Contract, PAI and PVIS are entitled to disgorge over $100 million of those profits and recover them from Vantage in this Arbitration. J-850, R's Prehearing Br. ¶ 123; App'x A ¶ 6.

26.     The same defects in Vantage's damages methodology bar any recovery of unpaid invoices at issue under the lien filed by Vantage on February 26, 2016.  This lien and its related state-court lawsuit are improper, and Vantage should be ordered to dismiss, release, and discharge them.  *See* J-852, R's Prehearing Resp. Br. ¶¶ 76–79.  Moreover, Vantage's claim regarding the lien appears nowhere in its Prehearing Brief, which renders it invalid.[245]  *See* J-849.  On this basis alone, recovery of the unpaid invoices must be denied.  *See* First Procedural Order ¶ 24.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. App'x A ¶¶ 19, 42, 61. | • J-847, R's Dispositive Mot. ¶¶ 74–75.<br>• J-850, R's Prehearing Br. ¶¶ 121–22; App'x A ¶¶ 19, 42, 61.<br>• J-852, R's Prehearing Resp. Br. ¶¶ 64–79.<br>• J-854, R's Prehearing Reply Br. ¶¶ 99–117. | • R's Posthearing Br. ¶¶ 277–94.<br>• R's Posthearing Resp. Br. ¶¶ 156–86. |

27.     **Respondents are Entitled to an Offset**.  Any alleged amount owed to Vantage for work performed but unpaid must be offset by (a) disgorgement of Vantage's ill-gotten profits, and (b) any damages, fees, or costs awarded to Respondents.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. ¶ 123. | • J-850, R's Prehearing Br. ¶ 123 | • R's Posthearing Br. ¶¶ 292–94.<br>• R's Posthearing Resp. Br. ¶¶ 184–86. |

---

[245]    Vantage first cited the unpaid invoices in its Post-Hearing Brief, in which it sought payment of $ 6.4 million in addition to the direct, benefit-of-the-bargain damages requested in Vantage's Pre-Hearing Brief (see Claimants' Post-Hearing Brief, ¶ 428).

28. **Respondents are Entitled to Exemplary/Consequential Damages for Vantage's Fraud**. Because of the overwhelming evidence of Vantage's bribery, Respondents are entitled to exemplary/consequential damages.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. ¶¶ 72–73; App'x A ¶ 11. | • J-850, R's Prehearing Br. ¶¶ 72–73. | • R's Posthearing Br. ¶¶ 292–94.<br>• R's Posthearing Resp. Br. ¶¶ 184–86. |

29. **Respondents are Entitled to an Award of Their Attorneys' Fees and Costs.** Respondents are entitled to their fees and costs because Claimants breached Article 24.2, as amended by the Third Novation, by filing this Arbitration without first engaging in "direct negotiations in good faith."

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. p. 47; App'x A ¶ 7. | • J-850, R's Prehearing Br. p. 47; App'x A ¶ 7.<br>• J-852, R's Prehearing Resp. Br. p. 33.<br>• J-854, R's Prehearing Reply Br. p. 47. | • R's Posthearing Br. p. 105<br>• R's Posthearing Resp. Br. p. 76.<br>• Aff. of William M. Katz in Support of R's Request for Legal Fees and Expenses ¶¶ 4–5. |

### E. Issues Regarding the Proper Parties in this Arbitration

30. PAI and VDDI are proper parties to this Arbitration. However, the Tribunal must decide several issues relating to its jurisdiction over VDEEP (a/k/a VDC), Petrobras Brazil, and PVIS.

