UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

VANTAGE DEEPWATER COMPANY and
VANTAGE DEEPWATER DRILLING,
INC.,

               Petitioners,

    -against-

PETROBRAS AMERICA INC.,
PETROBRAS VENEZUELA
INVESTMENTS & SERVICES, BV, and
PETRÓLEO BRASILEIRO S.A. –
PETROBRAS,

               Respondents.

Civil Action No. 4:18-cv-2246

**<u>RESPONDENTS' MOTION TO VACATE THE MAJORITY AWARD</u>**

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 3

I.    Background to the Arbitration ................................................................................ 3

    A.    Vantage's Bribery Scheme to Obtain the DSA .............................................. 3

         1.    *Vantage and Nobu Su* ............................................................................ 4

         2.    *Vantage's Agent Secures the DSA With Petrobras Through Bribes* ............................. 5

         3.    *Mr. Padilha Confesses and the Bribery Scheme Is Uncovered* ..................... 7

II.    The Arbitration ...................................................................................................... 8

    A.    Vantage Commences the Arbitration .............................................................. 8

    B.    Constitution of the Tribunal and Nomination of Judge Brower ...................... 9

    C.    The Tribunal's Pre-Hearing Rulings Frustrated Petrobras's Ability to Fairly Present Its Claims and Defenses .............................................................. 10

    D.    The Merits Hearing ....................................................................................... 11

    E.    The Majority Award ...................................................................................... 14

    F.    The Dissent .................................................................................................... 15

GROUNDS WARRANTING VACATUR ..................................................................... 16

I.    The Majority Award Must Be Vacated Under Section 10(a)(2) Based on the "Evident Partiality" of Judge Brower ......................................................................... 16

    A.    Judge Brower's Conduct at the Hearing Evinces Actual Bias Favoring Vantage ........... 17

    B.    Judge Brower's Close Personal Relationship with Vantage's Counsel Is Evidence of Partiality Necessitating Vacatur of the Majority Award .................... 22

    C.    Judge Brower's Past Record of Partiality Suggests Bias in the Instant Arbitration. ........ 24

    D.    Judge Brower's Bias Affected the Majority's View of Respondents .............................. 25

II.    The Award Should Be Vacated Under Section 10(a)(3) Based on the Tribunal's Refusal to Consider Evidence Pertinent and Material to the Controversy ................................. 28

    A.    Denial of Petrobras's Unopposed Requests to Depose Mr. Bragg and Mr. O'Leary Excluded Testimony that Was Pertinent and Material to the Bribery Issue .................... 30

    B.    The Tribunal Precluded Meaningful Cross-Examination of Vantage's Only Testifying Witness on the Bribery Issue .............................................................. 35

    C.    The Tribunal Refused to Accord Any Weight to Vantage's Disclosure of Its Offer to Pay the SEC $5 Million to Resolve the SEC's FCPA Investigation .................... 37

III.    The Majority Award Should Be Vacated as to Petrobras Brazil Under Section 10(a)(4) Because the Tribunal Failed to Issue a "Reasoned Award" ........................... 38

CONCLUSION ............................................................................................................... 40

**Page(s)**

**Cases**

*Bankers Life & Cas. Ins. Co. v. CBRE, Inc.*,
    830 F.3d 729 (7th Cir. 2016) ....................................................................... 38-39

*Brook v. Peak Int'l, Ltd.*,
    294 F.3d 668 (5th Cir. 2002) ............................................................................ 38

*Burlington N.R. Co. v. TUCO Inc.*,
    960 S.W.2d 629 (Tex. 1997) ............................................................................. 23

*Charalambopoulos v. Grammer*,
    No. 14-CV-2424-D, 2017 WL 1094394 (N.D. Tex. Mar. 8, 2017) ........................ 36

*Commonwealth Coatings Corp. v. Continental Casualty Co.*,
    393 U.S. 145 (1968) .................................................................................. 16, 23

*Cooper v. WestEnd Capital Mgmt., L.L.C.*,
    832 F.3d 534 (5th Cir. 2016) ............................................................................ 19

*Davidson v. Great Nat'l Life Ins. Co.*,
    737 S.W.2d 312 (Tex. 1987) ............................................................................. 35

*Gulf Coast Indus. Workers Union v. Exxon Co., USA*,
    70 F.3d 847 (5th Cir. 1995) .............................................................................. 28

*Holodnak v. Avco Corp., Avco-Lycoming Div.*,
    381 F. Supp. 191 (D. Conn. 1974) ................................................................... 19

*Hoteles Condado Beach, La Concha & Convention Ctr. v. Union de Tronquistas Local 901*
    763 F.2d 34 (1st Cir. 1985) .............................................................................. 35

*Householder Grp. v. Caughran*,
    354 F. App'x 848 (5th Cir. 2009) ........................................................ 16-17, 21, 24

*ICAP Corporates, LLC v. Drennan*,
    No. 14-CV-5451, 2015 WL 10319308 (D.N.J. Nov. 18, 2015) .............................. 37

*In re DePuy Orthopedics, Inc.*,
    888 F.3d 753 (5th Cir. 2018) ........................................................................ 26-27

*In re Fisher & Paykel Appliances, Inc.*,
    420 S.W.3d 842 (Tex. App. 2014) ..................................................................... 36

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
364 F.3d 274 (5th Cir. 2004) .................................................................................. 28

*Konkar Mar. Enters., S.A. v. Compagnie Beige D'Affretement*,
668 F. Supp. 267 (S.D.N.Y. 1987) .......................................................................... 37

*Leeward Constr. Co. v. Am. Univ. of Antigua*,
826 F.3d 634 (2d Cir. 2016) .............................................................................. 39-40

*Nat'l Football League Players Ass'n v. Nat'l Football League*,
270 F. Supp. 3d 939 (E.D. Tex. 2017) .................................................................. 29

*Nguyen v. Excel Corp.*,
197 F.3d 200 (5th Cir. 1999) .................................................................................. 36

*Positive Software Sols., Inc. v. New Century Mortg. Corp.*,
476 F.3d 278 (5th Cir. 2007) .......................................................................... 23, 25

*S.E.C. v. Brady*,
238 F.R.D. 429 (N.D. Tex. 2006) .......................................................................... 36

*Sarofim v. Tr. Co. of the West*,
440 F.3d 213 (5th Cir. 2006) .......................................................................... 38, 40

*Stage Stores, Inc. v. Gunnerson*,
477 S.W.3d 848 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ...................... 38, 40

*Sun Refining & Marketing Co. v. Statheros Shipping Corp.*,
761 F. Supp. 293 (S.D.N.Y. 1991) .................................................................. 17. 24

*Tempo Shain Corp. v. Bertek, Inc.*,
120 F.3d 16 (2d Cir. 1997) ................................................................................. 31-32

*Thomas Kinkade Co. v. Lighthouse Galleries, LLC*,
No. 09-CV-10757, 2010 WL 436604 (E.D. Mich. Jan. 27, 2010) .......................... 17

*Valentine v. Interactive Brokers LLC*,
1-15-943-CV, 2017 WL 3597735 (Tex. App.—Houston [1st Dist.] Aug. 22, 2017, pet. filed)
........................................................................................................................... 28-29

*Willy v. Admin. Review Bd.*,
423 F.3d 483 (5th Cir. 2005) .................................................................................. 36

**Statutes**

Federal Arbitration Act § 10(a)..................................................................................... *passim*

Tex. Civ. Practice & Remedies Code § 172.102(a)........................................................ 39

**Other Authorities**

ABA Code of Ethics Canon I........................................................................................ 17

BLACK'S LAW DICTIONARY (10th ed. 2014) ................................................................. 18

Restatement (Third) U.S. Law of Int'l Comm. Arb. (Draft of Apr. 16, 2012) ............................ 25

IBA Guidelines on Conflicts......................................................................................... 9

Sundaresh Menon, *Adjudicator, Advocate, or Something in Between?*
34 J. OF INT'L ARB. 347 (2017)..................................................................................... 17-18

**Rules**

American Arbitration Association Rule 22(a) ................................................................. 35

American Arbitration Association Rule 32(a) ................................................................. 35

# TABLE OF DEFINED TERMS

| Defined Term | Definition |
|---|---|
| **Parties** | |
| PAI | Petrobras America Inc. |
| PVIS | Petrobras Venezuela Investments & Services, BV |
| Petrobras Brazil | Petróleo Brasileiro S.A. – Petrobras |
| Petrobras or Respondents | PAI, PVIS, and Petrobras Brazil, collectively |
| VDEEP | Vantage Deepwater Company |
| VDVI | Vantage Deepwater Drilling, Inc. |
| Vantage or Petitioners | VDEEP and VDVI, collectively |
| **Key Terms** | |
| AAA | American Arbitration Association |
| Arbitration | Vantage v. Petrobras, ICDR Case No. 01-15-0004-8503 |
| Bragg | Vantage's Chief Executive Officer and board member, Paul Bragg |
| BSSE | Bureau of Safety and Environmental Enforcement |
| Chapter 1 | Federal Arbitration Act, 9 U.S.C. §§ 1-16 |
| Chapter 2 | Federal Arbitration Act, 9 U.S.C. §§ 201-208 |
| Chapter 3 | Federal Arbitration Act, 9 U.S.C. §§ 301-307 |
| Derman Decl. | Motion to Vacate the Majority Award, Declaration of Andrew Derman, dated August 31, 2018 |
| Dissent or Gaitis Dissent | Arbitrator James M. Gaitis' Objection to, and Dissent from, the Tribunal Majority's Final Award |

| | A copy of the Dissent is attached as Exhibit E to the Stern Declaration, **Dkt. 1-7** |
|---|---|
| DOJ | United States Department of Justice |
| DSA | Agreement for the Provision of Drilling Services, dated February 4, 2009 |
| | A copy of the DSA is attached as Exhibit B to the Stern Declaration, **Dkt. 1-4** |
| FAA | Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* |
| FCPA | Foreign Corruption Practices Act, 15 U.S.C. §§ 78dd-1, et seq. |
| FRCP | Federal Rules of Civil Procedure |
| FSIA | Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq. |
| Guaranty | Form of Payment and Performance Guaranty, dated February 4, 2009 |
| | A copy of the Guaranty is attached as Exhibit C to the Stern Declaration, **Dkt. 1-5** |
| ICDR | International Centre for Dispute Resolution, the international arm of the American Arbitration Association |
| Inter-American Convention or Panama Convention | Inter-American Convention on International Commercial Arbitration, 104 U.S.T. 448 (1990), *reprinted following* 9 U.S.C. § 301. |
| Katz Decl. | Motion to Vacate the Majority Award, Declaration of William M. Katz, Jr. |
| Majority | Judge Charles N. Brower and Professor William W. Park |
| Majority Award | June 29, 2018 Arbitration Award Issued by the Majority |
| | A copy of the Majority Award is attached as Exhibit A to the Stern Declaration, **Dkt. 1-3** |
| Newman Decl. | Expert Declaration of Lawrence W. Newman |

| | |
|---|---|
| New York Convention | Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature*, June 10, 1958, 21 U.S.T. 2517, *reprinted in* 9 U.S.C. § 201 (historical and statutory notes) |
| Nobu Su or Su | Vantage's largest shareholder and board member, Hsin-Chi Su |
| O'Leary | Vantage's board member, John O'Leary |
| Padilha | Vantage's agent, Hamylton Pinheiro Padilha, Jr. |
| Panama Convention | Inter-American Convention on International Commercial Arbitration, 104 U.S.T. 448 (1990), *reprinted following* 9 U.S.C. § 301 |
| Petition | Petition to Confirm the Final Award filed July 2, 2018, **Dkt. 1** |
| Pride | Pride International |
| Quinn | Quinn Emmanuel Urquhart & Sullivan LLP |
| SEC | United States Securities and Exchange Commission |
| Security Motion or Security Mot. | Motion to Obtain Security for Satisfaction of Judgment on Final Award, **Dkt. 15** |
| Stern Decl. | Petition to Confirm Arbitration Award, Declaration of Karl Stern, **Dkt. 1-2** |
| Third Novation | Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services, dated October 27, 2014<br><br>A copy of the Third Novation is attached as Exhibit D to the Stern Declaration, **Dkt. 1-6** |
| TMT | Taiwan Maritime Transportation Co. Ltd. |
| Weil | Weil, Gotshal & Manges LLP |

Petrobras respectfully submits this motion to vacate the Majority Award rendered against Petrobras pursuant to Section 10(a) of the FAA.[1]

## **INTRODUCTION**

The $622 million award issued by two members of the Tribunal over the extraordinary objection and dissent of the third, arose from an arbitral process that was fundamentally flawed. As the record in this case reveals, during the course of the Arbitration, Vantage's party-appointed arbitrator refused to act on serious conflicts of interest, exhibited open hostility towards Petrobras and improperly adopted the role of Vantage's advocate, rather than that of a neutral arbitrator; Petrobras was repeatedly denied the ability to adduce evidence showing that the contract at issue was obtained through bribery, the key disputed merits issue in the case; and the Majority rendered an incomplete award, which failed to address a key defense. These failings denied Petrobras the opportunity to fully and fairly present its bribery case and, as detailed below, require vacatur of the Majority Award.