31. **Only PAI and VDDI are Proper Parties for Vantage's claims; PVIS and Petrobras Brazil are not Proper Respondents in this Arbitration**. Because PAI and VDDI were the only parties to the Contract when it was terminated, they are the only proper parties for the claims alleged by Claimants in this Arbitration. No relief can be awarded against Petrobras Brazil because (a) the Tribunal lacks jurisdiction over Petrobras Brazil, and (b) Petrobras Brazil is not liable under the Guaranty as a matter of law. Likewise, PVIS was not a party to the Contract when it was terminated, and there is no basis for it to be liable for the claims alleged by Claimants.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. App'x A ¶¶ 15–16; 18–19. | • J-850, R's Prehearing Br. App'x A ¶¶ 15–16; 18–19. | • R's Posthearing Br. ¶¶ 5–19. |

32. **Both PAI and PVIS are Proper Counter-Claimants; Both VDEEP and VDDI are Proper Counter-Defendants**. Both PAI and PVIS are proper Counter-Claimants because they have claims arising from their time as the operative entities under the Contract. Likewise, both VDDI and VDEEP are proper Counter-Defendants for the counterclaims alleged by PAI and PVIS.

33. **Parties not Present in the Arbitration are not Proper to Consider**. Vantage has improperly sought damages on behalf of entities that are not present in this Arbitration and with whom Respondents never agreed to arbitrate. Any alleged losses for such entities must be disregarded.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|

| J-850, R's Prehearing Br. App'x A ¶¶ 15–16; 18. | J-850, R's Prehearing Br. App'x A ¶¶ 15–16; 18. | R's Posthearing Br. ¶¶ 5–14; 20–21. |

## F. <u>Issues Regarding the Governing Law</u>

34. **The Tribunal Must Apply Maritime Law, as Supplemented by Texas Law**. The Third Novation—the operative Contract in this Arbitration—mandates that the Tribunal apply maritime law, as supplemented by Texas law, to the claims and defenses arising from Vantage's bribery and corruption and its operational failures under the Contract. The laws of England and Wales have no bearing on these issues. Even if English law somehow applied, Vantage has never alleged that the Contract is ambiguous, and thus English law cannot apply to determine the parties' mutual intent. Instead, English law applies only to Vantage's claims against Petrobras Brazil under the Guaranty—claims which fail because (a) the Tribunal lacks jurisdiction over Petrobras Brazil, and (b) Petrobras Brazil is not liable under the Guaranty as a matter of law.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. ¶ 5 n.2 App'x A ¶ 15. | • J-847, R's Dispositive Mot. ¶ 46.<br><br>• J-850, R's Prehearing Br. ¶ 5 n.2 App'x A ¶ 15. | • R's Posthearing Br. ¶ 22.<br><br>• R's Posthearing Resp. Br. ¶¶ 5–29. |

35. **Preponderance of the Evidence is the Relevant Standard of Proof**. Contrary to Vantage's argument, Respondents' claims and defenses are governed by the preponderance standard under governing maritime and Texas law.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| • J-850, R's Prehearing Br. ¶ 5 n.2. | • J-850, R's Prehearing Br. ¶ 5 n.2.<br><br>• J-852, R's Prehearing Resp. Br. ¶¶ 26–28. | • R's Posthearing Br. ¶¶ 23–35.<br><br>• R's Posthearing Resp. Br. ¶¶ 46–49. |

36. **Respondents have not Asserted a Generic "Bribery" Defense**. Vantage procured the Contract through an illegal bribery scheme, which renders the Contract void *ab initio*. Vantage's so-called "bribery" defense appears nowhere in Respondents' pleadings and conflicts with the governing law that applies under the Third Novation.

| Identified in Respondents' Prehearing Brief | Supporting Argument and Evidence from Prehearing Briefing | Supporting Argument and Evidence from Posthearing Briefing |
|---|---|---|
| | 1.  J-850, R's Prehearing Br. ¶ 5 n.2.<br><br>J-852, R's Prehearing Resp. Br. ¶¶ 26–28. | • R's Posthearing Resp. Br. ¶¶ 39–41. |

### III. CONCLUSION

For the reasons stated above and those stated in earlier briefing and during the merits hearing, Vantage cannot recover on any of its claims, and PAI and PVIS can recover on their affirmative claims and are entitled to an award of damages, attorneys' fees, pre- and post-judgment interest, costs, and expenses, in excess of $100 million.