Multiple independent statutory grounds under the FAA support vacatur of the Majority Award on the record of the Arbitration. *First*, because of the "evident partiality" of Vantage's party-appointed arbitrator, Charles N. Brower, the Majority Award should be vacated pursuant to § 10(a)(2). Throughout the hearing, Judge Brower, who was obligated under the parties' agreement to be impartial, independent *and* neutral, displayed conduct that can only be regarded as reflecting actual bias toward Petrobras, including aggressively questioning a critical Petrobras witness for over 90 minutes and making belittling comments about Petrobras's counsel under his breath. *Second*, Petrobras was precluded from eliciting material, pertinent and critically important testimony and evidence on the bribery issue, in violation of § 10(a)(3). This included the

---

[1]   Petrobras files this 40-page brief in accordance with the parties' Joint Motion for Leave to Establish Filing Deadlines and Extend Page Limitations. Dkt. 27.

Tribunal's inexplicable denial of Petrobras's *unopposed* request to depose two former Vantage executives, both of whom were central figures in Vantage's bribery scheme and whose testimony had no substitute. *Third,* the Majority Award provides no foundation whatsoever for the Majority's $622 million finding of liability against Petrobras Brazil, a defect that mandates vacatur under § 10(a)(4) as to Petrobras Brazil.

This flawed Arbitration produced the extraordinary Dissent filed by experienced arbitrator James M. Gaitis, Esq., which reflects that the misconduct evident from a perusal of the record is only the tip of the iceberg. In the Dissent, Mr. Gaitis expresses his "belief and conclusion" that:

> the prehearing, hearing, and posthearing processes that led to the issuance of the Final Award have denied Respondents in this proceeding the fundamental fairness and due process protections meant to be provided to arbitrating parties by Sections 10(a)(1), 10(a)(2), 10(a)(3), 10(a)(4), and Chapters 2 and 3 of the [FAA].

Dkt. 1-7. As explained by Lawrence W. Newman, a well-known arbitrator who has submitted an expert declaration on Respondents' behalf, this is "an extraordinary statement to be found in a dissent in an international commercial arbitration." *See* Newman Decl. ¶ 24. Indeed, although Vantage attempts to portray this remarkable Dissent as a run-of-the-mill disagreement over the merits, it is instead an unequivocal statement from a seasoned professional who participated in the Arbitration that the Majority Award was issued in violation of each of the narrow yet critical grounds for vacatur and non-enforcement under the FAA and Panama Convention. *See id.* ¶¶ 23-24 (explaining that dissents in international arbitration are themselves "very unusual," and the Dissent here is "particularly unusual" "because of the breadth and nature of accusations that [Mr. Gaitis] made concerning the process by which the award came into being"). Further, Mr. Gaitis' deliberate refusal to co-sign the Majority Award is also "a remarkable repudiation of the content of the Majority Award . . . and emphasizes the rejection by Arbitrator Gaitis of the process by which the Majority Award was made." *Id.* ¶ 25.

The record evidence and the Dissent provide ample grounds to vacate the Majority Award pursuant to Section 10(a) of the FAA. But because Mr. Gaitis' Dissent showed that there is much more that is not presently in the record, before deciding the Petition and this motion, the Court should authorize service of a subpoena on Mr. Gaitis to give testimony about the basis of the Dissent and the specific reasons why he concluded that Petrobras had been denied a fair hearing in violation of the basic procedural safeguards contained within § 10 of the FAA, as set out in Petrobras's accompanying Motion for Leave to Serve a Subpoena on Mr. Gaitis.

## STATEMENT OF FACTS

### I. Background to the Arbitration

#### A. Vantage's Bribery Scheme To Obtain the DSA

The Arbitration arises out of the termination of the DSA entered into between PVIS and VDEEP for the provision of offshore drilling operations through the use of the *Titanium Explorer* deepwater drillship. *See* Dkt. 1-4; Ex. 13.[2] Vantage engaged in a complex bribery scheme to procure the DSA, which was carried out through its largest shareholder, Nobu Su, and its agent, Hamylton Padilha, and implicated Vantage executives and directors at the highest levels, including then-Vantage CEO and President, Paul Bragg, and John O'Leary, then a Vantage board member. *See* Ex. 14, p. 10; Ex. 15; Ex. 18 ¶¶ 4-8; ████████. Through Mr. Su, Vantage agreed to pay approximately $31 million in bribes, distributed as kickbacks to a Brazilian political party, Eduardo Musa, a General Manager in Petrobras's International Division, Jorge Zelada, the Executive Officer of Petrobras's International Division, and Mr. Padilha, as a commission for procuring the DSA. *See* Ex. 14, p. 10. Messrs. Padilha, Zelada, and Musa have each been criminally convicted in Brazil for participation in this bribery scheme, *see* Ex. 19 ¶¶ 417-20, which

---

[2]     All citations to "Ex." are to the Exhibits to the Katz Declaration.

**MOTION TO VACATE THE MAJORITY AWARD – Page 3**

was part of a much larger bribery and money-laundering scheme that has wracked Brazil since 2014.

Indeed, through Operation *Lava Jato* ("Operation Car Wash"), the Brazilian police and judiciary have determined that between 2004 and 2012, various contractors and suppliers of Petrobras engaged in a complex and well-concealed bribery scheme to overcharge Petrobras by billions of dollars. *See* ███████; Ex. 19 ¶¶ 52, 254, 336, 339, 358. Portions of the overcharges were distributed as kickbacks to Brazilian political parties, public officials, and certain former company executives, including Messrs. Musa and Zelada, who were involved in the scheme, while corrupt contractors and suppliers pocketed the rest. Ex. 20, pp. 2-5. In pursuing Operation *Lava Jato*, the Brazilian police have secured convictions of nearly 180 individuals, Ex. 21, like Mr. Padilha, who have admitted to using bribe payments to benefit their own companies and clients and the few former Petrobras executives who deceived and exploited Petrobras for their personal benefit. Ex. 19 ¶¶ 29, 52, 254, 336, 339, 358; Ex. 20; ███████. Petrobras has itself been found to be a victim of this bribery and money-laundering scheme by both the court of first instance, the Brazilian Supreme Court, and Brazilian prosecutors. Ex. 19 ¶¶ 52, 254, 336, 338, 358.

      1.     *Vantage and Nobu Su*

Vantage was formed in November 2007 by Mr. Bragg and Mr. O'Leary, two shipping executives who had met during their tenure at a shipping company called Pride. *See* Ex. 22, pp. 2, 4-5. Mr. Bragg and Mr. O'Leary departed Pride around the time a bribery scandal was uncovered *there* that required Pride to pay a $32.6 million penalty to the DOJ for violations of the FCPA and securities fraud. *See id.*; Ex. 23, p. 10.

In the fall of 2008, Vantage was inexperienced and starved for business. Ex. 24 ¶¶ 23-27. With no drillship through which to supply its services and no clients to vouch for its performance,

Vantage was not an approved drilling contractor for Petrobras, and therefore could not submit bids for Petrobras's offshore projects. *See* Ex. 18 ¶ 3-4; Ex. 25. Interested in nonetheless pursuing such opportunities, Mr. Bragg approached Mr. Su, a wealthy Taiwanese shipping magnate with ownership rights to two deepwater drillships, the *Platinum Explorer* and the *Titanium Explorer*. Ex. 24 ¶ 10. In exchange for his approval of use of his vessel, by June 2008 Vantage had made Mr. Su its largest shareholder and granted him control over three seats on Vantage's nine-member board. *See* Ex. 26 ¶ 7; Ex. 2, Tr. 331:21-332:23 (explaining Mr. Su controlled four seats by 2010).

2. *Vantage's Agent Secures the DSA With Petrobras Through Bribes*

Mr. Padilha was a Brazilian intermediary and agent in the offshore drilling industry. Ex. 18 ¶ 1. Mr. Padilha had previously worked with Mr. Bragg (at Pride) and with Mr. O'Leary, and in 2007, Mr. Bragg and Mr. O'Leary again hired Mr. Padilha to represent Vantage to obtain the DSA with Petrobras. *See id.*

Prior to October 2008, Vantage, which was not included on Petrobras's list of potential contractors, had submitted an untimely bid proposal to Petrobras, which was "not . . . analyzed [by Petrobras] due to a lack of time." Ex. 28 ¶ 6.2.4.4; *see also* Ex. 27; Ex. 18 ¶¶ 3-4. While working as Vantage's agent Mr. Padilha learned that in order to secure business with Petrobras, it was necessary to pay a "bribe commission" that would ultimately be distributed to employees in the Brazilian government. Ex. 14, pp. 9-10. Mr. Bragg introduced Mr. Padilha to Mr. Su, who also owned TMT, a Chinese company that could make bribery payments on behalf of Vantage without triggering compliance flags within Vantage. *Id.* Vantage then procured Petrobras's consideration of its untimely bid through payment of the bribe commissions. Ex. 18 ¶¶ 3, 4; Ex. 30; Ex. 31.

As a result, at the end of October 2008, Mr. Zelada requested that Vantage be included in Petrobras's bid evaluation ranking list. ███████. A request followed on November 18, 2008 from Mr. Musa for an updated proposal from Vantage. Ex. 18 ¶ 10. Mr. Bragg then coordinated

a meeting between Petrobras directors, Mr. Padilha and Mr. Su in New York City. Ex. 14, p. 10. At the meeting, the parties discussed the payment of bribes in connection with the potential drilling contract. *Id.* at p. 10; Ex. 32, p. 2; Ex. 18 ¶ 10. On December 3, 2008, Vantage submitted another untimely bid that nevertheless placed it on Petrobras's bid list, though it was not ranked at the top. ████████; Exs. 30-31; Ex. 14, pp. 21-23.

On December 15, 2008, following additional meetings in Brazil between Petrobras and Mr. Padilha, as well as other Vantage representatives, Vantage submitted an updated bid for the Petrobras contract. ████████. At the time of this submission Petrobras was still not ranked at the top. *Id.* However, on December 16, 2008, Mr. Musa altered Petrobras's methodology for evaluating the drilling proposals, resulting in Vantage being ranked first on the list of bids, despite having no work history and no clients to vouch for its performance. *Id.*; Ex. 29 ¶ 4.1.

Less than a week later, on December 20, 2008, Mr. Padilha and Mr. Su met with João Augusto Rezende Henriques, a political lobbyist for the Brazilian Democratic Movement Party ("PMDB"), in Rio de Janeiro, to arrange for the payment of bribes. Ex. 14, p. 11; ████████; Ex. 32, p. 2. On behalf of Vantage, Mr. Su arranged to have Valencia Drilling Corporation, a company under his ownership and control, transfer $15.5 million to an offshore company controlled by Mr. Henriques and another $15.5 million to Oresta Associated S.A., an offshore company controlled by Mr. Padilha. Ex. 14, pp. 11-12; ████████. Mr. Henriques then funneled payments to politicians and PMDB, while Padilla distributed funds to individuals at Petrobras, including Messrs. Zelada and Musa. Ex. 14, pp. 17-18; ████████; Ex. 34.

Just three days after that meeting, VDEEP and PVIS signed a memorandum of understanding for use of the *Titanium Explorer*. *See* Ex. 35. The DSA was subsequently executed on February 4, 2009, Dkt. 1-4. Petrobras Brazil was not a party to the DSA but separately executed

a secondary surety agreement, the "Guaranty," which was governed by English law. Dkt. 1-5. In October 2014, PVIS novated the DSA to PAI in the Third Novation. Dkt. 1-6.

3. *Mr. Padilha Confesses and the Bribery Scheme Is Uncovered*

In August 2013, Época, a Brazilian magazine, published an article mentioning conclusory allegations by Henriques that a Vantage shareholder had hired him to procure a drilling services contract with Petrobras for a commission of $14.5 million. *See* ███████. Petrobras promptly formed an Internal Review Commission to investigate the article's many allegations. *See* Ex. 36. The Commission's multiple attempts to interview Mr. Henriques about his statements were unsuccessful, and as a result, the Commission's Final Report, issued on October 25, 2013, stated that it could not "prove the veracity" of the bribery allegations with respect to Vantage. Ex. 28 ¶¶ 5.6, 6.2.2.14.[3] Nevertheless, Petrobras continued to investigate the Época allegations, resulting in a second report issue in May 2015. *See* Ex. 29.

The reaction at Vantage was markedly different. Shortly before the article's publication, the Época reporter emailed Mr. Bragg and Vantage's marketing department, asking for comment on the article. *See* Ex. 37. Mr. Bragg deleted the email and Vantage took no steps in response until July 2014, nearly a year after the publication of the article, when Vantage began an internal investigation into the allegations, with the assistance of Vidal Martinez. ███████.

On July 27, 2015, Mr. Padilha signed a plea agreement with Brazilian prosecutors, acknowledging that bribes were paid in connection with the DSA. *See* Ex. 32; ███████; Ex. 15. Following Mr. Padilha's confession, in August 2015, Vantage hired Weil and approached U.S. regulators to report possible violations of the FCPA in connection with the DSA. ███████.

---

[3] When questioned during the hearing about whether the Época article was evidence that Vantage had obtained the DSA through the payment of bribes, Douglas Halkett, Vantage's COO stated that as the Petrobras Commission had found, the article itself was insufficient proof that the alleged bribery had occurred. *See* Ex. 2, Tr. 439:17-21.

On August 31, 2015, PAI terminated the DSA, citing Vantage's breaches under three provisions of the DSA, including based on the falsity of Vantage's representation that no improper payments were made in obtaining the contract.  *See* Ex. 13.

On February 1, 2016, Messrs. Padilha, Zelada, Musa and Henriques were each criminally convicted in Brazil for their participation in the Vantage bribery scheme.  Ex. 19 ¶¶ 417-20.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████      █████████

Vantage's regulatory filings disclose that in early 2018 it reached an "agreement in principle" with the SEC to settle claims that Vantage violated the FCPA, and had offered to pay an approximately $5 million fine.  Ex. 38, p. 14.  This is a substantial sum for Vantage, ████████

███████████████████████████████████████████████████████

████████████████████████████████████      █████████

## II.     The Arbitration

### A.     Vantage Commences the Arbitration

Mere hours after the termination of the DSA on August 31, 2015, Vantage commenced the Arbitration pursuant to paragraph 8.1 of the Third Novation to the DSA, *see* Dkt. 1-3 ¶¶ 22, 38, claiming that PAI's termination of the DSA was a breach which entitled Vantage to recover damages "in excess of $450 million," Ex. 41 ¶ 8.  The parties' claims and defenses in the Arbitration turned largely on whether the DSA was procured through bribery and corruption.  *Id.*

---

4  ████████████████████████████████████████████████████

███████████████████      ████████

¶ 146; Ex. 40 ¶¶ 38-44. Petrobras emphasized that Vantage could not prove the existence of a valid contract, a key element of its breach claim, because the DSA was obtained through bribery. *See* Ex. 40 ¶¶ 38-44. To establish its claim for breach, Vantage sought a declaration that the DSA was "a valid and enforceable contract, notwithstanding Petrobras's allegation that illicit payments were made in connection with the contract." Ex. 41 ¶ 127.

      B.      <u>Constitution of the Tribunal and Nomination of Judge Brower</u>

The parties each nominated one arbitrator, respectively former Texas appellate Judge David Keltner for Vantage and James M. Gaitis, Esq. for Petrobras, Dkt. 1-3 ¶¶ 16-17, and on March 24, 2016, Professor William W. Park was confirmed as the Tribunal Chairman, *id.* ¶ 18. The parties agreed that "the Tribunal [would] provide a reasoned award" and that "arbitrators must remain neutral, impartial and independent." Dkt. 1-6, § 8.1, p. 10; Ex. 43 ¶¶ 10(B), 21.

After the Tribunal was constituted, Judge Keltner was removed as an arbitrator based on a conflict of interest, and on September 30, 2016, Charles N. Brower was confirmed as Vantage's party-nominated arbitrator in the place of Judge Keltner, Dkt. 1-3 ¶¶ 19, 48, 57, 136; Ex. 45.[5] In his disclosures before being confirmed, Judge Brower revealed his friendship with one of Quinn's partners, Epaminontas Triantafilou, who, before becoming a partner at Quinn had served as Judge Brower's law clerk at the Iran-United States Claims Tribunal. Ex. 44, p. 4. The ICDR requested that any objections to Brower's appointment be submitted by September 14, 2016. *See* Ex. 46.

Petrobras timely objected to Judge Brower's appointment, explaining, *inter alia*, that Judge Brower's "close personal friendship" with Mr. Triantafilou—who dedicated his 2015 book to Judge Brower—gave rise to "justifiable doubts as to [Judge Brower's] impartiality or independence," under the *IBA Guidelines on Conflicts*. *See* Ex. 47. Vantage responded with a

---

[5] Around this same time, Vantage submitted a request to substitute its original counsel, Jackson Walker LLP, with Quinn. Dkt. 1-3 ¶ 56. This replacement became effective on August 11, 2016. *Id.*

vociferous defense of Judge Brower, Ex. 48, and on September 30, 2016, the ICDR affirmed Judge Brower's appointment, Ex. 49.

C.    The Tribunal's Pre-Hearing Rulings Frustrated Petrobras's Ability to Fairly Present Its Claims and Defenses

Both before and during the hearing, the Tribunal issued a series of discovery-related rulings on privilege claims, document production, and depositions, in favor of Vantage and against Petrobras that impeded Petrobras's ability to present its claims and defenses.[6] These one-sided rulings commenced nearly from the outset of the Arbitration.  Time records for both Professor Park and Mr. Gaitis not only establish that there were "intra-tribunal objections" to the document production process, Ex. 61, p. 2, but moreover suggest that Mr. Gaitis was concerned that the Tribunal's "interpretation of ICDR Guidelines" related to document production and privilege issues, did not afford "equal treatment of parties," Ex. 66, p. 2 (11/5); Newman Decl. ¶¶ 84-92.

On January 23, 2017, Petrobras requested that the Tribunal order depositions of three former Vantage officers and directors, Mr. Bragg, Mr. O'Leary, and Christopher DeClaire.  Ex. 52.  Petrobras explained that it was critical to obtain testimony from these witnesses, who were either involved in, or aware of, the bribery scheme,[7] but Vantage refused to confirm whether it would make these individuals witnesses in the Arbitration and subject to cross-examination.

Inexplicably, even though Vantage did not object to the depositions of Messrs. Bragg and

---

[6]    *See, e.g.*, Ex. 50 (majority of Tribunal declines to order production for nine of Petrobras's 17 requests and orders production of documents responsive to all but one of Vantage's requests and a portion of another request); Ex. 51 (majority of Tribunal finds Vantage's counsel's affidavit adequate to sustain assertions of privilege and denies Petrobras's request for in camera review); Ex. 101 (declining to grant motion to compel documents containing facts or data relied upon by Vantage's expert Jacobs); Ex. 9, Tr. 2282:8-2283:5 (declining to allow Petrobras to admit document to impeach Jacobs' testimony); Ex. 1, Tr. 18:4-20:4 (permitting Vantage to change its damages theory and withdraw claims for reliance damages in the amount of over $1.3 billion long after deadline for amending pleadings has passed); Ex. 5, Tr. 1189:18-91:17 (permitting Vantage to voluntarily disclose documents related to Bareboat Charter and declining to compel production of related documents requested by Petrobras).

[7]    In June 2016, the Tribunal (as constituted with Judge Keltner prior to his removal) had, at Petrobras's request, issued non-party subpoenas for documents to Mr. Bragg, Mr. O'Leary, and Mr. DeClaire.  *See* Exs. 122-23.  Mr. Bragg and Mr. DeClaire refused to produce any of the requested evidence.  Dkt. 1-3 ¶¶ 131-32.

O'Leary, on February 16, 2017, the Tribunal "declin[ed] to order depositions." Ex. 53.[8] The same Procedural Order additionally denied Petrobras's Dispositive Motion, in which Petrobras had requested that the Tribunal rule on the party's bribery and corruption related disputes. *See id.* While denying Petrobras the ability to elicit testimony from Mr. Bragg or Mr. O'Leary on this issue, the Tribunal stated that "[t]he complex questions implicated in [Petrobras's Dispositive] Motion shall be further considered with the merits of other issues raised in this arbitration after the Tribunal has had the benefit of testimony and additional argument." *Id.*

D.    The Merits Hearing

The merits hearing took place in Houston from May 16 through June 1, 2017. Throughout the hearing, there was a significant disparity in the Tribunal's treatment of Vantage and Petrobras, which impeded Petrobras's ability to present its case and defense.

*First*, the Tribunal significantly restricted Petrobras's ability to solicit testimony relating to Weil's various reports to the U.S. regulators, which Vantage wielded as a shield to inquiry even though it had waived any privilege. For instance, the Tribunal strictly circumscribed Petrobras's ability to question Douglas Halkett—Vantage's Chief Operating Officer and the sole witness Vantage offered to testify concerning the bribery scheme to obtain the DSA—about the Weil presentations submitted on Vantage's behalf to the DOJ and SEC. Although Petrobras explained that under applicable Texas privilege law, Mr. Halkett's discussions with Weil were not privileged because these discussions formed, in part, the basis of the Weil reports that had been disclosed to the U.S. regulators, the Tribunal failed to address Petrobras's arguments or the applicable law, and inexplicably ruled that Petrobras was prohibited from asking Mr. Halkett any questions about his

---

[8]    While the Tribunal indicated that the parties could "agree with [Mr. Bragg or Mr. O'Leary] on a process for depositions on a voluntary basis under agreed procedures," this was a non-starter given that Mr. Bragg and Mr. O'Leary had refused to even produce documents; for that reason, Petrobras had sought the Tribunal's intervention, and the Tribunal's ensuing Order communicated to the parties that it did not believe the depositions should be pursued.

discussions with Weil, but was limited to "pointing to a particular section of the [Weil] report and ask[ing] about the facts in that report." Ex. 2, Tr. 294:24-295:5. Moreover, during the testimony of Mr. Padilha—the *only* witness with *personal* knowledge about the bribery as a result of the Tribunal's refusal to order depositions of Mr. Bragg and Mr. O'Leary—the Tribunal significantly limited Petrobras's ability to ask questions on the substance of the Weil reports. Ex. 6, Tr. 1476:25-1485:25. Similarly, the Tribunal refused to allow Petrobras to question Mr. Halkett— and severely circumscribed questioning of Mr. Padilha—regarding the conclusions and report relating to a 2014 investigation conducted by Vantage's former counsel, Vidal Martinez, which Mr. Halkett had affirmatively relied on in his direct testimony. Ex. 2, Tr. 317:5-320:6; Ex. 6, Tr. 1512:15-1516:19.

*Second*, while Judge Brower often seemed inattentive and disengaged during witness testimony, *see infra* pp. 13, 18, 19 n.17, when he did participate in arbitral questioning, he improperly adopted the role of Vantage's advocate, rather than that of a neutral arbitrator. Dkt. 1-6, § 8.1, p. 10. In particular, Judge Brower's questioning of Petrobras's witnesses was aggressive and antagonistic, and clearly aimed at discrediting the witnesses and undermining Petrobras's case, instead of developing the factual record. For example:

- **Padilha**. Judge Brower remarkably questioned Mr. Padilha for over 93 minutes,[9] during which he sought to impeach, embarrass, and discredit Mr. Padilha. Ex. 6, Tr. 1526:11-1527:7, 1532-53. In his time records, Mr. Gaitis fairly labels Judge Brower's questioning of Mr. Padilha as a "***x-exam[ination]***," Ex. 72, p. 3 (5/23), and an "***interrogation***," Ex. 73, p. 2 (6/30); Ex. 76, p. 1 (7/5); Ex. 79, p. 2 (1/23); *see also* Newman Decl. ¶¶ 61-67.

- **Lance Labiche**. Judge Brower attacked the credibility of Mr. Labiche, Petrobras's regulatory expert, characterizing Mr. Labiche as being "extraordinarily critical of [his] employer" and "pretty disgusted with them," and asking if that was why he [Mr. Labiche] left his government job. *See* Ex. 11, Tr. 2774:22-2775:12[10]; Newman Decl. ¶¶ 73-75.

---

[9]      Judge Brower's questioning of Mr. Padilha occupies 53 pages of the hearing transcript, nearly twice the number of pages as all of Judge Brower's questioning of other witnesses combined.

[10]      *See also id.* at 2775:13-2777:10 (Mr. Labiche informed Judge Brower that he left his job because his "wife came home crying" after dropping their children at day care, that he "respect[s]" his former employer and "love[s]"

- **Alvaro Negrao.** After Vantage's attorneys declined to make an application for further questions following Petrobras's re-direct of its operations expert Dr. Negrao, Judge Brower engaged in a near line-by-line attack of Dr. Negrao's testimony elicited by Petrobras on re-direct. *See* Ex. 9, Tr. 2126:11-2129:12. Mr. Gaitis referred to Judge Brower's questioning as an "*interrogation*." Ex. 78, p. 2 (9/25).

Judge Brower's vigorous cross-examination of Petrobras's witnesses stands in stark contrast to his limited, friendly questioning of Vantage's witnesses, which in at least one case took the form of a gratuitous effort at rehabilitation. *See* Ex. 7, Tr. 1812:16-1819:24.

*Third*, throughout the hearing, Judge Brower displayed hostility towards Petrobras's counsel by continuously making inappropriate, off-the-record comments under his breath and laughing at Petrobras's counsel's questions during cross-examination of Vantage's witnesses. *See* Derman Decl. ¶¶ 7-8. This included commenting that Petrobras's counsel's questions to witnesses were "ridiculous," "already talked about" and "asked and answered." *Id.* ¶ 8. At other points at the hearing, moreover, Judge Brower appeared to be asleep. *Id.* ¶ 10. Judge Brower's conduct was so egregious that he effectively acknowledged his behavior after Petrobras's counsel was forced to confront him about it directly. *See id.* ¶ 9 (citing Ex. 8, Tr. 1871:7-19, 1880:5-10).

*Fourth*, throughout the hearing there was open discord among the members of the Tribunal, further evidencing the extent to which the arbitral process had broken down. This ranged from Professor Park's noting his frustration about his ability to control the hearing as Chairman, *see* Ex. 9, Tr. 2216:24-2217:2 ("The President: Charlie, I'm aware of this, but we need to have one—I say this to both, we need to have one Chair."); to Professor Park and Mr. Gaitis expressing concern over Judge Brower's tone during his examination of witnesses, *see* Ex. 6, Tr. 1568-1569 ("The President: "I would ask [the question] a little bit more openly, if I were you, Charlie.").

On June 7, 2017, following the close of the merits hearing, Petrobras formally challenged

---

his former colleagues, but that "there's not a question in the world" that Vantage violated BSSE requirements).

Judge Brower on grounds that his conduct during the merits hearing "displayed actual bias against Respondents that requires his removal as an arbitrator in this proceeding." Ex. 54. The AAA denied the challenge without any explanation. Ex. 55.

E.    The Majority Award

The Majority issued its merits award on June 29, 2018. *See* Dkt. 1-3. The Majority first determined that PAI and PVIS "committed a material breach under the DSA." *Id.* ¶ 254. The Majority next turned to Vantage's antecedent argument "that the DSA was a valid contract," *id.* ¶ 255, requiring it to address Petrobras's defense that the "DSA was procured through bribery, which taints the Contract and renders it unenforceable." *id.* ¶ 272. Although bribery was a key disputed issue, the Majority Award's analysis of that issue is cabined to a total of seven paragraphs that either decline to identify the evidence analyzed or pronounce that the Tribunal "need not make a finding" on the issues presented. *Id.* ¶¶ 286-92.[11] Indeed, while at the hearing, Judge Brower suggested (inaccurately) that Petrobras's evidence of bribery was limited largely to Mr. Padilha's testimony and the Brazilian Federal Court Judgment,[12] the Majority Award mentions only a single piece of evidence, the Brazilian Judgment. *Id.* ¶ 276. Moreover, citing U.S. public policy promoting the settlement of disputes, the Majority Award elected to give "no weight" to Vantage's own announcement that it had reached an "agreement in principle" with the SEC to settle claims that they violated the FCPA and to pay an approximately $5 million fine. *Id.* ¶ 173.[13]

Following this perfunctory discussion, the Majority concluded that it need not determine whether the DSA was procured through bribery because "Respondents knowingly ratified the DSA

---

[11]    The Tribunal devoted another seven paragraphs to its rejection of Petrobras's counterclaims based on allegations of bribery and corruption. *Id.* ¶¶ 357-63.

[12]    Ex. 10, Tr. 2600:1-2603:24 (explaining that "we only have the written and oral evidence of Mr. Padilha as direct evidence of what's referred to as the bribery or corruption issue in this case," and noting that there was the Brazilian judgment, "Mr. Gama being told by Nobu Su … and inferences from certain emails").

[13]    Mr. Gaitis did not take part in the Tribunal's initial determination of whether to reopen the record to admit Vantage's May 2018 10-Q, filed as Exhibit R-2076, which contained this announcement. *Id.* ¶ 155.

in its current form," and were "estopped from claiming the [DSA] is void or voidable." *Id.* ¶ 290. The Majority supports its ratification holding with a single English law case proffered by Vantage: "[Vantage] cite[s] *Hughes v. Metropolitan Ry.*," *id.* ¶ 290 n.92 (emphasis added). The Majority said, however, that the choice of law is immaterial, based upon Vantage's statement in its brief that under either English or Federal Maritime law the result would be the same, *id.* ¶ 291 & n.93.

After finding for Vantage and against PAI and PVIS on liability, the Majority awarded Vantage damages of $622.02 million plus interest at a rate of 15.2% compounding monthly. *Id.* ¶¶ 531-35. Of this, $615 million—almost all—were "benefit of the bargain" damages. *Id.* ¶ 531.

With respect to Petrobras Brazil's defense that under English law, claims against Petrobras Brazil under the Guaranty were not ripe, the Majority Award states, without identifying the applicable law or conducting any analysis, that Petrobras Brazil "as primary obligor under the DSA and the Guaranty remains responsible for the breaches of that Contract." *Id.* ¶ 530.

F.    The Dissent

The Dissent, signed by Mr. Gaitis on June 28, 2018, is an unequivocal statement that Petrobras was denied "fundamental fairness and due process protections meant to be provided to arbitrating parties" under each ground of § 10 of the FAA and under the New York and Panama Conventions. Dkt. 1-7. While brief, the Dissent is an extraordinary and unprecedented condemnation of the "prehearing, hearing, and posthearing processes" that led to the $622 million Majority Award in Vantage's favor. *Id.* Mr. Gaitis also took the rare and unusual step of refusing to co-sign the Award, in a "remarkable repudiation" of the Majority's Award and a "rejection . . . of the process by which [it] was made." Newman Decl. ¶ 25 (citing Dkt. 1-3 ¶ 528).

In the Majority Award, Judge Brower and Professor Park dismissed Mr. Gaitis' conclusions in the Dissent that Petrobras was denied fundamental fairness and due process. Dkt. 1-3 ¶¶ 527-29. Tellingly, however, Judge Brower himself consciously anticipated a due process

challenge to the Majority Award. In January and February 2018, Judge Brower spent approximately ***thirty-three*** hours "[r]eviewing Gaitis' accusations against the record," and "[i]n light of Gaitis' accusations and stance of AAA review of hearing transcript undertaken as well as consideration as to whether disclosures ordered by AAA would be consistent with secrecy of deliberations, ***consider[ing] the possibility that [the] Tribunal Chairman or I or both might be challenged***." Ex. 56, p. 2 (1/27-28, 2/13-2/16) (emphasis added); Newman Decl. ¶ 91 (explaining that in requesting disclosures, the "AAA was probably determining whether the record reflected a basis for disqualifications" under the AAA Rules for "[p]artiality or lack of independence").

On July 6, 2018, following receipt of the Majority Award and Dissent, Petrobras applied to the ICDR for the withdrawal of the Majority Award and removal of its authors, Ex. 57, which was denied without explanation. Ex. 104.

## GROUNDS WARRANTING VACATUR

It is clear from the Dissent, and from the face of the arbitral record, that the proceedings leading to the Majority Award were so infused with misconduct that Petrobras was deprived of the ability to present its case on the key issue of bribery. The Majority Award was as a result issued in violation of §10(a) of the FAA and should be vacated.

**I.     The Majority Award Must Be Vacated Under Section 10(a)(2) Based on the "Evident Partiality" of Judge Brower**

The FAA "provide[s] not merely for any arbitration *but for an impartial one*." *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 147 (1968) (emphasis added). Under § 10(a)(2) of the FAA, "the United States court . . . may make an order vacating the award . . . where there was evident partiality or corruption in the arbitrators." 9 U.S.C. § 10(a)(2). Evident partiality exists where "a reasonable person would have to conclude that the arbitrator was partial to" the opposing party. *Householder Grp. v. Caughran*, 354 F. App'x 848, 852 (5th Cir.

2009).

Judge Brower's conduct at the arbitral hearing—towards counsel, witnesses and his fellow arbitrators—his friendship with a partner at Quinn (Vantage's counsel), and his past record of partiality demonstrate the standard for vacatur has been met here. *See Sun Refining & Mktg. Co. v. Statheros Shipping Corp.*, 761 F. Supp. 293, 302 (S.D.N.Y. 1991), *aff'd*, 948 F.2d 1277 (2d Cir. 1991) (vacating arbitrator award as a result of arbitrator's "evident partiality"); *Thomas Kinkade Co. v. Lighthouse Galleries, LLC*, No. 09-CV-10757, 2010 WL 436604, at *8 (E.D. Mich. Jan. 27, 2010) (noting that "[t]aken together [numerous] issues cast a dark shadow over the parties' arbitration proceeding" and that "time and again, irregularities in the proceeding favored [one party]"), *aff'd*, 711 F.3d 719 (6th Cir. 2013); *see also* Dkt. 1-7 (concluding that the "processes that led to the issuance of the Final Award have denied Respondents in this proceeding the fundamental fairness and due process protections meant to be provided to arbitrating parties by Section[] . . . 10(a)(2) of the [FAA]").[14]

A.     Judge Brower's Conduct at the Hearing Evinces Actual Bias Favoring Vantage

Arbitrators "must observe high standards of conduct so that the integrity and fairness of the process will be preserved," ABA Code of Ethics Canon I(A), p. 3, and must "conduct themselves in a way that is fair to all parties," *id.*, Canon I(D), p. 4. Members of a tribunal are "to exercise their function not as advocates of the parties nominating them, and *a fortiori* of one party when they are agreed upon by all, but with free independent and impartial minds as the circumstances permit." Sundaresh Menon, *Adjudicator, Advocate, or Something in Between?*, 34

---

[14]     While the Majority Award states that "The Chairman and Judge Brower each confirms that he has remained independent and impartial throughout the proceedings," Dkt. 1-3 ¶ 529, "[a]s the late Judge Weinfeld put it: 'This self-serving categorical denial of partiality or bias, of course, is neither controlling nor dispositive of the issue; nor is it considered by the court.'" *Sun Refining*, 761 F. Supp. at 302 (quoting *Hunt v. Mobil Oil Corp.*, 654 F. Supp. 1487, 1500 (S.D.N.Y.1987).

J. OF INT'L ARB. 347, 357 (2017).  The need for arbitrator impartiality is well established and nearly universally applicable in international arbitration.  *See id.* (noting "virtually every set of arbitration rules, national laws, and every code of ethics that has been promulgated in relation to international arbitration enshrines this principle").  Here, the parties agreed not only that the arbitrators must remain "impartial and independent," but also that they "must remain neutral," Dkt. 1-6, § 8.1, p. 10 (amending Cl. 24.2(B)), a term that "impose[s] an additional standard of conduct on the arbitrators that is broader, and therefore stricter, than 'impartiality'" and was intended to "add a behavioral component to the usual standards of keeping an open mind and being and remaining independent."[15]  Newman Decl. ¶¶ 34-35; *id.* ¶ 35 (explaining that an arbitrator's subsequent failure to conduct himself with neutrality can "invite an inference of evident partiality, which can be the basis for an application to vacate an award pursuant to Section 10(a)(2)").

Despite the well-established requirement of impartiality, Judge Brower's conduct revealed evident partiality towards Vantage and bias against Petrobras, through his hostility towards Petrobras's counsel and witnesses, intermittent disengagement with the proceedings, and aggression towards other members of the Tribunal.  Notably, while Judge Brower confirms in the Majority Award that he "remained independent and impartial throughout the proceedings," he does not confirm that he also remained "neutral."  Dkt. 1-3 ¶ 529.

**Hostility towards Petrobras's counsel**.  As detailed in the Derman Declaration, throughout the course of the hearing, Judge Brower's behavior evidenced the type of direct and

---

[15]	*See* BLACK'S LAW DICTIONARY 1203 (10th ed. 2014) (defining "neutral" as "(Of a judge, mediator, arbitrator, or actor) refraining from taking sides in a dispute; impartial; unbiased. . . . (Of a policy, interpretation, language, etc.) not inherently favoring any particular faction or point of view; couched so as not to express a predisposition or preference"); *id.* at 869 (defining "impartial" as "[n]ot favoring one side more than another; unbiased and disinterested; unswayed by personal interest").  Notably, the hearing protocol provided that "[a]rbitrator questions will normally be charged to the side conducting the examination or cross-examination, except that exchanges over five minutes will be allocated on a 50/50 basis," further underscoring the role of the tribunal members as impartial adjudicators whose questions would presumptively be of equal use (or harm) to each side, not as advocates. Ex. 102.

definite evidence of partiality that warrants vacatur. *See Cooper v. WestEnd Capital Mgmt., L.L.C.*, 832 F.3d 534, 545 (5th Cir. 2016). Judge Brower repeatedly made "snide" comments under his breath, including remarks that counsel to Petrobras's points were "ridiculous," had been "asked and answered," or "already [been] talked about," and interrupted the flow of cross-examination and distracted counsel and the witnesses. Derman Decl. ¶¶ 7-8. These comments were exclusively directed towards Petrobras and so persistent as to cause Petrobras's counsel to confront Judge Brower during the hearing.[16] *Id.* ¶ 9. In response to counsel's "request that Mr. Brower not make comments under his breath during the course of the hearing," Judge Brower did not deny this behavior, but effectively acknowledged it, replying, "I hear you." *Id.*[17]

Judge Brower's "curious, and overt, expression . . . of his hostility," Newman Decl. ¶ 76, "was a clear manifestation of bias, both the appearance and the reality, *id.* ¶ 77. Such "open hostility" is "evidence of partiality" within the meaning of § 10(a)(2) supporting the need for vacatur. *Holodnak v. Avco Corp., Avco-Lycoming Div.*, 381 F. Supp. 191, 198 (D. Conn. 1974) (vacating award under FAA where there was "substantial evidence of partiality . . . if not open hostility"), *aff'd in part, rev'd in part on other grounds*, 514 F.2d 285 (2d Cir. 1975).

**Cross-examination of Petrobras's witnesses**. Judge Brower's cross-examination of Mr. Padilha, one of Petrobras's key witnesses, persisted for more than 93 minutes via videoconference, well beyond the typical length of arbitrator questioning.[18] *See* Newman Decl. ¶¶ 50-56, 65, 67. Judge Brower's questioning, moreover, went beyond the role of an arbitrator seeking to "to obtain

---

[16] *See* Ex. 8, Tr. 1871:7-19 (stating that Judge Brower's comments raised "serious concerns about whether or not [he] [wa]s independent and impartial . . . [and] whether Judge Brower ha[d] prejudged this matter . . . .").

[17] Additionally, on occasion, Judge Brower appeared to be asleep or disengaged during Petrobras's presentation of its case and cross examination of witnesses, but did not exhibit similar disinterest in Vantage's case. *See* Derman Decl. ¶ 10. Despite Judge Brower's inattentiveness, when he did participate in arbitral questioning, he appeared to improperly adopt the role of Vantage's advocate.

[18] Furthermore, Mr. Padilha had already been subject to rigorous cross-examination by Vantage's counsel, during which "[m]ost, if not all, of the these points had already been made." Newman Decl. ¶ 63.

clarification" or even to adduce evidence. *Id.* ¶ 61. Rather, Judge Brower adopted the role of a cross-examiner, continually seeking to discredit and embarrass the witness. *See id*. ¶ 67 (describing Judge Brower's examination as "not one that any arbitrator should have undertaken" whose "principal purpose was to discredit one party's witness and not to clarify testimony"). Mr. Gaitis in his invoices, in fact, repeatedly refers to Judge Brower's questioning as cross-examination or "interrogation," rather than the type of questioning expected from an impartial and neutral arbitrator.[19] *See also id.* ¶ 61 (describing Judge Brower's behavior as "beyond what can be reasonably understood to comport with his obligation under the parties' agreement to be not only impartial and independent but also to be neutral").

For example, well aware of the financial terms and travel restrictions imposed on Mr. Padilha as a result of his conviction and sentence in Brazil, Judge Brower proceeded to probe Mr. Padilha about his personal wealth and the reasons for his inability to testify in person in Houston. *See* Ex. 6, Tr. 1526:11-1527:7; 1534:17-1539:7.[20] At one point during the questioning, Mr. Padilha's counsel in Brazil remarked that she had "never seen this" type of interrogation of a witness and noted the "embarrassing" effect of Judge Brower's questions. *Id.* at 1537:21-26. Even Professor Park interjected during Mr. Padilha's examination, requesting that Judge Brower "ask [a] question again," and warning Judge Brower to do so "a little bit more openly." *Id.* at 1569:5-7. Indeed, as Petrobras's expert explained, "[Judge Brower] manifestly and aggressively took sides with respect to the testimony of this critically important witness leading anyone present or reading the transcript to be under no illusion as to his position with respect to important issues in the case." Newman Decl. ¶ 65.

---

[19]    *See* Ex. 72, p. 3 (5/23) ("Brower x-exam of Padilha"); Ex. 73, p. 2 (6/30) ("Brower interrogation of Padilha"); Ex. 76, p. 1 (7/5) ("Brower interrogation of Padilha"); Ex. 79, p. 2 (1/23) ("Brower Interrog of Padilha").
[20]    *See also id.* at 1534:22-1535:25; 1538:16-1539:2 (questioning about the cancellation of Mr. Padilha's U.S. visa); *id.* at 1541-53 (aggressive impeachment of Mr. Padilha's statements).

Judge Brower conducted a similarly harsh interrogation of Mr. Labiche, Petrobras's regulatory expert, attacking his credibility based on critiques of his former employer. *See* Ex. 11, Tr. 2774:22-24 ("You have been, I think it's fair to say, extraordinarily critical of your former employer."); *id.* at 2775:11-12 ("Sounds like you might have gotten pretty disgusted with them. Is that why you left?"); *see also* Newman Decl. ¶¶ 73-75. As Mr. Newman explains, Judge Brower's "questioning was not intended to clarify anything. It was an attempt to show bias, a task for an advocate, not an arbitrator." *Id.* ¶ 75.

Judge Brower likewise adopted the role of Vantage's advocate during the testimony of Petrobras's operations expert, Dr. Negrao. After Vantage sought to establish that Dr. Negrao had failed to consider key evidence and instead summarized information from a report, Ex. 8, Tr. 2065:1-2118:11, Dr. Negrao clarified the evidence he considered on re-direct, *id.* at 2118:15-2126:7. When Vantage made no application for further questions, Judge Brower stepped in as its *de facto* advocate and engaged in a near line by line attack on Mr. Negrao's explanation. *See id.* at 2126:11-2129:13. Judge Brower's questioning of each of Petrobras's witnesses, with one exception (discussed below), was substantially longer than his questioning of any of Vantage's witnesses, many of whom Judge Brower addressed once, did not question at all or rehabilitated on behalf of Vantage. *See also supra* pp. 12-13. This behavior "exceeded the generally accepted boundaries for arbitrators' conduct of questioning witnesses only for purposes of clarification of their testimony." Newman Decl. ¶ 103. In light of the clear animus Judge Brower exhibited towards both Petrobras's counsel and their witnesses, "a reasonable person would have to conclude that [Judge Brower] was partial to" Vantage. *Householder Grp.*, 354 F. App'x at 852.

**Partiality towards Vantage**. Judge Brower's bias against Petrobras is further evidenced by his overt favor towards Vantage, both through his gratuitous rehabilitation of Vantage's expert

witness and his rulings on various disputes during the hearing.  Following Petrobras's cross-examination of Vantage's international law expert, Judge Stephen Schwebel, Judge Brower questioned the witness in an effort to rehabilitate his testimony.  *See* Newman Decl. ¶¶ 68-72.  Every substantive question Judge Brower asked Judge Schwebel was leading, *see* Ex. 7, Tr. 1812:16-1819:24, transforming Judge Brower into an advocate for Vantage rather than an impartial adjudicator.[21]  *See* Newman Decl. ¶¶ 68, 70 (explaining that Judge Brower posed "leading questions" that "would not have been permitted if asked by [Vantage's] counsel" and that invited Judge Schwebel to "bolster his written testimony").  Indeed, Mr. Gaitis openly recognized on the record that Judge Brower had pre-judged the dispute prior to the completion of the hearing.  *See* Ex. 7, Tr. 1822:14-23 ("Judge Brower: You [Mr. Gaitis] said that's the way this reads.  Is that a final conclusion on your part before the hearing is over and we've deliberated the case?  Mr. Gaitis: No, Charlie.  I think if you read these provisions, I think they're plainly written and that's what they say.  I think I'm farther away from a final conclusion in this hearing than you are, sir.  So that's a question that really was very inappropriate on your part.").[22]

> B.     Judge Brower's Close Personal Relationship with Vantage's Counsel Is Evidence of Partiality Necessitating Vacatur of the Majority Award

In addition to the troubling conduct Judge Brower exhibited during the arbitration hearing,

---

[21]     Showing the leading nature of the questions, the large majority of Judge Schwebel's answers to Judge Brower's inquiries were answers simply affirming statements by Judge Brower himself, who overtly led Judge Schwebel to the answers Judge Brower wanted.  *See, e.g.*, Ex. 7, Tr. 1812:22-1813:4 ("Judge Brower: . . . [W]ould the fact that the contract which is alleged to have been secured by bribery, was, in fact, objectively at or below market rates be relevant to consideration as to whether or not there was bribery?  Judge Schwebel: It might well be relevant, yes.  Judge Brower: Right."); *id.* at 1819:1-9 ("Judge Brower: And if the breach of a contract to be . . . performed at stated rates over an agreed period of time subject to termination provisions and so forth, if the claim is for the loss of profits that would have been earned absent the claimed breach of the contract, in your opinion those would be direct losses?  Judge Schwebel: Yes.  Yes, I agree with you, yes.").

[22]     Further disagreements between Judge Brower and the other members of the Tribunal evidenced a breakdown in the arbitral process, including with respect to Vantage's right to withdraw their counterclaims on the eve of the merits hearing, *see* Ex. 1, Tr. 18:7-19:9 ("Mr. Gaitis: . . . I am not sure I agree with Judge Brower that one can withdraw a claim whenever they want . . . ."), and the Chair's ability to control the hearing, *see* Ex. 9, Tr. 2216:24-2217:2 ("Judge Brower: He [Dr. Maness] has to go.  The President: Charlie, I am aware of this, but we need to have one – I say this to both, we need to have one Chair.").

**MOTION TO VACATE THE MAJORITY AWARD – Page 22**

Judge Brower's affiliations with Vantage's counsel and past record of removal and resignation also call into question his impartiality.

Following his appointment, Judge Brower revealed that he had a friendship with Mr. Triantafilou, a partner at Quinn, Vantage's counsel. Ex. 44, p. 5. This relationship included (1) Mr. Triantafilou's former employment as a law clerk to Judge Brower in 2010-11; (2) attendance of Mr. Triantafilou and his wife at intimate dinners hosted by Judge Brower (including a 15-person Thanksgiving dinner in 2015); (3) the dedication of a book which Mr. Triantafilou co-edited to Judge Brower, describing him as "first and foremost a mentor, teacher, and friend"; (4) Judge Brower's appearance at a program for the American Society of International Law at the invitation of Mr. Triantafilou during the pendency of the instant arbitration; and (5) Judge Brower's service alongside Mr. Triantafilou on the Board of Editors of the *World Arbitration & Mediation Review*, the last two instances of which were not included in Judge Brower's disclosures. *See id.* This friendship is not the kind of "trivial" connection that need not be revealed under § 10(a)(2), *Burlington N.R. Co. v. TUCO Inc.*, 960 S.W.2d 629, 637 (Tex. 1997), but the type that the Supreme Court held "might create an impression of possible bias." *Commonwealth Coatings*, 393 U.S. at 149. Further, recent appointments of Judge Brower as the party-selected arbitrator for clients represented by Quinn suggest an ongoing relationship with Vantage's firm that establishes at least the *appearance*—if not more—of partiality sufficient to warrant vacatur. Ex. 44, p. 4. *See Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 281 (5th Cir. 2007) ("[A]rbitrators 'not only must be unbiased but also must avoid even the appearance of bias,' in order to maintain confidence in the arbitration system." (internal quotation omitted)); *see also* Newman Decl. ¶ 46 (noting that the arbitrator's "conduct as it appears to a disinterested observer is what matters").

Taken together, Judge Brower's conduct and relationship with Quinn would lead a

"reasonable person to conclude that the arbitrator was partial" and predisposed to judge the case in Vantage's favor. *Householder Grp.*, 354 F. App'x at 852. Indeed, Petrobras raised multiple challenges to Judge Brower, including "as soon as [Petrobras] became aware of his selection to the panel and before the arbitration began," as well as during and after the hearing. *Sun Refining*, 761 F. Supp. at 304.[23]

    C.    <u>Judge Brower's Past Record of Partiality Suggests Bias in the Instant Arbitration.</u>

The concern that Judge Brower pre-judged the issues in the Arbitration is compounded by the fact that he has been removed or forced to resign from arbitral panels in three prior arbitrations based on concerns about his impartiality:

- In *Perenco Ecuador Ltd. v. Ecuador*—ICSID Case No. ARB/08/6, the Permanent Court of Arbitration ("PCA") held that Judge Brower's comments in an interview regarding a pending proceeding "g[a]ve a reasonable and informed third party justifiable doubts as to Judge Brower's impartiality" and "g[a]ve rise to justifiable doubts about his impartiality." Newman Decl. Ex. 2 ¶¶ 48, 53. The PCA stated that "Judge Brower no doubt has extensive experience in international arbitration and is highly regarded in the field, but this fact is irrelevant in applying the IBA." *Id.* Ex. 2 ¶ 63.

- Similarly, in in *Vale v. BSGR*, in response to a challenge that Judge Brower had, *inter alia*, prejudged the arbitral dispute, a three person division appointed by the London Court of International Arbitration found that "circumstances exist . . . giv[ing] rise to justifiable doubts as to the Chair's [Judge Brower] independence or impartiality" and that "the appointment of the Chair of the arbitral tribunal in this arbitration should be revoked." *See In re Application Pursuant to 28 USC § 1782 et al. v. Brower et al.*, 16-mc-2552, Dkt. 7-1 (D.D.C. Dec. 21, 2016).

- In *Tanesco v. IPTL*—ICSID Case No. ARB/98/8, a challenge was made in response to Judge Brower's review and approval of the publication of an article that described a hypothetical case using the facts and issues in the pending arbitration. Right before the International Centre for Settlement of Investment Disputes Chairman was scheduled to issue his decision on the challenge, Judge Brower resigned. Ex. 120, p. 1.

As these examples indicate, this is not the first time Judge Brower acted in a way that exhibited

---

[23]     Accordingly, "[t]his is not a classic example of a losing party seizing upon a pretext for invaliding the [arbitration] award." *Sun Refining*, 761 F. Supp. at 304 (internal quotation marks omitted). Because decisions on challenges to the AAA do not set forth the reasoning and the deliberative process is confidential, Petrobras does not know the bases for rejection of its challenges. *See* Ex. 121, p.5.

partiality as an arbitrator in the eyes of objective adjudicators.  *See* Newman Decl. ¶¶ 42-45.  Here too, "Arbitrator Brower's bias cannot be protected" and it is "[his] conduct as it appears to a disinterested observer is what matters."  *Id.* ¶ 46.

The cumulative effect of these multiple examples of Judge Brower's partiality demonstrates that "bias was clearly evident in [a] decisionmaker," such that this Court cannot uphold the Majority Award pursuant to § 10(a)(2).  *Positive Software*, 476 F.3d at 281; *see also* Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4-13, cmt. (f) (Draft of Apr. 16, 2012) ("[A] finding that an arbitrator had an unfair predisposition toward a particular outcome or an improper bias in favor of one party may be a basis for denying post-award relief [under the FAA].").

D.    Judge Brower's Bias Affected the Majority's View of Respondents

As an "inevitable [and] undesirable" consequence of Judge Brower's bias, the Majority Award reflects determinations "that can be regarded as insufficiently supported by the reasoning on which they were purportedly based and therefore possibly affected by bias in the tribunal in the form of a negative attitude toward the Respondents and positions taken by them."  Newman Decl. ¶¶ 80-83, 100.

For example, the Majority went out of its way to ignore, and indeed bury, the evidence and testimony elicited by Petrobras's counsel demonstrating that Mr. Halkett, the sole witness Vantage offered to testify concerning the bribery scheme, had a financial interest in the outcome of the Arbitration and that he lied about it.  As Petrobras repeatedly raised with the Tribunal during the Arbitration, Vantage's SEC filings and disclosures in its bankruptcy court proceeding reveal that Vantage's officers have a direct financial interest in the outcome of the Arbitration, and stand to receive significant remuneration based on Vantage's success, through an incentive compensation plan called the Amended and Restated 2016 Management Incentive Plan (the "2016 Amended

MIP").[24]  At the May 2017 merits hearing, Petrobras's counsel thus cross-examined Mr. Halkett about whether he had any personal interest in the award.  *See* Ex. 2, Tr. 343:22-344:11. Notwithstanding the fact that Mr. Halkett would irrefutably stand to share under the 2016 Amended MIP's set aside of 3.25% of the proceeds of recovery for a management bonus pool, Mr. Halkett testified that he was "not aware of that."  *Id.* at 344:7-11.  It is inconceivable that Mr. Halkett, the Chief Operating Officer of Vantage, was "not aware" of the 2016 Amended MIP—a document that Vantage filed with its SEC disclosures and directly referenced therein.  Mr. Halkett's response, however, echoes that of Vantage's counsel who, when confronted by the SEC filings and bankruptcy disclosure, nonetheless represented to the Tribunal on December 29, 2016 that no third party funders or lenders financed or would benefit from the Arbitration and that "*no officer of [Vantage] is entitled to a portion of the award in this arbitration*."  *See* Ex. 103 ¶ 1 (emphasis added).

Mr. Gaitis' time records reveal, on the other hand, that he, at least, saw through these misrepresentations, and understood not only that Mr. Halkett would benefit from Vantage's success in the arbitration, but that the Majority's failure to recognize this resulted in great prejudice to Petrobras.  Ex. 82, p. 2 (4/27) ("Review new 5th Circuit case—*DePuy* (re Halkett testimony—payments to witnesses)").[25]  In *In re DePuy Orthopedics, Inc.*, 888 F.3d 753, 792 (5th Cir. 2018),

---

[24]     *See, e.g.*, Ex. 116, pp. 3, 6, 11 (2016 Amended MIP, providing that "following [Vantage's] receipt of proceeds from an arbitration award issued in connection with the Petrobras [Arbitration]," Vantage's compensation committee will grant "Awards" to Vantage employees, directors and consultants out of a pool equal to the sum of "3.25% of the net cash proceeds" plus "3.25% of any non-cash consideration . . . "that [Vantage] receives with respect to such arbitration award"); Ex. 115, pp. 3, 5-6, 10-12 (same); Ex. 118, p. 53 ("Pursuant to the 2016 Amended MIP, the Compensation Committee may grant to employees, directors and consultants stock options, restricted stock, restricted stock units or other awards."); Ex. 117, p. 3 ("Additional awards may be granted by the Compensation Committee as soon as reasonably practicable following the Company's receipt of proceeds from an arbitration award issued in connection with the Company's outstanding litigation matter with Petrobras, in an amount equal to 3.25% of the net proceeds (if any) received by the Company pursuant to such litigation."); Ex. 119, Dkt. 8-2, p. 66 (proposal to award management "3.25% of any arbitration award in connection with the Petrobras litigation [the Arbitration]").

[25]     *See also* Ex. 79, p. 1 (10/20) ("Review witness fee authorities . . . [and] docs re Cs witness incentives"); *id.* p. 2 (1/26) ("Review exhibits re Halkett incentive"); *id.* (1/27) ("Review CB email, Cs Management Incentive Plan, delib notes; email to panel"); *id.* (1/28) ("draft dissent").

the case Mr. Gaitis reviewed, the Fifth Circuit vacated a $502 million verdict, where counsel's misrepresentations about payments to experts "leveraged the false contrast between defendants' paid mercenaries and plaintiffs' unpaid altruists to his clients' advantage" and thus "prevented defendants from fully and fairly defending themselves." *Id.* (internal quotation omitted).

Nevertheless, as with its blithe acceptance of Vantage's denial that it was even aware of the bribery scheme to procure the DSA in the face of substantial evidence to the contrary, the Majority Award utterly ignores Mr. Halkett's false testimony. Indeed, while the Majority Award cites Vantage's repeated assertion that Mr. Padilha, "Respondents' only witness on the [bribery] matter," was "not reliable," Dkt. 1-3 ¶ 271, it makes no mention of the fact that Mr. Halkett made affirmative misrepresentations to the Tribunal at the merits hearing. Moreover, the Majority tried to side step the issue of Mr. Halkett's credibility in its entirety: while noting in three separate paragraphs that Vantage's counsel had represented in December 2016 that no third party funders or lenders financed or would benefit from the Arbitration, the Majority Award conspicuously omits that this representation covered Vantage's management as well, thereby avoiding having to address Mr. Halkett's false testimony. *See id.* ¶¶ 60-62, 98. It is clear that the Majority was intent on reaching a specific conclusion, and would not allow this evidence to stand in its way.

As Mr. Newman explains, this was far from the only the example of the Majority's biased decision-making. *See, e.g.* Newman Decl. ¶ 82 (noting the Majority relied on a single case in support of its ruling on whether the DSA was voidable "which, in fact, provided no support for the award's important conclusion") (citing Dkt. 1-3 ¶ 372); *id.* ¶ 83 (noting the Majority's "puzzling" refusal to give weight to Vantage's statements in its Form 10-Q disclosing its agreement in principle with the SEC); *id.* ¶ 81 (observing that the Tribunal's refusal to grant Petrobras's request to order depositions of Mr. Bragg and Mr. O'Leary "paid little heed to the parties' agreement

expressing their willingness to take the testimony of [the two] witnesses"). Indeed, the sole support for the Majority's ratification holding is a single English law case that the Majority simply took at face-value from Vantage's brief. Dkt. 1-3 ¶ 290 n.92 ("Claimant cite[s] *Hughes v. Metropolitan Ry.*"); *see also id.* ¶ 291 & n.93 (concluding that the choice of law is immaterial, based upon Vantage's statement in its brief that under either English or Federal Maritime law the result would be the same). As Mr. Newman concluded following his review of the "compelling evidence" of bias in the record, Judge Brower's "partisan behavior inevitably skewed what should have been a collective truth-seeking environment in which the arbitrators carried out their responsibilities in accordance with accepted rules and norms," and thus "[i]t may reasonably be found, that the process that resulted was of one of fundamental unfairness . . . sufficient to warrant . . . *vacatur* of the award." Newman Decl. ¶ 103.

## II. The Award Should Be Vacated Under Section 10(a)(3) Based on the Tribunal's Refusal to Consider Evidence Pertinent and Material to the Controversy

An arbitral award must be vacated under FAA § 10(a)(3) "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). This standard is met "if the exclusion of relevant evidence deprives a party of a fair hearing," or if "the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 300-01 (5th Cir. 2004); *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995) (affirming vacatur where arbitrator refused to admit pertinent evidence, finding that "[s]uch misconduct falls squarely within the scope of Section 10"); *Valentine v. Interactive Brokers LLC*, 01-15-00943-CV, 2017 WL 3597735, at *11 (Tex. App.—Houston [1st Dist.] Aug. 22, 2017, pet. filed) (upholding vacatur of award under

§ 10(a)(3), finding that respondent did not receive a full and fair hearing where tribunal refused to consider evidence to rebut assertions made by petitioner's counsel). While "[t]he arbitrator is not bound to hear all of the evidence tendered by the parties . . . he must give each of the parties to the dispute adequate opportunity to present its evidence and arguments." *Nat'l Football League Players Ass'n v. Nat'l Football League*, 270 F. Supp. 3d 939, 951 (E.D. Tex. 2017) (finding that respondents were denied a fair hearing where they were precluded access to investigators' notes and the ability to cross-examine one key witness and question another), *vacated and remanded on other grounds*, 874 F.3d 222 (5th Cir. 2017).

Here, the Majority Award should be vacated because the Majority deprived Petrobras of the opportunity to adduce evidence of bribery that was highly pertinent and material to the controversy. While determining that "Respondents carry the burden of proving corruption by [Petitioners]," Dkt. 1-3 ¶ 172, the Majority severely impeded Petrobras's ability to discharge this burden by denying its unopposed request to depose Mr. Bragg, Vantage's former CEO and President, and Mr. O'Leary, a former Vantage director, both of whom had direct involvement in, and knowledge of, the bribery scheme; by precluding meaningful cross-examination of Mr. Halkett, the only witness Vantage made available to testify on the bribery issue; and by refusing to accord any weight to Vantage's disclosure of its offer to pay a $5 million penalty to the SEC to settle its claimed FCPA violation.

There was no substitute for this material, pertinent, and critically important evidence and it was thus fundamentally unfair—and a violation of FAA § 10(a)(3)—to deprive Petrobras of the opportunity to adduce it. Without this evidence, the Tribunal did not have a full picture of Vantage's bribery scheme before it and therefore was unable to reach a fair decision on the validity of the DSA and whether Vantage was entitled to enforce the contract it obtained through a bribery

scheme involving not only its largest shareholder, but also its President and CEO. *See* Dkt. 1-7 (concluding that the "processes that led to the issuance of the Final Award have denied Respondents in this proceeding the fundamental fairness and due process protections meant to be provided to arbitrating parties by Section[] . . . 10(a)(3) of the [FAA]").[26]

    A.    Denial of Petrobras's Unopposed Requests to Depose Mr. Bragg and Mr. O'Leary Excluded Testimony that Was Pertinent and Material to the Bribery Issue.

Mr. Bragg, the former CEO and President of Vantage, and Mr. O'Leary, a former Vantage director, were central figures in the Vantage bribery scheme. As set forth *supra* p. 5-6, it was Mr. Bragg who brought on board and then connected Nobu Su—Vantage's largest shareholder with control over three seats on Vantage's nine-member board, and whose company was used to pay the bribe commissions—with Mr. Padilha—Vantage's agent and a "good friend" of both Mr. Bragg and Mr. O'Leary, Ex. 6, Tr. 1474:10-1476:1, who facilitated payment of the bribes and has been criminally charged and convicted in Brazil for those acts. Ex. 19 ¶ 415. After connecting Mr. Su and Mr. Padilha, Mr. Bragg set up key meetings among Mr. Padilha, Mr. Su and Petrobras officials during which the payment of bribes was discussed in connection with the potential drilling contract. *See* Ex. 14, pp. 9-10; Ex. 32, p. 2; Ex. 18 ¶ 10. Mr. Padilha has testified that Mr. Bragg and Mr. O'Leary then assisted him in securing Mr. Su's commitment to pay the bribes, and that he kept the Vantage executives apprised of his efforts in furtherance of the bribery, including reporting to Mr. Bragg and Mr. O'Leary on his meetings with Mr. Henriques, the PMDB lobbyist who was convicted for distributing bribe payments to politicians and the PMDB political party in connection with the Vantage bribery scheme. *See* Ex. 18 ¶¶ 7-9; Ex. 84; Ex. 85; Ex. 19 ¶ 418.

---

[26]    As detailed below, the record is replete with evidence of the Majority's misconduct in refusing to hearing evidence that is pertinent and material to Petrobras's claims and defenses. However, the Dissent, as well as Mr. Gaitis' and Professor Park's time records, *see supra* p. 10, indicate further unfairness related to the Majority's document production determinations (among other things). As set forth in Petrobras's concurrently filed Motion for Leave to Serve a Subpoena, Mr. Gaitis' testimony is necessary to appreciate the extent of the Majority's due process violations.

When a reporter later emailed Mr. Bragg for comment on the Época article alleging that Vantage paid bribes to procure the DSA, *see* Ex. 37, Mr. Bragg opened the email but immediately deleted it without taking further action. █████████

Vantage itself appears to have recognized the importance of Mr. Bragg's and Mr. O'Leary's testimony, as Vantage did not oppose Petrobras's request to depose these individuals, but sought equal time to ask their own questions of the witnesses.[27]  This is unsurprising, █
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

Yet, despite their knowledge on an issue central to the Arbitration, the Tribunal inexplicably refused Petrobras's unopposed request to depose Mr. Bragg and Mr. O'Leary.  Ex. 53.  While the Tribunal indicated that the parties could "agree with [Mr. Bragg or Mr. O'Leary] on a process for depositions on a voluntary basis," with the admonition that the depositions "shall not disrupt the schedule for the hearings," *id.*, such an agreement was inconceivable, given that Mr. Bragg and Mr. O'Leary had already refused to produce documents when served with a subpoena from the Tribunal.  Dkt. 1-3 ¶ 132.  Indeed, in the context of the prior ruling the Tribunal "effectively discourage[ed]" the taking of the depositions at all.  Newman Decl. ¶ 81.

The Tribunal's denial of Petrobras's unopposed requests to depose Messrs. Bragg and O'Leary amounted to "fundamental unfairness and misconduct sufficient to vacate the award

---

[27]       It is worth noting that Vantage's request for equal time was unreasonable, given that Vantage had access to these individuals and was able to interview them on multiple occasions, including an interview of Mr. Bragg just a few weeks earlier on January 11, 2017.  Ex. 16, p. 18.

[28] ██████████████████████████████████████████████████    ████████████████

pursuant to section 10(a)(3) of the FAA." *See Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20-21 (2d Cir. 1997) (vacating award where the tribunal excluded material evidence which then left "unrebutted" the claim upon which it ultimately awarded relief). In *Tempo Shain*, the respondents requested that the tribunal continue the parties' merits hearing so that its former president would be able to testify, *id.* at 17-18, and the arbitrators refused and subsequently rendered an award in favor of the claimants. The respondents moved to vacate based on § 10(a)(3) of the FAA, *id.* at 18, and the Second Circuit vacated the award. As the Second Circuit explained, the former president "was the only person who could have testified in rebuttal of [claimants'] fraudulent inducement claim, and in support of [respondents'] fraudulent inducement claim," and the documentary evidence did not adequately address such testimony. *Id.* at 21. Thus, while arbitrators have substantial leeway in making evidentiary decisions and excluding testimony that would "merely be a cumulative 'rehash'" of other evidence, the Second Circuit found that failing to allow the president's testimony amounted to "fundamental unfairness and misconduct sufficient to vacate the award." *Id.* at 19, 21.

Here, as in *Tempo Shain*, testimony of Mr. Bragg and Mr. O'Leary—central figures in the Vantage bribery scheme—would not have been a mere "cumulative rehash," but was essential in order for Petrobras to discharge its burden of proving bribery, a key disputed merits issue on which liability turned. Indeed, the only witness Vantage provided who supposedly had knowledge of the bribery issue was Mr. Halkett, but he repeatedly testified that he was not involved in, did not have knowledge of or did not remember the relevant events.[29] Under the circumstances, Petrobras's

---

[29] *See, e.g.*, Ex. 2, Tr. 310:5-21 ("Q: . . . But you're telling me now the first conversation you had about the consequences of this illegal act, you don't remember? Mr. Halkett: I remember the discussions—I remember the shock of Paul calling me and telling me—I think it was a Sunday—that [Mr. Padilha] had made this statement and plea bargain in Brazil. And that's what I—that's what I remember being shocked about it and I truly believed that we had obtained the contract legally and this was a real shock. Q: And so what else was discussed in that conversation? What else do you remember? Mr. Halkett: I can't remember. Sorry."); *id* at 432:15-433:6 ("Q: So are you aware that Bragg received [the Época reporter's email], around the time of [the article's] publishing? Mr. Halkett: I was not

ability to question Mr. Bragg or Mr. O'Leary in order to adduce evidence uniquely within their knowledge—such as their emails and conversations with Mr. Padilha, or Mr. Bragg's conversations with Mr. Su and his deletion of the Época reporter's email—as well as to impeach their credibility, was crucial.

This is particularly so given that evidence of bribery, by its nature, is typically masked, concealed, and obscured.  Without Mr. Bragg's or Mr. O'Leary's testimony, Petrobras was severely handicapped in its ability to challenge or rebut Vantage's assertions that ambiguous evidence was not probative of misconduct, which Vantage based entirely on contentions regarding Mr. Bragg's and Mr. O'Leary's "subjective intent."  *See, e.g.*, Ex. 86 ¶¶ 48-49 (asserting that "each piece of evidence Petrobras tries to use to show that Mr. Bragg and Mr. O'Leary should have known of the alleged bribery is consistent with legitimate activity, particularly when viewed in the context of other facts that would have been part of Mr. Bragg's and Mr. O'Leary's subjective understanding at the time," and noting that the phrase "honor commitments" is "hardly unambiguous confirmation of illicit payments").[30]  In effect, the Tribunal allowed Vantage to argue Mr. Bragg's and Mr. O'Leary's state of mind without requiring them to testify, much less be cross-examined, on what they actually knew.

---

aware of it until recently.  Q: . . . And are you aware that the marketing department was copied on the e-mail to Mr. Bragg including this article?  Mr. Halkett: I was not aware.  Q: Who in the marketing department would that have gone to?  Mr. Halkett: There's a –I believe that a secretary in Singapore. . . . Q: And so you said you were back in Houston by 2012.  You had left Singapore at that time, correct?  Mr. Halkett: That's correct."); *id.* at 438:1-10 ("Q: And that that e-mail [from Época ] that was sent to both Mr. Bragg and Vantage marketing, it says here that Bragg had no pattern or practice. It says: We found no evidence that he discussed the e-mail with the marketing department, which also received it, but that the e-mail had been opened and subsequently deleted. What do you make of that? Mr. Halkett: He opened an e-mail and he didn't respond to it. I say I only became aware a few days ago.").

[30]    *See also, e.g.*, Ex. 87, p. 25 & Ex. 88, pp. 43-48 (arguing that "(double) hearsay and reliability concerns infect the September 2012 email that Petrobras cites from Su's associate Joseph Yeh, in which Mr. Yeh warns Mr. Bragg to '[b]e careful of a mad dog corned as it will bit[e] anything to get out of the jam'"); Ex. 88, p. 46 ("Petrobras cannot show that Vantage, Bragg, or O'Leary participated in a conspiracy, which requires a *knowing meeting of the minds* on an object or course of action."); Ex. 90, p. 11 (asserting that testimony that "shipyard commissions" as used in Mr. Padilha's November 17, 2008 email to Mr. Bragg asking for his input on Su's "proposed way to proceed on the deal regarding 'shipyard commissions'" refer to bribes is "pure conjecture"); Ex. 91, p. 106 (asserting that "[c]onsidering the actual content of the Época reporter's email "it is not surprising that a busy CEO like Mr. Bragg would ignore it").

The Majority's own statements regarding the parties' evidence make clear that, far from being cumulative, Mr. Bragg's and Mr. O'Leary's testimony would have been indisputably "pertinent and material." During the hearing, Judge Brower opined that "given the state of evidence, how deeply or not deeply one needs to be persuaded is important," and ventured that the only "direct evidence" of bribery in the record was Mr. Padilha's testimony and the "judgment of the court" in Brazil. Ex. 10, Tr. 2601:12-2602:4 (noting that there was also testimony amounting to "an assumption based on what is hearsay evidence" and "inferences from certain e-mails"). By failing to order Mr. Bragg's or Mr. O'Leary's deposition, the Tribunal denied Petrobras the ability to adduce additional, critical "direct evidence" of bribery, or to demonstrate that the "hearsay evidence" and the "inferences from certain e-mails" were in fact proof of Vantage's knowledge of corruption.[31] Both depositions were critical; the Tribunal granted neither one.

While failing to present either Mr. Bragg or Mr. O'Leary to testify, Vantage attempted to refute evidence of their knowledge of and involvement in the bribery scheme by attacking Mr. Padilha's credibility.[32] The Tribunal thus created a grotesque situation in which Judge Brower took 93 minutes to interrogate Mr. Padilha, after he had already been subject to three and one-half hours of cross-examination by Vantage's counsel—"the transparent purpose of [which] . . . was to help undermine [Mr. Padilha's] testimony regarding his assertions concerning the knowledge of [Mr.] Bragg . . . of the bribery," Newman Decl. ¶ 64—while, in place of any sworn testimony by

_____

[31]   Ultimately, the Majority Award did not consider the majority of the evidence offered in support of the existence of bribery, and says only that Petrobras relied on the Brazilian Court Judgment as "conclusive evidence of [Vantage's] bribery." Dkt. 1-3 ¶ 275.

[32]   *See, e.g.*, Dkt. 1-3 ¶ 271 ("[Vantage] assert[s] that Mr. Padilha is Respondents' only witness on [whether Vantage—and specifically Mr. Bragg—was "aware of the alleged bribery"], and is not reliable."); Ex. 86 ¶ 46 (dismissing Mr. Padilha's testimony that Mr. Su "'spoke explicitly to Bragg about the bribes and commissions and told Bragg he wanted to be repaid and that he would not pay the last installment'" as not credible); Ex. 91 ¶ 345 ("Mr. Padilha's testimony that he openly discussed the bribery scheme with Mr. Bragg and Mr. O'Leary after the contract was signed is not credible"); *id.* ¶ 63 n.8 ("Mr. Padilha claims he had explicit discussions with Mr. Bragg and Mr. O'Leary about the alleged bribery scheme after the DSA was signed; however, this testimony is unreliable for a number of reasons.").

Mr. Bragg or Mr. O'Leary, Vantage was permitted to "present" what they supposedly knew through arguments of its counsel. Mr. Padilha was subject to both Vantage's cross-examination and what amounted to an additional hostile cross-examination by Judge Brower, while Petrobras was not able to cross-examine Mr. Bragg or Mr. O'Leary at all. *See id.* ¶¶ 65-67; *see, e.g.*, *Davidson v. Great Nat'l Life Ins. Co.*, 737 S.W.2d 312, 314 (Tex. 1987) ("Due process requires an opportunity to confront and cross-examine adverse witnesses." (citation omitted)); *cf.* AAA Rule 32(a) (providing that arbitrators should ensure that "parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case").[33]

In light of the foregoing, it was fundamentally unfair to deny Petrobras the ability to question Mr. Bragg or Mr. O'Leary in a proceeding in which the Majority assigned it the burden of proof on the essential issue of whether Vantage, either directly or by imputation, obtained the DSA through bribery. *See Hoteles Condado Beach, La Concha & Convention Ctr. v. Union de Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985) (affirming decision to set aside award where arbitrators refused to consider evidence material to the claim for which liability was imposed). Indeed, the Majority itself effectively acknowledged that Mr. Bragg's testimony was key to understanding Vantage's participation in the bribery scheme to obtain the DSA, as it found that the evidence "[w]ith respect to Mr. Bragg['s participation] is less clear." Dkt. 1-3 ¶ 286. This was key evidence, without which the Tribunal lacked a full picture of the bribery scheme and all of its consequences.

     B.     The Tribunal Precluded Meaningful Cross-Examination of Vantage's Only Testifying Witness on the Bribery Issue

This unfairness to Petrobras was compounded by the significant limitations the Tribunal

---

[33]     *See also* AAA Rule 22(a) ("The arbitrator shall manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute, while at the same time promoting equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses.").

placed on Petrobras's cross-examination of Mr. Halkett, who, in the absence of Mr. Bragg and Mr. O'Leary, was the only Vantage witness on the bribery issue.[34]

As detailed *supra* pp. 11-12, during the merits hearing, Petrobras sought to question Mr. Halkett regarding the presentations and reports submitted by Vantage's attorneys at Weil to U.S. regulators in order to test the assertions contained in them. *See* Ex. 1, Tr. 286:11-287:3. In response to objections from Vantage's counsel purportedly on the basis of privilege, the Tribunal determined that Petrobras's questioning would be limited to "pointing to a particular section of the [Weil] report and ask[ing] about the facts in that report." Ex. 2, Tr. 294:24-295:12. Petrobras was denied the opportunity to ask questions about the factual information that Mr. Halkett supplied to Weil, even though such information is not privileged under black-letter Texas privilege law (which the parties agreed applied to the privilege issue).[35]

This substantial restriction on Petrobras's ability to examine the only Vantage witness available to testify regarding the assertions in the Weil reports—which Vantage relied on in its briefing and throughout the hearing as evidence of lack of wrongdoing, *see, e.g.*, Ex. 86 ¶¶ 50-51; Ex. 1, Tr. 82:5-83:3; Ex. 2, Tr. 292:9-293:1—again severely hampered Petrobras's ability to

---

[34] Beside Mr. Halkett, Vantage did not make available at the arbitration *any* of the *fifteen* other former and current employees interviewed by Weil for the DOJ and SEC investigations. ████████████

[35] Courts in the Fifth Circuit do not permit parties to use privilege as both a sword and shield. *See, e.g.*, *Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005) (noting that "a party may not use privileged information both offensively and defensively at the same time"); *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999) ("In accord with this principle is a client's inability to, at once, employ the privilege as both a sword and a shield. . . . Attempts at such improper dual usage of the privilege result in waiver by implication."); *Charalambopoulos v. Grammer*, No. 14-CV-2424-D, 2017 WL 1094394, at *3 (N.D. Tex. Mar. 8, 2017) ("In the . . . context of the attorney-client privilege, courts generally recognize that a privilege cannot be used simultaneously as both a sword and a shield."). Indeed, as state and federal courts in Texas have recognized, "the weight of authority does not favor recognition in Texas of a doctrine of selective waiver of privilege." *In re Fisher & Paykel Appliances, Inc.*, 420 S.W.3d 842, 851-52 (Tex. App. 2014); *see also, e.g.*, *S.E.C. v. Brady*, 238 F.R.D. 429, 440-41 (N.D. Tex. 2006) ("[T]he Fifth Circuit has yet to adopt the selective waiver doctrine . . . [and] is persuaded by the reasoning of the great weight of authority which has declined to adopt the selective waiver doctrine.").

While the Tribunal did not explain the basis for its ruling, its decision to allow Vantage to affirmatively rely on its presentations to U.S. regulators—which the Tribunal considered to be "of assistance to [it] in ascertaining the facts," Ex. 3, Tr. 566:25-567:3—yet preclude Mr. Halkett from testifying about discussions that formed the basis of that report, improperly permitted Vantage to use privilege as both a sword and shield. Indeed, Mr. Gaitis raised this issue during the hearing in noting that Vantage had used the reports "as a sword." Ex. 2, Tr. 292:9-293:1.

present its claims and defense.  *See Konkar Mar. Enters., S.A. v. Compagnie Beige D'Affretement*, 668 F. Supp. 267, 271 (S.D.N.Y. 1987) (finding that parties to an arbitration "must be allowed to present evidence without unreasonable restriction . . . and must be allowed to confront and cross-examine witnesses.").  "Where a party to an arbitration does not receive a full and fair hearing on the merits, a district court will not hesitate to vacate the award."  *Id*.

The patent unfairness in precluding Petrobras from eliciting testimony to rebut the assertions in the Weil reports was underscored by the Tribunal's decision to allow Vantage to introduce yet another presentation that its lawyers at Weil had submitted to the DOJ and SEC, long after the time for evidentiary submissions had closed.  Ex. 3, Tr. 560:8-567:3; ██████.  The additional presentation is an indisputable piece of advocacy ████████████████████████

████████████████████████████████████████████████████████

██████████████.  Nevertheless, and despite having refused to allow Petrobras the opportunity to impugn the substance and credibility of the Weil reports by examining Mr. Halkett, the Tribunal admitted the report, opining: "It's been submitted to the DOJ.  It's been submitted to the SEC and, therefore, it's clearly something that would be of assistance to the Tribunal in ascertaining the facts of this case."  Ex. 3, Tr. 566:25-567:3.  Having acknowledged that the Tribunal considered the Weil presentations to be probative evidence on the bribery issue, it was fundamentally unfair to deny Petrobras the right to cross-examine Mr. Halkett regarding their content.  *See ICAP Corporates, LLC v. Drennan*, No. 14-CV-5451, 2015 WL 10319308, at *14 (D.N.J. Nov. 18, 2015) ("It is patently unfair to preclude testimony intended to rebut key evidence.").

C.     The Tribunal Refused to Accord Any Weight to Vantage's Disclosure of Its Offer to Pay the SEC $5 Million to Resolve the SEC's FCPA Investigation.

Further evidencing the parties' unequal playing field, the Majority refused to accord any weight to the undisputed fact that Vantage offered to pay a $5 million penalty to the SEC—a

substantial offer ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████—in connection with its claimed violation of the FCPA.  Dkt. 1-3 ¶ 173; *see*

Ex. 38.  The decision of the Majority to re-open the record in order to admit Vantage's disclosure

of its offer to the SEC,[36] but to expressly give it no weight, is baffling, and is revealing of the

Majority's refusal to squarely confront the bribery allegations more generally.  The Majority's

reliance for this strange ruling on the "long-standing public policy at the arbitral seat (the United

States)" to promote settlement, which the Majority says "would generally exclude consideration

of such offers," Dkt. 1-3 ¶ 363, stands in stark contrast to its failure to even address the well-

established U.S. public policy against bribery.

III.    **The Majority Award Should Be Vacated as to Petrobras Brazil Under Section 10(a)(4) Because the Tribunal Failed to Issue a "Reasoned Award."**

Section 10(a)(4) requires vacatur "'[w]here the arbitrators exceeded their powers,'" *Brook*

*v. Peak Int'l, Ltd.*, 294 F.3d 668, 672 (5th Cir. 2002), or "if the arbitrators so imperfectly executed

their powers that a mutual, final, and definite award upon the subject matter submitted was not

made," *Stage Stores, Inc. v. Gunnerson*, 477 S.W.3d 848, 856 (Tex. App.—Houston [1st Dist.]

2015, no pet.) (quoting 9 U.S.C. § 10(a)(4)) (alteration omitted).  Here, the parties and arbitrators

agreed that the award was to be a "reasoned award."  *See* Ex. 43 ¶ 21.  "A reasoned award is

something short of findings and conclusions but more than a simple result."  *Sarofim v. Tr. Co. of*

*the West*, 440 F.3d 213, 215 n.1 (5th Cir. 2006) (alteration and internal quotation marks omitted).

Where the parties contracted for—and the Tribunal agreed to provide—a "reasoned award," the

"reasoning should be part of the face of the award."  *Bankers Life & Cas. Ins. Co. v. CBRE, Inc.*,

---

[36]      Mr. Gaitis refused to participate in this decision.  Ex. 100.

830 F.3d 729, 733 (7th Cir. 2016) (internal quotation marks omitted).[37]  The Majority Award

provides no foundation whatsoever for the Majority's finding of liability against Petrobras Brazil,

a defect that mandates vacatur under § 10(a)(4) as to Petrobras Brazil.

It is undisputed that Petrobras Brazil is not a party to the DSA or any of its amendments or

novations.  The sole basis for liability against Petrobras Brazil is the Guaranty, the only relevant

contract to which it is a party.  *See, e.g.*, Ex. 41 ¶ 18.  The parties agreed that the Guaranty is

governed by English law, Dkt. 1-5 ¶ 3.4, but disagreed as to whether the Guaranty creates

immediate liability for breach of the DSA, as Vantage contended, or whether it requires an

unsatisfied award against PAI or PVIS before liability arises, which was Petrobras's position.  In

their briefing on the issue of governing law, the parties cited competing sources of English law on

this point.  *See, e.g.*, Ex. 42; Exs. 91-98.

The Majority Award does not acknowledge, let alone resolve, this dispute.  *See* Tex. Civ.

Practice & Remedies Code § 172.102(a) (requiring the tribunal "decide the dispute according to

the rules of law designated by the parties as applicable to the substance of the dispute.").  Although

the Majority Award quotes at length from the DSA and its novations, *see* Dkt. 1-3 ¶ 37, it never

cites to or identifies the operative provisions of the Guaranty.  The Majority Award also fails to

discuss the competing arguments about what triggers liability under the Guaranty and applicable

English law on this issue.  Indeed, the entire basis for the Majority Award's more than $615 million

judgment against Petrobras Brazil is found in just one sentence.  *See id.* ¶ 530 ("For the avoidance

of doubt, the Tribunal confirms its jurisdiction over Petroleo Brasileiro, *which as primary obligor

under the DSA and the Guaranty remains responsible for the breaches of that Contract*."

(emphasis added)).  This sentence does not "set[] forth the basic reasoning of the arbitral panel on

---

[37]       *See also id.* (reversing district court's decision to uphold the award because it ignored the parties' agreement).

th[is] central issue." *Leeward Constr. Co. v. Am. Univ. of Antigua*, 826 F.3d 634, 640 (2d Cir. 2016) (noting agreement with holding of the Fifth Circuit). On every other issue, the Majority Award laid out the position of Vantage and Petrobras before providing its analysis and resolution. In contrast, liability of Petrobras Brazil under the Guaranty is relegated to this single sentence.

"Merely stating that one party wins because that party prevailed on the ultimate issue does not satisfy the [standard of a reasoned award] if the award does not mention a justification for why that party won." *Stage Stores*, 477 S.W.3d at 867 (internal quotation omitted). Such a rule would eviscerate the meaning of a reasoned award and likewise would deny the parties' the benefit of their agreement for "more than a simple result." *Sarofim*, 440 F.3d at 215. The Majority's failure "to identify and provide any amount of reasoning for" one of the fundamental issues presented precludes this Court from finding the Majority Award is "reasoned," as to Petrobras Brazil. *Stage Stores*, 477 S.W.3d at 863. Accordingly, this Court should vacate the Majority Award under § 10(a)(4) as to Petrobras Brazil.

## CONCLUSION

For the foregoing reasons, Petrobras respectfully requests that the Court enter an order authorizing service of a subpoena on Mr. Gaitis as set forth in Petrobras's accompanying motion; vacating the Majority Award in its entirety or, at a minimum, as to Petrobras Brazil, thereby permitting a new arbitration to be heard by a neutral tribunal in accordance with the parties' agreement; and granting such other relief that the Court deems appropriate.

Respectfully submitted,

By: _____
William M. Katz, Jr.
Federal Admission No. 21581
State Bar No. 00791003
william.katz@tklaw.com

THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: 214-969-1700
Facsimile: 214-969-1751

**ATTORNEYS FOR RESPONDENTS**
**PETROBRAS AMERICA INC. ,**
**PETROBRAS VENEZUELA INVESTMENTS &**
**SERVICES, BV AND PETRÓLEO BRASILEIRO**
**S.A. – PETROBRAS**


Ari D. MacKinnon
*(pro hac vice motion pending)*
amackinnon@cgsh.com
Boaz S. Morag
Federal Admission No. PRID18019
bmorag@cgsh.com

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 214-225-3999

**ATTORNEYS FOR RESPONDENT**
**PETRÓLEO BRASILEIRO S.A. – PETROBRAS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record via ECF on August 31, 2018.

_____
William M. Katz, Jr.