| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | Paul,<br><br>I have tried to contact you several times today without success and left messages on your mobile.<br><br>We finally managed to get the "green light" here in order to proceed on a possible negotiation for the two Vantage DPDS w/PB International.<br><br>On this regard I am sending attached a proposed draft of letter to be sent to the PB Intl. Director (Mr Jorge Zelada) asap so we can start the process in our end.<br><br>The idea will be to try to contract both Vantage DPDS under long term contracts (5 to 6 yrs) at the same time and under a "package" basis.<br><br>We will have also to do some additional homework in order to compare the current VTG vessels technical specs versus the PB Intl requirements and on this regard I will send you tomorrow the PB Intl. specs and also a copy of their standart Charter & Drilling contract (which was used on the last similar PB deals w/Pride and Transocean).<br><br>Pls send us asap the complete rigs technical specifications and list of equipments.<br><br>We also need to discuss the commercial aspects of the deal in order for us to be on the same page about how to proceed. | | |
| **9/18/08** | Derbyshire forwards Padilha's 9/17/08 email to O'Leary: "FYI" | | J032 |
| **9/25/08** | Derbyshire emails Zelada Vantage's proposal and technical specifications for three new-build deepwater rigs. | This is Vantage's first offer to Petrobras International: Platinum Explorer for $590,000 per day plus 15 % bonus, and Titanium Explorer for $560,000 per day plus 15 % bonus.<br><br>Derbyshire was Vantage's VP of Marketing.  *See* Tr. 235:10-16 (Halkett). | J033 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **9/25/08** | Derbyshire forwards his 9/25/08 email to Zelada to Bragg, Halkett, and Padilha: "For your information." | | J033 |
| **10/7/08** | Padilha replies-all to Derbyshire's 9/25/08 email to Derbyshire, Bragg, Halkett:<br><br>Dear Mike,<br><br>Thanks for the email.<br><br>We have approached PB on this and unfortunately they had a negative reaction to our proposal due to the following facts:<br><br>1) The indicative rates were higher if compared to the previous ones sent by Vantage to PB E&P under the recent market inquiry<br><br>2) They got several other ofers (Pacific Drilling; Cardiff; Pride; Oébrecht; Schahin...) in better terms (ranging from USD 520.000  to USD 560.000 inclusive of bonus).<br><br>I will return to Rio today and will revert to you again after I meet w/them in order to check if there is another angle we could try to explore on this matter. | Padilha tells Vantage that its proposed day rates are too high. | J034 |
| **10/7/08** | Derbyshire emails Padilha, Bragg, Halkett: | | J036 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | Hamylton<br><br>We used the same rates as we used in the recent market enquiry ??<br><br>Please let us know what we need to do tp put us in the running.<br><br>We follow your guidance<br><br>Mike | | |
| 10/9/08 | Zelada emails Musa: "Also include in the ranking the new chartering proposals that have not had time to be analyzed." | | J035 at Vantage 59926 |
| 10/10/08 | Padilha replies-all to Derbyshire's 10/7/08 email, explaining that Vantage's proposal "offered the same rates to E&P but WITHOUT bonus under their recent market inquiry. That means, under your proposal to PB International, w/ 15% bonus, a potential dayrate for the Platinum Explorer would be aprox.USD 678.500 (versus USD 590.000) and a dayrate for the Titanium Explorer would be aprox. USD 644.000 (versus USD 560.000). I have also approached today the E&P department about the ongoing discussions they are having with some of our | Padilha tells Vantage it will have to lower its day rates "to get back in the game." | J037 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | competitors and believe that they are currently targeting a total dayrate (inclusive of bonus) of USD 520.000 to USD 550.000 for 10000 ft rigs depending on rig specs and delivery date. They are also discussing with several contractors for existing rigs (ex: Ocean America for Diamond) once they have also commitments for consortiums w/other operators under partnerships in several deepwater blocks offshore Brazil. I believe that we might find an angle to get back in the game on the above mentioned range. We will continue to work on all alternatives here and keep you posted." | | |
| 10/16/08 | Derbyshire emails Padilha, Halkett, and Bragg:<br><br>"Hamylton<br><br>We would like to visit with you and present Vantage to PB and PB International. We are looking at the week of the 10th of November. Is this convenient for you and your client." | This concerns the introductory meeting (the "Introductory Meeting") in Brazil at which Vantage executives seek to convince Petrobras to do business with Vantage. The meeting takes place on November 11, 2008. *See* J857 (Halkett Stmt. 1) ¶¶ 53-54. | J037 |
| 10/16/08 | Pride is ranked in first place in Petrobras Brazil's internal rankings. | No direct evidence supports this assertion. ██████ ███████████████████████████ | ██████ |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | ███████████████████████████<br>███████████████████████████<br>███████████████████<br><br>As to the audit itself (J448), it was prepared during a period Petrobras was searching for a pretext to terminate the DSA.  Moreover, Petrobras has refused to produce documents cited in the audit, despite the Tribunal's orders that it do so.  *See* C. Post-Hearing Br. ¶¶ 303-304, 333-334, n. 75, 76, 104.  Accordingly, Vantage is entitled to an adverse inferences with respect to the rankings.<br><br>Finally, the contemporaneous documents show that around this time, Petrobras was aware that Pride was about to contract the rig under discussion to BP at a much higher rate.  J035 at Vantage_059930. | ███<br>J652 at Vantage 55617 |
| **10/21/08** | Padilha emails Derbyshire, copying Bragg:<br><br>"The bottom line is that due to the current market uncertainties, PB will be very careful on the next contracts fixtures and if we really want to play the game for the Vantage rigs I am afraid that the previous rates we have indicated to PB will simply not work (mainly because for them Vantage is still a question | Padilha continues to tell Vantage that it has to lower its proposed day rates.  "[T]he main problem we are facing here to promote the Vantage Drillships is unfortunately. . . . Dayrate!! . . . . *[I]f we really want to play the game for the Vantage rigs I am afraid that the previous rates we have indicated to PB will simply not work.*" (Emphasis added.) | J038 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | mark in terms of international operational capacity and while they have seen your brief 'operations setup' presentation, they still prefer to go w/ companies which they have already some knowledge)." | | |
| 10/29/08 | Derbyshire emails Padilha proposed agenda for meeting with Petrobras Brazil.<br><br>"Objectives" of meeting were: "To introduce Vantage Drilling to Petrobras Brazil (& Petrobras International): Our history, our people, our rigs, our systems and our financial strength. By doing so we believe Petrobras will see that Vantage Drilling is a serious new Drilling Contractor which is financially and operationally strong, and focused on delivering operations to our clients which live up to our vision of exceeding expectations." | The relates to the planning for the introductory meeting with Petrobras in Brazil, which takes place on November 11, 2008. *See* J857 (Halkett Stmt. 1) ¶¶ 53-54. | J039 at Vantage 47062 |
| 10/29/08 | Zelada instructs Musa to "start negotiations immediately with the top-ranking company in the chartering ranking in order to get a firm proposal to be presented for the analysis and approval of the BOD. Please urgently include in the ranking the companies that submitted proposals for new building rigs, but whose | The cited page from J035 does not set forth Zelada instructions to Musa. Instead, this is an email from Ricardo Abi Ramia, INTER-DN/GE. Ramia states:<br><br>"I spoke with the Director yesterday and got the following guidelines: | J035 at Vantage 59926<br><br>J292 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | GT analysis did not have time to be included in the prioritization process." | "In order to address the need for the exploratory program of ANI, we should start negotiations immediately with the top-ranking company in the chartering ranking in order to get a firm proposal to be presented for the analysis and approval of the BOD.<br><br>"Please urgently include in the ranking the companies that submitted proposals for new building rigs, but whose GT analysis did not have time to be included in the prioritization process.<br><br>"With the complete ranking, please prepare a DIP and send it to the BOD to seize the "New Building" opportunity. If time allows for it, we can include both opportunities in the same DIP, but it is important for the chartering issue to be addressed as quickly as possible." | |
| **10/30/08** | Musa emails Pride representatives, copying Padilha, "to invite Pride, as soon as possible, for a meeting for clarifications regarding your proposal for a newbuilding drill ship." | Petrobras was aware by 10/30/08 that Pride was about to close a contract with BP for the rig under discussion and at a much higher rate. See J035 at Vantage_059930. | J035 at Vantage 59931 |
| **10/30/08** | Padilha replies to Musa's 10/30/08 email:<br><br>"This time the deal [with Pride] will not be easy at all because Pride is due to close PS-4 | Padilha points out to Petrobras that Pride is about to contract out its proposed rig to a Petrobras competitor, BP, at a rate much higher than the rates Petrobras previously indicated it is willing to accept. Padilha | J035 at Vantage 59930 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | with BP for 5 to 6 years at rates above US $ 600,000 and Transocean has just announced a 5-year contract also above US $ 600,000 (see below) for a much cheaper and smaller ship (HHI's Gusto 10,000) But let's do our best to reach a good deal for both parties." | also points out that another drilling contractor had recently entered into a contract for a smaller drillship at a similarly high day rate. Therefore, Mr. Padilha is pointing out that the day rates Petrobras is demanding are below market. | |
| 10/31/08 | Zelada emails Musa: "That additional ranking that I requested is important." | | J035 at Vantage 59926; ████████ ██ |
| 11/3/08 | Halkett emails Padilha, copying Derbyshire and Bragg:<br><br>"Our objective is to prove to Petrobras that Vantage is a very serious new Drilling Contractor which is setting itself up for success from a technical, people and service delivery point of view. We have the rigs which will be financed and we can deliver an excellent service to Petrobras with our Ultra Deepwater Drillships. Vantage has taken the step to invest early in an organization to do it. If we can provide Petrobras this comfort then | This email concerns the Introductory Meeting between Vantage and Petrobras International in Brazil, which takes p lace on November 11, 2008.  J857 (Halkett Stmt. 1) ¶¶ 53-54. | J039 at Vantage 47059-60 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | the issue then becomes purely a commercial one. Let me have your guidance. Some of the presentations still need to be tidied up and details added but you will get the general idea of what we are trying to prove." | | |
| 11/3/08 | Padilha emails Halkett, copying Derbyshire and Bragg:<br><br>"Therefore, the main purpose of the meetings will be to introduce the company to PB and shall be more focused on general information about Vantage as a company, its current setup for building and operating its rigs and then the brief rigs technical specs. I will revert soon with the confirmation of the meetings dates as proposed by PB reps." | The email relates to the planning for the Introductory Meeting with Petrobras in Brazil, which takes place on November 11, 2008. *See* J857 (Halkett Stmt. 1) ¶¶ 53-54. | J039 at Vantage 47059 |
| 11/11/08 | Bragg and Halkett visit Musa and Zelada in Rio de Janeiro. Vantage fails to disclose that it does not own or have right to use the drillships in its proposal. | This is the Introductory Meeting between Vantage and Petrobras International in Brazil.<br><br>There is no evidence that Zelada attended this meeting. There is no evidence that illicit conduct occurred at this meeting.<br><br>TMT's ownership interest in the drillships was discussed with Petrobras at this meeting. As Bragg | J035 at Vantage 59932; J052 at Vantage 22648; Tr. 361–62 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | confirmed in a 12/3/08 email to Padilha, TMT's 50% ownership of the Platinum Explorer and 100% ownership of the Titanium Explorer was the "structure that we discussed during our meetings with Petrobras in November." J083.  Padilha also recalled that the drillship ownership issue was discussed at this meeting (which Padilha mistakenly thought was in October): "This thing about the ownership of the rig came up during these meetings in October [sic] when Vantage explained more clearly their structure, who they are, the background, what they were doing and specifically about this rig, they disclosed to Petrobras that they at that point did not own that rig. . . . So that was made more clear during the October [sic] meetings in Brazil." Tr. 1389:22-1390:9 (Padilha). | |
| 11/13/08 | To strengthen Vantage's proposal, Halkett emails Petrobras officials with several PowerPoints describing Vantage and emphasizing Vantage's close partnership with TMT. | This email is a follow up to the Introductory Meeting and focuses primarily on the Vantage team (which is not described to include Su) and the jackups and drillships.  Vantage's relationship with TMT is not referred to as a "close partnership."  Instead, TMT is mentioned twice in this 52 page document as "a strong financial backer and main shareholder" and a "41% shareholder in Vantage." | J044 |
| 11/08 | | Shortly after the Introductory Meeting, Petrobras "became interested to know a little bit more about | |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | who is [Mr. Su's] TMT and does [sic] these guys have the financial capability to support the construction of the rig because that would have been important for them to find out." Tr. 1390:17-1391:16 (Padilha). Around this time, Padilha calls Bragg and "just told him quickly that I was having some difficulties at the level of the international management" and asks Bragg to "set a meeting with Mr. Nobu Su." Tr. 1372:19-1373:1 (Padilha); J647 at 054785.<br><br>Although Padilha now claims he cannot recall the details of this conversation, J874 (Padilha Stmt.) ¶ 17, when he was asked during his testimony in Brazil, "Did you also mention the bribe to Mr. Paul Bragg," he unequivocally stated, "No. When I called Mr. Paul Bragg to ask him quickly that I was having some difficulties at the level of the international management, but I did not mention the bribe." J647 at Vantage_054784. | |
| **11/17/08** | Padilha emails Bragg: | There is no evidence that Padilha ever told Bragg that "Vantage would need to satisfy the 'bribe commission.'" To the extent Padilha referred to "bribe commission" in his March 2016 statement (J656), he was characterizing this email (J45) instead of describing what it actually said. Padilha testified that he never told Bragg that "shipyard commissions" referred to bribes. Tr. 1492:13-17 (Padilha). Padilha | J041; J045; J874 ¶ 9; Tr. 1492; J656 at PAI 21973 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| |  "Shipyard' commissions" refers to the bribes paid to obtain the Contract.  Padilha used the term "shipyard commissions" to reference bribes paid in his prior dealings with Pride International.  Padilha specifically noted that his agency commission would not be applied to the "shipyard commissions." At some point, Padilha informs Bragg that Vantage would need to satisfy the "bribe commission" to obtain a contract with Petrobras Brazil. | also testified that he never openly discussed bribes with anyone at Vantage. Tr. 1340:16-1341:7 (Padilha). Therefore, Padilha's characterization of this email is inconsistent with his testimony at the merits hearing as well as his pre-conviction testimony in which he did not implicate Vantage.  Considering his post-conviction incentive to implicate Vantage and his admitted propensity to lie about events surrounding the DSA, his post-conviction characterization of this document should be given no weight.<br><br>Without Padilha's mischaracterization of the document, the email as written is consistent with legitimate issues under discussion at the time, and inferring an illegitimate meaning is inappropriate. *See* C. Post-Hearing Br. ¶¶ 279-281. | |
| **11/18/08** | | Su's F3 Capital and Vantage Deepwater Company | J047 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
|  |  | enter into Share Sale and Purchase Agreement relating to Mandarin Drilling Corporation restructuring the relationship with respect to the Platinum Explorer. |  |
| 11/18/08 | Vantage issues press release disclosing that it does not own the drillships included in its contract proposal with Petrobras. Padilha was unaware this issue would be publicly disclosed. | Petrobras's characterization suggests that Padilha knows of the deal but does not know it will be publicly disclosed. In fact, Padilha is saying he is not aware that the deal had been done, which explains why he would have been asking about it the day before in his "shipyard commissions" email. | J046; Tr. 1447 |
| 11/18/08 | Press release announcing restructuring purchase agreement between TMT (Su) and Vantage for the Platinum Explorer.<br><br>The drillship is placed in jointly-owned company called Mandarin, which is owned 45% by Vantage and 55% by TMT (Su). "In connection with the new agreement, Vantage has agreed to enter into shipyard oversight, management and marketing agreements with Mandarin for the Platinum Explorer and with TMT for the two other drillships wholly owned by TMT, the Titanium Explorer and TMT #3. The final terms of these agreements are subject to final negotiation." |  | J689 at Vantage 54484; J046 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **11/18/08** | Musa calls Padilha for Vantage's updated proposal. | | J874 ¶ 10 |
| **11/18/08** | Bragg sets up New York meeting with Su, Padilha, and O'Leary, stating: "I am happy to coordinate the meeting, but I am copying each of your for convenience of future communications."<br><br>Padilha states that it was unusual to arrange meetings with a company director via the CEO. | The fact that it was unusual to arrange such a meeting makes it implausible that Padilha would have gotten it wrong when he unequivocally testified earlier in Brazil that he only told Bragg "quickly that I was having some difficulties at the level of the international management" and did not tell Bragg about any bribes.  Tr. 1372:19-1373:1 (Padilha); J647 at 054784-785.<br><br>The meeting is consistent with legitimate issues raised by Petrobras at the time about Su and his company's ability to fund the construction of the rigs and to ensure that arrangements will be in place for Vantage to deliver and operate the rig under a services agreement.  *See* C. Post-Hearing Br. ¶¶ 64-70, 282. | J048; J050; Tr. 1373 |
| **11/19/08** | Petrobras Brazil asks Vantage to submit a firm proposal for units, individually and as a set. | This email is J049. | J035 at Vantage 59933 |
| **11/19/08** | | Padilha emails Bragg and O'Leary regarding an upcoming meeting in New York and updates them "about what is going on here in Brazil so you can | |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | better understand where we are in preparation for our upcoming meeting." J050.  Padilha makes it clear that Vantage's proposed dayrates are too high and that Vantage will need to consider structures, such as package deals, that might close the gap:<br><br>"On the dayrates + mob side, the idea which we are trying to develop here is to open a wider range of alternatives and play with the numbers and cashflows in order to try to accommodate both PB and Vantage's dayrates expectations. . . not easy! . . . "[Y]ou can play with the several alternative cashflows for a 'package deal.'" J050 at Vantage_046692. | |
| 11/19/08 | Padilha emails O'Leary and Bragg stating "***now it is 'play ball' time so warm up well Mr. Nobu for the game!!***" | Around this time, Bragg has indicated to Padilha that Su is reluctant to share financial information regarding his companies, which Petrobras is requesting.  *See* J059.  A great deal of activity was centered on getting Su to provide this type of information. *See*, e.g., J074. | J052 (emphasis added) |
| 11/19/08 | Su, Padilha, and O'Leary finalize plans to meet with Su in New York. | | J055 at Vantage 82449 |
| 11/20/08 | Bragg, Padilha, and O'Leary discuss ways to assure Petrobras Brazil that Su and TMT are | | J056 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | financially sound, since Su had control of the drillships. | | |
| 11/21/08 | Petrobras Brazil asks for meeting with Vantage regarding Vantage's 11/18 press release.   Padilha emails O'Leary, stating "[y[ou will need to help me on this one asap." | Consistent with the legitimate concerns Petrobras had at the time, Padilha's writes to Bragg, copying O'Leary, as follows: "Once PB has no clue of who is TMT, and Vantage has no real track record, they have showed some serious concerns that Vantage might be in a quite big financial distress and that could end up on the same messy situation which they currently have on the MPF drillship ... contracted the drillship w/PB but went bankrupt !!

"My suggestion is that you send me an email which briefly explains (among others): 1) What was the original deal between TMT and DSME, 2) How you have acquired TMTs position on the 1st ship (Platinum) and how it works on the options you have for the others (Titanium and Cobalt), 3) The fact that the favorable contract w/DSME is such that you will be 100% able to fund the completion of the rigs, 4) What is in general terms the financial situation of Vantage and TMT versus the completion of these vessels, 5) why the press release is GOOD NEWS instead of BAD NEWS." | J057 |
| 11/21/08 | Bragg responds to Padilha with a positive | Among other things, Bragg explains the financial | J059 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|------|------------------------------|-----------------------------------------------------|----------|
|      | spin regarding the partnership between TMT and Vantage.  Padilha forwards the email to Musa. | arrangements with TMT and states, "As a result, we have been able to satisfy all of our pre-delivery funding requirements for the Platinum Explorer, our first ultra-deepwater drillship (Nov 2010 delivery). Additionally, the deal positions us to enjoy full access to two additional 'sister' units----Titanium Explorer (July 2011 delivery) and TMT #3---which we have tentatively called Cobalt Explorer (Nov/Dec 2011 delivery).  Vantage is providing the construction oversight, marketing and operations of those units."<br><br>Bragg also provides information about Su and TMT:<br><br>"So, who is TMT? TMT (Taiwan Maritime) is one of the world's largest and most profitable shipping companies. The company is a private, family-owned enterprise of Mr. Nobu Su. The business was started by Mr. Su's father-----and under Nobu's direction, has grown to be a highly-successful shipper focused primarily on energy markets. The company owns and operates mostly crude carriers (approximately 40 VLCC's) and has some exposure to LNG as well. . . .<br><br>"Our direct discussions with DSME (builder of our ships) have confirmed to us the strong business relationship that TMT enjoys with DSME. . . .  TMT has leveraged this relationship to negotiate excellent payment terms, generally, weighted toward the |          |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | completion of the rigs. In negotiating such, TMT also posted significant deposits and corporate guarantees in favor of the shipyard. clearly, DSME is quite satisfied with the financial capabilities of TMT—one of its largest (probably currently the largest) customers. . . .<br><br>"Mr. Su, like many private businessmen, is careful to protect the confidentiality of his financial success. However, I have found him to be very open to discuss his shipping empire with customers and partners. I believe I could arrange a visit with Petrobras representatives if they wish to ask questions of him directly. In the meanwhile , I will be happy to obtain feedback should Petrobras wish to forward any questions to us in writing regarding TMT." | |
| 11/22/08 | Bragg, Su, Padilha, and O'Leary meet in New York.  Padilha tells Su he must pay a bribe commission to obtain the Contract and Su agrees.  However, Su would only pay the bribes "once the transaction was completed." Su and Padilha agree that Su will go to Brazil to meet João Augusto Henriques, a lobbyist for Brazil's PMDB political party and a central figure in the bribery scheme.  Bragg distanced himself from the bribery discussions and "refused to learn the details about the 'difficulties' that were being | There is no evidence that Bragg or O'Leary participated in any discussions with Su involving bribery.   The cited evidence does not support the assertion that Bragg "distanced himself from the bribery."  Even Padilha admits that at no time prior to the execution of the DSA does he ever openly or directly discuss bribery with Bragg, anyone else at Vantage, or O'Leary. Tr. 1340:16-1341:7 (Padilha).<br><br>Halkett understands the purpose of the meeting in New York is for Padilha to get comfortable with Su and his ability to fund the drillship construction and | J064; J874 ¶ 10; J652 at ¶ 260; Tr. 1494; J601 at 11. |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | created." | that Vantage will have the right to deliver and operate the rigs. *See* Tr. 600:23-601:10 (Halkett). Contemporaneous documents support this understanding. *See* J067; C1004. | |
| **11/24/08** | | Consistent with Halkett's understanding of the purpose of the 11/22/08 meeting in New York, two days later, Padilha reports to Musa as follows:<br><br>"With regard to Petrobras' question about the possible risks of continuing to negotiate the contracting of one or more units of Vantage Drilling, we hereby forward the email below, sent by Vantage's CEO (Mr. Paul Bragg ... former CEO of Pride), where he provides a brief explanation about Vantage's current situation and also about TMT, its main shareholder.<br><br>"Since last Friday I have been personally meeting with Vantage's CEO and TMT's controller (Mr. Nobu Su) in NY in order to express Petrobras' concerns about the situation of both companies (VTG and TMT) in the current global financial crisis scenario, and I confess that I was very impressed with TMT's background, not only about the financial aspect, but also regarding the solid and extensive relationship they have with Korean shipyards (notably DSME and HHI), where they are building several other ships apart from those mentioned by VTG. | J067 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | "Among its international customers in the area of shipping and tankers are Petrobras and Vale do Rio Doce, and their current fleet profile provides a good indicator of the cash generation capacity of this company that currently controls VTG ... and the construction of the three drilling vessels in DSME.<br><br>"This way, they made themselves entirely available to PB to answer any questions about their companies (VTG and TMT), in order to settle any doubts about their financial and operational capacity should Petrobras enter into negotiations for the contracting of one or more of its platforms." | |
| 11/24/08 | Musa requests "as many documents as possible to substantiate" Bragg's 11/21/08 email regarding the partnership between TMT and Vantage; Vantage responds with a one-page letter from DSME, the Korean shipyard, and a single PowerPoint presentation vouching for TMT. Emails between O'Leary, Bragg, and Padilha show that Vantage largely prepared the letter purporting to come from DSME. | The only event on this date reflected in the referenced evidence is Musa's request for documentation supporting Padilha's 11/24/08 email reporting on his meeting with Su in New York and Bragg's 11/21/08 email describing the arrangements with TMT regarding the drillships. | J067; J074; J079; J093 |
| 11/26/08 | Halkett emails Vantage directors Steinar | Halkett is advocating that Su inject more money into | J377 at PAI |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | Thomassen and O'Leary, stating that Vantage was in a "very precarious financial situation," that he had "***lost confidence in the financial management of the company***," and that "***Nobu [Su]*** needs to take a firm hand and do what he needs to do to get this company on the correct road against as the ***now majority shareholder***." Halkett later confirms that Vantage was in a "complete financial mess" and that it was a "***very good thing***" that "***TMT (Nobu)***" was the "***major shareholder in Vantage.***" | the company. J857 (Halkett Stmt. 1) ¶ 99. | 51060–51061 (emphasis added) |
| 11/26/08 | O'Leary forwards Halkett's 11/26/08 email to Su. | | J071 |
| 11/28/08 | Vantage allows option to purchase 100% of Titanium Explorer for $695 million to expire. | | J083 |
| 11/29/08 | | In a series of emails:

Padilha asks O'Leary to "get from Nobu the necesssary [sic] information about his company track record, fleet profile and financial statements" to meet Petrobras requirements. J074 | J074 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | O'Leary sends a TMT presentation.<br><br>Padilha responds that the "preliminary information is sufficient for now," but states that Petrobras will require further information.<br><br>O'Leary responds, thanking Padilha for a draft letter from the shipyard, DSME, that will satisfy Petrobras, and with respect to TMT financial information, states, "Please do not over promise to Petrobras on the TMT financials - (i) TMT a private company and they are secretive about these matters, and (ii) they may not exist in a form presentable to a third party." | |
| **11/30/08** | O'Leary emails Bragg regarding his conversations with Su, noting that Steinar Thomassen (a director Vantage later designated as "independent") was representing the interests of TMT and Su on the Vantage Board. | Nothing in the cited email states that Steiner Thomassen was representing the interests of TMT and Su on the Vantage Board. | J078 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 12/2/08 | Vantage decides against purchasing drillship<br><br>02-Dec-2008<br><br>INTERNATIONAL: Vantage Drilling has elected not to exercise its option to purchase the second TMT drillship newbuild provisionally named Titanium Explorer.<br><br>However, Vantage will continue marketing the rig and has indicated it may reconsider purchasing the rig once a contract has been secured. TMT and Vantage agreed to modify the termination fee to allow Vantage to either issue 5 million shares of common stock or pay USD 10 million. Titanium Explorer (TMT/Mandarin Drsh Tbn2 in the ODS-Petrodata rig database) is on order at Daewoo Shipbuilding & Marine Engineering. Delivery is scheduled for 2011 based on construction starting early in 2009. | | J083 at Vantage 42907 |
| 12/2/08 | After receiving 12/2/08 news, Musa emails Padilha:<br><br>"Dear Hamylton, the below news does not match with what has been discussed recently…could you pls clarify ???" | The news was Vantage's announcement that it had allowed the option on the Titanium Explorer to lapse. | J083 at Vantage 42905–906 |
| 12/3/08 | Padilha forwards Musa's 12/2/08 email to Bragg:<br><br>"Pls send some explanations about the status of the Titanium, in order to make sure that Vantage will proceed on the negotiations as expected. It is of URGENCY that we also | The email reflects Petrobras's interest in confirming that Vantage will have the ability to deliver the rigs under discussion after the announcement that Vantage had allowed the option on the Titanium Explorer to lapse. | J083 at Vantage 42906 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | receive the letter from DSME…there is quote a lot of bullshit here from competitors that these rigs may not be built at all or sold to a third party.!!" | | |
| 12/3/08 | Bragg responds to Padilha's 12/3/08 email:<br><br>"We allowed our previous option at $695 million to buy 100% of Titanium expire on November 28. Our current agreement with respect to Titanium and TMT #3 is full operating contract, coupled with the right to buy up to 50% of each unit from the time we obtain customer contracts until completion and delivery of the units. We will buy in at TMT's price which is below the previous option price. This is the same structure that we discussed during our meetings with Petrobras in November." | Bragg also makes it clear that "[t]he construction and ownership status is unchanged from what we discussed:   Platinum Explorer---45%[;] Titanium Explorer---100%[;] TMT #3 (Cobalt)---100% TMT. . . . *This is the same structure that we discussed during our meetings with Petrobras in November.*"   J083 (emphasis added). | J083 at Vantage 42905 |
| 12/3/08 | Padilha emails Bragg and Halkett, copying O'Leary and Derbyshire, with draft proposal to send to Petrobras International "with the revised offer from Vantage for the two DPDS." | | J084 at Vantage 13438-39 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **12/3/08** | Vantage submits its bid for a 7-year contract offering the Platinum Explorer ($527,000 day rate, 10% performance bonus) and Titanium Explorer ($518,000 day rate, 10% performance bonus). Pride submits a proposal on December 4, which is rated higher than Vantage's proposal. | ██████████████████████████ ██████████████████████████ ██████████████████████████ ██████████████████████████ ██████ Petrobras has never produced any contemporaneous documents regarding the rankings, despite having been ordered by the Tribunal to do so. Accordingly, Vantage is entitled to an adverse inference that Pride did not submit an offer that ranked ahead of Vantage's offer as of 12/3/08. | ████ ████ J652 at Vantage 55619 |
| **12/4/08** | Pride submits proposal to Petrobras Brazil, which is rated higher than Vantage's 12/3/08 proposal. | The cited exhibit is an October 2013 audit by Petrobras. Petrobras has never produced any contemporaneous documents regarding the rankings, despite having been ordered by the Tribunal to do so. Accordingly, Vantage is entitled to an adverse inference that Pride did not submit an offer that ranked ahead of Vantage's offer as of 12/3/08. | J292 at Vantage 54585 |
| **12/5/08** | Padilha emails Bragg and Halkett, copying O'Leary and Derbyshire: | Padilha is building a case for Vantage to reduce the day rates in its 12/3/08 proposal. He is also continuing to make legitimate requests for information regarding TMT. | J084 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | Paul,<br><br>As you can imagine this is not an easy deal w/ the day to day bullshit here from our competitors (offering new rigs at low rates and also giving all kinds of bad news about Vantage...).<br><br>Queiroz Galvão just made an offer for the DP semi they are currently building on spec at FELS for 3.000m at low USD 500k´s for a 6 yrs deal, and Odebrecht is also on a rush to step in.<br><br>I will progress on the meetings here and remain optimistic that we shall be invited soon to negotiate...so try to get your visa !!<br><br>I will call you later as soon as I finish the meetings here to update you.<br><br>John,<br>We need to receive ASAP the signed letter which Nobu was supposed to get from DSME once this is now VERY important to show that the rigs will be built for sure and that TMT is a strong (including financial) company !!<br><br>Best Regards<br>Hamylton | | |
| **12/7/08** | Padilha emails Bragg, copying O'Leary, Derbyshire, and Halkett, stating in part: "We will also need you to check on Nobu's availability to meet either in NY or London | Halkett testified that he understood references to "agreements" in connection with a meeting involving Su during this time period related to construction and management agreements for the Titanium Explorer that remained to be finalized. *See* Tr. 600:23-601:10 (Halkett). Contemporaneous documents are consistent with Halkett's testimony. *See* C1004. Moreover, Padilha is also asking for the DSME letter, which was part of Petrobras's due diligence into Su and his companies. | J085 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | John,<br><br>Where is the DSME letter ??...this is VERY important now and we must send that to Petrobras BEFORE our upcoming meeting (and this was already ,made very clear to us) !!<br><br>We will also need you to check on Nobu's availability to meet either in NY or London to conclude the agreements which we have discussed.<br><br>Best Regards,<br>Hamylton | | |
| 12/7/08 | O'Leary responds to Padilha's 12/7/08 email, copying Halkett, Derbyshire, and Bragg:<br><br>Hi Hamylton,<br>I will check with Nobu on the dsme letter and revert soonest.<br>Best regards,<br>John | | J086 |
| 12/8/08 | O'Leary emails Padilha and Bragg: | | J087 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | ```
Hi Hamylton

Nobu confirmed that the DSME letter is being prepared.

Nobu's schedule is:
This week Korea
Dec 15 16 in Tokyo
After is free!!
Can the meetings be in Korea this week or Tokyo on Dec 15/16?
Please advise soonest.

Best regards

John
Sent from my BlackBerryR wireless device
``` | | |
| **12/8/08** | Padilha responds to O'Leary's 12/8/08 email, copying Bragg: "Regarding the meeting w/Nobu we propose to meet w/ him after his trip to Tokio (starting on Dec 17), either in London or NY."<br><br>O'Leary forwards email to Su: "See below response from HP. Meeting is proposed in London or NY after your Tokyo trip. Meanwhile, DSME letter is required asap." | | J087 |
| **12/8/08** | | Zelada asks Musa to "focus on contracting only one unit in replacement of the one assigned to E&P." | J096 |
| **12/8/08** | | Padilha reports that Vantage should anticipate a request from Petrobras for an offer for just one rig, discusses scheduling meetings for direct negotiations, | J088 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | and reiterates the need for the DSME letter and information regarding "the setup" between Vantage and TMT. | |
| 12/9/08 | | Musa emails Bragg to request Vantage's best offer for one rig:<br><br>"Unhappily your best offer is for two units combined. Due to the actual finance word [sic] situation we feel that it will be very difficult at this time to negotiate two units at same time. . . . Considering the above, I would like to kindly request you to review your proposal considering your best offer for one unit." | J092 |
| 12/9/08 | Bragg emails Musa, copying Padilha, attaching the letter from DSME and a brief introduction to TMT "which is the majority shareholder in Vantage" | Padilha confirms that the discussions regarding Su and TMT relate to Petrobras's concerns regarding the funding for construction of the rig:<br><br>"In preparation for our upcoming meeting and in order to try to progress on such discussions, we are sending here attached: 1) A letter from DSME which refers to our contractual status and the current relationship they have with our main shareholder (TMT). under such letter DSME confirms the fact that the current global credit crisis will not affect our ability to build and deliver such vessels at DSME.  2) A brief introduction to TMT, a large, privately-owned energy industry | J093 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | shipping company (which is the majority shareholder in vantage). We are ready to provide other information which you may require from us in order to provide you full confidence that we (vantage and TMT) will deliver top quality rigs and a first class operation." | |
| **12/9/08** | Bragg emails Musa, copying Padilha, revised bid for one rig (not two rigs, as proposed on 12/3/08) | Vantage's revised offer lowers the day rate from its 12/3/08 proposal for a seven year contract to $527,000 plus 10% bonus for the Platinum Explorer and $518,000 plus a 10% bonus for the Titanium Explorer. | J094 |
| **12/10/08** | Zelada authorizes Musa to begin "direct negotiations" with Vantage for a single drilling unit. | Zelada's authorization was in response to an email from Musa stating, "***Taking into account that the proposal presented has actually been reduced in comparison to the previous proposal and that we think that we can have some more gain, request authorization from this DINTER to start a direct negotiation with Vantage*** with a view to the possible contracting of a Drilling Ship for the international area in replacement of the unit previously contracted by PAI and later assigned to the national E&P (unit under construction by Sevan)."  (Emphasis added.) | J096 |
| **12/11/08** | Musa emails Bragg, copying Padilha, inviting Vantage to Petrobras Brazil's offices in Rio de Janeiro to discuss the proposed contract. | | J097 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **12/11/08** | Vantage and Petrobras Brazil meet in Brazil to discuss Vantage's drillship proposal. | Vantage and Petrobras negotiating teams meet in Brazil from 12/11/08 to 12/15/08 for technical and commercial negotiations. J857 (Halkett Stmt. 1) ¶ 68. There is no evidence that there was any discussion of bribery during these sessions or that sessions were influenced in any way be bribery. | J097 |
| **12/12/08** | Vantage and Petrobras Brazil meet in Brazil to discuss drillship's technical specifications under the contract. | | J097 |
| **12/12/08** | O'Leary emails Bragg and Padilha: "Nobu asked me to confirm his availability for a meeting in London on 17 Dec 08. He will keep the day open for you." | | J098 |
| **12/14/08** | Padilha responds to O'Leary's 12/12/08 email, copying Bragg, stating in part:<br><br>John,<br><br>As you may know, we are here proceeding on the negotiations w/PB (focus now is on the Titanium Explorer so Vantage can try to conclude the negotiations w/ONGC for the Platinum)...pls talk to Paul and he will update you on the negotiations status w/PB. | Halkett testified that he understood references to "agreements" in connection with a meeting involving Su during this time period related to construction and management agreements for the Titanium Explorer that remained to be finalized. *See* Tr. 600:23-601:10 (Halkett).   Contemporaneous documents are consistent with Halkett's testimony. *See* C1004. | J098;<br>J874 ¶ 15 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|------|------------------------------|------------------------------------------------------|----------|
| | There is still lots of hard work and we are schedule for additional meetings w/ PB for tomorrow to discuss both technical and contractual items which are still pending and I do not believe that we will close this quickly if I am not here all the time to follow up on everything.<br><br>Therefore I do not believe that I will be able to meet Nobu in London next week and to be honest I think he (and you) should come to Brazil to finalize our agreements (from the TMT end) once they are a "must" for us to conclude the overall deal...and once there is a lot $$$ on stake that should not be so hard for someone w/ a long range private jet...<br><br>Pls advise if you could come to Rio soon so we could meet and finalize that. | | |
| **12/14/08** | O'Leary forwards Padilha's 12/14/08 email to Su, copying Bragg and Padilha: | | J041 at PAI 21979 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|------|------|------|------|
| |  | | |
| 12/15/08 | Vantage re-bids for an 8-year contract offering the Titanium Explorer at a $490,000 day rate and 12.5% performance bonus. Pride remains on top of the rankings. | Vantage reduces it proposed rates, but there is no evidence that Pride remains on top of the rankings or is even has an outstanding proposal at this time. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Petrobras has never produced any contemporaneous documents regarding the rankings, despite having been ordered by the Tribunal to do so. Accordingly, Vantage is entitled to an adverse inference that Pride did not submit an offer | ▮▮▮▮▮▮▮ |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | that ranked ahead of Vantage's final offer. | |
| 12/16/08 | At Zelada's request, Musa revises the ranking procedure so that Vantage's proposal rises to first place.  Zelada and Musa later admit that their actions interfered with the contract procurement process in return for "undue advantage as a result of the contract." | ███████████████████████  ███████████████████████  ███████████████████████  ██████  Petrobras has never produced any documents regarding the change in ranking. Accordingly, Vantage is entitled to an adverse inference that Pride did not submit an offer that ranked ahead of Vantage's offer as of 12/3/08.  Other than statements by the Brazilian court, Petrobras has no evidence Zelada ever admitted that he interfered with the contract procurement process in return for undue advantage.  As to Musa, Petrobras did not present his testimony in this proceeding, despite Petrobras's ability to cause his appearance.  *See*  C. Post-Hearing Br. ¶ 309. Therefore, Vantage is entitled to an adverse inference that Musa's testimony would not support Petrobras's assertion about the change in rankings.  In Brazil, Musa testified that the ranking was changed to include the bonus with the day rate, J647 at | ████  ████ ████  J652 at ¶¶ 215, 248 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
|  |  | Vantage_054756, which he noted was a legitimate reason because "the total amount was more important than the partial value of the daily rate," *id.* at Vantage_054757. |  |
| 12/08 |  | Pride drops out of negotiations after "committ[ing] its drillship to another transaction." | J647 at 7; *see also* Tr. 1411:9-14 (Padilha) |
| 12/16/08 |  | Petrobras legal department issues a memorandum concluding that "the bidding process complied with Petrobras's own procurement standards." | *See* J101 ¶¶ 6–9 |
| 12/19/08 |  | Agreement to Perform Construction Management Services for Titanium Explorer is signed by Su and Vantage entities | J104 |
| 12/19/08 |  | Halkett emails Su's lawyer and asks about the status of agreements, and notes, "Just seen the Construction management agreement covers all 3 [drillships]. My mistake. As regards a Management Agreement for the Titanium Explorer . . . I am not sure what was planned but . . . it would probably help Nobu with Petrobras (visit this weekend) if there was a management agreement in place for the Titanium Explorer at least | C1004 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | which is the rig we are bidding there." | |
| **12/20/08** | Su, Padilha, and Henriques meet in Brazil at the Copacabana Palace Hotel.  Su agrees to pay Padilha approximately $15 million, and later finalizes an agreement with Henriques for a similar amount in bribes. | Padilha admits that he "didn't know for sure" whether Su and Henriques entered into an agreement, *see* Tr. 1401:13-18 (Padilha), and even assuming they did, Padilha does not know "the final purpose" of any agreement between Su and Henriques, *see* Tr. 1427:19-22 (Padilha). Padilha did not know whether Henriques paid money to Zelada or government officials or anyone else. *See* Tr. 1427:23-28:7, 1486:18-1487:19 (Padilha). | J874 ¶¶ 18-19; Tr. 1485 |
| **12/21/08** | Valencia (Su) and Oresta (Padilha) sign a commission agreement for $15.5 million. Padilha formed Oresta specifically to receive the payments from Su so that an audit of his other company, HP Petro Servicos De Consultoria, would not reveal the payments. | Padilha forms Oresta to hide from Vantage the fact that he is receiving a commission from Su. | J106; J874 ¶ 20; Tr. 1381, 1394–95 |
| **12/23/08** | PVIS and Vantage Deepwater Co. sign Memorandum of Understanding for Titanium Explorer. | While the Memorandum of Understanding is dated 12/23/08, documents indicate that it is not signed until January 2009. *See* J857 (Halkett Stmt. 1) ¶ 70; J125. | J109 |
| **Jan. 2009** | | Musa retires from Petrobras. | *See* J647 at Vantage_054751. |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **Jan. 2009** | Su increases his ownership interest in Vantage, and obtains the right to appoint four of the nine members of the Board. A former Su appointee to the Board – Steinar Thomassen – is nominally an independent director, but retains a long-standing relationship with Su. | The only evidence regarding Su's right to nominate an additional board member indicates that it is exercised in connection with the election of directors at Vantage Drilling Company's annual shareholder meeting on December 21, 2009. *See* J857 (Halkett Stmt. 1) ¶ 102; J696 at Vantage_057609.<br><br>As to Thomassen, there is no evidence to support the assertion that upon his re-election to the board in December 2009, he is only "nominally independent," whatever that means. Halkett testified that at that time, whatever his relationship he had with Su in the past, Thomassen is not aligned with Su in any way by the time he becomes an independent director. Tr. 417:21-418:23 (Halkett). | Tr. 416–18; 369 |
| **1/22/09** | Petrobras Brazil Executive Board approves Contract. | The cited exhibit sets forth a fulsome analysis of the rationale for entering into the DSA and the process followed in seeking proposals from the market, evaluating those proposals, and selecting and negotiation with Vantage. | J117; |
| **1/27/09** | Padilha (Hpetroconsult Consultoria S/C) and Vantage Drilling Co. sign Agency and Brokerage Agreement, which provides Padilha a 2.5% commission of the Contract's value ($45 million). At this time, Padilha | The Agency and Brokerage Agreement includes representations and warranties regarding FCPA compliance.<br><br>The cited evidence says nothing about Padilha | J119; Tr. 1396; J742 at Vantage 62406 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | thinks he might also be offered a seat on Vantage's Board. | thinking he might also be offered a seat on Vantage Drilling Company's Board. | |
| 1/29/09 | Vantage and TMT finalize additional financial transactions, including a $20 million credit line from TMT to Vantage. | It is not clear from the emails whether the credit facility is finalized at this time or earlier. | J121; J122 |
| 1/29/09 | Bragg emails Su regarding tension between TMT and Vantage, stating he knows that Su is "not happy" and "want[s] results." Bragg assures Su that he "hopes [Su] see us as a team" and that "your success is ours also." | Bragg also notes, "We are also doing our utmost to move away from reliance on TMT for development funding." | J121 |
| 1/29/09 | Despite Vantage's claim that Steiner Thomassen was an independent director, Bragg describes Thomassen as a "TMT [Su] representative" on the Board. | This is while Thomassen is a Su-nominated director, 11 months before the new Board is elected in December 21, 2009 with four Su-nominated directors and Thomassen serving as an independent director. *See* J696 at Vantage_057609; J857 (Halkett Stmt. 1) ¶ 102. | *Compare* Tr. 416–18 *with* J121 |
| Feb. 2009 | Zelada opens a secret bank account at the Banco Lombard Odier in Switzerland, which held the bribe money Zelada received from Raul Schmidt, who was involved in the bribery and responsible for routing the bribes to certain Petrobras official. Zelada's bribes | Other than unsupported statements by the Brazilian court, Petrobras has produced no evidence that any amounts paid to Schmidt by Oresta were transferred to any accounts held by Zelada. For its findings, the Brazilian court relied on the fact that Zelada had overseas accounts with more money than a Petrobras | J652 ¶¶ 11, 60–91 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | were ultimately transferred to the Bank Julius Baer in the Principality of Monaco.   After reviewing Zelada's bank records, the Brazilian Federal Court concluded:<br><br>90. The maintenance of a true fortune in secret accounts abroad by a public servant, which was not declared to the Brazilian authorities, together with the absence of any evidence or even mere explanation of possible lawful origin, is strong evidence of the practice of corruption crime by Jorge Luiz Zelada, including the crimes that are the subject of this prosecution.<br><br>91. It is also robust evidence corroborating the statements of collaborating criminals, who claim that he would have received undue advantage, since the money kept in secret accounts and undeclared abroad reflects the receipt of improper advantage. | official would be expected to have; however, there was no evidence to tie the money in those accounts to payments allegedly made in connection with the Titanium Explorer contract. | |
| 2/4/09 | PVIS and Vantage Deepwater Co. sign the Agreement for the Provision of Drilling Services. | | J001 |
| 2/18/09 | USD $6.2 million payment from Valencia (Su) to Oresta (Padilha); J128 at PAI 19990 (invoice), PAI 19988 (wire transfer of CHF $7.212 million). | Padilha understood that bribes would not be paid out of these funds.   Tr. 1381:20-1382:3, 1393:17-24 (Padilha) | J128; J136 |
| 3/1/09 | Valencia (Su) and Vantage Deepwater Co. sign Management Agreement for Titanium | | J129 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | Explorer. | | |
| 3/1/09 | Vantage and Valencia (Su) form informal joint venture to split profits. According to Vantage Drilling Company's Form 10-K: As of March 1, 2009, F3 Capital owns approximately 48.0% of our issued and outstanding ordinary shares. Upon completion of the restructuring agreement for the Platinum Explorer and assuming conversion of outstanding loans, F3 Capital will own approximately 67.0% of our issued and outstanding ordinary shares. Through his ownership of F3 Capital, Hsin-Chi Su, one of our directors, will have significant influence over matters such as the election of our directors; control over business, policies and affairs; and other matters submitted to our shareholders. | There is nothing in the cited email about the formation of an "informal joint venture" between Vantage and Valencia to split profits.  On this date, Valencia and Vantage Deepwater Company enter into a Management Agreement for Titanium Explorer, under which Vantage Deepwater Company will be paid a fee for operating the drillship, a component of which will be a percentage of Free Cash Flow (defined as "revenue generated directly from the performance of a Charter Agreement less the direct operating costs to generate the revenue").  J129 at Vantage_052505, 052513. | J689 at Vantage 54495 |
| 4/24/09 | $1.5 million payment from Padilha to Polar Capital Investments, Ltd. (Schmidt): 271. Hamylton Padilha also presented transfer statements of USD 1,500,000.00 on 04/24/2009 and USD 1,203,000.00 on 06/09/2009 to accounts that, according to him, would be controlled by Raul Schmidt (event 1, Annex 101 and Annex 103). In the transfer statements for USD 1,203,000.00 there is express reference to the beneficiary as being an account under the name of off-shore company Polar Capital Investment Ltd., with an account at the Lombard Odier in Switzerland. It is the same institution where Jorge Luiz Zelada and Raul Schmidt had accounts, according to information provided by the authorities of the Principality of Monaco pursuant to the request for cooperation. | Polar Capital Investments, Ltd. ("Polar Capital") is a company owned by Schmidt.  Other than the Brazilian court's unfounded conclusion, there is no evidence that any of the money Padilha pays to Polar Capital is in turn paid to Zelada.  To the contrary, Padilha understood that bribes are not be paid out of these funds.  Tr. 1381:20-1382:3, 1393:17-24 (Padilha). | J131; J601 at Vantage 58229; J211 at Vantage 7622; J652 at 55648–52 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **6/9/09** | $1.3 million payment from Padilha to Polar Capital Investments, Ltd. (Schmidt) | Other than the Brazilian court's unfounded conclusion, there is no evidence that any of the money Padilha paid to Polar Capital is in turn paid to Zelada. To the contrary, Padilha understood that bribes are not paid out of these funds.  Tr. 1381:20-1382:3, 1393:17-24 (Padilha) | J133; J652 at Vantage 55652 |
| **Mid-2009** | Henriques receives two installments of bribes during this time period and confirmed that Zelada also received bribes. | There is no documentary evidence that Henriques received two installments of bribes.  To support these statements, Petrobras cites: a criminal complaint, J637, which is hearsay; an indictment, J601, which is hearsay; an assertion in Padilha's arbitration statement, J874 ¶ 23, of which he admitted on cross examination he had no personal knowledge, *see* Tr. 1401:13-18, 1427:19-22  (Padilha); and a finding by the Brazilian court, which is hearsay and not otherwise binding in this proceeding, *see* C. Post-Hearing Br. ¶ 271. | J874 ¶ 23; J637 at 3-4; J601 at Vantage 58227; J652 at Vantage 55590 |
| **8/19/09** | Invoice evidencing payment of $4.65 million from Valencia (Su) to Oresta (Padilha). | Padilha understood that bribes are not be paid out of these funds.    Tr. 1381:20-1382:3, 1393:17-24 (Padilha) | J135 |
| **12/21/09** | Payment order from Frank Marketing, Ltd. (via Beat Blanz, Padilha's attorney-in-fact) to Polar Capital Investments, Ltd. (Schmidt) for | Other than the Brazilian court's unfounded conclusion, there is no evidence that any of the money Padilha paid to Polar Capital is in turn paid to Zelada. | J139 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | $2.141 million. | To the contrary, Padilha understood that bribes will not be paid out of these funds.  Tr. 1381:20-1382:3, 1393:17-24 (Padilha) | |
| **9/17/10** | Padilha pays Musa $500,000 of the monies received from Su, a payment corroborated by Henriques.   Musa confirms receiving the $500,000, and expressly identified to the Brazilian Federal Court two deposits from 9/17/10 in his account at the Julius Bar Bank in Geneva, Switzerland as the bribes he received:  252. As a result of the plea bargain agreement, the accused Eduardo Musa placed before the Court a copy of the aforementioned statements for the account opened on behalf of offshore Debase Assets S / A at the Julius Bär Bank in Geneva, Switzerland (event 144, annex13, annex15 and annex 16). Pages 4, 6 and 10 of annex 13, contain the identification of the said account. On page 2 of annex 16, two credit entries to the account are shown, on 09/17/2010 and 09/17/2010, from Petrobell Incorporated Grantmi and would correspond to deposits declared in judicial interrogation.  253. The extracts were shown to the accused Eduardo Musa during the hearing in which he confirmed its authenticity and said that the two entries would correspond to the payment of bribes. | According to Padilha, the payments to Musa are discussed for the first time after Musa left Petrobras and the DSA was signed.  Tr. 1422:7-25 (Padilha). | J874 ¶ 22; J637 at PAI 526–27; J601 at Vantage 58228; J682 ¶¶ 251–53 |
| **Mid-2011** | Dispute arises between Su and Vantage; Su tells Padilha that he spoke "explicitly" with Bragg about the bribes and demanded Vantage repay Su's payments for the bribes. | For this assertion, Petrobras relies on testimony in this arbitration about statements supposedly made by Su. This is hearsay.  Padilha's arbitration testimony about these supposed Su statements is also inconsistent with | J874 ¶ 23 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
|  |  | his testimony in Brazil, in which he did not implicate Bragg or anyone else at Vantage as having knowledge of alleged bribery.   The new testimony is not corroborated by any other evidence.   Considering Padilha is a collaborating witness who now has an incentive to produce new evidence implicating Vantage and a demonstrated propensity to lie, this testimony should be given no weight. |  |
| 9/26/11 | Padilha tells Bragg that their contract is with Zelada the "top boss." | While Petrobras tried at the merits hearing to impute a nefarious meaning to this reference, Padilha explained that he was simply talking about the fact that if Vantage needed an accommodation from Petrobras because it would be unable to deliver the rig by the contractual deadline, that decision would have to be made in Brazil and not by PAI management in the U.S.  *See* Tr.1488:1-1490:2 (Padilha) | J166; Tr. 1488 |
| 12/1/11 |  | This is the DSA deadline for delivery of the Titanium Explorer.  Vantage fails to meet the deadline.  As a result, Vantage is obligated to pay liquidated damages for 180 days, after which period, Petrobras has the absolute right to terminate the DSA. | J001 cl. 6.1.7 J857 (Halkett Stmt. 1) ¶ 85 |
| 3/11/12 | Su's associate, Joseph Yeh, emails T.K. Ong (Vantage director) about Su wanting to | █████████████████████████████ █████████████████████████████ | ████████ ██████ |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | "recoup pbr consulting fees." | ███████████ ██████████ ███████████████████████ ██████ | ██████ |
| **Shortly before 3/20/12** | Padilha and Bragg discuss bribes being paid in connection with the Contract. | This Padilha testimony from the merits hearing is inconsistent with his testimony in Brazil, in which he did not implicate Bragg or anyone at Vantage as having knowledge of alleged bribery. This new story is corroborated by no other evidence. Considering Padilha is a collaborating witness who now has an incentive to produce new evidence implicating Vantage and a demonstrated propensity to lie, this testimony should be given no weight. | Tr. 1342, 1491 |
| **3/20/12** | Valencia (Su) and Vantage Drilling Co. sign Purchase Agreement for Titanium Explorer. | | J190 |
| **3/23/12** | | Instead of exercising an undisputed right to terminate the DSA for late delivery of the Titanium Explorer, a negotiating committee of PAI and PVIS employees (untainted by any alleged bribery) negotiates and recommends to management a new commercial arrangement with Vantage regarding the Titanium Explorer (the Second Amendment), pursuant to which Petrobras postpones Petrobras's right to terminate the DSA for late delivery to November 25, 2012, and | J191 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | Vantage will, at an estimated $25 million cost, upgrade the rig's blowout preventer to meet new, post-Macondo regulations. | |
| **4/18/12** | Second Amendment to Contract and First Novation | Section 2 of the Second Amendment, entitled "Ratification," expressly states: "The other provisions of the Agreement shall remain unchanged and are hereby formally ratified and kept in force as originally agreed to by the Parties." <br><br> Section 8.5 of the First Novation provides, "All other terms and conditions of the Contract, any subsequent amendments, purchase orders and change orders not specifically modified in this Novation Agreement shall remain in force and binding on the Parties." | J004; J005 |
| **May 2012** | Vantage pays $196 in "agent fees" for the Titanium Explorer. | | J753 |
| **July 2012** | | Zelada retires from Petrobras. | J652 ¶ 83 |
| **7/6/12** | | HP Petro Servicos De Consultoria LTDA enters into a new Agency Agreement with Vantage Drilling Company relating to the Titanium Explorer, which included representations and warranties regarding FCPA compliance. | J209 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 7/12/12 | | Petrobras presentation touts the outstanding 2001-2011 exploration results in the U.S. Gulf of Mexico, citing 33 exploration wells drilled with 22 oil discoveries and 19 wildcat wells drilled with 11 oil discoveries. Petrobras identifies itself as the third largest player in the lower tertiary in the Gulf of Mexico. | J513 at Vantage_000 322-323 |
| 9/5/12 | While Su is engaged in litigation in the United Kingdom, one of Su's associates, Joseph Yeh, emails Bragg:<br><br>"Be careful of a mad dog cornered as it will bit[e] anything to get out of the jam. He [Su] has asked me a few times back in April to get money back from you **on payment to P**. I told him I want nothing to do with this. He threaten [sic] and stated all will go down in flame[s] **as he has proof on the allegation against you on the P contract**. Pls be prepared for desperation attempt if needed." | This is ambiguous, double hearsay, and there is no indication that Vantage understood the reference or perceived it as a credible threat. *See* C. Post-Hearing Br. ¶ 286. Further, Vantage and Su are adverse to each other in litigation in Harris County, Texas and after this email, Vantage continues to prosecute its claims. *See* J511. | J214 (emphasis added) |
| Dec. 2012 | Vantage pays $311,342 in "agent fees" for the Titanium Explorer. | | J753 |
| 12/11/12 | Padilha attempts to exercise his right to | | J226 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | acquire Vantage stock, but is informed by Vantage's compliance officers that his stocks will be issued in restricted form. | | |
| 12/24/12 | Padilha emails Bragg about the restricted stock: "Pls note that it was never mentioned to be any restrictions on the sale of VTG shares in our agreement and as you may know I will need to have liquidity now in order to honor commitments made on this project." Padilha believed his email would "motivate Bragg" to issues unrestricted shares by implying that Padilha might have to honor the "commitments" himself. | Padilha never tells Bragg what he means by "commitments," *see* Tr. 1497:13-1498:4 (Padilha), and Padilha testified that the "commitments" "could not refer to a bribe," Tr. 1433:4-7. (Padilha). | J227; J874 ¶ 25; Tr. 1506 |
| 12/25/12 | Bragg responds, telling Padilha he looked forward to discussing the issue. Padilha and Bragg had discussed the bribes by this time, and Bragg understood that "commitments" meant bribes. | There is no evidence that Bragg understood that "commitments referred to bribes." Padilha never tells Bragg what he means by "commitments," *see* Tr. 1497:13-1498:4 (Padilha), and admits that the word "commitments" "could not refer to a bribe," Tr. 1433:4-7. (Padilha). Padilha's testimony that he previously discussed bribes with Bragg is also inconsistent with Padilha's testimony in Brazil, in which he did not implicate Bragg or anyone at Vantage as having knowledge of | J227; Tr. 1499, 1506 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | alleged bribery.    Padilha's new story is not corroborated by any evidence.  Considering Padilha is a collaborating witness who has an incentive to produce new evidence implicating Vantage and a demonstrated propensity to lie, this testimony should be given no weight. | |
| **Jan. 2013** | Vantage pays $358,225 in "agent fees" for the Titanium Explorer. | | J753 |
| **1/16/13** | Bragg explained why the shares must be issued in restricted form, but offered to arrange for fellow Vantage board members to buy "$$$ million worth" to give Padilha the "liquidity" Padilha needed "to honor commitments made on this project" (*i.e.*, the bribes). | There is no reference to "commitments" or "liquidity" in Bragg's email.    Bragg, merely states, "Alternatively, I can probably get: a few of my fellow board members to join me in buying a couple of $$$rnillion worth, if that helps. Sorry for the inconvenience." *See* J252 at Vantage_62457. | J252 at Vantage 62457; J227 |
| **Feb. 2013** | Vantage pays $197,124 in "agent fees" for the Titanium Explorer. | | J753 |
| **February-March 2013** | Padilha sends Bragg several emails inquiring on the status of Bragg's offer to arrange for the purchase of Padilha's restricted stock. | | J252 at Vantage 62456 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **Mar. 2013** | Vantage credited $47,282 for "agent fees" for the Titanium Explorer. | | J753 |
| **3/25/13** | Bragg responds to Padilha that he, O'Leary, DeClaire, and Marcelo Guiscardo could each buy about $250,000 Padilha's Vantage stock to provide Padilha the "liquidity." | There is no mention of "liquidity" in Bragg's email. | J252 at Vantage 62454–455 |
| **Apr. 2013** | Vantage pays $672,077 in "agent fees" for the Titanium Explorer. | | J753 |
| **May 2013** | Vantage pays $393,622 in "agent fees" for the Titanium Explorer. | | J753 |
| **June 2013** | Vantage pays $460,073 in "agent fees" for the Titanium Explorer. | | J753 |
| **July 2013** | Vantage pays $481,722 in "agent fees" for the Titanium Explorer. | | J753 |
| **Aug. 2013** | Vantage pays $449,523 in "agent fees" for the Titanium Explorer. | | J753 |
| **8/2/13** | Henriques' interview with *Época* magazine. | | J273; |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | Henriques admits that he received bribes in a conversation with an undercover journalist for *Época* magazine: "Everyone got something. The party, me, and the people who helped. Whoever helps, gets something… And who received something? [No response, initially.] People from the inside (of Petrobras) whom I pay." | | J292 at Vantage 54562; J652 at ¶ 311 |
| 8/9/13 | *Época* reporter emails Bragg, copying Vantage's marketing department, for comment on the bribery allegations. Bragg opened and deleted the email, and there was no evidence that Bragg discussed the email with the Marketing Department or anyone else, including Vantage's lawyers or audit committee. | The reporter's email makes no mention of bribery allegations. The reporter simply requests a number of details regarding the DSA, such as when the contract was signed, who was involved in the negotiations, why PVIS and not Petróleo Brasileiro was the signatory, and the number and place of negotiation meetings  The report also asks about Henriques's role in the transaction and payments Su made to Henriques. | J272; ▬▬ ▬▬ ▬▬ |
| 8/11/13 | *Época* article published. Halkett admits that the article did not contain enough evidence to prove bribery occurred. | While the article is double hearsay, it is the evidence Petrobras relies on to show that Henriques actually paid bribes.  If the Tribunal were to accept the double hearsay as establishing that bribes were paid, then Halkett's comments regarding the article are irrelevant.  In any event, Halkett clarified that "I can't remember the article in detail.  I haven't read it recently." Tr. 441:11-12 (Halkett). | J273; Tr. 439 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 8/13/13 | Petrobras Brazil establishes an internal investigation committee to investigate the bribery allegations in the *Época* article. Vantage does nothing. | There is no evidence that anyone with Vantage had seen the *Época* article or the Petrobras audit before 2014, when the press publicly reported the results of Petrobras's 2013 audit of the allegations from the *Época* article. *See* Tr. 577:11-580:22 (Halkett). | J276 |
| Sept. 2013 | Vantage pays $451,318 in "agent fees" for the Titanium Explorer. | | J753 |
| Oct. 2013 | Vantage pays $464,642 in "agent fees" for the Titanium Explorer. | | J753 |
| 10/25/13 | Petrobras Brazil completes internal investigation and concludes that it cannot "prove the veracity" of the *Época* article's bribery allegations. Henriques denies allegations in *Época* article. | Petrobras's audit report concludes that "Petrobras good practices" were not observed and found "deficiencies in the process of contracting" consistent with the *Época* article. In particular, the audit finds that "Henriques exercised influence and acted as a business middle man with responsibility in the International Area," as confirmed by his "proximity with several employees who occupied key positions in that area." *Id.* ¶8.2. The Audit Report also notes "calls made on corporate telephones . . . [that] coincide[d] with periods related to the businesses mentioned in the report," including a call between Mr. Henriques and Mr. Zelada. *See id.* ¶¶6.3, 8.3.; however, | J292 at Vantage 54564, 54588 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | As to Henriques, he evades an in-person interview by the audit committee, and ultimately agrees only to answer written questions submitted by the committee to his attorney.  Even then, the written response to the questions is signed by Henriques' attorney, not Henriques, and does "not directly answer the questions sent by the committee, and it can be said that the statement generally denied what was contained in the report, despite the meeting with the journalist having been confirmed, without, however, knowing that the conversation was being recorded." J292 ¶ 5.6.<br><br>Petrobras does not seek any information from Vantage in connection with the audit and does not share the results of the audit with Vantage after it is completed. *See* Tr. 576:19-577:19, 582:5-24 (Halkett).<br><br>Petrobras does not seek to cancel the contract, because Petrobras concludes that the DSA was "technically justified," "at market value," and "had not generated a loss for Petrobras." J292 §§ 6.2.4.18, 8.4.<br><br>Petrobras has refused to produce documents cited in the audit, despite the Tribunal's orders that it do so.  Accordingly, Vantage is entitled to an adverse inference that these documents would further demonstrate Petrobras's knowledge of the alleged | |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
|  |  | bribery at the time of the audit. |  |
| **Nov. 2013** | Vantage pays $439,415 in "agent fees" for the Titanium Explorer. |  | J753 |
| **Dec. 2013** | Vantage pays $364,993 in "agent fees" for the Titanium Explorer. |  | J753 |
| **Dec. 2013** |  | Oil prices are around $100 per barrel, new contract day rates for drillships averaged more than $534,000, and drillships are in short supply. | *See* J759; J764; J856 (Jacobs Rpt. 1) ¶¶ 111-118 |
| **12/12/13** |  | Petrobras Board of Directors approves Second and Third Amendments and the First Novation and Second Novation. | J299 |
| **12/20/13** |  | Parties enter into Termination Agreement terminating the First Novation | J007 |
| **12/20/13** | Second Novation to Contract. | In the Second Novation, Petrobras affirms, "All other terms and conditions of the DSA, any subsequent amendments, not specifically modified in this | J008 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | Agreement shall remain in force and binding on the Parties." J008 § 7.11. | |
| 12/20/13 | | Parties enter into the Third Amendment, in which Petrobras affirms: "All other terms and conditions of the DSA shall remain in full force and effect, in the form already agreed by the Parties" | J006 § 3.1 |
| Jan. 2014 | Vantage pays $87,658 in "agent fees" for the Titanium Explorer. | | J753 |
| Feb. 2014 | Vantage pays $972,229 in "agent fees" for the Titanium Explorer. | | J753 |
| 2/14/14 | Vantage Drilling Co. files application for temporary injunction against Su in Texas state court. Vantage sought to enjoin Su "from transferring, selling, or otherwise encumbering any of the Shares of Vantage common stock obtained as a result of his acts of fraud and breaches of fiduciary duty to Vantage." | | J303 |
| Mar. 2014 | Vantage pays $113,536 in "agent fees" for the Titanium Explorer. | | J753 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **Apr. 2014** | Vantage pays $455,120 in "agent fees" for the Titanium Explorer. | | J753 |
| **May 2014** | Vantage pays $603,070 in "agent fees" for the Titanium Explorer. | | J753 |
| **June 2014** | Vantage pays $471,592 in "agent fees" for the Titanium Explorer. | | J753 |
| **July 2014** | Vantage pays $289,553 in "agent fees" for the Titanium Explorer. | | J753 |
| **July 2014** | | Press publicly reports the allegations regarding corruption surrounding the DSA in the *Época* article and the results of Petrobras's October 2013 audit of those allegations. There is no evidence that Vantage was aware of either before these press reports. | J327 Tr. 577:11-580:22 (Halkett). |
| **7/19/14** | Vantage finally begins an internal investigation into potential FCPA violations, but fails to tell PVIS or PAI. | Vantage launches the investigation immediately after the July 2014 reports of the *Época* article and Petrobras's October 2013 audit.  *See* Tr. 577:11-580:22 (Halkett). | Tr. 324, 326, 346 |
| **7/30/14** | | Oil prices are around $100 per barrel, new contract | *See* J759; |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | day rates for drillships averaged more than $534,000, and drillships are in short supply. | J764 at Vantage_057 186; J856 (Jacobs Rpt. 1) ¶¶ 111-118 |
| 7/30/14 | | Parties execute Amendment No. 4.  With knowledge of the allegations of bribery with respect to the DSA, Petrobras affirms that "All other terms and conditions of the DSA and the Novation Agreement shall remain in full force and effect, in the form already agreed by the parties." | J009 § 3.1 |
| Aug. 2014 | Vantage pays $349,343 in "agent fees" for the Titanium Explorer. | | J753 |
| 8/27/14 | Bragg and Vantage's audit committee discuss whether Vantage should continue paying Padilha in light of the ongoing Brazilian investigation. However, Vantage did not stop paying Padilha until July 31, 2015. | | J332; J742 at Vantage 62417–18 |
| Sept. 2014 | Vantage pays $415,341 in "agent fees" for the Titanium Explorer. | | J753 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **Oct. 2014** | Vantage pays $539,343 in "agent fees" for the Titanium Explorer. | | J753 |
| **10/23/14** | Petrobras Brazil board approves Third Novation. | | J342 |
| **10/27/14** | | Oil prices are over $80 per barrel, new contract day rates for drillships averaged more than $557,000, and drillships are in short supply. | *See* J759; J764 at Vantage_057 186; J856 (Jacobs Rpt. 1) ¶¶ 111-118 |
| **10/27/14** | Third Novation to Contract. | With knowledge of the allegations of bribery with respect to the DSA and the broader Lava Jato corruption scandal, Petrobras executes the Third Novation, expressly affirming: "All other terms and conditions of the Contract, any subsequent amendments, purchase orders and change orders not specifically modified in this Third Novation Agreement shall remain in force and binding on the Parties." J010 § 10.5. | J010 |
| **10/27/14** | Petrobras Brazil issues press release regarding Operation Carwash, including formation of | The Petrobras press release indicates that Petrobras was aware of the Operation Carwash investigation as | J343 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | investigative committees. | Petrobras has already taken numerous steps and been granted "official access to the entire content of the testimonies" taken at a corruption hearing on October 8, 2014, and signed contracts with two independent investigation firms on October 24 and 25, 2014. | |
| Nov. 2014 | Vantage pays $456,237 in "agent fees" for the Titanium Explorer. | | J753 |
| 11/6/14 | Padilha emails Bragg about the bribery allegations to "make it nice" and look like everything was okay. | Padilha states in the email, "[W]e both know well that none of us (VTG or HPPS) have never had any such involvement under such allegations (not to mention our compliance and full commitment to the FCPC rules and proper accounting practices)." J346 | J346; Tr.. 1573 |
| By end of Nov. 2014 | | Oil prices start to plummet. | *See* J856 (Jacobs Rpt. 1) ¶¶ 33-94 |
| Dec. 2014 | Vantage pays $291,161 in "agent fees" for the Titanium Explorer. | | J753 |
| Jan. 2015 | Vantage pays $321,116 in "agent fees" for the Titanium Explorer. | | J753 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **Feb. 2015** | Vantage pays $360,094 in "agent fees" for the Titanium Explorer. | | J753 |
| **2/24/15** | | Petrobras notifies Diamond Offshore that it has a right to terminate drilling contract on the Ocean Baroness drillship and verbally informs Diamond Offshore that it does not intend to continue to use the rig. | J786 |
| **Mar. 2015** | Vantage pays $460,759 in "agent fees" for the Titanium Explorer. | | J753 |
| **Mar. 2015** | | PAI's Fernando Gama admits Petrobras had no more work for the Titanium Explorer. | *See* Tr. 1070:12-1071:6 (Gama) |
| **Apr. 2015** | Vantage pays $468,311 in "agent fees" for the Titanium Explorer. | | J753 |
| **May 2015** | Vantage pays $477,437 in "agent fees" for the Titanium Explorer. | | J753 |
| **5/16/15** | | In an email to Vantage's FCPA counsel regarding allegations of bribery, Padilha states, "I have nothing | J467 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | to fear once no wrongdoing was done on this regard either by myself and believe also not from VTG side." | |
| 5/18/15 | Petrobras Audit Report released; report concludes there was no need for the Titanium Explorer and requests more information about Padilha. | This audit is prepared during a period Petrobras was searching for a pretext to terminate the DSA. Although it relies on no information that is not relied upon in the October 2013 audit, it purports to reach different conclusions—i.e., conclusions that Petrobras could have reached in it October 2013 audit.<br><br>Moreover, as it did with the October 2013 audit, Petrobras has refused to produce documents cited in this audit, despite the Tribunal's orders that it do so. Accordingly, Vantage is entitled to an adverse inference that these documents would further demonstrate Petrobras's knowledge of the alleged bribery at the time of the October 2013 audit. *See* C. Post-Hearing Br. ¶¶ 303-304, 310, 333-334, n. 75, 76, 104. | J448 at 54697, 54699 |
| 5/22/15 | Emails between Vidal Martinez (Vantage's FCPA counsel) and Padilha about FCPA issues. | The cited exhibits do not reference FCPA. Instead, Padilha forwards press reports and describes investigative activities in Brazil. As to the possibility that he may be called to testify, Padilha states, "Therefore I am not yet aware of what will happen this time and or if I will be really called to testify which if happens I will gladly be there as I have | J465; J467 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | nothing to fear once no wrongdoing was done on this regard either by myself and believe also not from VTG side." J465 at Vantage_054033; J467 at Vantage__062576. | |
| 5/28/15 | | Petrobras cancels five offshore ship leases from Schahin Petroleo. | J784 |
| June 2015 | Vantage pays $462,116 in "agent fees" for the Titanium Explorer. | | J753 |
| June 2015 | | Petbras has reduced its floating rigs from 82 down to 53 due to budget cuts. | *See* J513 at Vantage_000 372 |
| 6/4/15 | | Gama asks Kenneth Anderson at Vantage, "What is Vantage doing to market the TTX?" Tr. 987:13-990:12 (Anderson). When Anderson says, "I don't know what you are talking about, we have a contract with Petrobras and we figured Petrobras would decide on the next project and area of operations for the TTX," Gama responds, "Don't you see all the contracts being cancelled by Petrobras?" *Id.* 988:10-20. | Tr. 987:13-990:12, 988:10-20 (Anderson) |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **6/8/15 - 7/4/15** | Padilha emails Vantage requesting Vantage's response to Petrobras Brazil's internal investigation. | Padilha is referring to a detailed response, supported by documentation, to Petrobras's May 18, 2015 audit. On July 4, 2015, Padilha states, "Pls note again that it is our opinion that the VTG version of the PB report needs to be circulated ASAP to the media and Brazilian authorities otherwise everyone here will just have one side of the story which is no good and PB is clearly trying to build up a commercial (backed by legal) case in order not just to justify a cancellation of the TTX contract but also to request compensation for losses incurred under this contract."   J501 at Vantage__043104. | J485; J501 |
| **6/25/15** | | Gama tells Anderson "there is no more money being alloted for future development in the Gulf of Mexico." | J495; J863 (Anderson Stmt. 1) ¶ 31 |
| **6/29/15** | | Petrobras announces a new 2015-2019 Business and Management Plan adopting a $91 billion (41%) reduction in capital spending. | *See* J513 at Vantage_000 374-379 |
| **July 2015** | Vantage pays $395,312 in "agent fees" for the Titanium Explorer. | | J753 |
| **7/4/15** | Bragg and Padilha exchange emails about media reports of the bribery. | | J501 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 7/6/15 | Emails between Bragg and Padilha about whether to disclose FCPA investigation, as required by the Contract. | This email says nothing about "whether to disclose FCPA investigation" or that such disclosure is "required by the Contract." Instead, Bragg sends to Padilha a draft of his detailed response to the May 18, 2015 Petrobras audit and asks Padilha for his comments. | J502 |
| 7/15/15 | Vantage's response to Petrobras Brazil Audit Report. | This is Vantage's detailed response to Petrobras's May 18, 2015 audit, including extensive back-up documentation, that Bragg sent to Petróleo Brasileiro's Chief Executive Officer. | J513 |
| 7/27/15 | Padilha meets with Brazilian prosecutors and makes proffer, admitting that he participated in a bribery scheme on behalf of Vantage. | Padilha does not implicate Bragg or anyone else at Vantage in this document. Tr. 1533:11-19 (Padilha). | J578; Tr. 1337, 1354, 1359, 1523 |
| 7/30/15 | Vantage files a Form 8-K with the SEC, notifying its shareholders that Padilha was cooperating with the Brazilian government. | After noting media reports about Padilha's statements to the prosecutors, Vantage further stated, "if Mr. Padilha committed any illegal acts, he was not acting on our behalf or upon any instructions from the Company." | J710 at 6 |
| Aug. 2015 | Vantage credited $463,418 for "agent fees" for the Titanium Explorer. | | J753 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **8/5/15** | Indictment of Su, Padilha, Zelada, Schmidt, Musa, and Henriques. | | J601 |
| **8/31/15** | PAI terminates the Contract, citing the bribery and operational failures. | Petrobras misrepresents this termination letter, J630. There is no mention of bribery in this letter. In full, the letter states:<br><br>"Petrobras America Inc. - PAI and Petrobras Venezuela Investments & Services - PVIS (together refereed as "Petrobras") hereby provide notice of termination, pursuant to Articles 9.1 .1.3, 9.1.1.7, and 9.1.3.2 of the Contract, as novated by the Third Novation, which is still in effect because Drilling Operations for a Well are ongoing.<br><br>"Please ensure that any and all ongoing Drilling Operations are completed in a safe and effective manner, consistent with the Contract, Applicable Law, and Good Oil and Gas Field Practices.<br><br>"This letter is without prejudice to any of Petrobras' rights and remedies under the Contract or the Third Novation." | J630 |
| **Sept. 2015** | Vantage pays $5,454,286 in "agent fees" for the Titanium Explorer. | There is no indication what this entry represents and there is certainly no evidence of any payments to Padilha after July 2015. | J753 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 9/24/15 | | Petrobras terminates drillship contract with Odebrecht Oleo & Gas SA | J794 |
| 11/2/15 | | Petrobras terminates contracts with Diamond Offshore Drilling for one semi-submersible rig and one drillship. | J785 |
| 11/16/15 | Depositions of Padilha, Zelada, Musa, and Henriques. | The depositions are hearsay in this proceeding. | J647 |
| 2/1/16 | Judgment entered against Padilha, Zelada, Musa, and Henriques.  The Brazilian Court concludes that bribes were paid to Petrobras Brazil officials, and that Padilha was acting in Vantage's interest. | The statements in the judgment are hearsay and double hearsay, and the judgment is not binding on Vantage in this proceeding.  *See* C. Post-Hearing Br. ¶ 271. | J652 |
| After 2/1/16 | | Padilha has an incentive to come up with new information implicating Vantage in order to obtain a reduction in his sentence under the Brazilian judgment and to avoid prosecution in the U.S. | Tr. 1356:2-1360:18 (Padilha) |
| 3/15/16 | Padilha provides supplemental declaration to Brazilian prosecutors. | Petrobras lawyers participated in the preparation of this declaration. | J656 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **April or May 2016** | Padilha meets with the United States Department of Justice. | | Tr. 1357-58 |
| **11/9/16** | Initial Weil Gotshal presentation acknowledges that Petrobras officials received bribes. | Petrobras misrepresents the Weil presentation. The report does not "acknowledges that Petrobras officials received bribes." Instead, the statements Petrobras cites are under the heading, "Summary of *Allegations* – Padilha Plea Agreement & Indictment." J731 at Vantage_6512 (emphasis added). A summary of allegations is not an acknowledgement that the allegations are true. | J731 at Vantage 6512 |
| **2/13/17** | Supplemental Weil Gotshal presentation admits that Bragg and O'Leary knew of, or were willfully blind to, the bribes. | Petrobras misrepresents the Weil presentation. ██████ ████████████████████████████████████ ████████████████████ █████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████ ██████████████████ █████████     Vantage has demonstrated in this proceeding that Padilha's post-conviction statements purporting to implicate Bragg and O'Leary are unreliable for a number of reasons and should be given no weight in this proceeding. *See* C. Post-Hearing Br. ¶¶ 274-277. | ██████ ██████ ████ |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| **3/31/17** | | ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██ █████████████ ██ ██ ██ ████████        As to Padilha's March 15, 2016 statement and his January 20, 2017 statement in this arbitration, ████████████████ ██████████████████ ██████████████████ ███████ ██ ███████ ██ █████ ██████████████████ ██████████████████ █████████████████ █ ██ █████████████ ████ | ████ |
| **5/12/17** | | ██████████████████ ████████ █ ████████████ █████████████ | ████ |
| **8/11/17** | | DOJ issues letter to Vantage, stating, ""The Department acknowledges the full cooperation of Vantage Drilling in the investigation.  Based on the information known to the Department at this time, it has closed its inquiry in this matter." | C1009; C1010 |

Appendix 004527

**APPENDIX B**
**TO VANTAGE'S POST-HEARING RESPONSE**

**VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS TO**
**PETROBRAS'S DESCRIPTION OF EXHIBITS THAT PETROBRAS CLAIMS EVIDENCE**
**VANTAGE'S DELEGATION OF AUTHORITY TO NON-EMPLOYEE BOARD MEMBERS**

| Vantage Board of Directors | Vantage Officers/Employees |
|---|---|
| • Paul Bragg (2007-2016)<br>• Christopher DeClaire (2007-2009)<br>• Jorge Estrada (2007-2015)<br>• Marcelo Guiscardo (2007-2016)<br>• John O'Leary (2007-2016)<br>• John Russell (2007-2009)<br>• Nobu Su (2008-2011)<br>• Steinar Thomassen (2008-2016)<br>• Robert Grantham (2008-2016)<br>• George Esaka (2010)<br>• Tian Khiam ("T.K.") Ong (2010-2016)<br>• Duke Ligon (2011-2016)<br>• Steven Bradshaw (2012-2016) | • Paul Bragg (CEO 2007-2016)<br>• Douglas Halkett (COO 2008-present)<br>• Douglas Smith (CFO 2007-2016)<br>• Mike Derbyshire (VP Marketing 2008-2016)<br>• Christopher DeClaire (VP Administration 2008-2016; Chief Compliance Officer 2011-2015)<br>• Bill Thomson, (Engineering Manager 2008-2016; VP Marketing 2016-present)<br>• Edward Brantly, (CAO 2008-present)<br>• Christopher Celano (GC/Chief Compliance Officer 2008-2011)<br>• Mark Howell (Assoc. GC 2011-2013; GC 2013-2015)<br>• Nicolas Evanoff (GC 2015-2016) |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 6/20/08 | Paul Bragg and **John O'Leary** jointly approach Hamylton Padilha regarding Vantage's efforts to secure drillship contracts; Bragg introduces Padilha to | Bragg provides Padilha with information about Vantage and its drillships, copying O'Leary. | J-20 |

Appendix 004528

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | **TMT—Nobu Su**'s company—and describes **TMT** as Vantage's "largest shareholder." | | |
| 7/11/08 | Padilha, Bragg, and **O'Leary** meet privately in Paris to discuss securing a contract with Petrobras International. | Padilha saw Bragg and O'Leary in Paris and follows up with information regarding Petrobras International requirements and other general market information. | J-22 |
| | Message<br>From:  hppadilha@infolink.com.br [hppadilha@infolink.com.br]<br>Sent:  7/11/2008 1:52:03 PM<br>To:  Paul Bragg (Houston) [pbragg@vantagedrilling.com]<br>Subject:  Re: Drillships<br>Attachments: Etesco_Drillship_presentation_-_Draft_v7[1].ppt<br><br>Dear Paul,<br><br>Thanks for the email and kind words; it was also a pleasure to meet you an John (as usual). | | |
| 8/3/08 - 8/11/08 | **O'Leary** remains the only Board member involved in a separate email chain with Bragg and Padilha regarding negotiations with Petrobras. | The email exchanges refer to potential opportunities with Petrobras and do not relate to negotiations. | J-24; J-25 |
| 9/18/08 | M. Derbyshire, Vantage's Vice President of Marketing, emails **O'Leary** a personal "FYI" regarding Padilha's negotiations with Petrobras International. | The "FYI" does not relate to Padilha's "negotiations" with Petrobras International.  Instead he provides advice on how Vantage should approach Petrobras International. Padilha did not negotiate with Petrobras on Vantage's behalf.  Tr. 1494:9-11, 1577:1-12 (Padilha); Tr. 235:10-236:7, 422:4-12 (Halkett). | J-32 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 11/17/08 | Padilha emails Bragg with a list of action items regarding contract negotiations, and states: that there must be "a final position from your end (**Nobu**) to confirm acceptance and what is the proposed way to proceed on the deal regarding the "*shipyard commissions issue* . . . ." | No Vantage Drilling Company director is on this email. | J-45 (emphasis added) |
| 11/18/08 | Padilha, **O'Leary**, **Su**, and Bragg exchange emails to arrange a face-to-face meeting in New York.  Bragg circulates contact information  for Padilha, **O'Leary**, and **Su** so they can communicate with each other separately:<br><br>**From**: "Paul Bragg (Houston)" <PBragg@Vantagedrilling.com><br>**Date**: Tue, 18 Nov 2008 14:18:11 -0600<br>**To**: <ceo@colonmail.com>; <93813065@smartone-vodafone.blackberry.com><br>**CC**: <hppadilha@infolink.com.br>; <john@strand-energy.com><br>**Subject**: Meeting in NYC or London<br><br>Nobu,<br><br>  I spoke with Hamylton earlier today and he is available to travel to NYC on tomorrow's overnight flight if you are able to meet him there on Thursday or Friday. If not, he may be available to meet in Europe next week, but the meeting in NYC would be preferred.  I am happy to co-ordinate the meeting, but I am copying each of you for convenience of future communications.<br><br>Paul<br>Hamylton's cell  +5521 (9985) 7172<br><br>Nobu's cell +4477 6971 3806<br><br>John's cell +971 506581975 | Bragg circulates contact information "for convenience of future communications," J048, not so "they can communicate with each other separately," as Petrobras asserts. | J-48; Trans. 1373 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | Padilha states that it was unusual to arrange meetings with a company director via the CEO. | | |
| 11/18/08 | Vantage issues a press release announcing that Vantage was forced to restructure the Purchase Agreement with TMT for Vantage's acquisition of the Platinum Explorer.  The release also discloses that TMT wholly owns the Titanium Explorer. | | J-46 |
| 11/19/08 | **Su**, Padilha, and **O'Leary** finalize plans to meet in New York.  **Su** and **O'Leary** are the only Board members directly involved in the ongoing negotiations with Petrobras. | There is no evidence that Su or O'Leary were ever involved in the ongoing negotiations with Petrobras. To the contrary, Halkett and Padilha testified that they were not involved in the negotiations.  *See* Tr. 1494:9-11, 1577:1-12 (Padilha); Tr. 235:10-236:7, 422:4-12 (Halkett). | J-55 at Vantage 82449 |
| 11/19/08 | Padilha emails **O'Leary**, copying Bragg, with detailed descriptions of Padilha's ongoing negotiations with Petrobras and a draft of the proposed contract proposal between Vantage and Petrobras. | Padilha provides advice and market intelligence, but he does not engage in negotiations with Petrobras.  Tr. 235:10-25 (Halkett); Tr. 1414:1-16 (Padilha). | J-50; J-51: J-55 |
| 11/19/08 | After Eduardo Musa (director of Petrobras International) requests a contract proposal from Vantage, Padilha emails **O'Leary,** copying Bragg: | | J-52 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | Message<br><br>From:    Hamylton Padilha [hppadilha@infolink.com.br]<br>Sent:    11/19/2008 9:27:20 PM<br>To:    john@strand-energy.com<br>CC:    Paul Bragg (Houston) [/O=VANTAGE/OU=First administrative group/cn=Recipients/cn=PBragg<br>Subject:    ENC: FW: Vantage Drilling Co Presentations<br><br>John,<br><br><br>FYI, below is the PB email which has Just arrived....now it is "play ball" time so warm up well Mr. Nobu for the gam<br><br>If it is so cold in NY, I probably will take Julia along as she can warm me up well !! | | |
| 11/19/08 | **O'Leary** and **Su** continue to be the only Board members included in communications regarding the ongoing contract negotiations. | Su is not copied on this email. | J-54 |
| 11/20/08 | After Petrobras raises concerns regarding the financial health of **TMT (Su)**, Padilha immediately sends a private email to **O'Leary**:<br><br>**From:** Hamylton Padilha [mailto:hppadilha@infolink.com.br]<br>**Sent:** 20 November 2008 02:04<br>**To:** john@strand-energy.com<br>**Subject:** RES: FW: Vantage Drilling Co Presentations | | J-56 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | John,<br><br>How can we get asap some more info about TMT once this has been a request from PB as he just increased his participation 100% on the Platinum Explorer and currently controls 100% of the other two drillships (Titanium and Cobalt)...they need to know that this is no Delba o Etesco without large pockets to keep up on the project!!<br><br>Bragg, Padilha, and **O'Leary** discuss ways to assure Petrobras Brazil that **Su** and **TMT** are financially sound, since **Su** has control of the drillships. | | |
| 11/21/08 | Petrobras asks for meeting with Vantage after learning that Vantage does not own the drillships included in its contract proposal.  Padilha emails **O'Leary** and Bragg, stating "[y]ou will need to help me on this one asap." | | J-57; J-58 |
| 11/21/08 | Bragg emails Padilha, copying **O'Leary**, Halkett, Doug Smith, Derbyshire and Christopher DeClaire to discuss details about the financial health of **TMT** (**Su**). Bragg again describes **TMT** (**Su**) as Vantage's "largest shareholder." | | J-59; J-60; J-62; J-63 |
| 11/21/08 | **O'Leary** privately forwards **Su** the 11/21 email from Padilha requesting "help . . . asap." | | J-61 |
| 11/22/08 | Bragg, **Su**, Padilha, and **O'Leary** meet in New York. | | J-64; J-65 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 11/22/08 | During the New York meeting, Padilha tells **Su** he must pay a bribe commission to obtain the Contract and Su agrees.  However, **Su** would only pay the bribes "once the transaction was completed." **Su** and Padilha agree that **Su** will go to Brazil to meet João Augusto Henriques, a lobbyist for Brazil's PMDB political party and a central figure in the bribery scheme.<br><br>Bragg distanced himself from the bribery discussions and "refused to learn the details about the 'difficulties' that were being created." | The quote about Bragg does not describe Bragg's conduct at the November 22 meeting.  Petrobras is quoting it out of context. | J-874 ¶ 10; J-652 at ¶ 260; Trans. 1494:12-17; J-601 at 11. |
| 11/24/08 | **O'Leary** emails Bragg and Padilha to discuss another meeting with **Su**.<br><br>Message<br><br>From:  john@strand-energy.com [john@strand-energy.com]<br>Sent:  11/24/2008 7:40:51 PM<br>To:  Paul Bragg (Houston) [PBragg@Vantagedrilling.com]; Hamylton Padilha [hppadilha@infolink.com.br]<br>Subject:  Re: Enc: Vantage<br><br>Hamylton and Paul,<br>Best time for next mtg with Nobu is 1 to 3 December in London. After that his schedule is fully booked and it will not allow him to close this year.<br>John<br><br>Sent from my BlackBerry® wireless device | | J-66 |
| 11/25/08 | Padilha emails **O'Leary** and Bragg with private updates on contract negotiations. | Padilha describes information Petrobras would require from Vantage and TMT.  He does not update on contract negotiations. | J-68 |
| 11/25/08 | Padilha and **O'Leary** exchange several emails, | Contrary to Petrobras's assertion, the email does not say | J-69 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | copying Bragg, to arrange additional meetings with **Su** to discuss the contract. | the meeting with Su is to discuss the contract. Instead, the series of emails refer to Vantage's efforts to gather information regarding TMT to satisfy Petrobras's requests. | |
| 11/25/08 | Padilha emails Bragg, copying **O'Leary**, stating it would "be good that **John** also try to obtain ASAP the **TMT [Su]** company profile w/ all financial statements about **Nobu's** group of companies . . . ."  | | J-070 |
| 11/26/08 | Halkett emails **Steinar Thomassen** and **O'Leary**, stating that Vantage was in a "very precarious financial situation," that he had "lost confidence in the financial management of the company," and that "**Nobu** *needs to take a firm hand* and *do what he needs to do to get this company on the correct road* again as the *now majority shareholder*." | | J-71 (emphasis added) |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | Halkett also states that Vantage was in a "complete financial mess" and that it was a "very good thing" that "**TMT** (**Nobu**)" was the "***major shareholder in Vantage***." | | |
| 11/26/08 | **O'Leary** forwards Halkett's 11/26 email to **Su**:  | | J-71 |
| 11/29/08 | Halkett emails Petrobras Brazil with specifications for Vantage's drillships, copying Padilha, Derbyshire, Oliveira, Bragg and **O'Leary**. | | J-72; J-73 |
| 11/29/08–11/30/08 | **O'Leary**, Padilha, and Bragg exchange a series of emails discussing Petrobras' request for documentation of **TMT's** financial situation; **O'Leary** is delegated responsibility for gathering information about **TMT** from **Su**. | No responsibility is delegated to O'Leary in these emails. He simply responds to requests for information about TMT. | J-74 |

The embedded email image reads:

From: john@strand-energy.com
Sent: Tuesday, November 25, 2008 9:40 PM
To: ceo_blackberry
Subject: Fw: Vantage General
Attachments: 2008 Forecast V8.xlsx; Preliminary 2009

Importance: High
Sensitivity: Confidential

Nobu
See attached from Doug!
I am afraid he is right.
John

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 11/30/08 | Email from **O'Leary** to **Su**, copying Bragg, discussing the need to gather information on **TMT**:<br><br>Message<br><br>From: Strand Energy [john@strand-energy.com]<br>Sent: 11/30/2008 6:24:21 PM<br>To: Nobu Su bb Su [93813065@smartone-vodafone.blackberry.com]<br>CC: Paul Bragg (Houston) [/O=VANTAGE/OU=First administrative group/cn=Recip<br>Subject: Petrobras - TMT Information<br><br>Dear Nobu,<br><br>We sent the TMT presentation to Hamylton and he discussed with Petrobras. See his response below. Hamylton says TMT will be requested to provide detailed information about the financials of TMT and its group during the upcoming negotiations. This is a heads up.<br><br>John | | J-75 |
| 11/30/08 | **O'Leary** emails Padilha and Bragg regarding his conversations with **Su**:<br><br>Message<br><br>From: john@strand-energy.com [john@strand-energy.com]<br>Sent: 11/30/2008 6:57:43 PM<br>To: hppadilha@infolink.com.br; 'Paul Bragg (Houston)' [PBragg@Vantagedrilling.com]; John O Leary (john@strand-energy.com]<br>Subject: Re: FW: Dsme letter for Petrobras<br><br>Hi Hamylton,<br>Thanks. Fully understood and I have passed the message to Nobu already. However, as already mentioned these financials will be provided to the extent they exist! Please do not over promise here as I am not sure to be able to deliver!<br>Also note that the contracting parties will be (I) the single purpose rig owning company and (ii) the manager Vantage - itself a public company. Your own rig owning company is also an spc I presume!<br>John<br>Sent from my BlackBerry® wireless device | | J-77 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 11/30/08 | **O'Leary** emails Bragg regarding his conversations with **Su**, noting that **Steinar Thomassen** (a director Vantage claims was later "independent") was representing the interests of **TMT** and **Su** on the Vantage Board.  **O'Leary** is acting as the primary contact between Vantage and **Su**. | Nothing in the cited exhibit identifies O'Leary as "the primary contact between Vantage and Su." <br><br> O'Leary talks about the importance of finalizing the agreements with TMT under which Vantage would have the right to deliver and operate the drillships: "There is a perception within TMT (Steinar/Per and now Nobu) that the fees proposed by Vantage for the management agreements are too high! They asked me my advice. I said I would study and revert. However, I do not have a copy of what is being proposed! *I think it is important (if not imperative) for us to get these agreements signed simultaneously with the restructuring agreements. They ARE an integral part of the deal.*"  (Emphasis added.) | J-78 |
| 11/30/08 | **O'Leary** emails **Su**, copying Bragg, with a draft of the DSME letter vouching for TMT's financial health: <br><br> Dear Nobu <br><br> Here is a draft of the DSME letter. Note that it needs to be filled in for pertinent details. <br><br> Best regards, <br><br> John | | J-79 |
| 12/1/08 | Bragg and Padilha exchange emails discussing new requests for information from by Petrobras International, copying Halkett, Doug Smith, **O'Leary**, **Su**, Derbyshire, **Steinar Thomassen**, and Chris Celano. | The new requests from Petrobras are for information relating to TMT. | J-80; J-82 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | | | |
| 12/5/08 | Padilha emails Bragg and **O'Leary**, urging **O'Leary** to gather financial documents on **TMT**:<br><br>John,<br>We need to receive ASAP the signed letter which Nobu was supposed to get from DSME once this is now VERY important to show that the rigs will be built for sure and that TMT is a strong (including financial) company !!<br><br>Best Regards<br>Hamylton | | J-84 |
| 12/7/08 | Padilha emails Bragg and **O'Leary**, again urging **O'Leary** to submit documentation regarding **TMT's** finances.  Padilha also requests another meeting with **Su** in either New York or London to ***"conclude the agreements which we have discussed."*** | | J-85; J-89 (emphasis added) |
| 12/8/08 | **O'Leary**, **Su**, Padilha, and Bragg exchange emails to arrange a face-to-face meeting to discuss the contract. | There is no reference in the cited email to "a meeting to discuss the contract."  However, Su "confirmed that the DSME letter is being prepared." | J-87 |
| 12/8/08 | Padilha emails Bragg and **O'Leary** a private update on contract negotiations with Petrobras International. | | J-88 |
| 12/9/08 | **O'Leary** receives an email from DSME attaching a recommendation letter discussing **TMT's (and Su's)** financial situation; **O'Leary** forwards the DSME recommendation letter to Bragg and Padilha. | | J-89; J-90; J-91; J-93; J-95 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|------|------------------------------|-----------------------------------------------------|----------|
|  | Bragg forwards the DSME letter to Musa. |  |  |
| 12/12/08 | **O'Leary** initiates an email chain with Bragg and Padilha to arrange a face-to-face meeting with **Su** in London. |  | J-41 at PAI 21979 |
| 12/14/08 | Padilha replies to **O'Leary** and Bragg regarding the meeting with **Su**—Padilha states that **Su** and **O'Leary** should personally come to Brazil to "finalize our agreements (from the **TMT** end)": <br><br> From: "Hamylton Padilha" <br> Date: Sun, 14 Dec 2008 13:39:11 -0200 <br> To: <johnoleary@wanadoo.fr>; 'Paul Bragg (Houston)'<PBragg@ <br> Subject: RES: Meeting <br><br> Therefore I do not believe that I will be able to meet Nobu in London next week and to be honest I think he (and you) should come to Brazil to finalize our agreements (from the TMT end) once they are a "must" for us to conclude the overall deal...and once there is a lot $$$ on stake that should not be so hard for someone w/ a long range private jet... |  | J-41 at PAI 21979; J-98 |
| 12/14/08 | **O'Leary** emails **Su** and Bragg directly, copying Padilha, to coordinate **Su**'s trip to Brazil to "finalize details of the contract." |  | J-41 at PAI 21979 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | De: johnoleary [mailto:johnoleary@wanadoo.fr]<br>Enviada em: domingo, 14 de dezembro de 2008 19:37<br>Para: Nobu cell Su; 'Paul Bragg (Houston)'<br>Cc: 'Hamylton Padilha'<br>Assunto: FW: Meeting<br><br>Dear Nobu<br><br>Hamylton has reported that they are making very good progress with Petrobras. However, he need to stay in Rio to help finalise details of the contract with the Vantage technical teams and Petrobras. That means that he cannot come to London on December 17th as proposed by you. He proposes instead to welcome you to Rio. Could you please advise if you can make a trip to Rio and if so what date(s) would be most suitable for you?<br><br>Best regards,<br>John | | |
| 12/17/08 | **O'Leary** forwards **Su** an internal email from Derbyshire regarding the ONGC transaction. | | J-110 |
| 12/20/08 | **Su**, Padilha, and Henriques meet in Brazil at the Copacabana Palace Hotel.  **Su** agrees to pay Padilha approximately $15 million, and later finalizes an agreement with Henriques for a similar amount in bribes. | Padilha admitted that he "didn't know for sure" whether Su and Henriques entered into an agreement, *see* Tr. 1401:13-18 (Padilha), and even assuming they did, Padilha does not know "the final purpose" of any agreement between Su and Henriques, *see* Tr. 1427:19-22 (Padilha). Padilha did not know whether Henriques paid money to Zelada or government officials or anyone else. *See* Tr. 1427:23-28:7, 1486:18-1487:19 (Padilha). | J-874 ¶¶ 18-19; Trans. 1485 |
| 12/21/08 | **Valencia (Su)** and Oresta (Padilha) sign a commission agreement for $15.5 million. | Padilha forms Oresta to hide from Vantage the fact that he is receiving a commission from Su.  J857 ¶ 20. | J-106; J-874 ¶ 20; |
| 12/23/08 | Memorandum of Understanding for Titanium Explorer is signed. | While the Memorandum of Understanding is dated 12/23/08, documents indicate that it is not signed until January 2009.  *See* J125; J857 (Halkett Stmt. 1) ¶ 70. | J-109 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 1/4/09 | **Su** emails Bragg asking if his company, Valencia, needs to be a signatory to the Memorandum of Understanding for the drilling contract. <br><br> ----- Original Message ----- <br> From: ceo_blackberry <93813065@smartone-vodafone.blackberry.com> <br> To: Paul Bragg (Houston) <br> Cc: John Strandenergy <john@strand-energy.com>; Stainer Private <steinar.thomassen@broadpark.no> <ychen@colonmail.com> <br> Sent: Sun Jan 04 15:48:37 2009 <br> Subject: Pb Various issues <br><br> Deal Paul <br><br> Mou of pb is between pvis and vtg but not mention 3602 owners <br><br> It is necessary to have valencia drilling involved? <br><br> I will ask this question in london. <br><br> I suggest we hold meeting on 8 and 9 with all relative parties <br><br> Plse adv <br> Nobu <br> Sent from my BlackBerry® wireless device | | J-111 |
| 1/4/09 | Bragg responds to **Su's** email, stating that Valencia and Vantage are linked: | | J-111 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | **From:** "Paul Bragg (Houston)"<br>**Date:** Sun, 4 Jan 2009 16:10:35 -0600<br>**To:** <93813065@smartone-vodafone.blackberry.com><br>**Subject:** Re: Pb Various issues<br><br>Last week we provided a document that links all of the parties.  I believe that Steinar and your lawyers have it now.  Vantage has worked almost a year to be fully qualified as contractor with Petrobras and is now in good standing.  When MoU is signed, we should then execute management agreement with Valencia.  HP advises that PBR will likely ask us to sign MoU this week.  I am available to go to Brazil if needed.  We are scheduled to discuss financing with Wayzata this week.  I would like to determine how this financing is going before we set a meeting.  May we discuss a meeting after getting feedback on Monday?  I am looking to go to Singapore early: to meet with Benety if wayzata does not work out.<br>  In meanwhile I will check flight schedules to re-arrange schedule.<br>  Paul | | |
| 01/09 | **Su** increases his ownership interest in Vantage, and obtains the right to appoint four of the nine members of the Board.   A fifth board member – former **Su** appointee **Thomassen** – is nominally an independent director, but retains a long-standing relationship with **Su**. | The only evidence regarding Su's right to nominate an additional board member indicates that it was exercised in connection with the election of directors at Vantage Drilling Company's annual shareholder meeting on December 21, 2009.  *See* J696 at Vantage_057609; J857 (Halkett Stmt. 1) ¶ 102.<br><br>As to Steiner Thomassen, there is no evidence to support the assertion that upon his re-election to the board in December 21, 2009, he is only "nominally independent," whatever that means.  Halkett testified that at that time, whatever relationship he had with Su in the past, Thomassen is not aligned with Su in any way by the time he becomes an independent director.  J857 (Halkett Stmt. 1) ¶ 102. | Trans. 416–18; 369 |
| 1/16/09 | Minutes of the 1/16/09 Vantage Board of Directors Meeting; **Su** plays a key role in multiple financial | The only "financial moves" involving Su referenced in these minutes is a resolution approving a $10 million loan | J-115 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|------|------------------------------|----------------------------------------------------|----------|
| | moves made by Vantage during this meeting. | from Su's F3 Capital and an agreement to pay the termination fee on the lapsed Titanium Explorer option by issuing additional Vantage Drilling Company shares to F3 Capital. | |
| 1/23/09 | Once the Petrobras Board approves the drilling contract, Padilha immediately emails Bragg and **Su** with congratulations. | | J-118 |
| 1/29/09 | Vantage and **TMT (Su)** finalize additional financial transactions with Vantage, including a $20 million credit line from **TMT (Su)** to Vantage. | It is not clear from the emails whether the credit facility is finalized at this time or earlier. | J-121; J-122 |
| 1/29/09 | Bragg emails **Su** regarding tension between TMT and Vantage, stating he knows that **Su** is "not happy" and "want[s] results." Bragg assures **Su** that he "hopes [**Su**] see us as a team" and that "your success is ours also:" | | J-121 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | I completely share your frustration of getting Vantage to the point that it financially stands on its own feet, and to the point that it creates additional value for its shareholders. As the largest shareholder by far, the depressed stock price is no doubt frustrating to you.  Personally, I feel the impact deeply.  Additionally, as founder, I have a strong desire to make this not only work, but to be immensely successful for the shareholders and employees----as for more than two years I have given every ounce of my efforts to nothing else.<br><br>Your English and your body language is clear----you are not happy and you want results.  Understood, and you will get this quickly as possible. I will try to communicate better. Your input extremely important and also respected.  Nobu, I hope you see us as a team.  No one is working against your interests. To the contrary, your success is ours also.<br><br>Best regards,<br><br>Paul | | |
| 1/29/09 | In his 1/29 email to **Su**, Bragg states that **O'Leary** has been "instrumental" in negotiating deals for Vantage, and states the company will continue to delegate responsibility to **O'Leary** in the future:<br><br>I also communicate regularly with John O'Leary and he has been providing instrumental support.  He has committed to increase his time and efforts as well.  In addition to projects like Sea Dragon, he is meeting with customers and investors to resolve the jackup funding.  He is also following up on the sale or charter opportunity of a jackup to Arabian Drilling.  The team is continually discussing opportunities and coordinating actions.  I would hope that the feedback you get from Steinar, John, Doug H., etc. gives you some comfort that we are not wasting efforts or working outside of our positions or strengths. | The email says nothing about O'Leary negotiating deals or Vantage delegating responsibility to him.  Bragg tells Su, "I also communicate regularly with John O'Leary and he has been providing instrumental support. He has committed to increase his time and efforts as well." | J-121 |
| 1/29/09 | Despite Vantage's claim that **Steiner Thomassen** was an independent director, Bragg describes **Thomassen** as a "**TMT [Su]** representative" on the Board: | Thomassen does  not become an independent director until the December 2009 Vantage shareholders meeting. *See* J857 (Halkett Stmt. 1) ¶ 102. | *Compare* Trans. 416–18 *with* J-121 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| | Nobu, I have been speaking very regularly with Steinar as TMT representative a[...] TMT concerns he relays to me. I am aware and understand your disappointment [...] us. The market has not been kind to us, but we push onward with great resolve [...] | | |
| 1/30/09 | Bragg emails **Su** regarding their financial partnership, stating in part:<br><br>Message<br>From:   Paul Bragg (Houston)<br>Sent:   1/30/2009 5:51:25 PM<br>To:   93813065@smartone-vodafone.blackberry.com<br>Subject:   PPL Payments<br><br>Dear Nobu,<br><br>I apologize if you were unhappy with my emails yesterday.  I understand the challenges well and we have a committed team working to overcome them.<br><br>Please consider making the advance of $5 million on the $20 million facility right away so we can pay PPL on Monday or Tuesday the $6 million that we now owe them.  We will not be able to draw the next $10 million from the bank group until the Emerald starts operations in Thailand around Feb 15.  The deal that Benety made with us is good for Vantage.  If we do not make the payment, we are exposing ourselves to possible bad consequences--- | The email does not refer to a "financial partnership." Instead, Bragg is asking that Su advance funds under a credit facility. | J-123 |
| 5/25/09 | Bragg emails **O'Leary** to discuss **Su's** control of Vantage.   In particular, Bragg states that Vantage should reduce **Su's** controlling interest below 50% so that "**Su** will stop viewing himself as the sole owner:"<br><br>My strong conclusion is that we should forget private, get funded, and then build the company.  We will build the stock price and give Nobu and everyone else liquidity in the process.  In the short run, we need to fund ourselves.  We also need Nobu's interest to fall below 50% so he stops viewing himself as sole owner (everyone else just along for the ride).  In reality, his influence will be just as great at 40% as 60%, but his behavior will be different.  He has already lost his chances to "save company".  His efforts just caused more harm. | Su's interest in Vantage Drilling Company exceeds 50% for a month or two around May 2009. Tr. 616:19-617:11 (Halkett). | J-132 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 6/15/09 | Email chain between Derbyshire, Halkett, and **Su** regarding the Petrobras drilling contract. | | J-134 |
| 12/28/09 – 12/30/09 | Email exchange between Halkett, Bill Thomson, Bragg, **TK Ong** regarding conflicts between **Su** and Vantage. | | J-140 |
| 5/14/10 | Email exchange between Bragg, **TK Ong**, **George Esaka**, and unknown individuals regarding negotiations between Vantage and Valencia (**Su**). | | J-145 |
| 11/2/10 | Email chain between Halkett, Bragg, and Chris Celano, copying **O'Leary**, regarding start-up delays for the Titanium Explorer. | | J-150 |
| 4/12/11 | Email between Douglas Smith, **Ong**, Bragg, **Thomassen**, and Celano regarding novation of the Petrobras contract. | | J-154 |
| 7/1/11 – 7/4/11 | Email exchange between Halkett, **Thomassen**, **O'Leary**, Halkett, **Duke Ligon**, Padilha and Howell regarding conflict with **Su**. | | J-158; J-159;J-160; J-161: J-162 – 165 |
| 2/17/12 | **Ong** and Bragg exchange emails regarding Vantage's offer to **Su** to purchase the Titanium Explorer. | | J-172 |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 3/1/12 | Email exchange between Bragg, **Su**, **O'Leary**, **Thomassen**, **Marcelo Guiscardo**, **Jorge Estrada**, **Ligon**, **Steve Bradshaw**, **Ong**, **Padilha**, and Vantage officers regarding conflicts between Vantage and **Su**. | | J-173; J-174 |
| 3/17/12 | Email exchange with Vantage Board and Officers regarding 3/18/12 Board meeting to approve purchase agreement with **Su** regarding Titanium Explorer. | | J-184 |
| 9/5/12 | A **Su** associate, Joseph Yeh, emails Bragg regarding **Su**, stating "[b]e *careful of a mad dog cornered* as it will bit anything to get out of the jam" and noting that **Su** "has *proof on the allegation against you on the P contract*:" | | J-214 (emphasis added) |

| DATE | EVENT ACCORDING TO PETROBRAS | VANTAGE'S CORRECTIONS, CLARIFICATIONS, AND ADDITIONS | EVIDENCE |
|---|---|---|---|
| 2/4/13 | Email chain between D. Halkett and **Guiscardo**, copying **O'Leary** and **Thomassen**, regarding stuck casing on the Titanium Explorer:<br><br>**De:** Doug Halkett (Houston) [mailto:Doug.Halkett@vantagedrilling.com]<br>**Enviado el:** Monday, February 04, 2013 3:44 PM<br>**Para:** Marcelo Guiscardo<br>**CC:** john@strand-energy.com; Steinar Thomassen (steinar.thomassen@broadpark.no)<br>**Asunto:** RE: Food For Thought<br><br>Reality check today. We have stuck the 18" casing on the Titanium. Drillers fault. Petrobras not happy and risk of need to redrill a well with $60M spent already!!<br><br>Trouble is never far away!!!<br><br>Doug. |  | J-240 |
| 8/27/13 | Email chain between **Thomassen**, **Ligon**, **Estrada**, and Bragg regarding the bribery allegations and whether Vantage should still continue paying Padilha while the investigation of bribery is ongoing. |  | J-332 |
| 4/16/15 | Padilha emails Bragg and Halkett, copying Derbyshire and **O'Leary** regarding negotiations over new drillship contracts with Petrobras Brazil. |  | J-423; J-424 |

# APPENDIX C
## TO VANTAGE'S POST-HEARING RESPONSE

## VANTAGE'S SUMMARY RESPONSE TO FALSE AND MISLEADING STATEMENTS IN THE BODY OF RESPONDENTS' POST-HEARING BRIEF

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| ¶ 58 | ██████████████████████ ██████████████████████ ███ ███████ ████ ████ | ████████████████████████ ████████████████████████ ████████████████████████ ████████████████ ██████████████ ██████████████████ ██████████ ████████ |
| ¶ 58 | Bragg "received notice of the bribery" allegations from an email sent by an *Época* reporter. ████ ████ ████ ████████ | This is false.  ████ ████ ████ ████████████████████ █████████████ |
| ¶ 68 | "Padilha facilitated the bribes at the direction of Bragg, Su, and O'Leary." | This is false.  There is no evidence that Bragg and O'Leary gave Padilha any direction related to bribery.  To the contrary, Padilha testified that he never openly discussed bribery with Bragg or O'Leary before the DSA was signed. *See* Tr. 1340:16-1341:7 (Padilha). |
| ¶ 72 | Bragg was implicated in a bribery scandal at his former company and was fired as result. Citing J377, J151. | This is false.  There is no evidence to support this assertion.  To the contrary, the evidence shows that Bragg was not implicated in the referenced bribery.  *See* J151; J377 ¶ 12. |
| ¶ 74 | Because Vantage was a startup business, "[t]his reality placed Vantage 'in a different position than its competitors, such as Pride.'"  Citing Tr. 358 (Halkett). | This is misleading.  Halkett went on to clarify that "there were a whole bunch of other startups at the same time." Tr. 358:14-15 (Halkett). |

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| ¶ 75 | "[N]o company affiliated with Petrobras Brazil had any reason to hire Vantage." | This is false.   No evidence supports this assertion.  To the contrary, there were many reasons why Petrobras would contract with Vantage.   *See* Tr. 234:9-18, 392:6-394:1 (Halkett);   J513   at   Vantage_000311-313. Around the same time ONGC contracted with Vantage for the Platinum Explorer. Tr. 393:13-20; 613:23-614:12 (Halkett). |
| ¶80 | O'Leary and Su participated in the negotiations for the DSA. | This is false.  Tr. 1494:9-11;  1577:1-12 (Padilha); Tr. 235:10-236:7, 422:4-12 (Halkett). |
| ¶80 | Padilha "negotiated the DSA." | This is false.   Padilha acted as a broker, arranging meetings, providing information, making recommendations, and facilitating communication between the parties.   *See* Tr. 1414:1-16,   1415:22-1416:1   (Padilha);   Tr. 235:17-25 (Halkett). |
| ¶ 81 | "Vantage's corporate representative admitted that Vantage did not vet Padilha as required."  Citing Tr. 348-49 (Halkett). | This is false.  Halkett stated only that he lacked personal knowledge of the vetting Pride may have done. |
| ¶ 90 | Padilha was trying to direct Petrobras away from Pride to Vantage. | There is no evidence that Padilha tried to disadvantage Pride in the negotiations.   The evidence  actually  shows  that  Pride  was negotiating,  and  ultimately  entered  into  a contract with BP, for the drillship Pride was offering to Petrobras.  The BP rate was much higher than the rate under discussion with Petrobras.  Therefore, Pride took itself out of the running.   *See* J647 at Vantage_054755, 054779-781, 054799. |
| ¶ 91 | "Given Vantage's engagement of Padilha, Vantage had to provide PVIS with a variety of written notices under the Contract."   Citing J001 art. 10.20.1 – 10.20.3; Tr. 347-48 (Halkett) | This is false.   Petrobras was fully aware of Padilha's involvement, and there is no evidence that he satisfied the definition of an "Illegal Information Broker" under the cited provisions of the DSA.  *See* C. Post-Hearing Br. ¶¶ 351- |

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| | | 353. |
| ¶ 94, 97 | In the November 17, 2008 email referring to "shipyard commissions," "Padilha relayed to Bragg that Vantage would need to satisfy the 'bribe commission' to obtain the contract with Petrobras Brazil." and "asked for Bragg's input on several items, including the bribes" (citing J045). | This is false.  There is no mention of a "bribe commission" in this or any other document, nor did the email ask Bragg for any input regarding bribes.  *See* J45. |
| ¶ 95 | Vantage's "CEO avoided attending meetings that were critical to secure the $1.8 billion Contract, upon which Vantage's existence depended." | Petrobras cites no evidence to support its assertion that Bragg intentionally avoided any meeting.  Nor is there any evidence that Vantage's existence depended on the DSA.  In fact, at the time the contract was being negotiated, Vantage did not anticipate receiving the $1.8 billion in DSA revenue.  Instead, it anticipated receiving only a fee and a small percentage of revenue under its management agreement with Su. *See* J857 (Halkett Stmt. 1) ¶¶ 43-46. |
| ¶ 99 | "[T]he day after Padilha's 'shipyard commissions' email to Bragg, Padilha spoke with Musa about proceeding down the 'shipyard commissions' avenue." (Citing J874 (Padilha Stmt.) ¶ 10.) | This is false.  The cited paragraph from Padilha's statement simply stated, "The next day, November 18, 2008, Musa called me asking for Vantage's updated proposal." |
| ¶ 98 | "Vantage immediately started arranging the bribery scheme" by Bragg setting up the November 22, 2008 meeting in New York between Padilha and Su. | This is false.  There is no evidence that Bragg arranged a bribery scheme.  In fact, Padilha's testified that he had no direct communications with anyone at Vantage about the alleged bribery scheme and the contemporaneous evidence that shows the November 22, 2008 meeting was to address concerns Petrobras had about Su's ability to fund the rig construction and his relationship with Vantage. *See* C. Post-Hearing Br. ¶¶ 64-69, 274-281. |

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| ¶¶ 101, 131 | "Deep into the Contract's negotiations" and at the time of contracting, Vantage misrepresented to Petrobras that it owned the Titanium Explorer. | This is false. By November 18, 2008, Petrobras was fully aware that Su owned the vessel. *See* J083; J046; Tr. 1389:22-1390:9 (Padilha). That was before Vantage made its second offer and serious negotiations commenced. *See* J857 (Halkett Stmt. 1) ¶¶ 64-73; J081. |
| ¶ 102 | Halkett "acknowledged during the merits hearing" that Vantage's representations about ownership of the drillships "gave a false impression." Citing Tr. 365 (Halkett). | This is false. There is no such acknowledgement from Halkett in the cited material. |
| ¶ 102 | Halkett admitted that there was no oral agreement with TMT to access the drillships. Citing Tr. 365 (Halkett). | This is false. Halkett makes no such admission. Vantage had such an agreement as early as November 18, 2008. *See* J046. |
| ¶ 103 | Vantage "concealed" from Petrobras that its financing for the acquisition of the drillships fell through in October 2008. Citing Tr. 366-67, | This is false. There is no testimony that Vantage actively concealed anything from Petrobras. Halkett testified that Vantage did not tell Petrobras about the failed financing because "we would still have access to the ships to provide them per the contract through the management agreement." Tr. 367:5-9 (Halkett). |
| ¶ 103 | Halkett testified that Su was Vantage's only option to "potentially transform itself into a real operating company." Citing Tr. 369 (Halkett). | Halkett makes no such statement. To the contrary, Halkett testified that Vantage already was an operating company because it had already acquired the jackup rigs from Su. Tr. 388:7-11 (Halkett). |
| ¶ 104 | Vantage's announcement of its restructured deal with Su on November 18, 2008, "surprised Padilha, who did not know it would be disclosed publicly." Citing Tr. 1447 (Padilha). | This is misleading. Padilha did not testify that he was surprised or that he had any expectations regarding public disclosure. Padilha simply stated that he was not aware that the restructuring deal had been worked out at the time he wrote his "shipyard commissions" email the day before. *See* Tr. 1447:19-24 (Padilha). |

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| ¶ 110 | At the meeting on November 22, 2008 between Su and Padilha, "Padilha explained that there were 'problems related to the compliance obligations of the American company,' i.e., Vantage, so it was not possible for Vantage to pay the bribes directly. Accordingly, the solution was to pay the bribes indirectly using 'a company outside the United States, willing to make the payments of the improper advantages.'" Citing J601 (the Brazilian indictment). | This is false. Nothing in the cited exhibit, or any other evidence, supports Petrobras's assertion that Padilha made these statements to Su. (Moreover, the cited exhibit is the Brazilian indictment, which is hearsay.) |
| ¶ 111 | With respect to the meeting between Su and Padilha on November 22, 2008: "As Padilha explained to Brazilian prosecutors, Bragg was either (a) intentionally absent at these meetings, or (b) if present, purposefully tried to distance himself form the bribery discussions." Citing J601 (the Brazilian indictment). | This is false. No evidence supports this statement, including the cited Brazilian indictment, J601 (which is hearsay). Padilha never made this statement. |
| ¶ 112 | Halkett disclosed in a November 26, 2008, email that "Vantage was keeping two sets of books and records that did not match." Citing J071. | This is false. Halkett's email does make this statement. Instead, Halkett stated that there were two different financial models being run within the company by separate groups and that their respective cash flow projections did not match. Models are not books and records. |
| ¶ 113 | "Vantage commonly empowered its non-employee directors (e.g., Su and O'Leary) to participate in Vantage's negotiations of corporate transactions." Citing Tr. 1577 (Padilha). | This is false. On the page cited, Padilha testified, "I don't recall John [O'Leary] . . . participating in the direct negotiations with Petrobras." Tr. 1577:7-12 (Padilha). Padilha also testified unequivocally that Su did not participate in the negotiations of the DSA. Tr. 1494:9-11 (Padilha). |
| ¶ 119 | "[O]n December 9, 2008, Padilha sent a new proposal to Musa, lowering the effective day rates." Citing J035. | This is false. Padilha did not send this or any other Vantage offer to Petrobras. All offers were sent directly by Vantage to Petrobras. *See* |

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| | | J033; J081; J094. |
| **¶ 121** | "Although Halkett claimed that Su went to Rio [on December 20, 2008] because of Petrobras Brazil's concerns about TMT, the evidence shows that Vantage (not Petrobras Brazil first suggested a meeting in one of Bragg's emails: 'I believe that I could arrange a visit with Petrobras representatives if they wish to ask questions of [Su] directly.'" Citing J060. | This is misleading.  Petrobras insinuates that Vantage suggested the meeting in Brazil on December 20, 2008, to arrange bribes.  In fact, Bragg suggested the meeting on November 21, 2008, at the conclusion of his email describing TMT bona fides and the arrangements by which Vantage would deliver and operate the Titanium Explorer. *See* J060.  In other words, the request for a meeting on November 21, 2008, is consistent with and further confirms the understanding Vantage had as to the legitimate purpose of the meeting in Brazil. |
| **¶ 122** | "By sending Su to Brazil [in December 2008], Vantage supported Su acting on its behalf in the Contract negotiations." Citing Tr. 1494, 1496 (Padilha). | This is false.  When Padilha was asked whether "Su was there as part of the negotiations," he testified, "No." Tr. 1494:9-14 (Padilha). |
| **¶ 123** | On "December 16, [2008], Musa and Zelada changed the evaluation criteria, including the bonus as part of the day-rate calculation, which finally placed Vantage first rankings ahead of Pride." Citing J292 (Petrobras 2013 audit of the *Época* article). | This is misleading and incomplete.  First, the statement does not appear in Petrobras's 2013 audit.  Instead, it is in Petrobras's 2015 report.  While that second audit states that the ranking criteria was changed on December 16 to include "the bonus as part of the daily rate criterion," Petrobras has refused to produce any of the backup documentation for this assertion, despite the Tribunal's order that it do so.  Moreover, Petrobras chose not to present testimony from Musa who would have had knowledge of the basis for the rankings.  Therefore, Vantage is entitled to adverse inferences.

The statement is also misleading in that it suggests that Vantage moved up to first place above Pride because of a change in ranking criteria; however, it appears from the evidence that Vantage was ranked first before the alleged change in the system.  The last offer in the |

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| | | record from Pride is dated December 3, 2008, and is for a $525,000 day rate plus a 17% bonus (or $632,000 combined).  Vantage's December 3 offer was $560,000 plus a 10% bonus ($616,000 combined) and its December 9 offer was $518,000 plus a 10% bonus ($569,000 combined.  Vantage's December 15, 2008, offer (which is referred to in ¶ 123) lowered Vantage's offer for a $490,000 day rate and a 12.5% bonus (or $551,250 combined). Petrobras has not presented any evidence as to which prior offer was previously ranked against the Pride offer to result in Pride being ranked first.  A December 16, 2008, Petrobras legal memorandum, indicates that Vantage ranked first before revising its offer on December 9, 2008.  *See* J101 at Vantage_055699 (indicating that Vantage was asked after the first place ranking to lower its offer, which it did December 9, 2008 (*see* J094)). |
| ¶ 124 | "Zelada . . . later admitted that [his] actions interfered with the procedure for procuring the Contract and that [he] received 'undue advantage as a result of the contract.'"  Citing J652 ¶ 248 (the Brazilian judgment). | There is no evidence that supports a finding that Zelada ever made any such admissions. |
| ¶ 126 | "Henriques later testified that the $15 million [in payments from Su] was to be paid as follows: . . ."  Citing J652 ¶ 261 (Brazilian judgment). | This is false.  Henriques never testified that he was to be paid or was paid anything by Su.  The cited paragraph from the Brazilian judgment is quoting from the examination of Padilha, not Henriques, as Petrobras falsely states. |
| ¶ 127 | "Su agreed to these payments as 'kickbacks at the request of Jorge Luis Zelada.'"  Citing J652 ¶ 258. | There is no evidence that Zelada ever made such a request to Su. |

Appendix 004556

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| ¶ 127 | "Padilha has testified that, during the meeting [in Rio on December 20, 2008], Su, Padilha, and Henriques 'defined the kickbacks [sic] details.' . . . And Henriques confirmed that he was present for this meeting."   Citing J652 ¶¶ 258, 317 (Brazilian judgment) | This is false and misleading.  Padilha has consistently testified that he was not present at any meeting between Su and Henriques at which the subject of bribes was discussed.  Tr. 1426:17-22 (Padilha).<br><br>While Henriques confirmed that he met with Su in Rio, he denied discussing bribes with him. Instead, Henriques testified that he discussed other shipping-related transactions Su was interested in pursuing in Brazil.  *See* J647 at Vantage_054806-808. |
| ¶ 129¶ | "During the merits hearing, Halkett admitted that the timing of the MOU was odd, because Petrobras Brazil really wanted the Platinum Explorer, not the Titanium Explorer, but the Platinum Explorer was contracted to ONGC, an Indian oil company, at the last minute. . . . Halkett acknowledged, however, that despite this suspicious timing, he did not investigate whether there was any impropriety." Citing Tr. 399 (Halkett). | This is false and misleading.  Halkett never described the timing of the MOU as odd or suspicious.  Although he thought it was "a bit odd" that Petrobras did not require a guarantee from the owner of the Titanium Explorer, Tr. 391:8-16, he did not find it suspicious because:<br><br>""[M]y understanding at the time was that technically the ships were very good, especially the Titanium Explorer. . . and . . . because the rigs were being delivered from a reputable shipyard, DSME, they could be delivered on time and delivered as per contract, which was not happening with . . . several other Petrobras contracted ships. . . .<br><br>I believed we'd convinced Petrobras by reducing our price as well because we had lots of negotiations on price, and the market was still pretty good at the time. . . . So the terms were quite attractive and the fact that . . . the Titanium Explorer had good specs, so this was a contract with much lower day rate with longer duration [than the ONGC contract].  So it was . . . in the lower end of what other rigs were going for at the time."<br><br>Tr. 392:6-394:1 (Halkett) |

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| ¶ 134 | "After the MOU was signed on December 23, 2008, but before the Contract was signed on February 4, 2009, Su increased his ownership interest in Vantage. . . . Additionally, Su had the right to appoint four of the nine members of Vantage's board of directors, and one of the other five—Steiner Thomassen—had a long-standing relationship with Su." Citing Tr. 416-18 (Halkett). | This is misleading.  The increased ownership had nothing to do with the MOU or DSA.  It was the result of Su's investing more cash in the company.  *See* J689 at Vantage_05484, 054501-506, 04521-523;  J696 at Vantage_57569-570, 57592-593.<br><br>To the extent Su could appoint one additional director, that right was not exercised until the December 2009 shareholders' meeting.  *See* J857 (Halkett Stmt. 1) ¶ 102.<br><br>Whatever relationship Thomassen may have had with Su in the past, he was not aligned with Su at the time he transitioned to an independent director in December 2009.  *See* Tr. 333:7-334:9 (Halkett). |
| ¶ 136 | While Steiner Thomassen served as an independent director on the Vantage Board of Directors, "Vantage never confirmed that Thomassen was no longer working for Su or that Thomassen was truly independent."  Citing Tr. 333-335 (Halkett) | This is false and misleading.  Halkett was sure the Vantage Board "did some checking but I wasn't involved in that."  Tr. 335:3-15 (Halkett).  Although Halkett was not involved in that process, he testified in no uncertain terms that Thomassen was clearly not aligned with Su when he became an independent director."  Tr. 333:7-334:9 (Halkett).  And, Vantage reported Thomassen as an independent director to the SEC.  *See* Tr. 336:3-4. |
| ¶ 137 | "On January 4, 2009, Vantage began preparing "a document that links all of the parties," because it needed to closely link itself to TMT to secure the drillship necessary to perform the Contract."  Citing J111. | This is misleading.  The email is discussing the need to finalize the management agreement between Vantage and Valencia, the owner of the Titanium Explorer. |
| ¶ 137 | "Vantage issued a press release on January 29, 2009, stating that it would operate the Titanium Explorer as a matter of right through a TMT affiliate."  Citing J120. | This is false.  Vantage did not announce that it would operate the Titanium Explorer "through a TMT affiliate."  Instead, the release states, "Vantage will operate the rig pursuant to a management agreement with an affiliate of |

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| | | TMT. The management agreement provides for fixed and variable dayrate fees based on the performance of the rig to Vantage." |
| ¶ 138 | Citing emails from January 2009 (J121, J122), Petrobras purports to describe Vantage Drilling Company's debt and equity financing involving Su, and states that "[o]nce again, Vantage presented itself as unified with Su and TMT," citing emails from November 2008 (J040; J044). | This is misleading.  Petrobras's description of the debt and equity financing is incomprehensible.  A clear and accurate description of these arrangements is set forth in Vantage Drilling Company's annual SEC filings for 2008 and 2009.  *See* J689 at Vantage_05484, 054501-506, 04521-523; J696 at Vantage_57569-570, 57592-93.<br><br>Moreover, it is not clear what Petrobras means by Vantage being "unified with TMT."  TMT is not mentioned in J040, and an attachment to J044 merely states, "We have a strong financial backer and main shareholder in TMT." |
| ¶ 139 | "Padilha was more involved in Vantage's operations than just contract negotiations." Citing Tr. 1437 (Padilha). | This is false.  Padilha was acting as a broker and did not have authority to negotiate with Petrobras on Vantage's behalf. *See* Tr. 1414:1-16, 1415:22-1416:1 (Padilha); Tr. 235:17-25 (Halkett). |
| ¶ 142 | Petrobras asserts that the following exhibits show the payment of bribes to Zelada: J128; J211; J131; J133; J139. | This is false.  These exhibits show no payments to Zelada or any Zelada-owned entity.  Instead they show payments to Schmidt-owned company Polar Capital, either directly or through an intermediary, Slaney Capital and Frank Marketing Limited (*see* J601 at Vantage_058229). |
| ¶ 142 | "Henriques confirmed that Zelada received bribes."  Citing J637 at PAI000524 (a pre-trial order in the Brazilian criminal proceeding). | This is false.  Nowhere in this document, which is hearsay, does Henriques confirm that Zelada received bribes. |
| ¶ 142 | Citing Padilha's witness statement, J874 ¶ | Padilha's statement does not support this |

Appendix 004559

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| | 23, Petrobras states, "Henriques received the first and second installments of the bribes." | assertion.  In paragraph 23, Padilha stated, "I believe [Su] also paid the first and second installments of the bribes to Henriques."  And on cross examination, he testified that he had no actual knowledge if Su paid anything to Henriques and if so the purpose of such payments.  *See* Tr. 1427:23-1428:7 (Padilha). |
| ¶ 143 | "Vantage's corporate representative likewise admitted that the evidence indicates illicit money moved through several persons." Tr. 449 (Halkett). | This is false.  Halkett did not admit there were illicit payments.  Instead, he stated, "seems, based on this [J652 (Brazilian judgment)] that money passed from . . . Nobu Su to Hamylton." Tr. 449:18-20. |
| ¶ 147 | "Vantage admitted that it had a joint venture with Valencia to share profits." Citing Tr. 411 (Halkett). | This is false.  Halkett described the management agreement with Valencia under which Vantage operated the Titanium Explorer for a fee, including a share of profit.  Halkett did not testify that this was a joint venture. |
| ¶ 148 | "Su . . . tried to buy VDC (the then-parent company)." Citing J154. | This is false.  The cited email discusses what would happen if Su exercised an option relating to Vantage Deepwater Company, one of the Claimants.  There is no indication that Su ever tried to exercise this option. |
| ¶ 149 | "Vantage and Su continued to discuss Su buying Vantage, with the central concern being working 'together for a clear path forward to build shareholder value of Vantage." Citing J161 | This is false.   The cited emails involve discussions surround Vantage's acquisition of the Titanium Explorer (then called Dragonquest) and options for financing such an acquisition. |
| ¶ 160 | "Vantage described the [*Época*] article as being full of 'rumors and third party allegation." Citing J328. | The statement comes from an email authored by Padilha, not Vantage. |
| ¶ 161 | Petrobras asserts that after the *Época* article was published, Vantage "did not internally investigate whether the article's | This statement is false and misleading in that it assumes Vantage was aware of the article when it was published in 2013.  There is no evidence |

| R. POST-HEARING BR. ¶ | PETROBRAS'S FALSE AND MISLEADING STATEMENTS | THE TRUTH |
|---|---|---|
| | allegations were true." | that Vantage had seen the article until 2014, and it launched an investigation at that time. *See* Tr. 311:15-314:13, 577:11-581:8 (Halkett). |
| ¶ 167 | Petrobras asserts that Vantage did not tell Petrobras about its internal investigation because Petrobras "would have asked hard questions." Citing Tr. 346 (Halkett). | This is false.  Halkett never said avoiding hard questions was the reason Vantage did not share its audit findings with Petrobras. |
| ¶ 178 | Petrobras asserts that Vantage admitted "that the 2014 investigation conducted by Vantage's prior FCPA counsel, Vidal Martinez, was nothing more than a whitewash." | This is false.  Nothing in the record supports this assertion. |
| ¶ 186 | "One of the bribes seized from [Zelada's] Monaco bank account was 'one [Zelada] received as a result of [the] Titanium Explorer drilling vessel contract." Citing J652 ¶ 399. | While the Brazilian court made this finding, there is no evidence supporting it. |
| ¶ 189 | "Neither the DOJ nor the Brazilian prosecutors has found that Padilha is lying." | There is no evidence of any findings by the DOJ or Brazilian prosecutors relating to Padilha. |

Appendix 004561

# Exhibit 94

**CONFIDENTIAL**

**AMERICAN ARBITRATION ASSOCIATION**
**IN THE MATTER OF THE ARBITRATION BETWEEN**

| | | |
|---|---|---|
| VANTAGE DEEPWATER COMPANY | § | |
| and VANTAGE DEEPWATER | § | |
| DRILLING, INC., | § | |
| | § | |
| Claimants, | § | |
| | § | |
| v. | § | CASE NO. 01-15-0004-8503 |
| | § | |
| PETROBRAS AMERICA INC., | § | |
| PETROBRAS VENEZUELA | § | |
| INVESTMENTS & SERVICES B.V., | § | |
| and PETRÓLEO BRASILEIRO S.A. – | § | |
| PETROBRAS, | § | |
| | § | |
| Respondents. | § | |

## RESPONDENTS' POSTHEARING RESPONSE BRIEF

THOMPSON & KNIGHT LLP

By: _____
      Andrew B. Derman
      Texas Bar No. 05770700
      Andrew.Derman@tklaw.com
      William M. Katz, Jr.
      Texas Bar No. 00791003
      William.Katz@tklaw.com
      Matthew M. Mitzner
      Texas Bar No. 24068911
      Matthew.Mitzner@tklaw.com
      Catherine W. Clemons
      Texas Bar No. 24087316
      Catherine.Clemons@tklaw.com

1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
FAX (214) 969-1751

August 18, 2017             ATTORNEYS FOR RESPONDENTS

## TABLE OF CONTENTS

Page

I. Introduction and Summary ......................................................................... 1

II. Argument and Authorities ......................................................................... 2

  A. Governing Law ....................................................................................... 2

    1. Vantage has previously admitted that this arbitration is governed by maritime law, as supplemented by Texas law. ............................................................... 2

    2. Vantage has previously admitted that maritime law and English law are the same. ...... 4

    3. Vantage's argument in favor of English law proves too much and raises serious questions about the Tribunal's authority. .................................................. 7

    4. Because Vantage has never alleged that the Contract is ambiguous, English law cannot apply to determine the parties' mutual intent. ................................ 9

    5. English law applies only to Petrobras Brazil's Guaranty. ............................ 10

  B. Standard of Requisite Proof ............................................................... 12

    1. Vantage must prove that the Contract is valid and enforceable. ................... 12

    2. Until Vantage proves that the Contract is valid, Respondents have no burden to prove anything. ........................................................................ 14

    3. PAI and PVIS have never asserted the "bribery defense" created by Vantage. ........... 16

    4. Vantage's authorities do not support shifting its burden of proof to Respondents. ...... 16

    5. Preponderance of the evidence is the governing standard of proof in this arbitration.  18

  C. Overwhelming Evidence of Bribery and Corruption ............................. 19

    1. Vantage cannot escape the overwhelming evidence of bribery and corruption. .......... 19

    2. Vantage cannot separate itself from its officers, directors, shareholders, and agents. . 24

    3. Padilha's actions and knowledge are imputed to Vantage. ........................... 26

    4. Padilha's testimony was truthful and credible. .................................... 27

    5. Vantage ignores and misrepresents the bribery evidence's strength. ................ 29

    6. Vantage cannot distinguish between the payment of a "toll" and the payment of bribes. ............................................................................... 32

    7. The Contract is "tainted" because Vantage obtained it through bribery. .............. 33

    8. The DOJ's decision not to charge Vantage criminally is irrelevant to Vantage's liability in this civil arbitration. ................................................. 36

  D. Corporate Separateness ..................................................................... 38

    1. Vantage has neither pleaded nor proved alter ego. ................................. 38

    2. The *in pari delicto* doctrine cannot save Vantage's claims. ..................... 39

    3. The acts of Musa and Zelada cannot be imputed to PVIS or PAI. ..................... 39

| | | |
|---|---|---|
| **E.** | **Operational Issues** .................................................................................... | **41** |
| | 1. Vantage's operational witnesses are neither qualified nor credible............................ | 41 |
| | 2. Vantage materially breached the Contract and repeatedly violated Good Oil and Gas Field Practices on May 19 and July 19, 2015................................................ | 49 |
| | 3. Vantage repeatedly mischaracterizes the evidentiary record....................................... | 54 |
| **F.** | **Damages.** ................................................................................................... | **58** |
| | 1. The parties explicitly allocated risk in the Contract, and Article 19.9 prevents Vantage from recovering any damages. ..................................................... | 58 |
| | 2. Vantage's damages methodology improperly includes Vantage entities that are not parties to this proceeding................................................................. | 63 |
| | 3. Vantage overstates damages by not accounting for its lack of ownership of the Titanium Explorer. ......................................................................... | 65 |
| | 4. Vantage's damages methodology does not account for the impact of the bankruptcy proceeding. ......................................................................... | 68 |
| | 5. PAI and PVIS are entitled to over $100 million in damages on their counterclaims. ... | 69 |
| **G.** | **PAI's and PVIS's Counterclaims** ............................................................... | **70** |
| | 1. Vantage assisted and participated in a breach of fiduciary duty................................. | 70 |
| | 2. Vantage is liable for breach of contract, common-law fraud, and fraudulent inducement. ..................................................................................... | 71 |
| | 3. The Contract is void, voidable, unconscionable, and must be rescinded. ................... | 72 |
| | 4. The evidence supports Respondents' civil RICO claim. ............................................. | 72 |
| | 5. The evidence supports Respondents' conspiracy claim............................................... | 72 |
| | 6. The evidence supports Respondents' negligent-misrepresentation claim. ................... | 73 |
| | 7. The evidence supports Respondents' claim for unjust enrichment/money had and received. ......................................................................................... | 73 |
| | 8. The evidence entitles Respondents to a constructive trust........................................... | 74 |
| | 9. Respondents have proved damages arising from each of their counterclaims. ............ | 74 |
| **III. Conclusion** ........................................................................................................ | | **76** |

CONFIDENTIAL

## TABLE OF AUTHORITIES

### Cases

*Allstate Fin. Corp. v. Zimmerman,*
   330 F.2d 740 (5th Cir. 1964) ................................................................... 22

*Allstate Ins. Co. v. Elzanaty,*
   929 F. Supp. 2d 199 (E.D.N.Y. 2013) ..................................................... 12

*Am. Gen. Life Ins. v. Goldstein,*
   741 F. Supp. 2d 604 (D. Del. 2010) .......................................................... 9

*Am. Oil Co. v. M/T Lacon,*
   398 F. Supp. 1181 (S.D. Ga. 1973) .......................................................... 23

*Am. Renaissance Lines, Inc. v. Saxis S.S. Co.,*
   502 F.2d 674 (2d Cir. 1974) ..................................................................... 42

*Amerada Hess Corp. v. M/T Mariam,*
   533 F. Supp. 158 (S.D. Ala. 1982) ........................................................... 23

*Anchor Cas. Co. v. Bowers,*
   393 S.W.2d 168 (Tex. 1965) ..................................................................... 24

*Bailey v. Shell W. E&P, Inc.,*
   609 F.3d 710 (5th Cir. 2010) ...................................................................... 8

*Bankers Trust Co. v. Litton Sys., Inc.,*
   599 F.2d 488 (2d Cir. 1979) ..................................................................... 15

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
   472 U.S. 299 (1985) ................................................................................. 39

*Bordenkircher v. Hayes,*
   434 U.S. 357 (1978) ................................................................................. 36

*BP Expl. & Prod. Inc. v. Cashman Equip. Corp.,*
   132 F. Supp. 3d 876 (S.D. Tex. 2015) ..................................................... 61

*Bracton Corp. v. Evans Const. Co.,*
   784 S.W.2d 708 (Tex. App.—Houston [14th Dist.] 1990, no pet.) ................... 17,18

*Campbell v. United States,*
   365 U.S. 85 (1961) ................................................................................... 22

*City of Keller v. Wilson,*
   168 S.W.3d 802 (Tex. 2005) ..................................................................... 23

*Clevo Co. v. Hecny Transp., Inc.,*
   715 F.3d 1189 (9th Cir. 2013) ................................................................. 61

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC,*
   851 F. Supp. 2d 504 (S.D.N.Y. 2012) ..................................................... 38

*Coffel v. Stryker Corp.*,
284 F.3d 625 (5th Cir. 2002) ................................................................... 32

*Collins/Snoops Associates, Inc. v. CJF, LLC*,
988 A.2d 49 (2010) ................................................................................. 17

*Cook Composites, Inc. v. Westlake Styrene Corp.*,
15 S.W.3d 124 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd)................... 9

*Cooper v. Meridian Yachts, Ltd.*,
575 F.3d 1151 (11th Cir. 2009) ................................................................. 4

*Creel v. C.I.R.*,
419 F.3d 1135 (11th Cir. 2005) ............................................................... 23

*Crook v. Zorn*,
95 F.2d 782 (5th Cir. 1938) ..................................................................... 62

*Danny's Constr. Co. v. Birdair, Inc.*,
136 F. Supp. 2d 134 (W.D.N.Y. 2000) ...................................................... 12

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ............................................................................... 11

*Developers Sur. & Indem. Co. v. Bi-Tech Const., Inc.*,
979 F. Supp. 2d 1307 (S.D. Fla. 2013) ...................................................... 32

*Dundas Shipping & Trading Co., Ltd. v. Stravelakis Bros., Ltd.*,
508 F. Supp. 1000 (S.D.N.Y. 1981).......................................................... 65

*Fried, Krupp, GmbH, Krupp Reederei Und Brennstoff-Handel-Seeschiffarht v. Solidarity Carriers, Inc.*,
674 F. Supp. 1022 (S.D.N.Y. 1987).......................................................... 65

*Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*,
391 S.W.2d 41 (Tex. 1965)...................................................................... 24

*Hancock v. Variyam*,
400 S.W.3d 59 (Tex. 2013)...................................................................... 75

*Harris v. Archer*,
134 S.W.3d 411 (Tex. App.—Amarillo 2004, pet. denied).............................. 6

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ............................................................................... 18

*Houston Med. Testing Services, Inc. v. Mintzer*,
417 S.W.3d 691 (Tex. App.—Houston [14th Dist.] 2013, no pet.)................... 17

*Howell v. Kelly*,
534 S.W.2d 737 (Tex. App.—Houston [1st Dist.] 1976, no writ)..................... 17

*In re Chicago Rys. Co.*,
175 F.2d 282 (7th Cir. 1949) ................................................................... 22

v

*In re Deepwater Horizon,*
857 F.3d 246 (5th Cir. 2017) ................................................................. 31

*In re Trinity Installers, Inc.,*
No. 2004-139-1, 2005 WL 310792 (Dep't Agric. B.C.A. 2005) ............ 17

*Int'l Broth. of Elec. Workers, Local No. 265 v. O.K. Elec. Co., Inc.,*
793 F.2d 214 (8th Cir. 1986) ................................................................. 64

*Jaclyn, Inc. v. Edison Bros. Stores, Inc.,*
406 A.2d 474 (N.J. Super. 1979) ........................................................... 35

*Jasmine Int'l Trading & Services, Co. W.L.L. v. United States,*
120 Fed. Cl. 577 (2015) ......................................................................... 34

*Johnson v. PPI Tech. Services, L.P.,*
3 F. Supp. 3d 553 (E.D. La. 2014) ................................................... 60, 61

*Kellogg Brown & Root Servs., Inc. v. United States,*
728 F.3d 1348 (D.C. Cir. 1999) ............................................................ 34

*Kiel v. Tex. Emp'rs Ins. Ass'n,*
679 S.W.2d 656 (Tex. App.—Houston [1st Dist.] 1984, no writ) ......... 23

*Kinzbach Tool Co. v. Corbett-Wallace Corp.,*
138 Tex. 565 (1942) ......................................................................... 70, 75

*Langlais v. PennMont Ben. Services, Inc.,*
No. 11-CV-5275, 2012 WL 2849414 (E.D. Pa. July 11, 2012) ............. 64

*Lisbon Contractors, Inc. v. United States,*
828 F.2d 759 (Fed. Cir. 1987) .............................................................. 17

*Mary E. Bivins Found. v. Highland Cap. Mgmt.,*
451 S.W.3d 104 (Tex. App.—Dallas 2014, no pet.) ............................. 74

*Metro. Wholesale Supply, Inc. v. M/V ROYAL RAINBOW,*
12 F.3d 58 (5th Cir. 1994) .................................................................... 41

*Mowbray v. Avery,*
76 S.W.3d 663 (Tex. App.—Corpus Christi 2002, pet. denied) ....... 73, 74

*Murray & Sorenson v. United States,*
207 F.2d 119 (1st Cir. 1953) ................................................................ 37

*Nationwide Mut. Ins. Co. v. Home Ins. Co.,*
330 F.3d 843 (6th Cir. 2003) ................................................................ 64

*Negrete v. Nat'l R.R. Passenger Corp.,*
547 F.3d 721 (7th Cir. 2008) ................................................................ 19

*Nilsen v. Prudential-Bache Sec.,*
761 F. Supp. 279 (S.D.N.Y. 1991) ........................................................ 12

*Nwokedi v. Unlimited Restoration Specialists, Inc.,*
428 S.W.3d 191 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)....................................74

*Orion Shipping & Trading Co. v. E. States Petroleum Corp. of Panama, S. A.,*
312 F.2d 299 (2d Cir. 1963)...........................................................................................64

*Paudler v. Paudler,*
165 F.2d 901 (5th Cir. 1950) ..........................................................................................22

*PB Americas Inc. v. Continental Cas. Co.,*
690 F. Supp. 2d 242 (S.D.N.Y. 2010)...............................................................................9

*Peery v. Serenity Behavioral Health Sys.,*
No. 106-CV-172, 2009 WL 1438939 (S.D. Ga. May 15, 2009) ...........................................36

*Petras v. Criswell,*
248 S.W.3d 471 (Tex. App.—Dallas 2008, no pet.)...........................................................14

*Philip Morris, Inc. v. Grinnell Lithographic Co., Inc.,*
67 F. Supp. 2d 126 (E.D.N.Y. 1999) ................................................................................35

*Poublon v. C.H. Robinson co.,*
846 F.3d 1251 (9th Cir. 2017) ........................................................................................10

*Publicker Indus., Inc. v. Roman Ceramics Corp.,*
652 F.2d 340 (3d Cir. 1981)............................................................................................40

*Rabon v. Great Sw. Fire Ins. Co.,*
818 F.2d 306 (4th Cir. 1987) ....................................................................................36, 37

*Ragsdale v. Progressive Voters League,*
801 S.W.2d 880 (Tex. 1990)...........................................................................................23

*Ramirez v. T&H Lemont, Inc.,*
845 F.3d 772 (7th Cir. 2016) ..........................................................................................18

*Republic Nat'l Life Ins. Co. v. Heyward,*
568 S.W.2d 879 (Tex. Civ. App.—Eastland 1978, writ ref'd n.r.e.)......................................23

*Riggs v. Palmer,*
22 N.E. 188 (1889)........................................................................................................15

*Royal Ins. Co. of Am. v. Sw. Marine,*
194 F.3d 1009 (9th Cir. 1999) ........................................................................................61

*Sandoval v. Hartford Cas. Ins. Co.,*
653 S.W.2d 604 (Tex. App.—Amarillo 1983, no writ)........................................................23

*Scarf v. Jardine,*
7 App Cas 345 (1882)....................................................................................................61

*Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund,*
68 A.3d 665 (Del. 2013) ..................................................................................................7

*S.E.L. Maduro (Fla.), Inc. v. M/V Santa Lucia,*
   116 F.R.D. 289 (D. Mass. 1987) ............................................................... ibid.

*Siegler v. Telco Leasing, Inc.,*
   593 S.W.2d 850 (Tex. Civ. App.—Houston [1st Dist.] 1980, no writ) ................................. 61

*Sirkin v. Fourteenth St. Store,*
   108 N.Y.S. 830 (N.Y. App. Div. 1908) .................................................... 13, 14, 15

*Sisters of Providence in Washington v. A.A. Pain Clinic, Inc.,*
   81 P.3d 989 (Alaska 2003) ..................................................................... 67

*Smith v. United States,*
   133 S. Ct. 714 (2013) ......................................................................... 28

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.,*
   365 F.3d 353 (5th Cir. 2004) .................................................................. 31

*Staats v. Miller,*
   243 S.W.2d 686 (Tex. 1951) ................................................................... 74

*Stat Imaging LLC v. Medical Specialists, Inc.,*
   No. 13-C-1921, 2014 WL 5310256 (N.D. Ill. Oct. 17, 2014) ..................................... 67

*Steel Coils, Inc. v. Captain Nicholas I M/V,*
   197 F. Supp. 2d 560 (E.D. La. 2002) ...................................................... 40, 41

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*
   559 U.S. 662 (2010) ...................................................................... 16, 18

*Swinnea v. ERI Consulting Engineers, Inc.,*
   481 S.W.3d 747 (Tex. App.—Tyler 2016, no pet.) ............................................ 72

*Throckmorton v. Robinson,*
   83 S.W.2d 696 (Tex. Civ. App.—San Antonio 1935, no writ) ................................. 15

*Texas Dept. of Pub. Safety v. Norrell,*
   968 S.W.2d 16 (Tex. App.—Corpus Christi 1998, no pet.) ................................... 37

*Trans-Amazonica Iquitos, S.A. v. Georgia S. S. Co.,*
   335 F. Supp. 935 (S.D. Ga. 1971) ......................................................... 23

*U.S. ex rel. Bilokumsky v. Tod,*
   263 U.S. 149 (1923) ...................................................................... 22

*U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,*
   214 F.3d 1372 (D.C. Cir. 2000) ........................................................... 34

*Union Marine & Gen. Ins. Co. v. Am. Exp. Lines, Inc.,*
   274 F. Supp. 123 (S.D.N.Y. 1966) ........................................................ 61

*United States v. Carter,*
   217 U.S. 286 (1910) ...................................................................... 75

*United States v. Delgado,*
   903 F.2d 1495 (11th Cir. 1990) ............................................................ 36, 38

*United States v. Hale,*
   422 U.S. 171 (1975) ................................................................................ 22

*United States v. Kozeny,*
   667 F.3d 122 (2d Cir. 2011) .................................................................... 28

*United States v. Marlow,*
   235 F.2d 366 (5th Cir. 1956) .................................................................. 22

*United States v. Marrero-Ortiz,*
   160 F.3d 768 (1st Cir. 1998) .................................................................. 37

*United States v. Martino,*
   648 F.2d 367 (5th Cir. 1981) .................................................................. 29

*United States v. Philip Morris USA Inc.,*
   566 F.3d 1095 (D.C. Cir. 2009) .............................................................. 31

*United States v. Reyes,*
   16 F. Supp. 2d 759 (S.D. Tex. 1998) ...................................................... 37

*United States v. Roberson,*
   233 F.2d 517 (5th Cir. 1956) .................................................................. 22

*United States v. Romans,*
   823 F.3d 299 (5th Cir. 2016) .................................................................. 28

*United States v. Stouffer,*
   986 F.2d 916 (5th Cir. 1993) .................................................................. 29

*United States v. United States Gypsum Co.,*
   438 U.S. 422 (1978) ................................................................................ 29

*Walker v. Ross,*
   548 S.W.2d 447 (Tex. Civ. App.—Fort Worth 1977, writ ref'd n.r.e.) ................ 24

*Williams Elecs. Games, Inc. v. Garrity,*
   366 F.3d 569 (7th Cir. 2004) .................................................................. 35

## Statutory Authorities

18 U.S.C. § 1962(c) ...................................................................................... 72

Contract Disputes Act, 41 U.S.C. § 601 *et seq.* ........................................ 17

## Rules and Regulations

Fed. R. Evid. 804(b)(3) .......................................................................... 29, 30

## Treatises

Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 7.2 (Dec. 2016)............................ 32

Farnsworth, E. Allan, *Contracts* (4th ed. 2004)................................................................ 13, 14, 15

## Additional Authorities

Novation, *Blacks Law Dictionary*  (10th ed. 2014) ...................................................... 60

Restatement (Second) of Agency § 1........................................................................... 41

Restatement (Second) of Contracts § 279 ................................................................... 61

Restatement (Second) of Contracts § 280 ................................................................... 63

Restatement (Second) of Contracts § 380. .................................................................... 7

Restatement (Second) of Contracts § 178 illus. 12....................................................... 13

Restatement (Third) of Agency § 5.04 (2006)............................................................. 41

# I. Introduction and Summary

1.      During the three-week merits hearing, Respondents proved that Vantage procured the Contract through bribery and corruption and that Vantage cannot recover anything in this arbitration.   Recognizing the devastating impact of the testimony and evidence presented by Respondents during the merits hearing, Vantage's Posthearing Brief largely ignores that testimony and evidence, citing repeatedly to the direct testimony of Vantage's witnesses who were wholly discredited during cross-examination.[1]   Because Vantage omits much of what happened during the merits hearing, the Tribunal should focus carefully on Vantage's citations and evidence to confirm that it is not the direct testimony of witnesses who were repeatedly exposed as lacking personal knowledge and reliable grounds for their testimony and opinions.

2.      As shown during the merits hearing, Vantage's witnesses knew little, if anything, about many of the topics addressed in their direct testimony.   Perhaps the most memorable example was Kenneth Anderson's testimony about the cement bond logs for the Chinook #6 well.   Anderson testified on direct that cement bond log data "is commonly shared openly with the drilling contractor," and cement bond logs were provided to Vantage during the Chinook #5 and Ophir well campaigns. (J-863 ¶¶ 58, 79; J-872 ¶ 5.) Anderson further claimed that he had significant experience reviewing cement bond logs "section by section." (J-872 ¶ 5.)   During cross-examination, however, Anderson was forced to admit—after a very uncomfortable five-minute pause—that he could not read or interpret a cement bond log from the Chinook #5 well to determine the top of cement:   "I'm not going to waste anybody's time. I've looked at this document. All I could do is just call a number out and guess at it.  I can't make a determination looking at this." (Trans. 671, Anderson.)

---

[1] Capitalized terms used but not defined herein shall have the meaning given to them in Respondents' Second Amended Answering Statement and Counterclaim.

3.      Although Anderson ultimately gave the Tribunal an honest answer, the same cannot be said for Vantage, which has repeatedly changed its position on key issues and continues to do so in its posthearing briefing.  Vantage's latest "flip flop" concerns the governing law for this arbitration, which Vantage now argues should be English law, after admitting in earlier briefing that maritime law and Texas law govern this arbitration.  This reversal follows Vantage's earlier decisions (a) to allege reliance damages in early 2017 to prevent the Tribunal from granting Respondents' dispositive motion, and (b) to drop all of its reliance damages on May 15, 2017, the day before the merits hearing, after being caught trying to mislead the Tribunal about which Vantage entity bought the Titanium Explorer in 2012.  Vantage's litigation strategy can best be described as crass opportunism, wholly divorced from the facts, the law, and any previous representations to the Tribunal.

4.      For all of the reasons given below and in Respondents' prior briefing, Vantage cannot recover on any of its claims, and the Tribunal should deny all relief sought by Vantage. Instead, if the Tribunal finds that any profits were earned under the Contract, those profits should be awarded to Respondents as damages on their counterclaims.

## II. ARGUMENT AND AUTHORITIES

### A.  Governing Law

**1.     Vantage has previously admitted that this arbitration is governed by maritime law, as supplemented by Texas law.**

5.      In the May 4, 2016 version of the First Procedural Order, the Tribunal asked the parties to brief several threshold issues, including governing law.  In response to the First Procedural Order, Vantage acknowledged that maritime law governs this arbitration for two reasons:  (a) the Outer Continental Shelf Lands Act (OCSLA) requires that maritime law apply, and (b) the parties' operative contract—the Third Novation—dictates that maritime law apply.

(J-837 at 7–11.) In its earlier briefing, Vantage told the Tribunal that it was "clear" that the "parties cannot attempt to contract around or waive OCSLA's choice of law by including a 'choice of law' provision in an agreement." (*Id.* at 16.) Under case law applying OCSLA, according to Vantage, "the case is to be governed by maritime law." (*Id.* at 18–19.)

6.      Vantage continued to maintain that same position in subsequent briefing:  "There should be no doubt that, pursuant to both OCSLA and the parties' agreement, maritime law will control." (J-839 at 26.) Vantage stressed that applying any law other than maritime law to this arbitration would "imprudently… violate applicable U.S. statutory law and deprive the parties of the due process contemplated in their agreement." (*Id.*)

7.      Several months after filing these briefs, Vantage changed law firms for the second time and picked its second party-appointed arbitrator, after the first was disqualified.  After Judge Brower became Vantage's party-appointed arbitrator, he asked the parties to submit a joint summary to help educate him on the key disputed issues in the case.  The parties did so, and in that submission, Vantage continued to acknowledge that maritime law governs this arbitration:

### I.      Summary of Outstanding Issues Before the Tribunal

| Issue | Summary of Claimants' Position | Summary of Respondents' Position | Citations to Briefing |
|---|---|---|---|
| Governing law regarding the Drilling Contract and Third Novation | • This dispute is governed by the general maritime law of the United States.  Both OCSLA and the choice-of-law provision of the Third Novation to the Drilling Contract point to this result.<br>• There is developed maritime law—i.e., federal common law—applicable to each of the issues in this case.  Accordingly, although Claimants maintain that Louisiana law would be the applicable gap filler, the Tribunal need not determine whether Texas, Louisiana, or any other law would apply to supplement maritime law.<br>• Federal common law, of which maritime law | • General maritime law and United States federal law govern the contractual claims and defenses alleged in this proceeding. However, because the parties expressly agreed to apply Texas law to the extent general maritime law is inapplicable, Texas law applies as a gap-filler.<br>• To the extent Respondents' counterclaims and defenses involve bribery and corruption that occurred before the Drilling Contract was signed in 2009, the Tribunal should apply transnational public policy principles, in addition to general maritime law, the federal law of the United States, and Texas law. | • Claimants' Brief on Governing Law at 14-23<br>• Respondents' Brief Regarding Threshold Issues and Governing Law at 5-14<br>• Claimants' Response to Respondents' Brief Regarding Threshold Issues and Governing Law at 23-26<br>• Respondents' Response to Claimants' Brief on |

| Issue | Summary of Claimants' Position | Summary of Respondents' Position | Citations to Briefing |
|---|---|---|---|
| | is one species, is "necessarily informed" by principles of international law. *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 623 (1983); *see also Filartiga v. Pena-Irala*, 630 F.2d 876, 885 (2d Cir. 1980) ("The Law of nations . . . has always been part of the federal common law."); *In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d 493, 502 (9th Cir. 1992) ("It is also well settled that the law of nations is part of federal common law."). <br>• Claimants understand that this dispute will be resolved by the Tribunal at the time it resolves the Parties' substantive claims. Claimants reserve the right to supplement their existing briefing on this issue in their briefing on dispositive motions, if any, or in their briefing for the merits hearing. | | Governing Law at 2-4 |

8.      All told, Vantage has submitted hundreds of pages of briefing, all of which is based on the application of maritime law.  Given Vantage's prior admissions about maritime law, the Tribunal should reject Vantage's last-minute "flip flop" in favor of English law, especially when Vantage has made no attempt to reconcile its earlier briefing with its current argument in support of applying English law.

**2.      Vantage has previously admitted that maritime law and English law are the same.**

9.      After first suggesting in its final prehearing brief that English law might apply, Vantage admitted that there was no difference between English law and maritime law, because the "amalgam of federal common law and transnational law principles that comprise maritime law dictates the same result."  (J-853 ¶ 30.)  Given this admission, the Tribunal should question why Vantage is changing its position now.

10.      Further, it is axiomatic that when there is no conflict between two potentially applicable sets of law, there is no need to engage in a choice-of-law analysis. *E.g.*, *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1171 (11th Cir. 2009) ("In any conflict of laws analysis, the first issue that needs to be addressed is whether a conflict actually exists."). Although Vantage does not expressly state it, Vantage appears to acknowledge that there is a conflict

**RESPONDENTS' POSTHEARING RESPONSE BRIEF – PAGE 4**

between English law and maritime law, such that maritime law would eliminate Vantage's breach-of-contract claim, but English law would not.

11.    Vantage now improperly argues that English law applies to only one of the essential elements of its breach-of-contract claim—the existence of a valid agreement—on which Vantage admits that it has the burden of proof.  (C.'s Posthearing Br. ¶ 206 & n. 33.)  But a single claim cannot have different governing laws for each of its essential elements, although that is what Vantage appears to advocate.  (*See* Trans. 224, Cheng: ("And so there is, if you like, potentially a temporal split between the applicable law."))[2]

12.    Under governing maritime law, the Contract is void *ab initio*. *See S.E.L. Maduro (Fla.), Inc. v. M/V Santa Lucia*, 116 F.R.D. 289, 297 (D. Mass. 1987) ("It is beyond doubt that commercial bribery clearly contravenes a strong public policy and that the Court, in the due administration of justice, cannot enforce a [maritime] contract which is obtained by that means.").  The facts of *Maduro* are analogous and compelling.  There, the plaintiff "offered, gave and agreed to give" an undisclosed payment "to procure plaintiff's employment as a stevedore" under the contract at issue, but the principals did not know about the bribery. *Id.* at 291 ("In essence, the defendants claim that the McKay letter represents an illegal kickback to Beaufort Navigation, through its subsidiary, for obtaining the contract.").  Despite submitting hundreds of pages of briefing in this arbitration, Vantage has never developed a compelling response to the result dictated by *Maduro*:  the Contract is void and Vantage cannot recover on any of its claims.

13.    Instead, Vantage has proffered two arguments. First, Vantage argues that *Maduro* is consistent with other authorities cited for the proposition that voidable contracts can be

_____
[2] In fact, if there is any "temporal split" in the governing law, English law cannot apply because there was no Contract in place when the bribes were negotiated and agreed to in 2008.  And because there was no Contract, there was no governing law provision dictating that English law applies to anything.

enforced when "the innocent party has ratified the bargain." (*See* J-848, C.'s Opp. to Dispositive Mtn., ¶ 201.) Although *Maduro* has nothing to do with ratification, ratification likewise has nothing to do with whether, for public policy reasons, a commercial contract resulting from bribery is or is not enforceable. The *Maduro* court carefully analyzed maritime law concerning bribery and determined that maritime agreements resulting from commercial bribery are "unenforceable." *See Maduro*, 116 F.R.D. at 293–97 (citing to the Restatement).

14.     Second, Vantage argues that *Maduro* did not involve an "innocent" party that "had previously evidenced its intent to remain in the bargain and insisted on the other party's performance despite knowledge of alleged bribery." (C.'s Prehearing Resp. Br. ¶ 75.)  But this is just another argument about ratification, which does not apply to contracts (like the one here) that are void.  In other words, Vantage's argument about "intent" and insistence "on the other party's performance" are just different ways to say that Vantage believes that *Maduro* does not apply here because it did not address ratification.

15.     As explained above, however, the doctrine of ratification has nothing to do with whether a maritime contract is void when procured by bribery. *E.g.*, *Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied) ("A void contract cannot be ratified; a voidable contract can be ratified."). With its second response to *Maduro*, Vantage appears to try to muddy the difference between these two separate questions. (*See* C.'s Posthearing Br. ¶ 203.) Indeed, Vantage has not cited any authority discussing ratification in connection with a void contract, and *Maduro* shows that the Contract is void; thus ratification does not apply here.

16.     To properly analyze the void-voidable distinction, the Tribunal must first determine whether the Contract is void or voidable.  If it is void as dictated by *Maduro*, then the inquiry ends and ratification is irrelevant.  However, if the Contract is voidable, then the Tribunal

must decide whether ratification applies.  Basically, the void-voidable determination comes first; then, if the Contract is voidable, ratification becomes relevant. *See* RESTATEMENT (SECOND) OF CONTRACTS § 380.  And if ratification becomes relevant, Vantage must meet a very high burden to prove that ratification occurred.

17.     To prove ratification, Vantage must show that PAI had actual knowledge of the fraud; constructive or imputed knowledge will not suffice. *See id.* (citing *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 681 (Del. 2013) (holding that there was no ratification because plaintiff had no actual knowledge of the error when it purportedly ratified the mistake)); *accord* C.'s Posthearing Br. ¶ 319 (admitting that Vantage must prove that PAI had "knowledge of the relevant circumstances").  Vantage cannot meet its burden here because its corporate representative, Doug Halkett, admitted that the evidence "convinced" him that no bribery had occurred, even after he read the Época article in 2013:  "Q. So do you believe that Época article included factual information that was enough for the parties to be able to say a bribery occurred here? A. No…" (Trans. 439:17–21; *accord* Trans. 312:3–16; 431:6–13.)

**3.     Vantage's argument in favor of English law proves too much and raises serious questions about the Tribunal's authority.**

18.     Although Vantage has previously admitted that maritime law, as supplemented by Texas law, governs this arbitration, it now wants to disavow this admission and apply English law to a dispute that arises from the Third Novation's dispute-resolution clause.  As explained in the First Procedural Order, the Third Novation mandates that disputes be resolved though AAA arbitration in Houston, Texas, under governing maritime and Texas law, and the parties have agreed that the Third Novation is the operative contract here.  (*See* First Procedural Order ¶ 10.)

19.     Because the Third Novation is the operative contract, Vantage cannot cherry-pick governing law provisions from the Second Novation (or other agreements) to import into this arbitration.  Doing so only undermines the Tribunal's authority, which arises exclusively from the Third Novation. It is difficult to see how the Tribunal could rely on a governing law provision from another agreement that requires all disputes to be resolved through binding arbitration under the LCIA rules in London, England.  (*See* J-8 §§ 12.1, 12.2.)  The Tribunal is obviously not empaneled under the LCIA rules and has no authority to resolve disputes under the Second Novation or any agreement other than the controlling Third Novation.

20.     Further, as explained in Respondents' Prehearing Brief, PAI was the only "COMPANY" under the Contract when it was terminated in August 2015, and there is no evidence that PAI ever signed the Second Novation or otherwise agreed to apply English law to any dispute to which it is a party.  (*See* J-8 at Vantage 17640; 17642; 17663.) If the Tribunal were to accept Vantage's invitation to apply English law here, it would only be exceeding its authority and violating PAI's due process rights by applying a governing law to which PAI never agreed and which does not appear anywhere in the operative Third Novation. (*See* J-10 § 8.1.)

21.     Finally, if the Tribunal does not apply the Third Novation's governing law provision to any claim in this arbitration, it must conduct a detailed choice-of-law analysis to determine which jurisdiction has the most significant relationship to the conduct at issue for each specific claim.  *E.g.*, *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 722–23 (5th Cir. 2010). Because none of the conduct at issue occurred in England—the bribes and the Contract were negotiated and agreed to in New York, Houston, and Brazil; the Contract was terminated in Houston; the Titanium Explorer was operating in the Gulf of Mexico—English law would never

apply to any claim under the "most significant relationship" test.  Accordingly, there is no basis for the Tribunal to apply English law to any claim in this arbitration.

22.     Instead, the Tribunal should apply the governing law mandated by the Third Novation—maritime law as supplemented by Texas law—to all claims and counterclaims, because they are all intertwined.  *See Am. Gen. Life Ins. v. Goldstein*, 741 F. Supp. 2d 604, 611 (D. Del. 2010) ("Where contract and tort claims are intertwined and interdependent, both claims should be analyzed under the law of the same state… [This court has] serious doubts that any rational businessperson ... would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single contract based relationship.").

### 4.     Because Vantage has never alleged that the Contract is ambiguous, English law cannot apply to determine the parties' mutual intent.

23.     It is black-letter law that "courts will not look beyond the four corners of a contract unless the contractual terms are ambiguous." *E.g.*, *PB Americas Inc. v. Continental Cas. Co.*, 690 F. Supp. 2d 242, 239 (S.D.N.Y. 2010); *Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 131 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd) ("In determining the intention of the parties, we look only within the four corners of the agreement to see what is actually stated and not at what was allegedly meant.").  Despite hundreds of pages of briefing and pleadings in this arbitration, Vantage has never alleged that the Contract is in any way ambiguous; in fact, Vantage admits that the Contract is not ambiguous.  (C.'s Posthearing Br. ¶ 157.)  Given this admission, it would be improper for the Tribunal to accept Vantage's argument that English law should apply to determine the parties' objective mutual intent when entering into the Contract.  (*See* C.'s Posthearing Br. ¶ 205.)  Put simply, the parties' intent is irrelevant to an unambiguous agreement like the Contract.

### 5.   **English law applies only to Petrobras Brazil's Guaranty.**

24.    The Guaranty selects the laws of England and Wales as the governing law and incorporates by reference Article 24 of the Contract, which provides that any dispute must be resolved through arbitration in London, England, under the London Court of International Arbitration Rules, with the right to appeal to the High Court of England and Wales. (J-2 §§ 3.4, 3.5; J-1 §§ 24.1, 24.3.) Importantly, the Guaranty's definition of the "Contract" does not include any amendment, modification, or novation.  (J-2 at p. 1, § 3.5.)  This confirms that Petrobras Brazil agreed to arbitrate only in London, England, under the LCIA rules, pursuant to the original version of Article 24.  *See, e.g., Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1269 (9th Cir. 2017) (noting that "parties may agree to incorporate a document as it is updated or amended," but when they merely incorporate an extrinsic document, it refers only to "the then-existing" version).

25.    As further proof of Petrobras Brazil's agreement to arbitrate only in London, England under the LCIA rules, the Guaranty explicitly states that no modification "shall be binding unless executed in writing by all the parties." (J-2 § 3.7.) Tellingly, Vantage has not submitted any evidence proving that Petrobras Brazil ever agreed in writing to modify the Guaranty to subject itself to arbitration in Houston, Texas, under the AAA rules and governing maritime law, as supplemented by Texas law.

26.    Rather than confront the Guaranty's express language, which has never been modified, Vantage argues that the Guaranty refers to the Contract *as amended or novated* merely because it mentions the Contract.  (C.'s Posthearing Br. ¶ 198 ("The Guaranty makes specific reference to the DSA, which in turn explicitly states that it 'may be amended in writing and signed by both parties from time to time.'"). But Vantage's argument ignores the plain language of sections 3.5 and 3.7 of the Guaranty, as well as the different definitions of "Contract" in the

Guaranty and the Contract itself.  In the Contract, the parties defined "Contract" expansively to include all amendments and novations:   "'Contract' means this Contract for the provision of Drilling Operations and related services, *as the same may be amended in writing and signed by both Parties from time to time*." (J-1 at Vantage 10 (emphasis added).)  But the Guaranty's definition of "Contract" is narrower, omitting the phrase "as the same may be amended in writing and signed by both Parties from time to time."  (J-2 at p. 1, § 3.5.)  These different definitions prove that the parties knew how to reference amendments and novations, and that they intentionally chose not to do so in the Guaranty, which confirms that Petrobras Brazil agreed to arbitrate only under the original Article 24 of the Contract, *excluding any amendments or novations*, unless agreed to in writing by Petrobras Brazil.

27.    Recognizing the weakness of its legal arguments about the Guaranty, Vantage retreats to a policy argument that is equally unpersuasive: "The parties' intent that the Guaranty's arbitration clause should mirror the DSA's clause also makes practical business sense: it promotes efficiency in dispute resolution by allowing disputes under the DSA and Guaranty to be resolved together and avoids conflicting awards." (C.'s Posthearing Br. ¶ 198.)  This policy argument contravenes the entire premise of commercial arbitration as a private, contractual form of dispute resolution that allows parties to agree to whatever they like, regardless of efficiency. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985) ("The preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation....")

28.    Because arbitration agreements are sacrosanct and are strictly enforced, parties often find themselves in multiple, inefficient disputes related to the same or similar subject

matter.  *See, e.g.*, *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 213 (E.D.N.Y. 2013) ("Thus, the FAA compels the arbitration of arbitrable claims . . . even where the result would be the possibly inefficient maintenance of separate proceedings in different forums."); *Danny's Constr. Co. v. Birdair, Inc.*, 136 F. Supp. 2d 134, 146 (W.D.N.Y. 2000) (holding that "the inconvenience and difficulty associated with addressing related issues in separate litigation and arbitration do not preclude the enforcement of an arbitration agreement"); *Nilsen v. Prudential-Bache Sec.*, 761 F. Supp. 279, 288 (S.D.N.Y. 1991) ("The possibility of parallel proceedings 'occurs because the relevant federal law requires piecemeal resolution when necessary to effect an arbitration agreement.'") (internal citations omitted).

29.     For all of these reasons, the laws of England and Wales apply to the Guaranty, and Petrobras Brazil cannot be forced to arbitrate in this proceeding under rules and laws to which it never agreed.  Petrobras Brazil agreed to arbitrate only under the original Article 24, which requires Vantage to pursue any claim against Petrobras Brazil in London, England, under the LCIA rules.

**B.  Standard of Requisite Proof**

**1.  Vantage must prove that the Contract is valid and enforceable.**

30.     Vantage admits that it must prove the existence of a valid contract to prevail on its breach-of-contract claim. (C.'s Posthearing Br. ¶ 206; n. 33; ¶ 209.)  As proof, Vantage relies only on the contractual documents themselves, which are insufficient because of the overwhelming evidence of bribery, corruption, and fraud. (*See* C.'s Posthearing Br. ¶ 209 ("The evidence establishes that a valid and binding contract existed between the parties. *See* J001; J003-J009.").)  This type of circular reasoning does not carry Vantage's heavy burden of proof.

31.     To be clear, Respondents have never argued that the Contract was not signed or was nonexistent; instead, Respondents have shown why the Contract is void as a matter of law.

*See Maduro*, 116 F.R.D. at 297 ("It is beyond doubt that commercial bribery clearly contravenes a strong public policy and that the Court, in the due administration of justice, cannot enforce a [maritime] contract which is obtained by that means."). Because Vantage does not have a good response to *Maduro*, it relies only on the signed agreements to carry its burden of proof. This is insufficient.

32.     *Maduro* is consistent with a longstanding principle of United States law: agreements obtained by bribery are unenforceable, even if none of the agreements' terms violate public policy. *See* Farnsworth, E. Allan, *Contracts* 339 (4th ed. 2004). Citing *Sirkin v. Fourteenth St. Store*, 108 N.Y.S. 830, 833–34 (N.Y. App. Div. 1908), Allan Farnsworth, a noted contracts scholar, explained how the New York Supreme Court's Appellate Division reversed a trial court's decision enforcing an agreement procured by bribery: "[N]othing will be more effective in stopping the growth and spread of this corrupting and now criminal custom than a decision that the courts will refuse their aid to a guilty vendor." Considering similar arguments to those presented here, the *Sirkin* court further ruled that contracts procured by bribery cannot be ratified, but contracts that are only induced by fraud can be ratified. *Id.* at 835.

33.     These principles from *Sirkin* became "the basis of" the Restatement (Second) of Contracts § 178 illustration 12. *See* Farnsworth, *Contracts* at 339 n.8. That illustration confirms that Vantage cannot carry its burden to prove that the Contract is valid and enforceable: "A induces B to make an agreement to buy goods on credit from A by bribing B's purchasing agent. A delivers the goods to B. A's bribe tends to induce the agent to violate his fiduciary duty. B's promise to pay the price is unenforceable on grounds of public policy." *See* Restatement (Second) of Contracts § 178 illus. 12. As in the illustration, Vantage's bribes induced Zelada and Musa to violate their fiduciary duties to PVIS, thereby making PVIS's promise to pay

unenforceable on grounds of public policy.  Consequently, Vantage's breach-of-contract claim fails as a matter of law.

34.     Acknowledging that it cannot carry its burden to prove that the Contract is valid and enforceable, Vantage instead tries to shift its burden to Respondents, arguing that the validity of the Contract relates to the defenses of "illegality and fraudulent inducement." (C.'s Posthearing Br. ¶ 208.)  But Vantage cannot shift its burden, especially when it admits that a valid contract is an essential element of *its claims*. (*Id.* ¶ 206 & n. 33; ¶ 209.) And in any event, Respondents have never pleaded the defense of illegality because, as explained above by Farnsworth, *Sirkin*, and the Restatement, an agreement obtained by bribery does not have to contain illegal terms to be void.  Vantage cannot erect straw-men arguments to avoid its burden of proving that the Contract is valid and was not obtained by bribery.

**2.     Until Vantage proves that the Contract is valid, Respondents have no burden to prove anything.**

35.     Unless and until Vantage proves the essential elements of its breach-of-contract claim—including the validity of the Contract—Respondents have no obligation to prove any defense that would invalidate the Contract.  If Vantage cannot prove all essential elements, Vantage's breach-of-contract claim fails as a matter of law, and the Tribunal need not consider any of Respondents' defenses, for the reasons given below.

36.     *First*, as a matter of basic logic and black-letter law, an unenforceable contract cannot satisfy the "valid, enforceable contract" element of Vantage's breach-of-contract claim. *Petras v. Criswell*, 248 S.W.3d 471, 477 (Tex. App.—Dallas 2008, no pet.) ("The first necessary element for a successful breach of contract claim is a valid, enforceable contract.").  Unless Vantage proves that the Contract is valid, it cannot prevail in this arbitration.

37.     *Second*, consistent with validity being an essential element of a plaintiff's claim, courts have found that invalidity should be resolved during the plaintiff's case-in-chief, tying validity to the issue of consideration. *See Throckmorton v. Robinson*, 83 S.W.2d 696 (Tex. Civ. App.—San Antonio 1935, no writ) (concluding there was no valid consideration because the defendant did not have the legal right to do what he contracted to forbear from); *Bankers Trust Co. v. Litton Sys., Inc.*, 599 F.2d 488, 492 (2d Cir. 1979) ("[I]f *Sirkin* is accepted at face value [that the contract is truly void and unable to be ratified], the plaintiffs' claims would be unenforceable."). The Second Circuit in *Bankers Trust* examined why unenforceability must be considered during plaintiff's case-in-chief:

> Comment (a) to § 598 [of the Restatement] states that when a plaintiff sues to recover on an illegal bargain, courts deny relief because the Plaintiff is a wrongdoer, not because they favor the defendant. Courts will not aid a person "who founds his cause of action upon his own immoral or illegal act". Restatement of Contracts § 598, Comment (a) (1932)… In *McConnell* the court said that the court's concern is not with the position of the defendant; instead, the question is whether the plaintiff should be denied a recovery for the sake of public interests. 7 N.Y.2d at 469, 166 N.E.2d at 496, 199 N.Y.S.2d at 485. The well-known maxim that no one shall be permitted to profit by his own fraud summarizes the policy. *See Riggs v. Palmer*, 115 N.Y. 506, 511–12, 22 N.E. 188, 190 (1889).

*Bankers Trust*, 599 F.2d at 492; *see also* Farnsworth, Allan E. et al., *Contracts: Cases and Materials* 434–35 (6th ed. 2001) (examining how commercial bribery—similar to a lack of capacity, unconscionability, or adhesion contracts—renders a contract unenforceable as a matter of public policy because it calls into question whether a valid, enforceable agreement exists).

38.     Because Vantage has the threshold burden to prove the Contract's validity, it would be improper for the Tribunal to impose any burden of proof on Respondents unless and until Vantage carries its heavy burden, which it has not done.

**RESPONDENTS' POSTHEARING RESPONSE BRIEF – PAGE 15**

**3.    PAI and PVIS have never asserted the "bribery defense" created by Vantage.**

39.    Recognizing its inability to prove the Contract's validity as part of its case-in-chief, Vantage erects another "straw man" by arguing that Respondents must prove a five-element "bribery" defense that Respondents have never asserted and that does not apply under governing maritime and Texas law.

40.    As shown by the evidence presented to the Tribunal, Vantage procured the Contract through an illegal bribery scheme, which renders the Contract void *ab initio* under governing maritime law.  *See Maduro*, 116 F.R.D. at 297 ("It is beyond doubt that commercial bribery clearly contravenes a strong public policy and that the Court, in the due administration of justice, cannot enforce a [maritime] contract which is obtained by that means."). This straightforward legal principle negates all of Vantage's claims.

41.    Respondents' claims and defenses—as well as their respective elements—arising from Vantage's bribery and corruption are identified in Respondents' pleadings and prehearing briefs.  (J-850 ¶¶ 33–73.)  Tellingly, Vantage's five-element "bribery defense" appears nowhere in Respondents' pleadings, claims, or defenses, because that defense is a creation of Vantage's imagination and is not rooted in governing maritime or Texas law.  It would therefore be an error for the Tribunal to consider this unasserted defense arising from inapposite law.  *See Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 (2010) ("It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable.").

**4.    Vantage's authorities do not support shifting its burden of proof to Respondents.**

42.    Vantage incorrectly argues that Respondents have "the burden to establish that Vantage materially breached the contract." (C.'s Posthearing Br. ¶ 207.) As explained above, this

argument ignores Vantage's threshold burden to prove the Contract's validity, which means that unless and until Vantage does so, there is no Contract for Respondents to prove that Vantage materially breached.  In essence, the Contract is a nullity unless Vantage first proves its validity.

43.     Further, the authorities on which Vantage relies for this argument are inapposite for several reasons.  *First*, two of Vantage's cases were direct-access actions by contractors suing the United States government under the Contract Disputes Act, 41 U.S.C. § 601 *et seq*. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764 (Fed. Cir. 1987); *In re Trinity Installers, Inc.*, No. 2004-139-1, 2005 WL 310792 (Dep't Agric. B.C.A. 2005).  Because these cases involve statutory claims against the United States government, they do not provide the applicable burden of proof in this civil arbitration involving only private parties.

44.     *Second*, Vantage cites to a case interpreting Maryland law, which no party has ever argued applies here.  *See Collins/Snoops Associates, Inc. v. CJF, LLC*, 190 Md. App. 146, 149, 988 A.2d 49 (2010). And in any event, the court in *CJF* denied relief to both parties because neither met its burden of proof. *Id.*

45.     *Finally*, Vantage cites two Texas cases that do not apply. *Howell v. Kelly* addressed an attorney's quantum-meruit claim against a former client to recover fees under an oral contingency agreement. 534 S.W.2d 737 (Tex. App.—Houston [1st Dist.] 1976, no writ). Because quantum meruit applies only in the absence of a valid contract, *Howell* is irrelevant to Vantage's argument that the Contract is, in fact, valid and Respondents must prove that it has been materially breached.  *See Houston Med. Testing Services, Inc. v. Mintzer*, 417 S.W.3d 691, 695 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("When the parties themselves create a valid contract, there can be no recovery under [quatum meruit].").  And unlike Vantage, the plaintiff in *Bracton Corp. v. Evans Const. Co.* carried its threshold burden to prove that its

**RESPONDENTS' POSTHEARING RESPONSE BRIEF – PAGE 17**

contract was valid and enforceable.  784 S.W.2d 708 (Tex. App.—Houston [14th Dist.] 1990, no

pet.).  Thus, *Bracton* is distinguishable and provides no comfort to Vantage.

**5.    Preponderance of the evidence is the governing standard of proof in this arbitration.**

46.    As explained in Respondents' posthearing brief, "the Supreme Court has dispelled

the notion that a finding of fraud in civil litigation invariably demands clear and convincing

evidence…" *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 780 (7th Cir. 2016). "Regardless of

whether the litigation misconduct at issue is characterized by fraud, bad faith, fault, or quasi-

criminal misconduct," when the case remains a civil suit for money and not something more,

"proof by a preponderance of the evidence will suffice." *Id.* at 778, 781; *see also Herman &

MacLean v. Huddleston*, 459 U.S. 375, 387 (1983).  It would therefore be improper for the

Tribunal to apply any standard of proof other than preponderance of the evidence to the claims,

counterclaims, and defenses asserted by both Vantage and Respondents.

47.    In fact, applying "any standard other than preponderance of the evidence

'expresses a preference for one side's interests.'" *Ramirez*, 845 F.3d at 779 (quoting *Herman*,

459 U.S. at 390). And there is no basis in law or fact to do so here without building error into the

award. *See Stolt-Nielson S.A.*, 559 U.S. at 672 ("It is only when [an] arbitrator strays from

interpretation and application of the agreement and effectively 'dispense[s] his own brand of

industrial justice' that his decision may be unenforceable.").

48.    Further, applying a higher standard of proof would not change the outcome,

because the evidence of Vantage's bribery and corruption is overwhelming and conclusively

proves that Vantage procured the Contract through bribery. (*See* J-652.) In fact, an appellate

court just days ago affirmed the Brazilian Federal Court's judgment against Zelada and

***increased*** his punishment by lengthening his jail sentence.  *See TRF4 Increases Penalty for*

*Jorge Luiz Zelada, former director of Petrobras, Rio Grande Do Sul*, Aug. 2, 2017, available at http://g1.globo.com/rs/rio-grande-do-sul/noticia/trf4-aumenta-pena-de-jorge-luiz-zelada-ex-diretor-da-petrobras.ghtml. In explaining its decision, the appellate court emphasized that: "There is no explanation for the 11 million euros that were found in [Zelada's European bank] account." (*Id.*)

49.     For all these reasons, preponderance of the evidence is the governing standard of proof, and the evidence here easily satisfies it or any other standard advocated by Vantage. *See, e.g.*, *Negrete v. Nat'l R.R. Passenger Corp.*, 547 F.3d 721, 723-24 (7th Cir. 2008) ("There is no need to resolve the standard here because the evidence was clear and convincing.").

**C.  Overwhelming Evidence of Bribery and Corruption**

**1.     Vantage cannot escape the overwhelming evidence of bribery and corruption.**

50.     Vantage did not present any witness with personal knowledge about the bribery—not Bragg, Su, or O'Leary—even though Vantage obtained multiple witness interviews from Bragg and O'Leary during its internal investigation of the bribery related to the Contract.  ██████  ████████████  In fact, Vantage has not presented any alternate explanation proving that the Contract was procured legally, such that it is valid and enforceable.

51.     Rather than provide a viable and credible explanation proving the Contract's validity based on testimony from witnesses with personal knowledge of the negotiations, Vantage instead relies on witness statements drafted by its attorneys and signed by witnesses who knew nothing about the Contract's negotiations or its related bribes.

52.     For example, Vantage COO Doug Halkett claimed in his direct testimony that no bribes were paid to obtain the Contract and that the procurement process was totally legitimate. (J-857 ¶ 66.) But on cross-examination, Halkett was forced to admit that he was not a party to, and did not have personal knowledge of, multiple conversations between Bragg, O'Leary, and

Su, so he could not credibly testify that Su was never authorized to negotiate on Vantage's behalf. (Trans. 422–23, Halkett.)

53. Halkett also could not confirm that Su or any of his companies ever provided any financial information to Petrobras Brazil during the Contract's negotiations. (Trans. 382, Halkett.) Instead, the evidence proves that Vantage sent Petrobras Brazil a single page letter, purportedly from DSME, vouching for TMT. (J-93 at Vantage 13513.)[3] But of course, TMT was not negotiating an agreement with Petrobras Brazil, nor was it a signatory to any agreement with a Petrobras Brazil-related entity. Accordingly, Halkett's testimony about the DSME letter is pure speculation and wholly lacks credibility.

54. Halkett also tried to explain away Padilha's "shipyard commissions" email to Bragg, claiming that Padilha was referring to the construction management contracts. (Trans. 460, Halkett.) But on cross-examination, he admitted that this explanation made no sense. (Trans. 461–62, Halkett.) He then conceded that he first saw the email while preparing to testify in this arbitration, although he could not recall if he saw it before signing his first witness statement, in which he attempted to interpret the email and its meaning. (Trans. 463, Halkett.) Eventually, Halkett acknowledged that there is "a lot of evidence" that the bribery occurred. (Trans. 450, Halkett.)

55. Perhaps most troubling about Halkett's admission is his acknowledgment that he had never seen much of the bribery evidence before, and had no personal knowledge of it, even though Vantage relied on him as its key anti-bribery witness. (*E.g.*, Trans. 447–48, Halkett.) During the merits hearing, Halkett admitted that he was unaware of the invoices for the bribes,

---

[3] Although Vantage argues that the letter confirms "that the rig would be built," that is not what the letter says, and the Tribunal should review it carefully. (*See* C.'s Posthearing Br. ¶ 51.) Even Halkett declined to make that argument, claiming instead that the letter showed that Petrobras Brazil wanted to know if TMT was financially capable of finishing the ship's construction. (Trans. 382, Halkett.) But Halkett was forced to admit that he does not know if any TMT financial information was ever provided to Petrobras Brazil. (*Id.*)

the proofs of payment for the bribes, and the confessions from Musa and Henriques—all of which was extensively presented in Respondents' pleadings and prehearing briefs. (Trans. 452, Halkett.) Although Vantage has tried mightily to distance itself from the bribery, Halkett could not identify anything inaccurate in Padilha's confession. (Trans. 453.)  And there is nothing to identify.

56.    Halkett's ignorance of all the evidence proving the bribery is no defense, however.  Vantage could have called other witnesses to testify about the bribes—witnesses who actually had personal knowledge of them—but Vantage intentionally chose not to do so. ███

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████



██████████████████████    Rather than have any of these witnesses testify in this arbitration, Vantage opted to rely on Halkett, who can charitably be described as one of the most uninformed Chief Operating Officers in the history of the oil and gas industry.  His lack of knowledge of even the most basic concepts—like Vantage's profits and losses—was stunning, and it was not

credible because other witnesses confirmed that Halkett received information about Vantage's profitability. (Trans. 1241–243.)

57.     "Silence is often evidence of the most persuasive character," *U.S. ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54 (1923), and "[s]ilence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute an untrue accusation." *United States v. Hale*, 422 U.S. 171, 176 (1975). "Unquestionably the failure of a [party] in a civil case to testify or offer other evidence within his ability to produce and which would explain or rebut a case made by the other side, may, in a proper case, be considered as a circumstance against him and may raise a presumption that the evidence would not be favorable to his position." *United States v. Roberson*, 233 F.2d 517, 519 (5th Cir. 1956).

58.     "When a party to a civil action fails to testify and explain facts and circumstances peculiarly within his knowledge and ability to provide, the inference is justified that the testimony would be adverse." *United States v. Marlow*, 235 F.2d 366, 368 (5th Cir. 1956). "And though it was within their power and to their interests to do so, defendants offered no testimony to refute this evidence. Under the circumstances their silence 'not only strengthens the probative force of the affirmative proof but of itself is clothed with a certain probative force.'" *Paudler v. Paudler*, 165 F.2d 901, 903 (5th Cir. 1950) (citations omitted). This is the "ordinary rule, based on considerations of fairness, [which] does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." *Campbell v. United States*, 365 U.S. 85, 96 (1961); *Allstate Fin. Corp. v. Zimmerman*, 330 F.2d 740, 744 (5th Cir. 1964).[4]

---

[4] "A prima facie case is established by evidence adduced by the plaintiff in support of his case up to the time such evidence stands unexplained and uncontradicted." *In re Chicago Rys. Co.*, 175 F.2d 282, 289 (7th Cir. 1949). In "the absence of explanatory or contradictory evidence[,] the finding shall be in accordance with the proof establishing the prima facie case." *Id.* at 289–90. Where the plaintiff has presented uncontroverted prima facie proof, "the law will

59.     This rule has also been applied in the maritime context, because the "failure to produce important witnesses in an admiralty action may raise the inference that the testimony would have been unfavorable to the party by whom they should have been called." *Amerada Hess Corp. v. M/T Mariam*, 533 F. Supp. 158, 166 (S.D. Ala. 1982) (quoting *Am. Oil Co. v. M/T Lacon*, 398 F. Supp. 1181, 1186 (S.D. Ga. 1973), *aff'd*, 518 F.2d 1405 (5th Cir. 1974)).  That is exactly the situation here, and the Tribunal should infer that Vantage did not present Bragg, Su, or O'Leary as witnesses because their testimony would have been unfavorable to Vantage.

60.     Vantage could have presented testimony from witnesses who, unlike Halkett, had personal knowledge of the events and communications related to the bribes.  But Vantage consciously and intentionally elected not to do so, which gives rise to an inference that the bribery scheme did, in fact, occur.[5]

---

be satisfied with a less quantity of proof; and this is particularly so where there is the concurring circumstance of the facts being within the knowledge of the adversary party. Evidence which renders the existence of the negative probable may be sufficient in the absence of proof to the contrary… Full and conclusive proof, however, where a party has the burden of proving a negative, is not required." *Id.* at 290.

[5] This presumption is reflected in what is called the "missing witness inference." *See Creel v. C.I.R.*, 419 F.3d 1135, 1142 (11th Cir. 2005). "Failure to produce an important witness in an admiralty case may raise an inference that his testimony would have been unfavorable to a party by whom he should have been called." *Trans-Amazonica Iquitos, S.A. v. Georgia S. S. Co.*, 335 F. Supp. 935, 939 (S.D. Ga. 1971). This legal principle is well established under Texas law as well. A fact-finder's discretion to weigh evidence "is limited to the resolution of conflicting evidence; it is not within [the factfinder's] power to ignore the evidence and decide the issue in accordance with their own whims or wishes." *Kiel v. Tex. Emp'rs Ins. Ass'n*, 679 S.W.2d 656, 659 (Tex. App.—Houston [1st Dist.] 1984, no writ); *see also Republic Nat'l Life Ins. Co. v. Heyward*, 568 S.W.2d 879, 883 (Tex. Civ. App.—Eastland 1978, writ ref'd n.r.e.) ("The jury could not, however, find the converse of such testimony in the absence of independent evidence to support such finding."). Indeed, "undisputed evidence that allows of only one logical inference" cannot be disregarded, and the fact-finder cannot "reach a verdict contrary to such evidence." *City of Keller v. Wilson*, 168 S.W.3d 802, 814 (Tex. 2005).

Thus, in making credibility determinations, the Tribunal "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.* at 819; *see also Sandoval v. Hartford Cas. Ins. Co.*, 653 S.W.2d 604, 607 (Tex. App.—Amarillo 1983, no writ) ("The positive, unimpeached and uncontradicted testimony of a witness may not be arbitrarily discredited or disregarded, especially when the testimony is so clear that it is unnecessary to speculate on the witness' veracity." (citations omitted)). Indeed, when "the testimony of an interested witness is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct, and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law." *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). There is good policy behind this result:

The exception to the interested witness rule ... is especially true where the opposing party has the means and opportunity of disproving the testimony, if it is not true, and fails to do so.... In other

---

**RESPONDENTS' POSTHEARING RESPONSE BRIEF – PAGE 23**

2.      **Vantage cannot separate itself from its officers, directors, shareholders, and agents.**

61.      Throughout its Posthearing Brief, Vantage falsely denies that "anyone at Vantage" participated in or knew of the bribery through the following inaccurate statements, which flatly contradict both ███████████████████████████████████████ and (2) the variety of evidence presented during this arbitration:

- "From Vantage's perspective at the time the DSA was entered, the involvement of Mr. Padilha and Mr. Su appeared entirely legitimate." (C.'s Posthearing Br. ¶ 57.)

- "There was no reason for Vantage to believe Mr. Padilha would engage in corruption." (*Id.* ¶ 62.)

- "According to Mr. Padilha, his work for all of his clients over his long career had been free of corruption until he strayed in one instance in 2007. There is nothing to suggest that anyone was aware of that one instance." (*Id.* (internal cites omitted).)

- "Mr. Padilha testified that, before the DSA was signed, he never told anyone at Vantage that bribes would be paid. There is no evidence that he ever mentioned the alleged intermediaries, Mr. Schmidt or Mr. Henriques, to anyone at Vantage." (*Id.* ¶ 63.)[6]

- "There is no evidence that anyone at Vantage had a different understanding than Halkett's about why Su was involved in the discussions." (*Id.* ¶ 64.)

- "There is no evidence that Vantage was otherwise aware of the audit or the Época article before news reports in 2014." (*Id.* ¶ 83 (citing Halkett).)[7]

---

words, failure to contradict is another factor to be considered by the court; but it does not necessarily preclude the holding that a fact issue is raised when, as here, there are circumstances in evidence tending to discredit or impeach the testimony of the interested witness.

*Anchor Cas. Co. v. Bowers*, 393 S.W.2d 168, 170 (Tex. 1965). So where "a party has the means and opportunity to disprove testimony, if it is not true, and fails to do so, he is bound by such testimony." *Walker v. Ross*, 548 S.W.2d 447, 453 (Tex. Civ. App.—Fort Worth 1977, writ ref'd n.r.e.) (citing *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965)).

[6] There is undisputed evidence of Padilha testifying that he discussed all of this with Su.  (Trans. 1340–341; 1381–382; 1386–392; 1426 –427; 1485–487.)

[7] This statement ignores Bragg and Vantage's marketing department (J-272), and it flagrantly ignores ██████████
████████████████████████████████████████████████

- ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**RESPONDENTS' POSTHEARING RESPONSE BRIEF – PAGE 24**

- "Vantage neither offered nor paid any bribes to Petrobras officials, either directly or indirectly." (*Id*. ¶ 265.)

- "Vantage never delegated any authority to Mr. Su to act as the agent for Vantage Drilling Company or any of its subsidiaries—and never would have." (*Id*. ¶ 289, citing Halkett.)

- "As a matter of law, knowledge that Mr. Su acquired within the scope of his duties to Valencia and TMT was not imputed to Vantage Drilling Company or its subsidiaries at this time." (*Id*. ¶ 290.)

62.     In addition to being false, these statements highlight Vantage's failure to present witnesses with any personal knowledge of the bribes—like Bragg, O'Leary, or Su—as discussed above.  Vantage's approach to this arbitration appears similar to its approach to the underlying bribes used to obtain the Contract:  try to maintain plausible deniability, even if the evidence shows that Vantage's senior executives, board members, and agents knew or should have known of the bribes.

63.     The false statements listed above also highlight a fundamental problem with Vantage's posthearing brief—it largely ignores what happened at the merits hearing.  For example, Vantage's "lack of evidence" arguments ignore the following testimony from the hearing:  (a) Bragg knew that Padilha solicited bribes to Petrobras officials (Trans. 1483); (b) Bragg knew that Su paid bribes to Petrobras officials (Trans. 1485–86); and (c) extensive evidence shows that bribery occurred.  (Trans. 450.) Vantage's false statements also ignore

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ Vantage has ignored this evidence, made inaccurate arguments and assertions, and is hoping that the Tribunal will not take the time to review the testimony and evidence carefully to see that it disproves Vantage's false representations.  The Tribunal should not reward this improper conduct.

**RESPONDENTS' POSTHEARING RESPONSE BRIEF – PAGE 25**

### 3. Padilha's actions and knowledge are imputed to Vantage.

64.     Vantage cannot distance itself from Padilha and his actions and knowledge, all of which are imputed to Vantage, the principal on whose behalf Padilha was acting as its agent.

65.     *First*, Vantage inaccurately argues that Padilha was acting only as Valencia's agent.  (C.'s Posthearing Br. ¶ 63.)  This argument ignores the undisputed fact that Valencia is not a party to any agreement with any Petrobras entity, and it was Vantage—not Valencia—that paid Padilha tens of millions of dollars for obtaining and brokering the Contract for Vantage.  It would certainly be an odd situation for Padilha to have been acting only for Valencia, while Vantage paid him millions of dollars to procure a contract that only Vantage signed—but that is the logical end of Vantage's absurd argument.

66.     Vantage's inaccurate "Valencia only" argument also ignores the fact that Vantage fired Padilha as its agent because he was involved in the bribery that allowed Vantage to obtain the Contract.  (Trans. 1586, Padilha.)  Again, it seems odd for Vantage to fire an agent, who was allegedly working only for Valencia, because that agent negotiated, agreed to, accepted, and distributed bribes related to a $1.8 billion contract that Vantage, not Valencia, signed. Because the testimony and evidence proves that Padilha was Vantage's agent while he participated in the bribery scheme, his actions and knowledge are attributable to Vantage, notwithstanding Vantage's illogical and inaccurate "Valencia only" argument.

67.     *Second*, Vantage boldly argues, without any evidentiary basis, that Padilha viewed "Petrobras" as his client. (C.'s Posthearing Br. ¶ 59.)  Like Vantage's "Valencia only" argument, this "Petrobras as client" argument ignores the fact that Vantage, not Petrobras, fired Padilha for engaging in bribery related to the Contract.  If Padilha was not Vantage's agent, there would have been no reason for Vantage to fire him.  And there would have been no reason for Vantage to enter into a written agreement with Padilha.  (J-119.)  Additionally, this "Petrobras as

client" argument ignores the countless communications regarding the Contract between Padilha and Bragg, O'Leary, Su, and other Vantage officers, directors, and employees.  (*E.g.*, J-11; J-19 at Vantage 50659; J-24; J-27; J-30; J-33; J-37: J-45; J-52; J-56; J-84; J-41 at PAI 21979; J-166; J-346; *see also* R.'s Posthearing Br., App'x A.)

68.     In sum, Vantage has not proffered any viable argument that disproves Padilha's role as Vantage's agent.  Accordingly, Padilha's knowledge and actions related to the bribery—which allowed Vantage to obtain the Contract—must be imputed to Vantage.

### 4.     Padilha's testimony was truthful and credible.

69.     Vantage's approach to Padilha and his testimony is contradictory.  On one hand, Vantage tries to discredit Padilha and his uncontroverted testimony proving that Vantage knew of the bribery scheme. On the other hand, Vantage embraces Padilha's testimony when it supports Vantage's arguments. For example, Vantage dismisses Padilha's uncontroverted testimony discussing communications with Bragg and O'Leary about the bribery scheme, both before and after the Contract was signed (C.'s Posthearing Br. ¶¶ 20–21); but then Vantage relies on Padilha's testimony about his commissions (*id.* ¶ 61) and the Contract negotiations between Petrobras Brazil and Vantage (*id.* ¶¶ 65–66). Obviously, Vantage cannot have it both ways, rejecting unfavorable testimony and accepting favorable testimony. Vantage's contradictory approach merely affirms that Padilha testified truthfully and credibly, providing testimony that was perceived to be helpful to all parties, which is consistent with Padilha's candid statement during the merits hearing that he does not care who wins this arbitration: "Again, I've no interest whatsoever in who wins this case is already a tragedy. So if Vantage wins, Petrobras wins, nobody wins, a draw, I don't give a damn." (Trans. 1515, Padilha.)

70.     In addition to trying to discredit Padilha, Vantage also mischaracterizes his testimony at times, recognizing that his testimony was extremely harmful to Vantage.  For

example, Vantage argues that Padilha "testified in no uncertain terms that he did *not* tell Mr. Bragg about bribes," and then cites to Padilha's testimony discussing one specific telephone call with Bragg in November 2008. (C.'s Posthearing Br. ¶ 275.) Vantage cannot reach broad conclusions about what Padilha and Bragg discussed, while focusing only on testimony about one moment in time.  Indeed, Vantage's overbroad conclusion ignores Padilha's testimony that he and Bragg openly discussed the bribes in 2012 (Trans. 1341;1491, Padilha.) and indirectly discussed them during the Contract negotiations in 2008. (Trans. 1493–96, Padilha.)

71.    Even these indirect discussions make Vantage liable based on the doctrine of conscious avoidance. "When knowledge of existence of a particular fact is an element of the offense, such knowledge may be established when a person is aware of a high probability of its existence, and consciously and intentionally avoided confirming that fact." *United States v. Kozeny*, 667 F.3d 122, 132 (2d Cir. 2011). Further, once Bragg became aware of the bribery payments and did not report them, he became personally liable for them. *See United States v. Romans*, 823 F.3d 299, 320 (5th Cir.), *cert. denied*, 137 S. Ct. 195, 196 (2016) (Because conspiracy is a continuing offense, "a defendant who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence, and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot.") (quoting *Smith v. United State*s, 133 S. Ct. 714, 719 (2013) (internal quotation marks and citations omitted))).[8]

72.    Unlike Bragg, who never withdrew from the continuing conspiracy to pay bribes to obtain the Contract, Padilha withdrew in late July 2015 when he reported the conspiracy to Brazilian authorities. "Withdrawal from a joint criminal enterprise, such as a scheme to defraud,

---

[8] A person's membership in the ongoing unlawful scheme continues until he withdraws. *Smith*, 133 S. Ct. at 717. "Passive nonparticipation in the continuing scheme is not enough" to demonstrate withdrawal. *Smith*, 133 S. Ct. at 720. Instead, the defendant must prove that he took **affirmative** actions to withdraw, such as reporting to the authorities or in any way communicating to the other conspirators his desire or intention to withdraw from the conspiracy. *See Romans*, 823 F.3d at 321.

requires that the proponent show that he *affirmatively* took actions inconsistent with the object of the enterprise, and communicated his intent to withdraw in a manner reasonably calculated to reach his cohorts." *United States v. Stouffer*, 986 F.2d 916, 922 (5th Cir. 1993) (emphasis added) (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 464–65 (1978); *United States v. Martino*, 648 F.2d 367, 405 (5th Cir. 1981) (applying withdrawal defense to scheme to defraud)).

73.     Since withdrawing from the conspiracy, Padilha has met with criminal enforcement authorities in Brazil and the United States, and he has entered into agreements with them that would require him to go to jail if he was found to be lying about the conspiracy or his involvement.  Padilha therefore has an enormous incentive to tell the truth, which is what he did during the merits hearing and in his witness statement.  It is notable that Padilha has never been accused of lying, such that he would forfeit his non-prosecution agreements and report to jail.  Accordingly, Vantage's arguments about Padilha's truthfulness and credibility should be rejected.  Although Vantage may not like all of Padilha's testimony, it is truthful, credible, and represents the only testimony from a witness with personal knowledge of the bribery scheme.

**5.     Vantage ignores and misrepresents the bribery evidence's strength.**

74.     Of all the false statements in Vantage's Posthearing Brief, this is perhaps the most egregious: "Petrobras has no direct evidence that bribes were actually offered or paid to these individuals." (C.'s Posthearing Br. ¶ 266.)  As explained below, the direct and indirect evidence of Vantage's bribery and corruption is overwhelming and uncontroverted.

75.     <u>Direct Evidence</u>. *First*, Musa admitted that he received bribes. (J-652 at ¶¶ 251–53.)  Vantage's only response is to call this admission hearsay. (C.'s Posthearing Br. n. 49), but it qualifies as an exception to the hearsay rule for statements against interest (*see* Fed. R. Evid. 804(b)(3)), even though these types of evidentiary rules do not apply in this proceeding. (Trans. 1705.)

76.     *Second*, Henriques admitted that he was extensively involved in the bribery scheme. (J-652 at ¶¶ 309–13; 321–35; 350–58.)   His testimony, like Musa's, qualifies as an exception to the hearsay rule for statements against interest. Fed. R. Evid. 804(b)(3).

77.     *Third,* Padilha admitted that he was directly involved in the bribery scheme. Again, his testimony about participating in a criminal scheme qualifies as an admissible statement against interest.  Fed. R. Evid. 804(b)(3).

78.     *Fourth*, multiple documents—including invoices, wire transfer receipts, and documents from the Brazilian proceedings—show the movement of millions of dollars of bribes, including €11 million to Zelada's personal bank account, for which he has never provided any legitimate explanation. (J-652 at ¶¶ 59–88; R. Posthearing Br. ¶¶ 140–46.)

79.     Just days ago, an appellate court in Brazil affirmed Zelada's conviction and *increased* the length of his prison sentence. *See TRF4 Increases Penalty for Jorge Luiz Zelada, former director of Petrobras, Rio Grande Do Sul*, Aug. 2, 2017, available at http://g1.globo.com/rs/rio-grande-do-sul/noticia/trf4-aumenta-pena-de-jorge-luiz-zelada-ex-diretor-da-petrobras.ghtml.  As the prosecutor explained after the Brazilian judgment was affirmed:

> Zelada's case differs from others because of a very specific circumstance: all the proof was corroborated by the fact that it is indeclinable, which defines all the matter, in relation to all the crimes that are here, which is the verification of values around 11 million euros deposited in the name of the accused abroad.

*Id*.  Like Zelada, Vantage has never provided a satisfactory explanation for the €11 million sitting in Zelada's European bank account.

80.     <u>Circumstantial Evidence</u>. As explained in Respondents' Posthearing Brief, the circumstantial evidence before the Tribunal is more than sufficient to prove that Vantage

obtained the Contract through bribery and corruption. (R.'s Posthearing Br. ¶¶ 69–189; *e.g.*, *In re Deepwater Horizon*, 857 F.3d 246, 251 (5th Cir. 2017) ("A person's state of mind is rarely susceptible of proof by direct evidence, so specific intent to defraud may be, and most often is, inferred from the totality of the circumstances, including indirect and circumstantial evidence. That inference, pursuant to our precedent, can be drawn not only as a matter of fact, but also as a matter of law.").

81.     Padilha's close and longstanding relationship with Bragg and O'Leary is important because a "conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting circumstantial evidence." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1130 (D.C. Cir. 2009). And a corporate entity like Vantage can be liable for specific-intent offenses based on the knowledge and intent of its employees, corporate officers, and agents who made, directed, or approved the improper conduct. *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004). Contrary to Vantage's arguments, this imputation may be based on circumstantial evidence, and intent may be inferred from corporate behavior. *E.g.*, *Philip Morris*, 566 F.3d at 1119. At bottom, Vantage cannot avoid liability when, as here, its agents and executives could reasonably foresee what was likely to occur with respect to the bribery scheme.

82.     Likewise, evidence showing that Vantage was conscious of its own guilt can, and does, prove liability in civil cases like this one:

> [A]ny act evidencing consciousness of the weakness of the litigant's position should be admissible, as is true in criminal cases. Thus, a civil litigant should be permitted to… show the [opposing] party's realization of the weakness of their position in litigation by referencing a party's "failure to appear."

Edward J. Imwinkelried, UNCHARGED MISCONDUCT EVIDENCE § 7.2 (Dec. 2016) (citing, among others, *Developers Sur. & Indem. Co. v. Bi-Tech Const., Inc.*, 979 F. Supp. 2d 1307, 1317 (S.D. Fla. 2013)).

83.　Further, in intentional-tort cases—like this one—a party's subsequent acts can be used to prove intent.  *See Coffel v. Stryker Corp.*, 284 F.3d 625, 634 (5th Cir. 2002).  This is because intentional torts are closely analogous to criminal misconduct, because the elements of an intentional tort are similar to the elements of a crime (like bribery). *See Prosser*, LAW OF TORTS § 8 (4th ed.).

84.　Thus, Vantage's civil liability for bribery and fraud need not be proven by direct evidence and may instead be proven circumstantially through (a) evidence showing that Vantage knew it was guilty, and (b) Vantage's subsequent actions after the bribery occurred, including its PowerPoint presentations to the DOJ and the SEC ███████████████████████████ ████████████████████████

85.　For all these reasons, Vantage's misrepresentation that "Petrobras has no direct evidence that bribes were actually offered or paid to these individuals" is not only false, but also mischaracterizes the evidence and the applicable evidentiary standard.  Put simply, direct evidence is not the relevant standard, even though there is overwhelming direct and circumstantial evidence that Vantage obtained the Contract through bribery and corruption.

**6.　Vantage cannot distinguish between the payment of a "toll" and the payment of bribes.**

86.　Setting up another "straw man" argument, Vantage argues that it "is critically important that Petrobras prove money was paid to Mr. Zelada related to the DSA." (C.'s Posthearing Br. ¶ 272; *accord id.* ¶¶ 301–02.)  Not true.  As explained above, this is not the relevant standard, and in any event, direct and circumstantial evidence shows that bribes were

paid to Zelada and others to enable Vantage to obtain the Contract. (*See, e.g.*, R.'s Posthearing Br. App'x A.) This evidence disproves Vantage's argument that it merely paid a "toll" to participate in the bidding process—as opposed to paying bribes to obtain the Contract—and Vantage was forced to admit as much during cross-examination at the merits hearing, where it acknowledged that paying a "toll" was bribery and violated the FCPA. (Trans. 1713, 1724, Schwebel.)

87.     Unlike Vantage's lawyers in this arbitration, Vantage's FCPA counsel do not distort the evidentiary record, likely because they know the consequences of lying to the DOJ and the SEC.  While Vantage denies any knowledge of the bribery scheme to the Tribunal, ███



(R.'s Posthearing Br. ¶¶ 140–46; 173–81; 183–89; *see also* J-652 ¶¶ 59–88.)

**7.     The Contract is "tainted" because Vantage obtained it through bribery.**

88.     The Contract was induced by bribery and is therefore "tainted" for the reasons given below, notwithstanding Vantage's arguments to the contrary.  (*See* C.'s Posthearing Br. ¶ 301.)

89.     *First*, overwhelming evidence proves that Vantage obtained the Contract via bribery, including multiple documents and confessions which specifically acknowledge that Vantage was selected as the winning bidder due to the bribes it agreed to, and did in fact, pay. (*See, e.g.*, J-292 at Vantage 54586; J-652 at Vantage 55630 at ¶ 248.)  And other evidence shows

that Vantage's bribes caused Zelada and Musa to manipulate the bidding process and depart from established policies and procedures, all of which allowed Vantage to become the "winning" bidder for the Contract.  (*See* J-292; J-448 at Vantage 54723, 54698.)

90.     *Second*, although the Contract is "tainted" by bribery, the "taint" element advocated by Vantage is irrelevant here, because it arises only from the so-called "bribery defense" that Respondents have never asserted and that is not recognized under governing maritime and Texas law.  (*See supra*, Part B.3.)  Even Vantage's governing-law expert, Judge Schwebel, had to admit on cross-examination that "taint" is not a "fundamental question" and does not impact whether bribery vitiates the Contract.  (Trans. 1804–05.)  Judge Schwebel further admitted that, assuming bribes were paid to obtain the Contract, the Tribunal is "not required" to inquire further into whether those bribes affected the Contract's terms.  (*Id*.)  In sum, even Judge Schwebel—Vantage's expert and a leading international arbitrator—recognizes that "taint" is wholly irrelevant and that Vantage is wrong to argue otherwise.

91.     *Third*, the cases cited by Vantage to support its "taint" argument are all distinguishable.  *U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372 (D.C. Cir. 2000), and *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348 (D.C. Cir. 1999), are both False Claims Act cases, and their reasoning does not apply here. Although *Kellogg Brown* suggests that bribery must "taint" a contract's terms for purposes of a common-law-fraud claim, more recent decisions have interpreted this case to require only that the bribery be a but-for cause for the overall award of the contract.  *See, e.g.*, *Jasmine Int'l Trading & Services, Co. W.L.L. v. United States*, 120 Fed. Cl. 577, 583 (2015) (applying *Kellogg Brown* to hold that a party seeking to void a contract on grounds of commercial bribery must allege only that the "fraud was the but-for cause of the award" of the contract).

92.     And *Jaclyn, Inc. v. Edison Brothers Stores, Inc.*, relied on evidence showing that the plaintiff was interested in the defendant's products before the illegal bribes were paid. 406 A.2d 474, 485 (N.J. Super. 1979).  Thus, the bribes in *Jaclyn* did not fundamentally affect the bidding process, as they did here to allow an inexperienced company like Vantage to win a complex $1.8 billion deepwater drilling contract.

93.     *Finally*, as Arbitrator Gaitis noted during the merits hearing, federal common law presumes that bribery, in and of itself, evidences "taint" because the person paying the bribe inevitably "jacks up" its contract price to cover the cost of his illegal payments.  *See Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) (noting "that no one would pay a bribe who didn't anticipate garnering net additional revenue at least equal to the amount of the bribe; and that additional revenue is, at least as a first approximation, an additional expense to the person whose agent was bribed").[9]

94.     Put differently, the payment of bribes shows that the contract price was inflated by at least the amount of the bribes.  *Id.*  And Vantage's damages expert admitted as much during the merits hearing.  (Trans. 2241; 2248–249, Jacobs.)  Thus, the total amount of bribes paid is an additional expense to the non-paying party, such that the total amount is a "minimum estimate of the loss" suffered by non-paying party.  *Williams*, 366 F.3d at 576.  In fact, "there is a legal presumption that, at a minimum, the prices paid by [the party whose agent received the bribes] were inflated by the amount of the bribes."  *Philip Morris, Inc. v. Grinnell Lithographic Co., Inc.*, 67 F. Supp. 2d 126, 130 (E.D.N.Y. 1999).

---

[9] Vantage relies on *Williams* at multiple points in its briefing, although it never discusses the court's conclusions about a bribe's effect on the contract's economic terms.  *(E.g.*, J-849 at 30, 35, 41; C.'s Posthearing Br. ¶ 293.)

95.     For all these reasons, although Respondents are not required to prove that the Contract is "tainted," substantial direct and circumstantial evidence shows that it is so "tainted." Accordingly, Vantage cannot recover on any of its claims.

**8.     The DOJ's decision not to charge Vantage criminally is irrelevant to Vantage's liability in this civil arbitration.**

96.     Two days ago, Vantage announced that it had received a letter from the DOJ notifying Vantage that no criminal charges would be filed in the United States at this time for the bribes paid to obtain the Contract.  The DOJ noted, however, that if it learns of additional information, it may reopen its investigation of Vantage.  Although Vantage will likely argue that the DOJ's decision not to bring criminal charges in the United States somehow impacts Vantage's liability in this civil arbitration, that argument is wrong because the decision not to bring criminal charges is irrelevant to civil liability.

97.     The Supreme Court has stated clearly that "the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [a criminal prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).  When exercising their discretion, prosecutors must "take into account many factors irrelevant in a civil suit, such as the higher standard of proof required for criminal conviction." *Rabon v. Great Sw. Fire Ins. Co.*, 818 F.2d 306, 309 (4th Cir. 1987).  Accordingly, "evidence of non-prosecution in a criminal matter is not admissible to show 'innocence' in a civil matter. . . ." *Peery v. Serenity Behavioral Health Sys.*, No. 106-CV-172, 2009 WL 1438939, at *2 (S.D. Ga. May 15, 2009) (citing *Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1160 (11th Cir. 1986)).  Put differently, because "[t]here are many factors that influence the government's decision not to prosecute a defendant on certain charges . . . we cannot attribute the government's decision not to prosecute to an independent determination that the defendant is not guilty." *United States v. Delgado*, 903

F.2d 1495, 1499 (11th Cir. 1990).  Indeed, if a prosecutor were called to testify why criminal charges were not brought, "the government's counsel likely would take the stand and testify that the charges were dropped for reasons unrelated to the guilt of the defendant . . . [and] [t]he reasons expressed by the government's counsel could be highly incriminating with regard to the defendant who is seeking to have the evidence admitted." *Id.*  The same reasoning applies under Texas law. *See Texas Dept. of Pub. Safety v. Norrell*, 968 S.W.2d 16, 19 (Tex. App.—Corpus Christi 1998, no pet.) (holding that a prosecutor's decision not to file criminal charges "cannot constitute a factfinding or a certification that the accused is not guilty").

98.     Even an acquittal in a criminal case—something far more meaningful than the DOJ's decision not to prosecute Vantage at this time—"ordinarily does not prove innocence." *United States v. Marrero-Ortiz*, 160 F.3d 768, 775 (1st Cir. 1998); *United States v. Reyes*, 16 F. Supp. 2d 759, 761 (S.D. Tex. 1998) ("[A] judgment of acquittal is not a determination of guilt or innocence.").  In fact, it is "firmly established that the difference in degree of the burden of proof in criminal and civil cases precludes application of the doctrine of res judicata as a bar to a civil suit subsequent to an acquittal in a criminal prosecution grounded on the same facts, for the reason that the prior acquittal only adjudicated that the proof offered in the criminal case was not enough to establish the guilt of the accused beyond all reasonable doubt." *Murray & Sorenson v. United States*, 207 F.2d 119, 122 (1st Cir. 1953).  Tellingly, many courts have held that it is error to admit evidence of a nonprosecution or an acquittal on criminal charges during a related civil action.  *Rabon*, 818 F.2d at 309 (collecting cases); *cf. Marrero-Ortiz*, 160 F.3d at 775.

99.     In light of all this case law, it would be error for the Tribunal to conclude that the DOJ's decision not to charge Vantage criminally under United States law has any bearing on Vantage's liability in this civil arbitration. There is no way to know why the DOJ decided not to

charge Vantage criminally, and as explained above, it is likely due to "reasons unrelated to the guilt of the defendant." *Delgado*, 903 F.2d at 1499.  These unknown reasons could include a number of things, including concerns about jurisdiction; concerns about the statute of limitations; concerns about punishing a company that has already been through bankruptcy; and concerns about the company's ability to pay a significant financial penalty while it and the rest of its industry continue to struggle financially.

100.    Finally, although the DOJ has currently decided not to bring criminal charges, it is notable that the SEC continues to investigate Vantage, and thus Vantage may still face civil liability in the United States.  Indeed, the continuing SEC investigation is much more relevant to this arbitration, because both the SEC investigation and this arbitration are civil proceedings.  And in any event, as explained in detail above and in prior briefing, the evidence before the Tribunal has already proven guilt beyond a reasonable doubt in Brazil for Zelada, Musa, Henriques, and Padilha.  Accordingly, the DOJ's decision not to charge Vantage criminally does not change anything here, no matter what Vantage says about it.

### D.    Corporate Separateness

### 1.    Vantage has neither pleaded nor proved alter ego.

101.    As Respondents have repeatedly pointed out, the parties to this arbitration are on unequal footing regarding agency.  Specifically, Petrobras Brazil, PVIS, and PAI are separate legal entities, and Vantage has never asserted an alter ego theory that would connect them.  Yet Vantage continues to treat PVIS, PAI, and Petrobras Brazil as one collective company, which they undisputedly are not.  Although Respondents have discussed this issue repeatedly, Vantage has never addressed its failure to allege alter ego, likely because it knows that proving alter ego would require showing that Petrobras Brazil dominated PVIS's or PAI's business operations.  *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 509

(S.D.N.Y. 2012) (discussing alter ego liability in the maritime context). There is no such evidence in this arbitration, which disproves alter ego as a matter of law.

### 2. The *in pari delicto* doctrine cannot save Vantage's claims.

102.    The failure to plead alter ego prevents Vantage from treating Petrobras Brazil, PVIS, and PAI as one entity.  And the inability to treat the three Respondents as one entity prevents the Tribunal from resolving this arbitration using a "pox on both your houses" approach, because the actions and knowledge of each Respondent must be analyzed independently, which Vantage has never done. (*E.g.*, J-850 at 9.)

103.    Additionally, even if the three Respondents were considered one entity, Vantage still could not prevail on any of its claims because of the *in pari delicto* doctrine, which teaches that "[i]n a case of equal or mutual fault … the position of the defending party [*i.e.*, Respondents] … is the better one." *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). "This defense is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deferring illegality." *Id.*

### 3. The acts of Musa and Zelada cannot be imputed to PVIS or PAI.

104.    Musa and Zelada were executives of Petrobras Brazil and admittedly received bribes from Su and Padilha in exchange for awarding the Contract to Vantage. (J-652 at Vantage 55657 ¶ 297.)  Indeed, Zelada did not even try to explain why he had a secret bank account in Monaco containing €11 million that was never reported on his tax returns. (*Id*. at Vantage 55656 ¶¶ 295–96.)

105.    Yet, Musa and Zelada were never employees of PVIS and PAI, and had only limited authority to negotiate the Contract between PVIS and VDC.  And, as Respondents have repeatedly explained, without proof of alter ego between Petrobras Brazil and PVIS, Zelada and

Musa's limited authority to negotiate and procure the Contract does not impute their bribery to PVIS and PAI.  *Am. Renaissance Lines, Inc. v. Saxis S.S. Co.*, 502 F.2d 674, 677 (2d Cir. 1974) (noting, in the maritime context, that "a corporation … is entitled to a presumption of separateness from a sister corporation … even if both are controlled by the same individuals.")

106.    Despite this black-letter law, Vantage inaccurately argues that if Petrobras Brazil, Zelada, or Musa knew of the bribery, that knowledge should be imputed to PVIS and PAI.  (C.'s Posthearing Br. ¶ 297 n.71.)  This argument fails for the following reasons.

107.    *First*, as a threshold matter, the evidence shows that Petrobras Brazil was unaware of Musa's and Zelada's illegal acts.  For example, once allegations of corruption were first reported in the 2013 *Época* magazine article, Petrobras Brazil conducted an internal investigation to determine if the allegations were true.  That internal investigation was unable to substantiate the existence of bribery—in fact, the central figure in the alleged bribery scheme, Joao Augusto Rezende Henriques, flatly denied that any bribery occurred. (*See generally* J-292.)  Notably, in contrast, Vantage waited months after the *Época* magazine article was published before it initiated its own internal investigation of the bribery.  (*See, e.g.*,  J-326.)

108.    *Second*, Vantage's cases regarding imputation of knowledge are wholly unsupportive.  For example, *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 652 F.2d 340 (3d Cir. 1981) is irrelevant because it does not apply the governing law in this arbitration (*i.e.*, maritime or Texas law).  Moreover, *Publicker* discusses a parent company's contractual liability under contracts signed by its subsidiaries; it does not address imputation of knowledge between corporate entities or between corrupt agents and their unknowing principal.

109.    *Third*, the only case purporting to address imputation of knowledge is *Steel Coils, Inc. v. Captain Nicholas I M/V*, 197 F. Supp. 2d 560 (E.D. La. 2002), but this case is not based

on governing maritime or Texas law because it relies on a Fifth Circuit decision that declined to apply maritime law and instead applied Louisiana law. *See Steel Coils*, 197 F. Supp. 2d at 567 (citing *Metro. Wholesale Supply, Inc. v. M/V ROYAL RAINBOW*, 12 F.3d 58, 62 (5th Cir. 1994)).

110.    *Fourth*, there is no evidence that Petrobras Brazil was an agent of PVIS or PAI, as Claimants suggest.   Among other things, agency relationships require proof that the alleged agent was subject to the principal's control. Restatement (Second) of Agency § 1 cmt. a (1958)). And there is no evidence that PVIS or PAI ever controlled Petrobras Brazil.

111.    *Finally*, imputation would be improper in this case because, as Claimants acknowledge, "notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts *adversely to the principal in a transaction or matter*, *intending to act solely for the agent's own purposes* or those of another person."   *See* Restatement (Third) of Agency § 5.04 (2006) (emphasis added).   Here, the undisputed evidence shows that, by accepting bribes for their own personal benefit, Zelada and Musa acted outside the course and scope of any relationship with Petrobras Brazil, PVIS, or PAI.   Unlike Su, Padilha, Bragg, and O'Leary, who worked to benefit Vantage during the Contract negotiations, there is no evidence that Musa and Zelada were authorized by Petrobras Brazil, PVIS, or PAI to secretly engage in bribery.   Instead, Zelada and Musa engaged in the bribery solely for their own personal financial interests, and their actions did not benefit Petrobras Brazil, PVIS, or PAI.   Accordingly, the illegal acts of Zelada and Musa—of which Vantage was undeniably aware—cannot be imputed to Petrobras Brazil, PVIS, or PAI.

## E.  <u>Operational Issues</u>

### 1.    Vantage's operational witnesses are neither qualified nor credible.

112.    As explained at the start of this brief, Vantage's Posthearing Brief largely ignores the testimony and evidence presented during the merits hearing.   Nowhere is this more common

than during Vantage's discussion of the operational failures on the Titanium Explorer.  Vantage repeatedly cites to its witnesses' direct testimony or reports, ignoring devastating admissions made by those witnesses on cross-examination.  For the reasons given below, the Tribunal should reject the direct testimony from Vantage's operational witnesses, because all of those witnesses were shown to be unqualified and not credible during the merits hearing.

### a. Kenneth Anderson

113.    In his direct testimony, Kenneth Anderson testifies broadly about geological, engineering, and well-design concepts, even though he is not an engineer or a geologist, and was only Vantage's rig manager during the Chinook #6 well campaign.

114.    For example, in his direct testimony, Anderson criticized the design of the Chinook #6 well and purported to explain how geological concepts like porosity relate to well design and fluid losses:  "Avoiding fluid loss requires determining the porosity of the formation and then appropriately calibrating the weight of the fluid used and the rate and pressure at which it is circulated into the well." (*See* J-863 ¶ 66.)  But on cross-examination, Anderson struggled to define porosity, ultimately admitting that he has never taken an engineering or geology class. (Trans. 660–62.) Anderson's ignorance of engineering and geology is not surprising, as he admitted during the merits hearing that he is a high school dropout.  (Trans. 660.) And although he criticizes PAI's well design and engineering decisions on the Chinook #6 well, Anderson admitted on cross-examination that he is not a licensed professional engineer; he is not qualified to design a deepwater well; and he has never authored or signed a drilling program for a deepwater well. (Trans. 660–62, Anderson.)

115.    In addition to being unqualified to testify about engineering and geological concepts, Anderson is also unqualified to testify about cementing issues and the cement bond logs for the Chinook #6 well.  According to Anderson's direct testimony, Vantage's drill crew

would have anticipated the actual fluid losses on May 19 and July 19, 2015, if PAI had provided cement bond logs to Vantage. (*See* C.'s Posthearing Br. ¶ 130; *see also* J-863 ¶¶ 176–77; J-872 ¶¶ 5–6.) Anderson claimed that cement bond log data "is commonly shared openly with the drilling contractor," and cement bond logs were provided to Vantage during the Chinook #5 and Ophir well campaigns, and that he has reviewed those logs "section by section" with company men. (J-863 ¶¶ 58, 79; J-872 ¶ 5.)  But on cross-examination, Anderson could not read a cement bond log and identify the top of cement; after an awkward five-minute pause while he tried to read a cement bond long, Anderson finally gave up and admitted that he could only "call a number out and guess," conceding "I can't make a determination looking at this." (Trans. 669–71, Anderson.)

116.    Anderson's ignorance of cement bond logs and cementing issues is not surprising. He has never worked for a cement contractor, like Baker Hughes or Halliburton; he has never worked as a cement bond analyst; and he has never even met with or talked to a cement bond analyst.  (Trans. 668, Anderson.) Although he has spent over twenty-five years in the offshore drilling industry, Anderson has never been responsible for reading or interpreting cement bond logs. (*Id.*)  And if Anderson was not qualified to read and interpret a cement bond log, then no one on the Titanium Explorer was, because Anderson was the rig manager during the Chinook #6 campaign and had "overall responsibility for the Titanium Explorer and its crew" (J-863 ¶ 1), which includes safely and effectively managing the Titanium Explorer. (*See* Trans. 803.)

117.    Besides being wholly unqualified to testify on engineering, geological, and cementing issues, Anderson also disproved many of Vantage's criticisms of PAI while testifying on cross-examination.   For example, in his direct testimony, Anderson claimed that PAI "concealed critical information about drilling margins" from Vantage (J-867 ¶ 71), but on cross-

examination, Anderson admitted that the May 19 and July 19 fluid-loss events occurred during the completion phase of the Chinook #6 well, and thus drilling margins were irrelevant:

> Q.    So in the completion phase of a well, is there a drilling margin since you're not drilling?
> A.    I wouldn't think so.
> Q.    I didn't think so either. Right? So if you're in the completion phase, you don't have a drilling margin, correct?
> A.    I would say no.

(Trans. 802–03.) And although drilling margins were irrelevant during the completion phase, Anderson even admitted on cross-examination that drilling-margin information was never concealed from Vantage, because the results of the latest leak-off test were always posted in the Titanium Explorer's drill shack, as required by BSEE regulations.  (*Id*.)

### b.  *Eric Van Oort*

118.    The testimony from Dr. Van Oort should be rejected for two reasons: (1) he is unqualified to testify about well design and Good Oil and Gas Field Practices; and (2) his opinions are not based on the Contract's definition of Good Oil and Gas Field Practices.

### (i)  *Dr. Van Oort is not qualified to testify about Good Oil and Gas Field Practices or the design of the Chinook #6 well.*

119.    Dr. Van Oort does not teach students like Vantage's drill crew or topics that they would understand.  Instead, he teaches advanced engineering courses that are "on a higher and more sophisticated level," and a "novice to drilling would struggle mightily" in his courses. (Trans. 1990.) Thus, his students "have already gone through entry-level drilling engineering training." (*See* Trans. 1989, 1991.) The majority of his students go on to work for operators, not drilling contractors. (Trans. 1990.) He does not (and has never) taught deepwater rig crewmembers, and he admitted that there are no programs in the petroleum engineering department at the University of Texas that teach rig crewmembers—like Vantage's toolpushers,

**RESPONDENTS' POSTHEARING RESPONSE BRIEF – PAGE 44**

derrickmen, assistant drillers, or drillers. (Trans. 1990.) Moreover, Dr. Van Oort has never worked as a rig crewmember on a deepwater drillship, nor has he ever worked for a drilling contractor like Vantage. (Trans. 1933.) Finally, Dr. Van Oort is also unqualified to opine on PAI's well design, because he is not a licensed professional engineer and has never designed a deepwater well in the Gulf of Mexico. (Trans. 1932.)

### (ii) Dr. Van Oort's opinion is based on an improper definition of Good Oil and Gas Field Practices.

120.    Dr. Van Oort's testimony should also be rejected because he relies on his own definition of Good Oil and Gas Field Practices, rather than the Contract's definition. During the hearing, Dr. Van Oort admitted that the assistant driller's failure to reset the gain/loss alarm on May 19 was "a mistake," but this "mistake" did not amount to a violation of Good Oil and Gas Field Practices. (Trans. 2007–08.) According to Dr. Van Oort, "If there was gross negligence, then, indeed, there are situations where there could be violations of Good Oil and Gas Field Practices." (Trans. 2008.) Dr. Van Oort explained further: "My view is that there has to be a significant event where Vantage has clearly made a deliberate mistake that would not be in compliance with Good Oil and Gas Field Practices." (Trans. 2010.)

121.    Unlike Dr. Van Oort, the Contract does not define Good Oil and Gas Field Practices in terms of "gross negligence," a "significant event," or a "deliberate mistake." Instead, the Contract's definition is "those prudent and good practices, methods, techniques and standards, as are prevailing at the time in question, that are proven, generally accepted and up to date in the industry in connection with carrying out drilling related operations on behalf of a reputable international oil and gas field operator, including the design, engineering, construction, transportation, installation, hookup, testing, operation, maintenance, and acceptance of such

systems and facilities in a safe, efficient, reliable and economical manner and in compliance with Applicable Law." (J-1 at Vantage 12.)

122.    Because Dr. Van Oort's opinions and testimony are not based on the Contract's definition of Good Oil and Gas Field Practices, they should be rejected.  Vantage violated Good Oil and Gas Field Practices on May 19 and July 19, 2015, and Vantage cannot excuse its conduct through expert testimony that conflicts with the Contract.

### c.   *Dallas Bozeman*

123.    During the merits hearing, Dallas Bozeman, Vantage's director of deepwater operations, showed himself to be an uninformed witness and confirmed that Vantage failed to follow its own MOC procedures.  Bozeman claimed to be "the person in charge for the overall management and performance of drilling services by Vantage deepwater drillships" (J-862 ¶ 1), including "the implementation of" Vantage's safety management systems "at the rig level." (Trans. 1026.)   But when pressed for details about Vantage's safety management system, Bozeman could not explain how it worked and how it made critical safety information available to Vantage employees. (Trans. 1023–25.)

124.    Bozeman also acknowledged that Vantage failed to comply with its own MOC policy, which required it to provide PAI's drilling supervisor with notice of "any significant change of material, equipment or personnel or of any system / procedures that could have a bearing on the safety of the operation," and to discuss and agree to the changes with PAI's drilling supervisor "prior to implementation." (J-348 at PAI 505.)  But when Vantage changed the software for its safety management system in 2014, Bozeman admitted that "there was not a formal MOC done for that changeover" at the time, even though the software change required a formal MOC. (Trans. 1029; J-390 at PAI 59646–47.) Vantage did not initiate a MOC until 2015, after the change was implemented, and Vantage failed to take steps to ensure that no data was

lost when transferred from the old system to the new one, a key risk factor. (Trans. 1034–38; *see* J-376.)

### d. *Elmer Danenberger*

125.    During the merits hearing, Vantage's regulatory expert, Elmer Danenberger, acknowledged that he is not qualified to testify about the current state of offshore drilling regulation.  As Vantage admits, the post-Macondo world is "a world in which the United States government shut down all drilling operations in the Gulf of Mexico, beefed up regulatory agencies and created more stringent regulations." (C.'s Posthearing Br. ¶ 254.)  But Danenberger has no experience enforcing these "more stringent regulations" as a federal regulator in the post-Macondo world. (Trans. 2663.) In fact, Danenberger has not performed a single inspection of a deepwater drillship on behalf of BSEE, which did not even exist when Danenberger was a federal regulator. (*Id.*)

126.    In addition to having no personal experience as a regulator in the post-Macondo world, Danenberger did not even try to obtain knowledge from others with such experience. Danenberger did not interview any current or former BSEE inspectors or employees in preparing his expert reports (Trans. 2633), and he did not speak with anyone authorized by the applicable federal regulations to perform SEMS audits of deepwater drillships like the Titanium Explorer. (Trans. 2663-64.) Instead, Danenberger's only interviews related to his work in this matter occurred during one teleconference with some of Vantage's employees who were involved in the fluid loss events, although he cannot recall which employees participated. (*Id.*)

127.    Danenberger also showed that he was unfamiliar with the relevant federal regulations.  In his reports, Danenberger concluded that Vantage "did not violate any regulations during these fluid loss events" (J-861 ¶ 2), while relying on regulations that apply only to drilling operations, rather than completion operations. (*See, e.g.*, J-861 ¶¶ 11, 29, 35, 43, 53.)  As the

Tribunal knows, the May 19 and July 19, 2015 events occurred during the completion phase of the Chinook #6 well, not the drilling phase. Danenberger finally cited to a regulation governing the completion phase during the merits hearing, when he presented his introductory PowerPoint to the Tribunal. (*See* J-910 at slide 3; *see also* Trans. 2626–28.) Although Danenberger tried to explain away his ignorance of the difference between drilling and completion regulations by claiming they are "interchangeable," he provided no supporting evidence for this claim, admitting instead that he knew the difference between drilling and completion when drafting his reports. (Trans. 2629–30.)

128. Finally, Danenberger tried to minimize the impact of the incident of non-compliance ("INC") that BSEE issued during the Chinook #6 well campaign for Vantage's failure to recalibrate the gas sensor system on the Titanium Explorer. Danenberger admitted that the Chinook #6 INC was identical to an INC issued for the very same violation on the Chinook #5 well. (*See* Trans. 2665–75; *compare* J-445 *with* J-253.) But he falsely claimed that the Chinook #6 INC was "more of a record-keeping violation that had already been corrected before the inspectors got there." (Trans. 2619–20.) In fact, the INC presented "a serious threat," as explained by PAI's regulatory expert, Lance Labiche, a former BSEE regulator:

> So for those days that they were out of compliance, they didn't know if [the gas sensors] were going to work or not. They make it sound like, oh, it's just we had the piece of paper in the wrong file. No, it's that they didn't test a life-saving piece of equipment. And they did it multiple times.

(Trans. 2726–27.)

129. For all of these reasons, Danenberger and the rest of Vantage's operational witnesses are unqualified and are not credible. The Tribunal should therefore reject their testimony.

2. **Vantage materially breached the Contract and repeatedly violated Good Oil and Gas Field Practices on May 19 and July 19, 2015.**

    a. *Vantage had sufficient information to anticipate, recognize, and promptly stop the fluid losses.*

130.    Vantage falsely claims that PAI concealed information about the cement job that prevented Vantage from detecting and stopping the fluid losses. (C.'s Posthearing Br. ¶ 131.) In reality, Vantage knew that there were problems with the cement job and that fluid losses were likely to, and did in fact, occur on May 19 and July 19, 2015.

131.    In his direct testimony, Anderson claims that he "strongly advised" PAI to perform the conditioning (or wiper) trip to clean the wellbore before perforating the well. According to Anderson, the wiper trip "would have dramatically increased the chance of a successful cement job," and the fluid losses would not have occurred. (J-863 ¶ 77.) Anderson attributes the unsuccessful cement job and the fluid losses to PAI's decision not to perform the conditioning trip. (*See* J-863 ¶ 84.) Given the alleged importance of the conditioning trip and Vantage's knowledge that it was not performed, Anderson and the rest of the Vantage drill crew knew that the cement job was unlikely to succeed and should have been on high alert for fluid losses. Vantage cannot criticize PAI for not performing the conditioning trip without acknowledging that an allegedly experienced driller like Vantage would have known all the risks of not performing such a trip, including a bad cement job and fluid losses.

132.    Other factors, besides the lack of a conditioning trip, show that Vantage knew all about the problems with the cement job and the risk of fluid losses. As Dr. Van Oort admitted on cross-examination, Vantage knew that the well experienced total losses during the primary cement job on April 3, 2015, a strong indicator that the cement job was not successful: "Vantage, of course, from the experience of working the cementation, knew that, for instance,

total losses were experienced during the primary cementation. That indicates that there could be concerns about the primary cementation." (Trans. 1937.)

133.    Vantage also knew the cement job was unsuccessful because "abnormal and excessive" losses occurred when the well was perforated on May 6, 2015. (J-863 ¶ 82.)  And getting the perforating guns stuck in the well also indicated that there was a problem with the cement job, as Anderson acknowledged:  "I think the guns getting stuck was a result of the cement job." (Trans. 823.)

134.    Despite having all this knowledge about the lack of a conditioning trip, the total losses, and the stuck perforation guns, Vantage still could not identify and stop the fluid losses on May 19 and July 19, 2015.  Instead, when the critical gain/loss alarm sounded on May 19, Vantage's assistant driller silenced the alarm to prevent it from sounding again, as losses continued to occur.  This is a material breach of the contract and a violation of Good Oil and Gas Field Practices, and Vantage has no excuse because it knew about all the problems with the cement job long before May 19, 2015.

135.    Dr. Van Oort acknowledged that "[a]fter May 19th it became the clear responsibility of the driller to investigate losses and look for discrepancies on losses." (Trans. 1984.)  But Vantage did not do this, which resulted in a similar event on July 19, despite Vantage having full knowledge about the problems with the cement job.  In fact, Vantage had even more information about the cement job by July 19, because a cement squeeze was performed just days earlier on July 15 (*see* J-512; Trans. 653), and a cement squeeze "is a remedial operation" that is performed only "after a primary cementation has failed." (Trans. 653; *see* J-867 ¶ 87.) Thus, performing a cement squeeze should tell any qualified driller—which Vantage claims to be—that the original cement job was unsuccessful and fluid losses are highly likely to occur.  Moreover,

according to Dr. Van Oort, "cement squeezes, in general, have a low probability of success," so drillers like Vantage must be ever vigilant for fluid losses. (Trans. 1906.)

136.     Before the July 19 event, Vantage also knew that performing certain tasks could mask whether actual fluid losses were occurring. As Vantage's David Matlock stated in an internal email after the July 19 event, "I do not understand why we would be doing all the transferring to pits, filling sand traps and drilling cement which *__we know was a loss zone as we__* *__squeezed it__*? *__The last time we agreed too much was going on at one time and fluid__* *__management was not working with more than one operation transpiring at a time__*." (J-537 (emphasis added).)

137.     In sum, the cement job on the Chinook #6 well did not prevent Vantage from complying with the Contract.  Vantage knew about the problems with the cement job before it materially breached the Contract and repeatedly violated Good Oil and Gas Field Practices on May 19 and July 19, 2015.  The cement job did not prevent audible and visuals alarms from repeatedly sounding on May 19 and July 19, 2015.  Vantage had every opportunity to identify, recognize, and stop the unanticipated fluid losses on both days, but its drill crew failed to monitor the well in accordance with Applicable Law and Good Oil and Gas Field Practices. Instead, Vantage's drill crew disabled the gain/loss alarm on May 19 and then failed to investigate over forty alarms on July 19, all of which justified termination of the Contract.

> **b.** ***PAI's instructions on May 19 and July 19 complied with the approved plan of action, and management of change was not required.***

138.     Vantage falsely argues that its drill crew was unable to recognize fluid losses because PAI's company man instructed Vantage to perform operations that deviated from the plan of action ("POA") without following the MOC process. (C.'s Posthearing Br. ¶ 130.) However, an MOC was not required on either May 19 or July 19, 2015, because the operations

were either (1) included in the Vantage-approved plan of action, or (2) routine and necessary to perform the operations listed in the Vantage-approved POA.

139.    It is important for the Tribunal to remember that Vantage "vetted" and approved in advance *all* POAs on the Titanium Explorer, including the POAs for May 19 and July 19, 2015. (J-863 at ¶ 172.)  Although Vantage approved all POAs, it incorrectly claims that certain operations on July 19 were not included in the POA or that MOC was required before performing them.   The specific operations about which Vantage complains are as follows: (1) diverting fluid to sand traps; (2) pumping a "viscous sweep" while circulating bottoms up; (3) diverting fluid to the filter presses; and (4) circulating fluid at a rate greater than 10 barrels per minute. (*See id.*)

140.    *First*, during the merits hearing, Anderson withdrew Vantage's criticism about diverting fluid to the sand traps, because this activity is expressly stated in the July 19 POA. (Trans. 882–83; *see* J-544 at Vantage 18252.)

141.    *Second*, Vantage's criticism about the viscous sweep is likewise meritless, because the July 19 POA specifically mentions pumping a viscous sweep while circulating bottoms up.  The POA's "Advanced Preparation" section lists "things you need to look at or get ahead of time before this operation ensues" (Trans. 886–87), and the July 19 POA states to have "Barosweep material ready to be pumped as needed to clean debris from wellbore." (J-544 at Vantage 18251.) Anderson admitted that Barosweep is the material used to perform viscous sweeps, and that the July 19 POA required Barosweep to be "ready to be pumped as needed." (Trans. 888–89.) Thus, the POA expressly provided for this activity about which Vantage complains, so MOC was not required.

142.    Third, Vantage criticizes PAI's decision to divert contaminated completion fluid to the filter presses for conditioning or cleaning. (*See* J-867 ¶ 62.) But the July 19 POA instructed the drill crew to "circulate bottoms up" (J-544 at Vantage 18253), which means that completion fluid is circulating through the wellbore, bringing fluid from the bottom of the wellbore to the surface. (*See* Trans. 897.) When completion fluid circulates through the wellbore and returns to the surface, it is dirty and must be filtered (or cleaned) before it is recirculated, otherwise it can damages the reservoir. (*See* Trans. 757, 899–900.)

143.    To filter the dirty completion fluid, Vantage's drill crew had to pump the fluid through the filter presses to remove the contaminants from the completion fluid. (Trans. 757.) Anderson agreed that the only way to clean completion fluid on the Titanium Explorer was to run the completion fluid through the filter presses. (Trans. 757–58.) He also agreed that "every time you have dirty completion fluid on the Titanium Explorer, you have to use the filter presses." (Trans. 899.) Thus, the filtering process is a routine part of circulating bottoms up, and occurs in every completion phase of every well that Vantage has drilled. (Trans. 758–59.) Accordingly, Vantage trains its drill crew to perform this operation. (*See* Trans. 758.)  Because diverting the dirty completion fluid to the filter presses is a necessary part of circulating bottoms up, and circulating bottoms up was required under the POA, MOC was not required to use the filter presses.

144.    Finally, Vantage criticizes PAI for increasing the circulation rate without issuing an MOC. (J-863 ¶ 172.) However, MOC was not required because the POA instructed Vantage to "establish circulation at maximum rate." (J-544 at Vantage 18253.) The POA does not specify the maximum circulation rate, because it was within the company man's discretion, depending on the well conditions.  This is consistent with Anderson's description of PAI's role on the

Titanium Explorer: "Petrobras determined how it wanted to drill and complete the Chinook #6 well," so the company man would "instruct its contractors, including Vantage, on exactly what operations and procedures to implement, and when, and the contractors follow and perform those instructions." (J-863 ¶ 56.) Therefore, when the company man instructed Vantage's drill crew to increase the circulation rate on May 19 and July 19, 2015 no MOC was required.

145.   In sum, PAI's instructions on May 19 and July 19, 2015 were vetted and improved by Vantage, did not require MOC, and did not prevent Vantage from recognizing significant fluid losses. But Vantage did not recognize the significant fluid loses on either day and thus materially breached the Contract and repeatedly violated Good Oil and Gas Field Practices.

### 3.   Vantage repeatedly mischaracterizes the evidentiary record.

146.   Although Vantage's witnesses consistently professed that safety was paramount on the Titanium Explorer, Vantage criticizes PAI for conducting safety audits to ensure that Vantage's employees were trained and qualified, and that the rig's sophisticated equipment was in good working order. (*See* C.'s Posthearing Br. ¶ 100.) Vantage cannot have it both ways, touting the importance of safety, while criticizing PAI for taking steps to ensure safety.

147.   Vantage falsely claims that three audits performed in February, March, and April 2015 "validated the quality of Vantage's performance" and "show that Vantage met Good Oil and Gas Field Practices," and that Petrobras did not raise any issues about these audits. (C.'s Posthearing Br. p. 35, ¶ 100.) In fact, the opposite is true—the audits, which PAI could perform "at any time, for any reason whatsoever and at its sole discretion"—revealed serious concerns that PAI raised and Vantage largely ignored. (*See* J-1 Art. 13.4.1.)

148.   For example, Vantage criticizes PAI for performing an audit of Vantage's employees in February 2015, which concluded that fourteen Vantage crewmembers did "not

meet the minimum qualifications required in the Agreement." (J-388 at Vantage 43241; *see also*

Trans. 648, Anderson.)   By letter dated February 11, 2015, Petrobras notified Vantage that

Vantage had been in default since the date of the Third Novation for, among other things,

(a) failing to maintain "skilled, experienced, competent and efficient" personnel that met or

surpassed "any qualifications that are required under this Contract or by Applicable Law and

CONTRACTOR's training and experience standards," as required under Article 10.4.1;

(b) violating Applicable Law by failing to comply with Vantage's own MOC policy, pursuant to

Article 10.15; and (c) failing to obtain PAI's prior consent before replacing any Key Personnel,

as required under Article 10.4.4. (J-1 at Vantage 26, 33; *see* J-382.) Because Vantage's ongoing

contractual default "represents a serious exposure to the safe operational continuity of the

drillship," PAI demanded that Vantage take "immediate actions to address the default." (J-382.)

149.    Vantage refused to remedy the contractual defaults. First, it did not terminate or

replace the fourteen employees that PAI identified as not meeting minimum qualifications. In

fact, five of the fourteen continued to work on the Titanium Explorer, even after the May 19

event. (*Compare* J-388 at Vantage 43241, *with* J-468 at Vantage 22072) (Lee Soileau, Shane

Ardis, Philip Corbin, James Kilpatrick, Jared Thompson).) Moreover, Vantage later found two of

the fourteen at fault for the fluid loss events, issuing a written warning to Robert Goodnight after

the May 19 event for deviating "from required Vantage policy and training" (J-863 ¶ 137), and

terminating Matthew "Cody" Taylor after the July 19 event for not "halting operations on

complicated procedures that might obscure detection of a fluid loss." (J-863 ¶ 205.)

150.    PAI's February 11, 2015 letter also notified Vantage that it was in default for

violating its own MOC policy by replacing about 65% of its drill crew when returning to the

Gulf of Mexico from the Ophir campaign. (J-382; *see* Trans. 719, Anderson.) Vantage's MOC

policy required Vantage's rig manager, assistant rig manager, and OIM/captain to (a) provide written notice to PAI's drilling supervisor of "any significant change of material, equipment or personnel or of any system / procedures that could have a bearing on the safety of the operation;" and (b) discuss and agree to the implementation of all changes in advance. (J-348 at PAI 505.) But Vantage admittedly did not follow its MOC policy, as Anderson conceded during the merits hearing. (*See* Trans. 720.)

151.    Vantage also mischaracterizes its relationship with PAI as "very adversarial" during the Chinook #6 well campaign (Trans. 647, Anderson), alleging that PAI created a "climate of fear on the rig" where Vantage "felt we had a gun to our head as soon as we go to the Gulf of Mexico and people were scared for their jobs." (Trans. 494, Halkett.) But Vantage's witnesses admitted on cross-examination that very little changed between the Chinook #5 and Chinook #6 well campaigns—PAI used the same company men during both campaigns, and Fernando Gama was the well operations manager during both campaigns. (*See* Trans. 683–84.)

152.    Vantage also relies on misleading statistics to argue that it exhibited "excellent" performance during the Chinook #6 well campaign. These statistics—*e.g.*, TRIR rate, INC-to-inspection ratio, client focus appraisals—are irrelevant and misleading, because a single error or lapse in judgment can have deadly consequences on even the safest rig.  Further, these statistics do not affect whether Vantage (a) materially breached the Contract, or (b) repeatedly failed to comply with Good Oil and Gas Field Practices.

153.    For example, Vantage's TRIR rate measures the rate of employee injuries or illnesses on the Titanium Explorer. (*See* Trans. 2644, Danenberger.) But the May 19 and July 19 events have *nothing* to do with employee injuries on the Titanium Explorer, and there is no allegation that Vantage failed to exercise Good Oil and Gas Field Practices because its

employees were injured on the job.  Similarly, Vantage's INC-to-inspection rate measures how often BSEE issued INCs during the Chinook #6 well campaign for any violation of the federal regulations governing deepwater drilling. Thus, the issuance of an INC is a violation of Applicable Law, which constitutes a failure to operate in accordance with Good Oil and Gas Field Practices. But the converse is not true: just because BSEE does *not* issue an INC does *not* mean that Vantage was operating in compliance with Good Oil and Gas Field Practices. Danenberger acknowledged this in his second report, explaining that the "assumption that compliance equates to safety is dangerous in that compliance takes precedence over broader safety considerations, effective safety management, innovation, and continuous improvement." (J-865 ¶ 41.)

154.    Finally, Vantage relies on irrelevant instances during the Chinook #6 well campaign when it did its job—*i.e.*, properly monitored and recorded fluid volume on the Titanium Explorer. (C.'s Posthearing Br. ¶¶ 105–07.)  But just because Vantage sometimes complied with the Contract does not mean that it always complied, and the events on May 19 and July 19 were breaches of the Contract that justified termination, as acknowledged by Vantage's witnesses. (*See* Trans. 2650 (Danenberger: "the performance of the driller was not adequate, in my opinion"); Trans. 944 (Anderson admitting that Vantage employees were terminated for failing "to follow the important Vantage policy halting operations of complicated procedures that might obscure detection of a fluid loss"); *see also* J-558 at Vantage 18760 ("Lack of awareness/good oilfield practices by the Vantage drill crew").)

155.    It takes only one material breach of the Contract to justify termination, and the evidence here proves that Vantage materially breached the Contract on May 19 and July 19, and repeatedly violated Good Oil and Gas Field Practices.  Vantage cannot avoid termination by

arguing that its performance was better on days other than May 19 or July 19. That just shows that Vantage should have been able to comply with the Contract on May 19 and July 19, but failed to do so.

### F. **Damages.**

156.    Even assuming that Vantage could overcome the numerous issues that plague its claims against Respondents, it still cannot recover damages in this proceeding for a variety of reasons. *First*, Article 19.9 of the Contract prevents Vantage from recovering any damages. *Second*, Vantage's damages methodology focuses on damages for the entire family of Vantage-related entities, rather than the two named Claimants in this proceeding, ignoring the fact that most of these Vantage-related entities are not named parties and have no standing to recover. *Third*, Vantage's damages methodology overstates damages by omitting the cost to use the Titanium Explorer, which neither Claimant owned until March 2017. This omission is fatal to Vantage's damages calculation, which is based on alleged lost profits. *Fourth*, Vantage does not account for the impact of its bankruptcy filing on its alleged damages. *Finally*, if the Tribunal determines that damages are recoverable under the Contract notwithstanding Article 19.9, then PAI and PVIS are entitled to over $101 million in damages on their counterclaims.

### 1.    **The parties explicitly allocated risk in the Contract, and Article 19.9 prevents Vantage from recovering any damages.**

157.    As explained in Respondents' Posthearing Brief, the parties extensively addressed the allocation-of-risk in the Contract. (*See* Resps.' Posthearing Brief at Section II.D.) Under the Contract, each parties' liability is limited by Articles 19.6.1, 19.6.3, and 19.6.4, which address liability for a variety of things, including damage to the well, environmental damage, and damage due to a "Blow Out." (J-1, Art. 19.6.) Through these provisions, Vantage faced very limited liability for its repeated operational failures and that liability was capped at $10 million

**RESPONDENTS' POSTHEARING RESPONSE BRIEF – PAGE 58**

(*See id.*)  Accordingly, PAI bears virtually all of the risk of loss under the Contract, which is why PAI could not tolerate Vantage's operational failures and properly terminated the Contract.

158.    Consistent with the parties' limitation of liability in Article 19.6, Article 19.9 contains a broad, reciprocal limitation of liability for both parties' direct and indirect damages, including lost profits and lost revenues, regardless of which governing law applies. As Judge Schwebel admitted during the merits hearing, Article 19.9 prevents Vantage from recovering any profits and lost revenues in this arbitration.   (Trans. 1795–96, Schwebel.)   Moreover, this interpretation of Article 19.9 comports with other evidence that Vantage has omitted from its posthearing brief.

159.    For example, just days before the Contract was signed in February 2009, the parties' representatives discussed Vantage's demand for "a total liability[] cap for the whole contract," and Vantage's request to delete Articles 19.6.1., 19.6.3, and 19.6.4.  (J-114.)  Notably, this January 15, 2009 e-mail does not discuss Article 19.9, which shows that Vantage already understood that Article 19.9 is—as Respondents have advocated—a broad limitation of liability that prevents all parties from recovering direct and indirect damages, including lost profits and lost revenues, from each other.  In other words, if Vantage's reading of Article 19.9 were correct, then one would expect to see Vantage asking to delete Article 19.9, because it would impose significant liability on Vantage for PVIS's lost profits and lost revenues.  But Vantage was instead focused only on Articles 19.6.1, 19.6.3, and 19.6.4, because they are the only provisions in the Contract under which Vantage would face any potential liability.

160.    The day after this email, Vantage's board of directors met to discuss signing the Contract.  (J-115.)  The minutes from this January 16, 2009 meeting show that Vantage did not want to assume the potential $10 million liability cap under Articles 19.6.1, 19.6.3, and 19.6.4,

but that Vantage recognized that it "may have to do it to win the contract." (*Id.*)   After concluding that the $10 million cap was Vantage's only liability and was "capped and insurable," Vantage's board authorized the company's entry into the Contract. (*Id.*)   These minutes confirm that Respondents' reading of Article 19.9 is correct, otherwise it would have been inaccurate to say that Vantage's liability was "capped and insurable."  Under Vantage's reading of Article 19.9, its liability to PVIS for lost profits and lost revenues would have been unknowable and uninsurable on January 16, 2009, when the board approved the Contract.

161.    Recognizing that its reading of Article 19.9 is inaccurate, Vantage now argues that English law should govern Article 19.9's meaning, because the laws of England and Wales governed the Contract when it was signed in February 2009.  But this argument ignores the legal impact of a novation and the fact that PAI—the only "COMPANY" who was a party to the Contract at termination—never agreed to apply English law to the Contract.[10]

162.    As explained before, a novation substitutes a new contract for one that already exists.  *See* Novation, *Blacks Law Dictionary* (10th ed. 2014).  Once the novation is executed, the parties are no longer bound by the prior contract.  *See Johnson v. PPI Tech. Servs., L.P.*, 3 F. Supp. 3d 553, 561 (E.D. La. 2014) (discussing novation in the maritime context).  Indeed, both English and maritime law recognize that a novation effectively extinguishes the prior contract. *See Scarf v. Jardine,* 7 App Cas 345, 351 (1882) (noting that a novation substitutes a new contract for an old contract under English law); Restatement (Second) of Contracts § 279 cmt. a; § 280 cmt. a (1981) (discussing "novation" as a type of "substituted contract" in which the "parties intend the new contract to replace all the provisions of the earlier contract"); 30 Williston on Contracts § 76:46 (4th ed.) ("Extinguishment of the prior contracts is a primary

---

[10] And neither party has pleaded ambiguity. (*See supra*, Section II.A.4.)

element of a novation, but it is also an end result of the novation.").[11]   The same is true under

Texas law.  *See Siegler v. Telco Leasing, Inc.*, 593 S.W.2d 850, 852 (Tex. Civ. App.—Houston

[1st Dist.] 1980, no writ) (holding that a novation requires proof of "(1) a previous, valid

obligation, (2) *an agreement of the parties to a new contract*, (3) the *extinguishment of the old*

*contract* and, (4) the validity of the new contract") (emphasis added).

163.     Because a novation is considered a new contract, it "is subject to the same

requirements as any other contract"—*i.e.*, offer, acceptance, meeting of the minds, and

consideration.  *See* Restatement (Second) of Contracts § 280 cmt. c (1981); *see also Johnson*, 3

F. Supp. 3d at 561 (noting that a novation must create a "new contract" under maritime law).  In

particular, while a novation may incorporate terms from the original contract, the parties must

agree anew to those terms for purposes of the novation.  Put differently, parties must reach a new

"meeting of the minds" for each term in the novation, including any term copied from the

original contract.  As the Fifth Circuit explains:

> A novation . . . is simply the creation of a new contract in place of
> an old one. The formation of the new contract must be by the
> process by which any other contract is made. Thus there must be
> offer and acceptance, or meeting of the minds, and consideration.
> To effect a novation, all the parties must intend to terminate the old
> agreement and to substitute or create one that is entirely new. In so
> doing, the parties may adopt the writing evidencing the old as an
> integration of some of the terms of the new; but in such cases the
> minds of the parties must have met again on those terms and
> provisions under such circumstances as would amount to a new
> contract.

---

[11] Courts cite the Restatement (Second) of Contracts and Williston on Contracts as relevant authority in the maritime context.  *See, e.g., Clevo Co. v. Hecny Transp., Inc.*, 715 F.3d 1189, 1194 (9th Cir. 2013); *Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1016 (9th Cir. 1999); *BP Expl. & Prod. Inc. v. Cashman Equip. Corp.*, 132 F. Supp. 3d 876, 884 (S.D. Tex. 2015); *Union Marine & Gen. Ins. Co. v. Am. Exp. Lines, Inc.*, 274 F. Supp. 123, 128 (S.D.N.Y. 1966).

*Crook v. Zorn*, 95 F.2d 782, 783–84 (5th Cir. 1938).[12]

164.    Applied here, the law of novation precludes any reference to English law when interpreting Article 19.9.  Both sides agree that the Third Novation novated the Contract; that the Third Novation incorporates Article 19.9 of the Contract; and that the Third Novation is governed by maritime law, as supplemented by Texas law.  Because the Third Novation is a ***new*** contract that replaces the Contract, Article 19.9 must be interpreted in light of the parties' intent at the time they executed the Third Novation, not at the time they executed the original Contract. Indeed, the parties necessarily reached a new "meeting of the minds" on each term included in the Third Novation—including  Article 19.9.  And the parties likewise agreed that the Third Novation would be governed by maritime law, as supplemented by Texas law.  Accordingly, by incorporating Article 19.9 into a ***new*** contract subject to ***new*** governing law, the parties confirmed that Article 19.9 should be interpreted under the same maritime and Texas law that governs every other provision in the Third Novation.  It is irrelevant that Article 19.9 was governed by English law when the Contract was first signed.  By integrating this provision into the Third Novation, the parties effectively renegotiated Article 19.9 under the ***new*** law governing their ***new*** contract.  To hold otherwise would ignore the parties' clear intent as expressed in the Third Novation and would apply English law to PAI, which never agreed to apply English law to the Contract.

165.    In sum, because Vantage's benefit-of-the-bargain damages methodology seeks alleged lost profits, and because Article 19.9 bars the recovery of all lost profits, Vantage cannot recover any damages in this proceeding.

---

[12] Although *Crook* applies Texas law, it has been cited as authority in the maritime context. *See Johnson v. PPI Tech. Services, L.P.*, 3 F. Supp. 3d 553, 561 (E.D. La. 2014).

2.   **Vantage's damages methodology improperly includes Vantage entities that are not parties to this proceeding.**

166.   VDDI and VDC are the only two Claimants in this arbitration.  Nevertheless, Vantage's damages expert has calculated damages for the entire family of Vantage entities, rather than just the two named Claimants. (J-856 ¶ 17 (defining "Vantage" as "Vantage Drilling International, along with its predecessors and affiliates"); J-860 ¶ 1 ("This report provides additional opinions and relies upon the Prior Report and incorporates those defined terms.").) Indeed, Vantage's damages expert did not specifically analyze whether either of the two Claimants suffered any damages. (Trans. 2229.)

167.   Moreover, Vantage's corporate representative and Chief Operating Officer, Doug Halkett, admitted during the merits hearing that Vantage does not even know how to calculate profits and losses for the two named Claimants, as opposed to the overall Vantage enterprise:

> Q.  The reason why I'm asking this question is because here we have two very specific claimants and if all of the finances are done on the higher level, then we can't differentiate between what losses they incurred versus the overall enterprise. It becomes difficult to analyze the damages being sought.
>
> So my question for you is very specific, and that is, when looking at these numbers, is there even a method or way of telling what specific subsidiaries have incurred as losses by virtue of their work and then the profit that they have gained? Just them within the overall Vantage enterprise?
>
> A.  I don't know.

(Trans. 263, Halkett.)

168.   As Dr. Maness, Respondents' damages expert, explained, "there's two Claimants in this case, and my task, as I understand it, is to understand the harm that was done to those two Claimants."  (Trans. 2377–78.) "You may be compensating the totality of Vantage correctly, but our task is not to calculate the damages to Vantage collectively. Our task is to calculate the damage to the two Claimants in this case."  (Trans. 2378.)

169.    Vantage's collective approach to calculating damages for the entire Vantage enterprise is improper and invites the Tribunal to exceed its authority. Because arbitration is a creature of contract, and because the only Vantage-related entities in this arbitration are the two named Claimants, it would be improper to award any damages to the collective family of Vantage entities, including Vantage Drilling International, the ultimate parent company. *See generally Orion Shipping & Trading Co. v. E. States Petroleum Corp. of Panama, S.A.*, 312 F.2d 299, 301 (2d Cir. 1963) (vacating an arbitration award where the arbitrator entered judgment against a non-party, even though the prevailing party offered evidence that the non-party was an alter-ego of the corporation that was a party to the arbitration); *Int'l Broth. of Elec. Workers, Local No. 265 v. O.K. Elec. Co., Inc.*, 793 F.2d 214, 216 (8th Cir. 1986) (holding that arbitrators exceed their powers when they determine rights and obligations of individuals who are not parties to the arbitration proceedings); *Langlais v. PennMont Ben. Servs., Inc.*, No. 11-CV-5275, 2012 WL 2849414, at *7 (E.D. Pa. July 11, 2012) (refusing to confirm arbitration award against any defendant who was not a signatory to the arbitration agreement), *aff'd*, 527 F. App'x 215 (3d Cir. 2013); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 846–47 (6th Cir. 2003) (arbitration panel exceeded its authority when it awarded punitive damages to parties who were not a party to the arbitration clause nor the arbitration proceeding).

170.    It makes no difference that Vantage Driller ROCO SRL—the true owner of the Titanium Explorer—is a member of the collective family of Vantage entities. *See Fried, Krupp, GmbH, Krupp Reederei Und Brennstoff-Handel-Seeschiffarht v. Solidarity Carriers, Inc.*, 674 F. Supp. 1022, 1027 (S.D.N.Y. 1987), *aff'd sub nom.*, 838 F.2d 1202 (2d Cir. 1987) (the "corporate relationship alone does not provide a basis for allowing a party to the arbitration to assert the claim of an affiliate who is not itself a party to the arbitration agreement"); *Dundas Shipping &*

*Trading Co., Ltd. v. Stravelakis Bros., Ltd.*, 508 F. Supp. 1000, 1003 (S.D.N.Y. 1981) (affirming decision to deny an award to a petitioner because the petitioner had entered into a back-to-back contract with a third corporation, not a party to the arbitration, who had sustained all of the loss as a result of the respondent's alleged breach).

171.    Vantage argues that it should not be penalized here for organizing its corporate structure to maximize tax efficiency. In other words, Vantage wants the Tribunal to ignore the distinct corporations within the Vantage family of entities, so that it can recover in this arbitration. But Vantage cannot have it both ways. It is free to structure its entities in ways that maximize tax benefits, but that freedom may have consequences in legal proceedings like this one. These other Vantage-related entities included in Vantage's damages methodology are not parties to this arbitration, and the Tribunal does not have authority over them. In light of Vantage's failure to submit a damages methodology focused only on the two named Claimants, VDDI and VDC, Vantage cannot recover any damages.

### 3.    Vantage overstates damages by not accounting for its lack of ownership of the Titanium Explorer.

172.    Vantage's only remaining damages methodology is benefit-of-the-bargain, and under that theory, even Vantage acknowledges that it must properly account for all costs associated with using a drillship that it did not own until March 2017.  (J-860 ¶ 18 (Dr. Jacobs explaining that his damages formula must account for "costs to Vantage"); *id.* ¶ 19 (same).)

173.    Vantage's damages methodology is flawed, however, because it does not consider the costs incurred to use the Titanium Explorer during the time that Vantage did not own it. These costs arise from the Bareboat Charter Agreement ("BCA"), which gave Vantage the right to use the drillship so long as Vantage paid the drillship's owner—Vantage Driller ROCO SRL. (C-1005.)   Vantage accounted for these payments as expenses or costs (C-1007), which its

damages expert admits must be considered to calculate any profits to Vantage. (Trans. 2572–73.) However, Vantage has not accounted for the costs under the BCA in its damages methodology, and thus Vantage's damages are overstated, if they exist at all. When this cost is considered, Vantage's damages vary between $0 and $98.9 million, depending on which entity pays the ready-stack costs for the Titanium Explorer, and which discount rate is used to calculate the present value of Vantage's damages.

174.    Vantage's posthearing brief claims that Respondents "consistently treated the Bareboat Charter as irrelevant to costs in the but-for world." (C.'s Posthearing Br. ¶ 377.) But this argument conveniently ignores the fact that Vantage did not produce the BCA to Respondents until the merits hearing. Thus, Respondents did not "sandbag" Vantage at all when arguing that the costs associated with the BCA must be included in Vantage's damages calculations. Rather, Respondents were only addressing a new piece of evidence that Vantage should have produced months earlier.

175.    Further, Vantage argues that its internal "allocation of profit within a corporation's capital structure is not a cost that should be considered in calculating benefit-of-the-bargain damages," but this confuses the issue. Did VDDI and VDC incur costs to facilitate its performance of the Contract or not? Additionally, any arguments based on Vantage's "capital structure" are irrelevant to the extent they pertain to the capital structure of Vantage entities that are not parties to this proceeding.  (*See supra* ¶¶ 166–171.)

176.    The weakness of this argument is evidenced by Vantage's heavy reliance on GAAP principles and "scholarly articles" for support. Indeed, the only cases cited by Vantage to support this argument (*see* C.'s Posthearing Br. ¶¶ 397–400) involve situations where a single company paid salaries and benefits to its executives, not where (as here) a family of entities

engaged in a series of agreements to enable one entity to perform under the Contract while at the same time maximizing the tax advantages for the entire family of entities.  In short, the cases do not involve a cost associated with using an asset that the party seeking recovery does not own and therefore, they are distinguishable.  Moreover, at least two of the cases acknowledge the "split of authority" on the very point for which Vantage cites them.  *See Stat Imaging LLC v. Medical Specialists, Inc.*, No. 13 C 1921, 2014 WL 5310256, at *3 (N.D. Ill. Oct. 17, 2014); *Sisters of Providence in Wash. v. A.A. Pain Clinic, Inc.*, 81 P.3d 989, 1006 (Alaska 2003).

177.    Although Vantage complains that the end result of considering the costs associated with the BCA in calculating benefit-of-the-bargain damages would be little to no recovery for lost profits, that is exactly what Vantage bargained for in Article 19.9 of the Contract. Further, Vantage's decision to structure its entities and agreements to maximize tax advantages does not automatically mean that Vantage can never recover lost profits in any dispute, as Vantage implies in paragraphs 398–399 of its Posthearing Brief.  Instead, it simply means that this structure must still be considered when calculating damages.  In this case, it so happens that properly considering the various agreements and the costs associated with the BCA adversely impacts Vantage's damages.

178.    Vantage claims that the BCA was not like "an arrangement that is found between unaffiliated third parties . . . ." (C.'s Posthearing Br. ¶ 393.) But it makes no difference that Vantage wants to claim that the BCA was nothing more than a means to allocate profits between Vantage-related entities, or that if Vantage had entered into a similar agreement with a true third party, the terms would have been different.  What matters is that the BCA was required for Vantage to fulfill its obligations under the Contract, and therefore, it must be accounted for in any lost profits damages methodology put forth by Vantage.

179.     In sum, Vantage's benefit-of-the-bargain damages methodology omits a key cost—the payments to use the Titanium Explorer—and this omission overstates Vantage's damages by hundreds of millions of dollars.  Properly accounting for this cost reduces Vantage's damages to a range between $0 and $98.9 million, depending on whether there was a markup under the BCA and which discount rate is used to calculate the present value of Vantage's damages.

180.     Because Dr. Jacobs testified that no markup or transfer price was charged under the BCA, Vantage's damages should be $0.  (*See* Trans. 2220 (admitting no transfer price); *id.* 2331 (same).)  Further, because there is no evidence that Vantage is paying the ready-stack costs for the Titanium Explorer, the most Vantage can recover in damages is $24.3 million. (J-901, Maness Second Supplemental Report at ¶ 23.)

**4.     Vantage's damages methodology does not account for the impact of the bankruptcy proceeding.**

181.     Vantage's final damages methodology is based on the difference in present value of expected cash flows between the actual world—in which the Contract was terminated on August 31, 2015—and the but-for world—in which the Contract continued uninterrupted until the natural end of its term.  (J-888 ¶ 3.)  To properly calculate this difference in value, however, Vantage must account for all factors that impact its operations and profitability in both the actual and but-for worlds, including the bankruptcy that Vantage went through in the "actual world." (*Id.*)  Yet Vantage's damages expert ignores the fact that Vantage filed for bankruptcy after the alleged breach, which allowed Vantage to substantially restructure its debt and lower its payment obligations.  (*Id.*)  This is a cost avoided by not having to perform its contractual promises and must be accounted for in Vantage's damages methodology.

182.    By ignoring the impact of its bankruptcy in the but-for world, Vantage has overstated its alleged damages by approximately *$310 million*.  (*Id.* at ¶ 11.)  This is a significant omission and shows that Vantage is overstating its alleged damages.

183.    Vantage claims that Respondents are attempting "to derive a benefit from the losses it placed upon Vantage."  But Respondents' argument is simply a reality of the damages methodology advanced by Vantage.  Similar to its use of corporate structure to maximize tax advantages, Vantage cannot take advantage of its bankruptcy when it comes to its debt and payment obligations, while ignoring how that bankruptcy impacts its ability to recover damages in this proceeding.

### 5.    PAI and PVIS are entitled to over $100 million in damages on their counterclaims.

184.    As established at the merits hearing and in Respondents' posthearing briefing, including Section G below, Vantage engaged in a variety of misconduct constituting fraud, bribery, and aiding and abetting breaches of fiduciary duty by Zelada and Musa.  Although Vantage claims that Respondents have not established any right to recover on their counterclaims, this argument ignores the significant evidence from the merits hearing and summarized below.  Vantage's misconduct entitles PAI and PVIS to damages on their respective counterclaims, because they are seeking (among other things) disgorgement of Vantage's ill-gotten gains.  (J-850 at App'x A ¶¶ 6–8, 26, 30–32.)

185.    During the merits hearing, Dr. Jacobs acknowledged that Vantage's ill-gotten gains are reflected in Exhibit J-753, because it shows the alleged profits earned by Vantage while working for PAI.  (Trans. 2353.)  As explained above, PAI and PVIS do not believe that Vantage earned any profits under the Contract when the costs under the BCA are properly considered.

However, if the Tribunal disagrees and decides that Vantage did earn profits under the Contract, then PAI and PVIS are entitled to over $100 million in disgorgement damages.

186.     These damages are calculated as follows based on Exhibit J-753:  (a) during 2012, Vantage incurred a loss of $3,681,235; (b) during 2013, Vantage earned profits of $60,926,133; (c) during 2014, Vantage earned profits of $1,057,827; and (d) during 2015, Vantage earned profits of $43,526,577. (*See* J-753.) Adding these figures together results in a total of $101,829,302, which is the amount of damages to which PAI and PVIS are entitled on their counterclaims.

## G.  PAI's and PVIS's Counterclaims

187.     Vantage falsely argues that the counterclaims asserted by PAI and PVIS should be rejected.  (C.'s Posthearing Br. ¶¶ 434–69.)  All of these counterclaims are valid and proven for the reasons given below.

### 1.  Vantage assisted and participated in a breach of fiduciary duty.

188.     Musa and Zelada were limited agents of PVIS and were entrusted to protect PVIS's interests while negotiating the Contract. (J-52 (Musa); J-33 (Zelada).) Nevertheless, Musa and Zelada solicited and accepted bribes from Vantage in exchange for awarding the Contract to Vantage, and thereby breached their fiduciary duties to PVIS and acted outside the course and scope of their relationship with PVIS.  (R.'s Posthearing Br. ¶¶ 97–100; 110–111; 117–133; 140–146.)

189.     Through its various officers, directors, and agents—Su, Bragg, O'Leary, and Padilha—Vantage knowingly or with conscious avoidance facilitated the bribery scheme, and thus participated in the breaches of fiduciary duty by Zelada and Musa. (*Id*.)  Accordingly, Respondents are entitled to judgment on their breach-of-fiduciary duty claim. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 574 (1942) ("It is settled as the law of this State that

where a third party knowingly participates in the breach of a duty of a fiduciary, such third party

becomes a joint tortfeasor with the fiduciary and is liable as such.")

    **2.    Vantage is liable for breach of contract, common-law fraud, and fraudulent inducement.**

190.    In the unlikely event that the Contract is found to be valid and enforceable, the

evidence proves that Vantage fraudulently induced PVIS to sign the Contract through various

material misrepresentations, including the ethics representations in Articles 10.14.1, 10.14.2, and

10.14.3; the applicable-law representation in Article 10.15; and the illegal-information-brokering

representation in Article 10.20. Vantage breached each of these representations by paying bribes

to obtain the Contract. (R.'s Posthearing Br. ¶¶ 196–208.)

191.    The evidence also shows that Bragg failed to disclose what he knew about the

bribery scheme in 2011 during Vantage's dispute with Su and in 2012 during his

communications with Padilha, which both give rise to additional claims for fraud and fraudulent

inducement.  (*See* J-1, Art. 10.20.4, 10.21.)

192.    Direct and circumstantial evidence proves that Vantage knew these

representations or omissions were false, that Vantage knew or had reason to know that PVIS

(and later PAI) would rely on them, and that PVIS (and later PAI) entered and maintained the

Contract based on them. (*See e.g.*, R.'s Posthearing Br. ¶¶ 97–100; 110–111; 117–133; 140–146;

196–208.) The record likewise reflects that PVIS and PAI suffered damage as a result of

Vantage's fraud and are thus entitled, at minimum, to recover Vantage's illegally obtained

profits. *Swinnea v. ERI Consulting Engineers, Inc.*, 481 S.W.3d 747, 753 (Tex. App.—Tyler

2016, no pet.) (noting that forfeiture and equitable relief is a proper measure of damages for

fraud and fraudulent inducement).

193.    In the alternative, Vantage's bribery and corruption breached its obligations under Articles 10.14.2, 10.14.3, 10.20.1, 10.20.2, and 10.15 of the Contract, which bars Vantage from any recovery in this arbitration, and nominal damages should be awarded to the extent that proof of damages is required.  (*See generally* J-850 ¶¶ 63–64.)

### 3.    The Contract is void, voidable, unconscionable, and must be rescinded.

194.    As explained previously, Vantage's bribery and corruption render the Contract void, voidable, and unconscionable.  (J-850 ¶¶ 59–60; R.'s Posthearing Br. ¶¶ 190–195.)  If the Contract is neither void nor unconscionable, the bribery requires that the Contract be rescinded and that Vantage return all consideration paid to it by Respondents.  (J-850 ¶ 57.)

### 4.    The evidence supports Respondents' civil RICO claim.

195.    Through its agents Bragg, O'Leary, Su, and Padilha, Vantage committed multiple acts of bribery, including agreements to pay and the payments themselves, that formed a pattern and practice of racketeering activity in violation of 18 U.S.C. § 1962(c).  The various actors in the corruption scheme were independent from the overall RICO enterprise, agreed to act for their own benefit, and actively concealed their illegal activities from PVIS and PAI.  (J-850 ¶¶ 47–58; R.'s Posthearing Br. ¶¶ 97–100; 110–111; 117–133; 140–146.)  Consequently, Vantage has violated RICO.

### 5.    The evidence supports Respondents' conspiracy claim.

196.    As shown during the hearing, Vantage and its officers, directors, shareholders, vice-principals, and agents—in addition to Su's entities TMT and Oresta—conspired to develop a scheme to obtain the Contract through bribery and corruption.  (R.'s Posthearing Br. ¶¶ 97–100; 110–111; 117–133; 140–146.)  This conspiracy was effectuated with the full knowledge of Vantage (and without the knowledge of PVIS and PAI), which is sufficient to prove an actionable civil conspiracy under governing law.  (*See* J-850 ¶¶ 61–62.) Bragg unquestionably

joined the conspiracy no later than 2011, when he learned of the bribery during Vantage's dispute with Su, and continued to participate in it during 2012 and thereafter, following Padilha's express disclosure of the bribes and Bragg's failure to withdraw from the conspiracy.

### 6. The evidence supports Respondents' negligent-misrepresentation claim.

197.    As described above, Vantage made multiple false representations that were intended to guide PVIS and PAI in their decision to execute the Contract. (*See infra* Section G.2.) Vantage failed to exercise reasonable care or competence in making these misrepresentations, PVIS and PAI relied on them, and thereby suffered damage as a result. Accordingly, Respondents are entitled to economic damages for negligent misrepresentation.

### 7. The evidence supports Respondents' claim for unjust enrichment/money had and received.

198.    Even if Vantage's conduct is found not to be fraudulent, Vantage still has been unjustly enriched by its bribery and corruption. Though Vantage claims unjust enrichment is not a viable cause of action under maritime law (C.'s Posthearing Br. ¶ 455), Respondents have repeatedly explained that unjust enrichment is a form of remedy, not a specific claim for relief. (J-850 ¶ 67 (citing *Mowbray v. Avery*, 76 S.W.3d 663, 679–80 (Tex. App.—Corpus Christi 2002, pet. denied).)

199.    Money had and received is the claim for relief that supports the remedy of preventing unjust enrichment. *Mary E. Bivins Found. v. Highland Cap. Mgmt.*, 451 S.W.3d 104, 112 (Tex. App.—Dallas 2014, no pet.). The sole inquiry of this claim is whether the defendant holds money that belongs to the plaintiff. *Staats v. Miller*, 243 S.W.2d 686, 687–88 (Tex. 1951).

200.    Here, there is overwhelming evidence that Vantage procured the Contract through bribery and corruption—the exact type of unjust enrichment that gives rise to a claim for money had and received.  *See Mowbray*, 76 S.W.3d at 679 ("A party may recover under an unjust

enrichment theory where a person has obtained a benefit from another due to fraud, duress or

taking of undue advantage."). And, because proof of inequity does not turn on whether Vantage

engaged in any wrongdoing, all of the benefits the Vantage obtained through these unjust

circumstances must be returned to Respondents.

### 8.    The evidence entitles Respondents to a constructive trust.

201.    Vantage's bribery and corruption was no mere breach of contract—it was a

fraudulent scheme that allowed Vantage to wrongfully obtain the Contract and its related profits,

if any. Sworn testimony from this proceeding and from the Brazilian criminal investigation show

that Musa and Zelada accepted bribes from Vantage in exchange for manipulating the bidding

process to allow Vantage to "win" the Contract. (R's Posthearing Br. ¶¶ 97–111; 117–130.) A

constructive trust is an equitable remedy created to prevent just this type of unjust enrichment.

*Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 210 (Tex. App.—Houston

[1st Dist.] 2014, pet. denied). Because of Vantage's actual fraud, unjust enrichment, or traceable

gain from the Contract, Respondents are entitled to a constructive trust.

### 9.    Respondents have proved damages arising from each of their counterclaims.

202.    Vantage cannot avoid liability for assisting and facilitating breaches of fiduciary

duty by arguing that PVIS and PAI suffered no damages or were somehow benefited by the

corrupt Contract.  This argument has been squarely rejected by both Texas and federal courts:

> It is beside the point for either [the former employee] or [payor] to
> say that [the buyer] suffered no damages because it received full
> value for what it has paid and agreed to pay. A fiduciary cannot
> say to the one to whom he bears such relationship: You have
> sustained no loss by my misconduct in receiving a commission
> from a party opposite you, and therefore you are without remedy.
> It would be a dangerous precedent for us to say that unless some
> affirmative loss can be shown, the person who has violated his
> fiduciary relationship with another may hold on to any secret gain
> or benefit he may have thereby acquired. It is the law that in such
> instances if the fiduciary 'takes any gift, gratuity, or benefit in

> violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.'

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 573 (Tex. 1942).

> If an agent to sell effects a sale to himself, under the cover of the name of another person, he becomes, in respect to the property, a trustee for the principal; and, at the election of the latter, seasonably made, will be compelled to surrender it, or, if he has disposed of it to a bona fide purchaser, to account not only for its real value, but for any profit realized by him on such resale. And this will be done upon the demand of the principal, although it may not appear that the property, at the time the agent fraudulently acquired it, was worth more than he paid for it. The law will not, in such case, impose upon the principal the burden of proving that he was, in fact, injured, and will only inquire whether the agent has been unfaithful in the discharge of his duty.

*United States v. Carter*, 217 U.S. 286, 309 (1910). And even if there were no remedy for the injuries suffered by PAI and PVIS, then courts award at least nominal damages to prevent a wrongdoer like Vantage from avoiding liability. *See Hancock v. Variyam*, 400 S.W.3d 59, 65 (Tex. 2013).

203.    Vantage also cannot avoid liability by arguing that Respondents did not present their own damages expert. Respondents have consistently pleaded that they are entitled to damages based on the disgorgement of all of Vantage's ill-gotten gains, which does not require expert testimony, although Respondents co-opted Vantage's damages expert during the merits hearing and obtained his admission that Vantage's documents establish Respondents' damages. (Trans. 2353; J-753; see also R.'s Posthearing Br. ¶¶ 292–93.)

204.    The evidence proves that Vantage engaged in a variety of misconduct constituting (among other things) breaches of fiduciary duty, fraud, negligent misrepresentation, and conspiracy. Vantage's misconduct entitles PAI and PVIS to damages on their respective

counterclaims, because they are seeking disgorgement of Vantage's ill-gotten gains. (J-850 at Appx. A ¶¶ 6–8, 26, 30–32.) Assuming Vantage earned any profits on the Contract—and that is by no means certain—Vantage must disgorge over $100 million.  (*See infra*, Section F.5.)

### III. CONCLUSION

For all these reasons and those stated in earlier briefing and during the merits hearing, Vantage cannot recover on any of its claims, and PAI and PVIS can recover on their affirmative claims and are entitled to an award of damages, attorneys' fees, pre- and post-judgment interest, costs, and expenses, in excess of $100 million.

Appendix 004648

# Exhibit 95

Appendix 004649

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
AMERICAN ARBITRATION ASSOCIATION

IN THE MATTER OF ARBITRATION BETWEEN

Case No. 01-15-0004-8503

Vantage Deepwater Company
and Vantage Deepwater Drilling, Inc.,

CLAIMANTS,

-vs-

Petrobras America Inc.,
Petrobras Venezuela Investments & Services, BV,
and Petróleo Brasileiro S.A. – Petrobras,

RESPONDENTS.

_____

## CLAIMANTS' BRIEF ON GOVERNING LAW

13 May 2016

_____

BEFORE

David Keltner, Esq.
Kelly Hart & Hallman LLP
201 Main St., Suite 2500
Fort Worth, TX 76102
[Tel.] (817) 878-3560
david.keltner@kellyhart.com

Prof. William W. Park
Boston University
  School of Law
765 Commonwealth Ave.
Boston, MA 02215
[Tel.] (617) 353-3149
wwpark@bu.edu

James Gaitis, Esq.
International Arbitration
  Chambers
P.O. Box 1213
Whitefish, MT 59937
[Tel.] (406) 224-4228
gaitis1@aol.com



Exhibit

**J-837**

No. 01-150004-8503

Appendix 004650

# TABLE OF CONTENTS

Table of Authorities ............................................................................................... 3

Introduction ........................................................................................................... 7

Factual Background ............................................................................................... 9

I.  The Choice of Law Provisions  in The Agreements Between
    Vantage and Petrobras ................................................................................ 9

II. The *Titanium Explorer*'s Operations Under the Third Novation
    Agreement and the Claims at Issue  in These Arbitration
    Proceedings............................................................................................... 11

Argument .............................................................................................................. 14

I.  The Controlling Law In This Case Must Be Determined Under
    OCSLA ....................................................................................................... 14

II. Under OCSLA, Maritime Law Applies In This Case ............................... 18

III. Alternatively, the Parties' Agreement That U.S. Maritime Law Is
    Controlling Should Be Enforced ............................................................... 21

Conclusion ............................................................................................................ 24

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ace Am. Ins. Co. v. M-I, LLC,*
    699 F.3d 826 (5th Cir. 2012) ........................................................................ 20

*Chevron Oil Co. v. Huson,*
    404 U.S. 97 (1971) ...................................................................................... 15

*Clevo Co. v. Hecny Transp., Inc.,*
    715 F.3d 1189 (9th Cir. 2013) ................................................................. 22, 23

*Corbitt v. Diamond M. Drilling Co.,*
    654 F.2d 329 (5th Cir. 1981) ........................................................................ 20

*Curtis v. Schlumberger Offshore Serv., Inc.,*
    849 F.2d 805 (3d Cir. 1988) ......................................................................... 16

*In re Deepwater Horizon,*
    753 F.3d 570 (5th Cir. 2014) ........................................................................ 19

*Demette v. Falcon Drilling Co.,*
    280 F.3d 492 (5th Cir. 2002), *overruled on other grounds,*
    *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,*
    589 F.3d 778 (5th Cir. 2009) (en banc) ................................................. 16, 19, 20

*Diamond Offshore Co. v. A&B Builders, Inc.,*
    302 F.3d 531 (5th Cir. 2002), *overruled on other grounds,*
    *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,*
    589 F.3d 778 (5th Cir. 2009) (en banc) ......................................................... 16

*Entergy Ark, Inc. v. Neb.,*
    358 F.3d 528 (8th Cir. 2004) ........................................................................ 23

*F.W.F. Inc. v. Detroit Diesel Corp.,*
    494 F.Supp.2d 1342 (S.D. Fla. 2007), *aff'd,*
    308 F. App'x 389 (11th Cir. 2009) .................................................................. 9

*Flores v. Am. Seafoods Co.,*
    335 F.3d 904 (9th Cir. 2003) ........................................................................ 22

*Gulf Offshore Co. v. Mobil Oil Corp.,*
    453 U.S. 473 (1981) ................................................................................ 15, 16

*The Harrisburg,*
    119 U.S. 199 (1886) ........................................................................ 22

*Int'l Marine, L.L.C. v. FDT, L.L.C.,*
    619 F. App'x 342 (5th Cir. 2015) (per curiam) ......................................... 22, 23

*Kossick v. United Fruit Co.,*
    365 U.S. 731 (1961) ........................................................................ 20

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.,*
    754 F.2d 1223 (5th Cir. 1985) ............................................................ 19

*Lirette v. Popich Bros. Water Transp., Inc.,*
    699 F.2d 725 (5th Cir. 1983) .............................................................. 19

*Long Island Sav. Bank, FSB v. United States,*
    503 F.3d 1234 (Fed. Cir. 2007) ........................................................... 23

*Mariner Energy, Inc. v. Marathon Oil Co.,*
    2008 WL 6168755 (Am. Arbitration Ass'n 2008) (Sprouse, Arb.) ................... 17

*Norfolk S. Ry. Co. v. Kirby,*
    543 U.S. 14 (2004) ......................................................................... 22

*In re Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of
    Mexico, on April 20, 2010,*
    808 F.Supp.2d 943 (E.D. La. 2011)..................................................... 19, 20

*Petrobras Am., Inc. v. Vicinay Cadenas, S.A.,*
    815 F.3d 211 (5th Cir. 2016) ............................................................. 16

*Rodrigue v. Aetna Cas. & Sur. Co.,*
    395 U.S. 353 (1969) ................................................................... 15, 18

*Smith v. Pan Air Corp.,*
    684 F.2d 1102 (5th Cir. 1982) ............................................................ 19

*Smith v. Penrod Drilling Corp.,*
    960 F.2d 456 (5th Cir. 1992) .............................................................. 19

*Subaru of Am., Inc. v. David McDavid Nissan, Inc.,*
    84 S.W.3d 212 (Tex. 2002) ................................................................. 9

*In re Tasch, Inc.,*
    46 F. App'x 731 (5th Cir. 2002)......................................................... 23

*Tenn. Gas Pipeline v. Houston Cas. Ins.,*
    87 F.3d 150 (5th Cir. 1996) ................................................ 15, 18, 19

*Theriot v. Bay Drilling Corp.,*
    783 F.2d 527 (5th Cir. 1986) ............................................ 20

*Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge,*
    424 F.2d 684 (5th Cir. 1970) ............................................ 19

*Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.,*
    895 F.2d 1043 (5th Cir. 1990) .................................... 17, 19

*United States v. Maine,*
    420 U.S. 515 (1975) .......................................................... 14

## Constitutional Provisions, Rules, and Statutes

43 U.S.C. 1301 et seq. ........................................................... 14

43 U.S.C. § 1311(a) .............................................................. 14

43 U.S.C. § 1312 .................................................................... 14

43 U.S.C. § 1331(a) .............................................................. 15

43 U.S.C. § 1332(1) .............................................................. 15

43 U.S.C. § 1332(2) .............................................................. 18

43 U.S.C. § 1333(a) .............................................................. 17

43 U.S.C. § 1333(a)(1) ...................................................... 7, 15

43 U.S.C. § 1333(a)(2) .......................................................... 18

43 U.S.C. § 1333(a)(2)(A) ...................................................... 16

43 U.S.C. §§ 1331-1333 ........................................................ 17

33 C.F.R. § 140.10 ................................................................ 20

## Other Authorities

1 Thomas J. Schoenbaum,
    ADMIRALTY AND MARITIME LAW § 5-1 (5th ed. 2014) ........................................ 23

*Award in ICC Case No. 6474,*
    XXV Y.B. Comm. Arb. 279 (2000) ................................................................... 21

*Interim Awards and Final Award in ICC Case No. 4145,*
    XII Y.B. Comm. Arb. 97 (1987) ...................................................................... 21

N. Blackaby *et al.*,
    *Redfern and Hunter on International Arbitration* ¶3.94 (5th ed. 2009) ........ 21

S. REP. NO. 411, 83d Cong., 1st Sess. (1953) ............................................................. 15

INTRODUCTION

This arbitration involves a contract dispute between Claimants Vantage Deepwater Company and Vantage Deepwater Drilling, Inc. (collectively, "Vantage") and Respondents Petróleo Brasiliero S.A. – Petrobras, Petrobras America, Inc., and Petrobras Venezuela Investments & Services B.V. (collectively, "Petrobras"). The dispute arises out of oilfield exploration work performed by Vantage's drillship *Titanium Explorer* under a contract for drilling services with Petrobras.

For two alternative reasons, the general maritime law of the United States should be applied as the governing law in resolving the parties' dispute. First, Vantage and Petrobras' dispute arises from the *Titanium Explorer*'s operations to explore, develop or produce oil in the Gulf of Mexico, and specifically on the outer Continental Shelf ("OCS") off the coast of the State of Louisiana. The fact that this case arises out of a contractual dispute concerning the exploration for oil on the OCS is determinative of the governing law. Through a statute known as the Outer Continental Shelf Lands Act ("OCSLA"), the United States has mandated that the Constitution, laws, and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf. 43 U.S.C. § 1333(a)(1). Significantly, OCSLA's assertion of jurisdiction and governing law includes "all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed [on the OCS], which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom." *Id.*

Because this proceeding arises from a contract dispute concerning the *Titanium Explorer*'s operations to explore, develop or produce oil on the OCS, it falls

squarely within OCSLA's assertion of jurisdiction and governing law.  Thus, the panel should look to OCSLA to determine the law governing this dispute.  And, as will be explained herein, because the parties' agreement is a maritime contract, under OCSLA's choice of law provisions maritime law will control the resolution of their dispute.

Second, beyond OCSLA's direction that maritime law is controlling, the parties themselves also chose that maritime law should apply.  Recognizing the maritime nature of the work to be performed by the *Titanium Explorer*, Vantage and Petrobras expressly identified U.S. maritime law as the controlling law regarding their agreement.  *See* Third Novation Agreement, at § 24.1 ("This Contract shall be governed by, interpreted, enforced and construed in accordance with the general maritime law of the United States of America . . .").  In this regard, the only potential alternative to maritime law identified by Vantage and Petrobras in their agreement was Texas law, but Texas law could be invoked only "[i]f, for any reason, the general maritime law of the United States of America is not applicable." *Id.*  Because U.S. maritime law plainly applies to the parties' dispute, there is no basis for the panel to default to Texas law.

For these reasons, the panel should apply the general maritime law of the United States to resolve the claims and counterclaims asserted by the parties in this arbitration.[1]

---

1.   It is worth noting that the governing law question is not merely academic in this dispute.  To the contrary, the Tribunal's decision on governing law will bear directly and substantially on the resolution of the claims at issue.  For example, Vantage has asserted that the drilling contract at issue imposed on each party a duty of good faith and fair

FACTUAL BACKGROUND

I.    THE CHOICE OF LAW PROVISIONS IN THE AGREEMENTS BETWEEN VANTAGE AND PETROBRAS

In February 2009, Vantage Deepwater Company ("VDEEP") and Petrobras Venezuela Investments & Services B.V. ("PVIS") entered an eight year contract under which Vantage agreed to provide PVIS with a state-of-the art drilling rig, the *Titanium Explorer*, along with its crew and related equipment, for use in the exploration and production of offshore oil and gas assets. *See generally* Agreement for the Provision of Drilling Services ("Drilling Contract"); *see also id.*, at 4 (describing the work to be performed by the *Titanium Explorer* under the Drilling Contract as "Drilling Operations," which in turn were defined as "such operations as are directly or indirectly related to drilling, plug-back and side-track, testing or evaluation, deepening, completing or abandoning any [oil] Well"). At the same time, a "Form of Payment and Performance Guaranty" was executed by Petróleo Brasiliero S.A. – Petrobras ("Petrobras Brazil"), guaranteeing the performance and payment obligations assumed by PVIS under the Drilling Contract.

---

dealing, and that Petrobras violated that duty. Petrobras has responded that this claim must fail "because applicable Texas law does not recognize such a claim for relief." *See* Respondents' First Amended Answering Statement and Counterclaim, at 30.

Although Petrobras' characterization of Texas law is not entirely accurate, claims regarding good faith and fair dealing are treated quite differently under Texas law as opposed to the general maritime law of the United States. Under maritime law, "[e]very maritime contract imposes an obligation of good faith and fair dealing between the parties in its performance and enforcement." *See, e.g., F.W.F. Inc. v. Detroit Diesel Corp.*, 494 F.Supp.2d 1342, 1359 (S.D. Fla. 2007), *aff'd*, 308 F. App'x 389 (11th Cir. 2009). However, under Texas law, "the duty arises only when a contract creates or governs a special relationship between the parties." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225 (Tex. 2002). Thus, the resolution of Vantage's good faith and fair dealing claim may depend entirely on the governing law applied to this dispute.

---

On October 27, 2014, a "Third Novation and Amendment Agreement" was entered into by, *inter alia*, VDEEP, Vantage Deepwater Drilling, Inc. ("VDDI"), PVIS, and Petrobras America, Inc. ("PAI").  Under the Third Novation Agreement, PVIS novated the Drilling Contract to PAI and VDEEP novated the agreement to VDDI.  *See* Third Novation Agreement, at pp. 2-3.  The Third Novation Agreement was entered into in anticipation of the *Titanium Explorer* undertaking drilling operations in the Gulf of Mexico.   *Id.*, at 3 ("PAI wishes to use the [*Titanium Explorer*] to carry out operations in the U.S. Gulf of Mexico.").

The Third Novation Agreement included a "Governing Law" clause, which provided that the Agreement would be "governed by, interpreted, enforced, and construed in accordance with the general maritime law of the United States of America, not including, however, any of its conflicts of law rules which would direct or refer the Parties to the laws of any other jurisdiction."  *Id.*, at 9 (§ 24.1); *see also id.*, at 15 (§ 12.1) ("This Novation Agreement shall be governed by and construed in accordance with the same laws of the Contract as provided in the newly amended Article 24.1 of the Contract.").   The choice of law clause in the Third Novation Agreement further provided that, "[i]f, for any reason, the general maritime law of the United States of America is not applicable, then the Contract will be governed by the laws of the State of Texas, not including, however, any of its conflicts of law rules which would direct or refer the Parties to the laws of any other jurisdiction."  *Id.* at 9 (§ 24.1).  Thus, under the Third Novation Agreement the parties' contract is governed by, interpreted, enforced, and construed in accordance with the general

maritime law of the United States, except where maritime law is inapplicable, in which case the parties chose the laws of the State of Texas as a gap-filler.

Finally, the Third Novation Agreement included what is commonly known as a "merger clause," providing that the Third Novation "contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes any previous understandings, commitments, agreements or representations, whether oral or written." *Id.*, at 15 (§ 10.3).

## II. THE *TITANIUM EXPLORER'S* OPERATIONS UNDER THE THIRD NOVATION AGREEMENT AND THE CLAIMS AT ISSUE IN THESE ARBITRATION PROCEEDINGS

It is undisputed that, pursuant to the Third Novation Agreement, from October 2014 through August 31, 2015 (the date Petrobras declared the parties' contract was terminated), Petrobras required Vantage to move the *Titanium Explorer* to the Gulf of Mexico, and specifically the OCS off the coast of Louisiana, to conduct operations involving the exploration, development, or production of oil.

In July 2015, Petrobras suspended the *Titanium Explorer's* work, contending that the drillship was not operating safely and that Vantage had failed to implement an effective remediation plan in response to two operational incidents. Vantage disputed Petrobras' contentions and attempted unsuccessfully during July and August to negotiate with Petrobras regarding its concerns. On August 31, 2015, Petrobras announced that it was unilaterally terminating the parties' contract. On the same date, Vantage initiated these arbitration proceedings, filing its Demand for Arbitration against PVIS, PAI, and Petrobras Brazil.

Vantage has asserted that it is entitled to a declaratory judgment that Petrobras did not have the unilateral right to prematurely terminate the parties' contract. *See* Vantage's Second Amended Demand for Arbitration, at 7-8. Vantage has also asserted a claim that Petrobras breached the parties' agreement by, *inter alia*, wrongfully terminating the agreement on pretextual grounds. *See id.*, at 8-11. Finally, Vantage has asserted that Petrobras' actions also constituted a breach of the duty of good faith and fair dealing. *See id.*, at 11-12.

Vantage has requested an award of monetary damages to fully compensate it for the actual losses it has sustained due to unpaid invoices, wrongful work stoppages, wrongful applications of zero or reduced rates, and Petrobras' wrongful termination of the contract. Vantage has also requested an award of damages to compensate it for Petrobras' breach of the duty of good faith and fair dealing, as well as attorneys' fees and costs and pre-and post-judgment interest. In addition, to the extent necessary to satisfy any damages awarded, Vantage seeks to enforce the Form of Payment and Performance Guaranty executed by Petrobras Brazil. *See id.*, at 12-13.[2]

For its part, Petrobras has denied all of Vantage's claims. In addition to its initial assertions that the parties' agreement was properly terminated based on Vantage's allegedly unsafe operations, in its arbitration filings Petrobras has also asserted that the agreement is unenforceable by Vantage because it was illegally obtained through bribery. *See, e.g.*, Respondents' First Amended Answering

---

2. Based on information reviewed to date, Vantage expects to assert additional claims against Petrobras Brazil, and will do so before the amendment deadline established by the Tribunal.

Statement and Counterclaim, at 1 ("Because the drilling contract was illegally procured in 2009 and properly terminated on August 31, 2015, Claimants are not entitled to any relief in this arbitration, and Respondents are entitled to damages.").

Petrobras has also asserted a counterclaim against Vantage.  In this regard, Petrobras specifically invoked Article 24.2 of the Third Novation Agreement, which provides that any dispute between the parties shall be exclusively resolved "using direct negotiations and arbitration."   According to Petrobras, Vantage breached Article 24.2 by failing to engage in direct negotiations in good faith before filing this arbitration.  Based on this claim, Petrobras seeks to recover all of its attorneys' fees, consulting fees, and costs associated with this arbitration. *See id.*

Finally, Petrobras has asserted that both PVIS and Petrobras Brazil are not proper parties to this arbitration proceeding.   As to PVIS, Petrobras points to Articles 2.1 and 2.2 of the Third Novation Agreement, in which PAI replaced PVIS as a party to the Agreement and assumed PVIS's rights and obligations under the Agreement.  As to Petrobras Brazil, Petrobras maintains that  Petrobras Brazil's only connection to the parties' agreement is the Form of Payment and Performance Guaranty it executed in February 2009, that the Guaranty is construed according to the law of England and Wales, and that under this controlling law, Vantage's claim is premature.  More specifically, Petrobras maintains that, before any claim against Petrobras Brazil could be ripe for adjudication, there must first be a determination that PAI has no right of offset, counterclaim, or other defense available to it on Vantage's underlying claims for relief, and there must be a default, or failure to pay,

by PAI.  *See* Respondents' First Amended Answering Statement and Counterclaim, at 10-11.  For these reasons, according to Petrobras, Vantage cannot obtain any relief from PVIS or Petrobras Brazil in this proceeding, and this Tribunal lacks the appropriate authority and jurisdiction to adjudicate any claims against these parties.  *See id.*[3]

<div align="center">ARGUMENT</div>

I.  THE CONTROLLING LAW IN THIS CASE MUST BE DETERMINED UNDER OCSLA.

The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 et seq., and the Submerged Lands Act, 43 U.S.C. 1301 et seq., were enacted by Congress in 1953 to provide "for the orderly development of offshore resources."  *United States v. Maine*, 420 U.S. 515, 527 (1975).  Subject to certain exceptions, the Submerged Lands Act extended the boundaries of coastal States to include the seabed within three miles of their coasts.  43 U.S.C. §§ 1301, 1311(a), 1312.  OCSLA affirmed the federal government's primary authority over the outer Continental Shelf ("OCS"), which it defined as "all submerged lands lying seaward and outside of [the Submerged Land Act's three-mile limit], and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control."  43

---

3. Vantage has maintained that both PVIS and Petrobras Brazil are proper parties to this proceeding, asserting, among other things, that PVIS signed the August 2015 letter terminating the parties' agreement, and that under the Guaranty agreement Petrobras Brazil is bound to all the provisions of the parties' agreement, including the arbitration provision.  Petrobras instead suggests that any dispute between Vantage and PVIS and Petrobras Brazil may not be resolved in a unified arbitration proceeding (as the Drilling Contract plainly contemplates), but insists on fragmented proceedings in multiple forums by different tribunals.  In addition to contravening the letter and spirit of the parties' agreement, such a result needlessly entails the risk of conflicting and inefficient adjudications of the same dispute.  *See* Claimants' Reply and Answering Statement to Respondents' First Amended Answering Statement and Counterclaim, at 13-14.

U.S.C. §§ 1331(a), 1332(1); *see also Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480 n.7 (1981) (explaining that Congress passed OCSLA "to assert the exclusive jurisdiction and control of the Federal Government of the United States over the seabed and subsoil of the [OCS], and to provide for the development of its vast mineral resources.") (citing S. REP. NO. 411, 83d Cong., 1st Sess., 2 (1953)).

Thus, with the passage of OCSLA the OCS became an area of "exclusive Federal jurisdiction" as set forth by Congress, 43 U.S.C. § 1333(a)(1), and the United States Supreme Court. *See Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 353, 365 (1969); *Chevron Oil Co. v. Huson*, 404 U.S. 97, 100 (1971).[4]

OCSLA also created a body of substantive law to govern the OCS and certain activities related to it. The statute did so by, among other things: recognizing the OCS as an area of "exclusive Federal jurisdiction" and "extend[ing]" federal "laws and civil and political jurisdiction . . . to the subsoil and seabed of the outer Continental Shelf," as well as "to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed" erected "for the purpose of exploring for, developing, or producing resources therefrom, or . . . transporting such resources," 43 U.S.C. § 1333(a)(1). *See also Rodrigue*, 395 U.S. at 355 (noting that the purpose of OCSLA "was to define a body of law" for the OCS, and "this law was to be federal law of the United States"); *Tenn. Gas Pipeline v. Houston Cas. Ins.*, 87 F.3d 150, 153 (5th Cir. 1996) ( "One purpose of OCSLA was to

---

4. In the Third Novation, the parties recognized and agreed that the United States has "exclusive rights" over the "Territorial Waters of the United States of America," defining it as "the territorial waters of the United States and over which the United States has exclusive rights, in accordance with international law as referenced in the U.S. Internal Revenue Code Section 638." *See* Third Novation Agreement, at §2.7.

define the law applicable to the seabed, subsoil, and fixed structures on the OCS."). To the extent any gaps existed in federal law, OCSLA adopted the civil and criminal laws of the adjacent State as federal law on the OCS, 43 U.S.C. § 1333(a)(2)(A). *See Gulf Offshore Co.*, 453 U.S. at 480 (recognizing that "all law" on the OCS is federal law; although in certain circumstances, OCSLA borrows state law as "surrogate federal law").

Here, it is undisputed that the *Titanium Explorer*'s operations involved exploration for oil and gas on the OCS. Specifically, the *Titanium Explorer* was temporarily attached to the sea floor at various wells and engaged in drilling operations on the OCS. It is these activities that are the subject matter of the contractual dispute between Vantage and Petrobras, placing the case squarely under OCSLA. *See, e.g., Demette v. Falcon Drilling Co.,* 280 F.3d 492, 498 (5th Cir. 2002), *overruled on other grounds, Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778 (5th Cir. 2009) (en banc) (holding that a jack-up mobile offshore drilling unit, temporarily attached to the seabed "for the purpose of drilling for oil" is an OCSLA situs under § 1333(a)(1)).[5] Accordingly, OCSLA controls the law applicable to this dispute between Vantage and Petrobras.

Significantly, courts have made clear that parties cannot attempt to contract around or waive OCSLA's choice of law by including a "choice of law" provision in an agreement. *See Petrobras Am., Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211, 215

---

5. *See also Diamond Offshore Co. v. A&B Builders, Inc.,* 302 F.3d 531 (5th Cir. 2002), *overruled on other grounds, Grand Isle Shipyard,* 589 F.3d 778 (applying same principle to semi-submersible drilling rig); *Curtis v. Schlumberger Offshore Serv., Inc.*, 849 F.2d 805 (3d Cir. 1988) (same).

(5th Cir. 2016) ("Because OCSLA's choice of law scheme is prescribed by Congress, parties may not voluntarily contract around Congress's mandate."); *see also Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1050 (5th Cir. 1990) ("We find it beyond any doubt that OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary."). In this regard, the arbitration decision in *Mariner Energy, Inc. v. Marathon Oil Company*, 2008 WL 6168755 (American Arbitration Association 2008) (Sprouse, Arb.), is instructive.  In *Mariner Energy*, as here, the arbitrator confronted a breach of contract dispute in which the agreement at issue included a choice of law provision stating that the applicable law was to be the general maritime law of the United States to the extent applicable, and otherwise the laws of the State of Texas. *See id*.  However, the subject matter of the parties' agreement and their dispute concerned the production of oil from a platform on the OCS in the Gulf of Mexico off the coast of the Louisiana.   *See id*.   The arbitrator determined that the law applicable to the parties' contract claims would be dictated by OCSLA, not the choice of law provision in their agreement.  *See id*. (citing 43 U.S.C. §§ 1331-1333). Likewise here, the choice of law articulated in Vantage and Petrobras' agreement is ineffective because OCSLA's choice of law supersedes any such agreement.[6]

---

6. Because the parties' entire contract dispute arises from operations for the exploration and production of oil on the OCS, OCSLA supersedes the choice of law provisions in both the Third Novation Agreement as well as the Guaranty agreement.

II.    UNDER OCSLA, MARITIME LAW APPLIES IN THIS CASE.

As noted herein, *see supra* Part I, OCSLA makes federal law exclusive on the OCS, but in order to fill the substantial gaps in the coverage of federal law, OCSLA adopts the "'applicable and not inconsistent' laws of the adjacent States as surrogate federal law." *Gulf Offshore Co.*, 453 U.S. at 480 (quoting 43 U.S.C. § 1333(a)(2)); *accord Tenn. Gas Pipeline*, 87 F.3d at 153. State law was adopted as federal law because Congress knew that federal law, including maritime law, was inadequate to meet the full range of disputes that would arise on the OCS. *Rodrigue*, 395 U.S. at 357–58. Here, because Louisiana is the state adjacent to the site of the *Titanium Explorer*'s work, Louisiana law would apply under OCSLA. Texas law could not apply even if chosen by the parties.

However, while OCSLA was intended to apply to the full range of disputes that might occur on the OCS, it was not intended to displace general maritime law. This is clear from both the statute itself and court decisions. According to the statute, "this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected." 43 U.S.C. § 1332(2). Further, 43 U.S.C. § 1333(f) makes clear that the applicability of OCSLA law under 43 U.S.C. § 1333(a) shall not give rise to any inference that other provisions of law (such as general maritime law), do not also apply. Courts have also declared that

"where OCSLA and general maritime law both could apply, the case is to be governed by maritime law." *Tenn. Gas Pipeline*, 87 F.3d at 154.[7]

The question thus becomes whether admiralty jurisdiction and therefore maritime law apply to this contractual dispute. If they do, then maritime law will control. If not, Louisiana law would control. In this regard, courts have applied a three-part test to determine whether state law may be adopted to fill a gap in federal law under OCSLA. Under OCSLA, state law can apply as surrogate federal law only if: (1) The controversy arises on a situs covered by OCSLA (*i.e.*, the subsoil seabed, or artificial structures permanently or temporarily attached thereto); (2) Federal maritime law does not apply of its own force, and (3) The state law is not inconsistent with Federal law. *Grand Isle Shipyard*, 589 F.3d at 783 (citations omitted); *PLT Eng'g, Inc.*, 895 F.2d at 1047 (adopting test).

Here, state law cannot apply because maritime law applies of its own force. The construction of a maritime contract is governed by maritime law. *Lirette v. Popich Bros. Water Transport, Inc.*, 699 F.2d 725, 728 n. 11 (5th Cir. 1983); *Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge*, 424 F.2d 684, 691 (5th Cir. 1970). And, properly construed, the Third Novation Agreement is undoubtedly a maritime contract.

---

7. *See also Smith v. Penrod Drilling Corp.*, 960 F.2d 456, 459 (5th Cir. 1992) (for OCSLA to apply, federal maritime law must not apply of its own force); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1229 (5th Cir. 1985) ("[W]here admiralty and OCSLA jurisdiction overlap, the case is governed by maritime law."); *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1110 n.26 (5th Cir. 1982) (assuming that admiralty jurisdiction is lacking if the substantive law applicable is OCSLA-imposed state law); *In re Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010*, 808 F.Supp.2d 943, 950 (E.D. La. 2011)

Whether a particular contract can be characterized as maritime depends on the nature and character of the contract.  This test, known as the "focus of the contract" test, asks where the agreement contemplates that most of the work will be conducted.  If a majority of the work will be conducted aboard vessels on navigable water, then the contract is a maritime contract and subject to admiralty jurisdiction and maritime law.  *See Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961); *Grand Isle Shipyard*, 589 F.3d at 787; *Ace Am. Ins. Co. v. M-I, LLC*, 699 F.3d 826, 830-31 (5th Cir. 2012).

Notably, oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce.  *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538-39 (5th Cir. 1986) (holding that maritime law would govern the construction of a contract for drilling services to be performed by a vessel—a submersible drilling barge); *see also Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir. 1981) (invoking maritime law to construe an indemnity clause in a contract under which a company agreed to furnish a casing crew to a submersible drilling barge).  And there should be no dispute here that (1) the *Titanium Explorer* is a mobile offshore drilling unit (MODU), specifically a drillship, and therefore a vessel under controlling law;[8] and (2) the Third Novation contemplates that the *Titanium Explorer* will move to and between various drilling sites in the Gulf of Mexico to provide drilling services to Petrobras.

---

8. *In re Deepwater Horizon*, 753 F.3d 570, 571–74 (5th Cir. 2014); *see also* 33 C.F.R. § 140.10 ("Mobile offshore drilling unit or MODU means a vessel ... capable of engaging in drilling operations for exploration or exploitation of subsea resources.").

In sum, given that the focus of the Third Novation at issue in this case is the performance of drilling work by a vessel (the *Titanium Explorer*) on navigable waters, maritime law applies of its own force and, under OCSLA, provides the governing law for this proceeding.

## III.   ALTERNATIVELY, THE PARTIES' AGREEMENT THAT U.S. MARITIME LAW IS CONTROLLING SHOULD BE ENFORCED.

Alternatively, in the event that the Tribunal concludes that the law governing this dispute is not controlled by OCSLA, then the parties' choice of law provision in the Third Novation Agreement should be enforced.  In this regard, it is generally recognized that parties to an international commercial agreement are free to choose for themselves the law (or the legal rules) applicable to that agreement. N. Blackaby *et al.*, *Redfern and Hunter on International Arbitration* ¶3.94 (5th ed. 2009); *see also Award in ICC Case No. 6474*, XXV Y.B. Comm. Arb. 279, 283 (2000) ("In international commercial arbitration, the first and foremost duty of the arbitrator is undoubtedly to base his decisions, whether relating to jurisdiction or to the merits of the dispute, on the common will of the Parties, regarding for instance the applicable law."); *Interim Awards and Final Award in ICC Case No. 4145*, XII Y.B. Comm. Arb. 97, 101 (1987) ("The principle of autonomy – widely recognized – allows the parties to choose any law to rule their contract, even if not obviously related with [the dispute].").

Here, recognizing the maritime nature of their agreement, the parties expressly chose the general maritime law of the United States as the governing law in regard to interpreting and enforcing their agreement.  *See* Third Novation

Agreement, at § 24.1 ("This Contract shall be governed by, interpreted, enforced and construed in accordance with the general maritime law of the United States of America . . ."). The only potential alternative to maritime law identified by Vantage and Petrobras in their agreement was Texas law, but Texas law could be invoked only "[i]f, for any reason, the general maritime law of the United States of America is not applicable." *Id.* Because U.S. maritime law plainly applies to the parties' dispute, there is no basis for the panel to default to Texas law.

The parties' claims and counterclaims asserted in this proceeding all involve questions concerning the interpretation and enforceability of a maritime contract between Vantage and Petrobras. Simply put, disputes concerning the interpretation and enforcement of contracts are routinely addressed through U.S. maritime law. "When interpreting a maritime contract, general principles of contract law apply from federal admiralty law, rather than from state law." *Int'l Marine, L.L.C. v. FDT, L.L.C.*, 619 F. App'x 342, 349 (5th Cir. 2015) (per curiam). Indeed, it has long been recognized that maritime law itself is a species of federal common law. *See The Harrisburg*, 119 U.S. 199 (1886); *Flores v. Am. Seafoods Co.*, 335 F.3d 904 (9th Cir. 2003) (federal common law of contract interpretation applied where contract incorporates federal maritime law).

Thus, the principles in the federal common law of contracts apply in the maritime context. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) ("federal common law . . . appl[ies]" where contract suit is "under . . . admiralty jurisdiction"); *Clevo Co. v. Hecny Transp., Inc.*, 715 F.3d 1189, 1194 (9th Cir. 2013) ("Basic

principles in the common law of contracts readily apply in the maritime context.");
*In re Tasch, Inc.*, 46 F. App'x 731, at *2 (5th Cir. 2002) ("In maritime contract disputes, federal courts apply general principles of contract law.").  In short, "Basic principles of contract law apply."  1 Thomas J. Schoenbaum,  ADMIRALTY AND MARITIME LAW § 5-1 (5th ed. 2014).[9]

Thus, if the Tribunal looks beyond OCSLA to determine the law governing this dispute, it should enforce the parties' choice of U.S. maritime law.  And because this case concerns straightforward issues of contract interpretation and enforceability routinely encountered in maritime law, there is no reason to look to an alternative source of law in resolving this dispute.[10]

---

9. In practice, what this often means is that the Restatement will provide the controlling federal common law rule in maritime cases and other cases involving common law contract issues.  *See, e.g.*, *Int'l Marine*, 619 F. App'x at 349 ("Applying federal law in the contract context includes looking to 'principles of general contract law' that can be found in treatises or restatements of the law."); *Clevo Co.*, 715 F.3d at 1194 (looking to the Restatement (Second) of Contracts when determining basic principles of contract law in the maritime context where federal common law applies); *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1245 (Fed. Cir. 2007) (relying on Restatement as federal common law on contracts).  *See also Entergy Ark, Inc. v. Nebraska*, 358 F.3d 528, 547 (8th Cir. 2004) (referring to Restatement as federal common law on the meaning of good faith).

10. Petrobras has asserted that the law of England and Wales applies to determine whether Petrobras Brazil may be liable under the Guaranty agreement.  Not so.  The Guaranty expressly states that it is not a discrete agreement.  Rather, the Guaranty and the drilling contract together constitute the parties' entire agreement.  *See* Guaranty, at § 3.7.  And although both the drilling contract and the Guaranty initially specified that the law of England and Wales would be controlling, the subsequent amendments to the drilling contract, particularly in the Third Novation, altered the parties' choice of law and specified that general maritime law (or alternatively Texas law) would govern.  Further, Petrobras Brazil's obligations under the Guaranty will turn on the Tribunal's decisions concerning the enforceability and proper construction of the underlying drilling contract, which will plainly be governed by maritime law.

## CONCLUSION

Whether the Tribunal looks to OCSLA or the choice of law clause in the parties' agreement to determine applicable law, the general maritime law of the United States should govern the resolution of the parties' dispute in this proceeding.

Respectfully submitted,

JACKSON WALKER L.L.P.

By: */s/ Chip Babcock*
Charles L. Babcock
Texas Bar No. 01479500
Kent C. Sullivan
Texas Bar No. 19487300
Kathrine M. Silver
Texas Bar No. 24013510
Luke J. Gilman
Texas Bar No. 24074279
1401 McKinney, Suite 1900
Houston, Texas  77010
[Tel.] (713) 752-4200
[Fax] (713) 752-4221
cbabcock@jw.com
ksullivan@jw.com
ksilver@jw.com
lgilman@jw.com

ATTORNEYS FOR CLAIMANTS
VANTAGE DEEPWATER COMPANY and
VANTAGE DEEPWATER DRILLING, INC.

Appendix 004673

# Exhibit 96

Appendix 004674

<u>CONFIDENTIAL</u>

**AMERICAN ARBITRATION ASSOCIATION**
**IN THE MATTER OF THE ARBITRATION BETWEEN**

| | | |
|---|---|---|
| VANTAGE DEEPWATER COMPANY | § | |
| and VANTAGE DEEPWATER | § | |
| DRILLING, INC., | § | |
| | § | |
| Claimants, | § | |
| | § | |
| v. | § | CASE NO. 01-15-0004-8503 |
| | § | |
| PETROBRAS AMERICA INC., | § | |
| PETROBRAS VENEZUELA | § | |
| INVESTMENTS & SERVICES B.V., | § | |
| and PETRÓLEO BRASILEIRO S.A. – | § | |
| PETROBRAS, | § | |
| | § | |
| Respondents. | § | |

## <u>RESPONDENTS' RESPONSE TO CLAIMANTS' BRIEF ON GOVERNING LAW</u>

In response to Claimants' Brief on Governing Law, Respondents Petrobras America Inc. ("**PAI**"), Petrobras Venezuela Investments & Services B.V. ("**PVIS**"), and Petróleo Brasileiro S.A. – Petrobras ("**Petrobras**") (collectively, "**Respondents**") would show the Tribunal the following three things.

First, Louisiana law has no application here. Instead, the relevant governing law is federal maritime law, because the Agreement for the Provision of Drilling Services dated February 4, 2009, as novated (the "**Contract**"), is a maritime contract and the parties chose maritime law as the governing law in the Third Novation. Under the Outer Continental Shelf Lands Act ("**OCSLA**"), once the Tribunal determines that maritime law applies to the Contract, adjacent state law does not apply and is irrelevant. Accordingly, Claimants' argument to apply Louisiana law as the adjacent state law under OCSLA must be rejected.

Second, applicable maritime law requires Claimants to make an election of remedies with respect to their claim for repudiation or wrongful termination of the Contract. Claimants must

Exhibit
**J-840**
No. 01-150004-8503

**CONFIDENTIAL**

elect to (a) treat the contract as terminated and sue for the balance of all unmade payments under the Contract, discounted back to present value; or (b) treat the contract as still effective and (i) sue for the balance of unmade payments from the termination date to the date of the final award, discounted back to present value, and (ii) allow PAI or PVIS to continue using the Titanium Explorer for the duration of the Contract's term. Due to the complications of Claimants electing option (b) above and having Respondents continue to use the drillship, Respondents need to know what Claimants' election is well before the final award is issued.

Finally, the Guaranty is governed by the law of England and Wales, and not by federal maritime law or any other law. The Guaranty is not a maritime contract, so maritime law does not apply by its own force, and Petrobras is not a party to the Contract or the Third Novation, and never agreed to apply any law other than the law of England and Wales—the governing law in the Guaranty's choice-of-law provision.

I.    **Once maritime law applies to the Contract, adjacent Louisiana state law cannot apply and is therefore irrelevant.**

Because the parties' agree that the Contract is a maritime contract governed by maritime law, OCSLA's choice-of-law rules mandate that federal maritime law applies to the Contract and adjacent Louisiana state law cannot apply and is therefore irrelevant. OCSLA "provides comprehensive choice-of-law rules and federal regulation to a wide range of activity occurring beyond the territorial waters of the states on the outer continental shelf of the United States." *Demette v. Falcon Drilling Co., Inc.*, 280 F.3d 492, 495 (5th Cir. 2002). If OCSLA applies, the parties "must then turn to the OCSLA choice of law provision to ascertain whether state, federal, or maritime law applies to a particular case." *In re Deepwater Horizon*, 745 F.3d 157, 164 (5th Cir. 2014). As explained below, federal maritime law applies to the Contract and recognizes choice-of-law provisions like the one in the Third Novation. Thus, to the extent the Tribunal

<u>CONFIDENTIAL</u>

must apply any law other than federal maritime law to the Contract, the relevant gap-filling law is Texas law, not Louisiana law, because the parties chose Texas law as the secondary law in the Third Novation's governing law clause.

### A. Federal maritime law applies of its own force.

Under OCSLA, the "civil and criminal laws of each adjacent State" act as surrogate federal law unless, among other things, federal maritime law applies of its own force. *Union Tex. Petroleum Corp. v. PLT Eng'g*, 895 F.2d 1043, 1047 (5th Cir. 1990). In other words, OCSLA's choice-of-law analysis is binary—either federal maritime law applies **<u>OR</u>** the adjacent state's law applies. *Petrobras Am. Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211, 216 (5th Cir. 2016) ("OCSLA prescribes the applicability of either maritime law or adjacent state law . . . . *[T]hese regimes are alternative, not overlapping.*" (emphasis added)).

The Fifth Circuit's analysis in *Alleman v. Omni Energy Services Corp.* is instructive on this choice-of-law analysis. In *Alleman*, a helicopter operator (Omni) sought indemnification from an oil platform operator (W&T) after a helicopter accident killed one of W&T's employees. 580 F.3d 280, 282 (5th Cir. 2009). The contract between Omni and W&T chose general maritime law as the governing law. *Id.* On cross-motions for summary judgment, the district court found that OCSLA applied to the contract, and that under OCSLA, adjacent Louisiana state law applied. *Id.* at 283. On appeal, the Fifth Circuit framed the "dispositive issue" as whether OCSLA's adjacent-state law applied "as opposed to maritime law" and ignored the parties' choice-of-law clause. *Id.* The Fifth Circuit began its analysis by examining whether federal maritime law applied to the contract of its own force, because if it did, adjacent state law would not apply under OCSLA. *Id.* at 285. After concluding that the contract was **not** maritime in

**CONFIDENTIAL**

nature, the Fifth Circuit found that maritime law did not apply of its own force, and thus OCSLA's adjacent-state-law rule applied. *Id.*

Applying the Fifth Circuit's analysis in *Alleman* to the facts here, the Tribunal should find that federal maritime law applies to the Contract, because it is undisputed (i.e., the parties agree) that it is a maritime contract.  Thus, "if the contract is a maritime contract, federal maritime law applies of its own force, and state law does not apply." *Demette*, 280 F.2d at 497. Because federal maritime law applies, adjacent Louisiana state law does not apply and is therefore irrelevant. *See PLT Eng'g*, 895 F.2d at 1047.[1]

    **B.**    **Maritime law recognizes choice-of-law provisions like the Third Novation's, which applies Texas law to fill in any gaps related to the Contract.**

Here, the parties agree that contract is maritime; thus, maritime law applies to the Contract.  Under maritime law, choice-of-law provisions are routinely upheld. *Authenment v. Ingram Barge Co.*, 878 F. Supp. 2d 672 (E.D. La. 2012) (quoting *Great Lakes Reins. (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 243 (5th Cir. 2009)) ("[W]here the parties have included a choice of law provision, that state's law will govern unless the state has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purpose of maritime law."). Thus, to the extent the Tribunal must apply any state's law as a gap-filler supplementing federal maritime law, the applicable law is Texas's under the Third Novation's choice-of-law provision.

---

[1] This analysis explains why *Mariner Energy, Inc. v. Marathon Oil Co.*, 2008 WL 6168755 (Am. Arbitration Ass'n 2008) (Sprouse, Arb.), an arbitration award cited in Claimants' brief, is irrelevant.  That arbitration concerned a contract that was ***not*** maritime in nature, and thus adjacent state law could apply under OCSLA. *See id.* at *4. Because the Contract here is maritime in nature—something on which all parties agree—maritime law applies of its own force and adjacent state law cannot apply and is irrelevant. *See Alleman*, 580 F.3d at 283-85.

**RESPONDENTS' RESPONSE TO CLAIMANTS' BRIEF ON GOVERNING LAW—PAGE 4**

<u>CONFIDENTIAL</u>

## II.     General maritime law requires Claimants to make an election of remedies.

"Under maritime and contract law, an injured party is not required to repudiate the contract in order to preserve its right to sue the other for breach of the contract." *Natures Way Marine, LLC v. Everclear of Ohio, Ltd.*, 37 F. Supp. 3d 1232, 1239 (S.D. Ala. 2014), *amended on other grounds* 2014 WL 5465885 (S.D. Ala. 2014) (citing *Aaby v. St. Marine Corp.*, 181 F.2d 383, 385 (2d Cir. 1950)). After an alleged breach, however, the injured party has the option to either repudiate the contract or continue the agreement and claim damages from the defaulting party. *Id.* If the injured party elects to continue the agreement with knowledge of the breaching party's default, the injured party is not excused from performing its remaining duties. *Id.* (citing *Dunkin' Donuts of Am., Inc. v. Minerva, Inc.*, 956 F.2d 1566, 1571 (11th Cir. 1992) (a breach "merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it")).

In light of the these rules, Claimants must elect whether to either (1) allege a total breach, terminate the Contract, and sue for damages, or (2) continue the Contract, declare the default only a partial breach, and recover on those damages caused by a partial breach. *See id.*; *see also Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship*, 323 S.W.3d 203, 216 (Tex. App.—El Paso 2010, pet. denied); *Murray v. Crest Const., Inc.*, 900 S.W.2d 342, 344 (Tex. 1995). If Claimants elect to treat the Contract as terminated, the appropriate measure of damages is the present value of the future payments under the Contract. *See Jenkins v. Jenkins*, 991 S.W.2d 440, 447 (Tex. App.—Fort Worth 1999, pet. denied) ("When a party who is contractually obligated to make future payments of money to another repudiates the obligation without just excuse, the obligee is entitled to damages for the present value of the future payments due under the contract."). On the other hand, if Claimants elect to continue performance and sue for the alleged partial breach of

## CONFIDENTIAL

the Contract, any damages are based on only part of Claimants' remaining rights to performance. RESTATEMENT (SECOND) OF CONTRACTS § 236(2).

The Tribunal should order Claimants to make their election sooner, rather than later, because the parties should know the relevant measure of alleged damages during the discovery process, before preparing their fact witness statements and expert reports, and before presenting evidence at the final hearing. *See Culver v. Slater Boat Co.*, 722 F.2d 114, 121-22 (5th Cir. 1983) (holding parties may introduce expert opinion of the appropriate discount rate to apply to damages). Further, if Claimants are going to elect to continue the Contract, that will be significantly more complicated, from a logistics perspective, if the Tribunal were to agree with Claimants' argument that the Contract was improperly terminated. Forcing PAI or PVIS to take back the Titanium Explorer drillship and use it in ongoing or future operations is not something that should wait until the final award; the lead time necessary to plan the use of a drillship is measured in months or years, not days or weeks.

## III.    The Guaranty is governed by the law of England and Wales.

In a footnote, and without citing to any authority, Claimants argue that the Third Novation—which does **not even mention** the Guaranty or have Petrobras as a signatory— somehow amends the Guaranty to apply the general maritime laws of the United States.[2] However, the Guaranty unambiguously states that it is governed by the law of England and Wales. Further, it is undisputed that the parties have not amended the Guaranty, under the Third Novation or otherwise, to apply any other governing law. For the reasons given below, the Tribunal should reject Claimants' unsupported argument to apply to the Guaranty any law other than the law of England and Wales.

---

[2] As explained in Respondents' Brief on Threshold Issues and Governing Law, Petrobras is not a proper party to this arbitration and the Tribunal lacks jurisdiction over it.  This argument is made subject to and without waiving that jurisdictional challenge.

Appendix 004680

<u>**CONFIDENTIAL**</u>

### A.       The Guaranty is distinct from the Contract.

Claimants' argument that the Guaranty and Contract are but one contract should be rejected, because a guaranty, by its very nature, always relates to (and almost always references) another contractual obligation. Notwithstanding this relationship, courts have routinely rejected Claimants' argument and upheld a guaranty's governing-law provision, even if it differs from the governing law chosen in the underlying contract. *See, e.g.*, *Winspear v. Coca-Cola Refreshments, USA, Inc.*, No. 05-13-00712-CV, 2014 WL 2396142, at *3 (Tex. App.—Dallas Apr. 9, 2014, pet. denied) (rejecting argument that governing-law provision in credit agreement necessarily applied to the guaranty, reasoning "nothing . . . would inherently require the law of the same State to apply to the underlying debt and a Guaranty of that debt, and a party may, for various reasons, wish to have different laws apply to a Guaranty and the underlying debt."); *Georgetown Assocs., Ltd. v. Home Fed. Sav. & Loan Ass'n*, 795 S.W.2d 252, 253 (Tex. App.—Houston [14th Dist.] 1990, writ dismissed w.o.j.) (holding Texas choice-of-law provision in guaranty "should be respected" notwithstanding California choice-of-law provision in underlying promissory note). In light of these authorities, the Tribunal should reject Claimants' argument to apply to the Guaranty any law other than the law of England and Wales.

### B.       The parties did not intend for the Guaranty to be governed by the same law as the Contract.

Courts apply general contract-interpretation rules to a guaranty. *See McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375, 377 (5th Cir. 2013) ("We interpret the Guaranty as we would any other written agreement, according to the general principles of contract interpretation"); *Mid-S. Telecommc'ns Co. v. Best*, 184 S.W.3d 386, 390 (Tex. App.—Austin 2006, no pet.) ("We construe a guaranty as any other contract."). Under those rules, a guaranty's express terms are the best indication of the parties' intent. *See Comar*

**CONFIDENTIAL**

*Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 578 (5th Cir. 2015) (interpreting guaranty "to give legal effect to all such contracts according to the true intent of the parties," which is "determined by the words of the contract").

Here, the Contract originally chose the law of England and Wales as the governing law. Contract at Art. 24.1 ("This Contract shall be construed, enforced and governed in accordance with the laws of England and Wales . . . ."). In drafting the Guaranty, the parties could have simply adopted the Contract's governing-law provision by reference, and thus reflected an intent that those governing laws always remain the same. But they did not. Instead, the Guaranty has its own governing-law provision that expressly applies the law of England and Wales, and this governing-law selection was never changed in any agreement to which Petrobras was a signatory. Indeed, it is telling that the Contract was novated three different times, and not once was the governing law of the Guaranty ever changed in a document signed by Petrobras.

Further, the Guaranty's limiting language shows that the parties intended to apply the law of England and Wales to the Guaranty, irrespective of the Contract's governing law. *See Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1211 (9th Cir. 2001) (holding guaranty's choice-of-law clause should not be integrated into underlying loan obligation based on limiting language of guarantee). In *Shannon-Vail Five Inc.*, a borrower (Shannon) entered into six loan agreements with Bunch that were personally guaranteed by Dobron. *Id.* at 1208. Although the guarantee expressly provided that Nevada law governed its terms, the loan agreements were silent on their governing law. After Shannon sued Bunch for usury and conversion, Bunch argued that the guarantee's Nevada choice-of-law provision should be imported into the loan agreements. *Id.* at 1211. The district court rejected Bunch's argument and the Ninth Circuit affirmed, reasoning that the "limiting language" in the guarantee's governing-law provision

<u>CONFIDENTIAL</u>

"reveals that the choice-of-law clause was intended to apply only to the guarantee itself. Moreover, by definition, a guarantee is a separate undertaking in which the principal obligor does not join, and a guarantee exists independent of the original obligations between the principal obligor and the obligee." *Id.; see also Woods–Tucker Leasing Corp. of Ga. v. Kellum*, 641 F.2d 210, 215 n.7 (5th Cir. 1981) ("[T]he contract of the guarantor is his own separate undertaking, in which the principal does not join." (citation omitted)).

The Ninth Circuit's reasoning applies with equal force here. Section 3.4 of the Guaranty utilizes the same "limiting language" as the guarantee in *Shannon*: "***This Guaranty*** shall be governed by and construed under the laws of England and Wales without regard to its principles pertaining to conflict of laws." (emphasis added). As in *Shannon*, this limiting language evinces the parties' intent that Section 3.4's governing-law choice must apply to the Guaranty at all times, irrespective of any law chosen to govern the Contract.  The Tribunal should therefore reject Claimants' argument to apply to the Guaranty any law other than the law of England and Wales.

### C. The Guaranty is not a maritime contract.

Although the Contract is a maritime contract, the Guaranty is not, even though it secures the performance of or payment under a maritime contract. The United States Supreme Court explained this principle in *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961), when it found that a suit on a bond securing certain cargo was governed by maritime law, but an agreement to pay damages for another's breach of a maritime charter was not. Later cases confirm this principle that merely agreeing as guarantor "to pay damages for another's breach of a maritime charter is not a maritime contract." *Roswell Navigation v. Poseidon Marine Consultants, Inc.*, No. 95-2902, 1997 WL 680576, at *2 (E.D. La. Oct. 31, 1997) (citing *Fednav, Ltd. v. Isoramar,*

*S.A.*, 925 F.2d 599, 601 (2d Cir. 1991)). Put simply, the basis of a claim against a guarantor is a covenant to pay damages, which involves neither maritime services nor transactions. *See id.*

Here, the Guaranty "guarantees that the Payment Obligations will be paid and the Performance Obligations will be performed strictly in accordance with the terms of the Contract." Guaranty at § 1.2. Indeed, Claimants' Second Amended Demand for Arbitration expressly invokes the Guaranty's Payment Obligations "to ***satisfy the damages*** awarded" in this arbitration. Claimants' Second Am. Dem. at 13 (emphasis added). Given the Guaranty's express language and Claimants' reliance on the Guaranty to satisfy any damages award, the facts prove that the Guaranty is not a maritime contract. Accordingly, it would be improper to apply any law to the Guaranty other than the law of England and Wales, which are dictated by the Guaranty's express terms.

## CONCLUSION

For the reasons explained above, the Tribunal should (1) apply federal maritime law to the contractual claims and defenses in this arbitration, and refer to Texas law where maritime law is silent or there is any need to fill a governing-law gap; (2) order Claimants to make a prompt election of remedies with respect to their claim for repudiation or wrongful termination of the Contract; and (3) apply the law of England and Wales to the Guaranty.

Further, as explained in Respondents' Brief on Threshold Issues and Governing Law, the Tribunal should (4) dismiss PVIS and Petrobras from this arbitration because they are not proper parties and the Tribunal lacks jurisdiction over them, and (5) order Claimants to immediately remove and release the lien that they have improperly placed on PAI's property (i.e., the well).

Appendix 004684

<u>**CONFIDENTIAL**</u>

Date: June 10, 2016

Respectfully submitted,

THOMPSON & KNIGHT LLP

By: _____
      Andrew B. Derman
      Texas Bar No. 05770700
      Andrew.Derman@tklaw.com

      William M. Katz, Jr.
      Texas Bar No. 00791003
      William.Katz@tklaw.com

      Catherine W. Clemons
      Texas Bar No. 24087316
      Catherine.Clemons@tklaw.com

One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
Facsimile (214) 969-1751

ATTORNEYS FOR RESPONDENTS

Appendix 004685

# Exhibit 97

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
AMERICAN ARBITRATION ASSOCIATION

IN THE MATTER OF ARBITRATION BETWEEN

Case No. 01-15-0004-8503

Vantage Deepwater Company
and Vantage Deepwater Drilling, Inc.,

CLAIMANTS,

-vs-

Petrobras America Inc.,
Petrobras Venezuela Investments & Services, BV,
and Petróleo Brasileiro S.A. – Petrobras,

RESPONDENTS.

―――――――――――――――――

## CLAIMANTS' RESPONSE TO RESPONDENTS' BRIEF ON ELECTION OF REMEDIES

24 June 2016

―――――――――――――――――

BEFORE

David Keltner, Esq.
Kelly Hart & Hallman LLP
201 Main St., Suite 2500
Fort Worth, TX 76102
[Tel.] (817) 878-3560
david.keltner@kellyhart.com

Prof. William W. Park
Boston University
 School of Law
765 Commonwealth Ave.
Boston, MA 02215
[Tel.] (617) 353-3149
wwpark@bu.edu

James Gaitis, Esq.
International Arbitration
 Chambers
P.O. Box 1213
Whitefish, MT 59937
[Tel.] (406) 224-4228
gaitis1@aol.com

Exhibit

J-841

No. 01-150004-8503

### FACTUAL AND PROCEDURAL BACKGROUND

As the Tribunal is aware, this arbitration involves a contract dispute between Claimants Vantage Deepwater Company and Vantage Deepwater Drilling, Inc. (collectively, "Vantage") and Respondents Petróleo Brasiliero S.A. – Petrobras, Petrobras America, Inc., and Petrobras Venezuela Investments & Services B.V. (collectively, "Petrobras"). The dispute arises out of oilfield exploration work performed by Vantage's drillship *Titanium Explorer* under a contract for drilling services with Petrobras.

In July 2015, Petrobras suspended the *Titanium Explorer*'s work, contending that the drillship was not operating safely and that Vantage had failed to implement an effective remediation plan in response to two operational incidents. Vantage disputed Petrobras' contentions and attempted unsuccessfully during July and August to negotiate with Petrobras regarding its concerns. On August 31, 2015, Petrobras announced that it was unilaterally terminating the parties' contract. On the same date, Vantage initiated these arbitration proceedings, filing its Demand for Arbitration against PVIS, PAI, and Petrobras Brazil.

Vantage has made a claim that Petrobras breached the parties' agreement by, *inter alia*, wrongfully terminating the agreement on pretextual grounds. Vantage has requested an award of monetary damages to fully compensate it for the actual losses it has sustained due to unpaid invoices, wrongful work stoppages, wrongful applications of zero or reduced rates, and Petrobras' wrongful termination of the contract. *See id.*, at 12-13.

## ARGUMENT

In its briefing on governing law, Petrobras has argued that Vantage must make an immediate "election of remedies" between breach of contract damages and specific performance in this proceeding. *See* Respondents' Response to Claimants' Br. on Governing Law at 5. Petrobras is mistaken. It is a well-established principle that such an election is not required until the final adjudication of claims.

As a threshold matter, it is undisputed that federal maritime law governs here. *See, e.g., id.* at 1–3. It is likewise uncontroverted that, under maritime law, federal common law applies. *See, e.g.,* Vantage's Br. on Governing Law at 22. Finally, it is beyond serious dispute that, under federal law, parties may seek alternative remedies such as breach of contract damages and specific performance up until final judgment. As the Third Circuit has explained, the election of remedies doctrine is "an application of the law of estoppel" that allows a party to seek alternative remedies until the end of a case. *Abdallah v. Abdallah*, 359 F.2d 170, 174–75 (3rd Cir. 1966) (internal quotations omitted). Significantly, the *Abdallah* court specifically noted that damages and specific performance are acceptable alternative remedies. *Id.; see also, e.g., Shandley v. Cadle*, 573 Fed. Appx. 6, (1st Cir. 2014) (per curiam) ("the election of remedies doctrine is designed to prevent a double recovery for the same wrong, not to prevent the pursuit of inconsistent alternative theories of recovery prior to entry of judgment") (internal formatting omitted); *Gens v. Resolution Trust Corp.*, 112 F.3d 569, 573 (1st Cir. 1997) ("An election between legally inconsistent remedies can be made at any time

prior to the entry of final judgment") (internal formatting omitted).  And courts have consistently allowed breach of contract claimants to pursue recovery under both damages and specific performance theories.  *E.g.*, *Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr.*, 594 F.3d 285, 293-94 (4th Cir. 2010); *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 984 F.2d 223, 228-230 (7th Cir. 1993); *Abdallah*, 359 F.2d at 174-75.

Petrobras resists this longstanding, common sense principle, but cites no authority that actually supports its position.  Rather, the case law cited by Petrobras is completely inapposite.  First, Petrobras cites *Nature's Way Marine, LLC v. Everclear of Ohio, Ltd.*, 37 F. Supp. 3d 1232, 1239 (S.D. Ala. 2014).  *See* Respondents' Response to Claimants' Br. on Governing Law at 5.  But this case merely stands for the unremarkable proposition that, when one party breaches an agreement, the non-breaching party may choose whether to continue the contract.  The *Nature's Way* court unsurprisingly rejected the injured party's argument that having chosen to continue the contract, it then had free reign to turn around and breach the contract itself.  *Id.* at 1243.  *Nature's Way* has nothing to do with Petrobras's imagined notion that when a party initiates legal proceedings against another for wrongfully terminating the contract, it must immediately and irrevocably make a litigation choice between two potential remedies.  Indeed, the Seventh Circuit has expressly held that the law addressing "whether to affirm or disaffirm a contract," *i.e.*, the law at issue in *Nature's Way*, does not mean a party must "choose a specific remedy before arguing to a jury" and has no application

"where damages and specific performance are sought." *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 984 F.2d 223, 228 (7th Cir. 1993); *see also id.* at 228–29 (stating that "other courts agree" and collecting cases).

Petrobras also parenthetically cites *Dunkin' Donuts of America, Inc. v. Minerva, Inc.*, 956 F.2d 1566, 1571 (11th Cir. 1992), for the basic principle that a breach gives the injured party the option of canceling or continuing the contract. Again, this case fails to support Petrobras's conclusion that, after Petrobras wrongfully terminated the contract, Vantage must make an immediate litigation choice between two potential remedies. *See Medcom*, 984 F.2d at 228–29. Petrobras's reliance on *Dunkin' Donuts* is yet more puzzling, because in *Dunkin' Donuts* the plaintiff could seek only damages because she "never pleaded relief seeking to terminate or rescind" the contract at issue. *Dunkin' Donuts*, 956 F.2d at 1571. As such, *Dunkin' Donuts* provides no authority for Petrobras's novel, draconian, and unsupported vision of election of remedies law.

## Conclusion

The panel should follow applicable, established precedent, which does not require Vantage to elect remedies until this proceeding is adjudicated.

Respectfully submitted,

JACKSON WALKER L.L.P.


By: */s/ Chip Babcock*
    Charles L. Babcock
    Texas Bar No. 01479500
    Kent C. Sullivan
    Texas Bar No. 19487300
    Kathrine M. Silver
    Texas Bar No. 24013510
    Luke J. Gilman
    Texas Bar No. 24074279
    1401 McKinney, Suite 1900
    Houston, Texas  77010
    [Tel.] (713) 752-4200
    [Fax] (713) 752-4221
    cbabcock@jw.com
    ksullivan@jw.com
    ksilver@jw.com
    lgilman@jw.com

    ATTORNEYS FOR CLAIMANTS
    VANTAGE DEEPWATER COMPANY and
    VANTAGE DEEPWATER DRILLING, INC.

Appendix 004692

# Exhibit 98

Appendix 004693

**CONFIDENTIAL**

## AMERICAN ARBITRATION ASSOCIATION
### IN THE MATTER OF THE ARBITRATION BETWEEN

| | | |
|---|---|---|
| VANTAGE DEEPWATER COMPANY and VANTAGE DEEPWATER DRILLING, INC., | § § § § | |
| Claimants, | § § | |
| v. | § § | CASE NO. 01-15-0004-8503 |
| PETROBRAS AMERICA INC., PETROBRAS VENEZUELA INVESTMENTS & SERVICES B.V., and PETRÓLEO BRASILEIRO S.A. – PETROBRAS, | § § § § § § | |
| Respondents. | § | |

## RESPONDENTS' REPLY IN SUPPORT OF THEIR BRIEF REGARDING THRESHOLD ISSUES AND GOVERNING LAW

In support of their Brief Regarding Threshold Issues and Governing Law, Respondents Petrobras America Inc. ("**PAI**"), Petrobras Venezuela Investments & Services B.V. ("**PVIS**"), and Petróleo Brasileiro S.A. – Petrobras ("**Petrobras**") (collectively, "**Respondents**") would show the Tribunal the following three things.

*First*, Petrobras and PVIS are not proper parties to this arbitration and should be dismissed.

*Second*, the Tribunal has the power to order Claimants to remove the lien on PAI's property, so the dispute over unpaid invoices may be resolved "exclusively and finally" in this proceeding, in accordance with the parties' mandatory arbitration clause.

*Finally*, when determining the law governing the various claims asserted in this arbitration, the Tribunal should carefully differentiate the type of claim at issue (e.g., contractual, corruption, etc.) and the timing of the acts or omissions giving rise to the claim (e.g., before the

**Exhibit**

**J-842**

No. 01-150004-8503

## CONFIDENTIAL

drilling contract was signed in 2009, after the contract was signed, etc.).  Claimants' suggestion to apply maritime law to each and every claim in this proceeding is overbroad.

### I.  PETROBRAS AND PVIS ARE NOT PROPER PARTIES TO THIS ARBITRATION AND SHOULD BE DISMISSED.

**A.  Petrobras and PVIS have not waived their jurisdictional challenge.**

Claimants incorrectly argue that Petrobras and PVIS have waived their challenge to the Tribunal's jurisdiction. *See* Claimants' Response to Respondents' Brief Regarding Threshold Issues and Governing Law (the "**Response**") at 6-7, 10, 19.  Petrobras and PVIS have challenged the Tribunal's jurisdiction from the start of this arbitration.  *See* Respondents' Original Answering Statement and Counterclaim at 8-10.  And they have continued to do so since then. *See* First Amended Answering Statement and Counterclaim at 10-11.  That is exactly what the AAA's Commercial Rules contemplate.

Under AAA Rule 7, Petrobras and PVIS were required to "object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection."  Because Petrobras and PVIS timely asserted their jurisdictional challenge in Respondents' Original Answering Statement and Counterclaim—and have continued to assert it in Respondents' First Amended Answering Statement and Counterclaim—there can be no waiver.  *See Wilson v. M/V B911*, No. 10-3320, 2012 WL 519585, at *5 (E.D. La. Feb. 16, 2012) (defining waiver under general maritime law as a "voluntary or intentional relinquishment of a known right" that "emphasizes the mental attitude of the actor" (quoting *Morgan v. Thomas*, 448 F.2d 1356, 1365 (5th Cir. 1971))).  At no time has either Petrobras or PVIS voluntarily or intentionally relinquished the right to challenge the Tribunal's jurisdiction.

Appendix 004695

## CONFIDENTIAL

Although Claimants argue that Petrobras and PVIS "have invoked the Tribunal's jurisdiction by filing counterclaims against Vantage," Response at 6, that is not accurate.  Along with PAI, Petrobras and PVIS have requested their costs and fees associated with this arbitration, because Claimants failed to engage in the mandatory direct, good-faith negotiations required before filing this arbitration.  This request for costs and fees is not the voluntary or intentional relinquishment of any right, however.  It would certainly be an odd result for Claimants to file this arbitration without first negotiating in good faith; for Respondents to request their costs and fees associated with Claimants' failure; and for the Tribunal to find that, by seeking their costs and fees, Petrobras and PVIS have waived their ability to challenge the Tribunal's jurisdiction, notwithstanding the fact that they have complied with AAA Rule 7 and objected to the Tribunal's jurisdiction since filing their original answer and counterclaim.

Taken to its logical (and absurd) conclusion, Claimants' waiver argument would prevent any party challenging a tribunal's jurisdiction from ever requesting its costs and fees, because doing so would automatically subject the party to the very jurisdiction that is being challenged.  This circularity finds no support in the law, and Claimants have tellingly failed to cite any authority supporting their position.  In fact, challenging jurisdiction and requesting one's costs and fees are wholly consistent, so there can be no waiver.  Asking for costs and fees associated with a baseless claim is not the voluntary or intentional relinquishment of a known right, but rather the exercise of the right to raise a jurisdictional challenge to an improper claim.

For all these reasons, the Tribunal should reject Claimants' waiver argument and find that Petrobras and PVSI have timely and properly challenged the Tribunal's jurisdiction under AAA Rule 7.

CONFIDENTIAL

**B.      Claimants' good-faith-and-fair-dealing claim cannot defeat Petrobras' jurisdictional challenge.**

Petrobras' jurisdictional challenge is valid, notwithstanding Claimants' claim for breach of the duty of good faith and fair dealing.  *See* Response at 17.  As shown by Claimants' authorities, only those entities who are parties to the contract at issue owe a duty of good faith and fair dealing.  *See* Response at 17 (citing *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1352 (S.D. Fla. 2007) ("Every maritime contract imposes an obligation of good faith and fair dealing ***between the parties*** . . . ." (emphasis added)); *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) ("[i]f the ***party to a contract*** evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing." (emphasis added)).

Here, there are at least three reasons why the duty of good faith and fair dealing is no bar to Petrobras' jurisdictional challenge.  First, it is undisputed that Petrobras was not a party to the contract on which Claimants' base their claim for breach of the duty of good faith and fair dealing:  the Agreement for the Provision of Drilling Services dated February 4, 2009, as novated (the "**Contract**").[1]  Second, as noted above, the duty applies to maritime contracts, and the guaranty (the "**Guaranty**") to which Petrobras is a party is ***not*** a maritime contract, as explained in Respondents' briefs.  *See F.W.F., Inc.*, 494 F. Supp. 2d at 1352 ("***Every maritime contract*** imposes an obligation of good faith and fair dealing between the parties . . . ." (emphasis added)).  Finally, as explained below and in Respondents' briefs, performance under the Guaranty is not due yet—there would first have to be some liability finding as to PAI and then a failure to pay by PAI—so there can be no breach of the duty of good faith and fair dealing yet, even it is was somehow owed in connection with the Guaranty.

---

[1] The claim allegedly arises from the unilateral and premature termination of the Contract.  Response at 17.

In sum, Petrobras has a valid jurisdictional challenge, and Claimants' claim for breach of the duty of good faith and fair dealing does not prevent Petrobras from being dismissed as a party to this arbitration.

## C.    Dismissing Petrobras and PVIS from this arbitration at this point is not premature.

As noted above, AAA Rule 7 governs objections to the Tribunal's jurisdiction, and it further dictates the timing for any ruling:  "The arbitrator may rule on such objections as a preliminary matter or as part of the final award."  The Tribunal therefore has the power to rule now on the jurisdictional challenges and need not delay that ruling, as suggested by Claimants. *See* Response at 8.  Petrobras and PVSI therefore ask the Tribunal to rule now, as a preliminary matter, on their jurisdictional challenges.

Claimants' argument to delay ruling on the jurisdictional challenges until after further discovery and pleading is contradicted by the parties' arbitration clause, which reflects an intent to avoid protracted discovery and delay in ruling on contested matters:  "The Parties shall submit true copies of ***all documents*** considered relevant with their respective statements of claim or defense and any counterclaim or reply."[2]

Additionally, Claimants' argument suggests that they have not already had multiple opportunities to amend their pleadings and conduct discovery, when they have, in fact, done so. Claimants have filed three different arbitration demands since initiating this proceeding on September 1, 2015—an original demand, a first amended demand, and a second amended demand.  In addition to these three affirmative pleadings, Claimants have also filed a reply and answering statement to Respondents' answer and counterclaim.  Accordingly, Claimants have filed four different pleadings explaining their claims and positions to the Tribunal, and there is

---

[2] The arbitration clause may be found in paragraph 10 on page 3 of the First Procedural Order, revised on June 3, 2016.

no need to wait until after the September pleading deadline to rule on the jurisdictional challenges.

Further, as required by the Contract, the parties have produced documents in connection with the filing of their respective arbitration demands, answers, and counterclaims, so Claimants have had the benefit of those documents when determining what claims, if any, they might have against Petrobras and PVIS. There is therefore no need for further discovery before ruling on the jurisdictional challenges.

Finally, Claimants were required to have a good-faith basis for asserting claims against Petrobras and PVIS in their original arbitration demand, in their first amended demand, and in their second amended demand. Claimants' argument in favor of delay incorrectly suggests that they can file a claim, take discovery to find some support for it, and then amend their pleadings to survive a jurisdictional challenge.

In sum, the Tribunal should grant the jurisdictional challenges asserted by Petrobras and PVIS because Claimants filed this arbitration almost ten months ago; have filed three different arbitration demands; have filed another reply and answering statement; and have engaged in extensive document discovery with Respondents. There is no reason to delay any ruling on the pending jurisdictional challenges.

**D.      PVIS is not a party to the Drilling Contract.**

As explained in Respondents' Brief Regarding Threshold Issues and Governing Law (the "**Brief**"), PVIS is not a proper party to this arbitration because it was not a party to the Contract at the time of termination. Under Article 2.2 of the Third Novation, PAI replaced PVIS as a party to the Contract and assumed all of PVIS's rights and obligations under the Contract: "PAI accepts to replace PVIS as a party to the Contract, assuming all of PVIS's rights and obligations

## CONFIDENTIAL

under the Contract, and PVIS accepts such replacement." Further, Article 2.10 of the Third Novation states that "the defined term 'Company' shall be read as PAI under the [Contract] and PAI shall assume all PVIS' rights and obligations under the [Contract]."

Instead of addressing the Contract's express language, Claimants focus their argument on the August 2015 termination letter, alleging that PVIS's signature on that letter, "standing alone," is sufficient for the Tribunal to assert jurisdiction over PVIS. *See* Response at 20. Arbitration is a creature of contract, however, and the operative contract confirms that PVIS was not a party at the time of termination. Accordingly, PVIS should be dismissed from this proceeding, because Claimants have not identified any basis under the Contract to keep PVIS in this arbitration.

### E. English law supports Petrobras' dismissal from this arbitration.

Petrobras' only connection to the parties' dispute is the Guaranty signed in connection with the execution of the Contract. Under the laws of England and Wales, which govern the Guaranty, any claim against Petrobras is premature because the Guaranty is a secondary suretyship obligation, not an independent first demand instrument. *See* Brief at 2-5, 14.

In their Response, Claimants misread English law and the holdings in *Vossloh Aktiengesellschaft v Alpha Trains (UK) Ltd.* [2010] EWHC (Ch) 2443, 2010 WL 3927839 ("*Vossloh*"), *Carey Value Added S.L. v. Grupo Urvasco S.A.* [2010] EWHC (QB) 1905, 2010 WL 2865968 [¶ 37] (Eng.) ("*Carey*"), and *Marubeni Hong Kong & South China Ltd. v. Mongolian Gov't* [2005] 1 W.L.R. 2497, 2503.

In each of those cases, the creditor [i.e., Claimants] brought suit against the guarantor [i.e., Petrobras] **before** an adjudication of the principal debtor's [i.e., PAI's] liability to the creditor in an underlying obligation. *See, e.g.*, *Vossloh*, at ¶ 16. Whether the creditor could

recover against the guarantor before an adjudication of principal debtor's liability to the creditor turned on the nature of the obligation between the guarantor and the creditor. *See Vossloh*, at ¶ 2 ("The issue which I am asked to decide is the basis on which, under the 2009 Guarantee, [the guarantor] can be required to make payment to [the creditor].").

In *Vossloh*, the court noted that, if the obligation could be characterized as a "demand bond," the guarantor's liability to the creditor "is triggered by a demand alone," because "it constitutes an unconditional independent promise to pay on demand all amounts demanded." *Vossloh*, at ¶ 4. On the other hand, if the obligation is a "contract of guarantee," the guarantor's liability "is triggered upon proof (whether by admission or by decision of a competent court of law) of a breach of contract by" the principal debtor. *Vossloh*, at ¶¶ 3, 23-24 ("The surety's liability in such a case is **conditional** upon the principal's failure to pay the particular debt so that if the condition is fulfilled the surety's liability will sound in debt." (emphasis added)).

In *Carey*, the creditor sued the guarantor for amounts owed by the principal debtor under a loan agreement. *Carey*, at ¶ 1. After the creditor moved for summary judgment, the guarantor argued that there was no outstanding indebtedness because the principal debtor had validly rescinded the loan agreement, so it was no longer liable to the creditor. *Id.* Alternatively, the guarantor argued that the principal debtor had substantial claims against the creditor for breach of the loan agreement, which the guarantor was entitled to set off against any sums owed to the creditor. *Id.* In response, the creditor argued the guaranty was a demand bond, so the creditor was entitled to recover against the guarantor "without having first to litigate" the validity of the principal debtor's claims against the creditor for breach of the loan agreement. *Id.* The English court ultimately found that the guaranty was not a demand bond, so the creditor was not entitled to payment on demand, without regard to the underlying liability of the principal debtor.

**CONFIDENTIAL**

The same is true here.  For the reasons stated in Respondents' Brief, the Guaranty given by Petrobras is not a demand bond—i.e., Claimants cannot recover on it without first having to litigate the merits of their claims against PAI and PAI's defenses to those claims.  As a "contract of guarantee," the Guaranty does not require any performance or payment by Petrobras until Claimants first prove—"(whether by admission or by decision of a competent court of law)"—a failure to perform by PAI, the principal debtor.  *See Vossloh*, at ¶ 24.  Accordingly, Claimants' claims against Petrobras based on the Guaranty are premature, and Petrobras should be dismissed from this proceeding.

## II.      THE TRIBUNAL SHOULD ORDER CLAIMANTS TO REMOVE THE LIEN.

In the Contract, Claimants agreed to resolve any and all disputes, including disputes about liens, through binding arbitration:

> The parties **shall** exclusively and finally resolve any dispute or controversy ("Dispute") between them arising out of this Contract, including any claim, liability, loss, demand, damages, **lien**, or cause of action ("Claim") using direct negotiations and arbitration as set out in this Article 24.2.

Third Novation ¶ 8.1 (emphasis added).  By agreeing to resolve all disputes through arbitration, Claimants gave the Tribunal the authority to order them to remove the lien that was filed **after** Claimants initiated this proceeding and asserted a claim for the unpaid invoices that form the basis of the lien.

The Contract's language also refutes Claimants' argument that an order to remove the lien would be an "extraordinary" remedy.  *See* Response at 20.  Under the Contract, Claimants agreed that the Tribunal is authorized "to take any interim measures as the arbitrator considers or arbitrators consider necessary, including the making of interim orders or awards or partial final

CONFIDENTIAL

awards." Third Novation ¶ 8.1.1(F). The Tribunal would therefore be well within its authority to order Claimants to remove the lien, and it should issue such an order.

### III.   THE TRIBUNAL SHOULD CAREFULLY EVALUATE EACH CLAIM IN DETERMINING WHICH LAW APPLIES.

The parties generally agree that federal maritime law applies in this proceeding. However, for the reasons stated in Respondent's Brief, to the extent maritime law does not apply to a contractual issue, Texas law (not Louisiana law) should apply to fill any gap. *See* Brief at 5.

Additionally, Claimants overstate the application of maritime law, by suggesting that it can resolve "any issue in this case." Response at 24. Not every issue in the parties' claims, counterclaims, and defenses involves "straightforward issues of contract interpretation and enforceability." *See id.* at 25. Indeed, some of Respondents' counterclaims and defenses involve bribery and corruption that occurred *before* the Contract was signed in 2009. This extra-contractual conduct must be carefully evaluated before accepting Claimants' invitation to apply U.S. federal maritime law to every issue in this proceeding. *See, e.g.*, *World Duty Free Co. Ltd. v. Republic of Kenya* (ICSID Case No. ARB/00/7), at ¶ 157 (applying transnational public policy against corruption notwithstanding choice-of-law clause in parties' agreement).

### CONCLUSION

For the reasons explained above, the Tribunal should (1) dismiss PVIS and Petrobras from this arbitration because they are not proper parties and the Tribunal lacks jurisdiction over them; (2) order Claimants to immediately remove and release the lien that they have improperly placed on PAI's property; and (3) carefully apply general maritime law, Texas law, and/or transnational public policy, as appropriate.

## CONFIDENTIAL

Date: June 24, 2016

Respectfully submitted,

THOMPSON & KNIGHT LLP

By: _____
       Andrew B. Derman
       Texas Bar No. 05770700
       Andrew.Derman@tklaw.com

       William M. Katz, Jr.
       Texas Bar No. 00791003
       William.Katz@tklaw.com

       Catherine W. Clemons
       Texas Bar No. 24087316
       Catherine.Clemons@tklaw.com

One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
Facsimile (214) 969-1751

ATTORNEYS FOR RESPONDENTS

Appendix 004704

# Exhibit 99



# Commercial

## Arbitration Rules and Mediation Procedures

**Including Procedures for Large, Complex Commercial Disputes**



AMERICAN ARBITRATION ASSOCIATION®

Available online at **adr.org/commercial**

Rules Amended and Effective October 1, 2013
Fee Schedule Amended and Effective July 1, 2016

## Regional Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, Virginia**
P. Jean Baker, Esq.
Vice President
Phone: 202.223.7093
Email: BakerJ@adr.org

**States: Oklahoma, Texas**
Andrew Barton
Vice President
Phone: 210.998.5750
Email: BartonA@adr.org

**States: Alabama, Georgia**
John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org

**States: City of Houston, Louisiana, Mississippi**
Ingeuneal C. Gray, Esq.
Vice President
Phone: 832.308.7893
Email: GrayI@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**
Karen Jalkut
Vice President
Phone: 617.695.6062
Email: JalkutK@adr.org

**States: Alaska, California, Hawaii, Oregon, Washington**
Serena K. Lee, Esq.
Vice President
Phone: 415.671.4053
Email: LeeS@adr.org

**States: Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, West Virginia**
Michelle M. Skipper
Vice President
Phone: 704.643.8605
Email: SkipperM@adr.org

**States: Florida**
Rebecca Storrow, Ph.D.
Vice President
Phone: 954.372.4341
Email: StorrowR@adr.org

**States: Arizona, Colorado, Kansas, Idaho, Montana, Nebraska, Nevada, New Mexico, Utah, Wyoming**
Lance K. Tanaka
Vice President
Phone: 303.831.0824
Email: TanakaL@adr.org

**States: Arkansas, Illinois, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, Wisconsin**
A. Kelly Turner, Esq.
Vice President
Phone: 312.361.1116
Email: TurnerK@adr.org

**States: New York**
Jeffrey T. Zaino, Esq.
Vice President
Phone: 212.484.3224
Email: ZainoJ@adr.org

## Case Management Vice Presidents and Assistant Vice Presidents

Jeffrey Garcia
Vice President
Phone: 559.490.1860
Email: GarciaJ@adr.org
**Administers cases in: AK, AZ, AR, CA, CO, HI, ID, IL, IA, KS, LA, MN, MS, MO, MT, NE, NV, NM, ND, OK, OR, SD, TX, UT, WA, WI, WY**

John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org
**Administers cases in: AL, DC, FL, GA, IN, KY, MD, NC, OH, SC, TN, VA**

Yvonne Baglini
Assistant Vice President
Phone: 866.293.4053
Email: BagliniY@adr.org
**Administers cases in: CT, DE, MA, ME, MI, NH, NJ, NY, PA, RI, VT, WV**

# Table of Contents

Important Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Standard Arbitration Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Large, Complex Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


Commercial Arbitration Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

R-1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

R-2. AAA and Delegation of Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

R-3. National Roster of Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

R-4. Filing Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

R-5. Answers and Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

R-6. Changes of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

R-7. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

R-8. Interpretation and Application of Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

R-9. Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

R-10. Administrative Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

R-11. Fixing of Locale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

R-12. Appointment from National Roster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

R-13. Direct Appointment by a Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

R-14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties . . . . . . . 16

R-15. Nationality of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

R-16. Number of Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

R-17. Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

R-18. Disqualification of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

R-19. Communication with Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

R-20. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

R-21. Preliminary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

R-22. Pre-Hearing Exchange and Production of Information . . . . . . . . . . . . . . . . . 19

R-23. Enforcement Powers of the Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

R-24. Date, Time, and Place of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

R-25. Attendance at Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

R-26. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

R-27. Oaths . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rules Amended and Effective October 1, 2013. Fee Schedule Amended and Effective July 1, 2016.

COMMERCIAL RULES   3

R-28. Stenographic Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

R-29. Interpreters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-30. Postponements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-31. Arbitration in the Absence of a Party or Representative . . . . . . . . . . . . . . . . .22

R-32. Conduct of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-33. Dispositive Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-34. Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-35. Evidence by Written Statements and Post-Hearing Filing of Documents or
Other Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-36. Inspection or Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-37. Interim Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-38. Emergency Measures of Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-39. Closing of Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

R-40. Reopening of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-41. Waiver of Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-42. Extensions of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-43. Serving of Notice and Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-44. Majority Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-45. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-46. Form of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-47. Scope of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-48. Award Upon Settlement—Consent Award . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-49. Delivery of Award to Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-50. Modification of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-51. Release of Documents for Judicial Proceedings. . . . . . . . . . . . . . . . . . . . . . . .29

R-52. Applications to Court and Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . .29

R-53. Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-54. Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-55. Neutral Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-56. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-57. Remedies for Nonpayment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-58. Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

Preliminary Hearing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

P-1. General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

P-2. Checklist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Expedited Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

E-1. Limitation on Extensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

E-2. Changes of Claim or Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

E-3. Serving of Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

E-4. Appointment and Qualifications of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . 34

E-5. Exchange of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

E-6. Proceedings on Documents and Procedures for the Resolution of Disputes
Through Document Submission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

E-7. Date, Time, and Place of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E-8. The Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E-9. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E-10. Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Procedures for Large, Complex Commercial Disputes . . . . . . . . . . . . . . . . . . . . . . . . 37

L-1. Administrative Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

L-2. Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

L-3. Management of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Administrative Fee Schedules (Standard and Flexible Fees) . . . . . . . . . . . . . . . . . . . . 38

Commercial Mediation Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

M-1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

M-2. Initiation of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

M-3. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

M-4. Appointment of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

M-5. Mediator's Impartiality and Duty to Disclose . . . . . . . . . . . . . . . . . . . . . . . . . 40

M-6. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

M-7. Duties and Responsibilities of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . 41

M-8. Responsibilities of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

M-9. Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

M-10. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

M-11. No Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

M-12. Termination of Mediation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

M-13. Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

M-14. Interpretation and Application of Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

M-15. Deposits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

M-16. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-17. Cost of the Mediation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Appendix 004711

# Commercial Arbitration Rules and Mediation Procedures

(Including Procedures for Large, Complex Commercial Disputes)



## Important Notice

These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA®. To ensure that you have the most current information, see our web site at **www.adr.org.**

## Introduction

Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.

The American Arbitration Association® (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on various forms of alternative dispute resolution.

Appendix 004712

## Standard Arbitration Clause

The parties can provide for arbitration of future disputes by inserting the following clause into their contracts:

> *Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*

Arbitration of existing disputes may be accomplished by use of the following:

> *We, the undersigned parties, hereby agree to submit to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules the following Controversy: (describe briefly). We further agree that the above controversy be submitted to (one) (three) arbitrator(s). We further agree that we will faithfully observe this agreement and the rules, that we will abide by and perform any award rendered by the arbitrator(s), and that a judgment of any court having jurisdiction may be entered on the award.*

The services of the AAA are generally concluded with the transmittal of the award. Although there is voluntary compliance with the majority of awards, judgment on the award can be entered in a court having appropriate jurisdiction if necessary.

## Administrative Fees

The AAA charges a filing fee based on the amount of the claim or counterclaim. This fee information, which is included with these rules, allows the parties to exercise control over their administrative fees. The fees cover AAA administrative services; they do not cover arbitrator compensation or expenses, if any, reporting services, or any post-award charges incurred by the parties in enforcing the award.

## Mediation

Subject to the right of any party to opt out, in cases where a claim or counterclaim exceeds $75,000, the rules provide that the parties shall mediate their dispute upon the administration of the arbitration or at any time when the arbitration is pending. In mediation, the neutral mediator assists the parties in

reaching a settlement but does not have the authority to make a binding decision or award. Mediation is administered by the AAA in accordance with its Commercial Mediation Procedures. There is no additional filing fee where parties to a pending arbitration attempt to mediate their dispute under the AAA's auspices.

Although these rules include a mediation procedure that will apply to many cases, parties may still want to incorporate mediation into their contractual dispute settlement process. Parties can do so by inserting the following mediation clause into their contract in conjunction with a standard arbitration provision:

> *If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission agreement:

> *The parties hereby submit the following dispute to mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

## Large, Complex Cases

Unless the parties agree otherwise, the procedures for Large, Complex Commercial Disputes, which appear in this pamphlet, will be applied to all cases administered by the AAA under the Commercial Arbitration Rules in which the disclosed claim or counterclaim of any party is at least $500,000 exclusive of claimed interest, arbitration fees and costs. The key features of these procedures include:

> A highly qualified, trained Roster of Neutrals;

> A mandatory preliminary hearing with the arbitrators, which may be conducted by teleconference;

> Broad arbitrator authority to order and control the exchange of information, including depositions;

> A presumption that hearings will proceed on a consecutive or block basis.

# Commercial Arbitration Rules

## R-1. Agreement of Parties*

**(a)** The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a Demand for Arbitration or Submission Agreement received by the AAA. Any disputes regarding which AAA rules shall apply shall be decided by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

**(b)** Unless the parties or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $75,000, exclusive of interest, attorneys' fees, and arbitration fees and costs.

Parties may also agree to use these procedures in larger cases. Unless the parties agree otherwise, these procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Sections E-1 through E-10 of these rules, in addition to any other portion of these rules that is not in conflict with the Expedited Procedures.

**(c)** Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $500,000 or more, exclusive of claimed interest, attorneys' fees, arbitration fees and costs. Parties may also agree to use the procedures in cases involving claims or counterclaims under $500,000, or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Sections L-1 through L-3 of these rules, in addition to any other portion of these rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

**(d)** Parties may, by agreement, apply the Expedited Procedures, the Procedures for Large, Complex Commercial Disputes, or the Procedures for the Resolution of Disputes through Document Submission (Rule E-6) to any dispute.

**(e)** All other cases shall be administered in accordance with Sections R-1 through R-58 of these rules.

* *A dispute arising out of an employer-promulgated plan will be administered under the AAA's Employment Arbitration Rules and Mediation Procedures. A dispute arising out of a consumer arbitration agreement will be administered under the AAA's Consumer Arbitration Rules.*

## R-2. AAA and Delegation of Duties

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices. Arbitrations administered under these rules shall only be administered by the AAA or by an individual or organization authorized by the AAA to do so.

## R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Arbitrators ("National Roster") and shall appoint arbitrators as provided in these rules. The term "arbitrator" in these rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

## R-4. Filing Requirements

**(a)** Arbitration under an arbitration provision in a contract shall be initiated by the initiating party ("claimant") filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration.

**(b)** Arbitration pursuant to a court order shall be initiated by the initiating party filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of any applicable arbitration agreement from the parties' contract which provides for arbitration.

  **i.** The filing party shall include a copy of the court order.

  **ii.** The filing fee must be paid before a matter is considered properly filed. If the court order directs that a specific party is responsible for the filing fee, it is the responsibility of the filing party to either make such payment to the AAA and seek reimbursement as directed in the court order or to make other such arrangements so that the filing fee is submitted to the AAA with the Demand.

  **iii.** The party filing the Demand with the AAA is the claimant and the opposing party is the respondent regardless of which party initiated the court action. Parties may request that the arbitrator alter the order of proceedings if necessary pursuant to R-32.

**(c)** It is the responsibility of the filing party to ensure that any conditions precedent to the filing of a case are met prior to filing for an arbitration, as well as any time requirements associated with the filing. Any dispute regarding whether a condition precedent has been met may be raised to the arbitrator for determination.

Rules Amended and Effective October 1, 2013. Fee Schedule Amended and Effective July 1, 2016.

COMMERCIAL RULES   **11**

**(d)** Parties to any existing dispute who have not previously agreed to use these rules may commence an arbitration under these rules by filing a written submission agreement and the administrative filing fee. To the extent that the parties' submission agreement contains any variances from these rules, such variances should be clearly stated in the Submission Agreement.

**(e)** Information to be included with any arbitration filing includes:

    **i.** the name of each party;

    **ii.** the address for each party, including telephone and fax numbers and e-mail addresses;

    **iii.** if applicable, the names, addresses, telephone and fax numbers, and e-mail addresses of any known representative for each party;

    **iv.** a statement setting forth the nature of the claim including the relief sought and the amount involved; and

    **v.** the locale requested if the arbitration agreement does not specify one.

**(f)** The initiating party may file or submit a dispute to the AAA in the following manner:

    **i.** through AAA WebFile, located at **www.adr.org;** or

    **ii.** by filing the complete Demand or Submission with any AAA office, regardless of the intended locale of hearing.

**(g)** The filing party shall simultaneously provide a copy of the Demand and any supporting documents to the opposing party.

**(h)** The AAA shall provide notice to the parties (or their representatives if so named) of the receipt of a Demand or Submission when the administrative filing requirements have been satisfied. The date on which the filing requirements are satisfied shall establish the date of filing the dispute for administration. However, all disputes in connection with the AAA's determination of the date of filing may be decided by the arbitrator.

**(i)** If the filing does not satisfy the filing requirements set forth above, the AAA shall acknowledge to all named parties receipt of the incomplete filing and inform the parties of the filing deficiencies. If the deficiencies are not cured by the date specified by the AAA, the filing may be returned to the initiating party.

## R-5. Answers and Counterclaims

**(a)** A respondent may file an answering statement with the AAA within 14 calendar days after notice of the filing of the Demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of any answering statement to the claimant and to all other parties to the arbitration. If no answering statement is filed within the stated time, the respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

**(b)** A respondent may file a counterclaim at any time after notice of the filing of the Demand is sent by the AAA, subject to the limitations set forth in Rule R-6. The respondent shall send a copy of the counterclaim to the claimant and all other parties to the arbitration. If a counterclaim is asserted, it shall include a statement setting forth the nature of the counterclaim including the relief sought and the amount involved. The filing fee as specified in the applicable AAA Fee Schedule must be paid at the time of the filing of any counterclaim.

**(c)** If the respondent alleges that a different arbitration provision is controlling, the matter will be administered in accordance with the arbitration provision submitted by the initiating party subject to a final determination by the arbitrator.

**(d)** If the counterclaim does not meet the requirements for filing a claim and the deficiency is not cured by the date specified by the AAA, it may be returned to the filing party.

## R-6. Changes of Claim

**(a)** A party may at any time prior to the close of the hearing or by the date established by the arbitrator increase or decrease the amount of its claim or counterclaim. Written notice of the change of claim amount must be provided to the AAA and all parties. If the change of claim amount results in an increase in administrative fee, the balance of the fee is due before the change of claim amount may be accepted by the arbitrator.

**(b)** Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have a period of 14 calendar days from the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

## R-7. Jurisdiction

**(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

**(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

Rules Amended and Effective October 1, 2013. Fee Schedule Amended and Effective July 1, 2016.

COMMERCIAL RULES   **13**

### R-8. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

### R-9. Mediation

In all cases where a claim or counterclaim exceeds $75,000, upon the AAA's administration of the arbitration or at any time while the arbitration is pending, the parties shall mediate their dispute pursuant to the applicable provisions of the AAA's Commercial Mediation Procedures, or as otherwise agreed by the parties. Absent an agreement of the parties to the contrary, the mediation shall take place concurrently with the arbitration and shall not serve to delay the arbitration proceedings. However, any party to an arbitration may unilaterally opt out of this rule upon notification to the AAA and the other parties to the arbitration. The parties shall confirm the completion of any mediation or any decision to opt out of this rule to the AAA. Unless agreed to by all parties and the mediator, the mediator shall not be appointed as an arbitrator to the case.

### R-10. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, mediation of the dispute, potential exchange of information, a timetable for hearings, and any other administrative matters.

### R-11. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. Any disputes regarding the locale that are to be decided by the AAA must be submitted to the AAA and all other parties within 14 calendar days from the date of the AAA's initiation of the case or the date established by the AAA. Disputes regarding locale shall be determined in the following manner:

**(a)** When the parties' arbitration agreement is silent with respect to locale, and if the parties disagree as to the locale, the AAA may initially determine the place of

arbitration, subject to the power of the arbitrator after appointment, to make a final determination on the locale.

**(b)** When the parties' arbitration agreement requires a specific locale, absent the parties' agreement to change it, or a determination by the arbitrator upon appointment that applicable law requires a different locale, the locale shall be that specified in the arbitration agreement.

**(c)** If the reference to a locale in the arbitration agreement is ambiguous, and the parties are unable to agree to a specific locale, the AAA shall determine the locale, subject to the power of the arbitrator to finally determine the locale.

The arbitrator, at the arbitrator's sole discretion, shall have the authority to conduct special hearings for document production purposes or otherwise at other locations if reasonably necessary and beneficial to the process.

## R-12. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

**(a)** The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

**(b)** If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 14 calendar days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. The parties are not required to exchange selection lists. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable to that party. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

**(c)** Unless the parties agree otherwise, when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

## R-13. Direct Appointment by a Party

**(a)** If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. The notice of appointment, with the name and address of the arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

**(b)** Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Section R-18 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Section R-18(b) that the party-appointed arbitrators are to be non-neutral and need not meet those standards.

**(c)** If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

**(d)** If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 14 calendar days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

## R-14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties

**(a)** If, pursuant to Section R-13, either the parties have directly appointed arbitrators, or the arbitrators have been appointed by the AAA, and the parties have authorized them to appoint a chairperson within a specified time and no appointment is made within that time or any agreed extension, the AAA may appoint the chairperson.

**(b)** If no period of time is specified for appointment of the chairperson, and the party-appointed arbitrators or the parties do not make the appointment within 14 calendar days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

**(c)** If the parties have agreed that their party-appointed arbitrators shall appoint the chairperson from the National Roster, the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Section R-12, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Section.

Appendix 004721

## R-15. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these rules.

## R-16. Number of Arbitrators

**(a)** If the arbitration agreement does not specify the number of arbitrators, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. A party may request three arbitrators in the Demand or Answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

**(b)** Any request for a change in the number of arbitrators as a result of an increase or decrease in the amount of a claim or a new or different claim must be made to the AAA and other parties to the arbitration no later than seven calendar days after receipt of the R-6 required notice of change of claim amount. If the parties are unable to agree with respect to the request for a change in the number of arbitrators, the AAA shall make that determination.

## R-17. Disclosure

**(a)** Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration. Failure on the part of a party or a representative to comply with the requirements of this rule may result in the waiver of the right to object to an arbitrator in accordance with Rule R-41.

**(b)** Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

**(c)** Disclosure of information pursuant to this Section R-17 is not an indication that the arbitrator considers that the disclosed circumstance is likely to affect impartiality or independence.

### R-18. Disqualification of Arbitrator

**(a)** Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for:

**i.** partiality or lack of independence,

**ii.** inability or refusal to perform his or her duties with diligence and in good faith, and

**iii.** any grounds for disqualification provided by applicable law.

**(b)** The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Section R-13 shall be non-neutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

**(c)** Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified under the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

### R-19. Communication with Arbitrator

**(a)** No party and no one acting on behalf of any party shall communicate *ex parte* with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate *ex parte* with a candidate for direct appointment pursuant to R-13 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

**(b)** Section R-19(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Section R-18(b), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Section R-18(b), the AAA shall as an administrative practice suggest to the parties that they agree further that Section R-19(a) should nonetheless apply prospectively.

**(c)** In the course of administering an arbitration, the AAA may initiate communications with each party or anyone acting on behalf of the parties either jointly or individually.

**(d)** As set forth in R-43, unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

Appendix 004723

## R-20. Vacancies

**(a)** If for any reason an arbitrator is unable or unwilling to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

**(b)** In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

**(c)** In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

## R-21. Preliminary Hearing

**(a)** At the discretion of the arbitrator, and depending on the size and complexity of the arbitration, a preliminary hearing should be scheduled as soon as practicable after the arbitrator has been appointed. The parties should be invited to attend the preliminary hearing along with their representatives. The preliminary hearing may be conducted in person or by telephone.

**(b)** At the preliminary hearing, the parties and the arbitrator should be prepared to discuss and establish a procedure for the conduct of the arbitration that is appropriate to achieve a fair, efficient, and economical resolution of the dispute. Sections P-1 and P-2 of these rules address the issues to be considered at the preliminary hearing.

## R-22. Pre-Hearing Exchange and Production of Information

**(a)** *Authority of arbitrator.* The arbitrator shall manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute, while at the same time promoting equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses.

**(b)** *Documents.* The arbitrator may, on application of a party or on the arbitrator's own initiative:

   **i.** require the parties to exchange documents in their possession or custody on which they intend to rely;

   **ii.** require the parties to update their exchanges of the documents on which they intend to rely as such documents become known to them;

   **iii.** require the parties, in response to reasonable document requests, to make available to the other party documents, in the responding party's possession or custody, not otherwise readily available to the party seeking the documents, reasonably believed by the party seeking the documents to exist and to be relevant and material to the outcome of disputed issues; and

iv.   require the parties, when documents to be exchanged or produced are maintained in electronic form, to make such documents available in the form most convenient and economical for the party in possession of such documents, unless the arbitrator determines that there is good cause for requiring the documents to be produced in a different form. The parties should attempt to agree in advance upon, and the arbitrator may determine, reasonable search parameters to balance the need for production of electronically stored documents relevant and material to the outcome of disputed issues against the cost of locating and producing them.

## R-23. Enforcement Powers of the Arbitrator

The arbitrator shall have the authority to issue any orders necessary to enforce the provisions of rules R-21 and R-22 and to otherwise achieve a fair, efficient and economical resolution of the case, including, without limitation:

**(a)** conditioning any exchange or production of confidential documents and information, and the admission of confidential evidence at the hearing, on appropriate orders to preserve such confidentiality;

**(b)** imposing reasonable search parameters for electronic and other documents if the parties are unable to agree;

**(c)** allocating costs of producing documentation, including electronically stored documentation;

**(d)** in the case of willful non-compliance with any order issued by the arbitrator, drawing adverse inferences, excluding evidence and other submissions, and/or making special allocations of costs or an interim award of costs arising from such non-compliance; and

**(e)** issuing any other enforcement orders which the arbitrator is empowered to issue under applicable law.

## R-24. Date, Time, and Place of Hearing

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 calendar days in advance of the hearing date, unless otherwise agreed by the parties.

Appendix 004725

### R-25. Attendance at Hearings

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person.

### R-26. Representation

Any party may participate without representation (*pro se*), or by counsel or any other representative of the party's choosing, unless such choice is prohibited by applicable law. A party intending to be so represented shall notify the other party and the AAA of the name, telephone number and address, and email address if available, of the representative at least seven calendar days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

### R-27. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

### R-28. Stenographic Record

**(a)** Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three calendar days in advance of the hearing. The requesting party or parties shall pay the cost of the record.

**(b)** No other means of recording the proceedings will be permitted absent the agreement of the parties or per the direction of the arbitrator.

**(c)** If the transcript or any other recording is agreed by the parties or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

**(d)** The arbitrator may resolve any disputes with regard to apportionment of the costs of the stenographic record or other recording.

## R-29. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

## R-30. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

## R-31. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

## R-32. Conduct of Proceedings

**(a)** The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

**(b)** The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

**(c)** When deemed appropriate, the arbitrator may also allow for the presentation of evidence by alternative means including video conferencing, internet communication, telephonic conferences and means other than an in-person presentation. Such alternative means must afford a full opportunity for all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute and, when involving witnesses, provide an opportunity for cross-examination.

**(d)** The parties may agree to waive oral hearings in any case and may also agree to utilize the Procedures for Resolution of Disputes Through Document Submission, found in Rule E-6.

## R-33. Dispositive Motions

The arbitrator may allow the filing of and make rulings upon a dispositive motion only if the arbitrator determines that the moving party has shown that the motion is likely to succeed and dispose of or narrow the issues in the case.

## R-34. Evidence

**(a)** The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default, or has waived the right to be present.

**(b)** The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

**(c)** The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

**(d)** An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

## R-35. Evidence by Written Statements and Post-Hearing Filing of Documents or Other Evidence

**(a)** At a date agreed upon by the parties or ordered by the arbitrator, the parties shall give written notice for any witness or expert witness who has provided a written witness statement to appear in person at the arbitration hearing for examination. If such notice is given, and the witness fails to appear, the arbitrator may disregard the written witness statement and/or expert report of the witness or make such other order as the arbitrator may consider to be just and reasonable.

**(b)** If a witness whose testimony is represented by a party to be essential is unable or unwilling to testify at the hearing, either in person or through electronic or other means, either party may request that the arbitrator order the witness to appear in person for examination before the arbitrator at a time and location where the witness is willing and able to appear voluntarily or can legally be compelled to do so. Any such order may be conditioned upon payment by the requesting party of all reasonable costs associated with such examination.

**(c)** If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

Rules Amended and Effective October 1, 2013. Fee Schedule Amended and Effective July 1, 2016.

COMMERCIAL RULES   **23**

## R-36. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

## R-37. Interim Measures

**(a)** The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

**(b)** Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

**(c)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

## R-38. Emergency Measures of Protection

**(a)** Unless the parties agree otherwise, the provisions of this rule shall apply to arbitrations conducted under arbitration clauses or agreements entered on or after October 1, 2013.

**(b)** A party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile or e-mail or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

**(c)** Within one business day of receipt of notice as provided in section (b), the AAA shall appoint a single emergency arbitrator designated to rule on emergency applications. The emergency arbitrator shall immediately disclose any circumstance likely, on the basis of the facts disclosed on the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

**(d)** The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such a schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone or video conference or on written submissions as alternatives to a formal hearing. The emergency arbitrator shall have the authority vested in the tribunal under Rule 7, including the authority to rule on her/his own jurisdiction, and shall resolve any disputes over the applicability of this Rule 38.

**(e)** If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage shall result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim order or award granting the relief and stating the reason therefore.

**(f)** Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the panel is constituted; thereafter such a request shall be addressed to the panel. The emergency arbitrator shall have no further power to act after the panel is constituted unless the parties agree that the emergency arbitrator is named as a member of the panel.

**(g)** Any interim award of emergency relief may be conditioned on provision by the party seeking such relief for appropriate security.

**(h)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with this rule, the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in this rule and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

**(i)** The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the tribunal to determine finally the apportionment of such costs.

## R-39. Closing of Hearing

**(a)** The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

**(b)** If documents or responses are to be filed as provided in Rule R-35, or if briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If no documents, responses, or briefs are to be filed, the arbitrator shall declare the hearings closed as of the date of the last hearing (including telephonic hearings). If the case was heard without any oral hearings, the arbitrator shall close the hearings upon the due date established for receipt of the final submission.

Rules Amended and Effective October 1, 2013. Fee Schedule Amended and Effective July 1, 2016.

COMMERCIAL RULES   **25**

**(c)** The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing. The AAA may extend the time limit for rendering of the award only in unusual and extreme circumstances.

## R-40. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties , the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award (14 calendar days if the case is governed by the Expedited Procedures).

## R-41. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

## R-42. Extensions of Time

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these rules, except the time for making the award. The AAA shall notify the parties of any extension.

## R-43. Serving of Notice and Communications

**(a)** Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

**(b)** The AAA, the arbitrator and the parties may also use overnight delivery or electronic facsimile transmission (fax), or electronic (e-mail) to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by e-mail or other methods of communication.

**(c)** Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

**(d)** Unless otherwise instructed by the AAA or by the arbitrator, all written communications made by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

**(e)** Failure to provide the other party with copies of communications made to the AAA or to the arbitrator may prevent the AAA or the arbitrator from acting on any requests or objections contained therein.

**(f)** The AAA may direct that any oral or written communications that are sent by a party or their representative shall be sent in a particular manner. The failure of a party or their representative to do so may result in the AAA's refusal to consider the issue raised in the communication.

## R-44. Majority Decision

**(a)** When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement or section (b) of this rule, a majority of the arbitrators must make all decisions.

**(b)** Where there is a panel of three arbitrators, absent an objection of a party or another member of the panel, the chairperson of the panel is authorized to resolve any disputes related to the exchange of information or procedural matters without the need to consult the full panel.

## R-45. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 calendar days from the date of closing the hearing, or, if oral hearings have been waived, from the due date set for receipt of the parties' final statements and proofs.

## R-46. Form of Award

**(a)** Any award shall be in writing and signed by a majority of the arbitrators. It shall be executed in the form and manner required by law.

**(b)** The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

Rules Amended and Effective October 1, 2013. Fee Schedule Amended and Effective July 1, 2016.

COMMERCIAL RULES  **27**

## R-47. Scope of Award

**(a)** The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

**(b)** In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

**(c)** In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

**(d)** The award of the arbitrator(s) may include:

**i.** interest at such rate and from such date as the arbitrator(s) may deem appropriate; and

**ii.** an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

## R-48. Award Upon Settlement—Consent Award

**(a)** If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses.

**(b)** The consent award shall not be released to the parties until all administrative fees and all arbitrator compensation have been paid in full.

## R-49. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at their last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

## R-50. Modification of Award

Within 20 calendar days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other

parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto.

## R-51. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party to the arbitration, furnish to the party, at its expense, copies or certified copies of any papers in the AAA's possession that are not determined by the AAA to be privileged or confidential.

## R-52. Applications to Court and Exclusion of Liability

**(a)** No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

**(b)** Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary or proper party in judicial proceedings relating to the arbitration.

**(c)** Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

**(d)** Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

**(e)** Parties to an arbitration under these rules may not call the arbitrator, the AAA, or AAA employees as a witness in litigation or any other proceeding relating to the arbitration. The arbitrator, the AAA and AAA employees are not competent to testify as witnesses in any such proceeding.

## R-53. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe administrative fees to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable. The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

## R-54. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and

Rules Amended and Effective October 1, 2013. Fee Schedule Amended and Effective July 1, 2016.

COMMERCIAL RULES   **29**

the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

## R-55. Neutral Arbitrator's Compensation

**(a)** Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation.

**(b)** If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

**(c)** Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

## R-56. Deposits

**(a)** The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

**(b)** Other than in cases where the arbitrator serves for a flat fee, deposit amounts requested will be based on estimates provided by the arbitrator. The arbitrator will determine the estimated amount of deposits using the information provided by the parties with respect to the complexity of each case.

**(c)** Upon the request of any party, the AAA shall request from the arbitrator an itemization or explanation for the arbitrator's request for deposits.

## R-57. Remedies for Nonpayment

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment.

**(a)** Upon receipt of information from the AAA that payment for administrative charges or deposits for arbitrator compensation have not been paid in full, to the extent the law allows, a party may request that the arbitrator take specific measures relating to a party's non-payment.

**(b)** Such measures may include, but are not limited to, limiting a party's ability to assert or pursue their claim. In no event, however, shall a party be precluded from defending a claim or counterclaim.

**(c)** The arbitrator must provide the party opposing a request for such measures with the opportunity to respond prior to making any ruling regarding the same.

**(d)** In the event that the arbitrator grants any request for relief which limits any party's participation in the arbitration, the arbitrator shall require the party who is making a claim and who has made appropriate payments to submit such evidence as the arbitrator may require for the making of an award.

**(e)** Upon receipt of information from the AAA that full payments have not been received, the arbitrator, on the arbitrator's own initiative or at the request of the AAA or a party, may order the suspension of the arbitration. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

**(f)** If the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full deposits requested within the time provided after the suspension, the arbitrator, or the AAA if an arbitrator has not been appointed, may terminate the proceedings.

## R-58. Sanctions

**(a)** The arbitrator may, upon a party's request, order appropriate sanctions where a party fails to comply with its obligations under these rules or with an order of the arbitrator. In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.

**(b)** The arbitrator must provide a party that is subject to a sanction request with the opportunity to respond prior to making any determination regarding the sanctions application.

# Preliminary Hearing Procedures

## P-1. General

**(a)** In all but the simplest cases, holding a preliminary hearing as early in the process as possible will help the parties and the arbitrator organize the proceeding in a manner that will maximize efficiency and economy, and will provide each party a fair opportunity to present its case.

**(b)** Care must be taken to avoid importing procedures from court systems, as such procedures may not be appropriate to the conduct of arbitrations as an alternative form of dispute resolution that is designed to be simpler, less expensive and more expeditious.

## P-2. Checklist

**(a)** The following checklist suggests subjects that the parties and the arbitrator should address at the preliminary hearing, in addition to any others that the parties or the arbitrator believe to be appropriate to the particular case. The items to be addressed in a particular case will depend on the size, subject matter, and complexity of the dispute, and are subject to the discretion of the arbitrator:

**(i)** the possibility of other non-adjudicative methods of dispute resolution, including mediation pursuant to R-9;

**(ii)** whether all necessary or appropriate parties are included in the arbitration;

**(iii)** whether a party will seek a more detailed statement of claims, counterclaims or defenses;

**(iv)** whether there are any anticipated amendments to the parties' claims, counterclaims, or defenses;

**(v)** which

    **(a)** arbitration rules;

    **(b)** procedural law; and

    **(c)** substantive law govern the arbitration;

**(vi)** whether there are any threshold or dispositive issues that can efficiently be decided without considering the entire case, including without limitation,

    **(a)** any preconditions that must be satisfied before proceeding with the arbitration;

    **(b)** whether any claim or counterclaim falls outside the arbitrator's jurisdiction or is otherwise not arbitrable;

    **(c)** consolidation of the claims or counterclaims with another arbitration; or

    **(d)** bifurcation of the proceeding.

**(vii)** whether the parties will exchange documents, including electronically stored documents, on which they intend to rely in the arbitration, and/or make written requests for production of documents within defined parameters;

**(viii)** whether to establish any additional procedures to obtain information that is relevant and material to the outcome of disputed issues;

**(ix)** how costs of any searches for requested information or documents that would result in substantial costs should be borne;

**(x)** whether any measures are required to protect confidential information;

**(xi)** whether the parties intend to present evidence from expert witnesses, and if so, whether to establish a schedule for the parties to identify their experts and exchange expert reports;

**(xii)** whether, according to a schedule set by the arbitrator, the parties will

**(a)** identify all witnesses, the subject matter of their anticipated testimonies, exchange written witness statements, and determine whether written witness statements will replace direct testimony at the hearing;

**(b)** exchange and pre-mark documents that each party intends to submit; and

**(c)** exchange pre-hearing submissions, including exhibits;

**(xiii)** the date, time and place of the arbitration hearing;

**(xiv)** whether, at the arbitration hearing,

**(a)** testimony may be presented in person, in writing, by videoconference, via the internet, telephonically, or by other reasonable means;

**(b)** there will be a stenographic transcript or other record of the proceeding and, if so, who will make arrangements to provide it;

**(xv)** whether any procedure needs to be established for the issuance of subpoenas;

**(xvi)** the identification of any ongoing, related litigation or arbitration;

**(xvii)** whether post-hearing submissions will be filed;

**(xviii)** the form of the arbitration award; and

**(xix)** any other matter the arbitrator considers appropriate or a party wishes to raise.

**(b)** The arbitrator shall issue a written order memorializing decisions made and agreements reached during or following the preliminary hearing.

## Expedited Procedures

### E-1. Limitation on Extensions

Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the Demand for Arbitration or counterclaim as provided in Section R-5.

### E-2. Changes of Claim or Counterclaim

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, upon the agreement of the other party, or the consent of the arbitrator. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $75,000, the case will be administered under the regular procedures unless all parties and the arbitrator agree that the case may continue to be processed under the Expedited Procedures.

### E-3. Serving of Notices

In addition to notice provided by Section R-43, the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

### E-4. Appointment and Qualifications of Arbitrator

**(a)** The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

**(b)** The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

**(c)** The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Section R-18. The parties shall notify the AAA within seven calendar days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

## E-5. Exchange of Exhibits

At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

## E-6. Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission

Where no party's claim exceeds $25,000, exclusive of interest, attorneys' fees and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. Where cases are resolved by submission of documents, the following procedures may be utilized at the agreement of the parties or the discretion of the arbitrator:

**(a)** Within 14 calendar days of confirmation of the arbitrator's appointment, the arbitrator may convene a preliminary management hearing, via conference call, video conference, or internet, to establish a fair and equitable procedure for the submission of documents, and, if the arbitrator deems appropriate, a schedule for one or more telephonic or electronic conferences.

**(b)** The arbitrator has the discretion to remove the case from the documents-only process if the arbitrator determines that an in-person hearing is necessary.

**(c)** If the parties agree to in-person hearings after a previous agreement to proceed under this rule, the arbitrator shall conduct such hearings. If a party seeks to have in-person hearings after agreeing to this rule, but there is not agreement among the parties to proceed with in-person hearings, the arbitrator shall resolve the issue after the parties have been given the opportunity to provide their respective positions on the issue.

**(d)** The arbitrator shall establish the date for either written submissions or a final telephonic or electronic conference. Such date shall operate to close the hearing and the time for the rendering of the award shall commence.

**(e)** Unless the parties have agreed to a form of award other than that set forth in rule R-46, when the parties have agreed to resolve their dispute by this rule, the arbitrator shall render the award within 14 calendar days from the date the hearing is closed.

**(f)** If the parties agree to a form of award other than that described in rule R-46, the arbitrator shall have 30 calendar days from the date the hearing is declared closed in which to render the award.

**(g)** The award is subject to all other provisions of the Regular Track of these rules which pertain to awards.

Rules Amended and Effective October 1, 2013. Fee Schedule Amended and Effective July 1, 2016.

COMMERCIAL RULES   **35**

## E-7. Date, Time, and Place of Hearing

In cases in which a hearing is to be held, the arbitrator shall set the date, time, and place of the hearing, to be scheduled to take place within 30 calendar days of confirmation of the arbitrator's appointment. The AAA will notify the parties in advance of the hearing date.

## E-8. The Hearing

**(a)** Generally, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of documents within two business days after the hearing. For good cause shown, the arbitrator may schedule additional hearings within seven business days after the initial day of hearings.

**(b)** Generally, there will be no stenographic record. Any party desiring a stenographic record may arrange for one pursuant to the provisions of Section R-28.

## E-9. Time of Award

Unless otherwise agreed by the parties, the award shall be rendered not later than 14 calendar days from the date of the closing of the hearing or, if oral hearings have been waived, from the due date established for the receipt of the parties' final statements and proofs.

## E-10. Arbitrator's Compensation

Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

# Procedures for Large, Complex Commercial Disputes

## L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA shall, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call. The conference will take place within 14 calendar days after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

**(a)** to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

**(b)** to discuss the views of the parties about the technical and other qualifications of the arbitrators;

**(c)** to obtain conflicts statements from the parties; and

**(d)** to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

## L-2. Arbitrators

**(a)** Large, complex commercial cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. With the exception in paragraph (b) below, if the parties are unable to agree upon the number of arbitrators and a claim or counterclaim involves at least $1,000,000, then three arbitrator(s) shall hear and determine the case. If the parties are unable to agree on the number of arbitrators and each claim and counterclaim is less than $1,000,000, then one arbitrator shall hear and determine the case.

**(b)** In cases involving the financial hardship of a party or other circumstance, the AAA at its discretion may require that only one arbitrator hear and determine the case, irrespective of the size of the claim involved in the dispute.

**(c)** The AAA shall appoint arbitrator(s) as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator(s) shall not have served as the mediator in the mediation phase of the instant proceeding.

## L-3. Management of Proceedings

**(a)** The arbitrator shall take such steps as deemed necessary or desirable to avoid delay and to achieve a fair, speedy and cost-effective resolution of a Large, Complex Commercial Dispute.

**(b)** As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be scheduled in accordance with sections P-1 and P-2 of these rules.

**(c)** The parties shall exchange copies of all exhibits they intend to submit at the hearing at least 10 calendar days prior to the hearing unless the arbitrator(s) determines otherwise.

**(d)** The parties and the arbitrator(s) shall address issues pertaining to the pre-hearing exchange and production of information in accordance with rule R-22 of the AAA Commercial Rules, and the arbitrator's determinations on such issues shall be included within the Scheduling and Procedure Order.

**(e)** The arbitrator, or any single member of the arbitration tribunal, shall be authorized to resolve any disputes concerning the pre-hearing exchange and production of documents and information by any reasonable means within his discretion, including, without limitation, the issuance of orders set forth in rules R-22 and R-23 of the AAA Commercial Rules.

**(f)** In exceptional cases, at the discretion of the arbitrator, upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator may order depositions to obtain the testimony of a person who may possess information determined by the arbitrator to be relevant and material to the outcome of the case. The arbitrator may allocate the cost of taking such a deposition.

**(g)** Generally, hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.


## Administrative Fee Schedules (Standard and Flexible Fees)

*FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT **www.adr.org/feeschedule.***

Appendix 004743

# Commercial Mediation Procedures

## M-1. Agreement of Parties

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedural guidelines, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

## M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a request for mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via WebFile at **www.adr.org.**

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

(i) A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.

(ii) The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.

(iii) A brief statement of the nature of the dispute and the relief requested.

(iv) Any specific qualifications the mediator should possess.

## M-3. Representation

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

## M-4. Appointment of the Mediator

If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

**(i)** Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

**(ii)** If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

**(iii)** If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

## M-5. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the *Model Standards of Conduct for Mediators* in effect at the time a mediator is appointed to a case. Where there is a conflict between the *Model Standards* and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

## M-6. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

## M-7. Duties and Responsibilities of the Mediator

**(i)** The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

**(ii)** The mediator is authorized to conduct separate or *ex parte* meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.

**(iii)** The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

**(iv)** The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

**(v)** In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

**(vi)** The mediator is not a legal representative of any party and has no fiduciary duty to any party.

## M-8. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-9. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

## M-10. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

   **(i)**   Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;

   **(ii)**   Admissions made by a party or other participant in the course of the mediation proceedings;

   **(iii)**  Proposals made or views expressed by the mediator; or

   **(iv)**  The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

## M-11. No Stenographic Record

There shall be no stenographic record of the mediation process.

## M-12. Termination of Mediation

The mediation shall be terminated:

(i) By the execution of a settlement agreement by the parties; or

(ii) By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or

(iii) By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or

(iv) When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

## M-13. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

## M-14. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

## M-15. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

Appendix 004748

## M-16. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

## M-17. Cost of the Mediation

*FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT* ***www.adr.org/feeschedule.***

Appendix 004749

© 2016 American Arbitration Association, Inc. All rights reserved. These rules are the copyrighted property of the
American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services.
Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws.
Please contact 800.778.7879 or websitemail@adr.org for additional information.

## Regional Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, Virginia**
P. Jean Baker, Esq.
Vice President
Phone: 202.223.7093
Email: BakerJ@adr.org

**States: Oklahoma, Texas**
Andrew Barton
Vice President
Phone: 210.998.5750
Email: BartonA@adr.org

**States: Alabama, Georgia**
John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org

**States: City of Houston, Louisiana, Mississippi**
Ingeuneal C. Gray, Esq.
Vice President
Phone: 832.308.7893
Email: GrayI@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**
Karen Jalkut
Vice President
Phone: 617.695.6062
Email: JalkutK@adr.org

**States: Alaska, California, Hawaii, Oregon, Washington**
Serena K. Lee, Esq.
Vice President
Phone: 415.671.4053
Email: LeeS@adr.org

**States: Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, West Virginia**
Michelle M. Skipper
Vice President
Phone: 704.643.8605
Email: SkipperM@adr.org

**States: Florida**
Rebecca Storrow, Ph.D.
Vice President
Phone: 954.372.4341
Email: StorrowR@adr.org

**States: Arizona, Colorado, Kansas, Idaho, Montana, Nebraska, Nevada, New Mexico, Utah, Wyoming**
Lance K. Tanaka
Vice President
Phone: 303.831.0824
Email: TanakaL@adr.org

**States: Arkansas, Illinois, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, Wisconsin**
A. Kelly Turner, Esq.
Vice President
Phone: 312.361.1116
Email: TurnerK@adr.org

**States: New York**
Jeffrey T. Zaino, Esq.
Vice President
Phone: 212.484.3224
Email: ZainoJ@adr.org

## Case Management Vice Presidents and Assistant Vice Presidents

Jeffrey Garcia
Vice President
Phone: 559.490.1860
Email: GarciaJ@adr.org
**Administers cases in: AK, AZ, AR, CA, CO, HI, ID, IL, IA, KS, LA, MN, MS, MO, MT, NE, NV, NM, ND, OK, OR, SD, TX, UT, WA, WI, WY**

John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org
**Administers cases in: AL, DC, FL, GA, IN, KY, MD, NC, OH, SC, TN, VA**

Yvonne Baglini
Assistant Vice President
Phone: 866.293.4053
Email: BagliniY@adr.org
**Administers cases in: CT, DE, MA, ME, MI, NH, NJ, NY, PA, RI, VT, WV**



AMERICAN ARBITRATION ASSOCIATION®

800.778.7879 | websitemail@adr.org | adr.org

Appendix 004751

# Exhibit 100

**McKenney, Dina**

| | |
|---|---|
| **From:** | Park, William W <wwpark@bu.edu> |
| **Sent:** | Sunday, May 20, 2018 5:48 PM |
| **To:** | Karl Stern; Katz, Bill; quirozy@adr.org; cbrower@20essexst.com; Derman, Andrew B.; Charles Eskridge; Rowsey, Catherine; Kate Shih; pjd@doblaw.com; dna@doblaw.com; f.gama@petrobras.com; Tai-Heng Cheng; gaitis1@aol.com; Davis, Janelle L.; Rector, Brett |
| **Cc:** | Yanett Quiroz |
| **Subject:** | RE: Vantage Deepwater Company v. Petrobras America, Inc. - Case 01-15-0004-8503 |

Party Representatives:

Having considered the Parties' respective communications on Respondents' application of 10 May 2018, the Tribunal rules that hearings shall be reopened for the limited purpose of admitting and considering Form 10-Q filed with the SEC on 4 May 2018 by Vantage Drilling International, now labelled as Exhibit R-2076.

The ruling was issued by a majority of the tribunal including Judge Brower and Chairman Park, as permitted by AAA Rule 44-B. Arbitrator Gaitis expressly declined to participate in making the ruling.

The Parties shall now submit any final comments on the effect and weight to be given to Exhibit R-2076.

Such comments shall be filed simultaneously, forty-eight (48) hours from issuance of this ruling. The hearings will then be closed to permit the Tribunal to consider the effect of Exhibit R-2076 on this arbitration.

To ensure simultaneity in submissions, please send comments only to Ms. Quiroz at the ICDR, who on receipt of observations from both sides will forward them to the Tribunal.

For the sake of good order, perhaps the Parties can acknowledge safe receipt of this message.

With best wishes,
WWP


**Professor William W. Park**
Boston University School of Law
765 Commonwealth Avenue
Boston, MA 02215

Telephone: +1 (617) 353-3149
E-mail: wwpark@bu.edu



**From:** Park, William W
**Sent:** Monday, May 14, 2018 15:54
**To:** Karl Stern ; Katz, Bill ; quirozy@adr.org; cbrower@20essexst.com; Derman, Andrew B. ; Charles Eskridge ; Rowsey, Catherine ; Kate Shih ; pjd@doblaw.com; dna@doblaw.com; f.gama@petrobras.com; Tai-Heng Cheng ; gaitis1@aol.com; Davis, Janelle L. ; Rector, Brett
**Subject:** RE: Vantage Deepwater Company v. Petrobras America, Inc. - Case 01-15-0004-8503

Party Representatives:
The Tribunal thanks counsel for their further exchanges on the Form 10-Q filed with the SEC.
We shall now proceed to address and decide the matter.
With best wishes,
WWP


**Professor William W. Park**
Boston University School of Law
765 Commonwealth Avenue
Boston, MA 02215

Telephone: +1 (617) 353-3149
E-mail: wwpark@bu.edu



**From:** Karl Stern <karlstern@quinnemanuel.com>
**Sent:** Monday, May 14, 2018 17:53
**To:** Katz, Bill <William.Katz@tklaw.com>; Park, William W <wwpark@bu.edu>; quirozy@adr.org; cbrower@20essexst.com; Derman, Andrew B. <Andrew.Derman@tklaw.com>; Charles Eskridge <charleseskridge@quinnemanuel.com>; Rowsey, Catherine <Catherine.Rowsey@tklaw.com>; Kate Shih <kateshih@quinnemanuel.com>; pjd@doblaw.com; dna@doblaw.com; f.gama@petrobras.com; Tai-Heng Cheng <taihengcheng@quinnemanuel.com>; gaitis1@aol.com; Davis, Janelle L. <Janelle.Davis@tklaw.com>; Rector, Brett <Brett.Rector@tklaw.com>
**Subject:** RE: Vantage Deepwater Company v. Petrobras America, Inc. - Case 01-15-0004-8503

Members of the Tribunal:

Claimants cited the DOJ's decision not to prosecute Claimants only as further refutation of Respondents' assertion in their briefing that Claimants somehow admitted liability through the Weil submissions to the DOJ. *See* Claimants' Post-Hearing Response Brief at ¶ 81. Such use is not inconsistent with the authorities Respondents cite below nor with the authorities holding an SEC settlement irrelevant and inadmissible.

Regards, Karl

**Karl Stern**
*Partner,*
Quinn Emanuel Urquhart & Sullivan, LLP

711 Louisiana Street, Suite 500
Houston, TX 77002
713-221-7171 Direct
713.221.7000 Main Office Number
713-221-7100 FAX
karlstern@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Katz, Bill [mailto:William.Katz@tklaw.com]
**Sent:** Sunday, May 13, 2018 10:04 PM
**To:** Park, William W <wwpark@bu.edu>; Karl Stern <karlstern@quinnemanuel.com>; quirozy@adr.org; cbrower@20essexst.com; Derman, Andrew B. <Andrew.Derman@tklaw.com>; Charles Eskridge <charleseskridge@quinnemanuel.com>; Rowsey, Catherine <Catherine.Rowsey@tklaw.com>; Kate Shih <kateshih@quinnemanuel.com>; pjd@doblaw.com; dna@doblaw.com; f.gama@petrobras.com; Tai-Heng Cheng <taihengcheng@quinnemanuel.com>; gaitis1@aol.com; Davis, Janelle L. <Janelle.Davis@tklaw.com>; Rector, Brett <Brett.Rector@tklaw.com>
**Subject:** RE: Vantage Deepwater Company v. Petrobras America, Inc. - Case 01-15-0004-8503

Professor Park,

Respondents do not wish to delay the issuance of the award, but they believe that their request is timely under Rule 40, which allows the Tribunal to reopen the hearing "at any time before the award is made." If the Tribunal grants Respondents' request, the award must still issue within "30 calendar days from the closing of the reopened hearing," pursuant to Rule 40.

Respondents further note that Claimants have argued that the DOJ's decision not to prosecute Claimants for the bribery and corruption at issue in this arbitration is relevant here, even though "evidence of non-prosecution in a criminal matter is not admissible to show 'innocence' in a civil matter." *Peery v. Serenity Behavioral Health Sys.*, No. 106-CV-172, 2009 WL 1438939, at *2 (S.D. Ga. May 15, 2009) (citing *Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1160 (11th Cir. 1986)). "There are many factors that influence the government's decision not to prosecute a defendant on certain charges" and "we cannot attribute the government's decision not to prosecute to an independent determination that the defendant is not guilty." *United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir. 1990); *see Texas Dept. of Pub. Safety v. Norrell*, 968 S.W.2d 16, 19 (Tex. App.—Corpus Christi 1998, no pet.) (holding that a prosecutor's decision not to file criminal charges "cannot constitute a factfinding or a certification that the accused is not guilty").

If the DOJ's decision not to criminally charge Claimants is relevant – as argued by Claimants – then it's only appropriate to consider Claimants' agreement to pay up to $5 million to the SEC to settle civil charges related to

the bribery and corruption at issue in this arbitration. This $5 million fine will allow Claimants to avoid larger and more significant penalties for their bribery and corruption. Finally, if the SEC commissioners do not vote to approve the settlement and Claimants are formally charged with violating the FCPA, we would expect Claimants to promptly notify the Tribunal and Respondents.

Other than these observations, Respondents have nothing further to add. Thank you.

Regards,

Bill

**William M. Katz, Jr. | Thompson & Knight LLP**
Partner

One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, Texas 75201
214.969.1330 (direct) | 214.880.3279 (fax) | william.katz@tklaw.com
vCard | Bio | www.tklaw.com

This message may be confidential and attorney-client privileged. If received in error, please do not read. Instead, reply to me that you have received it in error and delete the message.

**From:** Park, William W [mailto:wwpark@bu.edu]
**Sent:** Friday, May 11, 2018 5:51 PM
**To:** Karl Stern; Katz, Bill; quirozy@adr.org; cbrower@20essexst.com; Derman, Andrew B.; Charles Eskridge; Rowsey, Catherine; Kate Shih; pjd@doblaw.com; dna@doblaw.com; f.gama@petrobras.com; Tai-Heng Cheng; gaitis1@aol.com; Davis, Janelle L.; Rector, Brett
**Subject:** RE: Vantage Deepwater Company v. Petrobras America, Inc. - Case 01-15-0004-8503

Party Representatives:
The Tribunal acknowledges receipt of Claimants' comment on Respondents' application with respect to the Form 10-Q filed with the SEC on 4 May.
Absent a request by Respondent for leave to file further observations, the Tribunal will now proceed to consider the application.
With best wishes,
WWP

**From:** Karl Stern <karlstern@quinnemanuel.com>
**Sent:** Friday, May 11, 2018 23:13
**To:** Park, William W <wwpark@bu.edu>; Katz, Bill <William.Katz@tklaw.com>; quirozy@adr.org; cbrower@20essexst.com; Derman, Andrew B. <Andrew.Derman@tklaw.com>; Charles Eskridge <charleseskridge@quinnemanuel.com>; Rowsey, Catherine <Catherine.Rowsey@tklaw.com>; Kate Shih <kateshih@quinnemanuel.com>; pjd@doblaw.com; dna@doblaw.com; f.gama@petrobras.com; Tai-Heng Cheng <taihengcheng@quinnemanuel.com>; gaitis1@aol.com; Davis, Janelle L. <Janelle.Davis@tklaw.com>; Rector, Brett <Brett.Rector@tklaw.com>
**Subject:** RE: Vantage Deepwater Company v. Petrobras America, Inc. - Case 01-15-0004-8503

Members of the Tribunal:

While Claimants appreciate the time the Tribunal has given Claimants to comment on Respondents' application to reopen the hearing, Claimants submit those comments now with the hope of expediting

the resolution of the application and avoiding any delay in the issuance of an award. The application should be denied on two independent bases: first, the supposedly new information on which Respondents base the application was available before the Tribunal closed the hearing; and second, the material put at issue is neither relevant nor probative.

As to the first point, Respondents assert in their application that the quoted disclosure from Claimants' Form 10-Q was not available prior to Ms. Quiroz's April 27, 2018 letter notifying the parties that the hearing was closed as of April 25, 2018. This is incorrect. The exact same disclosure was set forth, verbatim, in Claimants' Form 10-K for the fiscal year ended December 31, 2017, which was publicly filed with the Securities and Exchange Commission on March 29, 2018. This was 27 days before the hearing was closed. *Compare* page 45 of the attached 10-K *with* page 14 of the 10-Q, and pages 11 and 22 of the 10-K to page 27 of the 10-Q. Because this disclosure is not new and was available well before the close of the hearing, Respondents' application to reopen the hearing should be denied.

As to the second point, Vantage has not admitted any violations, and there is nothing in the disclosure that suggests otherwise. It simply states that Vantage has offered to enter into a settlement with the SEC which it expects to finalize in the second quarter if accepted by the SEC. This provides no relevant or probative evidence to any issue in dispute.

Under Rule 408 of the Federal Rules of Evidence and similar rules adopted by virtually every court in the United States, evidence of settlement is not admissible as evidence going to the merits of a disputed claim. Rule 408 has been applied consistently to settlements with the SEC. *See, e.g., Carpenters Health & Welfare Fund v. Coca–Cola Co.,*No. 00–cv–2838, 2008 WL 9358563 (N.D. Ga. Apr. 23, 2008); *In re Blech Sec. Litig.*, No. 94 CIV. 7696 (RWS), 2003 WL 1610775, at *11 (S.D.N.Y. Mar. 26, 2003); *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 473 (D.N.J. 1998). As articulated by the courts, the rationale for this rule is twofold: "First, the relevancy of the settlement communications is thought to be suspect because they may have been an attempt to purchase peace rather than an admission of liability. Second, … the rule's exclusion of settlement evidence furthers public policy by promoting the voluntary settlement of disputes, which would be discouraged if evidence of compromise were later used in court." *Flexuspine, Inc. v. Globus Med., Inc*., 2016 WL 9279999, at *2 (E.D. Tex. July 6, 2016); *see also Lyondell Chem. Co. v. Occidental Chem. Corp*., 608 F.3d 284 (5th Cir. 2010) ("[T]he relevancy of settlement communications is thought to be suspect because they may have been an attempt to purchase peace rather than an admission of liability."); *State Farm Mut. Auto. Ins. Co. v. Wilborn*, 835 S.W.2d 260, 261 (Tex. Ct. App.—Houston [14th District] 1992, no writ) ("Offers to settle are also excluded from evidence on the grounds that such evidence does not represent a party's actual position, but is an amount he is willing to give or take to avoid the expense or annoyance of litigation.")

This rationale applies here. That Vantage has offered to buy its peace in a disputed matter—particularly considering the cost of any further proceeding and the overhang an ongoing investigation has on the company's financial arrangements (as reflected in the last sentence of the second excerpt from the 10-Q quoted by Respondents in their application, highlighted below)—has absolutely no bearing on the issues to be decided by this Tribunal.

Accordingly, Respondents' eleventh hour application, through which it seeks to delay the award, should be denied.

Regards, Karl

**Karl Stern**
*Partner,*

Quinn Emanuel Urquhart & Sullivan, LLP

711 Louisiana Street, Suite 500
Houston, TX 77002
713-221-7171 Direct
713.221.7000 Main Office Number
713-221-7100 FAX
karlstern@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Park, William W [mailto:wwpark@bu.edu]
**Sent:** Thursday, May 10, 2018 7:13 PM
**To:** Katz, Bill <William.Katz@tklaw.com>; quirozy@adr.org; cbrower@20essexst.com; Derman, Andrew B. <Andrew.Derman@tklaw.com>; Charles Eskridge <charleseskridge@quinnemanuel.com>; Rowsey, Catherine <Catherine.Rowsey@tklaw.com>; Kate Shih <kateshih@quinnemanuel.com>; pjd@doblaw.com; dna@doblaw.com; f.gama@petrobras.com; Karl Stern <karlstern@quinnemanuel.com>; Tai-Heng Cheng <taihengcheng@quinnemanuel.com>; gaitis1@aol.com; Davis, Janelle L. <Janelle.Davis@tklaw.com>; Rector, Brett <Brett.Rector@tklaw.com>
**Subject:** RE: Vantage Deepwater Company v. Petrobras America, Inc. - Case 01-15-0004-8503

Party Representatives:
The Tribunal acknowledges receipt of Respondents' application of even date with respect to the Form 10-Q filed with the SEC on 4 May 2018 by Vantage Drilling International.
Claimants are invited to comment, with observations to be filed not later than Friday 18 May.
With best wishes,
WWP

**From:** Katz, Bill <William.Katz@tklaw.com>
**Sent:** Thursday, May 10, 2018 17:45
**To:** quirozy@adr.org; cbrower@20essexst.com; Derman, Andrew B. <Andrew.Derman@tklaw.com>; charleseskridge@quinnemanuel.com; Rowsey, Catherine <Catherine.Rowsey@tklaw.com>; kateshih@quinnemanuel.com; pjd@doblaw.com; dna@doblaw.com; Park, William W <wwpark@bu.edu>; f.gama@petrobras.com; karlstern@quinnemanuel.com; taihengcheng@quinnemanuel.com; gaitis1@aol.com; Davis, Janelle L. <Janelle.Davis@tklaw.com>; Rector, Brett <Brett.Rector@tklaw.com>
**Subject:** RE: Vantage Deepwater Company v. Petrobras America, Inc. - Case 01-15-0004-8503

Members of the Tribunal,

Appendix 004758

Pursuant to AAA Rule 40, Respondents hereby apply to the Tribunal to reopen the hearing to consider a document that was not available to Respondents when Ms. Quiroz sent her April 27, 2018 letter notifying the parties that the hearing was closed as of April 25, 2018. Under Rule 40, the Tribunal may reopen the hearing "upon application of a party, at any time before the award is made." Because no award has been made yet, the Tribunal may reopen the hearing to consider the attached document labeled as Respondents' Exhibit 2076.

R-2076 is a copy of Claimants' Form 10-Q filed with the United States Securities and Exchange Commission (SEC) on May 4, 2018. This filing discloses that Claimants have reached an agreement in principle with the SEC to settle their alleged violations of the Foreign Corrupt Practices Act (FCPA) and pay a fine of up to $5 million, as reflected in the following passages from the exhibit, which may be found on pages 14 and 27 of the PDF:

> *Other Events:* Since July 2015, the Company has been cooperating in an investigation by the U.S. Department of Justice ("DOJ") and the SEC arising from allegations that Hamylton Padilha, the Brazilian agent VDC used in the contracting of the Titanium Explorer drillship to Petróleo Brasileiro S.A. ("Petrobras"), and Mr. Hsin-Chi Su, a former member of the Board of Directors and a significant shareholder of our former parent company, VDC, had engaged in an alleged scheme to pay bribes to former Petrobras executives, in violation of the U.S. Foreign Corrupt Practices Act ("FCPA"). In August 2017, we received a letter from the DOJ acknowledging our full cooperation in the DOJ's investigation and closing the investigation without any action against the Company. We have continued our cooperation in the investigation by the SEC into the same allegations and engaged in negotiations with the staff of the Division of Enforcement of the SEC to resolve their investigation. **We have reached an agreement in principle with the staff relating to terms of a proposed offer of settlement, which is being presented to the Commission for approval. While there can be no assurance that the proposed offer of settlement will be accepted by the Commission, the Company believes the proposed resolution will become final in the second quarter of 2018. In connection with the proposed offer of settlement, we have accrued a liability in the amount of $5 million.** If the Commission does not accept the proposed offer of settlement and the SEC determines that violations of the FCPA have occurred, the Company could be subject to civil and criminal sanctions, including monetary penalties, as well as additional requirements or changes to our business practices and compliance programs, any or all of which could have a material adverse effect on our business and financial condition. For more information about this matter, please see "*Note 7. Commitments and Contingencies*".

> <div align="center">***</div>

> In July 2015, we became aware of media reports that Hamylton Padilha, the Brazilian agent VDC used in the contracting of the Titanium Explorer drillship to Petrobras, had entered into a plea arrangement with the Brazilian authorities in connection with his role in facilitating the payment of bribes to former Petrobras executives. Among other things, Mr. Padilha provided information to the Brazilian authorities of an alleged bribery scheme between former Petrobras executives and Mr. Hsin-Chi, who was, at the time of the alleged bribery scheme, a member of the Board of Directors and a significant shareholder of our former parent company, VDC. When we learned of Mr. Padilha's plea agreement and the allegations, we voluntarily contacted the DOJ and the SEC to advise them of these developments, as well as the fact that we had engaged outside counsel to conduct an internal investigation of the allegations. Since disclosing this matter to the

DOJ and SEC, we have cooperated fully in their investigation of these allegations. In connection with such cooperation, we advised both agencies in early 2010 that we engaged outside counsel to investigate a report of alleged improper payments to customs and immigration officials in Asia. That investigation was concluded in 2011, and we determined at that time that no disclosure was warranted; however, in an abundance of caution, we provided the results of this investigation to the DOJ and SEC in light of the allegations in the Petrobras matter. In August 2017, we received a letter from the DOJ acknowledging our full cooperation in the DOJ's investigation into the Company concerning possible violations of the FCPA by VDC in the Petrobras matter and indicating that the DOJ has closed such investigation without any action. **In addition, the Company has engaged in negotiations with the staff of the Division of Enforcement of the SEC to resolve their investigation. We have reached an agreement in principle with the staff of the SEC relating to terms of a proposed offer of settlement, which is being presented to the Commission for approval. While there can be no assurance that the proposed offer of settlement will be accepted by the Commission, the Company believes the proposed resolution will become final in the second quarter of 2018. In connection with the proposed offer of settlement, we have accrued a liability in the amount of $5 million.** If the Commission does not accept the proposed offer of settlement and the SEC determines that violations of the FCPA have occurred, the Company could be subject to civil and criminal sanctions, including monetary penalties, as well as additional requirements or changes to our business practices and compliance programs, any or all of which could have a material adverse effect on our business and financial condition. Additionally, if we become subject to any judgment, decree, order, governmental penalty or fine, this may constitute an event of default under the terms of our secured debt agreements and, following notice from the requisite lenders and/or noteholders, as applicable, result in our outstanding debt under the 2016 Term Loan Facility and 10% Second Lien Notes becoming immediately due and payable at par, and our outstanding debt under Convertible Notes becoming immediately due and payable at the make-whole amount specified in the indenture governing the Convertible Notes.

For all these reasons, Responses request that the Tribunal reopen the hearing to consider exhibit R-2076, which was not available to Respondents until after Claimants filed it with the SEC on May 4, 2018. Thank you.

Regards,

Bill

**William M. Katz, Jr. | Thompson & Knight LLP**
Partner

One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, Texas 75201
214.969.1330 (direct) | 214.880.3279 (fax) | william.katz@tklaw.com
vCard | Bio | www.tklaw.com

This message may be confidential and attorney-client privileged. If received in error, please do not read. Instead, reply to me that you have received it in error and delete the message.

**From:** quirozy@adr.org [mailto:quirozy@adr.org]
**Sent:** Friday, April 27, 2018 10:25 AM

Appendix 004760

**To:** cbrower@20essexst.com; Derman, Andrew B.; charleseskridge@quinnemanuel.com; Rowsey, Catherine; kateshih@quinnemanuel.com; pjd@doblaw.com; dna@doblaw.com; wwpark@bu.edu; f.gama@petrobras.com; karlstern@quinnemanuel.com; taihengcheng@quinnemanuel.com; gaitis1@aol.com; Katz, Bill; mariobenvenuto@petrobras.com.br

**Subject:** Vantage Deepwater Company v. Petrobras America, Inc. - Case 01-15-0004-8503

Hello,

Please review the attached correspondence regarding the above-referenced case.

Feel free to contact me with any questions, comments or concerns you have related to this matter.

Thank you.

 **Yanett Quiroz**
**International Case Director**
International Centre for Dispute Resolution
American Arbitration Association
9 Greenway Plaza, Suite 1275
Houston**,** TX 77046
www.icdr.org
**T:** 832 308 5626
**F:**

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

Appendix 004761

# Exhibit 101

Appendix 004762

ICDR, American Arbitration Association
Case No. 01-15-0004-8503

Vantage Deepwater Company
Vantage Deepwater Drilling, Inc.

Claimants

v.

Petrobras America Inc.
Petrobras Venezuela Investments & Services, BV
Petróleo Brasileiro S.A. – Petrobras

Respondents

Procedural Order of 24 April 2017

| Honorable Charles N. Brower | Professor William W. Park | James M. Gaitis, Esq. |
| 20 Essex Street Chambers | Boston University School of Law | International Arbitration Chambers |
| 20 Essex Street | 765 Commonwealth Avenue | P. O. Box 1213 |
| London WC2R 3AL, England | Boston, Massachusetts 02215 USA | Whitefish, Montana 59937 USA |

Respondents' Motion of 11 April 2017

The Tribunal has considered Respondents' Motion of 11 April 2017 seeking additional data considered by Claimants' damages expert, Dr. E Allen Jacobs, as well as (i) Claimants' Response of 14 April 2017; (ii) Respondents' filing of a Supplemental Expert Report of Dr. Robert Maness of 15 April 2017, and (iii) Claimants' observations of 19 April 2017.

On 11 April, pursuant to Sections 17 and 23 of the First Procedural Order, Respondents sought an order from the Tribunal "compelling Claimants to produce additional documents containing facts or data considered by Claimants' damages expert, Dr. E. Allen Jacobs."

Section 17 of the First Procedural Order provides inter alia that expert reports "shall conform to the requirements of Federal Rule of Civil Procedure 26(a)(2)(B)."  Section 23 of the First Procedural Order provides inter alia that a party requires "relief relating to this order, such Party shall … file with the Tribunal a motion for leave, showing good cause why such relief should be granted.  Federal Rule of Civil Procedure 26(a)(2)(B) requires inter alia disclosure of "the facts or data considered by [an expert] witness in forming [his opinions]"  In this connection, Respondents sought disclosure of a list of eleven items set forth in their letter of 11 April.

On 4 April 2017, Claimants confirmed that Respondents already have been supplied with all documents considered by Dr. Jacobs, and that nothing has been withheld.  They also confirm that Dr. Jacobs did not consider the general ledger or other source documents.  Claimants represented that the latest dated records Dr. Jacobs considered were from December 2016. Moreover, with respect to certain of the documents sought, Claimants stated that Respondents already have in

Appendix 004763
Procedural Order of 24 April 2017

their possession all responsive documents, including agency agreements with Mr. Padilha and monthly records of fees paid to Mr. Padilha.  Finally, Claimants contend that Respondents' request constitutes a belated and backdoor attempt to obtain discovery not obtained during the Parties' exchange of Redfern requests.

On 15 April 2017, making reference to their earlier request, Respondents filed a Supplemental Expert Report of Dr. Robert Maness dated 14 April 2017 which they contended explains in paragraphs 12 through 15 why the allegedly missing data is significant when trying to calculate Claimants' alleged lost profits related to the Drilling Contract.

On 19 April 2017 Claimants replied that the Supplemental Expert Report of Dr. Maness indicates that Respondents seek cost data for the entirety of Vantage's fleet of rigs in order to verify the appropriateness of costs allocated to the Titanium Explorer.  Claimants renewed their objection that request as coming too late and being unnecessary to confirm the appropriateness of Vantage's cost allocations.  Claimants also noted that the Second Witness Statement of Douglas Halkett authenticates the business records reflecting these cost allocations.  Claimants confirmed that Mr. Halkett can be available to explain further the basis for the allocations.

Finally, Claimants offer to provide sworn testimony concerning the accuracy and appropriateness of the costs allocated to the Titanium Explorer.

Having carefully weighed the Parties' respective positions, the Tribunal declines to grant the Respondents' Motion of 11 April 2017.

For the Tribunal,

William W. Park, Chairman
24 April 2017, Houston, Texas

Appendix 004764

# Exhibit 102

Appendix 004765

ICDR, American Arbitration Association
Case No. 01-15-0004-8503
Vantage Deepwater Company
Vantage Deepwater Drilling, Inc.

CLAIMANTS

v.

Petrobras America Inc.
Petrobras Venezuela Investments & Services, BV
Petróleo Brasileiro S.A. – Petrobras

RESPONDENTS

Procedural Order of 11 May 2017

| Honorable Charles N. Brower | Professor William W. Park | James M. Gaitis, Esq. |
|---|---|---|
| 20 Essex Street Chambers | Boston University School of Law | International Arbitration Chambers |
| 20 Essex Street | 765 Commonwealth Avenue | P. O. Box 1213 |
| London WC2R 3AL, England | Boston, Massachusetts 02215 USA | Whitefish, Montana 59937 USA |

Having considered the Parties' positions on hearing protocols, including matters discussed during today's telephone conference and noted in the joint letter of 10 May 2017, the Tribunal hereby rules on open matters and confirms certain directions conveyed earlier.

1.  After opening statements (up to 2.5 hours each) Claimants' fact witnesses will testify followed by Respondents' fact witnesses.

2.  On 22 May 2017 Mr. Padilha will testify in English via videoconference from Rio, with attorneys from both sides present.

3.  Experts will be heard following fact witnesses, grouped according to expert disciplines, presented back-to-back within each discipline, with Claimants' experts testifying first.  The Tribunal reserves discretion to recall experts for conferencing as it deems appropriate after hearing their testimony.

4. The Parties shall present closing oral arguments of up to 2.5 hours each.

5.  Time for witness examination and cross-examination will be allocated according to a principle of parity on a 50/50 basis, subject to appropriate adjustment during hearings to ensure the case is heard properly.  The Parties shall calculate the hours available for each side based on a hearing day from 09:30 to 17:30, with an hour for lunch and two 15 minute stretch breaks.  Each side shall designate a time-keeper, the two of whom shall confer daily on time used.  Arbitrator questions will normally be charged to the side conducting the examination or cross-examination, except that exchanges over five minutes will be allocated on a 50/50 basis.  Time spent on procedural objections will normally be charged to the side conducting the examination or cross-examination, except if more than five minutes, in which event time will be charged to the side against which a ruling is made.

For the Tribunal,

William W. Park, Chairman
11 May 2017, Houston, Texas

Appendix 004766

# Exhibit 103

Appendix 004767

ICDR, American Arbitration Association
Case No. 01-15-0004-8503

Vantage Deepwater Company
Vantage Deepwater Drilling, Inc.

CLAIMANTS

v.

Petrobras America Inc.
Petrobras Venezuela Investments & Services, BV
Petróleo Brasileiro S.A. – Petrobras

RESPONDENTS

### Procedural Order of 3 January 2017

| | | |
|---|---|---|
| Honorable Charles N. Brower | Professor William W. Park | James M. Gaitis, Esq. |
| 20 Essex Street Chambers | Boston University School of Law | International Arbitration Chambers |
| 20 Essex Street | 765 Commonwealth Avenue | P. O. Box 1213 |
| London WC2R 3AL, England | Boston, Massachusetts 02215 USA | Whitefish, Montana 59937 USA |

Having considered the Parties' submissions on third-party funding and Claimants' privilege log, the Tribunal directs as follows.

1. Third-party Funding.  Claimants confirmed on 29 December 2016 that (i) no third-party funder finances this arbitration, (ii) no lender has a right to the award in this arbitration, (iii) no lender required this arbitration to be filed, and (iv) no officer of Claimants is entitled to a portion of the award in this arbitration.  No reason having been offered to doubt the veracity of these confirmations, the Tribunal declines to pursue the matter now, subject to revisiting the question upon any new information offered or pursuant to a different context for inquiry.

2. Affidavit.  Claimants' Texas counsel is invited to submit a sworn affidavit confirming details justifying assertions of privilege under Texas law, including the specific nature of any legal advice and/or anticipated litigation.  Such affidavit shall be submitted within four Houston business days of this Order, with any comments from Respondents filed within four Houston business days thereafter.  If Claimants consider it would assist assessment of privilege claims, they may produce redacted copies of documents for review by the Tribunal and Respondents.

3. Crime Fraud Exception.  The Tribunal invites submissions on the "Crime Fraud Exception" as applied to log nos. 1-3 and 45-54, including (a) nexus between relevant communications and alleged crime or fraud, (b) the nature of a *prima facie* case under Texas law needed to invoke the exception and (c) if it is argued that under Texas law a *prima facie* case sufficient to defeat privilege must be established by evidence, the evidence establishing the alleged crime or fraud in this instance.  The Tribunal contemplates two sequential rounds, initiated by Respondents.  After conferring, counsel shall present a joint proposal within two Houston business days of this Order.  Absent agreement, each side shall propose its alternative.

For the Tribunal,

*William W. Park*

William W. Park, Chairman
3 January 2017, Houston, Texas

Appendix 004768

# Exhibit 104

Appendix 004769



Steven Andersen
Vice President
9 Greenway Plaza, Suite 1275
Houston, TX 77046

July 13, 2018

**Via Email Only**

Karl Stern, Esq.
Charles Eskridge, Esq.
Kate Kaufmann Shih, Esq.
Quinn Emanuel Urquhart & Sullivan LLP
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
karlstern@quinnemanuel.com
charleseskridge@quinnemanuel.com
kateshih@quinnemanuel.com

Tai-Heng Cheng
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor,
New York, New York 10010
taihengcheng@quinnemanuel.com

Paul J. Dobrowski, Esq.
Danielle N. Andrasek, Esq.
Dobrowski Larkin & Johnson, LLP
4601 Washington Avenue
Suite 300
Houston, TX 77007
pjd@doblaw.com
dna@doblaw.com

William M. Katz, Jr., Esq.
Andrew B. Derman, Esq.
Catherine Clemons
Thompson & Knight LLP
One Arts Plaza
1722 Routh Street
Suite 1500
Dallas, TX 75201
william.katz@tklaw.com
andrew.derman@tklaw.com
catherine.clemons@tklaw.com

Fernando Gama
Petrobras America, Inc.
10350 Richmond Avenue
Suite 1400
Houston, TX 77042
f.gama@petrobras.com

Case Number: 01-15-0004-8503

Vantage Deepwater Company
and Vantage Deepwater Drilling Inc.
-vs-
Petrobras America, Inc.
Petrobras Venezuela Investments & Services, BV
Petroleo Brasileiro - SA - Petrobras

Dear Counsel,

The ICDR confirms receipt of Respondents' letter dated July 6, 2018. We also confirm receipt of Claimants' letter dated July 9, 2018. We note that the opposing Counsel have been copied on these communications.

As an administering arbitral institution the ICDR is not authorized to withdraw an arbitration award, and any action to enforce or challenge an award is subject to the purview of the courts. Further, given that the final award was issued and no issues remain before the tribunal, the ICDR cannot consider the request to disqualify Judge Brower and Professor Park.

Sincerely,

/s/

Yanett Quiroz, LL. M.
Director
(832)308-5626
quirozy@adr.org

Appendix 004771

# Exhibit 105

| 95th Congress | } HOUSE OF REPRESENTATIVES { | Report |
|---|---|---|
| 1st Session | | No. 95-640 |

# UNLAWFUL CORPORATE PAYMENTS ACT OF 1977

———————————

September 28, 1977 - Ordered to be printed

———————————

Mr. Staggers, from the committee of conference,

submitted the following

## REPORT

together with

## MINORITY VIEWS

[To accompany H.R. 3815]

[Including cost estimate of the Congressional Budget Office]

The Committee on Interstate and Foreign Commerce to whom was referred the bill (H.R. 3815) to amend the Securities Exchange Act of 1934 to make it unlawful for an issuer of securities registered pursuant to section 12 of such Act or an issuer required to file reports pursuant to section 15(d) of such Act to make certain payments to foreign officials and other foreign persons, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment strikes out all after the enacting clause and inserts in lieu thereof the following:

[*language of bill omitted*]

{4}

## PURPOSE OF THE LEGISLATION

H.R. 3815 is designed to prohibit the corrupt use of the mails or other means and instrumentalities of interstate commerce by U.S. corporations, directly or indirectly, to bribe foreign officials, foreign political parties, or candidates for foreign political office. The bill's coverage does not extend to so-called grease or facilitating payments.

## NEED FOR THE LEGISLATION

More than 400 corporations have admitted making questionable or illegal payments. The companies, most of them voluntarily, have reported paying out well in excess of $300 million in corporate funds to foreign government officials, politicians, and political parties. These corporations have included some of the largest and most widely held public companies in the United States; over 117 of them rank in the top Fortune 500 industries. The abuses disclosed run the

gamut from bribery of high foreign officials in order to secure some type of favorable action by a foreign government to so-called facilitating payments that allegedly were made to ensure that government functionaries discharge certain ministrial [sic] or clerical duties. Sectors of industry typically involved are: drugs and health care; oil and gas production and services; food products; aerospace, airlines and air services; and chemicals.

The payment of bribes to influence the acts or decisions of foreign officials, foreign political parties or candidates for foreign political office is unethical. It is counter to the moral expectations and values of the American public. But not only is it unethical, it is bad business as well. It erodes public confidence in the integrity of the free market system. It short-circuits the marketplace by directing business to those companies too inefficient to compete in terms of price, quality or service, or too lazy to engage in honest salesmanship, or too intent upon unloading marginal products. In short, it rewards corruption instead {5} of efficiency and puts pressure on ethical enterprises to lower their standards or risk losing business.

Bribery of foreign officials by some American companies casts a shadow on all U.S. companies. The exposure of such activity can damage a company's image, lead to costly lawsuits, cause the cancellation of contracts, and result in the appropriation of valuable assets overseas.

Corporate bribery is also unnecessary. The Secretary of Treasury testified before the Subcommittee on Consumer Protection and Finance:

Paying bribes. . . is simply not necessary to the successful conduct of business in the United States or overseas. My own experience as Chairman of the Bendix Corp. was that it was not necessary to pay bribes to have a successful export sales program.

Nor is Secretary Blumenthal's experience unique. Former SEC Chairman Hills testified:

Indeed, we find in every industry where bribes have been revealed that companies of equal size are proclaiming that they see no need to engage in such practices.

Despite the fact that the payments which this bill would prohibit are made to foreign officials, in many cases the resulting adverse competitive affects are entirely domestic. Former Secretary of Commerce Richardson pointed out that in a number of instances, "payments have been made not to "outcompete" foreign competitors, but rather to gain an edge over other U.S. manufacturers."

Corporate bribery also creates severe foreign policy problems for the United States. The revelation of improper payments invariably tends to embarrass friendly governments, lower the esteem for the United States among the citizens of foreign nations, and lend credence to the suspicions sown by foreign opponents of the United States that American enterprises exert a corrupting influence on the political processes of their nations. For example, in 1976, the Lockheed scandal shook the Government of Japan to its political foundation and gave opponents of close ties between the United States and Japan an effective weapon with which to drive a wedge between the two nations. In another instance, Prince Bernhardt of the Netherlands was forced to resign from his official position as a result of an inquiry into allegations that he received $1 million in pay-offs from Lockheed. In Italy, alleged payments by Lockheed, Exxon, Mobil Oil, and other corporations to officials of the Italian Government eroded public support for that Government and jeopardized U.S. foreign policy, not only with respect to Italy and the Mediterranean area, but with respect to the entire NATO alliance as well.

Finally, a strong antibribery statute would actually help U.S. corporations resist corrupt demands. According to former Gulf Oil Co., Chairman Bob Dorsey:

If we could cite our law which says we just may not do it, we would be in a better position to resist these pressures and refuse those requests.

## {6} NATURE OF THE LEGISLATION

The committee considered two possible approaches for curbing the type of bribery payments defined in sections 2 and 3. One approach is to require that these payments be publicly disclosed and criminal penalties imposed for failure to disclose. The other approach, which the committee adopted in H.R. 3815, is to outlaw the payoffs with criminal

sanctions.

The Subcommittee on Consumer Protection and Finance received extensive testimony on both approaches during the 94th and 95th Congresses. There emerged a clear consensus that foreign bribery is a reprehensible activity and that action must be taken to proscribe it. After carefully considering all the testimony adduced, the committee concluded that it should be outlawed rather than legalized through disclosure. The committee believes the criminalization approach to be the most effective deterrent, the least burdensome on business, and no more difficult to enforce than disclosure.

The committee determined that disclosure can never be an effective deterrent because the anticipated benefit of making a bribe, such as winning a multimillion dollar contract, generally exceeds the adverse effect, if any, of disclosing 1 year later a lump sum figure without names, amounts or even countries. Criminalization, on the other hand, has proven an effective deterrent. Although a vast number of questionable corporate payments have been disclosed, subsequent management changes have been attendant only to disclosures of domestic bribery. The reason is obvious: domestic bribes are clearly illegal whereas foreign bribes are not.

The committee also found that criminalization is no more difficult to enforce than disclosure. Both approaches involve proving beyond a reasonable doubt the same factual and legal elements. Most importantly, though, criminalization is far less burdensome on business. Most disclosure proposals would require U.S. corporations doing business abroad to report all foreign payments including perfectly legal payments such as for promotional purposes and for sales commissions. A disclosure scheme, unlike outright prohibition, would require U.S. corporations to contend not only with an additional bureaucratic overlay but also with massive paperwork requirements.

## COMMITTEE CONSIDERATION

The committee's consideration of improper overseas payments and related abuses by some American corporations commenced during the 94th Congress. The legislative proposals considered during the 94th Congress were based, in part, on an extensive "Report on Questionable and Illegal Corporate Payments and Practices" that was issued by the SEC on May 12, 1976. The SEC Report summarized that agency's enforcement efforts with respect to such corporate payments under existing law and revealed the widespread nature of the practice of questionable corporate foreign payments. On September 21 and 22, 1976, the Subcommittee on Consumer Protection and Finance held hearings on several bill to prohibit such payments including H.R. 15481, H.R. 13870, H.R. 13953, and S. 3664. Testimony was presented by the Chairman of the Securities and Exchange Commission Roderick Hills, {7} representatives from the Departments of State, Treasury, and Commerce, Representative John E. Moss, Chairman of the Subcommittee on Oversight and Investigations, Representative Solarz, Representative Harrington, the American Institute of Certified Public Accountants, public interest groups and the Bar. As a result of end of session pressures, the Subcommittee was unable to report the bill out prior to the adjournment of the 94th Congress.

In the 95th Congress, the Subcommittee on Consumer Protection and Finance held hearings on April 20 and 21, 1977, which focused on the bills H.R. 1602 (Messrs. Murphy and Solarz) and H.R. 3815 (Mr. Eckhardt). The subcommittee heard from Secretary of the Treasury Blumenthal, Chairman of the Securities and Exchange Commission Williams, Representative Moss, Representative Harrington, public interest groups and the bar. The subcommittee reported out H.R. 3815 with amendments on May 12, 1977. The full committee reported the bill by voice vote on September 20, 1977, a quorum being present.

## SECTION BY SECTION ANALYSIS

*Section. 1. Short Title*

This title may be cited as the "Unlawful Corporate Payments Act of 1977".

*Section. 2. Prohibition Against Certain Payments to Officials by Registered Companies*

This section of the bill, which enacts a new section 30A of the Securities Exchange Act of 1934, prohibits the corrupt

use of the mails or other means and instrumentalities of interstate commerce to offer, pay or promise to pay any money, or to offer, or give, or promise to give anything of value to any foreign official, any foreign political party or any candidate for foreign political office. The new provision would also prohibit the authorization of such payments or gifts. The prohibition in section 2 applies to any issuer of securities registered with the Commission pursuant to section 12(b) of the Securities Exchange Act or required to file reports with the Commission pursuant to section 15(d) of the act. Section 2 also applies to any officer, director, employee, or agent of such an issuer, and to any natural person in control of such an issuer, who may authorize, order or carry out, any act or practice constituting a violation of this section. However, an agent of the issuer shall not be subject to the sanctions of section 2 unless the issuer is found to have violated the section.

The term "control" is defined as the power to exercise a controlling influence over the management or policies of a domestic concern. Any person who owns beneficially, either directly or through one or more controlled domestic concerns, more than 50 per centum of the voting securities of a domestic concern, shall be presumed to control such corporation and any person who does not so own more that 50 percent of the voting securities of such corporation shall be presumed not to have such control.

H.R. 3815 broadly prohibits transactions that are corruptly intended to induce the recipient to use his or her influence to affect any act or decision of a foreign official, foreign government or an instrumentality of a foreign government. The word "corruptly" is used in order to make clear that the offer, payment, promise, or gift, must be intended to induce the recipient to misuse his official position; for example, wrongfully to direct business to the payor or his client, to obtain preferential legislation or regulations, or to induce a foreign official to fail to perform an official function. The word "corruptly" connotes an evil motive or purpose such as that required under 18 U.S.C. 201(b) which prohibits domestic bribery. As in 18 U.S.C. 201(b), the word "corruptly" indicates an intent or desire wrongfully to influence the recipient. It does not require that the act he fully consummated or succeed in producing the desired outcome.

*Facilitating payments*

The language of the bill is deliberately cast in terms which differentiate between such payments and facilitating payments, sometimes called "grease payments". In using the word "corruptly", the committee intends to distinguish between payments which cause an official to exercise other than his free will in acting or deciding or influencing an act or decision and those payments which merely move a particular matter toward an eventual act or decision or which do not involve any discretionary action. In defining "foreign official", the committee emphasizes this crucial distinction by excluding from the definition of "foreign official" government employees whose duties are essentially ministerial or clerical.

For example, a gratuity paid to a customs official to speed the processing of a customs document would not be reached by the bill. Nor would it reach payments made to secure permits, licenses, or the expeditious performance of similar duties of an essentially ministerial or clerical nature which must of necessity by performed in any event.

While payments made to assure or to speed the proper performance of a foreign official's duties may be reprehensible in the United States, the committee recognizes that they are not necessarily so viewed elsewhere in the world and that it is not feasible for the United States to attempt unilaterally to eradicate all such payments. As a result, the committee has not attempted to reach such payments. However, where the payment is made to influence the passage of law, regulations, the placement of government contracts, the formulation of policy or other discretionary governmental functions, such payments would be prohibited.

The committee fully recognizes that the proposed law will not reach all corrupt payments overseas. For example, Sections 2 and 3 would not permit prosecution of a foreign national who paid a bribe overseas acting entirely on his own initiative. The committee notes, however, that in the majority of bribery cases investigated by the SEC some responsible official or employee of the U.S. parent company had knowledge of the bribery and either explicitly or implicitly approved the practice. Under the bill as reported, such persons could be prosecuted. The concepts of aiding and abetting and joint participation would apply to a violation under this bill in the same manner in which those concepts have always applied in both SEC civil actions and in implied private actions brought under the securities

laws generally.

## {9}*SEC enforcement*

In the case of companies that currently file reports with the Securities and Exchange Commission, the Committee concluded that the Commission should retain investigative jurisdiction as to the prohibitions against corrupt payments in section 2 of the bill. This has been accomplished by providing that section 2 would amend the Securities Exchange Act of 1934. In the case of domestic concerns not otherwise subject to the Commission's jurisdiction, responsibility for the criminal prosecution of violations of the bill rests solely with the Justice Department.

Since its creation in 1934, the Commission, through its own attorneys, has been solely responsible for the conduct of all civil litigation, both trial and appellate, to which the Commission is a party. This arrangement has been effective and fruitful in insuring the proper discharge of the Commission's statutory mandate to protect the investing public. Accordingly, the committee intends that this arrangement shall not be altered.

The committee found that the SEC was in a far superior position to investigate reporting companies alleged to have bribed foreign officials because of its immediate access to those company's [sic] books and Commission filings. Further, retaining SEC jurisdiction in the case of reporting companies will avoid a costly duplication of effort which would result if enforcement of the antibribery statute were made the sole responsibility of the Justice Department.

Most importantly, the committee recognized the SEC's singular expertise at ferreting out foreign bribery. It was the Commission alone that followed up on the finding of the Watergate Special Prosecution Force in early 1975. On the other hand, it was not until late 1976 that the Justice Department formed a task force to investigate allegations of foreign corporate payments and to review all materials relating to such activities generated by the SEC and congressional committees.

A further reason for vesting investigative jurisdiction in the SEC with respect to section 2 arises from the Commission's well-deserved reputation for independence in its efforts. The committee would prefer to have investigations such as these, which may be politically sensitive, conducted by an independent agency responsive to Congress rather than the Executive branch.

Finally, the committee believes that, by assigning the SEC enforcement responsibilities with respect to Section 2, it will strengthen the Commission's ability to enforce compliance with existing requirements of the securities laws. Although there may be practical impediments to enforcement in individual cases, proof of bribery and other white collar crimes is often difficult to obtain in domestic cases. Moreover, the Commission's enforcement efforts under existing law demonstrate that it is possible to investigate successfully improper foreign payments made on behalf of American corporations.

The SEC's responsibilities would extend to conducting investigations, bringing civil actions, {10} commencing administrative proceedings if appropriate,[1] defending lawsuits against the Commission and its staff arising out o f the Commission's obligations under this Act, and referring cases to the Justice Department for criminal prosecution where warranted, just as the Commission currently does with respect to its existing responsibilities under the federal securities laws. The Commission, of course, will retain the power to seek all of the existing equitable remedies that have been recognized by the courts under the securities laws, and the Committee anticipates that the commission will continue to tailor remedies to fit the circumstances of specific cases.

Traditionally, there has been a close working relationship between the Justice Department and the SEC. The Committee fully expects that this cooperation between the two agencies will continue with respect to the enforcement of the provisions of this bill.

The Committee intends that the courts shall recognize a private cause of action based on this legislation, as they have in cases involving other provisions of the Securities Exchange Act, on behalf of persons who suffer injury as a result of prohibited corporate bribery. The recognition of such a private cause would enhance the deterrent effect of this legislation and provide a necessary supplement to the enforcement efforts of the Commission and the Department of Justice.

In addition, the Committee intends that no proof of *scienter* be required in a Commission enforcement action brought under the provisions of this bill, or of any other provision of the federal securities laws. Although the Supreme Court has held that private plaintiffs seeking to recover monetary damages for violations of Securities Exchange Act Rule 10b-5, 17 CFR 240.10b-5, must establish that the defendant acted with *scienter*, the appellate courts quite properly have never required proof of *scienter* in any of the Commission's own enforcement proceedings. *Compare Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976) with *Securities and Exchange Commission v. World Radio Mission, Inc.,* 544 F.2d 535 (1st Cir. 1976); *Securities and Exchange Commission v. Management Dynamics, Inc.,* 515 F.2d 801 (2d Cir. 1975); *Securities and Exchange Commission v. Spectrum, Ltd.,* 489 F.2d 535 (2d Cir. 1973). In the context of an SEC action to enjoin future violations of the securities laws, a defendant's state of mind should make no difference. The harm to the public is the same regardless of whether or not the violative conduct involved *scienter.* Because an SEC enforcement action is designed to protect the public against the recurrence of violative conduct, and not to punish a state of mind, this Committee intends that *scienter* is not an element of any Commission enforcement proceeding. In so stating, we affirm the views expressed in 1975, when the Congress considered the Securities Acts Amendments of 1975. See S. Rep. 94-75, 94th Cong., 1st Sess. (1975) at 76.

The bill as reported provides that any officer, director or agent of an issuer or a domestic business concern, or any natural person in con- **{11}** -trol of such a corporation, must be found to have violated the law "knowingly and willfully." Consistent with the often-reiterated holdings of the courts that have interpreted a similar standard in the few places it is included in the federal securities laws, the knowledge required is merely that a defendant be aware that he is committing the act which constitutes the violation - not that he knows his conduct is illegal or has any specific intent to violate the law. *See, e.g., Tager v. Securities and Exchange Commission,* 344 F.2d 5, 8 (2d Cir. 1965); *Gearhardt & Otis, Inc. v. Securities and Exchange Commission,* 348 F. 2d 798, 802-803 (D.C. Cir. 1965); *Authur Lipper Corporation, et al., v. Securities and Exchange Commission,* 547 F.2d 171, 181 (2d Cir. 1976). Indeed, even in the criminal context, neither knowledge of the law violated nor the intention to act in violation of the law is generally necessary for conviction, and the Committee does not intend that either be required here in either civil or criminal proceedings. *See Ellis v. United States,* 206 U.S. 246, 257 (1907).

The penalties for each violation of section 2 would be a fine of up to $10,000 and/or imprisonment for up to 5 years; but in the case of a corporation a fine of up to $1 million could be imposed.

*Liability of agents.*

The bill specifically provides that an agent of an issuer, as distinguished from an officer, director or other person in a policymaking position, shall not be subject to the penalties of the bill until it is shown in a separate proceeding or in the proceeding against such agent that the issuer itself was in violation of the provisions of the bill. This provision reflects the Committee's concern that in some instances a low level employee or agent of the corporation - perhaps the person who is designated to make the payment - might otherwise be made the scapegoat for the corporation. The essential elements of these prosecutions will presumably take place on foreign soil. Such an agent or employee unlike the corporation possibly would not have the resources, legal or financial, to provide witnesses necessary to his defense. Accordingly, the practical effect of sections 2(c)(2) and 3(c)(2) is to require the corporation to bring in witnesses to rebut the contention of its involvement. These witnesses would then be available to the agent in his defense.

## PROHIBITION AGAINST CERTAIN PAYMENTS TO OFFICIALS BY OTHER

## DOMESTIC CONCERNS

*Section 3.* This section subjects any domestic business concern, other than one subject to the reporting requirements of the Securities Exchange Act, any officer, director or agent of such a domestic business concern or any natural person in control of such a domestic business concern to the same prohibitions and penalties that are set forth in section 2. However, an agent of the domestic concern shall not be subject to the sanctions of section 3 unless the domestic

concern is found to have violated the section.

The term "domestic concern" is defined in the bill to mean any corporation, partnership, association, joint-stock company, business trust, unincorporated organization or sole proprietorship, which is owned or controlled by individuals who are citizens or nationals of the {12} United States, which has its principal place of business in the United States, or which is organized under the laws of a State of the United States or any territory, possession, or commonwealth of the United States.

By so defining domestic concern, the committee intends to reach not only all U.S. companies other than those subject to SEC jurisdiction, but also foreign subsidiaries of any U.S. corporation. The committee found it appropriate to extend the coverage of the bill to non-U.S. based subsidiaries because of the extensive use of such entities as a conduit for questionable or improper foreign payments authorized by their domestic parent.[2]

The committee believes this extension of U.S. jurisdiction to so-called foreign subsidiaries is necessary if the legislation is to be an effective deterrent to foreign bribery. Failure to include such subsidiaries would only create a massive loophole in this legislative scheme through which millions of bribery dollars will continue to flow. The Committee believes that the qualified extraterritorial application of this bill clearly supported by the legislative principles of international law.[3]

The term "control" is defined as the power to exercise a controlling influence over the management or policies of a domestic concern. Any person who owns beneficially, either directly or through one or more controlled domestic concerns, more than 50 per cent of the voting securities of a domestic concern, shall be presumed to control such corporation and any person who does not so own more than 50 percent of the voting securities of such corporation shall be presumed not to have such control.

The term "interstate commerce" is defined to mean trade, commerce, transportation, or communication among the several States, or between any foreign country and any State, or between any State and any place or ship outside thereof. The term includes the intrastate use of a telephone or other interstate means of communication and the intrastate use of any other interstate instrumentality.

Violations of the prohibition in section 3 by domestic concerns would be investigated and prosecuted by the Justice Department. Since the Securities Exchange Act of 1934 provides the SEC with authority to enforce its provisions including those of section 2 by civil injunction, the committee provided similar authority for the Justice Department to enforce the provisions of this sections [sic].

The penalties for each violation of this provision would be a fine of up to $10,000 or imprisonment for up to 5 years, or both, but in the case of a corporation a fine of up to $1 million could be imposed.

*[CBO estimate omitted]*

DEPARTMENT OF STATE
*Washington, D.C., April 20, 1977.*

{16} Hon. Harley O. Staggers.
*Chairman, Committee on Interstate and Foreign Commerce.*

Dear Mr. Chairman: The Secretary has asked me to reply to your letter of March 7, requesting the Department of State's views on H.R. 3815, a bill to amend the Securities Exchange Act to make it unlawful for specified persons to make certain payments to foreign officials and other foreign persons.

The administration has carefully reviewed the problem of foreign bribery, and has made its views known through Secretary of the Treasury Michael Blumenthal's testimony on S. 305 before the Senate Banking Committee on March 16, 1977. The Administration agrees with the aims of both S. 305 and H.R. 3815 and is in the process of suggesting improvements to them. The Department of State is hopeful that a law can be passed which will aid the Government's efforts to deter bribery of public officials abroad.

The Office of Management and Budget advises that from the standpoint of the administration's program there is no objection to the submission of this report.

Sincerely,

Douglas J. Bennet, Jr.,
*Assistant Secretary for
Congressional Relations.*

**{17}**

DEPARTMENT OF JUSTICE,
*Washington, D.C., April 20, 1977*

Hon. Harley O. Staggers,
*Chairman, Interstate and Foreign Commerce Committee, House of Representatives, Washington D.C.*

Dear Mr. Chairman: As previously indicated to the Senate Banking Committee, the Administration firmly supports legislation which would proscribe the bribery of foreign public officials by American businesses and their representatives. Accordingly, we are in complete accord with the aims and objectives of H.R. 3815 which would directly criminalize such illicit practices. Secretary Blumenthal will be testifying before the Committee on H.R. 3815 and will fully elaborate the Administration's position with respect to the issue of foreign payments. The purpose of this letter is to directly address our specific concerns regarding the enforcement provisions of H.R. 3815 and to point out certain apparent weaknesses of the Bill.

As the Department that will be ultimately responsible for criminally prosecuting any violations of H.R. 3815, we are acutely sensitive to the need for the Bill to provide an effective mechanism for detecting and investigating suspected violations of its provisions. Our experience in combatting domestic political corruption, coupled with our own recent efforts to develop prosecution [sic] involving the bribery of foreign officials amply demonstrates the difficulties of gathering sufficient credible and admissible evidence to support prosecution. By its very nature the bribery of public officials is covert and generally involves consensual parties who go to great lengths to conceal the transaction. When the official involved is a representative of a foreign government and most of the critical acts take place outside of the country, the problems of detection, investigation and prosecution are necessarily compounded.

Considering the anticipated enforcement problems associated with any statute which would proscribe bribery of foreign officials, we believe it imperative that we be in a position to rapidly mobilize maximum available investigative responsibility between the Securities and Exchange Commission and the Federal Bureau of Investigation. Rather than create such an anomaly, the Administration proposes instead to retain present Securities and Exchange Commission jurisdiction over illicit foreign payments by issuers subject to their registration requirements while simultaneously assigning criminal investigative jurisdiction to the Federal Bureau of Investigation for such cases regardless of the identity of the briber. This is in accord with current practices involving alleged domestic corruption by issuers and their representatives and experience has shown that it in no way restricts the Securities and Exchange Commission from continuing its own civil investigative efforts designed to protect the investing public.

The Department fully recognizes the expertise developed by the Securities and Exchange Commission over the past several years in the area of illicit foreign payments and believes they must play a vital role in any future attempt to deter and eradicate once and for all bribery of foreign officials by American issuers. Through their voluntary disclosure program they have performed a vital public service **{18}** in exposing the pervasive and apparently long-standing practice of some businesses to engage in such illicit practices. Their proposed Rules governing corporate record keeping, if promulgated, should further thwart attempts by issuers to conceal such payments and will presumably result in many fertile investigative leads. In order to be in a position to develop credible evidence in admissible form, this expertise, in our view, should be combined with that of the Federal Bureau of Investigation in

investigating corruption and in gathering evidence abroad. By affording jurisdiction over such offenses to the Federal Bureau of Investigation, we would be able to utilize the expertise of both agencies to ensure vigorous and prompt criminal prosecutions of violations of the proposed statute.

Several additional features of H.R. 3815, in our view, pose potential enforcement problems. First, as currently worded the statute would require that the mails or instrumentality [sic] of interstate commerce be directly used to offer or make the prohibited payment. We believe this to be unduly restrictive and suggest instead that the provision be modified so as to provide that the mails or interstate facility need only be used in furtherance of the illicit payment, offer, et cetera.

Second, we believe "acquiesce" by employees or officials is too vague a concept upon which to predicate criminal liability. If by the term you wish to reach those who assist those engaging in the illicit practice, then we suggest that the term is not needed in light of the provisions of sections 2, 3 and 4 of title 18.

Lastly, we wish to comment briefly on the provision of H.R. 3815 which would enable the Department to seek in appropriate cases injunctive relief. While we welcome this authority, we anticipate that in the future relatively few cases will involve continuing criminal activities which would initially lend themselves to such action. While it is conceivable that instances will arise where bribe payments will be made over a period of time possibly linked to the volume of sales, thereby suggesting immediate injunctive action, we expect future cases to primarily involve single bribe instances which will not effectively lend themselves to this preliminary form of judicial action.

I would be more than happy for Department representatives to meet with members of your staff and discuss more fully the points raised in this letter.


Sincerely,

Patricia M. Wald,
*Assistant Attorney General,*
*Office of Legislative Affairs.*


{19}


## MINORITY VIEWS TO H.R. 3815, UNLAWFUL CORPORATE PAYMENTS ACT

This legislation would prohibit U.S. corporations from making payments or promises of payments to foreign political or governmental officials. Payments falling within the scope of the bill must be made or offered with the purpose of corruptly influencing an act or decision of the foreign official or inducing that official to use his influence to affect a decision of a foreign government. [4] We support, without reservation, the goal of H.R. 3815, which is the elimination of foreign bribery. Certainly, any legislation which will restore public confidence in American business and will prevent a continuation of the practices which recently have been disclosed is desirable and should be enacted. We are concerned, however, that the approach adopted by H.R. 3815 is not the most effective to eliminate questionable foreign payments.

In general terms the bill makes certain payments unlawful and imposes criminal sanctions on the making of payments described in the bill. The criminalization approach is contrasted with the approach recommended by Former Secretary of Commerce Elliot Richardson which would have required disclosure of improper payments. We believe that adoption of the disclosure approach would, in no way, imply that payoffs will be condoned as long as they are disclosed. Rather, we believe that this approach would prove ultimately to be a much more effective deterrent than would the provisions of H.R. 3815. This is because the legislation will be extremely difficult, if not impossible, to enforce. Payments falling within the scope of the legislation would include payments made on foreign soil to foreign officials and most of such payments certainly require the active cooperation of foreign individuals and governments. Without such cooperation, the difficulties of obtaining witnesses and evidence to successfully investigate and prosecute the case would be

insurmountable.

The difficulties of the criminalization approach to dealing with the problems of questionable foreign payments were reiterated by Secretary of the Treasury Blumenthal when he testified before the Consumer Protection and Finance Subcommittee. At that time he stated:

I have always felt a criminal statute such as this one will not be easy to enforce, particularly because it does involve acts that take place in other countries, the whole ques- {20} -tion of extra territoriality and gets you into questions of availability of witnesses, gets you into the question of acts taken in other jurisdictions in which the laws are different...we must not underestimate the difficulties of enforcement that in any case will result from this kind of legislation.

Former Secretary of Commerce Elliot Richardson expressed similar fears which are highlighted in the report of the President's Task Force on Questionable Payments Abroad:

The Task Force has concluded, however, that the criminalization approach would represent little more than a policy assertion, for the enforcement of such a law would be very difficult if not impossible. . . The Task Force has concluded that unless reasonably enforceable criminal sanctions were devised, the criminal approach would represent poor public policy.

We believe that legislation that cannot be effectively enforced will do little to deter payoffs. On the other hand, disclosure could be a very effective deterrent especially in combination with the other sanctions against such payments which exist in present securities, antitrust, tax and criminal law. We are concerned that the committee may have constructed a paper tiger which in the long run will do little to discourage conduct which we all believe has no place in the American business community.

We note that in this regard that the disclosure concept in the political area was finally utilized in the Federal Election Campaign Act of 1971. Its effect has been dramatic when compared to the nearly 50 years of benign neglect given unlawful political contributions prior to that time. Hopefully, H.R. 3815 will not be a law shielding corruption for 50 years before the effective deterrent to foreign bribery - full disclosure - is required.

The legislation also sets up a curious division in enforcement responsibilities between the Securities and Exchange Commission and the Department of Justice. This is because the bill amends the Securities and Exchange Act of 1934 as well as the criminal code, thereby giving the SEC authority to enforce the provisions of the bill as they apply to companies regulated by the Commission with the Department of Justice enforcing the bill with respect to all other domestic companies falling within the scope of the bill. We believe that this split in enforcement responsibility is unwise for several reasons.

The investigation of illegal payoffs to foreign officials is at best only indirectly related to the SEC's primary responsibility which is the protection of investors. We are reluctant to see the Commission redirect its already limited resources away from carrying out its primary mission of protecting investors to investigating foreign bribery. This is especially true when there is another body within the government more suited to that role - that is, the Department of Justice. The bill gives the Justice Department enforcement authority with respect to those companies not regulated by the SEC. We see no good reason for establishing two different programs to enforce the act in two different Federal entities - the SEC and the Department of Justice. Certainly this aspect of the Legislation does nothing to advance the cause of governmental efficiency.

{21} Further, we note that responsibility for investigating and prosecuting domestic bribery cases rests solely within the Department of Justice. It remains a mystery to us why the committee would choose to split enforcement responsibility with respect to foreign bribery when enforcement authority for a related crime - domestic bribery - resides in the Department of Justice.

During committee consideration of this bill it was argued that this split was necessary so that the committee could retain jurisdiction over the subject matter dealt with in the legislation. If protection of jurisdictional turf is the only thing at stake here, then only the Judiciary Committee need be concerned. However, we believe that the split in

responsibility between the Justice Department and SEC which is now found in the bill could have an adverse impact on U.S. foreign policy. As pointed out above, H.R. 3815 does not affect domestic bribery - that is already unlawful under title 18. H.R. 3815 is a measure aimed exclusively at illegal foreign activity. Its enactment will invite employees of the SEC - a quasi-legislative agency - to be running all over the world either reincarnating the "ugly American" or creating SEC American foreign policy.

Those supporting this curious split of authority argue that the Department of Justice as a part of the Executive Branch might be more aware fo the political ramifications of vigorous enforcement of the bill and would, therefore, fail to prosecute violators vigorously. If our colleagues in the Majority, however, are distrustful of the Department of Justice, the answer is certainly not placing in other agencies authorities that more properly belong in the Department of Justice. Indeed, such an approach merely delays making the Department of Justice a more even-handed law enforcement agency.

Samuel L. Devine
James T. Broyhill
Clarence J. Brown
Joe Skubitz
James M. Collins
Edward Madigan
Carlos J. Moorhead
Norman F. Lent

1. For example, Rule 2(e) of the Commission's Rule of Practice, 17 CFR 201.2(e), authorizes the Commission to censure, suspend, or bar professionals, such as accountants and lawyers, from practicing before the Commission. A public or private Rule 2(e) proceeding might, in the Commission's view, be preferable, or used in addition to a civil injunctive action or criminal referral, in particular cases.

2. A survey of public documents filed with the Securities and Exchange Commission which disclose questionable or improper payment activities show that at least 64 U.S. public corporations made such payments through foreign subsidiaries. Of those companies, 19 corporations have made payments aggregating $1 million or more over various periods of time.

3. As a general rule, the application of federal criminal law is limited to the territory of the United States. However, there are a number of Federal statutes with criminal sanctions which have extraterritorial applications: 18 U.S.C. § 1546 (fraud and misuse of visas, permits, and other entry documents), 18 U.S.C. § 2314 (transportation of stolen goods, securities, moneys, fraudulent state stamps, or articles used in counterfeiting), 18 U.S.C. § 2381 (treason committed "within the United States or elsewhere"), 50 App. 18 U.S.C. § 1 et seq. (Trading with the Enemy Act), 15 U.S.C. § 776 et seq. (Securities Exchange Act of 1934), 15 U.S.C. § 1-7 (Sherman Anti-Trust Act), 15 U.S.C. § 41 et seq. (Federal Trade Commission Act), et cetera.

The cases indicate that in the extraterritorial application of U.S. law by the Congress, "[sic]*United States v. Erdos,* 474 F.2d 157, 159 (4th Cir. 1973). "From the body of international law, Congress may pick and choose whatever recognized principle of national jurisdiction is necessary to accomplish the purpose sought by the legislation, *United States v. Rodriguez,* 182 F. Supp. 479, 491 (S.D. Cal. 1960).

There are a number of theories of legislative jurisdiction under international law, at least three of which are applicable here. See, "Jurisdiction with Respect to Crime-Draft Convention, with Comment, Prepared by the Research in International Law the Harvard Law School" 29 *American Journal of International Law* (Supp.) 439 (1935) and American Law Institute, *Restatement (Second) of the Law of Foreign Relations of the United States,* ch. 2 (1965).

The first of these is the familiar territorial principle *Restatement* § 17. Under this principle, a nation may prescribe rules of law regulating conduct occurring within its territory, regardless of where the effect of the conduct falls. This is the principle Congress in presumed to have relied upon unless its specifically indicates otherwise. *American Banana Co. v. United Fruit Co.,* 213 U.S. 347 (1907).

Appendix 004783

The second principle grants a nation jurisdiction to prescribe rules of law attaching legal consequences to conduct that occurs outside its territory if the conduct causes an effect within the prescribing nation's territory. *Restatement* § 18. Under this theory, the courts have upheld Congressional regulation of the conduct of noncitizens, even if the conduct took place outside the U.S., so long as the consequences of the conduct are felt within the U.S. See, *United States v. Pizzarusso,* 388 F.2d 8 (2d Cir.), cert. denied, 392 F.2d 912 (D.C. Cir. 1973) [sic]. *United States v. Braverman,* 376 F.2d 249 (2d Cir.), *cert. denied,* 389 U.S. 885 (1967); and *Record v. United States,* 375 F. 2d 882 (5th Cir.), *cert. denied sub nom. Groleau v. United States,* 389 U.S. 884 (1967).

A third pertinent theory of international jurisdiction is the nationality principle. *Restatement* § 30. Under this theory, a nation has jurisdiction to prescribe rules of law regulating the conduct of its nationals wherever located. This principle would extend jurisdiction to include any corporation chartered by a State of the United States. See, *Vermilya-Brown Co. v. Cornell,* 335 U.S. 377 (1948); *United States v. Cotten,* 471 F. 2d 744 (9th Cir.), *cert. denied,* 411 U.S. 936 (1973); and *Gillars v. United States,* 182 F. 2d 962 (D.C. Cir. 950 [sic]) as cases where the courts have upheld Congressional regulation of the actions of U.S. citizens outside the territorial jurisdiction of the U.S.

4. It is our understanding that the bill is not intended to reach "facilitating" or "grease" payments such as a gratuity paid to a customs official to speed the processing of documents, payments made to secure licenses or permits which would be issued in any event, or payments made under duress to protect a business investment. Although these kinds of payments would not be proper in the United States, we realize that they are a recognized part of doing business in certain foreign countries and agree that any legislation should not attempt to eliminate such payments. The bill is only aimed at payments or promises made to induce an official to misuse his position wrongfully to direct business to the person making the payment or to obtain preferential legislation or regulations.

Appendix 004784

# Exhibit 106

| 95th Congress | **} SENATE {** | Report |
|---|---|---|
| 1st Session | | No. 95-114 |

FOREIGN CORRUPT PRACTICES AND

**DOMESTIC AND FOREIGN INVESTMENT**

**IMPROVED DISCLOSURE ACTS OF 1977**

————

REPORT

of the

COMMITTEE ON BANKING, HOUSING,

AND URBAN AFFAIRS

UNITED STATES SENATE

to accompany

S. 305

together with

ADDITIONAL VIEWS

May 2 (legislative day, March 28), 1977. - Ordered to be printed

The Committee on Banking, Housing and Urban Affairs favorably reports a bill (S. 305) to amend the Securities Exchange Act of 1934 to require companies subject to the jurisdiction of the Securities and Exchange Commission to maintain accurate records, to prohibit certain bribes, to expand and improve disclosure of ownership of the securities of U.S. companies, and for other purposes, and recommends that the bill, as amended by the committee, do pass.

History of the Bill

During the 94th Congress, the Committee on Banking, Housing and Urban Affairs held extensive hearings on the

matter of improper payments to foreign government officials by American corporations. The committee considered several bills designed to deal with the problem in various ways including S. 3133 introduced by Senator Proxmire on March 11, 1976; S. 3379 introduced by Senators Church, Clark and Pearson on May 5, 1976, and S. 3418 introduced by Senator Proxmire at the request of the Securities and Exchange Commission (SEC) on May 12, 1976.

On May 12, 1976, the committee received from the SEC an extensive "Report on Questionable and Illegal Corporate Payments and Practices," ("SEC report") which summarized the SEC's enforcement activities and findings to that date. That report traced the history of the Commission's discovery of conduct involving the misuse of corporate funds and the commencement of investigations which subsequently revealed that instances of undisclosed questionable or illegal [*page 2*] corporate payments were indeed widespread and represented a serious breach in the operation of the Commission's system of corporate disclosure and, correspondingly, in public confidence in the integrity of the system of capital formation. The SEC report also analyzed the public filings of 89 corporations that had disclosed varying types of questionable payments, plus six special reports obtained as the result of SEC enforcement actions and the allegations made in eight additional cases in which the SEC had obtained some form of judicial relief. Finally, the report contained the SEC's analysis of the degree of disclosure required concerning questionable foreign payments under the existing Federal securities laws and outlined the legislative and other responses which the Commission recommended to remedy these problems.

On June 22, 1976, the committee met and ordered reported a bill, S. 3664, which incorporated the SEC's recommendations and a direct prohibition against the payment of overseas bribes by any U.S. business concern. (1) On September 15, 1976, the Senate, by a unanimous vote of 86-0 passed S. 3664. The House of Representatives, however, did not complete work on that legislation before its adjournment on October 2, 1976.

Title II of S. 305, which would amend the Federal securities laws to enhance the present system of disclosure of the ownership of American business, has also been the subject of numerous hearings and careful deliberation by the committee in the past. Last year, as part of S. 3084, the committee reported favorably (2) and the Senate passed the disclosure provisions as title III of S. 3084. No final action was taken by the Congress on this bill prior to adjournment either.

Shortly after the 95th Congress convened on January 18, 1977, Senators Proxmire and Williams introduced S. 305. As introduced, title I of the bill was identical to S. 3664, the measure which the Senate had passed unanimously during the prior Congress and title II was substantially the same as Title II of S. 3084.

The committee held hearing on S. 305 on March 16, 1977, and received testimony from Senator Metcalf, the Securities and Exchange Commission, the Department of the Treasury, the American Bankers Association, and the Securities Industry Association. Subsequently, on April 7, 1977, the committee met in open session to consider S. 305. The committee ordered the bill, with an amendment, to be reported to the Senate.

## Summary of the Bill

### a. title i - corporate bribery of foreign officials

Title I of S. 305 is designed to prevent the use of corporate funds for corrupt purposes. As reported, Title I:

- Requires companies subject to the jurisdiction of the SEC to maintain strict accounting standards and management control over their assets;
- Prohibits the falsification of accounting records and the deceit of accountants auditing, the books and records of such companies; and [*page 3*]
- Makes it a crime for U.S. companies to bribe a foreign government official for the specified corrupt purposes. Companies violating the criminal prohibitions face maximum fines of $500,000. Individuals acting on behalf of such companies face a maximum fine of $10,000 and 5 years in jail.

In the past, corporate bribery has been concealed by the falsification of corporate books and records. Title I removes this avenue of coverup, reinforcing the criminal sanctions which are intended to serve as the significant deterrent to corporate bribery. Taken together, the accounting requirements and criminal prohibitions of Title I should effectively deter corporate bribery of foreign government officials.

## b. title ii - improved disclosure of corporate ownership

### [*OMITTED*]

## Need for Legislation

### a. title i - corporate bribery of foreign officials

Recent investigations by the SEC have revealed corrupt foreign payments by over 300 U.S. companies involving hundreds of millions of dollars. These revelations have had severe adverse effects. Foreign governments friendly to the United States in Japan, Italy, and the Netherlands have come under intense pressure from their own people. The image of American democracy abroad has been tarnished. Confidence in the financial integrity of our corporations has been impaired. The efficient functioning of our capital markets as been hampered.

[*page 4*] Corporate bribery is bad business. In our free market system it is basic that the sale of products should take place on the basis of price, quality, and service. Corporate bribery is fundamentally destructive of this basic tenet. Corporate bribery of foreign officials takes place primarily to assist corporations in gaining business. Thus foreign corporate bribery affects the very stability of overseas business. Foreign corporate bribes also affect our domestic competitive climate when domestic firms engage in such practices as a substitute for healthy competition for foreign business.

Managements which resort to corporate bribery and the falsification of records to enhance their business reveal a lack of confidence about themselves. Secretary of the Treasury Blumenthal, in appearing before the committee in support of the criminalization of foreign corporate bribery testified that: "Paying bribes - apart from being morally repugnant and illegal in most countries - is simply not necessary for the successful conduct of business here or overseas."

The committee concurs in Secretary Blumenthal's judgment. Many U.S. firms have taken a strong stand against paying foreign bribes and are still able to compete in international trade. Unfortunately, the reputation and image of all U.S. businessmen has been tarnished by the activities of a sizable number, but by no means a majority of American firms. A strong antibribery law is urgently needed to bring these corrupt practices to a halt and to restore public confidence in the integrity of the American business system.

## b. title ii - disclosure of corporate ownership

### [*OMITTED*]

### [*page 7*]

## Nature of Legislation

### a. title i - corporate bribery of foreign officials

*1. Accurate accounting*

The committee recognizes that the SEC has broad authority to promulgate accounting standards for companies subject to jurisdiction under its existing authority. Nevertheless, the committee believes the Commission's current program for accurate accounting should be supplemented by an explicit statement of statutory policy. The accounting standards in S. 305 are intended to operate in tandem with the criminalization provisions of the bill to deter corporate bribery. S. 305 expresses a public policy which encompasses a unified approach

to the matter of corporate bribery.

This legislation imposes affirmative requirements on issuers to maintain books and records which accurately and fairly reflect the transactions of the corporation and to design an adequate system of internal controls to assure, among other things, that the assets of the issuer are used for proper corporate purpose. The committee believes that the imposition of these affirmative duties under our securities laws coupled with attendant civil liability and criminal penalties for failure to comply with the statutory standard will go a long way to prevent the use of corporate assets for corrupt purposes. Public confidence in securities markets will be enhanced by assurance that corporate recordkeeping is honest.

Section 102 of the bill as reported amends section 13(b) of the Securities Exchange Act by adding new paragraphs (b)(2), (b)(3), (b)(4), and (b)(5). The provisions of section 102 apply to issuers which have securities listed on an exchange pursuant to subsection 12(b) of the Securities Exchange Act, to issuers which meet the requirements of section 12(g) of that Act, and to issuers subject to the reporting requirement of section 15(d) of the Act.

The purpose of section 102 is to strengthen the accuracy of the corporate books and records and the reliability of the audit process which constitute the foundations of our system of corporate disclosure. Section 102 substantially embodies the measures which the SEC recommended to the committee in its May 22, 1976, report on questionable payments. New subparagraph (b)(2)(A) imposes an obligation on issuers to maintain books and records that accurately and fairly reflect transactions and dispositions of the assets of the issuers. (3)

Subparagraph (b)(2)(B) would require issuers to devise and maintain an adequate system of internal accounting controls sufficient to *[page 8]* provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with generally accepted accounting principles or any other applicable criteria. Because the accounting profession has defined the objectives of a system of accounting control, the definition of the objectives contained in this subparagraph is taken from the authoritative accounting literature. *See* American Institute of Certified Public Accountants, Statement on Auditing Standards No. 1, 320.28 (1973).

The establishment and maintenance of a system of internal controls is an important management/obligation [*sic*]. A fundamental aspect of management's stewardship responsibility is to provide shareholders with reasonable assurances that the business is adequately controlled. Additionally, management has a responsibility to furnish shareholders and potential investors with reliable financial information on a timely basis. An adequate system of internal accounting controls is necessary to management's discharge of these obligations.

The committee understands that auditors customarily provide management with comments on the state of the client's internal controls. Those comments are designed to assist the issuer in improving its system of internal controls and thereby to assist the auditor in the conduct of its audit. The committee recognizes that no system of internal controls is perfect, and that there will always be room for improvement. Auditor's comments and suggestions to management on possible improvements are to be encouraged.

The establishment and maintenance of a system of internal control and accurate books and records are fundamental responsibilities of management. The expected benefits to be derived from the conscientious discharge of these responsibilities are of basic importance to investors and the maintenance of the integrity of our capital market system. The committee recognizes, however, that management must exercise judgment in determining the steps to be taken, and the cost incurred, in giving assurance that the objectives expressed will be achieved. Here, standards of reasonableness must apply. In this regard, the term "accurately" does not mean exact precision as measured by some

abstract principle. Rather it means that an issuer's records should reflect transactions in conformity with generally accepted accounting principles or other applicable criteria. While management should observe every reasonable prudence in satisfying the objectives called for in new paragraph (2) of section 13(b), the committee recognizes that management must necessarily estimate and evaluate the cost/benefit relationships of the steps to be taken in fulfillment of its responsibilities under this paragraph. The accounting profession will be expected to use their professional judgment in evaluating the systems maintained by issuers. The size of the business, diversity of operations, degree of centralization of financial and operating management, amount of contact by top management with day-to-day operations, and numerous other circumstances are factors which management must consider in establishing and maintaining an internal accounting controls system.

- *Prohibition against falsification of accounting records and deception of auditors*

Paragraph (b)(3) would make it unlawful for any person, directly or indirectly, knowingly to falsify any book, record or account main[*page 9*]tained, or required to be maintained, for an accounting purpose of an issuer subject to paragraph (b)(2) of section 13 of the Securities Exchange Act of 1934. This paragraph covers both actions of commission and omission.

Paragraph (b)(4) would prohibit knowingly making false or misleading statements, or knowingly omitting to state facts necessary to be stated, to an accountant in connection with an audit or examination of issuers identified in paragraph (b)(2) of section 13 of the Securities Exchange Act. This paragraph would also apply to audits in connection with a securities offering registered or to be registered under the Securities Act of 1933. Concepts of aiding and abetting are applicable to conduct covered by these sections. By specifically prohibiting the making of knowingly materially false or misleading statements or omissions to auditors, the bill is designed to encourage careful communications between the auditors and persons from whom the auditors seek information in the audit process. The committee is of the view that a proscription on knowing false statements to auditors will enhance the integrity of the auditing process.

The amendments to section 13(b) prohibiting the falsification of corporate books and records and the making of misleading representations to auditors are not intended to make unlawful conduct which is merely negligent. To clarify the purpose of these paragraphs, therefore, the committee inserted the term "knowingly" in appropriate places in both paragraphs (3) and (4). As explained to the committee, the term "knowingly" connotes a "conscious undertaking" Thus these paragraphs proscribe and make unlawful conduct which is rooted in a conscious undertaking to falsify records or mislead auditors through a statement or conscious omission of material facts.

The committee believes that the inclusion of the "knowingly" standard is appropriate because of the danger, inherent in matters relating to financial recordkeeping, that inadvertent misstatements or minor discrepancies arising from an unwitting error in judgment might be deemed actionable. The committee does not, however, intend that the use of the term ing [*sic*] "knowingly" will provide a defense for those who shield themselves from the facts. The knowledge required is that the defendant be aware that he is committing the act which is false not that he know that his conduct is illegal. The inclusion of this standard is intended to be limited to matters arising under these new subsections and not to any other provisions of the securities laws. As a result, in this limited instance, in order to prove that falsification of corporate accounting records or deception of auditors is "knowingly" committed, the Commission will be required to establish this element in actions arising under new paragraphs 13(b)(3) and 13(b)(4).

The knowledge required is that the person be aware that he is or may be making a false statement or causing corporate records to be falsified through a conscious undertaking or due to his conscious disregard for the truth.

The bill, as reported, would also permit the head of any agency or department responsible for national security matters to exempt, on a limited basis, an issuer involved in an endeavor related to national security from the accounting and reporting requirements of the bill. The facts and circumstances to which the directive applies must be reported to the President. [*page 10*]

*3. Criminalization of foreign bribery*

The committee recognizes that the SEC has diligently sought to enforce the existing provisions of the Federal securities laws by requiring corporate reports to disclose "material" payments. Nevertheless, the committee has concluded that - "The serious abuses which the Commission has uncovered justify an explicit congressional affirmation of our national commitment of ending corrupt foreign payments. While the Commission has made substantial progress in its enforcement program, the committee believes that legislation is appropriate to make clear that cessation of these abuses is a matter, not merely of SEC concern, but of national policy."

Secretary of the Treasury Blumenthal supported the criminalization of overseas bribery in testimony before the committee. The committee considered the matter extensively in the 94th Congress and concluded that the criminalization approach was preferred over a disclosure approach. Direct criminalization entails no reporting burden on corporations and less of an enforcement burden on the Government. The criminalization of foreign corporate bribery will to a significant extent act as a self- enforcing, preventative mechanism.

Sections 103 and 104 of the bill provide criminal penalties for foreign corrupt bribery. Section 103 applies to issuers and reporting firms under the jurisdiction of the SEC. Section 104 applies to all other domestic concerns. Under sections 103 and 104, a corporation is prohibited from making payments to a foreign official for the purpose of inducing him to obtain or retain business for the corporation or to influence legislation or regulations of the Government.

Payments to officials of a foreign political office [*sic*] having the purposes set forth respecting payments to foreign government officials are likewise proscribed. And payments to agents, while knowing or having reason to know, that all or a portion of the payment will be offered or given to a foreign government official, foreign political party or candidate for foreign political office for the proscribed purposes are also forbidden.

The statute covers payments made to foreign officials for the purposes of obtaining business or influencing legislation or regulations. The statue does not, therefore, cover so-called "grease payments" such as payments for expediting shipments through customs or placing a transatlantic telephone call, securing required permits, or obtaining adequate police protection, transactions which may involve even the proper performance of duties.

The word "corruptly" is used in order to make clear that the offer, payment, promise, or gift, must be intended to induce the recipient to misuse his official position in order to wrongfully direct business to the payor or his client, or to obtain preferential legislation or a favorable regulation. The word "corruptly" connotes an evil motive or purpose, an intent to wrongfully influence the recipient. It does not require that the act be fully consummated, or succeed in producing the desired outcome.

Sections 103 and 104 cover payments and gifts intended to influence the recipient, regardless of who first suggested the payment or gift. The defense that the payment was demanded on the part of a government official as a price for gaining entry into a market or to obtain a contract would not suffice since at some point the U.S. company would make a conscious decision whether or not to pay a bribe. That [*page 11*] the payment may have been first proposed by the recipient rather than the U.S. company does not alter the corrupt purpose on the part of the person paying the bribe. On the other hand true extortion situations would not be covered by this provision since a payment to an official to keep an oil rig from being dynamited should not be held to be made with the requisite corrupt purposes.

Section 305 as reported also covers the officers, directors, employees, or stockholders making overseas bribes on behalf of the corporation. This provision is intended to make clear that it is corporate or business bribery which is being proscribed. Whether or not a particular situation involves bribery by the corporation or by an individual acting on his own will depend on all the facts and circumstances, including the position of the employee, the care with which the board of directors supervises management, the care with which management supervises employees in sensitive positions and its adherence to the strict accounting standards set forth under section 102. The prohibitions against corrupt payments apply in this regard to payments by agents where the corporation paying them knew or had reason to know they would be passed on in whole or in part to a foreign government official for a proscribed purpose. Of course, where the corporation knows the payment will be passed on for a proscribed purpose, the violation is complete.

The committee has recognized that the bill would not reach all corrupt overseas payments. For example, the bill would not cover payments by foreign nationals acting solely on behalf of foreign subsidiaries where there is no nexus with

U.S. interstate commerce or the use of U.S. mails and where the issuer, reporting company, or domestic concern had no knowledge of the payment. But a U.S. company which "looks the other way" in order to be able to raise the defense that they were ignorant of bribes made by a foreign subsidiary, could be in violation of section 102 requiring companies to devise and maintain adequate accounting controls. Under the accounting section no off-the-books accounting fund could be lawfully maintained, either by a U.S. parent or by a foreign subsidiary, and no improper payment could be lawfully disguised.

### 4. Enforcement responsibilities

After careful consideration the committee concluded that the SEC should continue to have a role in the investigation of violations of the criminal prohibitions as they apply to companies under the jurisdiction of the SEC. The SEC has been the principal agency of the Government taking the lead in the investigation of foreign bribery. This is as it should be for the bribery of foreign officials often violates our securities laws to the extent the payment is not disclosed to investors. The SEC has thus developed considerable expertise in investigation [*sic*] corrupt overseas payments. This same expertise can be put to work in investigating potential violations of the antibribery provisions of this legislation. If this investigative responsibility were to be assigned solely to the Justice Department, as some had advocated, that agency would have to duplicate the investigative capability already in the SEC at a greater cost to the Government.

It should be emphasized that while the SEC investigates potential violations of the securities laws, the only remedy it can bring on its own is an injunctive action. When the SEC believes it has compiled enough evidence for a criminal action, it refers the case to the Justice [*page 12*] Department for criminal prosecution. This same division of responsibility would also apply with respect to the antibribery provisions of this legislation.

The committee believes this division of responsibility will result in a stronger enforcement effort compared to an exclusive assignment to the Justice Department. It is often difficult to assemble the degree of evidence required in a criminal action, but enough evidence may exist to enable the SEC to halt a continuation of the corrupt practices through an injunctive action.

The committee expects that close cooperation will develop between the SEC and the Justice Department at the earliest stage of any investigation in order to insure that the evidence needed for a criminal prosecution does not become stale. The arrangements which the committee expects the SEC and Justice to work out on criminal matters is in no way intended to cast doubt upon the authority of the SEC to prosecute and defend its own civil litigation. Under the bill, the Justice Department retains sole investigative and prosecutional jurisdiction over domestic concerns covered but which are not otherwise within the jurisdiction of the SEC.

The committee believes that, by assigning to the SEC enforcement responsibilities for the new prohibition, it will strengthen the Commission's ability to enforce compliance with the existing requirements of the securities laws, and with the new accounting provisions recommended by the Commission and included as section 102 of the bill. Obviously, there may be practical impediments to enforcement in individual cases, just as proof of bribery and other white collar crimes is often difficult to obtain in domestic cases. Nonetheless, the Commission's enforcement efforts under existing U.S. law demonstrate that it is entirely feasible for U.S. agencies successfully to investigate improper foreign payments made on behalf of American corporations.

The SEC's responsibilities would extend to conducting investigations, bringing civil injunctive actions, commencing administrative proceedings if appropriate, (4) defending lawsuits against the Commission and its staff arising out of the Commission's obligations under this Act, and referring cases to the Justice Department for criminal prosecution on a timely basis. The Commission, of course, will retain all of its existing remedies under the securities laws, and the committee anticipates that the Commission will continue to tailor remedies to fit the circumstances of specific cases.

### b. title ii - disclosure of corporate ownership

[*OMITTED*]

*[page 16]*

Section-by-section Analysis

The purpose of this legislation would be accomplished by amending existing sections 13(b), 13(d), 15(d), and 32(a) of the Securities Exchange Act of 1934 ("the act") and by adding new sections 13(g), 13(h), and new section 30A, to the act. Further, a new provision would be added to the criminal code.

a. title i - foreign corrupt practices

*Short title*

Section 101. This title may be cited as the "Foreign Corrupt Practices Act of 1977."

*Integrity of accounting records and reports*

Section 102 of the bill would amend section 13 of the Exchange Act by renumbering exiting subsection (b) as (b)(1) and by adding four new paragraphs. New paragraph 13(b)(2) would apply only to issuers which have a class of securities registered pursuant to section 12 of the act and issuers required to file reports pursuant to section 15(d) of the act ("reporting companies"). It would require reporting companies to make and keep books, records, and accounts which accurately and fairly reflect all of their transactions and dispositions of assets.

A reporting company also would be required to establish and maintain an adequate system of internal accounting controls sufficient to provide reasonable assurances that:

- Transactions are executed in accordance with management directions;
- Transactions are recorded in a manner that permits the company to prepare its financial statements in accordance with generally accepted accounting principles or other applicable criteria and to maintain accountability for its assets;
- Access to company assets is permitted only in accordance with management authorization; and
- The recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to differences.

New paragraph (3) would make it unlawful for any person knowingly to make or cause to be made a materially false or misleading statement or to omit to state or cause another person to omit to state any material fact necessary in order to make statements to accountant not misleading. This paragraph would apply to statements made to an accountant in connection with any examination or audit of an issuer with securities registered under the Securities Act of 1933, as well as any examination or audit of a reporting company. *[page 17]*

New paragraph (5) would provide that no duty or liability could be imposed under new paragraphs (2), (3), or (4) upon any person acting pursuant to a written directive of the head of an agency responsible for national security. This exclusion only applies, however, to the extent that the requirements of new paragraphs (2), (3), or (4) would be likely to result in the disclosure of properly classified national security information. Every directive executed by a national security agency head under this paragraph would have to describe specifically the facts which are not to be disclosed and the surrounding circumstances. These directives would expire annually unless renewed in writing. Agency heads would maintain a file of these directives, and each year on October 1 all directives in force during the prior year would have to be transmitted to the President for his review and certification that all conformed to law.

*Prohibition against certain payments to officials by registered companies*

Section 103 of the bill would add a new section 30A to the Act to prohibit any reporting company, or any officer, director, or employee, or shareholder acting on behalf of such a company, to use the mails or the means or

instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, or promise to pay, or authorization of the payment of, any money, offer, gift, or promise to give anything of value, to three classes of persons:

- An official of a foreign government or instrumentality of a foreign government,
- A foreign political party or an official of a foreign political party, or a candidate for a foreign political office, or
- Any other person while the issuer knows or has reason to know that money or a gift will be offered, promised or given to an official of a foreign political party, or a candidate for a foreign political office.

The scope of section 30A is limited by the requirement that the offer, promise authorization, payment, or gift must have as a purpose inducing the recipient to use influence with the foreign government or instrumentality, or to refrain from performing any official responsibilities, so as to direct business to any person, maintain an established business opportunity with any person, divert any business opportunity from any person or influence the enactment or promulgation of legislation or regulations of that government or instrumentality.

*Prohibition against certain payments to officials by other domestic concerns*

Section 104 of the bill would prohibit persons included in the definition of the term "domestic concern" who would not be covered by new section 30A of the Act from engaging in any of the same types of conduct prohibited by that section.

The term "domestic concern" is defined in the bill to mean an individual who is a citizen or national of the United States as well as any corporation, partnership, association, joint-stock company, business trust, or unincorporated organization which is owned or controlled by individuals who are citizens or nationals of the United States and which has its principal place of business in the United States or any territory, possession, or commonwealth of the United States.

The term "interstate commerce" is defined to mean trade, commerce, transportation, or communication among the several States, or between any foreign country and any State or between any State and [*page 18*] any place or ship on trade thereof. The term includes the interstate use of a telephone or other interstate means of communication and the intrastate use of any other interstate instrumentality.

The penalties for each violation of section 103 or section 104 would be a fine of up to $10,000 or imprisonment for up to 5 years, or both, but in the case of a corporation a fine of up to $500,000 could be imposed.

b. title ii - disclosure

[*OMITTED*]

Cost of Legislation

[*OMITTED*]

Additional Views of Senators Tower, Garn, and Lugar

[*OMITTED*]

1. See Senate Report No. 94-1031, 94th Cong., 2d sess.

2. See Senate Report No. 94-917, 94th Cong., 2d sess. (1976) to accompany S. 3084, the Export Administration Amendments, Foreign Boycotts, and Domestic and Foreign Investments Improved Disclosure Acts of 1976.

Appendix 004784

3. The phrase "disposition of its assets" is not intended as a limitation on the scope of the requirement that accurate books and records be maintained. The issuer's responsibility to keep records correctly reflecting the status of its liabilities and equities is no less than its obligation to maintain such records concerning its assets. The word "transactions" in the bill encompasses accuracy in accounts of every character.

4. For example, rule 2(e) of the Commission's rules of practice, 17 CFR 201.2(e), authorizes the Commission to censure, suspend, or bar professionals, such as accountants and lawyers, from practicing before the Commission. A public or private rule 2(e) proceeding might, in the Commission's view, be preferable, or used in addition to a civil injunctive action or criminal referral , in particular cases.

Appendix 004795

# Exhibit 107

| 106TH CONGRESS | | SENATE | | EXEC. RPT. |
| 2d Session | } | | { | 106–15 |

## INTER-AMERICAN CONVENTION AGAINST CORRUPTION

———————————

JUNE 30, 2000.—Ordered to be printed

———————————

Mr. HELMS, from the Committee on Foreign Relations,
submitted the following

# R E P O R T

[To accompany Treaty Doc. 105–39]

The Committee on Foreign Relations, to which was referred the Inter-American Convention Against Corruption ("The Convention"), adopted and opened for signature at the Specialized Conference of the Organization of American States (OAS) at Caracas, Venezuela, on March 29, 1996, signed by the United States on June 27, 1996, at the Twenty-Seventh Regular Session of the OAS General Assembly meeting in Panama City, Panama, having considered the same, reports favorably thereon with six understandings, one declaration and three provisos, and recommends that the Senate give its advice and consent to ratification thereof as set forth in this report and the accompanying resolution of ratification.

## CONTENTS

| | | Page |
|---|---|---|
| I. | Purpose | 1 |
| II. | Background | 2 |
| III. | Summary | 2 |
| IV. | Entry Into Force and Denunciation | 6 |
| V. | Committee Action | 7 |
| VI. | Committee Recommendation and Comments | 7 |
| VII. | Explanation of Proposed Convention | 8 |
| VIII. | Text of the Resolution of Ratification | 8 |
| IX. | Annex | 11 |

## I. PURPOSE

The purpose of the Inter-American Convention Against Corruption ("the Convention") is to require Parties to the Convention to criminalize solicitation or acceptance of bribes and other corrupt acts, to criminalize transnational bribery in commerce, and to eliminate bank secrecy or political grounds as the bases to refuse

2

cooperation with other Parties in criminal investigations under the Convention.

## II. Background

On March 29, 1996, a Specialized Inter-American Conference met in Caracas, Venezuela, and negotiators from twenty-one OAS member states signed the Convention. The United States signed the Convention on June 2, 1996, at the twenty-seventh regular session of the OAS General Assembly in Panama City, Panama. On March 6, 1997, the Convention entered into force following deposit of the second instrument of ratification. The President submitted the Convention to the Senate for advice and consent on April 1, 1998. As of the date of this report, twenty-six OAS member states had signed the Convention, and twenty had deposited their instruments of ratification.

## III. Summary

### A. General

The Convention was the first multilateral instrument of its kind. It is hoped that the Convention will be an effective tool to assist in the hemispheric effort to combat corruption. It may also enhance the law enforcement efforts of the Parties in other areas, given the links that often exist between corruption and organized criminal activity such as drug trafficking.

The United States has long been concerned about bribery of foreign officials. In 1977, the United States enacted the Foreign Corrupt Practices Act to criminalize the bribery of foreign officials, and has urged other nations to adopt similar statutes. The Convention is intended to ensure that Parties enact statutes to criminalize bribery and other kinds of public corruption. It establishes a treaty-based regime of obligations among OAS member states to fight corruption. Within the Convention are limited requirements similar to the U.S. Foreign Corrupt Practices Act and other U.S. laws relative to bribery of public officials.

In 1998 the United States became Party to the Organization for Economic Cooperation and Development (OECD) Convention on Bribery in International Business Practices. Like the OAS Convention, the OECD agreement requires parties to enact statutes similar to the Foreign Corrupt Practices Act. The OECD Convention criminalizes payment, or the "supply side" of bribes. While the OAS Convention, too, addresses the supply side, it also addresses the "demand side" by committing its parties to outlaw solicitation or acceptance of bribes and other corrupt acts.

In submitting the Convention to the Senate, the Executive Branch stated that the Convention will not require implementing legislation for the United States.

### B. Key Provisions

The Convention has a preamble and twenty-eight articles. Key provisions are summarized below.

*Federalism.* Article I of the Convention sets forth the scope of the Convention's operation. The United States understands the Con-

3

vention to impose obligations on the Federal Government. The Convention does not impose obligations on the conduct of state, local or other non-Federal officials.

*Anti-Corruption Measures.* In Article III of the Convention, Parties undertake a broad obligation to consider—with a view to creating, maintaining and strengthening institutional capacity—a variety of domestic measures. These measures include: (1) standards of conduct and implementation of the standards for the correct, honorable, and proper fulfillment of public functions; (2) instruction to government personnel to ensure proper understanding of their responsibilities; (3) systems for financial disclosure of persons who perform public functions; (4) open and transparent government procurement systems; (5) government revenue collection and control systems that deter corruption; (6) laws that deny favorable tax treatment for expenditures made in violation of the anti-corruption laws; (7) systems for protecting individuals who report acts of corruption; (8) oversight bodies to implement anti-corruption laws; (9) deterrents to the bribery of government officials, such as the requirement that businesses keep accurate books and records; (10) mechanisms to encourage participation by civil society in anti-corruption activities; and (11) further study of preventative measures.

*Jurisdiction.* Article V of the Convention obliges the Parties to establish jurisdiction over covered offenses. Parties must establish jurisdiction over acts committed in their territory, and over the acts of persons present in their territory whose extradition to a second country they deny on the basis of nationality.

*Covered Offenses.* Article VI of the Convention specifies the acts of corruption to which the Convention applies: (1) the solicitation or acceptance by a government official or by a person who performs public functions of any article of monetary value or other benefit in exchange for any act or omission in the performance of his public functions; (2) the offering or granting to a government official or a person who performs public functions of any article of monetary value or other benefit in exchange for any act or omission in the performance of his public functions; (3) any act or omission in the discharge of his duties by a government official or a person who performs public functions for the purpose of illicitly obtaining benefits; (4) the fraudulent use or concealment of property derived from any acts referred to in this article; and (5) the participation in any manner in the commission or attempted commission of any of these acts. In addition, two or more Parties to the Convention may agree to cover additional offenses.

*Criminalization.* Article VII obligates Parties to establish as criminal offenses the acts of corruption described in Article VI. Parties must also facilitate cooperation among themselves pursuant to the Convention. There are statutes already in effect in the United States that criminalize a wide range of corrupt acts. Although these statutes may not in all cases be defined in terms or elements identical to those used in the Convention, the conduct intended under the Convention to be criminalized would in fact be criminal conduct under U.S. law. Although there is no general "attempt" statute in U.S. federal criminal law, federal statutes criminalize "attempts" in connection with specific crimes. Moreover, significant acts of corruption involving "attempts" would be generally subject

4

to prosecution in the context of one or more other crimes. Accordingly, the United States will enact no new legislation to implement Article VII.

*Transnational Bribery.* Pursuant to Article VIII, each Party, subject to its Constitution and fundamental legal principles, must prohibit and punish transnational bribery. This offense is defined as the offering or granting by Party nationals, persons having habitual residence in a Party, and Party-domiciled businesses, to a government official of another state any article of monetary value or any other benefit in connection with any economic or commercial transaction in exchange for any act or omission in the performance of that official's public functions. However, because of the constitutional proviso mentioned above, the Article does not assume that every state will criminalize such activity. In the event a country has not criminalized transnational bribery it is obligated to provide assistance and cooperation to the extent possible to other states. Current United States law provides criminal sanctions for transnational bribery. No additional legislation is needed for the United States to comply with the obligation imposed in Article VIII of the Convention.

*Illicit Enrichment.* Subject to its Constitution and fundamental legal principles, each Party is required by Article IX of the Convention to establish as an offense the significant increase in the assets of a government official that cannot reasonably be explained by lawful earnings during the performance of public functions. If a nation does not establish such a criminal offense, it is nonetheless obligated to provide assistance and cooperation to the extent possible. In the United States such a statute would be unconstitutional because it would place the burden of proof on the individual, rather than the government. Consequently, the Executive Branch proposed an understanding stating that in the United States the establishment of such an offense would be inconsistent with the U.S. Constitution and the fundamental principles of the U.S. legal system, and that the United States is not obligated to establish a new criminal offense of illicit enrichment under Article IX of the Convention.

*Progressive Development.* Article XI sets out a list describing conduct that is not covered by the Convention, but which negotiators view as desirable areas for the enactment of domestic laws in order to criminalize and deter corruption. For Parties with statutes already in place which criminalize the conduct described in Article XI, the relevant conduct will be deemed to fall within the Convention's coverage. Article XI covers (1) the improper use by a government official or a person who performs public functions of any kind of classified information which that person has obtained because of or in the performance of his functions; (2) the improper use by a government official or a person who performs public functions of any kind of property belonging to the state to which that person has access because of or in the performance of his functions; (3) any act or omission by any person who seeks to obtain a decision from a public authority whereby he illicitly obtains any benefit or gain, whether or not the act or omission harms state property; and (4) the diversion by a government official of any movable or immovable property, monies, or securities belonging to the state, to an inde-

5

pendent agency, or to an individual that the official has obtained because of his position for purposes of administration, custody, or other reasons.

*Extradition.* Article XIII provides that the Convention may serve as the legal basis for extradition with respect to any offense to which the Convention applies. However, the United States shall not consider the Convention to be the legal basis for extradition to any country with which the United States has no bilateral extradition treaty in force. Where the United States does have a bilateral extradition treaty in force, that bilateral extradition treaty shall serve as the legal basis for extradition for offenses that are extraditable in accordance with this Convention.

*Mutual Legal Assistance.* Article XIV of the Convention requires broad mutual legal and technical assistance among the Parties. In no case may United States assistance be provided to the International Criminal Court, unless the treaty establishing the Court has entered into force for the United States by and with the advice and consent of the Senate, as required by Article II, section 2 of the United States Constitution.

*Property/Proceeds of Offenses.* Article XV sets out assistance requirements regarding proceeds and property. Parties must provide to each other the broadest possible measure of assistance, in the identification, tracing, freezing, seizure, and forfeiture of property or proceeds obtained, derived from, or used in the commission of corruption offenses. However, in no case may United States assistance be provided to the International Criminal Court, unless the treaty establishing the Court has entered into force for the United States by and with the advice and consent of the Senate, as required by Article II, section 2 of the United States Constitution.

*Bank Secrecy.* Under Article XVI of the Convention, Parties may not invoke bank secrecy as a basis to refuse to provide assistance sought by a requesting state. In applying this Article, Parties may take into account their domestic law, procedural provisions, or bilateral or multilateral agreements. The Article also permits a requested Party to limit use by the requesting state of information provided under this Article.

*Political Exception.* Article XVII provides that a political purpose, in and of itself, may not be a grounds for refusing a request for assistance from a Party under Articles XIII (Extradition), XIV (Assistance and Cooperation), XV (Measures Regarding Property) and/or XVI (Bank Secrecy).

*Central Authorities.* Under Article XVIII, each Party must designate a central authority to make and receive requests for assistance and cooperation.

*Final Clauses.* Articles XXI (Signature), XXII (Ratification), XXIII (Accession) and XXIV (Reservations) provide that the Convention is open for signature by OAS Member States. The Convention is subject to ratification, and shall remain open for accession by states which are not OAS members. Instruments of ratification and accession must be deposited with the OAS General Secretariat, currently located in Washington, D.C. Reservations that are not incompatible with the object and purpose of the Convention are permitted.

6

### C. THE U.S. FOREIGN CORRUPT PRACTICES ACT

During the mid-1970s, investigations and legal actions against numerous domestic corporations revealed the practice by some U.S. corporations of making questionable or illegal payments to foreign government officials. The legal and regulatory mechanisms for dealing with these payments had involved actions by the Securities and Exchange Commission (SEC) against public corporations for concealing from required public disclosure substantial payments made by the firm and the potential for an antitrust action for restraint of trade or fraud prosecutions by the Justice Department.

Government officials and administrators contended that more direct prohibitions on foreign bribery and more detailed requirements concerning corporate record-keeping and accountability were needed to deal effectively with the problem. The revelations of slush funds and secret payments by American corporations were stated to have affected adversely American foreign policy, damaged the image of American democracy, and impaired public confidence in the financial integrity of American corporations. Congress responded with the passage of the Foreign Corrupt Practices Act of 1977.

After enactment, Congress for a number of years considered amending the Foreign Corrupt Practices Act. After a great deal of debate through at least three Congresses, the Foreign Corrupt Practices Act Amendments were signed into law as Title V of the Omnibus Trade and Competitiveness Act of 1988 on August 23, 1988. One provision of the 1988 Amendments encouraged the Administration to negotiate a treaty at the OECD that would require other countries to enact similar laws prohibiting bribery of foreign government officials.

The OAS Convention is another step forward in the effort to multinationalize the fight against corruption in transnational business. Although there are differences in detail, the Committee believes that the OAS Convention's provisions on transnational bribery (Article VIII) are consistent with the Foreign Corrupt Practices Act. Both are concerned with payments made to obtain business, or the giving of something for value for an official act, omission or exercise of influence.

### IV. ENTRY INTO FORCE AND DENUNCIATION

#### A. ENTRY INTO FORCE

The Convention entered into force on March 6, 1997. For each State ratifying or acceding to the Convention after its entry into force, the Convention shall enter into force on the thirtieth day after deposit by such State of its instrument of ratification or accession.

#### B. DENUNCIATION

The Convention shall remain in force indefinitely, but any of the States Parties may denounce it. A denouncing state party's instrument of denunciation must be deposited with the General Secretariat of the Organization of American States. One year from the

7

date of deposit of the instrument of denunciation, the Convention shall cease to be in force for the denouncing State.

## V. Committee Action

The Committee on Foreign Relations held a public hearing on the Convention on May 2, 2000 (a transcript of the hearing and questions for the record can be found in the annex to this report). The Committee considered the Convention on June 7, 2000, and ordered it favorably reported by voice vote, with the recommendation that the Senate give its advice and consent to the ratification of the proposed Convention subject to six understandings, one declaration and three provisos.

## VI. Committee Recommendation and Comments

The Committee on Foreign Relations recommends favorably the proposed Convention. On balance, the Committee believes that the proposed Convention is in the interest of the United States and urges the Senate to act promptly to give its advice and consent to ratification.

### EXTRADITION AND MUTUAL LEGAL ASSISTANCE

Ratification of a bilateral extradition treaty granting the authority to extradite individuals in the United States to other nations generally reflects an endorsement of the judicial system, and the level of respect for human rights in the nation with which the United States enters into an extradition relationship. Although the proposed Convention provides the authority for extradition and legal assistance (should Parties choose to use the Convention for such authority), the Committee is concerned that nations may seek extradition of individuals in the United States under the Convention even in situations where there is no bilateral extradition treaty with the United States authorizing extradition.

In order to ensure that this possibility does not arise, the Committee's recommended resolution of ratification includes an understanding that the United States will not use the proposed Convention as the legal basis for extradition to any country with which the United States has no bilateral extradition treaty in force. In addition, the understanding makes clear that when the United States has a bilateral extradition treaty in force, that bilateral extradition treaty, not the Convention, will serve as the legal basis for extradition of individuals for offenses covered under the Convention.

In addition, the Committee's recommended resolution of ratification includes an understanding that no assistance may be provided to the International Criminal Court in connection with United States activities under this Convention unless the International Criminal Court's organic statute, the Rome Statute, enters into force for the United States pursuant to constitutional procedures.

Finally, the Committee understands that lawful intelligence activities of the United States Government are not covered by this Convention, and therefore it is unnecessary to provide any exemptions for such activities.

8

## VII. Explanation of Proposed Convention

For a detailed article-by-article analysis of the proposed Convention, see the corresponding Letter of Submittal from the Secretary of State, which is set forth at pages V–XIV of Senate Treaty Document 105–39.

## VIII. Text of the Resolution of Ratification

*Resolved, (two-thirds of the Senators present concurring therein),* That the Senate advise and consent to the ratification of the Inter-American Convention Against Corruption, adopted and opened for signature at the Specialized Conference of the Organization of American States (OAS) at Caracas, Venezuela, on March 29, 1996, (Treaty Doc. 105–39); referred to in this resolution of ratification as "The Convention," subject to the understandings of subsection (a), the declaration of subsection (b), and the provisos of subsection (c).

(a) UNDERSTANDINGS.—The advice and consent of the Senate is subject to the following understandings, which shall be included in the instrument of ratification of the Convention and shall be binding on the President:

(1) APPLICATION OF ARTICLE I.—The United States of America understands that the phrase "at any level of its hierarchy" in the first and second subparagraphs of Article I of the Convention refers, in the case of the United States, to all levels of the hierarchy of the Federal Government of the United States, and that the Convention does not impose obligations with respect to the conduct of officials other than Federal officials.

(2) ARTICLE VII ("DOMESTIC LAW").—

(A) Article VII of the Convention sets forth an obligation to adopt legislative measures to establish as criminal offenses the acts of corruption described in Article VI(1). There is an extensive network of laws already in place in the United States that criminalize a wide range of corrupt acts. Although United States laws may not in all cases be defined in terms or elements identical to those used in the Convention, it is the understanding of the United States, with the caveat set forth in subparagraph (B), that the kinds of official corruption which are intended under the Convention to be criminalized would in fact be criminal offenses under U.S. law. Accordingly, the United States does not intend to enact new legislation to implement Article VII of the Convention.

(B) There is no general "attempt" statute in U.S. federal criminal law. Nevertheless, federal statutes make "attempts" criminal in connection with specific crimes. This is of particular relevance with respect to Article VI(1)(c) of the Convention, which by its literal terms would embrace a single preparatory act done with the requisite "purpose" of profiting illicitly at some future time, even though the course of conduct is neither pursued, nor in any sense consummated.

9

The United States will not criminalize such conduct per se, although significant acts of corruption in this regard would be generally subject to prosecution in the context of one or more other crimes.

(3) TRANSNATIONAL BRIBERY.—Current United States law provides criminal sanctions for transnational bribery. Therefore, it is the understanding of the United States of America that no additional legislation is needed for the United States to comply with the obligation imposed in Article VIII of the Convention.

(4) ILLICIT ENRICHMENT.—The United States of America intends to assist and cooperate with other States Parties pursuant to paragraph 3 of Article IX of the Convention to the extent permitted by its domestic law. The United States recognizes the importance of combating improper financial gains by public officials, and has criminal statutes to deter or punish such conduct. These statutes obligate senior-level officials in the federal government to file truthful financial disclosure statements, subject to criminal penalties. They also permit prosecution of federal public officials who evade taxes on wealth that is acquired illicitly. The offense of illicit enrichment as set forth in Article IX of the Convention, however, places the burden of proof on the defendant, which is inconsistent with the United States Constitution and fundamental principles of the United States legal system. Therefore, the United States understands that it is not obligated to establish a new criminal offense of illicit enrichment under Article IX of the Convention.

(5) EXTRADITION.—The United States of America shall not consider this Convention as the legal basis for extradition to any country with which the United States has no bilateral extradition treaty in force. In such cases where the United States does have a bilateral extradition treaty in force, that bilateral extradition treaty shall serve as the legal basis for extradition for offenses that are extraditable in accordance with this Convention.

(6) PROHIBITION ON ASSISTANCE TO THE INTERNATIONAL CRIMINAL COURT.—The United States of America shall exercise its rights to limit the use of assistance it provides under the Convention so that any assistance provided by the Government of the United States shall not be transferred to or otherwise used to assist the International Criminal Court agreed to in Rome, Italy, on July 17, 1998, unless the treaty establishing the Court has entered into force for the United States by and with the advice and consent of the Senate, as required by Article II, section 2 of the United States Constitution.

(b) DECLARATION.—The advice and consent of the Senate is subject to the following declaration:

TREATY INTERPRETATION.—The Senate affirms the applicability to all treaties of the constitutionally based principles of treaty interpretation set forth in Condition (1) of the resolution of ratification of the INF Treaty, approved by the Senate on

10

May 27, 1988, and Condition (8) of the resolution of ratification of the Document Agreed Among the State Parties to the Treaty on Conventional Armed Forces in Europe, approved by the Senate on May 14, 1997.

(c) PROVISOS.—The advice and consent of the Senate is subject to the following provisos:

(1) ENFORCEMENT AND MONITORING.—Not later than April 1, 2001, and annually thereafter for five years, unless extended by an Act of Congress, the President shall submit to the Committee on Foreign Relations of the Senate, and the Speaker of the House of Representatives, a report that sets out:

(A) RATIFICATION.—A list of the countries that have ratified the Convention, the dates of ratification and entry into force for each country, and a detailed account of U.S. efforts to encourage other nations that are signatories to the Convention to ratify and implement it.

(B) DOMESTIC LEGISLATION IMPLEMENTING THE CONVENTION AND ACTIONS TO ADVANCE ITS OBJECT AND PURPOSE.— A description of the domestic laws enacted by each Party to the Convention that implement commitments under the Convention and actions taken by each Party during the previous year, including domestic law enforcement measures, to advance the object and purpose of the Convention.

(C) PROGRESS AT THE ORGANIZATION OF AMERICAN STATES ON A MONITORING PROCESS.—An assessment of progress in the Organization of American States (OAS) toward creation of an effective, transparent, and viable Convention compliance monitoring process which includes input from the private sector and non-governmental organizations.

(D) FUTURE NEGOTIATIONS.— A description of the anticipated future work of the Parties to the Convention to expand its scope and assess other areas where the Convention could be amended to decrease corrupt activities.

(2) MUTUAL LEGAL ASSISTANCE.—When the United States receives a request for assistance under Article XIV of the Convention from a country with which it has in force a bilateral treaty for mutual legal assistance in criminal matters, the bilateral treaty will provide the legal basis for responding to that request. In any case of assistance sought from the United States under Article XIV of the Convention, the United States shall, consistent with U.S. laws, relevant treaties and arrangements, deny assistance where granting the assistance sought would prejudice its essential public policy interest, including cases where the Central Authority, after consultation with all appropriate intelligence, anti-narcotic, and foreign policy agencies, has specific information that a senior government official who will have access to information to be provided under this Convention is engaged in a felony, including the facilitation of the production or distribution of illegal drugs.

(3) SUPREMACY OF THE CONSTITUTION.—Nothing in the Convention requires or authorizes legislation or other action by the United States of America that is prohibited by the Constitution of the United States as interpreted by the United States.

# IX. ANNEX

---

## INTER-AMERICAN CONVENTION AGAINST CORRUPTION (Treaty Doc. 105–39)

---

### TUESDAY, MAY 2, 2000

U.S. SENATE,
COMMITTEE ON FOREIGN RELATIONS,
*Washington, DC.*

The committee met, pursuant to notice, at 2:03 p.m., in room SD–419, Dirksen Senate Office Building, the Hon. Lincoln D. Chafee, presiding.

Present: Senator Chafee.

Senator CHAFEE. This afternoon we are having a hearing to consider the Inter-American Convention Against Corruption, and the United States signed the Convention on June 27, 1996. And it was transmitted to the Senate on April 1, 1998. To date, 18 of the Convention's 26 signatories have ratified.

Today's hearing will give this committee an opportunity to explore the many facets of the Convention, including how the United States becoming a party to it will affect U.S. interests.

As long as history has been recorded, corruption has been an unfortunate fact of life in the administration of government. For a variety of reasons, cultural, economic and moral, public officials have been lured by and often succumb to the temptation to put the common good aside for personal gain.

Corruption is antithetical to successful democracy, as it severs the trust that links public servants with the people they represent.

As the world's leader in the promotion of democratic values, the United States has a unique obligation to confront the many challenges to these cherished values. Public corruption ranks among those challenges.

Corruption not only wastes public resources, but it also discourages investment from overseas. Indeed when conducting operations abroad, an international businessperson seeks, among other things, a sound and honest host government that upholds the rule of law.

If a government is known or suspected to be corrupt, the willingness of the business community to invest is diminished. Corruption thus deters international trade and consequently hinders economic growth.

The United States has been in the forefront of the fight against international corruption. In 1977, Congress enacted the Foreign

Appendix 004807

12

Corrupt Practices Act which, among other things, criminalizes the bribing of foreign officials.

More recently, in 1998, the United States became party to the Organization for Economic Cooperation and Development Convention on Bribery in International Business Practices, a treaty aimed at combating corruption in the private sector.

The next major step in fighting international corruption is the Inter-American Convention Against Corruption. The Convention commits our trading partners in the Americas to criminalize a wide range of corrupt acts, increase enforcement, enhance legal and judicial cooperation and strengthen preventive measures such as disclosures of assets.

The administration has indicated that no implementing legislation will be needed for U.S. compliance with the Convention.

Other nations, however, will have to enact substantial reform measures. I believe that ratification of this Convention is very much in our national interest, and hope this hearing can illuminate its many attributes.

As an elected official, I surely recognize that foreign aid is one of the least popular expenditures of the Federal Government. Skeptics often liken providing foreign assistance to pouring money down the drain of corrupt governments.

Perhaps, this Convention will, among other things, help begin to erase that perception and enhance the confidence of American taxpayers in continued U.S. international engagement.

I would like to thank all of today's witnesses for sharing with the committee their informed views on these important issues. I look forward to a useful and informative discussion.

I am very honored to have as our first witness, the Honorable Alan P. Larson, the Under Secretary of State for Economic, Business and Agricultural Affairs.

And I am very honored that you took your valuable time to present your views on this important subject. Welcome.

[Prepared statement and news release by Senator Chafee follow:]

PREPARED STATEMENT OF SENATOR LINCOLN D. CHAFEE

This afternoon the Foreign Relations Committee holds a hearing on an important international agreement, the Inter-American Convention Against Corruption. The United States signed the Convention on June 27, 1996 and it was transmitted to the Senate on April 1, 1998. To date, eighteen of the Convention's twenty-six signatories have ratified. Today's hearing will give this committee an opportunity to explore the many facets of the Convention, including how the U.S. becoming a party to it will affect U.S. interests.

As long as history has been recorded, corruption has been an unfortunate fact of life in the administration of government. For a variety of reasons—cultural, economic and moral—public officials have been lured by, and often succumb to, the temptation to put the common good aside for personal gain. Corruption is antithetical to successful democracy, as it severs the trust that links public servants with the people they represent. As the world's leader in the promotion of democratic values, the United States has a unique obligation to confront the many challenges to these cherished values. Public corruption ranks among those challenges.

Corruption not only wastes public resources, but it also discourages investment from overseas. Indeed, when conducting operations abroad, an international businessperson seeks, among other things, a sound and honest host government that upholds the rule of law. If a government is known or suspected to be corrupt, the willingness of the business community to invest is diminished. Corruption thus deters international trade and, consequently, hinders economic growth.

The United States has been in the forefront of the fight against international corruption. In 1977, Congress enacted the Foreign Corrupt Practices Act, which, among

13

other things, criminalizes the bribing of foreign officials. More recently, in 1998 the United States became party to the Organization for Economic Cooperation and Development (OECD) Convention on Bribery in International Business Practices, a treaty aimed at combating corruption in the private sector.

The next major step in fighting international corruption is the Inter-American Convention Against Corruption. The Convention commits our trading partners in the Americas to criminalize a wide range of corrupt acts, increase enforcement, enhance legal and judicial cooperation, and strengthen preventive measures such as disclosure of assets. The Administration has indicated that no implementing legislation will be needed for U.S. compliance with the Convention. Other nations, however, will have to enact substantial reform measures. I believe that ratification of this Convention is very much in our national interest, and hope this hearing can illuminate its many attributes.

As an elected official, I surely recognize that foreign aid is one of the least popular expenditures of the federal government. Skeptics often liken providing foreign assistance to "pouring money down the drain of corrupt governments." Perhaps this Convention will, among other things, help begin to erase that perception and enhance the confidence of American taxpayers in continued U.S. international engagement.

I would like to thank all of today's witnesses for sharing with the committee their informed views on these important issues. I look forward to a useful and informative discussion.

————

[For Immediate Release—Tuesday, May 2, 2000]

CHAFEE SIGNALS APPROVAL OF INTER-AMERICAN CONVENTION AGAINST CORRUPTION

WASHINGTON, DC.—U.S. Senator Lincoln D. Chafee (R–RI)—Chairman of the Senate Foreign Relations Subcommittee on the Western Hemisphere, Peace Corps, Narcotics and Terrorism—today signalled his support for the Inter-American Convention Against Corruption.

At a Foreign Relations Committee hearing to examine the merits of the convention, Chafee noted that the treaty would require many of its signatory nations to take substantial legislative steps to eliminate public corruption, while the United States is already in full compliance. He also noted that anti-corruption campaigns were critical for many developing nations which hope to attract foreign direct investment.

"As long as history has been recorded, corruption has been an unfortunate fact of life in the administration of government," Chafee said at the hearing. "For a variety of reasons—cultural, economic and moral—public officials have been lured by, and often succumb to, the temptation to put the common good aside for personal gain."

Chafee continued. "Corruption not only wastes public resources, but it also discourages investment from overseas. Moreover, corruption is antithetical to successful democracy, as it severs the trust that links public servants with the people they represent. As the world's leader in the promotion of democratic values, the United States has a unique obligation to confront the many challenges to these cherished values. Public corruption ranks among those challenges."

In 1996, President Clinton signed the Inter-American Convention Against Corruption. The terms of the treaty require parties to criminalize the solicitation or acceptance of bribes; strengthen cooperation in criminal investigations, and; enact preventative measures, including asset disclosure and conflict of interest standards for public officials, as well as strong procurement rules.

Since the Western Hemisphere accounted for 44 percent of U.S. exports in 1999, the adoption of anti-corruption measures will significantly aid U.S. businesses with international ties. U.S. businesses, already bound by the Convention Against Bribery of Foreign Public Officials to avoid offering bribes to foreign officials, often find themselves competing on an uneven playing field against foreign domestic competition. Domestic businesses often feel free—or even required—to provide bribes and kickbacks to public officials as the cost of doing business. The Inter-American Convention would require signatories to outlaw and aggressively prosecute these practices.

14

**STATEMENT OF HON. ALAN P. LARSON, UNDER SECRETARY OF STATE FOR ECONOMIC, BUSINESS AND AGRICULTURAL AFFAIRS, DEPARTMENT OF STATE**

Mr. LARSON. Mr. Chairman, thank you. And I am very honored to be here today to testify in support, enthusiastically, of the Inter-American Convention Against Corruption.

With your permission, Mr. Chairman, I would like to submit my written statement for the record——

Senator CHAFEE. Yes.

Mr. LARSON [continuing]. And make, very quickly, a few main points about this Convention.

The first is that it is very strongly in our interest. The second is that it is part of a global strategy. Third, it advances our interest in several important discreet ways. It has significant substantive provisions. And as you indicated, Mr. Chairman, it requires no change in U.S. law.

Mr. Chairman, in the Americas, corruption is a major obstacle to development, and it is a threat to democracy. Corruption also deprives our businesses of the opportunity to operate in a transparent, honest and predictable environment. And this Convention is a very important regional instrument to help us combat these problems.

It is part of a global strategy, and you outlined some of the most important features of that: Our leadership in passing the Foreign Corrupt Practices Act in 1977; our leadership in pushing for the multi-lateralization of many of the key attributes of the Foreign Corrupt Practices Act in the OECD Convention Against Bribery.

We are also working in other fora. We have made anti-corruption efforts a major part of the stability pact for the countries of Southeast Europe. And we are working very hard with the international financial institutions, the IMF and the regional development banks to incorporate anti-corruption principles in their programs.

Mr. Chairman, I believe that ratification of the Inter-American Convention would advance four important U.S. objectives.

First of all, it would strengthen the ability of the United States to continue to play a leadership role on these issues. The willingness of the countries in this hemisphere to sign and ratify this treaty is one indication of their seriousness.

And I have noticed in my travels throughout the region and in my meetings with senior officials from this part of the world that they genuinely believe that it is in their interest to attack this problem.

That said, signing and ratifying a treaty is not enough. As you indicated, many of them will have to implement new laws, and they will have to make sure that those laws are adequately enforced.

And to do that, I think we will need, as the United States, to play a leadership role in promoting effective implementation. U.S. businesses will benefit from the legal regimes that this Convention is designed to promote.

The Convention will also provide and strengthen—it will strengthen and augment the existing mechanisms that we have for international cooperation on law enforcement matters.

15

In addition the ratification of this treaty will bolster our efforts to support democratic institutions in this country—in this hemisphere, institutions that really are debilitated by corruption.

Now, the specific provisions of the Inter-American Convention are spelled out in more detail in my written testimony.

I would just like to highlight that the Convention does require states to take specific steps to combat corruption. It imposes an obligation on each state to enact legislation that will criminalize acts of corruption that are specified in the Convention, and that these include the solicitation or acceptance of bribes; the offering or granting of bribes; any act or omission by a government official to obtain illicit benefits for himself or others; the fraudulent use or concealment of property derived from the above mentioned acts; and participation in or association or a conspiracy to commit such acts.

Second, the Convention also includes provisions on international cooperation and assistance such as extradition, mutual legal assistance, asset seizure and forfeiture. This cooperation will be subject to the limits of applicable existing treaties including bilateral treaties and the domestic laws of each country. It also envisions technical cooperation and exchange of experience, which can help in the implementation.

Third, subject to each country's constitution and fundamental legal principles, the Convention establishes an obligation to criminalize the bribery of foreign government officials. In this way, it deals with the same type of core issue that the OECD Convention deals with.

To sum up, Mr. Chairman, I believe it is critical to the international strategy of the United States in combating corruption, for the United States to become a party to the Inter-American Convention Against Corruption. It gives us credibility in our international efforts. It helps us ensure that the obligations of the treaty are implemented faithfully.

It responds to the desire of our business community for the United States to be involved in this first-ever legal framework for cooperation among the governments of this hemisphere to address the problem.

We really appreciate the opportunity that this hearing provides for consideration of the treaty, and I would be pleased to answer any questions you may have.

I did want to mention that the Deputy Legal Advisor of the State Department, Jamie Borek, is with me, if there turns out to be highly technical or highly legal questions that arise.

Thank you.

Senator CHAFEE. Thank you, Mr. Larson.

[The prepared statement of Mr. Larson follows:]

PREPARED STATEMENT OF HON. ALAN P. LARSON

Mr. Chairman and members of the Committee:

I am pleased to appear before you today to testify in support of the Inter-American Convention Against Corruption ("the Convention"), and to address generally the issue of corruption in the Americas.

16

A POLITICAL COMMITMENT TO COMBAT CORRUPTION IN THIS HEMISPHERE

The problem of corruption is a major obstacle to development in the Americas, and we believe every effort must be made to address it. Corruption slows and impedes the consolidation of democratic institutions, and weakens the rule of law. It undermines the confidence of people in their government. It is all too often linked with trans-border criminal activity, including drug trafficking, organized crime, and money laundering. In sum, its effects are wide-ranging and pernicious.

Corruption also undermines the ability of businesses of the United States and other countries to operate in a transparent, honest and predictable environment. In 1996, an IMF study found that corruption lowers investment and economic growth. The reason is simple: investors are wary of investing in countries where corruption is prevalent, and low levels of investment lead to low growth. The Finance Ministers of the Western Hemisphere, at their meeting in Mexico in February 2000, noted that "corruption has been recognized as a serious problem that adversely affects investment, public revenue, growth, and development in much of the Western Hemisphere" and that corruption is "a threat to investor and taxpayer confidence."

A shared recognition of the importance of this issue prompted the nations of the Hemisphere to agree to develop an unprecedented regional instrument to help combat that scourge of corruption. During the early 1990s, the democratic governments of Latin America became increasingly aware that corruption threatened political stability and economic growth in their countries. When the 34 democratically elected heads of state met in Miami in 1994 for the first Summit of the Americas, there was widespread support for practical action to combat corruption. The President of Venezuela specifically recommended negotiation of an Inter-American Convention Against Corruption.

The willingness of the Hemisphere's countries to take this step, and to follow it up—as a significant number have—by signing and ratifying the treaty promptly, reflects a commitment by the governments of the region to address the problem in a serious fashion. My travels in the region and contacts with regional leaders convince me that popular support for anti-corruption initiatives remain strong and that governments are committed to action. However, it is not enough for countries to sign and ratify the Convention and pass new criminal laws. U.S. leadership will be critical to ensuring the implementation of the obligations of the Convention. We will be working on an effective strategy to ensure that the countries of the Hemisphere fully implement this agreement. By becoming a Party to the Convention, the United States will be better placed to promote its effective implementation.

ONE ELEMENT OF A GLOBAL APPROACH

The fight against corruption is a high priority in our foreign policy, particularly with regard to this Hemisphere. The United States has taken a leadership position in combating overseas commercial bribery ever since the enactment in 1977 of the Foreign Corrupt Practices Act ("FCPA"). Later, we led the effort to negotiate an international convention that would enshrine the basic provisions of the FCPA: the Organization for Economic Cooperation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("the OECD Anti-Bribery Convention"). The United States Senate voted its advice and consent to ratification of that Convention in 1998. In the same year, Congress passed implementing legislation that broadened the FCPA slightly to conform to our obligations under the Convention. Nineteen other states have ratified the OECD Convention, which entered into force in February 1999. A vigorous review of implementation is under way; the domestic implementing laws of 21 countries have been scrutinized by the OECD Bribery Working Group. The success of the United States on the OECD Convention is a tribute to the strong bipartisan support from the members of this Committee, and from others in both the House and Senate.

The Administration is combating corruption on many other fronts. In February of last year, Vice President Gore hosted the Global Forum on Fighting Corruption, which was attended by representatives from over 90 countries. Among the attendees were twenty-one OAS member governments, five at the level of Vice-President, and one head of a national parliament; the Attorney General of Mexico; and several representatives from Latin American non-governmental organizations. At the Forum, the Vice President and the Secretary of State made clear the importance of the Inter-American Convention and the commitment of the Administration to its ratification. We are now making preparations for the Second Global Forum, which we are cohosting with the government of The Netherlands, and which will take place in The Hague in May of next year.

The Administration has encouraged the IMF, the World Bank, and the Inter-American Development Bank to incorporate anti-corruption principles in their pro-

17

grams. All three of these major international financial organizations are involved in supporting and monitoring a wide variety of anti-corruption programs that include judicial reform, integrated financial systems, the development of public ethics offices, and public administration reform. These institutions, along with the U.S. Government, the United Nations and a number of foundations belong to an 18 member Donor Consultative Group on Accountability/Anti-corruption in Latin America and the Caribbean. The Group meets regularly and shares information about anti-corruption activities in the hemisphere.

We have also pushed for a strong Anti-Corruption Initiative for the Stability Pact for Southeast Europe. Countries of the region have made commitments to take priority measures against corruption, especially actions to: implement international anti-corruption instruments, promote good governance, strengthen legislation, promote transparency and integrity in business, and support public involvement. An anti-corruption steering group under the Stability Pact will monitor progress in anti-corruption efforts. The United States, the European Commission, the OECD, and the Council of Europe, and the World Bank are working closely in support of this Initiative.

Thus, our anti-corruption effort involves a set of integrated policies. Regional efforts such as the Inter-American Convention are an integral part of this framework.

### PROVISIONS OF THE INTER-AMERICAN CONVENTION

The Inter-American Convention was adopted at the Specialized Conference on Corruption of the Organization of American States (OAS) in Caracas, Venezuela, on March 29, 1996. Twenty-one states signed the treaty on the date of its adoption. The United States participated actively in the Convention's negotiation, and signed it on June 27, 1996. To date, 26 states have signed, and 18 states have deposited their instruments of ratification. The Convention entered into force on March 6, 1997.

The Convention was the first instrument of its kind in the world to be negotiated, and was adopted and opened for signature on March 29, 1996 at Caracas. In addition to requiring parties to criminalize acts of corruption, the Inter-American Convention will enhance cooperation among the nations in the Hemisphere in the battle against both domestic and transnational acts of corruption. I will describe the principal provisions of the Convention and then summarize some of the distinct advantages to the United States of becoming a party.

The Convention requires that the States Party take specific steps to combat corruption. It imposes an obligation on each State Party to enact such legislation as is necessary to criminalize the acts of corruption specified in the Convention. Such acts include, the solicitation or acceptance of bribes; the offering or granting of bribes; any act or omission by a government official to obtain illicit benefits for himself or others; the fraudulent use or concealment of property derived from the above-mentioned acts; and participation in, or association or conspiracy to commit, such acts.

Thus, the treaty requires criminalization not only of the "supply side" or "active" bribery (i.e., the offering of bribes) but also the "demand side" or "passive" bribery (i.e., the solicitation or acceptance of bribes). Although most nations in the Hemisphere already to some extent have enacted corruption legislation, such as anti-bribery laws, the Convention seeks to ensure that such legislation is broad and comprehensive in key areas.

The United States can become a party to the Convention without any additional legislation, because existing U.S. law is already sufficient to satisfy the Convention's provisions regarding requirements for legislation, and the other provisions in the Convention are self-executing and will not require implementing legislation. However, to clarify our interpretation of certain provisions of the Convention, we recommend the submission with the U.S. instrument of ratification of certain Understandings, which I will describe further on in this statement.

The Convention also includes provisions on certain forms of international cooperation and assistance. These include extradition, mutual legal assistance, and asset seizure and forfeiture. With respect to all of these forms of cooperation, the Convention expressly provides that cooperation will be subject to the limitations of applicable existing treaties, including bilateral ones, and to the domestic law of each country. The Convention also contemplates technical cooperation and exchanges of experiences. All of the foregoing are comparable to forms of cooperation already envisioned in various law enforcement treaties to which the United States is a party. Through such cooperation and assistance, the Convention will facilitate the prevention, investigation, and prosecution of acts of corruption.

One especially noteworthy feature of the Convention is the obligation in Article VIII to criminalize the bribery of foreign officials. In recent years, the United States

18

Government has sought in a number of multilateral fora to persuade other governments to adopt legislation akin to the U.S. Foreign Corrupt Practices Act. The Convention represented a breakthrough on that front, and lent impetus to similar measures pursued by the United States in other multilateral fora, such as the OECD, the Council of Europe, and the United Nations.

BENEFITS OF U.S. RATIFICATION

The United States would benefit from becoming a Party to the Inter-American Convention in many ways. First, becoming a Party would strengthen the ability of the United States to continue to assert a leadership role in this area. Most of the countries in this Hemisphere are at least signatories to the Convention, and a significant number either are or may soon become Parties. Given the strong position the United States has historically taken in opposition to corruption, and the fact that our laws and policies on this issue are at the forefront internationally, our absence from this treaty regime would be conspicuous, and would detract from our ability to exert pressure on the various states which are party to implement the Convention to the most vigorous extent possible.

Second, U.S. business will benefit from a legal regime that is designed to address the problem of corruption in this Hemisphere. The corruption of governmental officials significantly hinders business transactions and yields economic inefficiencies. The Convention imposes requirements on other states to criminalize transnational bribery, which would help level the playing field for U.S. companies competing for business in the region. Some countries of the Hemisphere have significant capital-exporting multinational enterprises, so the further expansion of prohibitions on transnational bribery in those countries' legal systems would be a significant complement to the OECD Convention. Clearly, U.S. businesses see the benefits of this Convention, as manifested by the letter dated April 7, 2000 sent to Senator Helms by the leaders of 10 leading business associations to express support for the ratification this year of the Convention.

A third advantage to the United States is that the Convention augments existing mechanisms for international cooperation in law enforcement matters. For example, most of our older extradition treaties with countries in the region render extraditable only certain offenses listed in the treaty. The Corruption Convention would supplement such treaties with the additional offenses contemplated by the Convention, thereby enabling the United States to more effectively obtain the extradition of offenders accused of corruption offenses.

Fourth, ratification would further U.S. efforts to support democratic institutions in the region. Corruption debilitates and destabilizes government institutions. Democracy has made impressive strides in the Western Hemisphere; with the exception of Cuba, democratically elected governments are the norm. However, as recent events in Ecuador and Paraguay underline, democracies remain vulnerable and fragile. Public corruption further undermines the legitimacy of governments and weakens support for the often difficult steps that responsible governments must take. Corruption has become a rallying cry for citizens too long denied transparent, accountable government. A recent survey in the Hemisphere demonstrated that while the majority of citizens still support democracy as the preferred system of government, a majority are also deeply dissatisfied with the practice of democracy in their country. In many countries in the region, corruption by entrenched political parties and interests has become a major issue in electoral politics in recent years, bringing the issue front and center and demonstrating how corruption can bring down even democratically elected governments if it is not effectively addressed.

FOUR UNDERSTANDINGS

The Administration recommends that the United States include four Understandings when it deposits its instrument of ratification for the Convention. These Understandings, the proposed texts of which were included in the Administration's transmittal of the Convention to the Senate, would clarify views of the United States about certain provisions of the Convention. Our views as set forth in these Understandings are consistent with the text and history of the Convention.

First, regarding Article I (on definitions), we recommend an Understanding that the Treaty imposes obligations only with respect to the conduct of U.S. federal officials. We believe this needs to be an Understanding, rather than a Reservation, because it simply reaffirms a point that was already addressed without dissent during the treaty negotiations. At the conclusion of the negotiations, the United States delegate read a statement into the record, asserting that we understood the Convention would not impose obligations with respect to officials other than federal officials for countries with a federal system of government. This statement was seconded by the

19

delegation from Canada and from other States with federal systems, and was not challenged by any of the other delegations.

Second, regarding Article VII (on legislation), we recommend an Understanding to the effect that existing U.S. laws already criminalize the conduct that the Convention requires be criminalized, even though such laws may not necessarily be defined in terms or elements identical to those used in the Convention. This should be an Understanding rather than a Reservation because the requirement in Article VII refers to criminalization by the Parties of certain acts of corruption described in Article VI, but does not call for each State Party to incorporate into its domestic law each specific element of the acts specified in Article VI.

Third, concerning Article VIII (on transnational bribery), we recommend an Understanding to indicate that the Foreign Corrupt Practices Act (FCPA), a law already in effect for the United States, satisfies the requirement of this Article. Such an Understanding would be consistent with the negotiating history, as this Article was included at the behest of the United States for the very purpose of requiring other States to enact legislation comparable to the FCPA. We believe an Understanding of this nature is necessary simply because the elements of the FCPA are not identical in every minute respect to the elements of the offense described in Article VIII, and there was no expectation by any of the negotiating delegations that the United States would need to modify the FCPA to comply with the Treaty.

Finally, regarding Article IX (on illicit enrichment), we recommend an Understanding that establishment of such an offense would be inconsistent with the U.S. Constitution and fundamental principles of our legal system, and that therefore—in accordance with the terms of the Article—the U.S. will not establish a new criminal offense of that nature. By its terms, Article IX renders the obligation to criminalize illicit enrichment subject to each State Party's "Constitution and the fundamental principles of its legal system." To the extent that Article IX contemplates establishment of an offense of "illicit enrichment" which would entail shifting the burden of proof to the defendant in a criminal prosecution, it would be inconsistent with the U.S. Constitution and fundamental principles of our legal system. Since the text of Article IX expressly contemplates opt-out in such circumstances, there would be no need to style this statement as a Reservation rather than as an Understanding.

CONCLUSION

In conclusion, Mr. Chairman, we believe that to support democracy and sound economic development, we need to take strong action against corruption. This has been a top priority of this Administration, and with strong bipartisan and private sector support, we have made significant progress. The Inter-American Convention Against Corruption will be an important step to advance this cause in our own Hemisphere. It addresses for the first time certain forms of corruption and encourages international cooperation and assistance. U.S. ratification will ensure that we remain a leader in anti-corruption efforts and help create an environment which will promote long-term growth and opportunities for U.S. firms. The Convention is very much in the interest of the United States and our partners in the Hemisphere. The Administration strongly supports and urges the United States Senate to give its advise and consent to the Convention.

I will be pleased to answer any questions the Committee may have.

————

RESPONSES OF HON. ALAN P. LARSON TO ADDITIONAL QUESTIONS SUBMITTED FOR THE RECORD

*Question 1.* The letter of submittal to the President by the Secretary of State recommends an understanding relating to Article VII. The proposed understanding indicates that there is an "extensive network of laws already in place in the United States that criminalize a wide range of corrupt acts."

Please elaborate on the network of such laws.

Answer. The following is a summary of the U.S. federal laws in place that satisfy the requirements of Article VII of the Convention, which requires the States Parties to criminalize the offenses set forth in Article VI.

While no single federal statute uses precisely the terms of Article VI of the Convention, Article VI(1)(a) (solicitation or acceptance of bribes) and VI(1)(b) (offering or granting bribes) were patterned on U.S. law (18 U.S.C. § 201 (b) and (c)), and various federal anti-corruption laws are so comprehensive that no further legislation

20

would be needed to prosecute the conduct described in Article VI. The following U.S. statutes cover the conduct described in Article VI(1)(a), VI(1)(b), and VI(1)(c):

  18 U.S.C. §201(b) (bribery of public officials)
  18 U.S.C. §201(c) (making or receiving illegal gratuities)
  18 U.S.C. §208 (acts affecting a personal financial interest)
  18 U.S.C. §641 (theft or misuse of Government property)
  18 U.S.C. §666 (theft or bribery involving Federal programs)
  18 U.S.C. §1951 (bribery or extortion affecting commerce)
  18 U.S.C. §371 (conspiracy to defraud the Government)
  18 U.S.C. §1341 (mail fraud)
  18 U.S.C. §1343 (wire fraud)
  18 U.S.C. §1346 (honest services fraud)
  2 U.S.C. §§437g(d), 441a-441h (Federal campaign financing)

The offense of fraudulent use of property described in Article VI(1)(d) (fraudulently using or concealing property derived from bribery) would be covered under 18 U.S.C. §§1341, 1343, and 1346, the same Federal fraud statutes that are used to cover corruption-related acts. The fraudulent concealment of bribe proceeds could be prosecuted under 18 U.S.C. §§1956 and 1961(1), as a specified unlawful act for the purposes of money laundering.

Participation in any of the above acts of corruption, as described in Article VI(1)(e), is punishable pursuant to 18 U.S.C. §2 (aiding and abetting) and 18 U.S.C. §3 (accessory after the fact). Conspiracy is punishable under 18 U.S.C. §371. As noted in the recommended understanding to Article VII, although there is no general "attempt" statute under federal law, the attempt to bribe or engage in other significant acts of corruption will generally be subject to prosecution under one of the substantive offenses described above.

*Question 2.* Article XIII(2) of the treaty provides that "[e]ach of the offenses to which this article applies shall be deemed to be included as an extraditable offense in any extradition treaty in force between the States Parties." Article XIII(3) provides that the Convention may be used as the "legal basis for extradition with respect to any offense to which this article applies."

—Will the United States require the existence of a bilateral treaty in order to extradite for offenses under this Convention?

—Given that the United States does not have in effect an offense of illicit enrichment, and doing so would be inconsistent with the U.S. Constitution and fundamental principles of the U.S. legal system, will the United States regard offenses under Article IX as extraditable offenses under any treaty?

Answer. Consistent with past U.S. practice with respect to multilateral law enforcement conventions, the United States will not rely on the Convention alone as the basis for extradition, but rather will extradite only to countries with which it has a bilateral extradition treaty in force.

The crime of illicit enrichment, as it is defined in Article IX of the Convention, would not be an extraditable offense for the United States. United States extradition law and practice under our extradition treaties require "dual criminality," i.e., the conduct for which extradition is sought must be considered criminal in both the Requesting and Requested State. The offense of "illicit enrichment" as it is defined in Article IX is not criminal under current U.S. law and therefore would not be extraditable under U.S. practice. However, if the underlying conduct that was the basis for the foreign charges was criminal under applicable U.S. criminal statutes (e.g., false statements, fraud, criminal tax violations, embezzlement) extradition would be possible, assuming all other conditions for extradition under the relevant bilateral treaty are satisfied. This is consistent with Article XIII(5) of the Convention, which provides that "[e]xtradition shall be subject to the conditions provided for by the law of the Requested State or by applicable extradition treaties, including the grounds on which the Requested State may refuse extradition."

Senator CHAFEE. I am a big believer in when you have a hearing, you actually hear, and I welcome you. And I have no further questions. Thank you for your testimony.

Mr. LARSON. OK.

Senator CHAFEE. And we will convene the next panel.

Mr. LARSON. Great. Thank you very much.

Senator CHAFEE. Welcome.

For the next panel, we have Ms. Nancy Zucker Boswell, the Honorable William T. Pryce and Ms. Lucinda Low.

21

And we will start in the middle with the Honorable William T. Pryce. Welcome.

**STATEMENT OF HON. WILLIAM T. PRYCE, VICE PRESIDENT, COUNCIL OF THE AMERICAS, WASHINGTON, DC**

Mr. PRYCE. Thank you very much, Mr. Chairman. Good afternoon and I am Bill Pryce, the vice president of the Council of the Americas, in charge of our Washington operations. And I appreciate the opportunity to testify before you today.

I would like permission to submit my testimony for the record. And I will try to make it much briefer here.

First of all, I wanted to say that we certainly would associate ourselves with your very fine statement about the problems of corruption. And I would also associate our business organization with the words of Mr. Larson.

I want to applaud your efforts, Mr. Chairman, and those of Chairman Helms, for scheduling this hearing on the issue of corruption in the Americas. This once taboo subject can have such far-reaching negative consequences that addressing it is critical to continuing economic and political and social progress in development in Latin America.

Corruption and this Convention, of course, are also of concern to our member companies who suffer the consequences of missed opportunities and the uncertainty of investments.

The practice of corruption in the conduct of international business operations represents an inefficient use of resources that leads to economic, political and social costs.

Corruption is costly, inefficient; and it results in a poor quality product or service. It penalizes the best and most efficient producers and rewards the least efficient. The new interrelated economy of the 21st century warrants a new way of doing business.

There are also damaging political costs to corruption. Corruption is secretive and behind the scenes. Therefore, the public does not know what is going on and is left out of the process. The result is a loss of accountability and a weakening of institutions from the inside.

It is almost like a house that is getting rotted by termites and you do not see it, but all of sudden it falls down. The rule of law is weakened and democracy is undermined. Corruption, since it is hidden, is by its very nature undemocratic.

Socially, corruption is destructive of morality and public decency. It undermines and weakens the strong social values that are necessary for a true and modern democratic system to function.

It also reduces a sense of crime and guilt, because if corrupt acts can be done with impunity, then other types of theft and criminal activity will be more likely to occur.

Mr. Chairman, it was not long ago that businessmen would brag privately about their illicit business practices. Corruption was part of the business of doing business. Now, there are conferences on corruption, and there is a growing recognition that the topic must be addressed.

Although corrupt practices have certainly not been eliminated, there is a much greater sense that corruption is wrong and it needs to be minimized. In fact, although some industrialized countries

22

continue to offer tax deductions for bribes, this practice is generally being phased out.

The changing climate of opinion is largely due to U.S. leadership and to recent multilateral developments.

As we all know, the passage of the Foreign Corrupt Practices Act in 1977 was a historic first step. And it was a courageous bold move that made it a crime for U.S. citizens and companies to bribe U.S. officials.

This initiative in the beginning cost U.S. companies billions of dollars in lost business. And it was criticized in some circles. But it was a bold demonstration of leadership, and now most U.S. businessmen praise the legislation.

And although other countries did not follow suit for many years, we confronted the fact that over 400 U.S. companies admitted making questionable illegal payments to foreign governments and politicians. We took the high road and gained increased respect for the U.S. throughout the world.

We now have another opportunity following the OECD Convention, which I will not speak about, because I know it has already been covered—but we have another opportunity to continue the U.S. leadership in the fight against corruption.

The Inter-American Convention Against Corruption is the next logical step in the effort to combat unfair business practices.

Negotiated under the auspices of the Organization of American States, the Convention criminalizes the solicitation and acceptance of bribes, providing a comprehensive legal framework to combat public corruption in the hemisphere.

It identifies acts of corruption and creates binding obligations for enforcement of anti-corruption measures.

It is important both because it addresses the solicitation of bribes and because it broadens the reach of anti-corruption oversight by covering most of the countries of Latin America.

An important instrument in efforts to combat corruption is the establishment of transparency measures. The transparency laws and regulations go hand-in-hand with anti-corruption efforts and can serve to stop corruption before it happens.

They can shine a bright light into the dark and secret corners where corruption is practiced and bring it to an end. That which is not stopped then is attacked by the anti-corruption laws that have teeth.

The Inter-American Convention Against Corruption provides transparency measures in its provisions, requiring the registration of income, and assets and liabilities of persons who perform public functions in certain posts and making such registrations public.

The Convention also has a mechanism to ensure that publicly held companies and other types of associations maintain books and records which accurately reflect the acquisition and disposition of assets and have sufficient internal accounting controls to enable their officers to detect corrupt acts. Again, these measures can work to preempt corruption and are part of the Convention.

It is—in a colloquialism, it is a great help in keeping the honest people honest. It is a great, great help.

Although, it was U.S. leadership that helped bring about the Inter-American Convention, we are now in a position where other

23

countries are moving ahead on this agreement, while we have not yet given our full support.

Mr. Chairman, each year, the Council of the Americas assists its member companies in addressing disputes over questionable contracts and business practices with governments and business leaders throughout the Americas.

Corruption remains one of the most pressing problems for conducting international business. The costs of corruption for companies are very difficult to measure. And information on these missed opportunities is not quantifiable, but there is no doubt that corruption negatively impacts our companies.

This Convention is not a panacea, but what we are talking about is adopting an international agreement that promotes accountability and transparency, and it will lead to more predictable rules for U.S. companies doing business overseas. In effect, it will help level the playing field for U.S. business.

The corrosive influence of corruption hinders the full development of the countries of the hemisphere and limits opportunities for U.S. companies.

The U.S. must do all it can to address this critical issue. The U.S. has been a leader in combating corruption and taking bold stands and enacting landmark legislation.

And the Inter-American Convention is in U.S. interests, because it forbids what is already against U.S. law. U.S. corporations and investors are bound by the FCPA, and therefore, U.S. industry will lose a unilateral disadvantage that is otherwise applied to them, if this Convention is adopted. It will level the playing field, as I said, and remove our self-imposed unilateral sanction of ethical business practices.

As of now, the Inter-American Convention has been ratified by 18 of the 26 countries that have signed the document. The United States has yet to ratify it.

And to advance that Convention and to maintain our leadership role in the hemisphere, it is essential that we do ratify and do so soon.

This Convention will not solve all the problems of corruption in the hemisphere, but it is an excellent beginning. And if we do not ratify, we will be sending a message that we believe the Convention lacks merit.

Mr. Chairman, in conclusion, I would note that this Convention is a great start and gives the hemisphere a solid benchmark to work from. However, to fully realize the benefits of this Convention, we need to focus on implementation and the establishment of consistent rules.

Multilateral followup is required to ensure that the damaging effects of corruption of and by public officials are eliminated. But the U.S. cannot lead in these efforts to implement the Convention if we ourselves have not ratified it.

On behalf of the Council of the Americas, I strongly urge the committee to recommend that the Senate ratify this Convention as soon as possible.

Thank you, sir. And I would be happy to answer any questions.

Senator CHAFEE. Well, thank you, Mr. Pryce. It is exciting our hemisphere is leading the way in this area.

24

[The prepared statement of Mr. Pryce follows:]

PREPARED STATEMENT OF AMBASSADOR WILLIAM T. PRYCE

Good afternoon, Mr. Chairman and Members of the Committee. I am Bill Pryce, Vice President of the Council of the Americas in charge of our Washington operations, and I appreciate the opportunity to testify before you today.

The Council is the leading business organization dedicated to promoting hemispheric economic integration, free trade and investment, open markets, and the rule of law throughout the Western Hemisphere. The Council's membership includes major U.S. multinational companies with interests in Latin America. Members represent a variety of sectors: manufacturing, energy, transportation, technology, communications, banking, financial services, and natural resources, among others.

I want to applaud your efforts Mr. Chairman and those of Chairman Helms for scheduling this hearing on the issue of corruption in the Americas. This once taboo subject can have such far-reaching negative consequences that addressing it is critical to continuing economic and political progress and development in Latin America. Corruption and this convention are of course also of concern to our member companies who suffer the consequences of missed contract opportunities and the uncertainty of investments.

The practice of corruption in the conduct of international business operations represents an inefficient use of resources that leads to economic, political and social costs. From an economic standpoint corruption is costly, inefficient and results in a poor quality product or service. It penalizes the best and most efficient producers and rewards the least efficient. The new interrelated economy of the 21st century warrants a new way of doing business.

There are also damaging political costs to corruption. Corruption is secretive and behind the scenes; therefore, the public does not know what is going on and is left out of the process. The result is a loss of accountability and a weakening of institutions from the inside. The rule of law is weakened and democracy is undermined. Corruption, since it is hidden, is by its very nature undemocratic.

Socially, corruption is destructive of morality and public decency. It undermines and weakens strong social values that are necessary for a true modern democratic system to function. It also reduces a sense of crime and guilt because if corrupt acts can be done with impunity, other types of theft and criminal activity will be more likely to occur.

These costs of corruption add up and must be addressed. Old habits are hard to break but there is a changing environment concerning corruption. We need to embrace this change in attitude and lead the effort to reduce corruption and its debilitating costs.

Mr. Chairman, it wasn't long ago that businessmen would brag privately about their illicit business practices. Corruption was part of the business of doing business. Now, there are conferences on corruption and there is a growing recognition that the topic must be addressed. Although corrupt practices have certainly not been eliminated, there is a much greater sense that corruption is wrong and needs to be minimized. In fact, although some industrialized countries continue to offer tax deductions for bribes, this practice is generally being phased out.

The changing climate of opinion is largely due to U.S. leadership and to recent multilateral developments. The passage of the Foreign Corrupt Practices Act (FCPA) in 1977 was a historic first step, where our country confronted corruption. This courageous move made it a crime for U.S. citizens and companies to bribe officials of another country. This initiative cost U.S. businesses billions in lost business and was criticized in some circles, but it was a bold demonstration of leadership and now most U.S. businessmen praise the legislation. Although other countries did not follow suit for many years, we confronted the fact that over 400 U.S. companies admitted making questionable or illegal payments to foreign government officials and politicians. We took the high road and gained increased respect for the U.S. throughout the world.

In 1988, the Congress called upon the Executive Branch to negotiate with our trading partners at the Organization for Economic Cooperation and Development (OECD) an international agreement that would require our trading partners to enact laws similar to our FCPA. Due to committed U.S. leadership and years of hard work, the OECD Convention to Combat Bribery of Foreign Public Officials was signed and ratified and came into force on February 15, 1999. This convention works to eliminate corruption in transactions involving companies and public-sector bodies. Under the convention it is illegal for any citizen of an OECD member country to bribe or attempt to bribe a foreign government official. This Convention would not have been adopted without U.S. leadership.

25

We now have another opportunity to continue U.S. leadership in the fight against corruption. The Inter-American Convention Against Corruption is the next logical step in the effort to combat unfair business practices. Negotiated under the auspices of the Organization of American States, the Convention criminalizes the solicitation and acceptance of bribes, providing a comprehensive legal framework to combat public corruption in the hemisphere. The Convention identifies acts of corruption and creates binding obligations and enforcement of anti-corruption measures. The Inter-American Convention is important both because it addresses the solicitation of bribes and because it broadens the reach of anti-corruption oversight by covering the countries of Latin America.

An important instrument in efforts to combat corruption is the establishment of transparency measures. Transparency laws and regulations go hand in hand with anti-corruption efforts and can serve to stop corruption before it happens. They can shine a bright light into the dark and secret corners where the corruption is practiced and bring it to an end. That which is not stopped is then attacked by the anti-corruption laws that have teeth. The Inter-American Convention Against Corruption provides transparency measures in its provisions requiring the registration of income, assets and liabilities of persons who perform public functions in certain posts and making such registrations public. The Convention also has a mechanism to ensure that publicly held companies and other types of associations maintain books and records which accurately reflect the acquisition and disposition of assets, and have sufficient internal accounting controls to enable their officers to detect corrupt acts. Again, these measures can work to preempt corruption and are part of the Convention.

Although it was U.S. leadership that helped bring about the Inter-American Convention, we are now in a position where other countries are moving ahead on this agreement while we have not yet offered our full support.

Mr. Chairman, each year, the Council assists its member companies in addressing disputes over questionable contracts and business practices with governments and business leaders throughout the Americas. Corruption remains one of the most pressing problems for conducting international business. The costs of corruption for companies are very difficult to measure. Information on missed opportunities is not quantifiable. But there is no doubt that corruption negatively impacts companies. This Convention is not a panacea, but what we are talking about is adopting an international agreement that promotes accountability and transparency and will lead to more predictable rules for U.S. companies doing business abroad. It will help level the playing field for U.S. business.

There is no question that corruption has a harmful effect on developing countries. Corruption discourages foreign investment and disrupts normal business practices. It undermines respect for governmental institutions and fosters organized crime. Examples of the tremendous costs of corruption on governments and citizens reveal how expensive this problem is. In a speech last year, Vice President Gore spoke of the case of Guatemala where third-party procurement monitoring has helped reduce corruption in the Ministry of Health. This has gained savings of 43 percent for the Ministry and lowered the price of its medicine by an average of 20 percent.

The corrosive influence of corruption hinders the full development of the countries of the hemisphere and limits opportunities for U.S. companies. The United States must do all it can to address this critical issue. The U.S. has been a leader in combating corruption, taking bold stands and enacting landmark legislation. The Inter-American Convention is in U.S. interests because it forbids what is already against U.S. law; U.S. corporations and investors are bound by the FCPA. Therefore, U.S. industry would lose a unilateral disadvantage that is otherwise applied to them. The Convention would level the playing field for U.S. business interests and remove our self-imposed, unilateral sanction of ethical business practices.

As of now, the Inter-American Convention Against Corruption has been ratified by 18 of the 26 countries that have signed the document. The United States has yet to ratify it. To advance the convention and to maintain our leadership role in the hemisphere it is absolutely essential that we do so and soon. The convention will not solve all the problems of corruption in the hemisphere but it is an excellent beginning, If we don't ratify we would be sending a message that we believe the convention lacks merit.

Mr. Chairman, in conclusion I would note that this convention is a great start and gives the hemisphere a solid benchmark to work from. However, to fully realize the benefits of this convention we need to focus on implementation and the establishment of consistent rules. Multilateral follow-up is required to ensure that the damaging effects of corruption of and by public officials are eliminated. But the U.S. cannot effectively lead in efforts to implement this convention if we ourselves have

26

not ratified it. On behalf of the Council of the Americas I strongly urge the committee to recommend that the Senate ratify the convention as soon as possible.

Senator CHAFEE. I would now like to hear from Ms. Nancy Zucker Boswell. Welcome, Nancy.

## STATEMENT OF NANCY ZUCKER BOSWELL, MANAGING DIRECTOR, TRANSPARENCY INTERNATIONAL USA, WASHINGTON, DC

Ms. BOSWELL. Thank you, Mr. Chairman. I am honored to be here today to testify on behalf of Transparency International.

We are a non-governmental organization dedicated to combating international corruption. We have grass roots national chapters in over 70 countries worldwide; 20 of them here in the Americas, including in Argentina, Brazil, Canada, Chile, Colombia, Peru, Mexico, and Venezuela.

The U.S. chapter, of which I am the managing director, is supported by a broad coalition of more than 30 American multi-nationals and leading lawyers, accountants, judges, academics and other distinguished individuals.

Our chapters in Latin America have found that corruption undermines development, distorts income distribution and corrodes public trust in democratic institutions. As has been pointed out, it also adds to the cost of business.

Latin America is a particularly important growth market, but corruption has undermined its potential for growth. We believe the Inter-American Convention Against Corruption can make a major contribution to addressing these problems.

As you noted in your opening remarks, Mr. Chairman, the Convention will directly benefit U.S. interests. Ratification is broadly supported by major business organizations. Many of them have signed a letter of support. We would like to ask, Mr. Chairman, that this letter be submitted into the record of this hearing.

[The letter referred to follows Ms. Boswell's prepared statement.]

Let me suggest three primary reasons for Senate action. First, there is now a window of opportunity for reform in the Americas. Second, the Convention can make a major contribution to the broader anti-corruption efforts in this hemisphere. And third, U.S. leadership is essential to securing these objectives.

A window of opportunity for reform finally opened for the first time since Congress took the historic step to end widespread bibery in international business.

As my colleague Bill Pryce noted, when Congress enacted the Foreign Corrupt Practices Act, it expected others to follow. But for almost two decades, no one did. Recently, however, there has been a profound change in attitude; and the issue is now high on the international agenda.

This is in part due to the mounting evidence, both to the private sector, civil society, the government and development assistance communities that corruption has severe economic, social and political costs.

The interests of these various sectors in reducing these costs has fueled the growth of the anti-corruption movement and opened an opportunity for reform.

27

By 1994, massive bribery scandals had led to the removal of several Latin Presidents from office, and there was a new willingness to confront the issue. There was also a strong public demand for change that brought new leadership to the fore.

They agreed with the U.S. initiative to place the issue on the 1994 Summit of the Americas. The leaders committed then to negotiate a hemispheric agreement. And within 15 months, the Inter-American Convention was concluded. Its rapid conclusion is striking testimony, both to U.S. leadership and to the regional consensus, for action.

The Convention is also one part of a broader anti-corruption reform program. If we are truly to have an impact, that program must also include economic and legal reforms, such as deregulation and privatization, creating a more independent judicial system, private sector action, greater freedom of the press and more meaningful public participation.

The Convention thus is an important addition to this broader reform program. Under Secretary Larson has described some of the provisions, and my colleague from the American Bar Association will provide greater detail.

I would like to simply underscore that in addition to being one element of a broad reform program, the Convention makes a very valuable addition to the start made by the OECD Anti-Bribery Convention.

That Convention will have a marked impact limiting the actions of major U.S. competitors, because they are virtually all based in OECD member countries.

But it addresses only the supply side; in other words, the companies that pay the bribes. As we indicated when we testified before this committee in 1998, the demand side also has to be addressed, and the Inter-American Convention does that. It focuses primarily on the public officials.

It is far broader in scope than the OECD, reflecting the complex nature of corruption and the comprehensive approach that is needed to confront it. Together, these two landmark Conventions provide a pincer attack on corruption.

This brings me to the third reason for U.S. ratification. And that is: U.S. leadership is essential to securing the full potential of these two Conventions. They will only be realized if there is effective implementation and enforcement.

At this committee's hearings on the OECD Convention, Chairman Helms expressed his skepticism about the will of the OECD signatories to fully enforce their commitments. In ratifying the Convention, the Senate recognized the importance of a followup process.

Since the OECD Convention entered into force in 1999, a vigorous process has made encouraging progress moving signatories to fulfill their commitments. Many countries have already been found to be in compliance. And those that are not have been told to address their deficiencies.

Peer pressure is moving them to take the remedial steps necessary and warning others not to submit inadequate measures.

We believe that a peer review process will be even more important for the Inter-American Convention because its implementation

28

will be complex, time-consuming and costly. Countries will need to enact considerable new legislation and regulations in order to come into compliance. And experience demonstrates that peer review will ensure that high standards are met.

However, the Inter-American Convention does not provide for such a process, and the current program involves only country workshops and technical assistance. We have worked to encourage parties to move forward to create a peer process and are finding some resistance to creating it.

A key stumbling block is that the U.S. has not yet ratified the Convention. And it is difficult for us to press for strong followup until it has.

Senate ratification is clearly a prerequisite not only to creating the process but to enabling the U.S. to fully participate in it. We are concerned that unless the U.S. participates, regional progress may stall, and our ability to stimulate action in other countries may be handicapped.

On the other hand, ratification will demonstrate the importance the U.S. places on the Convention as a key element of its anti-corruption strategy. It will send a strong message of support to reformers and remove any pretext others might have for not moving forward.

As others have noted, this is a non-controversial agreement that embodies U.S. values. It enjoys bipartisan support and requires no implementing legislation. Therefore, we think the Convention should be ratified unanimously.

We would respectfully suggest that the committee maintain its important oversight function by requiring that progress reports on implementation be provided.

In 1998, Chairman Helms placed such stringent reporting requirements on the resolution of ratification for the OECD Convention. That resolution calls for an assessment of the effectiveness, transparency and viability of the OECD monitoring process, including its inclusion of input from the private sector and non-governmental organizations. Transparency International fully supported the chairman's action then and does so again today.

In conclusion, we believe that this Convention can make a real difference in reducing corruption and promoting the rule of law across the hemisphere.

Reform will significantly improve market opportunities, promote equitable development and make democratic institutions more effective. For over 20 years, this country has taken the lead in promoting anti-corruption reform here at home and around the world.

Ratification of this Convention will send a strong signal that we continue to place the utmost importance on good governance and we expect others to do the same.

We appreciate the committee's holding this hearing and your consideration of this important instrument.

Thank you.

Senator CHAFEE. Thank you, and also for the good work Transparency International does on this subject.

Ms. BOSWELL. Thank you.

[The prepared statement of Ms. Boswell follows:]

29

PREPARED STATEMENT OF NANCY ZUCKER BOSWELL

Mr. Chairman and members of the committee on Foreign Relations, I am very pleased to be invited to testify before you today on behalf of Transparency International. TI is a non-governmental organization that is dedicated to combating international corruption. Since its founding in 1993, it has grown rapidly and now has grass roots national chapters in over 70 countries. Twenty of them are in the Americas, including in Argentina, Brazil, Canada, Chile, Colombia, Peru, Mexico, Venezuela and the U.S.

The U.S. chapter, of which I am the Managing Director, is supported by a broad coalition, including more than thirty major American companies, lawyers, accountants, scholars, jurists, development experts, and other distinguished individuals.

In Latin America, as in many other parts of the world where corruption is systemic and institutions are weak, corruption has undermined development, distorted income distribution, and corroded trust in democratic institutions, with profound consequences both within and beyond national borders. It has also added to the cost of business. Latin America is an important growth market, but corruption has undermined the potential for growth.

The Inter-American Convention Against Corruption can make a major contribution to addressing these problems. It will strengthen the rule of law and transparency in Latin America. This will create a more hospitable environment for business, promote development, and build more accountable and democratic institutions.

The Convention has already been ratified by 18 nations, including most every major Latin American country. In order to have a practical impact, the Convention must be implemented and effectively enforced. U.S. leadership is vital to achieving this objective, and prompt U.S. ratification is needed or this effort will falter. The Convention clearly embodies our values and ratification requires no implementing action on our part. Senate action will directly benefit U.S. interests and is broadly supported by leading business organizations.[1] They have signed a letter in support of Senate ratification of the Convention, and we would like to ask the Chairman to submit it into the record of this hearing.

I would like to highlight in my testimony three primary reasons for prompt Senate action:

- first, there is now a window of opportunity for reform in the Americas;
- second, the Convention can make a major contribution to broader anti-corruption efforts in the hemisphere;
- third, U.S. leadership is essential to securing its objectives.

I. THERE IS NOW A WINDOW OF OPPORTUNITY FOR REFORM IN THE AMERICAS

In 1977, when Congress enacted the Foreign Corrupt Practices Act,[2] it took the first historic step on the path to end widespread bribery in international business. It was expected that others would also criminalize bribery of foreign officials.

For almost two decades, no one followed. But, in recent years, there has been a profound change in attitude. Thanks in part to the work of Transparency International, the issue is now high on the international agenda. Mounting evidence has demonstrated that corruption has severe economic, social and political costs with adverse effects on the private sector, civil society, the government and the development assistance community. This coincidence of interests has fueled the growth of the anti-corruption movement and created a window of opportunity for reform.

By 1994, following massive bribery scandals and the removal of several Latin presidents from office, there was a new willingness to confront the issue. There was strong public demand for change and new leadership elected to take action.

The U.S. found support among the leaders for placing the issue of corruption on the agenda of the Miami Summit of the Americas. The Summit Declaration stated that "effective democracy requires a comprehensive attack on corruption" and that "corruption in both public and private sectors weakens democracy and undermines the legitimacy of governments and institutions."[3]

The leaders committed to negotiate a hemispheric agreement and to undertake the many necessary economic, legal and regulatory reforms that are part of an effective anti-corruption program.

---

[1] These include the Association of American Chambers of Commerce of Latin America, the Brazil-U.S. Business Council, the Business Roundtable, the Council of the Americas, , the Mexico-U.S. Business Committee, the National Association of Manufacturers, the National Foreign Trade Council, PhRMA, the U.S. Chamber of Commerce, and the U.S. Council for International Business.

[2] Pub. L. No. 95–213, 91 Stat. 1494 (1977).

[3] Summit of the Americas, Plan of Action, No. 5, Miami, Fla., Dec. 11, 1994.

30

Fifteen months after the Summit, the Inter-American Convention Against Corruption was concluded and signed by 21 nations.[4] The Convention's rapid conclusion is striking testimony both to U.S. leadership and to the regional consensus for action.

Since its conclusion, it has been ratified by 18 countries, including Argentina, Chile, Colombia, Costa Rica, Panama, and Venezuela. Recent elections in many of these countries have brought to power a new set of leaders committed to intensify reform efforts.

II. THE CONVENTION CONTRIBUTES TO BROADER REFORM EFFORTS IN THE HEMISPHERE

The Convention is an important part of the broader anti-corruption agenda that is needed to address corruption. That agenda was agreed to at the 1994 Summit and includes deregulation and privatization, simplification of administrative procedures and creating more independent judicial systems. It also includes private sector action; stricter auditing and accounting standards; and greater freedom of the press, wider publication of information and more meaningful public participation.

The criminal and preventive measures of the Convention are important steps in this broad approach. The principal provisions of the Convention call on parties to:

- Criminalize solicitation or acceptance of bribes and other corrupt acts by public officials;
- Strengthen cooperation in criminal investigations and preclude the use of bank secrecy laws or political grounds as the bases for refusing cooperation;
- Promote "preventive" measures, including disclosure of assets and conflict of interest standards for public officials, and strong procurement rules.

The Convention is far broader in scope than the OECD Convention on Bribery of Foreign Public Officials,[5] reflecting the complex nature of corruption and the comprehensive approach that is needed to confront it. The OECD Convention, which this body ratified unanimously on July 31, 1999, requires the 34 signatory nations to enact legislation similar to the FCPA, prohibiting companies from bribing foreign public officials to obtain or retain business or other improper advantage. The OECD Convention will have a marked impact on the actions of major U.S. competitors because they are virtually all based in OECD member countries.

The OECD Convention addresses only the "supply" side, e.g., the companies that pay bribes. As we indicated when TI testified before this committee on June 9, 1998, the "demand" side also has to be addressed and that is what the Inter-American Convention does. It focuses primarily on the public officials who demand or take bribes. Together, these two landmark conventions provide a pincer attack on corruption.

III. U.S. LEADERSHIP IS ESSENTIAL TO SECURING ITS OBJECTIVES

However, their full potential will only be realized if there is effective implementation and enforcement. U.S. leadership is critical to accomplishing this objective.

At this committee's hearings on the OECD Convention, Chairman Helms expressed his skepticism about the will of the OECD signatories to implement and fully enforce their commitments. In ratifying that convention, the Senate recognized the importance of a monitoring process.

Since the OECD Convention entered into force on February 15, 1999, a vigorous peer review monitoring process has made encouraging progress moving signatories to fulfill their commitments. It has reviewed the implementing legislation of most of the 21 countries that have ratified to date. TI National Chapters have played an active part in the monitoring process and have submitted their analysis of implementing legislation.

Many countries have been found to be in compliance. Those that are not have been told to address the deficiencies. Peer pressure is moving them to take remedial steps and warning others not to submit inadequate measures.

A peer review process will be even more important for the Inter-American Convention because its implementation will be more complex and time-consuming. Considerable new legislation and regulations will be required to bring countries into compliance. Technical expertise and best practices will be necessary to ensure high standards are met. Many government agencies will have to participate in the process and there will be competing demands for resources.

---

[4] Reprinted at 35 I.L.M. 724 (1996).
[5] Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, reprinted at 37 I.L.M. (1998).

31

Currently, the Inter-American Convention does not provide for a peer review monitoring process, and the OAS follow-up program involves only country workshops and technical assistance.

Transparency International has been encouraging the OAS to establish such a process, and there has been some good progress in building consensus over the past six months. Last November, we brought together experts from across the hemisphere to consider how best to make progress. The experts concluded that a peer review process will be essential to secure effective implementation, especially in countries where laws are on the books but not always effectively enforced.

The OAS is currently working to strengthen the follow-up process. In February, the Finance Ministers of the Western Hemisphere issued a statement calling for the establishment of a multilateral mutual review mechanism. In March, the OAS Secretary General opened a Special Session on the Convention by noting an emerging consensus for such mechanisms.

Nonetheless, there is still strong resistance to creating such a mechanism. A key stumbling block is that the U.S. has not yet ratified the Convention. It will be difficult for the U.S. to press for a strong follow-up process until it has ratified.

Prompt Senate ratification is clearly a prerequisite step to creating the process and to enabling the U.S. to fully participate in it. Unless the U.S. participates, progress may stall. Our ability to stimulate action in other countries will be handicapped if the U.S. is not at the table.

Ratification will demonstrate the importance we place on the Convention as a key element of an effective anti-corruption strategy. It will send a strong message of support for reformers and remove any pretext others might use for not moving forward.

This is a non-controversial agreement that embodies U.S. values. It enjoys the broad support of all sectors, including the leading business organizations. To our knowledge, no organization opposes it.

The Administration has indicated that no implementing legislation is needed because existing U.S. laws and practices are already in compliance with the Convention. As with the OECD Convention, we think that the Inter-American Convention should be ratified unanimously.

Chairman Helms placed stringent reporting requirements on the resolution of ratification for the OECD Convention. TI recommended that this committee ask the State Department to provide periodic progress reports on the OECD Convention. Today, we respectfully suggest again that the Committee continue to maintain its important oversight function by asking, as a condition for ratification, that it call for progress reports on the Inter-American Convention.

CONCLUSION

In conclusion, the Inter-American Convention can make a real difference in reducing corruption and promoting the rule of law and greater accountability across the hemisphere. These reforms will significantly raise standards, improving market opportunities, promoting equitable development, and making democratic institutions more accountable. For over twenty years, the U.S. has taken the lead in promoting anticorruption reform at home and around the world. Ratification of this Convention will send a strong signal that the U.S. continues to places the utmost importance on good governance and expects others to do the same.

We would like to express our appreciation for the Committees's scheduling this hearing and for its consideration of this important instrument.

————

APRIL 7, 2000.

The Honorable JESSE HELMS
*Chairman,*
*Senate Committee on Foreign Relations,*
*450 Dirksen Senate Office Building,*
*Washington, DC.*

DEAR MR. CHAIRMAN: We are writing to express our support for ratification this year of the Inter-American Convention Against Corruption that was transmitted to the Senate on April 1, 1998.

The Inter-American Convention is the next important step in the fight against bribery and corruption in this hemisphere. Your prompt action helped criminalize the "supply side" of bribery with the entry-into-force of the OECD Anti-Bribery Convention on February 15, 1999. Since then, the OECD Working Group has been mak-

32

ing good progress in ensuring that our trading partners enact laws comparable to the FCPA. But, the OECD Convention only applies to those who pay the bribe.

There is much to do on the "demand side" to secure laws and practices that provide a hospitable environment for U.S. business and trade, foster economic development, and promote democracy and accountable institutions. The Inter-American Convention is a strong beginning, committing our major trading partners in the hemisphere to criminalize a wide range of corrupt acts, step up enforcement, enhance legal and judicial cooperation, and strengthen preventive measures, such as codes of conduct for public officials, disclosure of assets, and whistle blower protection.

Realizing the Convention's full potential will be a long and difficult process and will require U.S. political leadership. Ratification is absolutely imperative to demonstrate that the United States takes its obligations seriously and expects the same of others.

The Administration has indicated that no implementing legislation is needed. For other countries, implementation will require substantial reform. To accelerate this process, the OAS has initiated a follow-up program, providing technical assistance and model laws, and has circulated a questionnaire that will reveal the extent of reform needed.

When the Convention was negotiated, the parties did not consider a formal monitoring program. However, in light of the positive experience of the OECD and the Financial Action Task Force, the OAS Working Group is currently considering creating a peer review monitoring mechanism. U.S. ratification is essential if we are to promote this outcome and to participate in the important follow-on process.

We look forward to the opportunity to address any issues of concern and appreciate your continued support for meaningful anti-corruption reform across the hemisphere.

Sincerely,

MASTON N. CUNNINGHAM, *President, AACCLA*
ROBERT C. PETTERSON, *Chairman, U.S. Section, Brazil-U.S. Business Council*
THOMAS E. MCNAMARA, *President, Council of the Americas*
JAMES R. JONES, *Chairman, U.S. Council, Mexico-U.S. Business Committee*
JERRY JASINOWSKI, *President, National Association of Manufacturers*
FRANK D. KITTREDGE, *President, National Foreign Trade Council*
ALAN F. HOLMER, *President and CEO, Pharmaceutical Research and Manufacturers of America*
FRITZ HEIMANN, *Chairman, Transparency International-USA*
L. CRAIG JOHNSTONE, *Senior Vice President, International, Economic and National Security Affairs, U.S. Chamber of Commerce*
THOMAS M.T. NILES, *President, U.S. Council for International Business*

Senator CHAFEE. I would just add that even with the ratification of the treaty, it is still going to be difficult back in my home State of Rhode Island. We still struggle with corruption.

We are not above it. There is scandal going on in our capital city of Providence, bribery of elected officials and officials that work for the government.

Ms. BOSWELL. You make a—that is an excellent point. That is indeed, I think, all the more reason why our partners down in the Americas need this Convention, to help them make the kind of progress we would all like to see them make.

Senator CHAFEE. Yes, sometimes it is ingrained so deeply in the culture, it takes awhile, but you have to start somewhere. And we are doing that here hopefully.

Ms. BOSWELL. Exactly. Thank you so much.

Senator CHAFEE. Thank you.

Ms. Lucinda Low, welcome.

33

**STATEMENT OF LUCINDA A. LOW, REPRESENTATIVE TO THE INTER-AMERICAN BAR ASSOCIATION, AMERICAN BAR ASSOCIATION, WASHINGTON, DC**

Ms. Low. Thank you very much. I would like to thank the committee first for conducting this hearing and for the opportunity to testify.

I am testifying today on behalf of the American Bar Association. I currently serve as the American Bar Association's representative to the Inter-American Bar Association.

In 1997, when I had the privilege of chairing the ABA Section of International Law and Practice, the House of Delegates of the American Bar Association adopted a policy in support of ratification by the United States of the Inter-American Convention Against Corruption with minimal reservations, understandings, and declarations. The House of Delegates' policy also called for prompt, full and consistent implementation of the Convention.

With your permission, Mr. Chairman, I would like to submit our full statement for the record and summarize only some key points here today in my oral remarks.

I would like to focus on the Convention, what it is, how it fits in the context both of U.S. measures to combat corruption, and the international architecture that is growing up in recent years around this issue.

I would then like to address several reasons why we think now is an appropriate time for the United States to ratify the Convention, and then comment briefly on the issue of reservations, understandings and declarations.

As you have noted, Mr. Chairman, the Inter-American Convention was, in fact, the first multilateral instrument to combat corruption agreed to. It came out of the Summit of the Americas, and its focus is on the issue of public sector corruption, and the problems that public sector corruption creates for economic development, political stability and hemispheric integration.

The Inter-American Convention takes, what I like to call, a holistic view of the problem of corruption. It addresses corruption both from the supply side and from the demand side, as other speakers have indicated.

It requires criminalization of a number of acts of corruption, including the crime of trans-national bribery, which we criminalized in our Foreign Corrupt Practices Act.

It requires countries to consider a series of, what are called, preventive measures to promote the rule of law and to reform the states and state processes.

And finally, it contains provisions for international cooperation in the investigation and enforcement of offenses.

As such, it is a broader instrument than the OECD Anti-Bribery Convention, which targets specifically the issue of the transnational bribery of foreign public officials and international cooperation in the investigation and enforcement of that specific offense.

In a way, you can see the Inter-American Convention as the outline or the blueprint for the legal and institutional infrastructure that countries need to put into place to combat what Nancy has rightly indicated is the complex problem of public corruption.

34

I like to see it as a kind of "to do" list for countries, steps they need to take to deal with this problem of corruption.

Now, in the case of the United States, we have basically created this infrastructure over a period of years. We have enacted all of the elements on the "to do" list, not always precisely in the same form as the Convention calls for. But if you study this instrument, as I have, you will see that they are all there.

And that means that the United States does not need to enact any implementing legislation upon ratification of the Convention, although there are several understandings that may be appropriate.

Why then, if the United States has already enacted everything it needs to enact does the United States need to be part of this regime?

There are several reasons why U.S. participation is, in our view, essential; and previous speakers have touched on these. But let me just highlight three that I think are particularly salient.

First, it is important and useful for the United States to be part of the international cooperation provisions of this Convention, which Under Secretary Larson alluded to. This will help us enforce our own laws and will support other countries' efforts to make corruption not a crime of impunity, but a crime that can be enforced.

And I would note that the Inter-American Convention's provisions in this regard are very similar to the provisions of the OECD Antibribery Convention, which the U.S. has supported.

I would also note that if you look at recent enforcement of the U.S. Foreign Corrupt Practices Act, you will see that a number of recent cases come out of the Latin American region. So this is not an academic issue.

The second reason why I think the United States needs to be part of this regime is to help shape the implementation and enforcement of the Convention, to help develop implementation priorities.

For the most part, the Convention is what we would call a non-self-executing treaty. It requires the enactment of domestic laws. It requires the enforcement of those laws.

And so the manner in which countries implement this Convention, the priorities they attach to issues of preventive measures, what should come first becomes a very, very important issue. And the United States should be at the table for that process.

Third, but not least in this list of three of the reasons for U.S. ratification, is for the United States to show its long-term commitment to the problem of combating corruption in the Americas. The Convention, as has already been noted, was done with significant support from the United States.

Certain provisions of the Convention such as the transnational bribery provision were done with the direct encouragement of the United States. And so it is especially important for the United States to follow through with ratification of the Convention.

Now is arguably a critical time for the United States to act. The Convention has now been in force for 3 years. As you, yourself, noted, Mr. Chairman, it has widespread adherence in the region. And that is a very encouraging sign. That it could attract 26 sig-

35

natories and 18 parties in such a short period of time is very good progress indeed.

And there are many key countries in the hemisphere list. But there are still gaps in ratification. And I note that the momentum may be beginning to slow down. We had eight countries ratify in 1997; five in 1998; four in 1999; and only one to date in this year 2000. And when the issue comes to implementation, the gaps may be even larger.

U.S. ratification, in our view, would help reinvigorate this process and would allow the United States, as I have indicated, to push for full implementation, consistent implementation and active enforcement, as we believe in the American Bar Association would be appropriate and desirable.

So for these reasons, the American Bar Association supports ratification of this Convention by the United States this year.

The last issue I would like to comment on is a more technical issue dealing with reservations, understandings and declarations. As noted earlier, the ABA believes in general that the RUD's to this Convention should be kept to a minimum.

Reservations can undercut the effectiveness of a Convention. And we note that to date among the 18 countries that have ratified, the number of reservations has been quite minimal, only one that we are aware of.

For the United States, we believe no reservations to the Convention are warranted.

There are several understandings that have been proposed by the administration. These, in general, reflect differences between the U.S. approach to the problem of criminalization of acts of corruption and the Latin American approach, or differences between common law systems and civil law system, as well as the fact that we have a Federal system of government.

The only real issue in our view with respect to the proposed understandings is what to do on the subject of illicit enrichment. Illicit enrichment is one of the Convention's provisions that calls for a criminalization when a public official has assets that cannot be explained in relation to the lawfully earned income of that official during his term in office.

As this offense is written in the Inter-American Convention, to implement it by the United States would create a constitutional conflict, because it would violate the presumption of innocence set forth in our Constitution.

However, the Inter-American Convention allows for an opt-out right with respect to this offense of illicit enrichment, which means that the United States can ratify the Convention if it wishes without taking a reservation on this point.

If the U.S. does exercise this opt-out right—and we understand that is what has been proposed by the administration—there is some risk that this opting out could encourage other countries to opt out, not so much of the illicit enrichment provision which is already a feature of the legal regimes of many Latin America countries, but possibly opt out of the transnational bribery criminalization obligation, which is structurally analogous to illicit enrichment.

36

We would view this as an undesirable result and, therefore, suggest that the committee may want to consider another alternative, which would be rather than opting out, to declare that existing laws in the United States effectively implement this provision.

And we are speaking here specifically of the combination of disclosure laws for senior Federal Government officials coupled with criminal tax enforcement provisions and specifically the net worth method of proof for criminal tax evasion. If the United States were to choose this approach, it should do so with the understanding that it would not be shifting the constitutional burden of proof.

On that technical note, then, let me close my remarks by reiterating my thanks to the committee for its leadership in taking this issue up at this time.

Let me also express the hope that the committee will move expeditiously to recommend advise and consent to this Convention so it can go to the floor. This will be an excellent year for the United States to ratify the Inter-American Convention and would confirm continued U.S. leadership in this critical area.

I am available to answer any questions you may have. And let me also introduce my colleague from the American Bar Association, Stuart Demming, who heads the ABA's task force on corrupt practices, who is also available for any questions.

Thank you very much.

Senator CHAFEE. Thank you.

[The prepared statement of Ms. Low follows:]

PREPARED STATEMENT OF LUCINDA A. LOW

Mr. Chairman and Members of the Committee:

Thank you for the opportunity to testify before the Committee concerning U.S. ratification of the Inter-American Convention Against Corruption.

My testimony today is submitted on behalf of the American Bar Association. I am a former chair of the ABA Section of International Law and Practice, and currently serve on the International Section's Council and as the ABA's representative to the Inter-American Bar Association. With me is Stuart Deming, an officer of the Section of International Law and Practice and current co-Chair of an ABA Task Force on Standards on Corrupt Practices.

In 1997, during my chairmanship, the International Law Section of the ABA developed a report and recommendation on the Inter-American Convention Against Corruption. This report and recommendation, a copy of which is attached, calls on the United States and other OAS Member States to ratify the Inter-American Convention Against Corruption promptly, encourages ratification to be subject to minimal reservations and understandings, and urges prompt, full and consistent implementation by States Parties. Our recommendation was approved by the ABA House of Delegates in 1997 and thus constitutes official ABA policy. It is complemented by a 1998 ABA policy supporting U.S. ratification of the OECD Antibribery Convention, and an earlier policy urging the development of international standards to combat public corruption in international business transactions.

In my testimony today, I would like to focus principally on how the Inter-American Convention Against Corruption, as a regional instrument for the Western Hemisphere, fits into the emerging international standards against public corruption, and, within that context, why it is in the U.S. interest to participate in the Convention's regime. I would also like to address certain technical issues regarding ratification and implementation, and to answer any questions the Committee members may have about the Convention, or how it compares to U.S. law or other international instruments.

At the outset, I would like to commend the Committee for its support of U.S. ratification of the OECD Antibribery Convention in 1998. The OECD Convention is a highly-targeted instrument that addresses one principal issue—transnational bribery of foreign public officials—from the "supply," or bribe payers, side. Its focus is on disciplining business actors from major capital exporting countries and on establishing cooperation mechanisms for facilitating investigations and enforcing its pro-

37

visions. Prompt U.S. ratification of the OECD Convention was a crucial step in putting its prohibitions into effect for a critical mass of countries in a record time frame. The OECD Convention furthered an important U.S. policy goal of establishing, in the countries that compete most strongly with the U.S. for major international projects, standards regarding the bribery of foreign public officials that parallel U.S. standards, as reflected in our Foreign Corrupt Practices Act (FCPA). The OECD Convention thus leveled the playing field for U.S. international business and set an international standard with which U.S. business could readily comply.

Now that the OECD Convention has entered into force and is being implemented, it is an appropriate time to turn to ratification of the Inter-American Convention. For different reasons, U.S. ratification of this instrument is also strongly in the interests of the United States. And unlike the OECD Convention, which required amendments to the FCPA, the Inter-American Convention requires no changes to U.S. law.

Why is it in the U.S. interest to ratify the Inter-American Convention? To answer this question requires an understanding of how the Inter-American Convention differs from its OECD counterpart. The Inter-American Convention was borne of the first Summit of the Americas in Miami in 1994. It was recognized by the Summit participants that hemispheric economic integration, made possible by the shift in the region towards democratic governments and the establishment of free-market economies, required progress in the rule of law, transparency in administrative processes, and modernization of the state. Corruption—especially public corruption—undermines the development of democratic institutions and effective market mechanisms. It leads to misallocation of resources, and threatens the rule of law and political stability, adversely affecting the ability of countries to attract capital and foster economic development.

In many Latin American countries, public corruption is a "demand side" problem as much as a supply side problem. There is a need to strengthen civil service and the judiciary, reform laws and administrative processes (e.g., public procurement) to make them more modern, transparent and efficient, and to develop new systems of checks and balances, and watchdog institutions. Although some countries in the region are capital exporters, most are not. Thus, most of the OAS countries are not likely in the near to medium term to become parties to the OECD Antibribery Convention. More importantly, the OECD Convention approach, which focuses narrowly on the issue of transnational bribery and closely-related offenses, is not currently an approach—as the OAS Member States themselves have recognized—that adequately addresses the needs of the Latin American region. Rather, a broader-based effort, focusing on both the demand and the supply sides of public corruption, and on preventive measures as well as criminalization, is the more appropriate approach for the region as a whole at this time.

The Inter-American Convention reflects this broader, systemic approach to the issue of public corruption. In addition to requiring criminalization of a range of offenses (referred to as "acts of corruption")—domestic bribery, transnational bribery, illicit enrichment, among others—and providing for cooperation among signatory countries in investigations and enforcement, it requires countries to undertake reforms on the "demand" (or official government) side, in tax and customs administration, procurement systems, civil service reform, and the like—the so-called preventive measures. In addition, like the OECD Convention, it requires parties to cooperate in the investigation and prosecution of offenses, including in the areas of mutual legal assistance, extradition, and asset tracing and seizure. The Inter-American Convention can thus be seen as representing a kind of "to do" list for countries to combat public corruption as well as providing tools for effective enforcement of the relevant laws. In our view, it is precisely this kind of approach that makes sense for the region at this time.

Unlike some Inter-American treaties, the OAS Anticorruption Convention has garnered significant support from the countries of the region in a relatively short time. It has been signed by 26 OAS Member States, and went into effect in 1997. Currently 18 countries are parties, including two countries—Argentina and Mexico—that are also parties to the OECD Convention. Despite this strong start, however, significant gaps remain in ratification and implementation.

Like the OECD Antibribery Convention, the Inter-American Corruption Convention's success depends on widespread ratification, implementation and enforcement by the relevant countries. And because the Inter-American Convention is significantly broader in scope than the OECD Convention, implementation and enforcement poses even a greater challenge for States Parties than they do in the OECD Convention context. Priorities must be established, especially in the area of preventive measures, and resources must be allocated. Under the best of circumstances, full implementation cannot be expected to happen overnight, but will occur over a

38

period of years. In fact, the history to date is that although important steps have been taken by a number of countries, overall implementation has been spotty.

The United States, as the country most responsible for putting the issue of public corruption onto the hemispheric agenda and, among capital exporting countries, among the countries with the most at stake in the region in terms of promoting the rule of law and democratic institutions and developing market economies, needs to be a full participant in this implementation process. The United States does not need any implementing legislation of its own to participate in the Convention's regime; we have over the years enacted in some form all of the various items on the Convention's "to do" list. The United States does have an interest, however, in ensuring that the Convention is fully implemented and enforced by other countries of the region. in helping countries set priorities among the range of items on the "to do" list, in helping devise the best approach to a particular issue, and in keeping countries' feet to the fire if implementation and enforcement lag.

Without having ratified the Convention, however, it is unlikely the United States will have the ability to influence the implementation and enforcement process as fully as it would like. For example, the OAS is exploring the establishment of a monitoring mechanism for the Convention that will be open only to countries that have ratified the Convention. Even without such a mechanism, however, the views of non-ratifying countries on implementation and enforcement issues are unlikely to be accorded the same deference as ratifying countries. Moreover, for the United States, as one of the proponents of the Convention, to refuse to ratify the Inter-American Convention now would be taken as a sign by the other OAS Member States that the United States is not seriously committed to reform in this hemisphere.

For these reasons, U.S. ratification of the Convention makes sense. Ratification sends a strong message to countries of the region of a sustained commitment of the United States to this issue. It positions the United States to play a continued leadership role within the hemisphere on this issue. It supports our national goals of promoting democratization and economic development, and is an important complement to hemispheric integration. It also promotes the goal of universal ratification in the region.

Let me now turn to the questions of reservations, understandings and declarations (RUDs). As noted at the outset, the ABA's 1997 policy on the Inter-American Convention recommended that any ratifications be subject to minimal RUDs. Reservations, if excessive, can undercut the effectiveness of a treaty. The Inter-American Convention, Article XXIV, permits reservations to specific articles provided the reservations do not conflict with the purpose of the treaty. To date, the reservations taken by ratifying countries have been minimal.

As we understand it, the Administration has proposed no reservations to the Convention, but has proposed several understandings, to Articles VII, VIII and IX. The proposed understanding with respect to Article VII would make clear that the United States does not intend to enact new laws to implement Article VII, since existing laws effectively reflect the "acts of corruption" required to be criminalized in that Article. The proposed understanding with respect to Article VIII similarly would clarify that the United States considers the Foreign Corrupt Practices Act to constitute adequate implementation of that Article's requirement to criminalize transnational bribery. We concur with both those understandings. We also note with respect to Article VIII that the Inter-American Juridical Committee of the OAS has clarified that facilitating payments may be excepted from a prohibition on transnational bribery consistent with the Convention.

The final proposed understanding relates to Article IX, illicit enrichment. The Convention permits countries to "opt out" of the criminalization obligations of Articles VIII and IX both, without the need to take a reservation, if criminalization would conflict with their constitutions or fundamental legal principles. As the State Department report accompanying the transmittal of the Convention to the Senate points out, Article IX of the Convention raises such a conflict in light of the constitutional presumption of innocence in Article IV of the U.S. Constitution. The Administration therefore recommends that the United States "opt out" of the criminalization obligation under Article IX, but declare its willingness to provide assistance to other countries in the investigation and enforcement of illicit enrichment cases consistent with U.S. domestic law, as required by the Convention.

The ABA policy does not explicitly address how the illicit enrichment issue should be handled. The accompanying report notes, however, that although the constitutional concern with our enacting a penal offense as specified in Article IX would be substantial, U.S. law currently contains measures that collectively function as the equivalent of such a provision for senior federal government officials. Specifically, when the financial disclosure obligations for senior federal officials under the Ethics

39

in Government Act are coupled with the so-called "net worth method of proof" for criminal tax evasion under 26 U.S.C. §7201, the result is the effective criminalization of illicit enrichment of these officials, enforced through the tax code. A similar result follows in other contexts when state and local disclosure regimes are taken into consideration.

Accordingly, one alternative to the U.S. exercising the "opt out" right built into the Convention (the exercise of which may prompt other countries to opt out of Article VIII or IX as well) might be for the United States to declare that the foregoing measures represent effective implementation of this obligation and that no further implementing legislation is contemplated. Were the United States to do so, care would need to be taken to ensure that such a step is not construed as shifting the burden of proof. For this reason, if the United States does not opt out of Article IX, its ratification should be subject to the understanding that the burden of proof under U.S. law would remain unchanged.

Again, thank you for the opportunity to testify and for your consideration of the Convention at this timely juncture. I would be happy to answer any questions the Committee may have.

———

AMERICAN BAR ASSOCIATION

Policy Adopted at the ABA's 1997 Annual Meeting

*Resolved,* That the American Bar Association supports the prompt ratification and implementation of the Inter-American Convention Against Corruption (Inter-American Convention) by the United States, by other members of the Organization of American States (OAS), and by other countries that are eligible to accede to the Inter-American Convention.

*Further Resolved,* That the American Bar Association urges:

(1) that such ratification be subject to minimal reservations and under- standings; and

(2) that such implementation be full, effective and consistent.

*Further Resolved,* That, to assure consistency and effectiveness, the American Bar Association supports the criminalization of the bribery of foreign officials through the Inter-American Convention and through other instruments and fora in a manner consistent with the agreed upon common elements set forth in the Annex to the Organization for Economic Cooperation and Development's (OECD) Revised Recommendation of the Council on Combating Bribery in International Business Transactions and with the basic principles of the Foreign Corrupt Practices Act of the United States.

*Further Resolved,* That the American Bar Association supports efforts by the OECD and its member countries to promptly carry out, fully implement, and actively enforce the OECD's Revised Recommendation of the Council on Combating Bribery in International Business Transactions in a manner that effectively deters foreign corrupt practices in the conduct of international business.

Senator CHAFEE. And as Nancy said earlier, this should not be controversial and hopefully we can move expeditiously forward. And before we adjourn, I would just like to ask if you would like to add anything extemporaneous on the subject.

Mr. Pryce.

Mr. PRYCE. I would just say that there is real progress, but that one of the biggest impediments to new investment in Latin America among our countries is the lack of respect for the rule of the law, and not combating corruption undermines that respect. And it is one part of a greater whole that is very important to have it ratified for that reason also.

Senator CHAFEE. Yes. We talk about a global economy. Well, we should start with a hemispheric economy, especially considering the broad range of first, second, and Third World economies in this hemisphere. And so this is an exciting move forward and hopefully we can ratify soon.

Any other comments before we adjourn?

40

Lucinda.

Ms. Low. Just to endorse the comment about corruption being the flip side of the rule of law. I think that, in part, explains why the Bar has been so committed to this issue.

Senator Chafee. Thank you.

And the hearing record will be left open for 3 days to give members an opportunity, who were not able to be here this afternoon, to further ask questions for the record.

So thank you once again for taking your valuable time and sharing your thoughts with us here.

The meeting is adjourned.

[Whereupon, at 2:45 p.m., the hearing was adjourned.]

[The following letter was received subsequent to the hearing for inclusion in the record.]

THE CARTER CENTER,
LATIN AMERICAN AND CARIBBEAN PROGRAM,
*Atlanta, GA, May 4, 2000.*

The Honorable JESSE HELMS
*Chairman,*
*Senate Committee on Foreign Relations,*
*450 Dirksen Senate Office Building,*
*Washington, DC.*

TO SENATOR JESSE HELMS:

I write to commend you for holding a hearing on the Inter-American Convention Against Corruption and to urge the Senate to ratify this convention. Since the Congress approved the Foreign Corrupt Practices Act during my administration, the U.S. has been a leader in the field of ending bribery and corruption. It is essential that we continue to demonstrate our commitment and leadership to encourage others to confront this vice that harms investment, development, and democracy.

The OECD approval of its Convention Against the Bribery of Foreign Officials in 1997 and the subsequent Senate ratification of this convention was a crucial step forward in ending the supply side of foreign bribery. The OAS Convention provides the other side of the coin—focusing on the demand side within countries and the necessary implementation of legal and policy reforms to criminalize and to prevent corruption, as well as mutual assistance needed to combat international corruption.

We have been working with governments in this hemisphere and with Transparency International and national NGOs in Latin America to encourage ratification and implementation of the OAS Convention. In May 1999, we held a major conference at The Carter Center in Atlanta on Transparency for Growth, focusing on measures to combat and prevent corruption in our hemisphere. A number of current and former leaders signed our final declaration (attached) with recommendations that included not only the urgency to ratify and implement the OAS Convention, but also the need to establish a monitoring mechanism to help ensure that the new rules are actually enforced. I then wrote to all the leaders of this hemisphere, including President Clinton, to inform them of our findings and to urge ratification and implementation of the Convention.

We would be in a much stronger position to work for change among our Latin American neighbors and to encourage the OAS to adopt monitoring mechanisms if the U.S. first ratifies the Convention. The United States would not have to implement any new legislation to come into compliance with the treaty. Continued United States leadership in this area is vital, and l hope that you will expedite the Convention's coming to the Senate floor and give it your full support.

Sincerely,

JIMMY CARTER.

[Attachment]

41

FINAL STATEMENT

"Transparency for Growth" Conference, Council of Presidents and Prime
Ministers of the Americas, Wednesday, May 5, 1999

Corruption is one of the principal threats to democracy, growth and equity in the
hemisphere. It distorts public services, deters investment, discriminates against the
poor, and destroys public confidence in democratic governments. This was the start-
ing point of two days of discussion at The Carter Center by hemispheric leaders,
members of the private sector, journalists, and NGOs. Representing the Council of
Presidents and Prime Ministers, a group of 32 former and current heads of govern-
ment from Latin America and the Caribbean, the leaders in this conference con-
cluded that progress toward transparency can be achieved where civil society and
governments work together to overcome opposition from vested interests. Indeed,
important progress has been made already.

Participants from two dozen countries discussed strategies, including implementa-
tion of international conventions against corruption, the role of civil society includ-
ing media and the private sector in promoting transparency, and measures to in-
crease accountability in government-business transactions. The group encountered
a diversity of opinion, driven by the very different social and economic contexts in
the region, and recognized that solutions will necessarily need to be tailored to each
country. Furthermore, some sources of corruption are international, including multi-
national corporations and narco-trafficking, and small countries may be particularly
vulnerable. Solutions must therefore reach across borders. We are also aware that
corruption is systemic, affecting all aspects of society, and consequently there will
be no quick fix. The solutions, too, will need to be systemic, engaging society broadly
and tackling the problem from several directions at once.

Rich discussions yielded creative ideas about practical first steps. Here are some
of our conclusions:

First, we recognize that although corruption is an ethical issue, it is also a policy
problem, meaning it can be remedied by setting and enforcing rules that encourage
people to do the right thing. It is a crime of calculation. Where the benefits outweigh
the penalties for illicit behavior, systems can provide incentives for corruption. A
shorthand description is Corruption = Monopoly + Discretion − Accountability. The
task is to remove the opportunities provided by monopolies and discretionary deci-
sion-making power, and increase the costs of corruption through detection and en-
forcement of a nation's laws.

The good news is that there are solutions, and improvements can begin imme-
diately. But it takes civic courage and commitment from leaders, international lend-
ers and other organizations, coalitions of businesses and NGOs in civil society, to
illuminate previously dark corners of government transactions. The antidote to cor-
ruption is information, committed leadership, collective action and clear rules.

Second, it is time to move from denunciations to diagnosis. Hard data is necessary
to combat the problem, and it is now possible to get it. New diagnostic tools, includ-
ing analyses and interviews of businesses, citizens and public officials, are now
available from the World Bank and others to provide a map of the nature and loca-
tion of corruption in public and private organizations. This information that can be
used to devise national action plans for every segment of the society. We encourage
governments to carry out these diagnoses and make them public, and then to chal-
lenge every branch of the government and civil society to create action plans to re-
solve their specific problems.

Third, as democracy has begun to consolidate more broadly in the hemisphere,
one dilemma it has introduced is how to finance campaigns and political parties
without leaving elected leaders obligated to special interest groups, narco-traf-
fickers, or tainted money, or without spending vast quantities of money that is des-
perately needed for development. The interdependence of the public and private sec-
tor is highlighted by businesses dependent on public contracts for their livelihood,
and political parties dependent on private contributions. Opening up those trans-
actions through specific disclosure mechanisms will begin to level the playing field.
We recommend:

a) Enforcing existing laws and strengthening regulation, oversight institu-
tions and audit capacity.

b) Regulation and disclosure requirements for income and expenditures of
parties and candidates.

c) Reducing campaign expenses by limiting the campaign period, and fos-
tering free media time on TV and radio under equal conditions.

42

    d) Financial disclosure requirements for public officials, elected or appointed, to avoid conflict of interest and illicit enrichment, with periodic monitoring by a special office.

    e) National laws prohibiting bribery, which might be developed via a model statute process.

    f) Business codes of conducts and compliance programs as a prerequisite to bid on World Bank and IDB-financed projects, or to appear on national registers of approved contractors.

    g) Streamlining of public procurement laws and broad deregulation.

Fourth, transparency is the first step in combating corruption, but it requires a media and civil society capable of accessing information and then using it to demand accountability from their governments. We recommend:

    a) Laws be enacted that require governments to open up and provide documentation about their budgeting and spending procedures so that citizens and journalists can have the information they need to understand and evaluate what their governments are doing.

    b) Training NGOs to use new technologies, including the internet, and to monitor privatization and public contracting.

    c) Publication of public contract awards, dates of delivery of goods, schedules of payments, and the bidding process in privatizations.

    d) Quarterly report cards on the service delivery quality in certain sectors, such as health, as well as on efforts to reduce corruption via the national action plans.

    e) Databases about civil servant credentials in order to prevent nepotism and patronage.

    f) Public hearings to provide opportunities for citizens to give input on priorities for public works projects and bid requirements within budgetary limitations.

    g) Formation of regional informational networks and databases so that citizens can learn about access to information and share successful strategies to combat corruption.

Fifth, we wish to emphasize the importance of a free press in promoting transparency and democracy. The status of press freedom in the hemisphere is sometimes discouraging. The Inter-American Press Association recently found that fourteen countries have press laws that place regulations on freedom of the press. Seventeen countries have so-called insult laws that can result in imprisonment for journalists convicted of criticizing government officials. Eight countries have laws requiring licensing of journalists or mandatory membership in associations. In the last decade, 203 journalists have been killed in the Americas, a human rights situation so deplorable that the region's presidents and prime ministers asked the OAS last year to establish a special office for preventing such incidents, which the OAS has done. Only six countries in the hemisphere have laws dealing with the right of access to information that are considered effective.

To support professionalism in the media, and avoid unsupported denunciations that make headlines and sell papers but undercut the media's credibility, we recommend:

    a) Development of laws that will secure access to information by making official documents open to public inspection without undue delay or burdensome paperwork.

    b) Expansion of programs to train the press to conduct solid investigations based on evidence.

    c) Strengthening of the judicial system's capacity to investigate and prosecute corruption where the evidence indicates it is merited, such that no one is tried in the press and innocent citizens have an oppomtunity to defend their good names in a just court.

Sixth, we are convinced that recent treaties, including the OECD Convention Against Bribery and the Inter-American Convention Against Corruption are important steps in bringing a common approach to solving both the demand and supply side of bribery. But they will only be effective when fully implemented by signatory countries. We urge member states of the OAS at their June 1999 General Assembly to call for:

    a) Prompt ratification by all OAS member states as per their commitments in the Plan of Action of the Santiago Summit of the Americas;

    b) Creation of a peer review mechanism that will promote consistent and effective implementation of criminal laws and preventive measures, and which will share best practices and model laws;

43

   c) Provision by the IDB and World Bank of all necessary technical assistance for capacity building in order to enable and support full implementation of the Inter-American Convention.

The corruption issue is one of concern to all nations, and should receive attention at the highest levels. Here we want to commend U.S. Vice President Al Gore for his global forum last February. In closing, we want to emphasize the need for ethical values not only in government but in businesses, journalism, banking and indeed every walk of life. Perhaps most important are the messages we convey to our children through education in schools and churches, as it is they who will pay the price if we fail to act now to stem this ill. We are committed to carrying our transparency work further, and we hope you will join us in this important endeavor.

JAMIL MAHUAD WITT, *President of Ecuador*

SAID MUSA, *Prime Minister of Belize*

ARTHUR ROBINSON, *President of Trinidad and Tobago*

NICOLAS ARDITO-BARLETTA, *former president of Panama*

RODRIGO CARAZO, *former president of Costa Rica*

JIMMY CARTER, *former president of the United States*

OSVALDO HURTADO, *former president of Ecuador*

ALFONSO LOPEZ MICHELSEN, *former president of Colombia*

GONZALO SANCHEZ DE LOZADA, *former president of Bolivia*

JUAN CARLOS WASMOSY, *former president of Paraguay*

AMBASSADOR RICHARD BERNAL, *representative of Jamaican Prime Minister P.J. Patterson*

DANIEL ROMERO, *representative of former Venezuelan president Carlos Andres Perez*

JOSE MIGUEL VILLALOBOS, *representative of Costa Rican president Miguel Angel Rodriguez*

○

Appendix 004839

# Exhibit 108

Appendix 004840

**INTER-AMERICAN CONVENTION AGAINST CORRUPTION (B-58)**

Adopted at the third plenary session, held on March 29, 1996)

PREAMBLE

THE MEMBER STATES OF THE ORGANIZATION OF AMERICAN STATES,

CONVINCED that corruption undermines the legitimacy of public institutions and strikes at society, moral order and justice, as well as at the comprehensive development of peoples;

CONSIDERING that representative democracy, an essential condition for stability, peace and development of the region, requires, by its nature, the combating of every form of corruption in the performance of public functions, as well as acts of corruption specifically related to such performance;

PERSUADED that fighting corruption strengthens democratic institutions and prevents distortions in the economy, improprieties in public administration and damage to a society's moral fiber;

RECOGNIZING that corruption is often a tool used by organized crime for the accomplishment of its purposes;

CONVINCED of the importance of making people in the countries of the region aware of this problem and its gravity, and of the need to strengthen participation by civil society in preventing and fighting corruption;

RECOGNIZING that, in some cases, corruption has international dimensions, which requires coordinated action by States to fight it effectively;

CONVINCED of the need for prompt adoption of an international instrument to promote and facilitate international cooperation in fighting corruption and, especially, in taking appropriate action against persons who commit acts of corruption in the performance of public functions, or acts specifically related to such performance, as well as appropriate measures with respect to the proceeds of such acts;

DEEPLY CONCERNED by the steadily increasing links between corruption and the proceeds generated by illicit narcotics trafficking which undermine and threaten legitimate commercial and financial activities, and society, at all levels;

BEARING IN MIND the responsibility of States to hold corrupt persons accountable in order to combat corruption and to cooperate with one another for their efforts in this area to be effective; and

DETERMINED to make every effort to prevent, detect, punish and eradicate corruption in the performance of public functions and acts of corruption specifically related to such performance,

HAVE AGREED

Appendix 004841

to adopt the following

## INTER-AMERICAN CONVENTION AGAINST CORRUPTION

### Article I
### Definitions

For the purposes of this Convention:

"Public function" means any temporary or permanent, paid or honorary activity, performed by a natural person in the name of the State or in the service of the State or its institutions, at any level of its hierarchy.

"Public official", "government official", or "public servant" means any official or employee of the State or its agencies, including those who have been selected, appointed, or elected to perform activities or functions in the name of the State or in the service of the State, at any level of its hierarchy.

"Property" means assets of any kind, whether movable or immovable, tangible or intangible, and any document or legal instrument demonstrating, purporting to demonstrate, or relating to ownership or other rights pertaining to such assets.

### Article II
### Purposes

The purposes of this Convention are:

1. To promote and strengthen the development by each of the States Parties of the mechanisms needed to prevent, detect, punish and eradicate corruption; and

2. To promote, facilitate and regulate cooperation among the States Parties to ensure the effectiveness of measures and actions to prevent, detect, punish and eradicate corruption in the performance of public functions and acts of corruption specifically related to such performance.

### Article III
### Preventive Measures

For the purposes set forth in Article II of this Convention, the States Parties agree to consider the applicability of measures within their own institutional systems to create, maintain and strengthen:

1. Standards of conduct for the correct, honorable, and proper fulfillment of public functions. These standards shall be intended to prevent conflicts of interest and mandate the proper conservation and use of resources entrusted to government officials in the performance of their functions. These standards shall also establish measures and systems requiring government officials to report to appropriate authorities acts of corruption in the performance of public functions. Such measures should help preserve the public's confidence in the integrity of public servants and government processes.

2. Mechanisms to enforce these standards of conduct.

3. Instruction to government personnel to ensure proper understanding of their responsibilities and the ethical rules governing their activities.

4. Systems for registering the income, assets and liabilities of persons who perform public functions in certain posts as specified by law and, where appropriate, for making such registrations public.

5. Systems of government hiring and procurement of goods and services that assure the openness, equity and efficiency of such systems.

6. Government revenue collection and control systems that deter corruption.

7. Laws that deny favorable tax treatment for any individual or corporation for expenditures made in violation of the anticorruption laws of the States Parties.

8. Systems for protecting public servants and private citizens who, in good faith, report acts of corruption, including protection of their identities, in accordance with their Constitutions and the basic principles of their domestic legal systems.

9. Oversight bodies with a view to implementing modern mechanisms for preventing, detecting, punishing and eradicating corrupt acts.

10. Deterrents to the bribery of domestic and foreign government officials, such as mechanisms to ensure that publicly held companies and other types of associations maintain books and records which, in reasonable detail, accurately reflect the acquisition and disposition of assets, and have sufficient internal accounting controls to enable their officers to detect corrupt acts.

11. Mechanisms to encourage participation by civil society and nongovernmental organizations in efforts to prevent corruption.

12. The study of further preventive measures that take into account the relationship between equitable compensation and probity in public service. Article IV Scope This Convention is applicable provided that the alleged act of corruption has been committed or has effects in a State Party.

**Article V**
**Jurisdiction**

1. Each State Party shall adopt such measures as may be necessary to establish its jurisdiction over the offenses it has established in accordance with this Convention when the offense in question is committed in its territory.

2. Each State Party may adopt such measures as may be necessary to establish its jurisdiction over the offenses it has established in accordance with this Convention when the offense is committed by one of its nationals or by a person who habitually resides in its territory.

3. Each State Party shall adopt such measures as may be necessary to establish its jurisdiction over the offenses it has established in accordance with this Convention when the alleged criminal is present in its territory and it does not extradite such person to another country on the ground of the nationality of the alleged criminal.

4. This Convention does not preclude the application of any other rule of criminal jurisdiction established by a State Party under its domestic law.

## Article VI
## Acts of Corruption

1. This Convention is applicable to the following acts of corruption:

a. The solicitation or acceptance, directly or indirectly, by a government official or a person who performs public functions, of any article of monetary value, or other benefit, such as a gift, favor, promise or advantage for himself or for another person or entity, in exchange for any act or omission in the performance of his public functions;

b. The offering or granting, directly or indirectly, to a government official or a person who performs public functions, of any article of monetary value, or other benefit, such as a gift, favor, promise or advantage for himself or for another person or entity, in exchange for any act or omission in the performance of his public functions;

c. Any act or omission in the discharge of his duties by a government official or a person who performs public functions for the purpose of illicitly obtaining benefits for himself or for a third party;

d. The fraudulent use or concealment of property derived from any of the acts referred to in this article; and

e. Participation as a principal, coprincipal, instigator, accomplice or accessory after the fact, or in any other manner, in the commission or attempted commission of, or in any collaboration or conspiracy to commit, any of the acts referred to in this article.

2. This Convention shall also be applicable by mutual agreement between or among two or more States Parties with respect to any other act of corruption not described herein.

## Article VII
## Domestic Law

The States Parties that have not yet done so shall adopt the necessary legislative or other measures to establish as criminal offenses under their domestic law the acts of corruption described in Article VI(1) and to facilitate cooperation among themselves pursuant to this Convention.

## Article VIII
## Transnational Bribery

Subject to its Constitution and the fundamental principles of its legal system, each State Party shall prohibit and punish the offering or granting, directly or indirectly, by its nationals, persons having their habitual residence in its territory, and businesses domiciled there, to a government official of another State, of any article of monetary value, or other benefit, such as a gift, favor, promise or advantage, in connection with any economic or commercial transaction in exchange for any act or omission in the performance of that official's public functions.

Among those States Parties that have established transnational bribery as an offense, such offense shall be considered an act of corruption for the purposes of this Convention.

Any State Party that has not established transnational bribery as an offense shall, insofar as its laws permit, provide assistance and cooperation with respect to this offense as provided in this Convention.

## Article IX
## Illicit Enrichment

Subject to its Constitution and the fundamental principles of its legal system, each State Party that has not yet done so shall take the necessary measures to establish under its laws as an offense a significant increase in the assets of a government official that he cannot reasonably explain in relation to his lawful earnings during the performance of his functions.

Among those States Parties that have established illicit enrichment as an offense, such offense shall be considered an act of corruption for the purposes of this Convention.

Any State Party that has not established illicit enrichment as an offense shall, insofar as its laws permit, provide assistance and cooperation with respect to this offense as provided in this Convention.

## Article X
## Notification

When a State Party adopts the legislation referred to in paragraph 1 of articles VIII and IX, it shall notify the Secretary General of the Organization of American States, who shall in turn notify the other States Parties. For the purposes of this Convention, the crimes of transnational bribery and illicit enrichment shall be considered acts of corruption for that State Party thirty days following the date of such notification.

## Article XI
## Progressive Development

1. In order to foster the development and harmonization of their domestic legislation and the attainment of the purposes of this Convention, the States Parties view as desirable, and undertake to consider, establishing as offenses under their laws the following acts:

a. The improper use by a government official or a person who performs public functions, for his own benefit or that of a third party, of any kind of classified or confidential information which that official or person who performs public functions has obtained because of, or in the performance of, his functions;

b. The improper use by a government official or a person who performs public functions, for his own benefit or that of a third party, of any kind of property belonging to the State or to any firm or institution in which the State has a proprietary interest, to which that official or person who performs public functions has access because of, or in the performance of, his functions;

c. Any act or omission by any person who, personally or through a third party, or acting as an intermediary, seeks to obtain a decision from a public authority whereby he illicitly obtains for himself or for another person any benefit or gain, whether or not such act or omission harms State property; and

d. The diversion by a government official, for purposes unrelated to those for which they were intended, for his own benefit or that of a third party, of any movable or immovable property, monies or securities belonging to the State, to an independent agency, or to an individual, that such official has received by virtue of his position for purposes of administration, custody or for other reasons.

2. Among those States Parties that have established these offenses, such offenses shall be considered acts of corruption for the purposes of this Convention.

3. Any State Party that has not established these offenses shall, insofar as its laws permit, provide assistance and cooperation with respect to these offenses as provided in this Convention.

## Article XII
## Effect on State Property

For application of this Convention, it shall not be necessary that the acts of corruption harm State property.

## Article XIII
## Extradition

1. This article shall apply to the offenses established by the States Parties in accordance with this Convention.

2. Each of the offenses to which this article applies shall be deemed to be included as an extraditable offense in any extradition treaty existing between or among the States Parties. The States Parties undertake to include such offenses as extraditable offenses in every extradition treaty to be concluded between or among them.

3. If a State Party that makes extradition conditional on the existence of a treaty receives a request for extradition from another State Party with which it does not have an extradition treaty, it may consider this Convention as the legal basis for extradition with respect to any offense to which this article applies.

Appendix 004846

4. States Parties that do not make extradition conditional on the existence of a treaty shall recognize offenses to which this article applies as extraditable offenses between themselves.

5. Extradition shall be subject to the conditions provided for by the law of the Requested State or by applicable extradition treaties, including the grounds on which the Requested State may refuse extradition.

6. If extradition for an offense to which this article applies is refused solely on the basis of the nationality of the person sought, or because the Requested State deems that it has jurisdiction over the offense, the Requested State shall submit the case to its competent authorities for the purpose of prosecution unless otherwise agreed with the Requesting State, and shall report the final outcome to the Requesting State in due course.

7. Subject to the provisions of its domestic law and its extradition treaties, the Requested State may, upon being satisfied that the circumstances so warrant and are urgent, and at the request of the Requesting State, take into custody a person whose extradition is sought and who is present in its territory, or take other appropriate measures to ensure his presence at extradition proceedings.

<div align="center">

**Article XIV**
**Assistance and Cooperation**

</div>

1. In accordance with their domestic laws and applicable treaties, the States Parties shall afford one another the widest measure of mutual assistance by processing requests from authorities that, in conformity with their domestic laws, have the power to investigate or prosecute the acts of corruption described in this Convention, to obtain evidence and take other necessary action to facilitate legal proceedings and measures regarding the investigation or prosecution of acts of corruption.

2. The States Parties shall also provide each other with the widest measure of mutual technical cooperation on the most effective ways and means of preventing, detecting, investigating and punishing acts of corruption. To that end, they shall foster exchanges of experiences by way of agreements and meetings between competent bodies and institutions, and shall pay special attention to methods and procedures of citizen participation in the fight against corruption.

<div align="center">

**Article XV**
**Measures Regarding Property**

</div>

1. In accordance with their applicable domestic laws and relevant treaties or other agreements that may be in force between or among them, the States Parties shall provide each other the broadest possible measure of assistance in the identification, tracing, freezing, seizure and forfeiture of property or proceeds obtained, derived from or used in the commission of offenses established in accordance with this Convention.

2. A State Party that enforces its own or another State Party's forfeiture judgment against property or proceeds described in paragraph 1 of this article shall dispose of

the property or proceeds in accordance with its laws. To the extent permitted by a State Party's laws and upon such terms as it deems appropriate, it may transfer all or part of such property or proceeds to another State Party that assisted in the underlying investigation or proceedings.

<div align="center">

**Article XVI**
**Bank Secrecy**

</div>

1. The Requested State shall not invoke bank secrecy as a basis for refusal to provide the assistance sought by the Requesting State. The Requested State shall apply this article in accordance with its domestic law, its procedural provisions, or bilateral or multilateral agreements with the Requesting State.

2. The Requesting State shall be obligated not to use any information received that is protected by bank secrecy for any purpose other than the proceeding for which that information was requested, unless authorized by the Requested State.

<div align="center">

**Article XVII**
**Nature of the Act**

</div>

For the purposes of articles XIII, XIV, XV and XVI of this Convention, the fact that the property obtained or derived from an act of corruption was intended for political purposes, or that it is alleged that an act of corruption was committed for political motives or purposes, shall not suffice in and of itself to qualify the act as a political offense or as a common offense related to a political offense.

<div align="center">

**Article XVIII**
**Central Authorities**

</div>

1. For the purposes of international assistance and cooperation provided under this Convention, each State Party may designate a central authority or may rely upon such central authorities as are provided for in any relevant treaties or other agreements.

2. The central authorities shall be responsible for making and receiving the requests for assistance and cooperation referred to in this Convention.

3. The central authorities shall communicate with each other directly for the purposes of this Convention.

<div align="center">

**Article XIX**
**Temporal Application**

</div>

Subject to the constitutional principles and the domestic laws of each State and existing treaties between the States Parties, the fact that the alleged act of corruption was committed before this Convention entered into force shall not preclude procedural cooperation in criminal matters between the States Parties. This provision shall in no case affect the principle of non-retroactivity in criminal law, nor shall application of this provision interrupt existing statutes of limitations relating to crimes committed prior to the date of the entry into force of this Convention.

## Article XX
## Other Agreements or Practices

No provision of this Convention shall be construed as preventing the States Parties from engaging in mutual cooperation within the framework of other international agreements, bilateral or multilateral, currently in force or concluded in the future, or pursuant to any other applicable arrangement or practice.

## Article XXI
## Signature

This Convention is open for signature by the Member States of the Organization of American States.

## Article XXII
## Ratification

This Convention is subject to ratification. The instruments of ratification shall be deposited with the General Secretariat of the Organization of American States.

## Article XXIII
## Accession

This Convention shall remain open for accession by any other State. The instruments of accession shall be deposited with the General Secretariat of the Organization of American States.

## Article XXIV
## Reservations

The States Parties may, at the time of adoption, signature, ratification, or accession, make reservations to this Convention, provided that each reservation concerns one or more specific provisions and is not incompatible with the object and purpose of the Convention.

## Article XXV
## Entry Into Force

This Convention shall enter into force on the thirtieth day following the date of deposit of the second instrument of ratification. For each State ratifying or acceding to the Convention after the deposit of the second instrument of ratification, the Convention shall enter into force on the thirtieth day after deposit by such State of its instrument of ratification or accession.

## Article XXVI
## Denunciation

This Convention shall remain in force indefinitely, but any of the States Parties may denounce it. The instrument of denunciation shall be deposited with the General Secretariat of the Organization of American States. One year from the date of deposit

Appendix 004849

of the instrument of denunciation, the Convention shall cease to be in force for the denouncing State, but shall remain in force for the other States Parties.

## Article XXVII
## Additional Protocols

Any State Party may submit for the consideration of other States Parties meeting at a General Assembly of the Organization of American States draft additional protocols to this Convention to contribute to the attainment of the purposes set forth in Article II thereof. Each additional protocol shall establish the terms for its entry into force and shall apply only to those States that become Parties to it.

## Article XXVIII
## Deposit of Original Instrument

The original instrument of this Convention, the English, French, Portuguese, and Spanish texts of which are equally authentic, shall be deposited with the General Secretariat of the Organization of American States, which shall forward an authenticated copy of its text to the Secretariat of the United Nations for registration and publication in accordance with Article 102 of the United Nations Charter. The General Secretariat of the Organization of American States shall notify its Member States and the States that have acceded to the Convention of signatures, of the deposit of instruments of ratification, accession, or denunciation, and of reservations, if any.

Appendix 004850

# Exhibit 109

# JUSTICE NEWS

**Deputy Attorney General Rosenstein Delivers Remarks at the 34th International Conference on the Foreign Corrupt Practices Act**

Oxon Hill, MD ~ Wednesday, November 29, 2017

---

*Remarks as prepared for delivery*

Good morning and thank you, Sandra for that thoughtful and brief introduction.

It is a pleasure for me to be here with so many compliance officers, lawyers, auditors, and corporate executives for ACI's 34th annual conference on the Foreign Corrupt Practices Act.

I must admit that I was amused by a marketing blurb for this event.  It promised that the audience would hear from "anti-corruption" leaders and other "highly respected" experts.

Then, it noted that you also would hear from government officials.  I hope those categories are not mutually exclusive!

As a matter of fact, the experts you will hear from include some of the federal government's leading fraud prosecutors and investigators. I am proud to work with them.

This year, we mark four decades since Congress enacted the FCPA.  It was the first effort by any country in the world to make it a crime to pay bribes to foreign officials.

There was a time in the 1960s and '70s when paying bribes was viewed as a necessary part of doing business abroad.  Some American companies were unapologetic about making corrupt payments.

Corruption was rife in many parts of the world.  There were European countries that allowed companies to deduct bribes on their corporate tax returns, as business expenses.

In 1976, the U.S. Senate Banking Committee revealed that hundreds of U.S. companies had made corrupt foreign payments. The payments totaled hundreds of millions of dollars.

The Committee concluded that there was a need for anti-bribery legislation.  Its report reasoned that "[c]orporate bribery is bad business" and "fundamentally destructive" in a free market society.

Paying bribes may still be common in some places.  But that does not make it right.  As Thomas Jefferson famously said: "On matters of style, swim with the current.  On matters of principle, stand like a rock."

Some people refer to me as a career prosecutor, but I studied management, marketing, and finance at an undergraduate business school.  I expected to put those skills to use in corporate America.  Law enforcement took me in a different direction, but understanding the business world remains valuable to my work.

One of the lessons I learned in business school is that ethical conduct is a good investment. Companies sometimes gain a short-term advantage over competitors by cutting corners, but in the long run, companies with a culture of integrity usually prevail in the marketplace.

Appendix 004852

Good people want to work for honest businesses. Investors trust them.  Customers like to do business with them.

I visited the nation of Armenia in 1994, just as it was emerging from seven decades of Soviet domination. I gave a talk about public corruption at the University of Yerevan, the oldest university in the country. After I finished, a student raised his hand with a question. He asked me, "If you cannot pay bribes in America, how do you get electricity?"

It was a pragmatic question that illustrated how that young man had learned to think about his society. Corruption may start small, but it has a tendency to spread like an infection.  It stifles innovation, fuels inefficiency, and inculcates distrust of government.

I offer those thoughts in the spirit of the open dialogue of this conference.  But it is not for the Department of Justice to say whether the FCPA reflects sound policymaking.  The United States Congress made that judgment.  Our mission is to detect, deter, and punish violations of the laws of the United States.

The Attorney General and I have been faithful to that principle.  We plan to continue to emphasize it as an essential step in promoting respect for the rule of law.

The FCPA is the law of the land.  We will enforce it against both foreign and domestic companies that avail themselves of the privileges of the American marketplace.

The United States plays a central role in the worldwide fight against corruption, and we serve as a role model.  Following our lead, many other countries have joined America by implementing their own anti-corruption laws.  Those laws do not just encourage good business.  They promote good government.

The Organization for Economic Co-operation and Development adopted an Anti-Bribery Convention in 1997.  That convention fuels the growing international rejection of corruption.

Forty-three nations participate in the OECD Anti-Bribery Convention.  The agreement establishes legally binding standards.  Member countries are required to adopt laws that criminalize bribery of foreign public officials in international business transactions.  Just a few months ago, a new country, Costa Rica, ratified the convention.

These forty-three nations recognize the importance of a level playing field that protects citizens and honest businesses.

Earlier this year, Attorney General Sessions spoke about the harmful consequences of corruption.  It leads to increased prices, substandard products and services, and reduced investment.

It is no coincidence that crime syndicates and authoritarian rulers use corruption to enrich themselves. They engage in corruption to consolidate political power and defeat legitimate political adversaries.

Working together with international partners, we are making headway in combatting corruption. Federal prosecutors in our Criminal Division's Fraud Section, together with Assistant U.S. Attorneys and law enforcement partners, continue to secure convictions in important FCPA-related cases.

Recently, the FCPA Unit worked with the U.S. Attorney's Office for the Southern District of New York to obtain a trial conviction against a former Guinean Minister of Mines, for laundering proceeds from $8 million in bribes.

The FCPA Unit and the U.S. Attorney's Office for the Southern District of New York secured another trial victory against a Chinese billionaire for bribing United Nations officials.

In a third case, FCPA prosecutors worked with Assistant U.S. Attorneys in the Central District of California, and prevailed at trial against a South Korean earthquake research center director who laundered the bribery proceeds in the United States.

In total, 19 individuals have pleaded guilty or been convicted in FCPA-related cases so far this year.

The Department of Justice announced another significant case earlier this month.  Two former executives of Rolls–Royce and its subsidiaries, along with a former employee and a consultant, all pleaded guilty to conspiracy in connection with a scheme to bribe foreign officials.

That results reflects tremendous work by the FCPA Unit, Assistant U.S. Attorneys for the Southern District of Ohio, U.S. Postal Inspectors, and the FBI, as well as cooperation with law enforcement authorities in the United Kingdom, Brazil, Austria, Germany, the Netherlands, Singapore, and Turkey.  We look forward to continuing to work with our international partners.

Those cases and others like them reinforce the Department's commitment to hold individuals accountable for criminal activity.

Effective deterrence of corporate corruption requires prosecution of culpable individuals.  We should not just announce large corporate fines and celebrate penalizing shareholders.

Most American companies are serious about engaging in lawful business practices.  Those companies want to do the right thing. They need our support to protect them from criminals who seek unfair advantages.

Law enforcement agencies prosecute criminal wrongdoing only after it occurs.  Those prosecutions achieve deterrence indirectly.  But a company with a robust compliance program can prevent corruption and reduce the need for enforcement.

That frees agents and prosecutors to focus on people who are committing other financial crimes.  It also allows them to focus on different threats to the American people, including terrorism, gang violence, drug trafficking, child exploitation, and human smuggling.  People who commit those horrendous crimes do not make voluntary disclosures.

Threats to American safety and security will grow more complex over time.  We need corporate America to help us detect and fight those threats.

As Attorney General Jeff Sessions explained, "Societies where the rule of law is treasured … tend to flourish and succeed. Societies where the rule of law is subject to political whims and personal biases tend to become … afflicted by corruption, poverty, and human suffering."

The most fundamental mission of the Department of Justice is to protect the American people by enforcing the rule of law.

The rule of law is good for business. It allows businesses to compete for work, enter contracts, make investments, and project revenue with some assurance about the future.  It establishes a mechanism to resolve disputes, and it provides a degree of protection from arbitrary government action.

Corporate America should regard law enforcement as an ally.  We support the rule of law, which establishes and safeguards a vibrant economic marketplace for your products and services.

The government should provide incentives for companies to engage in ethical corporate behavior.  That means fully cooperating with government investigations, and doing what is necessary to remediate misconduct – including implementing a robust compliance program.  Good corporate behavior also means notifying law enforcement about wrongdoing.

The incentive system set forth in the Department's FCPA Pilot Program motivates and rewards companies that want to do the right thing and voluntarily disclose misconduct.

In the first year of the Pilot Program, the FCPA Unit received 22 voluntary disclosures, compared to 13 during the previous year.  In total, during the year and a half that the Pilot Program was in effect, the FCPA Unit received 30 voluntary disclosures, compared to 18 during the previous 18–month period.

We analyzed the Pilot Program and concluded that it proved to be a step forward in fighting corporate crime.  We also determined that there were opportunities for improvement.

So today, I am announcing a revised FCPA Corporate Enforcement Policy.

The new policy enables the Department to efficiently identify and punish criminal conduct, and it provides guidance and greater certainty for companies struggling with the question of whether to make voluntary disclosures of wrongdoing.

Before I speak about the substance of the policy, let me digress for a moment to make a process point.

I know that previous corporate fraud policies often were identified by the name of the Deputy Attorney General who wrote the memo.  It is nice to be remembered. But one of my goals is not to be remembered for writing a memo.

After spending nearly three decades trying to keep track of prolix memos, I want the Department to issue concise policy statements.  Historical background and commentary should go in a cover memo or a press release.  In most instances, the substance of a policy should be in the United States Attorneys' Manual, and it should be readily understood and easily applied by busy prosecutors.

So, the FCPA Corporate Enforcement Policy I am announcing today will be incorporated into the United States Attorneys' Manual.

We expect the new policy to reassure corporations that want to do the right thing.  It will increase the volume of voluntary disclosures, and enhance our ability to identify and punish culpable individuals.

The new policy, like the rest of the Department's internal operating policies, creates no private rights and is not enforceable in court.  But it does promote consistency by attorneys throughout the Department.

Establishing internal policies helps guide our exercise of discretion and combat the perception that prosecutors act in an arbitrary manner.

The new policy does not provide a guarantee.  We cannot eliminate all uncertainty.  Preserving a measure of prosecutorial discretion is central to ensuring the exercise of justice.

But with this new policy, we strike the balance in favor of greater clarity about our decision-making process.

The advantage of the policy for businesses is to provide transparency about the benefits available if they satisfy the requirements.  We want corporate officers and board members to better understand the costs and benefits of cooperation.  The policy therefore specifies what we mean by voluntary disclosure, full cooperation, and timely and appropriate remediation.

Even if a company does not make a voluntary disclosure, benefits are still available for cooperation and remediation.  Those steps assist the Department in running an efficient investigation that identifies culpable individuals.  They also reduce the likelihood that crimes will be committed again.

I want to highlight a few of the policy's enhancements.

Appendix 004855

First, the FCPA Corporate Enforcement Policy states that when a company satisfies the standards of voluntary self-disclosure, full cooperation, and timely and appropriate remediation, there will be a presumption that the Department will resolve the company's case through a declination.  That presumption may be overcome only if there are aggravating circumstances related to the nature and seriousness of the offense, or if the offender is a criminal recidivist.

It makes sense to treat corporations differently than individuals, because corporate liability is vicarious; it is only derivative of individual liability.

Second, if a company voluntarily discloses wrongdoing and satisfies all other requirements, but aggravating circumstances compel an enforcement action, the Department will recommend a 50% reduction off the low end of the Sentencing Guidelines fine range.  Here again, criminal recidivists may not be eligible for such credit.  We want to provide an incentive for good conduct.  And scrutiny of repeat visitors.

Third, the Policy provides details about how the Department evaluates an appropriate compliance program, which will vary depending on the size and resources of a business.

The Policy therefore specifies some of the hallmarks of an effective compliance and ethics program.  Examples include fostering a culture of compliance; dedicating sufficient resources to compliance activities; and ensuring that experienced compliance personnel have appropriate access to management and to the board.

We expect that these adjustments, along with adding the FCPA Corporate Enforcement Policy to the U.S. Attorneys' Manual, will incentivize responsible corporate behavior and reduce cynicism about enforcement.

Of course, companies are free to choose not to comply with the FCPA Corporate Enforcement Policy.  A company needs to adhere to the policy only if it wants the Department's prosecutors to follow the policy's guidelines.

Companies that violate the FCPA are always free to choose a different path.  In those instances, if crimes come to our attention through whistleblowers or other means, the Department will take appropriate action consistent with the facts, the law, and the Principles of Federal Prosecution of Business Organizations.

Since 2016, the Fraud Section's FCPA Unit has secured criminal resolutions in 17 FCPA-related corporate cases, resulting in penalties and forfeiture to the Department in excess of $1.6 billion.  Of those 17 corporate criminal resolutions, only two were voluntary disclosures under the Pilot Program.

Significantly, each of the two voluntary disclosure cases was resolved through a non-prosecution agreement, and in neither case did we impose a compliance monitor.

Of the 15 corporate resolutions that were not voluntary disclosures, all but three were resolved through guilty pleas, deferred prosecution agreements, or some combination of the two.  In ten of those cases, the company was required to engage an independent compliance monitor.

Over that same time period, seven additional matters that came to our attention through voluntary disclosures were resolved under the Pilot Program through declinations with the payment of disgorgement.  Clearly, this is not immunity.

Allow me to conclude with the observation that corrupt government officials and criminals who bribe them learn from the cases we bring and the investigative techniques we use.

Appendix 004856

Criminals try to evade law enforcement.  But they also need to evade internal controls and compliance programs, if those internal controls and programs exist.  Honest companies pose a meaningful deterrent to corruption.

Companies can protect themselves by exercising caution in choosing their business associates and by ensuring appropriate oversight of their activities.

There is an ancient proverb that counsels, "If you want to know a person's character, consider his friends."

My advice is to make sure that you can stand proudly with the company you keep.

Thank you very much.

---

**Speaker:**
Deputy Attorney General Rod J. Rosenstein

**Component(s):**
Office of the Deputy Attorney General

*Updated November 29, 2017*

Appendix 004857

# Exhibit 110



COUNCIL OF EUROPE

Avenue de l'Europe
F-67075 Strasbourg Cedex
Tel. +33 (0)3 88 41 20 00
www.coe.int

CONSEIL DE L'EUROPE

Treaty Office

You are here:　Conventions



COUNCIL OF EUROPE

CONSEIL DE L'EUROPE

*European Treaty Series - No. 173*

## Criminal Law Convention on Corruption *

Strasbourg, 27.I.1999

**Preamble**

The member States of the Council of Europe and the other States signatory hereto,

Considering that the aim of the Council of Europe is to achieve a greater unity between its members;

Recognising the value of fostering co-operation with the other States signatories to this Convention;

Convinced of the need to pursue, as a matter of priority, a common criminal policy aimed at the protection of society against corruption, including the adoption of appropriate legislation and preventive measures;

Emphasising that corruption threatens the rule of law, democracy and human rights, undermines good governance, fairness and social justice, distorts competition, hinders economic development and endangers the stability of democratic institutions and the moral foundations of society;

Believing that an effective fight against corruption requires increased, rapid and well-functioning international co-operation in criminal matters;

Welcoming recent developments which further advance international understanding and co-operation in combating corruption, including actions of the United Nations, the World Bank, the International Monetary Fund, the World Trade Organisation, the Organisation of American States, the OECD and the European Union;

Having regard to the Programme of Action against Corruption adopted by the Committee of Ministers of the Council of Europe in November 1996 following the recommendations of the 19th Conference of European Ministers of Justice (Valletta, 1994);

Recalling in this respect the importance of the participation of non-member States in the Council of Europe's activities against corruption and welcoming their valuable contribution to the implementation of the Programme of Action against Corruption;

_____

(*)　The Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community entered into force on 1 December 2009. As a consequence, as from that date, any reference to the European Economic Community shall be read as the European Union.

Further recalling that Resolution No. 1 adopted by the European Ministers of Justice at their 21st Conference (Prague, 1997) recommended the speedy implementation of the Programme of Action against Corruption, and called, in particular, for the early adoption of a criminal law convention providing for the co-ordinated incrimination of corruption offences, enhanced co-operation for the prosecution of such offences as well as an effective follow-up mechanism open to member States and non-member States on an equal footing;

Bearing in mind that the Heads of State and Government of the Council of Europe decided, on the occasion of their Second Summit held in Strasbourg on 10 and 11 October 1997, to seek common responses to the challenges posed by the growth in corruption and adopted an Action Plan which, in order to promote co-operation in the fight against corruption, including its links with organised crime and money laundering, instructed the Committee of Ministers, *inter alia*, to secure the rapid completion of international legal instruments pursuant to the Programme of Action against Corruption;

Considering moreover that Resolution (97) 24 on the 20 Guiding Principles for the Fight against Corruption, adopted on 6 November 1997 by the Committee of Ministers at its 101st Session, stresses the need rapidly to complete the elaboration of international legal instruments pursuant to the Programme of Action against Corruption;

In view of the adoption by the Committee of Ministers, at its 102nd Session on 4 May 1998, of Resolution (98) 7 authorising the partial and enlarged agreement establishing the "Group of States against Corruption – GRECO", which aims at improving the capacity of its members to fight corruption by following up compliance with their undertakings in this field,

Have agreed as follows:

**Chapter I – Use of terms**

**Article 1 – Use of terms**

For the purposes of this Convention:

a   "public official" shall be understood by reference to the definition of "official", "public officer", "mayor", "minister" or "judge" in the national law of the State in which the person in question performs that function and as applied in its criminal law;

b   the term "judge" referred to in sub-paragraph a above shall include prosecutors and holders of judicial offices;

c   in the case of proceedings involving a public official of another State, the prosecuting State may apply the definition of public official only insofar as that definition is compatible with its national law;

d   "legal person" shall mean any entity having such status under the applicable national law, except for States or other public bodies in the exercise of State authority and for public international organisations.

## Chapter II – Measures to be taken at national level

### Article 2 – Active bribery of domestic public officials

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law, when committed intentionally, the promising, offering or giving by any person, directly or indirectly, of any undue advantage to any of its public officials, for himself or herself or for anyone else, for him or her to act or refrain from acting in the exercise of his or her functions.

### Article 3 – Passive bribery of domestic public officials

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law, when committed intentionally, the request or receipt by any of its public officials, directly or indirectly, of any undue advantage, for himself or herself or for anyone else, or the acceptance of an offer or a promise of such an advantage, to act or refrain from acting in the exercise of his or her functions.

### Article 4 – Bribery of members of domestic public assemblies

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law the conduct referred to in Articles 2 and 3, when involving any person who is a member of any domestic public assembly exercising legislative or administrative powers.

### Article 5 – Bribery of foreign public officials

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law the conduct referred to in Articles 2 and 3, when involving a public official of any other State.

### Article 6 – Bribery of members of foreign public assemblies

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law the conduct referred to in Articles 2 and 3, when involving any person who is a member of any public assembly exercising legislative or administrative powers in any other State.

### Article 7 – Active bribery in the private sector

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law, when committed intentionally in the course of business activity, the promising, offering or giving, directly or indirectly, of any undue advantage to any persons who direct or work for, in any capacity, private sector entities, for themselves or for anyone else, for them to act, or refrain from acting, in breach of their duties.

### Article 8 – Passive bribery in the private sector

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law, when committed intentionally, in the course of business activity, the request or receipt, directly or indirectly, by any persons who direct or work for, in any capacity, private sector entities, of any undue advantage or the promise thereof for themselves or for anyone else, or the acceptance of an offer or a promise of such an advantage, to act or refrain from acting in breach of their duties.

### Article 9 – Bribery of officials of international organisations

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law the conduct referred to in Articles 2 and 3, when involving any official or other contracted employee, within the meaning of the staff regulations, of any public international or supranational organisation or body of which the Party is a member, and any person, whether seconded or not, carrying out functions corresponding to those performed by such officials or agents.

### Article 10 – Bribery of members of international parliamentary assemblies

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law the conduct referred to in Article 4 when involving any members of parliamentary assemblies of international or supranational organisations of which the Party is a member.

### Article 11 – Bribery of judges and officials of international courts

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law the conduct referred to in Articles 2 and 3 involving any holders of judicial office or officials of any international court whose jurisdiction is accepted by the Party.

### Article 12 – Trading in influence

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law, when committed intentionally, the promising, giving or offering, directly or indirectly, of any undue advantage to anyone who asserts or confirms that he or she is able to exert an improper influence over the decision-making of any person referred to in Articles 2, 4 to 6 and 9 to 11 in consideration thereof, whether the undue advantage is for himself or herself or for anyone else, as well as the request, receipt or the acceptance of the offer or the promise of such an advantage, in consideration of that influence, whether or not the influence is exerted or whether or not the supposed influence leads to the intended result.

**Article 13 – Money laundering of proceeds from corruption offences**

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law the conduct referred to in the Council of Europe Convention on Laundering, Search, Seizure and Confiscation of the Products from Crime (ETS No. 141), Article 6, paragraphs 1 and 2, under the conditions referred to therein, when the predicate offence consists of any of the criminal offences established in accordance with Articles 2 to 12 of this Convention, to the extent that the Party has not made a reservation or a declaration with respect to these offences or does not consider such offences as serious ones for the purpose of their money laundering legislation.

**Article 14 – Account offences**

Each Party shall adopt such legislative and other measures as may be necessary to establish as offences liable to criminal or other sanctions under its domestic law the following acts or omissions, when committed intentionally, in order to commit, conceal or disguise the offences referred to in Articles 2 to 12, to the extent the Party has not made a reservation or a declaration:

a   creating or using an invoice or any other accounting document or record containing false or incomplete information;

b   unlawfully omitting to make a record of a payment.

**Article 15 – Participatory acts**

Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law aiding or abetting the commission of any of the criminal offences established in accordance with this Convention.


**Article 16 – Immunity**

The provisions of this Convention shall be without prejudice to the provisions of any Treaty, Protocol or Statute, as well as their implementing texts, as regards the withdrawal of immunity.

**Article 17 – Jurisdiction**

1   Each Party shall adopt such legislative and other measures as may be necessary to establish jurisdiction over a criminal offence established in accordance with Articles 2 to 14 of this Convention where:

a   the offence is committed in whole or in part in its territory;

b   the offender is one of its nationals, one of its public officials, or a member of one of its domestic public assemblies;

c   the offence involves one of its public officials or members of its domestic public assemblies or any person referred to in Articles 9 to 11 who is at the same time one of its nationals.

2   Each State may, at the time of signature or when depositing its instrument of ratification, acceptance, approval or accession, by a declaration addressed to the Secretary General of the Council of Europe, declare that it reserves the right not to apply or to apply only in specific cases or conditions the jurisdiction rules laid down in paragraphs 1 b and c of this article or any part thereof.

3   If a Party has made use of the reservation possibility provided for in paragraph 2 of this article, it shall adopt such measures as may be necessary to establish jurisdiction over a criminal offence established in accordance with this Convention, in cases where an alleged offender is present in its territory and it does not extradite him to another Party, solely on the basis of his nationality, after a request for extradition.

4   This Convention does not exclude any criminal jurisdiction exercised by a Party in accordance with national law.

**Article 18 – Corporate liability**

1   Each Party shall adopt such legislative and other measures as may be necessary to ensure that legal persons can be held liable for the criminal offences of active bribery, trading in influence and money laundering established in accordance with this Convention, committed for their benefit by any natural person, acting either individually or as part of an organ of the legal person, who has a leading position within the legal person, based on:

–   a power of representation of the legal person; or

–   an authority to take decisions on behalf of the legal person; or

–   an authority to exercise control within the legal person;

as well as for involvement of such a natural person as accessory or instigator in the above-mentioned offences.


2   Apart from the cases already provided for in paragraph 1, each Party shall take the necessary measures to ensure that a legal person can be held liable where the lack of supervision or control by a natural person referred to in paragraph 1 has made possible the commission of the criminal offences mentioned in paragraph 1 for the benefit of that legal person by a natural person under its authority.

3   Liability of a legal person under paragraphs 1 and 2 shall not exclude criminal proceedings against natural persons who are perpetrators, instigators of, or accessories to, the criminal offences mentioned in paragraph 1.

**Article 19 – Sanctions and measures**

1   Having regard to the serious nature of the criminal offences established in accordance with this Convention, each Party shall provide, in respect of those criminal offences established in accordance with Articles 2 to 14, effective, proportionate and dissuasive sanctions and measures, including, when committed by natural persons, penalties involving deprivation of liberty which can give rise to extradition.

2   Each Party shall ensure that legal persons held liable in accordance with Article 18, paragraphs 1 and 2, shall be subject to effective, proportionate and dissuasive criminal or non-criminal sanctions, including monetary sanctions.

3   Each Party shall adopt such legislative and other measures as may be necessary to enable it to confiscate or otherwise deprive the instrumentalities and proceeds of criminal offences established in accordance with this Convention, or property the value of which corresponds to such proceeds.

**Article 20 – Specialised authorities**

Each Party shall adopt such measures as may be necessary to ensure that persons or entities are specialised in the fight against corruption. They shall have the necessary independence in accordance with the fundamental principles of the legal system of the Party, in order for them to be able to carry out their functions effectively and free from any undue pressure. The Party shall ensure that the staff of such entities has adequate training and financial resources for their tasks.

### Article 21 – Co-operation with and between national authorities

Each Party shall adopt such measures as may be necessary to ensure that public authorities, as well as any public official, co-operate, in accordance with national law, with those of its authorities responsible for investigating and prosecuting criminal offences:

a   by informing the latter authorities, on their own initiative, where there are reasonable grounds to believe that any of the criminal offences established in accordance with Articles 2 to 14 has been committed, or

b   by providing, upon request, to the latter authorities all necessary information.

### Article 22 – Protection of collaborators of justice and witnesses

Each Party shall adopt such measures as may be necessary to provide effective and appropriate protection for:

a   those who report the criminal offences established in accordance with Articles 2 to 14 or otherwise co-operate with the investigating or prosecuting authorities;

b   witnesses who give testimony concerning these offences.

### Article 23 –   Measures to facilitate the gathering of evidence and the confiscation of proceeds

1   Each Party shall adopt such legislative and other measures as may be necessary, including those permitting the use of special investigative techniques, in accordance with national law, to enable it to facilitate the gathering of evidence related to criminal offences established in accordance with Article 2 to 14 of this Convention and to identify, trace, freeze and seize instrumentalities and proceeds of corruption, or property the value of which corresponds to such proceeds, liable to measures set out in accordance with paragraph 3 of Article 19 of this Convention.

2   Each Party shall adopt such legislative and other measures as may be necessary to empower its courts or other competent authorities to order that bank, financial or commercial records be made available or be seized in order to carry out the actions referred to in paragraph 1 of this article.

3   Bank secrecy shall not be an obstacle to measures provided for in paragraphs 1 and 2 of this article.

## Chapter III – Monitoring of implementation

### Article 24 – Monitoring

The Group of States against Corruption (GRECO) shall monitor the implementation of this Convention by the Parties.

## Chapter IV – International co-operation

### Article 25 – General principles and measures for international co-operation

1   The Parties shall co-operate with each other, in accordance with the provisions of relevant international instruments on international co-operation in criminal matters, or arrangements agreed on the basis of uniform or reciprocal legislation, and in accordance with their national law, to the widest extent possible for the purposes of investigations and proceedings concerning criminal offences established in accordance with this Convention.

2   Where no international instrument or arrangement referred to in paragraph 1 is in force between Parties, Articles 26 to 31 of this chapter shall apply.

3   Articles 26 to 31 of this chapter shall also apply where they are more favourable than those of the international instruments or arrangements referred to in paragraph 1.

### Article 26 – Mutual assistance

1   The Parties shall afford one another the widest measure of mutual assistance by promptly processing requests from authorities that, in conformity with their domestic laws, have the power to investigate or prosecute criminal offences established in accordance with this Convention.

2   Mutual legal assistance under paragraph 1 of this article may be refused if the requested Party believes that compliance with the request would undermine its fundamental interests, national sovereignty, national security or *ordre public*.

3   Parties shall not invoke bank secrecy as a ground to refuse any co-operation under this chapter. Where its domestic law so requires, a Party may require that a request for co-operation which would involve the lifting of bank secrecy be authorised by either a judge or another judicial authority, including public prosecutors, any of these authorities acting in relation to criminal offences.

### Article 27 – Extradition

1   The criminal offences established in accordance with this Convention shall be deemed to be included as extraditable offences in any extradition treaty existing between or among the Parties. The Parties undertake to include such offences as extraditable offences in any extradition treaty to be concluded between or among them.

2   If a Party that makes extradition conditional on the existence of a treaty receives a request for extradition from another Party with which it does not have an extradition treaty, it may consider this Convention as the legal basis for extradition with respect to any criminal offence established in accordance with this Convention.

3   Parties that do not make extradition conditional on the existence of a treaty shall recognise criminal offences established in accordance with this Convention as extraditable offences between themselves.

4   Extradition shall be subject to the conditions provided for by the law of the requested Party or by applicable extradition treaties, including the grounds on which the requested Party may refuse extradition.

5    If extradition for a criminal offence established in accordance with this Convention is refused solely on the basis of the nationality of the person sought, or because the requested Party deems that it has jurisdiction over the offence, the requested Party shall submit the case to its competent authorities for the purpose of prosecution unless otherwise agreed with the requesting Party, and shall report the final outcome to the requesting Party in due course.

### Article 28 – Spontaneous information

Without prejudice to its own investigations or proceedings, a Party may without prior request forward to another Party information on facts when it considers that the disclosure of such information might assist the receiving Party in initiating or carrying out investigations or proceedings concerning criminal offences established in accordance with this Convention or might lead to a request by that Party under this chapter.

### Article 29 – Central authority

1    The Parties shall designate a central authority or, if appropriate, several central authorities, which shall be responsible for sending and answering requests made under this chapter, the execution of such requests or the transmission of them to the authorities competent for their execution.

2    Each Party shall, at the time of signature or when depositing its instrument of ratification, acceptance, approval or accession, communicate to the Secretary General of the Council of Europe the names and addresses of the authorities designated in pursuance of paragraph 1 of this article.

### Article 30 – Direct communication

1    The central authorities shall communicate directly with one another.

2    In the event of urgency, requests for mutual assistance or communications related thereto may be sent directly by the judicial authorities, including public prosecutors, of the requesting Party to such authorities of the requested Party. In such cases a copy shall be sent at the same time to the central authority of the requested Party through the central authority of the requesting Party.

3    Any request or communication under paragraphs 1 and 2 of this article may be made through the International Criminal Police Organisation (Interpol).

4    Where a request is made pursuant to paragraph 2 of this article and the authority is not competent to deal with the request, it shall refer the request to the competent national authority and inform directly the requesting Party that it has done so.

5    Requests or communications under paragraph 2 of this article, which do not involve coercive action, may be directly transmitted by the competent authorities of the requesting Party to the competent authorities of the requested Party.

6    Each State may, at the time of signature or when depositing its instrument of ratification, acceptance, approval or accession, inform the Secretary General of the Council of Europe that, for reasons of efficiency, requests made under this chapter are to be addressed to its central authority.

### Article 31 – Information

The requested Party shall promptly inform the requesting Party of the action taken on a request under this chapter and the final result of that action. The requested Party shall also promptly inform the requesting Party of any circumstances which render impossible the carrying out of the action sought or are likely to delay it significantly.

## Chapter V – Final provisions

### Article 32 – Signature and entry into force

1    This Convention shall be open for signature by the member States of the Council of Europe and by non-member States which have participated in its elaboration. Such States may express their consent to be bound by:

   a    signature without reservation as to ratification, acceptance or approval; or

   b    signature subject to ratification, acceptance or approval, followed by ratification, acceptance or approval.

2    Instruments of ratification, acceptance or approval shall be deposited with the Secretary General of the Council of Europe.

3    This Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date on which fourteen States have expressed their consent to be bound by the Convention in accordance with the provisions of paragraph 1. Any such State, which is not a member of the Group of States against Corruption (GRECO) at the time of ratification, shall automatically become a member on the date the Convention enters into force.

4    In respect of any signatory State which subsequently expresses its consent to be bound by it, the Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date of the expression of their consent to be bound by the Convention in accordance with the provisions of paragraph 1. Any signatory State, which is not a member of the Group of States against Corruption (GRECO) at the time of ratification, shall automatically become a member on the date the Convention enters into force in its respect.

### Article 33 – Accession to the Convention

1    After the entry into force of this Convention, the Committee of Ministers of the Council of Europe, after consulting the Contracting States to the Convention, may invite the European Community as well as any State not a member of the Council and not having participated in its elaboration to accede to this Convention, by a decision taken by the majority provided for in Article 20d of the Statute of the Council of Europe and by the unanimous vote of the representatives of the Contracting States entitled to sit on the Committee of Ministers.

2    In respect of the European Community and any State acceding to it under paragraph 1 above, the Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date of deposit of the instrument of accession with the Secretary General of the Council of Europe. The European Community and any State acceding to this Convention shall automatically become a member of GRECO, if it is not already a member at the time of accession, on the date the Convention enters into force in its respect.

### Article 34 – Territorial application

1　Any State may, at the time of signature or when depositing its instrument of ratification, acceptance, approval or accession, specify the territory or territories to which this Convention shall apply.

2　Any Party may, at any later date, by a declaration addressed to the Secretary General of the Council of Europe, extend the application of this Convention to any other territory specified in the declaration. In respect of such territory the Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date of receipt of such declaration by the Secretary General.

3　Any declaration made under the two preceding paragraphs may, in respect of any territory specified in such declaration, be withdrawn by a notification addressed to the Secretary General of the Council of Europe. The withdrawal shall become effective on the first day of the month following the expiration of a period of three months after the date of receipt of such notification by the Secretary General.

**Article 35 – Relationship to other conventions and agreements**

1　This Convention does not affect the rights and undertakings derived from international multilateral conventions concerning special matters.

2　The Parties to the Convention may conclude bilateral or multilateral agreements with one another on the matters dealt with in this Convention, for purposes of supplementing or strengthening its provisions or facilitating the application of the principles embodied in it.

3　If two or more Parties have already concluded an agreement or treaty in respect of a subject which is dealt with in this Convention or otherwise have established their relations in respect of that subject, they shall be entitled to apply that agreement or treaty or to regulate those relations accordingly, in lieu of the present Convention, if it facilitates international co-operation.

**Article 36 – Declarations**

Any State may, at the time of signature or when depositing its instrument of ratification, acceptance, approval or accession, declare that it will establish as criminal offences the active and passive bribery of foreign public officials under Article 5, of officials of international organisations under Article 9 or of judges and officials of international courts under Article 11, only to the extent that the public official or judge acts or refrains from acting in breach of his duties.

**Article 37 – Reservations**

1　Any State may, at the time of signature or when depositing its instrument of ratification, acceptance, approval or accession, reserve its right not to establish as a criminal offence under its domestic law, in part or in whole, the conduct referred to in Articles 4, 6 to 8, 10 and 12 or the passive bribery offences defined in Article 5.

2　Any State may, at the time of signature or when depositing its instrument of ratification, acceptance, approval or accession declare that it avails itself of the reservation provided for in Article 17, paragraph 2.

3　Any State may, at the time of signature or when depositing its instrument of ratification, acceptance, approval or accession declare that it may refuse mutual legal assistance under Article 26, paragraph 1, if the request concerns an offence which the requested Party considers a political offence.

4　No State may, by application of paragraphs 1, 2 and 3 of this article, enter reservations to more than five of the provisions mentioned thereon. No other reservation may be made. Reservations of the same nature with respect to Articles 4, 6 and 10 shall be considered as one reservation.

**Article 38 – Validity and review of declarations and reservations**

1　Declarations referred to in Article 36 and reservations referred to in Article 37 shall be valid for a period of three years from the day of the entry into force of this Convention in respect of the State concerned. However, such declarations and reservations may be renewed for periods of the same duration.

2　Twelve months before the date of expiry of the declaration or reservation, the Secretariat General of the Council of Europe shall give notice of that expiry to the State concerned. No later than three months before the expiry, the State shall notify the Secretary General that it is upholding, amending or withdrawing its declaration or reservation. In the absence of a notification by the State concerned, the Secretariat General shall inform that State that its declaration or reservation is considered to have been extended automatically for a period of six months. Failure by the State concerned to notify its intention to uphold or modify its declaration or reservation before the expiry of that period shall cause the declaration or reservation to lapse.

3　If a Party makes a declaration or a reservation in conformity with Articles 36 and 37, it shall provide, before its renewal or upon request, an explanation to GRECO, on the grounds justifying its continuance.

**Article 39 – Amendments**

1　Amendments to this Convention may be proposed by any Party, and shall be communicated by the Secretary General of the Council of Europe to the member States of the Council of Europe and to every non-member State which has acceded to, or has been invited to accede to, this Convention in accordance with the provisions of Article 33.

2　Any amendment proposed by a Party shall be communicated to the European Committee on Crime Problems (CDPC), which shall submit to the Committee of Ministers its opinion on that proposed amendment.

3　The Committee of Ministers shall consider the proposed amendment and the opinion submitted by the CDPC and, following consultation of the non-member States Parties to this Convention, may adopt the amendment.

4　The text of any amendment adopted by the Committee of Ministers in accordance with paragraph 3 of this article shall be forwarded to the Parties for acceptance.

5　Any amendment adopted in accordance with paragraph 3 of this article shall come into force on the thirtieth day after all Parties have informed the Secretary General of their acceptance thereof.

**Article 40 – Settlement of disputes**

1　The European Committee on Crime Problems of the Council of Europe shall be kept informed regarding the interpretation and application of this Convention.

2　In case of a dispute between Parties as to the interpretation or application of this Convention, they shall seek a settlement of the dispute through negotiation or any other peaceful means of their choice, including submission of the dispute to the European Committee on Crime

Appendix 004864

Problems, to an arbitral tribunal whose decisions shall be binding upon the Parties, or to the International Court of Justice, as agreed upon by the Parties concerned.

**Article 41 – Denunciation**

1   Any Party may, at any time, denounce this Convention by means of a notification addressed to the Secretary General of the Council of Europe.

2   Such denunciation shall become effective on the first day of the month following the expiration of a period of three months after the date of receipt of the notification by the Secretary General.

**Article 42 – Notification**

The Secretary General of the Council of Europe shall notify the member States of the Council of Europe and any State which has acceded to this Convention of:

a   any signature;

b   the deposit of any instrument of ratification, acceptance, approval or accession;

c   any date of entry into force of this Convention in accordance with Articles 32 and 33;

d   any declaration or reservation made under Article 36 or Article 37;

e   any other act, notification or communication relating to this Convention.


In witness whereof the undersigned, being duly authorised thereto, have signed this Convention.

Done at Strasbourg, this 27th day of January 1999, in English and in French, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Council of Europe. The Secretary General of the Council of Europe shall transmit certified copies to each member State of the Council of Europe, to the non-member States which have participated in the elaboration of this Convention, and to any State invited to accede to it.

Source : Treaty Office on http://conventions.coe.int - * Disclaimer.

Appendix 004865

# Exhibit 111



UNITED NATIONS
*Office on Drugs and Crime*

# UNITED NATIONS CONVENTION AGAINST CORRUPTION





UNITED NATIONS

Appendix 004868

UNITED NATIONS OFFICE ON DRUGS AND CRIME
Vienna

# UNITED NATIONS CONVENTION
# AGAINST CORRUPTION



UNITED NATIONS
New York, 2004

Appendix 004869

Appendix 004870

# Foreword

Corruption is an insidious plague that has a wide range of corrosive effects on societies. It undermines democracy and the rule of law, leads to violations of human rights, distorts markets, erodes the quality of life and allows organized crime, terrorism and other threats to human security to flourish.

This evil phenomenon is found in all countries—big and small, rich and poor—but it is in the developing world that its effects are most destructive. Corruption hurts the poor disproportionately by diverting funds intended for development, undermining a Government's ability to provide basic services, feeding inequality and injustice and discouraging foreign aid and investment. Corruption is a key element in economic underperformance and a major obstacle to poverty alleviation and development.

I am therefore very happy that we now have a new instrument to address this scourge at the global level. The adoption of the United Nations Convention against Corruption will send a clear message that the international community is determined to prevent and control corruption. It will warn the corrupt that betrayal of the public trust will no longer be tolerated. And it will reaffirm the importance of core values such as honesty, respect for the rule of law, accountability and transparency in promoting development and making the world a better place for all.

The new Convention is a remarkable achievement, and it complements another landmark instrument, the United Nations Convention against Transnational Organized Crime, which entered into force just a month ago. It is balanced, strong and pragmatic, and it offers a new framework for effective action and international cooperation.

The Convention introduces a comprehensive set of standards, measures and rules that all countries can apply in order to strengthen their legal and regulatory regimes to fight corruption. It calls for preventive measures and the criminalization of the most prevalent forms of corruption in both public and private sectors. And it makes a major breakthrough by requiring Member States to return assets obtained through corruption to the country from which they were stolen.

These provisions—the first of their kind—introduce a new fundamental principle, as well as a framework for stronger cooperation between States to prevent and detect corruption and to return the proceeds. Corrupt officials will in future find fewer ways to hide their illicit gains. This is a particularly important issue for many developing countries where corrupt high officials have

plundered the national wealth and where new Governments badly need resources to reconstruct and rehabilitate their societies.

For the United Nations, the Convention is the culmination of work that started many years ago, when the word corruption was hardly ever uttered in official circles. It took systematic efforts, first at the technical, and then gradually at the political, level to put the fight against corruption on the global agenda. Both the Monterrey International Conference on Financing for Development and the Johannesburg World Summit on Sustainable Development offered opportunities for Governments to express their determination to attack corruption and to make many more people aware of the devastating effect that corruption has on development.

The Convention is also the result of long and difficult negotiations. Many complex issues and many concerns from different quarters had to be addressed. It was a formidable challenge to produce, in less than two years, an instrument that reflects all those concerns. All countries had to show flexibility and make concessions. But we can be proud of the result.

Allow me to congratulate the members of the bureau of the Ad Hoc Committee for the Negotiation of a Convention against Corruption on their hard work and leadership, and to pay a special tribute to the Committee's late Chairman, Ambassador Héctor Charry Samper of Colombia, for his wise guidance and his dedication. I am sure all here share my sorrow that he is not with us to celebrate this great success.

The adoption of the new Convention will be a remarkable achievement. But let us be clear: it is only a beginning. We must build on the momentum achieved to ensure that the Convention enters into force as soon as possible. I urge all Member States to attend the Signing Conference in Merida, Mexico, in December, and to ratify the Convention at the earliest possible date.

If fully enforced, this new instrument can make a real difference to the quality of life of millions of people around the world. And by removing one of the biggest obstacles to development it can help us achieve the Millennium Development Goals. Be assured that the United Nations Secretariat, and in particular the United Nations Office on Drugs and Crime, will do whatever it can to support the efforts of States to eliminate the scourge of corruption from the face of the Earth. It is a big challenge, but I think that, together, we can make a difference.

*Kofi A. Annan*
*Secretary-General*

## Contents

*Page*

General Assembly resolution 58/4 of 31 October 2003 . . . . . . . . . . . . . . . . . . . .   1

Annex.   United Nations Convention against Corruption . . . . . . . . . . . . . . . . .   5

   I.   General provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

   II.   Preventive measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

   III.   Criminalization and law enforcement . . . . . . . . . . . . . . . . . . . . . . . . .   17

   IV.   International cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

   V.   Asset recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

   VI.   Technical assistance and information exchange . . . . . . . . . . . . . . . . .   48

   VII.   Mechanisms for implementation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

   VIII.   Final provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

**General Assembly resolution 58/4
of 31 October 2003**

**United Nations Convention
against Corruption**

*The General Assembly*,

*Recalling* its resolution 55/61 of 4 December 2000, in which it established an ad hoc committee for the negotiation of an effective international legal instrument against corruption and requested the Secretary-General to convene an intergovernmental open-ended expert group to examine and prepare draft terms of reference for the negotiation of such an instrument, and its resolution 55/188 of 20 December 2000, in which it invited the intergovernmental open-ended expert group to be convened pursuant to resolution 55/61 to examine the question of illegally transferred funds and the return of such funds to the countries of origin,

*Recalling also* its resolutions 56/186 of 21 December 2001 and 57/244 of 20 December 2002 on preventing and combating corrupt practices and transfer of funds of illicit origin and returning such funds to the countries of origin,

*Recalling further* its resolution 56/260 of 31 January 2002, in which it requested the Ad Hoc Committee for the Negotiation of a Convention against Corruption to complete its work by the end of 2003,

*Recalling* its resolution 57/169 of 18 December 2002, in which it accepted with appreciation the offer made by the Government of Mexico to host a high-level political conference for the purpose of signing the convention and requested the Secretary-General to schedule the conference for a period of three days before the end of 2003,

*Recalling also* Economic and Social Council resolution 2001/13 of 24 July 2001, entitled "Strengthening international cooperation in preventing and combating the transfer of funds of illicit origin, derived from acts of corruption, including the laundering of funds, and in returning such funds",

*Expressing its appreciation* to the Government of Argentina for hosting the informal preparatory meeting of the Ad Hoc Committee for the Negotiation of a Convention against Corruption in Buenos Aires from 4 to 7 December 2001,

1

*Recalling* the Monterrey Consensus, adopted by the International Conference on Financing for Development, held in Monterrey, Mexico, from 18 to 22 March 2002,[1] in which it was underlined that fighting corruption at all levels was a priority,

*Recalling also* the Johannesburg Declaration on Sustainable Development, adopted by the World Summit on Sustainable Development, held in Johannesburg, South Africa, from 26 August to 4 September 2002,[2] in particular paragraph 19 thereof, in which corruption was declared a threat to the sustainable development of people,

*Concerned* about the seriousness of problems and threats posed by corruption to the stability and security of societies, undermining the institutions and values of democracy, ethical values and justice and jeopardizing sustainable development and the rule of law,

1.   *Takes note* of the report of the Ad Hoc Committee for the Negotiation of a Convention against Corruption,[3] which carried out its work at the headquarters of the United Nations Office on Drugs and Crime in Vienna, in which the Ad Hoc Committee submitted the final text of the draft United Nations Convention against Corruption to the General Assembly for its consideration and action, and commends the Ad Hoc Committee for its work;

2.   *Adopts* the United Nations Convention against Corruption annexed to the present resolution, and opens it for signature at the High-level Political Signing Conference to be held in Merida, Mexico, from 9 to 11 December 2003, in accordance with resolution 57/169;

3.   *Urges* all States and competent regional economic integration organizations to sign and ratify the United Nations Convention against Corruption as soon as possible in order to ensure its rapid entry into force;

4.   *Decides* that, until the Conference of the States Parties to the Convention established pursuant to the United Nations Convention against Corruption decides otherwise, the account referred to in article 62 of the Convention will be operated within the United Nations Crime Prevention and Criminal Justice Fund, and encourages Member States to begin making adequate voluntary contributions to the above-mentioned account for the provision to developing

---

[1] *Report of the International Conference on Financing for Development, Monterrey, Mexico, 18-22 March 2002* (United Nations publication, Sales No. E.02.II.A.7), chap. I, resolution 1, annex.

[2] *Report of the World Summit on Sustainable Development, Johannesburg, South Africa, 26 August-4 September 2002* (United Nations publication, Sales No. E.03.II.A.1 and corrigendum), chap. I, resolution 1, annex.

[3] A/58/422 and Add.1.

2

countries and countries with economies in transition of the technical assistance that they might require to prepare for ratification and implementation of the Convention;

5.    *Also decides* that the Ad Hoc Committee for the Negotiation of a Convention against Corruption will complete its tasks arising from the negotiation of the United Nations Convention against Corruption by holding a meeting well before the convening of the first session of the Conference of the States Parties to the Convention in order to prepare the draft text of the rules of procedure of the Conference of the States Parties and of other rules described in article 63 of the Convention, which will be submitted to the Conference of the States Parties at its first session for consideration;

6.    *Requests* the Conference of the States Parties to the Convention to address the criminalization of bribery of officials of public international organizations, including the United Nations, and related issues, taking into account questions of privileges and immunities, as well as of jurisdiction and the role of international organizations, by, inter alia, making recommendations regarding appropriate action in that regard;

7.    *Decides* that, in order to raise awareness of corruption and of the role of the Convention in combating and preventing it, 9 December should be designated International Anti-Corruption Day;

8.    *Requests* the Secretary-General to designate the United Nations Office on Drugs and Crime to serve as the secretariat for and under the direction of the Conference of the States Parties to the Convention;

9.    *Also requests* the Secretary-General to provide the United Nations Office on Drugs and Crime with the resources necessary to enable it to promote in an effective manner the rapid entry into force of the United Nations Convention against Corruption and to discharge the functions of secretariat of the Conference of the States Parties to the Convention, and to support the Ad Hoc Committee in its work pursuant to paragraph 5 above;

10.    *Further requests* the Secretary-General to prepare a comprehensive report on the High-level Political Signing Conference to be held in Merida, Mexico, in accordance with resolution 57/169, for submission to the General Assembly at its fifty-ninth session.

Appendix 004876

*Annex*

# United Nations Convention against Corruption

### Preamble

*The States Parties to this Convention*,

*Concerned* about the seriousness of problems and threats posed by corruption to the stability and security of societies, undermining the institutions and values of democracy, ethical values and justice and jeopardizing sustainable development and the rule of law,

*Concerned also* about the links between corruption and other forms of crime, in particular organized crime and economic crime, including money-laundering,

*Concerned further* about cases of corruption that involve vast quantities of assets, which may constitute a substantial proportion of the resources of States, and that threaten the political stability and sustainable development of those States,

*Convinced* that corruption is no longer a local matter but a transnational phenomenon that affects all societies and economies, making international co-operation to prevent and control it essential,

*Convinced also* that a comprehensive and multidisciplinary approach is required to prevent and combat corruption effectively,

*Convinced further* that the availability of technical assistance can play an important role in enhancing the ability of States, including by strengthening capacity and by institution-building, to prevent and combat corruption effectively,

*Convinced* that the illicit acquisition of personal wealth can be particularly damaging to democratic institutions, national economies and the rule of law,

*Determined* to prevent, detect and deter in a more effective manner international transfers of illicitly acquired assets and to strengthen international cooperation in asset recovery,

*Acknowledging* the fundamental principles of due process of law in criminal proceedings and in civil or administrative proceedings to adjudicate property rights,

*Bearing in mind* that the prevention and eradication of corruption is a responsibility of all States and that they must cooperate with one another, with the support and involvement of individuals and groups outside the public sector, such as civil society, non-governmental organizations and community-based organizations, if their efforts in this area are to be effective,

*Bearing also in mind* the principles of proper management of public affairs and public property, fairness, responsibility and equality before the law and the need to safeguard integrity and to foster a culture of rejection of corruption,

*Commending* the work of the Commission on Crime Prevention and Criminal Justice and the United Nations Office on Drugs and Crime in preventing and combating corruption,

*Recalling* the work carried out by other international and regional organizations in this field, including the activities of the African Union, the Council of Europe, the Customs Cooperation Council (also known as the World Customs Organization), the European Union, the League of Arab States, the Organisation for Economic Cooperation and Development and the Organization of American States,

*Taking note with appreciation* of multilateral instruments to prevent and combat corruption, including, inter alia, the Inter-American Convention against Corruption, adopted by the Organization of American States on 29 March 1996,[1] the Convention on the Fight against Corruption involving Officials of the European Communities or Officials of Member States of the European Union, adopted by the Council of the European Union on 26 May 1997,[2] the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, adopted by the Organisation for Economic Cooperation and Development on 21 November 1997,[3] the Criminal Law

---

[1]See E/1996/99.

[2]*Official Journal of the European Communities*, C 195, 25 June 1997.

[3]See *Corruption and Integrity Improvement Initiatives in Developing Countries* (United Nations publication, Sales No. E.98.III.B.18).

Convention on Corruption, adopted by the Committee of Ministers of the Council of Europe on 27 January 1999,[4] the Civil Law Convention on Corruption, adopted by the Committee of Ministers of the Council of Europe on 4 November 1999,[5] and the African Union Convention on Preventing and Combating Corruption, adopted by the Heads of State and Government of the African Union on 12 July 2003,

*Welcoming* the entry into force on 29 September 2003 of the United Nations Convention against Transnational Organized Crime,[6]

*Have agreed as* follows:

## Chapter I
## General provisions

### Article 1.   Statement of purpose

The purposes of this Convention are:

*(a)*  To promote and strengthen measures to prevent and combat corruption more efficiently and effectively;

*(b)*  To promote, facilitate and support international cooperation and technical assistance in the prevention of and fight against corruption, including in asset recovery;

*(c)*  To promote integrity, accountability and proper management of public affairs and public property.

### Article 2.   Use of terms

For the purposes of this Convention:

*(a)*  "Public official" shall mean: (i) any person holding a legislative, executive, administrative or judicial office of a State Party, whether appointed or elected, whether permanent or temporary, whether paid or unpaid, irrespective of that person's seniority; (ii) any other person who performs a public function, including for a public agency or public enterprise, or provides a public service, as defined in the domestic law of the State Party and as applied in the pertinent area of law of that State Party; (iii) any other person defined as a "public

---

[4]Council of Europe, *European Treaty Series*, No. 173.

[5]Ibid., No. 174.

[6]General Assembly resolution 55/25, annex I.

7

official" in the domestic law of a State Party. However, for the purpose of some specific measures contained in chapter II of this Convention, "public official" may mean any person who performs a public function or provides a public service as defined in the domestic law of the State Party and as applied in the pertinent area of law of that State Party;

(b)   "Foreign public official" shall mean any person holding a legislative, executive, administrative or judicial office of a foreign country, whether appointed or elected; and any person exercising a public function for a foreign country, including for a public agency or public enterprise;

(c)   "Official of a public international organization" shall mean an international civil servant or any person who is authorized by such an organization to act on behalf of that organization;

(d)   "Property" shall mean assets of every kind, whether corporeal or incorporeal, movable or immovable, tangible or intangible, and legal documents or instruments evidencing title to or interest in such assets;

(e)   "Proceeds of crime" shall mean any property derived from or obtained, directly or indirectly, through the commission of an offence;

(f)   "Freezing" or "seizure" shall mean temporarily prohibiting the transfer, conversion, disposition or movement of property or temporarily assuming custody or control of property on the basis of an order issued by a court or other competent authority;

(g)   "Confiscation", which includes forfeiture where applicable, shall mean the permanent deprivation of property by order of a court or other competent authority;

(h)   "Predicate offence" shall mean any offence as a result of which proceeds have been generated that may become the subject of an offence as defined in article 23 of this Convention;

(i)   "Controlled delivery" shall mean the technique of allowing illicit or suspect consignments to pass out of, through or into the territory of one or more States, with the knowledge and under the supervision of their competent authorities, with a view to the investigation of an offence and the identification of persons involved in the commission of the offence.

### Article 3.   Scope of application

1.   This Convention shall apply, in accordance with its terms, to the prevention, investigation and prosecution of corruption and to the freezing, seizure, confiscation and return of the proceeds of offences established in accordance with this Convention.

8

2.    For the purposes of implementing this Convention, it shall not be necessary, except as otherwise stated herein, for the offences set forth in it to result in damage or harm to state property.

### *Article 4.    Protection of sovereignty*

1.    States Parties shall carry out their obligations under this Convention in a manner consistent with the principles of sovereign equality and territorial integrity of States and that of non-intervention in the domestic affairs of other States.

2.    Nothing in this Convention shall entitle a State Party to undertake in the territory of another State the exercise of jurisdiction and performance of functions that are reserved exclusively for the authorities of that other State by its domestic law.

### Chapter II
### Preventive measures

### *Article 5.    Preventive anti-corruption policies and practices*

1.    Each State Party shall, in accordance with the fundamental principles of its legal system, develop and implement or maintain effective, coordinated anti-corruption policies that promote the participation of society and reflect the principles of the rule of law, proper management of public affairs and public property, integrity, transparency and accountability.

2.    Each State Party shall endeavour to establish and promote effective practices aimed at the prevention of corruption.

3.    Each State Party shall endeavour to periodically evaluate relevant legal instruments and administrative measures with a view to determining their adequacy to prevent and fight corruption.

4.    States Parties shall, as appropriate and in accordance with the fundamental principles of their legal system, collaborate with each other and with relevant international and regional organizations in promoting and developing the measures referred to in this article. That collaboration may include participation in international programmes and projects aimed at the prevention of corruption.

9

*Article 6.   Preventive anti-corruption body or bodies*

1.    Each State Party shall, in accordance with the fundamental principles of its legal system, ensure the existence of a body or bodies, as appropriate, that prevent corruption by such means as:

*(a)*  Implementing the policies referred to in article 5 of this Convention and, where appropriate, overseeing and coordinating the implementation of those policies;

*(b)*  Increasing and disseminating knowledge about the prevention of corruption.

2.    Each State Party shall grant the body or bodies referred to in paragraph 1 of this article the necessary independence, in accordance with the fundamental principles of its legal system, to enable the body or bodies to carry out its or their functions effectively and free from any undue influence. The necessary material resources and specialized staff, as well as the training that such staff may require to carry out their functions, should be provided.

3.    Each State Party shall inform the Secretary-General of the United Nations of the name and address of the authority or authorities that may assist other States Parties in developing and implementing specific measures for the prevention of corruption.

*Article 7.   Public sector*

1.    Each State Party shall, where appropriate and in accordance with the fundamental principles of its legal system, endeavour to adopt, maintain and strengthen systems for the recruitment, hiring, retention, promotion and retirement of civil servants and, where appropriate, other non-elected public officials:

*(a)*  That are based on principles of efficiency, transparency and objective criteria such as merit, equity and aptitude;

*(b)*  That include adequate procedures for the selection and training of individuals for public positions considered especially vulnerable to corruption and the rotation, where appropriate, of such individuals to other positions;

*(c)*  That promote adequate remuneration and equitable pay scales, taking into account the level of economic development of the State Party;

*(d)*  That promote education and training programmes to enable them to meet the requirements for the correct, honourable and proper performance of public functions and that provide them with specialized and appropriate training to enhance their awareness of the risks of corruption inherent in the

performance of their functions. Such programmes may make reference to codes or standards of conduct in applicable areas.

2.    Each State Party shall also consider adopting appropriate legislative and administrative measures, consistent with the objectives of this Convention and in accordance with the fundamental principles of its domestic law, to prescribe criteria concerning candidature for and election to public office.

3.    Each State Party shall also consider taking appropriate legislative and administrative measures, consistent with the objectives of this Convention and in accordance with the fundamental principles of its domestic law, to enhance transparency in the funding of candidatures for elected public office and, where applicable, the funding of political parties.

4.    Each State Party shall, in accordance with the fundamental principles of its domestic law, endeavour to adopt, maintain and strengthen systems that promote transparency and prevent conflicts of interest.

## Article 8.    Codes of conduct for public officials

1.    In order to fight corruption, each State Party shall promote, inter alia, integrity, honesty and responsibility among its public officials, in accordance with the fundamental principles of its legal system.

2.    In particular, each State Party shall endeavour to apply, within its own institutional and legal systems, codes or standards of conduct for the correct, honourable and proper performance of public functions.

3.    For the purposes of implementing the provisions of this article, each State Party shall, where appropriate and in accordance with the fundamental principles of its legal system, take note of the relevant initiatives of regional, interregional and multilateral organizations, such as the International Code of Conduct for Public Officials contained in the annex to General Assembly resolution 51/59 of 12 December 1996.

4.    Each State Party shall also consider, in accordance with the fundamental principles of its domestic law, establishing measures and systems to facilitate the reporting by public officials of acts of corruption to appropriate authorities, when such acts come to their notice in the performance of their functions.

5.    Each State Party shall endeavour, where appropriate and in accordance with the fundamental principles of its domestic law, to establish measures

11

and systems requiring public officials to make declarations to appropriate authorities regarding, inter alia, their outside activities, employment, investments, assets and substantial gifts or benefits from which a conflict of interest may result with respect to their functions as public officials.

6.   Each State Party shall consider taking, in accordance with the fundamental principles of its domestic law, disciplinary or other measures against public officials who violate the codes or standards established in accordance with this article.

### Article 9.   Public procurement and management of public finances

1.   Each State Party shall, in accordance with the fundamental principles of its legal system, take the necessary steps to establish appropriate systems of procurement, based on transparency, competition and objective criteria in decision-making, that are effective, inter alia, in preventing corruption. Such systems, which may take into account appropriate threshold values in their application, shall address, inter alia:

(a)   The public distribution of information relating to procurement procedures and contracts, including information on invitations to tender and relevant or pertinent information on the award of contracts, allowing potential tenderers sufficient time to prepare and submit their tenders;

(b)   The establishment, in advance, of conditions for participation, including selection and award criteria and tendering rules, and their publication;

(c)   The use of objective and predetermined criteria for public procurement decisions, in order to facilitate the subsequent verification of the correct application of the rules or procedures;

(d)   An effective system of domestic review, including an effective system of appeal, to ensure legal recourse and remedies in the event that the rules or procedures established pursuant to this paragraph are not followed;

(e)   Where appropriate, measures to regulate matters regarding personnel responsible for procurement, such as declaration of interest in particular public procurements, screening procedures and training requirements.

2.   Each State Party shall, in accordance with the fundamental principles of its legal system, take appropriate measures to promote transparency and accountability in the management of public finances. Such measures shall encompass, inter alia:

(a)   Procedures for the adoption of the national budget;

(b)  Timely reporting on revenue and expenditure;

(c)  A system of accounting and auditing standards and related oversight;

(d)  Effective and efficient systems of risk management and internal control; and

(e)  Where appropriate, corrective action in the case of failure to comply with the requirements established in this paragraph.

3.    Each State Party shall take such civil and administrative measures as may be necessary, in accordance with the fundamental principles of its domestic law, to preserve the integrity of accounting books, records, financial statements or other documents related to public expenditure and revenue and to prevent the falsification of such documents.

### Article 10.    Public reporting

Taking into account the need to combat corruption, each State Party shall, in accordance with the fundamental principles of its domestic law, take such measures as may be necessary to enhance transparency in its public administration, including with regard to its organization, functioning and decision-making processes, where appropriate. Such measures may include, inter alia:

(a)  Adopting procedures or regulations allowing members of the general public to obtain, where appropriate, information on the organization, functioning and decision-making processes of its public administration and, with due regard for the protection of privacy and personal data, on decisions and legal acts that concern members of the public;

(b)  Simplifying administrative procedures, where appropriate, in order to facilitate public access to the competent decision-making authorities; and

(c)  Publishing information, which may include periodic reports on the risks of corruption in its public administration.

### Article 11.    Measures relating to the judiciary and prosecution services

1.    Bearing in mind the independence of the judiciary and its crucial role in combating corruption, each State Party shall, in accordance with the fundamental principles of its legal system and without prejudice to judicial independence, take measures to strengthen integrity and to prevent opportunities for corruption among members of the judiciary. Such measures may include rules with respect to the conduct of members of the judiciary.

13

2.    Measures to the same effect as those taken pursuant to paragraph 1 of this article may be introduced and applied within the prosecution service in those States Parties where it does not form part of the judiciary but enjoys independence similar to that of the judicial service.

### Article 12.   Private sector

1.    Each State Party shall take measures, in accordance with the fundamental principles of its domestic law, to prevent corruption involving the private sector, enhance accounting and auditing standards in the private sector and, where appropriate, provide effective, proportionate and dissuasive civil, administrative or criminal penalties for failure to comply with such measures.

2.    Measures to achieve these ends may include, inter alia:

*(a)* Promoting cooperation between law enforcement agencies and relevant private entities;

*(b)* Promoting the development of standards and procedures designed to safeguard the integrity of relevant private entities, including codes of conduct for the correct, honourable and proper performance of the activities of business and all relevant professions and the prevention of conflicts of interest, and for the promotion of the use of good commercial practices among businesses and in the contractual relations of businesses with the State;

*(c)* Promoting transparency among private entities, including, where appropriate, measures regarding the identity of legal and natural persons involved in the establishment and management of corporate entities;

*(d)* Preventing the misuse of procedures regulating private entities, including procedures regarding subsidies and licences granted by public authorities for commercial activities;

*(e)* Preventing conflicts of interest by imposing restrictions, as appropriate and for a reasonable period of time, on the professional activities of former public officials or on the employment of public officials by the private sector after their resignation or retirement, where such activities or employment relate directly to the functions held or supervised by those public officials during their tenure;

*(f)* Ensuring that private enterprises, taking into account their structure and size, have sufficient internal auditing controls to assist in preventing and detecting acts of corruption and that the accounts and required financial statements of such private enterprises are subject to appropriate auditing and certification procedures.

3.    In order to prevent corruption, each State Party shall take such measures as may be necessary, in accordance with its domestic laws and regulations regarding the maintenance of books and records, financial statement disclosures and accounting and auditing standards, to prohibit the following acts carried out for the purpose of committing any of the offences established in accordance with this Convention:

*(a)*   The establishment of off-the-books accounts;

*(b)*   The making of off-the-books or inadequately identified transactions;

*(c)*   The recording of non-existent expenditure;

*(d)*   The entry of liabilities with incorrect identification of their objects;

*(e)*   The use of false documents; and

*(f)*   The intentional destruction of bookkeeping documents earlier than foreseen by the law.

4.    Each State Party shall disallow the tax deductibility of expenses that constitute bribes, the latter being one of the constituent elements of the offences established in accordance with articles 15 and 16 of this Convention and, where appropriate, other expenses incurred in furtherance of corrupt conduct.

## Article 13.   Participation of society

1.    Each State Party shall take appropriate measures, within its means and in accordance with fundamental principles of its domestic law, to promote the active participation of individuals and groups outside the public sector, such as civil society, non-governmental organizations and community-based organizations, in the prevention of and the fight against corruption and to raise public awareness regarding the existence, causes and gravity of and the threat posed by corruption. This participation should be strengthened by such measures as:

*(a)*   Enhancing the transparency of and promoting the contribution of the public to decision-making processes;

*(b)*   Ensuring that the public has effective access to information;

*(c)*   Undertaking public information activities that contribute to non-tolerance of corruption, as well as public education programmes, including school and university curricula;

*(d)*   Respecting, promoting and protecting the freedom to seek, receive, publish and disseminate information concerning corruption. That freedom may be subject to certain restrictions, but these shall only be such as are provided for by law and are necessary:

(i)    For respect of the rights or reputations of others;

15

(ii)   For the protection of national security or *ordre public* or of public health or morals.

2.   Each State Party shall take appropriate measures to ensure that the relevant anti-corruption bodies referred to in this Convention are known to the public and shall provide access to such bodies, where appropriate, for the reporting, including anonymously, of any incidents that may be considered to constitute an offence established in accordance with this Convention.

### Article 14.   Measures to prevent money-laundering

1.   Each State Party shall:

*(a)*   Institute a comprehensive domestic regulatory and supervisory regime for banks and non-bank financial institutions, including natural or legal persons that provide formal or informal services for the transmission of money or value and, where appropriate, other bodies particularly susceptible to money-laundering, within its competence, in order to deter and detect all forms of money-laundering, which regime shall emphasize requirements for customer and, where appropriate, beneficial owner identification, record-keeping and the reporting of suspicious transactions;

*(b)*   Without prejudice to article 46 of this Convention, ensure that administrative, regulatory, law enforcement and other authorities dedicated to combating money-laundering (including, where appropriate under domestic law, judicial authorities) have the ability to cooperate and exchange information at the national and international levels within the conditions prescribed by its domestic law and, to that end, shall consider the establishment of a financial intelligence unit to serve as a national centre for the collection, analysis and dissemination of information regarding potential money-laundering.

2.   States Parties shall consider implementing feasible measures to detect and monitor the movement of cash and appropriate negotiable instruments across their borders, subject to safeguards to ensure proper use of information and without impeding in any way the movement of legitimate capital. Such measures may include a requirement that individuals and businesses report the cross-border transfer of substantial quantities of cash and appropriate negotiable instruments.

3.   States Parties shall consider implementing appropriate and feasible measures to require financial institutions, including money remitters:

*(a)*   To include on forms for the electronic transfer of funds and related messages accurate and meaningful information on the originator;

16

*(b)* To maintain such information throughout the payment chain; and

*(c)* To apply enhanced scrutiny to transfers of funds that do not contain complete information on the originator.

4.   In establishing a domestic regulatory and supervisory regime under the terms of this article, and without prejudice to any other article of this Convention, States Parties are called upon to use as a guideline the relevant initiatives of regional, interregional and multilateral organizations against money-laundering.

5.   States Parties shall endeavour to develop and promote global, regional, subregional and bilateral cooperation among judicial, law enforcement and financial regulatory authorities in order to combat money-laundering.

## Chapter III
## Criminalization and law enforcement

### *Article 15.   Bribery of national public officials*

Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally:

*(a)* The promise, offering or giving, to a public official, directly or indirectly, of an undue advantage, for the official himself or herself or another person or entity, in order that the official act or refrain from acting in the exercise of his or her official duties;

*(b)* The solicitation or acceptance by a public official, directly or indirectly, of an undue advantage, for the official himself or herself or another person or entity, in order that the official act or refrain from acting in the exercise of his or her official duties.

### *Article 16.   Bribery of foreign public officials and officials of public international organizations*

1.   Each State Party shall adopt such legislative and other measures as may be necessary to establish as a criminal offence, when committed intentionally, the promise, offering or giving to a foreign public official or an official of a public international organization, directly or indirectly, of an undue advantage, for the official himself or herself or another person or entity, in order that the official act or refrain from acting in the exercise of his or her official duties, in order to obtain or retain business or other undue advantage in relation to the conduct of international business.

17

2.    Each State Party shall consider adopting such legislative and other measures as may be necessary to establish as a criminal offence, when committed intentionally, the solicitation or acceptance by a foreign public official or an official of a public international organization, directly or indirectly, of an undue advantage, for the official himself or herself or another person or entity, in order that the official act or refrain from acting in the exercise of his or her official duties.

### Article 17.   Embezzlement, misappropriation or other diversion of property by a public official

Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally, the embezzlement, misappropriation or other diversion by a public official for his or her benefit or for the benefit of another person or entity, of any property, public or private funds or securities or any other thing of value entrusted to the public official by virtue of his or her position.

### Article 18.   Trading in influence

Each State Party shall consider adopting such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally:

(a)   The promise, offering or giving to a public official or any other person, directly or indirectly, of an undue advantage in order that the public official or the person abuse his or her real or supposed influence with a view to obtaining from an administration or public authority of the State Party an undue advantage for the original instigator of the act or for any other person;

(b)   The solicitation or acceptance by a public official or any other person, directly or indirectly, of an undue advantage for himself or herself or for another person in order that the public official or the person abuse his or her real or supposed influence with a view to obtaining from an administration or public authority of the State Party an undue advantage.

### Article 19.   Abuse of functions

Each State Party shall consider adopting such legislative and other measures as may be necessary to establish as a criminal offence, when committed intentionally, the abuse of functions or position, that is, the performance of or failure to perform an act, in violation of laws, by a public official in the

18

discharge of his or her functions, for the purpose of obtaining an undue advantage for himself or herself or for another person or entity.

### Article 20.   Illicit enrichment

Subject to its constitution and the fundamental principles of its legal system, each State Party shall consider adopting such legislative and other measures as may be necessary to establish as a criminal offence, when committed intentionally, illicit enrichment, that is, a significant increase in the assets of a public official that he or she cannot reasonably explain in relation to his or her lawful income.

### Article 21.   Bribery in the private sector

Each State Party shall consider adopting such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally in the course of economic, financial or commercial activities:

*(a)*  The promise, offering or giving, directly or indirectly, of an undue advantage to any person who directs or works, in any capacity, for a private sector entity, for the person himself or herself or for another person, in order that he or she, in breach of his or her duties, act or refrain from acting;

*(b)*  The solicitation or acceptance, directly or indirectly, of an undue advantage by any person who directs or works, in any capacity, for a private sector entity, for the person himself or herself or for another person, in order that he or she, in breach of his or her duties, act or refrain from acting.

### Article 22.   Embezzlement of property in the private sector

Each State Party shall consider adopting such legislative and other measures as may be necessary to establish as a criminal offence, when committed intentionally in the course of economic, financial or commercial activities, embezzlement by a person who directs or works, in any capacity, in a private sector entity of any property, private funds or securities or any other thing of value entrusted to him or her by virtue of his or her position.

### Article 23.   Laundering of proceeds of crime

1.  Each State Party shall adopt, in accordance with fundamental principles of its domestic law, such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally:

(a) (i) The conversion or transfer of property, knowing that such property is the proceeds of crime, for the purpose of concealing or disguising the illicit origin of the property or of helping any person who is involved in the commission of the predicate offence to evade the legal consequences of his or her action;

(ii) The concealment or disguise of the true nature, source, location, disposition, movement or ownership of or rights with respect to property, knowing that such property is the proceeds of crime;

(b) Subject to the basic concepts of its legal system:

(i) The acquisition, possession or use of property, knowing, at the time of receipt, that such property is the proceeds of crime;

(ii) Participation in, association with or conspiracy to commit, attempts to commit and aiding, abetting, facilitating and counselling the commission of any of the offences established in accordance with this article.

2. For purposes of implementing or applying paragraph 1 of this article:

(a) Each State Party shall seek to apply paragraph 1 of this article to the widest range of predicate offences;

(b) Each State Party shall include as predicate offences at a minimum a comprehensive range of criminal offences established in accordance with this Convention;

(c) For the purposes of subparagraph (b) above, predicate offences shall include offences committed both within and outside the jurisdiction of the State Party in question. However, offences committed outside the jurisdiction of a State Party shall constitute predicate offences only when the relevant conduct is a criminal offence under the domestic law of the State where it is committed and would be a criminal offence under the domestic law of the State Party implementing or applying this article had it been committed there;

(d) Each State Party shall furnish copies of its laws that give effect to this article and of any subsequent changes to such laws or a description thereof to the Secretary-General of the United Nations;

(e) If required by fundamental principles of the domestic law of a State Party, it may be provided that the offences set forth in paragraph 1 of this article do not apply to the persons who committed the predicate offence.

### Article 24.   Concealment

Without prejudice to the provisions of article 23 of this Convention, each State Party shall consider adopting such legislative and other measures as may

Appendix 004893

be necessary to establish as a criminal offence, when committed intentionally after the commission of any of the offences established in accordance with this Convention without having participated in such offences, the concealment or continued retention of property when the person involved knows that such property is the result of any of the offences established in accordance with this Convention.

## Article 25.   Obstruction of justice

Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally:

*(a)* The use of physical force, threats or intimidation or the promise, offering or giving of an undue advantage to induce false testimony or to interfere in the giving of testimony or the production of evidence in a proceeding in relation to the commission of offences established in accordance with this Convention;

*(b)* The use of physical force, threats or intimidation to interfere with the exercise of official duties by a justice or law enforcement official in relation to the commission of offences established in accordance with this Convention. Nothing in this subparagraph shall prejudice the right of States Parties to have legislation that protects other categories of public official.

## Article 26.   Liability of legal persons

1. Each State Party shall adopt such measures as may be necessary, consistent with its legal principles, to establish the liability of legal persons for participation in the offences established in accordance with this Convention.

2. Subject to the legal principles of the State Party, the liability of legal persons may be criminal, civil or administrative.

3. Such liability shall be without prejudice to the criminal liability of the natural persons who have committed the offences.

4. Each State Party shall, in particular, ensure that legal persons held liable in accordance with this article are subject to effective, proportionate and dissuasive criminal or non-criminal sanctions, including monetary sanctions.

21

*Article 27.   Participation and attempt*

1.   Each State Party shall adopt such legislative and other measures as may be necessary to establish as a criminal offence, in accordance with its domestic law, participation in any capacity such as an accomplice, assistant or instigator in an offence established in accordance with this Convention.

2.   Each State Party may adopt such legislative and other measures as may be necessary to establish as a criminal offence, in accordance with its domestic law, any attempt to commit an offence established in accordance with this Convention.

3.   Each State Party may adopt such legislative and other measures as may be necessary to establish as a criminal offence, in accordance with its domestic law, the preparation for an offence established in accordance with this Convention.

*Article 28.   Knowledge, intent and purpose*
*as elements of an offence*

Knowledge, intent or purpose required as an element of an offence established in accordance with this Convention may be inferred from objective factual circumstances.

*Article 29.   Statute of limitations*

Each State Party shall, where appropriate, establish under its domestic law a long statute of limitations period in which to commence proceedings for any offence established in accordance with this Convention and establish a longer statute of limitations period or provide for the suspension of the statute of limitations where the alleged offender has evaded the administration of justice.

*Article 30.   Prosecution, adjudication and sanctions*

1.   Each State Party shall make the commission of an offence established in accordance with this Convention liable to sanctions that take into account the gravity of that offence.

2.   Each State Party shall take such measures as may be necessary to establish or maintain, in accordance with its legal system and constitutional principles, an appropriate balance between any immunities or jurisdictional

privileges accorded to its public officials for the performance of their functions and the possibility, when necessary, of effectively investigating, prosecuting and adjudicating offences established in accordance with this Convention.

3.    Each State Party shall endeavour to ensure that any discretionary legal powers under its domestic law relating to the prosecution of persons for offences established in accordance with this Convention are exercised to maximize the effectiveness of law enforcement measures in respect of those offences and with due regard to the need to deter the commission of such offences.

4.    In the case of offences established in accordance with this Convention, each State Party shall take appropriate measures, in accordance with its domestic law and with due regard to the rights of the defence, to seek to ensure that conditions imposed in connection with decisions on release pending trial or appeal take into consideration the need to ensure the presence of the defendant at subsequent criminal proceedings.

5.    Each State Party shall take into account the gravity of the offences concerned when considering the eventuality of early release or parole of persons convicted of such offences.

6.    Each State Party, to the extent consistent with the fundamental principles of its legal system, shall consider establishing procedures through which a public official accused of an offence established in accordance with this Convention may, where appropriate, be removed, suspended or reassigned by the appropriate authority, bearing in mind respect for the principle of the presumption of innocence.

7.    Where warranted by the gravity of the offence, each State Party, to the extent consistent with the fundamental principles of its legal system, shall consider establishing procedures for the disqualification, by court order or any other appropriate means, for a period of time determined by its domestic law, of persons convicted of offences established in accordance with this Convention from:

*(a)*  Holding public office; and

*(b)*  Holding office in an enterprise owned in whole or in part by the State.

8.    Paragraph 1 of this article shall be without prejudice to the exercise of disciplinary powers by the competent authorities against civil servants.

9.    Nothing contained in this Convention shall affect the principle that the description of the offences established in accordance with this Convention

23

and of the applicable legal defences or other legal principles controlling the lawfulness of conduct is reserved to the domestic law of a State Party and that such offences shall be prosecuted and punished in accordance with that law.

10.    States Parties shall endeavour to promote the reintegration into society of persons convicted of offences established in accordance with this Convention.

### Article 31.   *Freezing, seizure and confiscation*

1.    Each State Party shall take, to the greatest extent possible within its domestic legal system, such measures as may be necessary to enable confiscation of:

*(a)*   Proceeds of crime derived from offences established in accordance with this Convention or property the value of which corresponds to that of such proceeds;

*(b)*   Property, equipment or other instrumentalities used in or destined for use in offences established in accordance with this Convention.

2.    Each State Party shall take such measures as may be necessary to enable the identification, tracing, freezing or seizure of any item referred to in paragraph 1 of this article for the purpose of eventual confiscation.

3.    Each State Party shall adopt, in accordance with its domestic law, such legislative and other measures as may be necessary to regulate the administration by the competent authorities of frozen, seized or confiscated property covered in paragraphs 1 and 2 of this article.

4.    If such proceeds of crime have been transformed or converted, in part or in full, into other property, such property shall be liable to the measures referred to in this article instead of the proceeds.

5.    If such proceeds of crime have been intermingled with property acquired from legitimate sources, such property shall, without prejudice to any powers relating to freezing or seizure, be liable to confiscation up to the assessed value of the intermingled proceeds.

6.    Income or other benefits derived from such proceeds of crime, from property into which such proceeds of crime have been transformed or converted or from property with which such proceeds of crime have been intermingled shall also be liable to the measures referred to in this article, in the same manner and to the same extent as proceeds of crime.

7.    For the purpose of this article and article 55 of this Convention, each State Party shall empower its courts or other competent authorities to order that bank, financial or commercial records be made available or seized. A State Party shall not decline to act under the provisions of this paragraph on the ground of bank secrecy.

8.    States Parties may consider the possibility of requiring that an offender demonstrate the lawful origin of such alleged proceeds of crime or other property liable to confiscation, to the extent that such a requirement is consistent with the fundamental principles of their domestic law and with the nature of judicial and other proceedings.

9.    The provisions of this article shall not be so construed as to prejudice the rights of bona fide third parties.

10.    Nothing contained in this article shall affect the principle that the measures to which it refers shall be defined and implemented in accordance with and subject to the provisions of the domestic law of a State Party.

### Article 32.    Protection of witnesses, experts and victims

1.    Each State Party shall take appropriate measures in accordance with its domestic legal system and within its means to provide effective protection from potential retaliation or intimidation for witnesses and experts who give testimony concerning offences established in accordance with this Convention and, as appropriate, for their relatives and other persons close to them.

2.    The measures envisaged in paragraph 1 of this article may include, inter alia, without prejudice to the rights of the defendant, including the right to due process:

*(a)* Establishing procedures for the physical protection of such persons, such as, to the extent necessary and feasible, relocating them and permitting, where appropriate, non-disclosure or limitations on the disclosure of information concerning the identity and whereabouts of such persons;

*(b)* Providing evidentiary rules to permit witnesses and experts to give testimony in a manner that ensures the safety of such persons, such as permitting testimony to be given through the use of communications technology such as video or other adequate means.

3.    States Parties shall consider entering into agreements or arrangements with other States for the relocation of persons referred to in paragraph 1 of this article.

4.    The provisions of this article shall also apply to victims insofar as they are witnesses.

5.    Each State Party shall, subject to its domestic law, enable the views and concerns of victims to be presented and considered at appropriate stages of criminal proceedings against offenders in a manner not prejudicial to the rights of the defence.

### Article 33.   Protection of reporting persons

Each State Party shall consider incorporating into its domestic legal system appropriate measures to provide protection against any unjustified treatment for any person who reports in good faith and on reasonable grounds to the competent authorities any facts concerning offences established in accordance with this Convention.

### Article 34.   Consequences of acts of corruption

With due regard to the rights of third parties acquired in good faith, each State Party shall take measures, in accordance with the fundamental principles of its domestic law, to address consequences of corruption. In this context, States Parties may consider corruption a relevant factor in legal proceedings to annul or rescind a contract, withdraw a concession or other similar instrument or take any other remedial action.

### Article 35.   Compensation for damage

Each State Party shall take such measures as may be necessary, in accordance with principles of its domestic law, to ensure that entities or persons who have suffered damage as a result of an act of corruption have the right to initiate legal proceedings against those responsible for that damage in order to obtain compensation.

### Article 36.   Specialized authorities

Each State Party shall, in accordance with the fundamental principles of its legal system, ensure the existence of a body or bodies or persons specialized in combating corruption through law enforcement. Such body or bodies or persons shall be granted the necessary independence, in accordance with the fundamental principles of the legal system of the State Party, to be able to carry out

their functions effectively and without any undue influence. Such persons or staff of such body or bodies should have the appropriate training and resources to carry out their tasks.

### *Article 37.   Cooperation with law enforcement authorities*

1.    Each State Party shall take appropriate measures to encourage persons who participate or who have participated in the commission of an offence established in accordance with this Convention to supply information useful to competent authorities for investigative and evidentiary purposes and to provide factual, specific help to competent authorities that may contribute to depriving offenders of the proceeds of crime and to recovering such proceeds.

2.    Each State Party shall consider providing for the possibility, in appropriate cases, of mitigating punishment of an accused person who provides substantial cooperation in the investigation or prosecution of an offence established in accordance with this Convention.

3.    Each State Party shall consider providing for the possibility, in accordance with fundamental principles of its domestic law, of granting immunity from prosecution to a person who provides substantial cooperation in the investigation or prosecution of an offence established in accordance with this Convention.

4.    Protection of such persons shall be, mutatis mutandis, as provided for in article 32 of this Convention.

5.    Where a person referred to in paragraph 1 of this article located in one State Party can provide substantial cooperation to the competent authorities of another State Party, the States Parties concerned may consider entering into agreements or arrangements, in accordance with their domestic law, concerning the potential provision by the other State Party of the treatment set forth in paragraphs 2 and 3 of this article.

### *Article 38.   Cooperation between national authorities*

Each State Party shall take such measures as may be necessary to encourage, in accordance with its domestic law, cooperation between, on the one hand, its public authorities, as well as its public officials, and, on the other hand, its authorities responsible for investigating and prosecuting criminal offences. Such cooperation may include:

*(a)* Informing the latter authorities, on their own initiative, where there are reasonable grounds to believe that any of the offences established in accordance with articles 15, 21 and 23 of this Convention has been committed; or

*(b)* Providing, upon request, to the latter authorities all necessary information.

### Article 39.   Cooperation between national authorities and the private sector

1.   Each State Party shall take such measures as may be necessary to encourage, in accordance with its domestic law, cooperation between national investigating and prosecuting authorities and entities of the private sector, in particular financial institutions, relating to matters involving the commission of offences established in accordance with this Convention.

2.   Each State Party shall consider encouraging its nationals and other persons with a habitual residence in its territory to report to the national investigating and prosecuting authorities the commission of an offence established in accordance with this Convention.

### Article 40.   Bank secrecy

Each State Party shall ensure that, in the case of domestic criminal investigations of offences established in accordance with this Convention, there are appropriate mechanisms available within its domestic legal system to overcome obstacles that may arise out of the application of bank secrecy laws.

### Article 41.   Criminal record

Each State Party may adopt such legislative or other measures as may be necessary to take into consideration, under such terms as and for the purpose that it deems appropriate, any previous conviction in another State of an alleged offender for the purpose of using such information in criminal proceedings relating to an offence established in accordance with this Convention.

### Article 42.   Jurisdiction

1.   Each State Party shall adopt such measures as may be necessary to establish its jurisdiction over the offences established in accordance with this Convention when:

*(a)*  The offence is committed in the territory of that State Party; or

*(b)*  The offence is committed on board a vessel that is flying the flag of that State Party or an aircraft that is registered under the laws of that State Party at the time that the offence is committed.

2.   Subject to article 4 of this Convention, a State Party may also establish its jurisdiction over any such offence when:

*(a)*  The offence is committed against a national of that State Party; or

*(b)*  The offence is committed by a national of that State Party or a stateless person who has his or her habitual residence in its territory; or

*(c)*  The offence is one of those established in accordance with article 23, paragraph 1 *(b)* (ii), of this Convention and is committed outside its territory with a view to the commission of an offence established in accordance with article 23, paragraph 1 *(a)* (i) or (ii) or *(b)* (i), of this Convention within its territory; or

*(d)*  The offence is committed against the State Party.

3.   For the purposes of article 44 of this Convention, each State Party shall take such measures as may be necessary to establish its jurisdiction over the offences established in accordance with this Convention when the alleged offender is present in its territory and it does not extradite such person solely on the ground that he or she is one of its nationals.

4.   Each State Party may also take such measures as may be necessary to establish its jurisdiction over the offences established in accordance with this Convention when the alleged offender is present in its territory and it does not extradite him or her.

5.   If a State Party exercising its jurisdiction under paragraph 1 or 2 of this article has been notified, or has otherwise learned, that any other States Parties are conducting an investigation, prosecution or judicial proceeding in respect of the same conduct, the competent authorities of those States Parties shall, as appropriate, consult one another with a view to coordinating their actions.

6.   Without prejudice to norms of general international law, this Convention shall not exclude the exercise of any criminal jurisdiction established by a State Party in accordance with its domestic law.

29

## Chapter IV
## International cooperation

### *Article 43.   International cooperation*

1.     States Parties shall cooperate in criminal matters in accordance with articles 44 to 50 of this Convention. Where appropriate and consistent with their domestic legal system, States Parties shall consider assisting each other in investigations of and proceedings in civil and administrative matters relating to corruption.

2.     In matters of international cooperation, whenever dual criminality is considered a requirement, it shall be deemed fulfilled irrespective of whether the laws of the requested State Party place the offence within the same category of offence or denominate the offence by the same terminology as the requesting State Party, if the conduct underlying the offence for which assistance is sought is a criminal offence under the laws of both States Parties.

### *Article 44.   Extradition*

1.     This article shall apply to the offences established in accordance with this Convention where the person who is the subject of the request for extradition is present in the territory of the requested State Party, provided that the offence for which extradition is sought is punishable under the domestic law of both the requesting State Party and the requested State Party.

2.     Notwithstanding the provisions of paragraph 1 of this article, a State Party whose law so permits may grant the extradition of a person for any of the offences covered by this Convention that are not punishable under its own domestic law.

3.     If the request for extradition includes several separate offences, at least one of which is extraditable under this article and some of which are not extraditable by reason of their period of imprisonment but are related to offences established in accordance with this Convention, the requested State Party may apply this article also in respect of those offences.

4.     Each of the offences to which this article applies shall be deemed to be included as an extraditable offence in any extradition treaty existing between States Parties. States Parties undertake to include such offences as extraditable offences in every extradition treaty to be concluded between them. A State Party whose law so permits, in case it uses this Convention as the basis for extradition,

30

shall not consider any of the offences established in accordance with this Convention to be a political offence.

5.    If a State Party that makes extradition conditional on the existence of a treaty receives a request for extradition from another State Party with which it has no extradition treaty, it may consider this Convention the legal basis for extradition in respect of any offence to which this article applies.

6.    A State Party that makes extradition conditional on the existence of a treaty shall:

*(a)* At the time of deposit of its instrument of ratification, acceptance or approval of or accession to this Convention, inform the Secretary-General of the United Nations whether it will take this Convention as the legal basis for cooperation on extradition with other States Parties to this Convention; and

*(b)* If it does not take this Convention as the legal basis for cooperation on extradition, seek, where appropriate, to conclude treaties on extradition with other States Parties to this Convention in order to implement this article.

7.    States Parties that do not make extradition conditional on the existence of a treaty shall recognize offences to which this article applies as extraditable offences between themselves.

8.    Extradition shall be subject to the conditions provided for by the domestic law of the requested State Party or by applicable extradition treaties, including, inter alia, conditions in relation to the minimum penalty requirement for extradition and the grounds upon which the requested State Party may refuse extradition.

9.    States Parties shall, subject to their domestic law, endeavour to expedite extradition procedures and to simplify evidentiary requirements relating thereto in respect of any offence to which this article applies.

10.    Subject to the provisions of its domestic law and its extradition treaties, the requested State Party may, upon being satisfied that the circumstances so warrant and are urgent and at the request of the requesting State Party, take a person whose extradition is sought and who is present in its territory into custody or take other appropriate measures to ensure his or her presence at extradition proceedings.

11.    A State Party in whose territory an alleged offender is found, if it does not extradite such person in respect of an offence to which this article applies

31

solely on the ground that he or she is one of its nationals, shall, at the request of the State Party seeking extradition, be obliged to submit the case without undue delay to its competent authorities for the purpose of prosecution. Those authorities shall take their decision and conduct their proceedings in the same manner as in the case of any other offence of a grave nature under the domestic law of that State Party. The States Parties concerned shall cooperate with each other, in particular on procedural and evidentiary aspects, to ensure the efficiency of such prosecution.

12.   Whenever a State Party is permitted under its domestic law to extradite or otherwise surrender one of its nationals only upon the condition that the person will be returned to that State Party to serve the sentence imposed as a result of the trial or proceedings for which the extradition or surrender of the person was sought and that State Party and the State Party seeking the extradition of the person agree with this option and other terms that they may deem appropriate, such conditional extradition or surrender shall be sufficient to discharge the obligation set forth in paragraph 11 of this article.

13.   If extradition, sought for purposes of enforcing a sentence, is refused because the person sought is a national of the requested State Party, the requested State Party shall, if its domestic law so permits and in conformity with the requirements of such law, upon application of the requesting State Party, consider the enforcement of the sentence imposed under the domestic law of the requesting State Party or the remainder thereof.

14.   Any person regarding whom proceedings are being carried out in connection with any of the offences to which this article applies shall be guaranteed fair treatment at all stages of the proceedings, including enjoyment of all the rights and guarantees provided by the domestic law of the State Party in the territory of which that person is present.

15.   Nothing in this Convention shall be interpreted as imposing an obligation to extradite if the requested State Party has substantial grounds for believing that the request has been made for the purpose of prosecuting or punishing a person on account of that person's sex, race, religion, nationality, ethnic origin or political opinions or that compliance with the request would cause prejudice to that person's position for any one of these reasons.

16.   States Parties may not refuse a request for extradition on the sole ground that the offence is also considered to involve fiscal matters.

17.   Before refusing extradition, the requested State Party shall, where appropriate, consult with the requesting State Party to provide it with ample

32

opportunity to present its opinions and to provide information relevant to its allegation.

18. States Parties shall seek to conclude bilateral and multilateral agreements or arrangements to carry out or to enhance the effectiveness of extradition.

### Article 45.   Transfer of sentenced persons

States Parties may consider entering into bilateral or multilateral agreements or arrangements on the transfer to their territory of persons sentenced to imprisonment or other forms of deprivation of liberty for offences established in accordance with this Convention in order that they may complete their sentences there.

### Article 46.   Mutual legal assistance

1.   States Parties shall afford one another the widest measure of mutual legal assistance in investigations, prosecutions and judicial proceedings in relation to the offences covered by this Convention.

2.   Mutual legal assistance shall be afforded to the fullest extent possible under relevant laws, treaties, agreements and arrangements of the requested State Party with respect to investigations, prosecutions and judicial proceedings in relation to the offences for which a legal person may be held liable in accordance with article 26 of this Convention in the requesting State Party.

3.   Mutual legal assistance to be afforded in accordance with this article may be requested for any of the following purposes:

*(a)* Taking evidence or statements from persons;

*(b)* Effecting service of judicial documents;

*(c)* Executing searches and seizures, and freezing;

*(d)* Examining objects and sites;

*(e)* Providing information, evidentiary items and expert evaluations;

*(f)* Providing originals or certified copies of relevant documents and records, including government, bank, financial, corporate or business records;

*(g)* Identifying or tracing proceeds of crime, property, instrumentalities or other things for evidentiary purposes;

*(h)* Facilitating the voluntary appearance of persons in the requesting State Party;

*(i)*   Any other type of assistance that is not contrary to the domestic law of the requested State Party;

*(j)*   Identifying, freezing and tracing proceeds of crime in accordance with the provisions of chapter V of this Convention;

*(k)*   The recovery of assets, in accordance with the provisions of chapter V of this Convention.

4.   Without prejudice to domestic law, the competent authorities of a State Party may, without prior request, transmit information relating to criminal matters to a competent authority in another State Party where they believe that such information could assist the authority in undertaking or successfully concluding inquiries and criminal proceedings or could result in a request formulated by the latter State Party pursuant to this Convention.

5.   The transmission of information pursuant to paragraph 4 of this article shall be without prejudice to inquiries and criminal proceedings in the State of the competent authorities providing the information. The competent authorities receiving the information shall comply with a request that said information remain confidential, even temporarily, or with restrictions on its use. However, this shall not prevent the receiving State Party from disclosing in its proceedings information that is exculpatory to an accused person. In such a case, the receiving State Party shall notify the transmitting State Party prior to the disclosure and, if so requested, consult with the transmitting State Party. If, in an exceptional case, advance notice is not possible, the receiving State Party shall inform the transmitting State Party of the disclosure without delay.

6.   The provisions of this article shall not affect the obligations under any other treaty, bilateral or multilateral, that governs or will govern, in whole or in part, mutual legal assistance.

7.   Paragraphs 9 to 29 of this article shall apply to requests made pursuant to this article if the States Parties in question are not bound by a treaty of mutual legal assistance. If those States Parties are bound by such a treaty, the corresponding provisions of that treaty shall apply unless the States Parties agree to apply paragraphs 9 to 29 of this article in lieu thereof. States Parties are strongly encouraged to apply those paragraphs if they facilitate cooperation.

8.   States Parties shall not decline to render mutual legal assistance pursuant to this article on the ground of bank secrecy.

9.   *(a)*   A requested State Party, in responding to a request for assistance pursuant to this article in the absence of dual criminality, shall take into account the purposes of this Convention, as set forth in article 1;

*(b)* States Parties may decline to render assistance pursuant to this article on the ground of absence of dual criminality. However, a requested State Party shall, where consistent with the basic concepts of its legal system, render assistance that does not involve coercive action. Such assistance may be refused when requests involve matters of a *de minimis* nature or matters for which the cooperation or assistance sought is available under other provisions of this Convention;

*(c)* Each State Party may consider adopting such measures as may be necessary to enable it to provide a wider scope of assistance pursuant to this article in the absence of dual criminality.

10.   A person who is being detained or is serving a sentence in the territory of one State Party whose presence in another State Party is requested for purposes of identification, testimony or otherwise providing assistance in obtaining evidence for investigations, prosecutions or judicial proceedings in relation to offences covered by this Convention may be transferred if the following conditions are met:

*(a)* The person freely gives his or her informed consent;

*(b)* The competent authorities of both States Parties agree, subject to such conditions as those States Parties may deem appropriate.

11.   For the purposes of paragraph 10 of this article:

*(a)* The State Party to which the person is transferred shall have the authority and obligation to keep the person transferred in custody, unless otherwise requested or authorized by the State Party from which the person was transferred;

*(b)* The State Party to which the person is transferred shall without delay implement its obligation to return the person to the custody of the State Party from which the person was transferred as agreed beforehand, or as otherwise agreed, by the competent authorities of both States Parties;

*(c)* The State Party to which the person is transferred shall not require the State Party from which the person was transferred to initiate extradition proceedings for the return of the person;

*(d)* The person transferred shall receive credit for service of the sentence being served in the State from which he or she was transferred for time spent in the custody of the State Party to which he or she was transferred.

12.   Unless the State Party from which a person is to be transferred in accordance with paragraphs 10 and 11 of this article so agrees, that person, whatever his or her nationality, shall not be prosecuted, detained, punished or subjected to any other restriction of his or her personal liberty in the territory

35

of the State to which that person is transferred in respect of acts, omissions or convictions prior to his or her departure from the territory of the State from which he or she was transferred.

13. Each State Party shall designate a central authority that shall have the responsibility and power to receive requests for mutual legal assistance and either to execute them or to transmit them to the competent authorities for execution. Where a State Party has a special region or territory with a separate system of mutual legal assistance, it may designate a distinct central authority that shall have the same function for that region or territory. Central authorities shall ensure the speedy and proper execution or transmission of the requests received. Where the central authority transmits the request to a competent authority for execution, it shall encourage the speedy and proper execution of the request by the competent authority. The Secretary-General of the United Nations shall be notified of the central authority designated for this purpose at the time each State Party deposits its instrument of ratification, acceptance or approval of or accession to this Convention. Requests for mutual legal assistance and any communication related thereto shall be transmitted to the central authorities designated by the States Parties. This requirement shall be without prejudice to the right of a State Party to require that such requests and communications be addressed to it through diplomatic channels and, in urgent circumstances, where the States Parties agree, through the International Criminal Police Organization, if possible.

14. Requests shall be made in writing or, where possible, by any means capable of producing a written record, in a language acceptable to the requested State Party, under conditions allowing that State Party to establish authenticity. The Secretary-General of the United Nations shall be notified of the language or languages acceptable to each State Party at the time it deposits its instrument of ratification, acceptance or approval of or accession to this Convention. In urgent circumstances and where agreed by the States Parties, requests may be made orally but shall be confirmed in writing forthwith.

15. A request for mutual legal assistance shall contain:

*(a)* The identity of the authority making the request;

*(b)* The subject matter and nature of the investigation, prosecution or judicial proceeding to which the request relates and the name and functions of the authority conducting the investigation, prosecution or judicial proceeding;

*(c)* A summary of the relevant facts, except in relation to requests for the purpose of service of judicial documents;

*(d)* A description of the assistance sought and details of any particular procedure that the requesting State Party wishes to be followed;

36

*(e)*   Where possible, the identity, location and nationality of any person concerned; and

*(f)*   The purpose for which the evidence, information or action is sought.

16.   The requested State Party may request additional information when it appears necessary for the execution of the request in accordance with its domestic law or when it can facilitate such execution.

17.   A request shall be executed in accordance with the domestic law of the requested State Party and, to the extent not contrary to the domestic law of the requested State Party and where possible, in accordance with the procedures specified in the request.

18.   Wherever possible and consistent with fundamental principles of domestic law, when an individual is in the territory of a State Party and has to be heard as a witness or expert by the judicial authorities of another State Party, the first State Party may, at the request of the other, permit the hearing to take place by video conference if it is not possible or desirable for the individual in question to appear in person in the territory of the requesting State Party. States Parties may agree that the hearing shall be conducted by a judicial authority of the requesting State Party and attended by a judicial authority of the requested State Party.

19.   The requesting State Party shall not transmit or use information or evidence furnished by the requested State Party for investigations, prosecutions or judicial proceedings other than those stated in the request without the prior consent of the requested State Party. Nothing in this paragraph shall prevent the requesting State Party from disclosing in its proceedings information or evidence that is exculpatory to an accused person. In the latter case, the requesting State Party shall notify the requested State Party prior to the disclosure and, if so requested, consult with the requested State Party. If, in an exceptional case, advance notice is not possible, the requesting State Party shall inform the requested State Party of the disclosure without delay.

20.   The requesting State Party may require that the requested State Party keep confidential the fact and substance of the request, except to the extent necessary to execute the request. If the requested State Party cannot comply with the requirement of confidentiality, it shall promptly inform the requesting State Party.

21.   Mutual legal assistance may be refused:

*(a)*   If the request is not made in conformity with the provisions of this article;

37

*(b)* If the requested State Party considers that execution of the request is likely to prejudice its sovereignty, security, *ordre public* or other essential interests;

*(c)* If the authorities of the requested State Party would be prohibited by its domestic law from carrying out the action requested with regard to any similar offence, had it been subject to investigation, prosecution or judicial proceedings under their own jurisdiction;

*(d)* If it would be contrary to the legal system of the requested State Party relating to mutual legal assistance for the request to be granted.

22.  States Parties may not refuse a request for mutual legal assistance on the sole ground that the offence is also considered to involve fiscal matters.

23.  Reasons shall be given for any refusal of mutual legal assistance.

24.  The requested State Party shall execute the request for mutual legal assistance as soon as possible and shall take as full account as possible of any deadlines suggested by the requesting State Party and for which reasons are given, preferably in the request. The requesting State Party may make reasonable requests for information on the status and progress of measures taken by the requested State Party to satisfy its request. The requested State Party shall respond to reasonable requests by the requesting State Party on the status, and progress in its handling, of the request. The requesting State Party shall promptly inform the requested State Party when the assistance sought is no longer required.

25.  Mutual legal assistance may be postponed by the requested State Party on the ground that it interferes with an ongoing investigation, prosecution or judicial proceeding.

26.  Before refusing a request pursuant to paragraph 21 of this article or postponing its execution pursuant to paragraph 25 of this article, the requested State Party shall consult with the requesting State Party to consider whether assistance may be granted subject to such terms and conditions as it deems necessary. If the requesting State Party accepts assistance subject to those conditions, it shall comply with the conditions.

27.  Without prejudice to the application of paragraph 12 of this article, a witness, expert or other person who, at the request of the requesting State Party, consents to give evidence in a proceeding or to assist in an investigation, prosecution or judicial proceeding in the territory of the requesting State Party shall not be prosecuted, detained, punished or subjected to any other restriction of his or her personal liberty in that territory in respect of acts, omissions or

38

convictions prior to his or her departure from the territory of the requested State Party. Such safe conduct shall cease when the witness, expert or other person having had, for a period of fifteen consecutive days or for any period agreed upon by the States Parties from the date on which he or she has been officially informed that his or her presence is no longer required by the judicial authorities, an opportunity of leaving, has nevertheless remained voluntarily in the territory of the requesting State Party or, having left it, has returned of his or her own free will.

28.   The ordinary costs of executing a request shall be borne by the requested State Party, unless otherwise agreed by the States Parties concerned. If expenses of a substantial or extraordinary nature are or will be required to fulfil the request, the States Parties shall consult to determine the terms and conditions under which the request will be executed, as well as the manner in which the costs shall be borne.

29.   The requested State Party:

*(a)*   Shall provide to the requesting State Party copies of government records, documents or information in its possession that under its domestic law are available to the general public;

*(b)*   May, at its discretion, provide to the requesting State Party in whole, in part or subject to such conditions as it deems appropriate, copies of any government records, documents or information in its possession that under its domestic law are not available to the general public.

30.   States Parties shall consider, as may be necessary, the possibility of concluding bilateral or multilateral agreements or arrangements that would serve the purposes of, give practical effect to or enhance the provisions of this article.

## *Article 47.   Transfer of criminal proceedings*

States Parties shall consider the possibility of transferring to one another proceedings for the prosecution of an offence established in accordance with this Convention in cases where such transfer is considered to be in the interests of the proper administration of justice, in particular in cases where several jurisdictions are involved, with a view to concentrating the prosecution.

## *Article 48.   Law enforcement cooperation*

1.   States Parties shall cooperate closely with one another, consistent with their respective domestic legal and administrative systems, to enhance the

39

effectiveness of law enforcement action to combat the offences covered by this Convention. States Parties shall, in particular, take effective measures:

*(a)* To enhance and, where necessary, to establish channels of communication between their competent authorities, agencies and services in order to facilitate the secure and rapid exchange of information concerning all aspects of the offences covered by this Convention, including, if the States Parties concerned deem it appropriate, links with other criminal activities;

*(b)* To cooperate with other States Parties in conducting inquiries with respect to offences covered by this Convention concerning:

(i) The identity, whereabouts and activities of persons suspected of involvement in such offences or the location of other persons concerned;

(ii) The movement of proceeds of crime or property derived from the commission of such offences;

(iii) The movement of property, equipment or other instrumentalities used or intended for use in the commission of such offences;

*(c)* To provide, where appropriate, necessary items or quantities of substances for analytical or investigative purposes;

*(d)* To exchange, where appropriate, information with other States Parties concerning specific means and methods used to commit offences covered by this Convention, including the use of false identities, forged, altered or false documents and other means of concealing activities;

*(e)* To facilitate effective coordination between their competent authorities, agencies and services and to promote the exchange of personnel and other experts, including, subject to bilateral agreements or arrangements between the States Parties concerned, the posting of liaison officers;

*(f)* To exchange information and coordinate administrative and other measures taken as appropriate for the purpose of early identification of the offences covered by this Convention.

2. With a view to giving effect to this Convention, States Parties shall consider entering into bilateral or multilateral agreements or arrangements on direct cooperation between their law enforcement agencies and, where such agreements or arrangements already exist, amending them. In the absence of such agreements or arrangements between the States Parties concerned, the States Parties may consider this Convention to be the basis for mutual law enforcement cooperation in respect of the offences covered by this Convention. Whenever appropriate, States Parties shall make full use of agreements or arrangements, including international or regional organizations, to enhance the cooperation between their law enforcement agencies.

Appendix 004913

3.    States Parties shall endeavour to cooperate within their means to respond to offences covered by this Convention committed through the use of modern technology.

### Article 49.   Joint investigations

States Parties shall consider concluding bilateral or multilateral agreements or arrangements whereby, in relation to matters that are the subject of investigations, prosecutions or judicial proceedings in one or more States, the competent authorities concerned may establish joint investigative bodies. In the absence of such agreements or arrangements, joint investigations may be undertaken by agreement on a case-by-case basis. The States Parties involved shall ensure that the sovereignty of the State Party in whose territory such investigation is to take place is fully respected.

### Article 50.   Special investigative techniques

1.    In order to combat corruption effectively, each State Party shall, to the extent permitted by the basic principles of its domestic legal system and in accordance with the conditions prescribed by its domestic law, take such measures as may be necessary, within its means, to allow for the appropriate use by its competent authorities of controlled delivery and, where it deems appropriate, other special investigative techniques, such as electronic or other forms of surveillance and undercover operations, within its territory, and to allow for the admissibility in court of evidence derived therefrom.

2.    For the purpose of investigating the offences covered by this Convention, States Parties are encouraged to conclude, when necessary, appropriate bilateral or multilateral agreements or arrangements for using such special investigative techniques in the context of cooperation at the international level. Such agreements or arrangements shall be concluded and implemented in full compliance with the principle of sovereign equality of States and shall be carried out strictly in accordance with the terms of those agreements or arrangements.

3.    In the absence of an agreement or arrangement as set forth in paragraph 2 of this article, decisions to use such special investigative techniques at the international level shall be made on a case-by-case basis and may, when necessary, take into consideration financial arrangements and understandings with respect to the exercise of jurisdiction by the States Parties concerned.

4.    Decisions to use controlled delivery at the international level may, with the consent of the States Parties concerned, include methods such as intercepting and allowing the goods or funds to continue intact or be removed or replaced in whole or in part.

41

# Chapter V
# Asset recovery

## *Article 51.   General provision*

The return of assets pursuant to this chapter is a fundamental principle of this Convention, and States Parties shall afford one another the widest measure of cooperation and assistance in this regard.

## *Article 52.   Prevention and detection of transfers of proceeds of crime*

1.   Without prejudice to article 14 of this Convention, each State Party shall take such measures as may be necessary, in accordance with its domestic law, to require financial institutions within its jurisdiction to verify the identity of customers, to take reasonable steps to determine the identity of beneficial owners of funds deposited into high-value accounts and to conduct enhanced scrutiny of accounts sought or maintained by or on behalf of individuals who are, or have been, entrusted with prominent public functions and their family members and close associates. Such enhanced scrutiny shall be reasonably designed to detect suspicious transactions for the purpose of reporting to competent authorities and should not be so construed as to discourage or prohibit financial institutions from doing business with any legitimate customer.

2.   In order to facilitate implementation of the measures provided for in paragraph 1 of this article, each State Party, in accordance with its domestic law and inspired by relevant initiatives of regional, interregional and multilateral organizations against money-laundering, shall:

*(a)*   Issue advisories regarding the types of natural or legal person to whose accounts financial institutions within its jurisdiction will be expected to apply enhanced scrutiny, the types of accounts and transactions to which to pay particular attention and appropriate account-opening, maintenance and record-keeping measures to take concerning such accounts; and

*(b)*   Where appropriate, notify financial institutions within its jurisdiction, at the request of another State Party or on its own initiative, of the identity of particular natural or legal persons to whose accounts such institutions will be expected to apply enhanced scrutiny, in addition to those whom the financial institutions may otherwise identify.

3.   In the context of paragraph 2 *(a)* of this article, each State Party shall implement measures to ensure that its financial institutions maintain adequate

42

records, over an appropriate period of time, of accounts and transactions involving the persons mentioned in paragraph 1 of this article, which should, as a minimum, contain information relating to the identity of the customer as well as, as far as possible, of the beneficial owner.

4.    With the aim of preventing and detecting transfers of proceeds of offences established in accordance with this Convention, each State Party shall implement appropriate and effective measures to prevent, with the help of its regulatory and oversight bodies, the establishment of banks that have no physical presence and that are not affiliated with a regulated financial group. Moreover, States Parties may consider requiring their financial institutions to refuse to enter into or continue a correspondent banking relationship with such institutions and to guard against establishing relations with foreign financial institutions that permit their accounts to be used by banks that have no physical presence and that are not affiliated with a regulated financial group.

5.    Each State Party shall consider establishing, in accordance with its domestic law, effective financial disclosure systems for appropriate public officials and shall provide for appropriate sanctions for non-compliance. Each State Party shall also consider taking such measures as may be necessary to permit its competent authorities to share that information with the competent authorities in other States Parties when necessary to investigate, claim and recover proceeds of offences established in accordance with this Convention.

6.    Each State Party shall consider taking such measures as may be necessary, in accordance with its domestic law, to require appropriate public officials having an interest in or signature or other authority over a financial account in a foreign country to report that relationship to appropriate authorities and to maintain appropriate records related to such accounts. Such measures shall also provide for appropriate sanctions for non-compliance.

### Article 53.   Measures for direct recovery of property

Each State Party shall, in accordance with its domestic law:

*(a)*   Take such measures as may be necessary to permit another State Party to initiate civil action in its courts to establish title to or ownership of property acquired through the commission of an offence established in accordance with this Convention;

*(b)*   Take such measures as may be necessary to permit its courts to order those who have committed offences established in accordance with this Convention to pay compensation or damages to another State Party that has been harmed by such offences; and

*(c)* Take such measures as may be necessary to permit its courts or competent authorities, when having to decide on confiscation, to recognize another State Party's claim as a legitimate owner of property acquired through the commission of an offence established in accordance with this Convention.

### Article 54.   Mechanisms for recovery of property through international cooperation in confiscation

1.   Each State Party, in order to provide mutual legal assistance pursuant to article 55 of this Convention with respect to property acquired through or involved in the commission of an offence established in accordance with this Convention, shall, in accordance with its domestic law:

*(a)* Take such measures as may be necessary to permit its competent authorities to give effect to an order of confiscation issued by a court of another State Party;

*(b)* Take such measures as may be necessary to permit its competent authorities, where they have jurisdiction, to order the confiscation of such property of foreign origin by adjudication of an offence of money-laundering or such other offence as may be within its jurisdiction or by other procedures authorized under its domestic law; and

*(c)* Consider taking such measures as may be necessary to allow confiscation of such property without a criminal conviction in cases in which the offender cannot be prosecuted by reason of death, flight or absence or in other appropriate cases.

2.   Each State Party, in order to provide mutual legal assistance upon a request made pursuant to paragraph 2 of article 55 of this Convention, shall, in accordance with its domestic law:

*(a)* Take such measures as may be necessary to permit its competent authorities to freeze or seize property upon a freezing or seizure order issued by a court or competent authority of a requesting State Party that provides a reasonable basis for the requested State Party to believe that there are sufficient grounds for taking such actions and that the property would eventually be subject to an order of confiscation for purposes of paragraph 1 *(a)* of this article;

*(b)* Take such measures as may be necessary to permit its competent authorities to freeze or seize property upon a request that provides a reasonable basis for the requested State Party to believe that there are sufficient grounds for taking such actions and that the property would eventually be subject to an order of confiscation for purposes of paragraph 1 *(a)* of this article; and

(c)   Consider taking additional measures to permit its competent authorities to preserve property for confiscation, such as on the basis of a foreign arrest or criminal charge related to the acquisition of such property.

## Article 55.   International cooperation for purposes of confiscation

1.   A State Party that has received a request from another State Party having jurisdiction over an offence established in accordance with this Convention for confiscation of proceeds of crime, property, equipment or other instrumentalities referred to in article 31, paragraph 1, of this Convention situated in its territory shall, to the greatest extent possible within its domestic legal system:

(a)   Submit the request to its competent authorities for the purpose of obtaining an order of confiscation and, if such an order is granted, give effect to it; or

(b)   Submit to its competent authorities, with a view to giving effect to it to the extent requested, an order of confiscation issued by a court in the territory of the requesting State Party in accordance with articles 31, paragraph 1, and 54, paragraph 1 (a), of this Convention insofar as it relates to proceeds of crime, property, equipment or other instrumentalities referred to in article 31, paragraph 1, situated in the territory of the requested State Party.

2.   Following a request made by another State Party having jurisdiction over an offence established in accordance with this Convention, the requested State Party shall take measures to identify, trace and freeze or seize proceeds of crime, property, equipment or other instrumentalities referred to in article 31, paragraph 1, of this Convention for the purpose of eventual confiscation to be ordered either by the requesting State Party or, pursuant to a request under paragraph 1 of this article, by the requested State Party.

3.   The provisions of article 46 of this Convention are applicable, mutatis mutandis, to this article. In addition to the information specified in article 46, paragraph 15, requests made pursuant to this article shall contain:

(a)   In the case of a request pertaining to paragraph 1 (a) of this article, a description of the property to be confiscated, including, to the extent possible, the location and, where relevant, the estimated value of the property and a statement of the facts relied upon by the requesting State Party sufficient to enable the requested State Party to seek the order under its domestic law;

(b)   In the case of a request pertaining to paragraph 1 (b) of this article, a legally admissible copy of an order of confiscation upon which the request is

45

based issued by the requesting State Party, a statement of the facts and infor-
mation as to the extent to which execution of the order is requested, a statement
specifying the measures taken by the requesting State Party to provide adequate
notification to bona fide third parties and to ensure due process and a statement
that the confiscation order is final;

(c)   In the case of a request pertaining to paragraph 2 of this article, a
statement of the facts relied upon by the requesting State Party and a descrip-
tion of the actions requested and, where available, a legally admissible copy of
an order on which the request is based.

4.    The decisions or actions provided for in paragraphs 1 and 2 of this
article shall be taken by the requested State Party in accordance with and subject
to the provisions of its domestic law and its procedural rules or any bilateral or
multilateral agreement or arrangement to which it may be bound in relation to
the requesting State Party.

5.    Each State Party shall furnish copies of its laws and regulations that
give effect to this article and of any subsequent changes to such laws and
regulations or a description thereof to the Secretary-General of the United
Nations.

6.    If a State Party elects to make the taking of the measures referred to
in paragraphs 1 and 2 of this article conditional on the existence of a relevant
treaty, that State Party shall consider this Convention the necessary and suffi-
cient treaty basis.

7.    Cooperation under this article may also be refused or provisional
measures lifted if the requested State Party does not receive sufficient and timely
evidence or if the property is of a *de minimis* value.

8.    Before lifting any provisional measure taken pursuant to this article,
the requested State Party shall, wherever possible, give the requesting State Party
an opportunity to present its reasons in favour of continuing the measure.

9.    The provisions of this article shall not be construed as prejudicing the
rights of bona fide third parties.

### Article 56.   Special cooperation

Without prejudice to its domestic law, each State Party shall endeavour to
take measures to permit it to forward, without prejudice to its own investiga-
tions, prosecutions or judicial proceedings, information on proceeds of offences

established in accordance with this Convention to another State Party without prior request, when it considers that the disclosure of such information might assist the receiving State Party in initiating or carrying out investigations, prosecutions or judicial proceedings or might lead to a request by that State Party under this chapter of the Convention.

### Article 57.   Return and disposal of assets

1.     Property confiscated by a State Party pursuant to article 31 or 55 of this Convention shall be disposed of, including by return to its prior legitimate owners, pursuant to paragraph 3 of this article, by that State Party in accordance with the provisions of this Convention and its domestic law.

2.     Each State Party shall adopt such legislative and other measures, in accordance with the fundamental principles of its domestic law, as may be necessary to enable its competent authorities to return confiscated property, when acting on the request made by another State Party, in accordance with this Convention, taking into account the rights of bona fide third parties.

3.     In accordance with articles 46 and 55 of this Convention and paragraphs 1 and 2 of this article, the requested State Party shall:

*(a)*  In the case of embezzlement of public funds or of laundering of embezzled public funds as referred to in articles 17 and 23 of this Convention, when confiscation was executed in accordance with article 55 and on the basis of a final judgement in the requesting State Party, a requirement that can be waived by the requested State Party, return the confiscated property to the requesting State Party;

*(b)*  In the case of proceeds of any other offence covered by this Convention, when the confiscation was executed in accordance with article 55 of this Convention and on the basis of a final judgement in the requesting State Party, a requirement that can be waived by the requested State Party, return the confiscated property to the requesting State Party, when the requesting State Party reasonably establishes its prior ownership of such confiscated property to the requested State Party or when the requested State Party recognizes damage to the requesting State Party as a basis for returning the confiscated property;

*(c)*  In all other cases, give priority consideration to returning confiscated property to the requesting State Party, returning such property to its prior legitimate owners or compensating the victims of the crime.

4.     Where appropriate, unless States Parties decide otherwise, the requested State Party may deduct reasonable expenses incurred in investigations,

47

prosecutions or judicial proceedings leading to the return or disposition of confiscated property pursuant to this article.

5.    Where appropriate, States Parties may also give special consideration to concluding agreements or mutually acceptable arrangements, on a case-by-case basis, for the final disposal of confiscated property.

### Article 58.    Financial intelligence unit

States Parties shall cooperate with one another for the purpose of preventing and combating the transfer of proceeds of offences established in accordance with this Convention and of promoting ways and means of recovering such proceeds and, to that end, shall consider establishing a financial intelligence unit to be responsible for receiving, analysing and disseminating to the competent authorities reports of suspicious financial transactions.

### Article 59.    Bilateral and multilateral agreements and arrangements

States Parties shall consider concluding bilateral or multilateral agreements or arrangements to enhance the effectiveness of international cooperation undertaken pursuant to this chapter of the Convention.

## Chapter VI
## Technical assistance and information exchange

### Article 60. Training and technical assistance

1.    Each State Party shall, to the extent necessary, initiate, develop or improve specific training programmes for its personnel responsible for preventing and combating corruption. Such training programmes could deal, inter alia, with the following areas:

(a)  Effective measures to prevent, detect, investigate, punish and control corruption, including the use of evidence-gathering and investigative methods;

(b)  Building capacity in the development and planning of strategic anti-corruption policy;

(c)  Training competent authorities in the preparation of requests for mutual legal assistance that meet the requirements of this Convention;

48

*(d)* Evaluation and strengthening of institutions, public service management and the management of public finances, including public procurement, and the private sector;

*(e)* Preventing and combating the transfer of proceeds of offences established in accordance with this Convention and recovering such proceeds;

*(f)* Detecting and freezing of the transfer of proceeds of offences established in accordance with this Convention;

*(g)* Surveillance of the movement of proceeds of offences established in accordance with this Convention and of the methods used to transfer, conceal or disguise such proceeds;

*(h)* Appropriate and efficient legal and administrative mechanisms and methods for facilitating the return of proceeds of offences established in accordance with this Convention;

*(i)* Methods used in protecting victims and witnesses who cooperate with judicial authorities; and

*(j)* Training in national and international regulations and in languages.

2.    States Parties shall, according to their capacity, consider affording one another the widest measure of technical assistance, especially for the benefit of developing countries, in their respective plans and programmes to combat corruption, including material support and training in the areas referred to in paragraph 1 of this article, and training and assistance and the mutual exchange of relevant experience and specialized knowledge, which will facilitate international cooperation between States Parties in the areas of extradition and mutual legal assistance.

3.    States Parties shall strengthen, to the extent necessary, efforts to maximize operational and training activities in international and regional organizations and in the framework of relevant bilateral and multilateral agreements or arrangements.

4.    States Parties shall consider assisting one another, upon request, in conducting evaluations, studies and research relating to the types, causes, effects and costs of corruption in their respective countries, with a view to developing, with the participation of competent authorities and society, strategies and action plans to combat corruption.

5.    In order to facilitate the recovery of proceeds of offences established in accordance with this Convention, States Parties may cooperate in providing each other with the names of experts who could assist in achieving that objective.

49

6.    States Parties shall consider using subregional, regional and international conferences and seminars to promote cooperation and technical assistance and to stimulate discussion on problems of mutual concern, including the special problems and needs of developing countries and countries with economies in transition.

7.    States Parties shall consider establishing voluntary mechanisms with a view to contributing financially to the efforts of developing countries and countries with economies in transition to apply this Convention through technical assistance programmes and projects.

8.    Each State Party shall consider making voluntary contributions to the United Nations Office on Drugs and Crime for the purpose of fostering, through the Office, programmes and projects in developing countries with a view to implementing this Convention.

### Article 61.   Collection, exchange and analysis of information on corruption

1.    Each State Party shall consider analysing, in consultation with experts, trends in corruption in its territory, as well as the circumstances in which corruption offences are committed.

2.    States Parties shall consider developing and sharing with each other and through international and regional organizations statistics, analytical expertise concerning corruption and information with a view to developing, insofar as possible, common definitions, standards and methodologies, as well as information on best practices to prevent and combat corruption.

3.    Each State Party shall consider monitoring its policies and actual measures to combat corruption and making assessments of their effectiveness and efficiency.

### Article 62.   Other measures: implementation of the Convention through economic development and technical assistance

1.    States Parties shall take measures conducive to the optimal implementation of this Convention to the extent possible, through international cooperation, taking into account the negative effects of corruption on society in general, in particular on sustainable development.

50

2.    States Parties shall make concrete efforts to the extent possible and in coordination with each other, as well as with international and regional organizations:

*(a)*  To enhance their cooperation at various levels with developing countries, with a view to strengthening the capacity of the latter to prevent and combat corruption;

*(b)*  To enhance financial and material assistance to support the efforts of developing countries to prevent and fight corruption effectively and to help them implement this Convention successfully;

*(c)*  To provide technical assistance to developing countries and countries with economies in transition to assist them in meeting their needs for the implementation of this Convention. To that end, States Parties shall endeavour to make adequate and regular voluntary contributions to an account specifically designated for that purpose in a United Nations funding mechanism. States Parties may also give special consideration, in accordance with their domestic law and the provisions of this Convention, to contributing to that account a percentage of the money or of the corresponding value of proceeds of crime or property confiscated in accordance with the provisions of this Convention;

*(d)*  To encourage and persuade other States and financial institutions as appropriate to join them in efforts in accordance with this article, in particular by providing more training programmes and modern equipment to developing countries in order to assist them in achieving the objectives of this Convention.

3.    To the extent possible, these measures shall be without prejudice to existing foreign assistance commitments or to other financial cooperation arrangements at the bilateral, regional or international level.

4.    States Parties may conclude bilateral or multilateral agreements or arrangements on material and logistical assistance, taking into consideration the financial arrangements necessary for the means of international cooperation provided for by this Convention to be effective and for the prevention, detection and control of corruption.


## Chapter VII
## Mechanisms for implementation

*Article 63.    Conference of the States Parties to the Convention*

1.    A Conference of the States Parties to the Convention is hereby established to improve the capacity of and cooperation between States Parties to achieve the objectives set forth in this Convention and to promote and review its implementation.

2.    The Secretary-General of the United Nations shall convene the Conference of the States Parties not later than one year following the entry into force of this Convention. Thereafter, regular meetings of the Conference of the States Parties shall be held in accordance with the rules of procedure adopted by the Conference.

3.    The Conference of the States Parties shall adopt rules of procedure and rules governing the functioning of the activities set forth in this article, including rules concerning the admission and participation of observers, and the payment of expenses incurred in carrying out those activities.

4.    The Conference of the States Parties shall agree upon activities, procedures and methods of work to achieve the objectives set forth in paragraph 1 of this article, including:

(a)  Facilitating activities by States Parties under articles 60 and 62 and chapters II to V of this Convention, including by encouraging the mobilization of voluntary contributions;

(b)  Facilitating the exchange of information among States Parties on patterns and trends in corruption and on successful practices for preventing and combating it and for the return of proceeds of crime, through, inter alia, the publication of relevant information as mentioned in this article;

(c)  Cooperating with relevant international and regional organizations and mechanisms and non-governmental organizations;

(d)  Making appropriate use of relevant information produced by other international and regional mechanisms for combating and preventing corruption in order to avoid unnecessary duplication of work;

(e)  Reviewing periodically the implementation of this Convention by its States Parties;

(f)  Making recommendations to improve this Convention and its implementation;

(g)  Taking note of the technical assistance requirements of States Parties with regard to the implementation of this Convention and recommending any action it may deem necessary in that respect.

5.    For the purpose of paragraph 4 of this article, the Conference of the States Parties shall acquire the necessary knowledge of the measures taken by States Parties in implementing this Convention and the difficulties encountered by them in doing so through information provided by them and through such supplemental review mechanisms as may be established by the Conference of the States Parties.

52

6.    Each State Party shall provide the Conference of the States Parties with information on its programmes, plans and practices, as well as on legislative and administrative measures to implement this Convention, as required by the Conference of the States Parties. The Conference of the States Parties shall examine the most effective way of receiving and acting upon information, including, inter alia, information received from States Parties and from competent international organizations. Inputs received from relevant non-governmental organizations duly accredited in accordance with procedures to be decided upon by the Conference of the States Parties may also be considered.

7.    Pursuant to paragraphs 4 to 6 of this article, the Conference of the States Parties shall establish, if it deems it necessary, any appropriate mechanism or body to assist in the effective implementation of the Convention.

### *Article 64.   Secretariat*

1.    The Secretary-General of the United Nations shall provide the necessary secretariat services to the Conference of the States Parties to the Convention.

2.    The secretariat shall:

*(a)*  Assist the Conference of the States Parties in carrying out the activities set forth in article 63 of this Convention and make arrangements and provide the necessary services for the sessions of the Conference of the States Parties;

*(b)*  Upon request, assist States Parties in providing information to the Conference of the States Parties as envisaged in article 63, paragraphs 5 and 6, of this Convention; and

*(c)*  Ensure the necessary coordination with the secretariats of relevant international and regional organizations.

## Chapter VIII
## Final provisions

### *Article 65.   Implementation of the Convention*

1.    Each State Party shall take the necessary measures, including legislative and administrative measures, in accordance with fundamental principles of its domestic law, to ensure the implementation of its obligations under this Convention.

2.    Each State Party may adopt more strict or severe measures than those provided for by this Convention for preventing and combating corruption.

## Article 66.   Settlement of disputes

1.    States Parties shall endeavour to settle disputes concerning the interpretation or application of this Convention through negotiation.

2.    Any dispute between two or more States Parties concerning the interpretation or application of this Convention that cannot be settled through negotiation within a reasonable time shall, at the request of one of those States Parties, be submitted to arbitration. If, six months after the date of the request for arbitration, those States Parties are unable to agree on the organization of the arbitration, any one of those States Parties may refer the dispute to the International Court of Justice by request in accordance with the Statute of the Court.

3.    Each State Party may, at the time of signature, ratification, acceptance or approval of or accession to this Convention, declare that it does not consider itself bound by paragraph 2 of this article. The other States Parties shall not be bound by paragraph 2 of this article with respect to any State Party that has made such a reservation.

4.    Any State Party that has made a reservation in accordance with paragraph 3 of this article may at any time withdraw that reservation by notification to the Secretary-General of the United Nations.

## Article 67.   Signature, ratification, acceptance, approval and accession

1.    This Convention shall be open to all States for signature from 9 to 11 December 2003 in Merida, Mexico, and thereafter at United Nations Headquarters in New York until 9 December 2005.

2.    This Convention shall also be open for signature by regional economic integration organizations provided that at least one member State of such organization has signed this Convention in accordance with paragraph 1 of this article.

3.    This Convention is subject to ratification, acceptance or approval. Instruments of ratification, acceptance or approval shall be deposited with the Secretary-General of the United Nations. A regional economic integration organization may deposit its instrument of ratification, acceptance or approval if at least one of its member States has done likewise. In that instrument of

54

ratification, acceptance or approval, such organization shall declare the extent of its competence with respect to the matters governed by this Convention. Such organization shall also inform the depositary of any relevant modification in the extent of its competence.

4.    This Convention is open for accession by any State or any regional economic integration organization of which at least one member State is a Party to this Convention. Instruments of accession shall be deposited with the Secretary-General of the United Nations. At the time of its accession, a regional economic integration organization shall declare the extent of its competence with respect to matters governed by this Convention. Such organization shall also inform the depositary of any relevant modification in the extent of its competence.

### Article 68.    Entry into force

1.    This Convention shall enter into force on the ninetieth day after the date of deposit of the thirtieth instrument of ratification, acceptance, approval or accession. For the purpose of this paragraph, any instrument deposited by a regional economic integration organization shall not be counted as additional to those deposited by member States of such organization.

2.    For each State or regional economic integration organization ratifying, accepting, approving or acceding to this Convention after the deposit of the thirtieth instrument of such action, this Convention shall enter into force on the thirtieth day after the date of deposit by such State or organization of the relevant instrument or on the date this Convention enters into force pursuant to paragraph 1 of this article, whichever is later.

### Article 69.    Amendment

1.    After the expiry of five years from the entry into force of this Convention, a State Party may propose an amendment and transmit it to the Secretary-General of the United Nations, who shall thereupon communicate the proposed amendment to the States Parties and to the Conference of the States Parties to the Convention for the purpose of considering and deciding on the proposal. The Conference of the States Parties shall make every effort to achieve consensus on each amendment. If all efforts at consensus have been exhausted and no agreement has been reached, the amendment shall, as a last resort, require for its adoption a two-thirds majority vote of the States Parties present and voting at the meeting of the Conference of the States Parties.

2.   Regional economic integration organizations, in matters within their competence, shall exercise their right to vote under this article with a number of votes equal to the number of their member States that are Parties to this Convention. Such organizations shall not exercise their right to vote if their member States exercise theirs and vice versa.

3.   An amendment adopted in accordance with paragraph 1 of this article is subject to ratification, acceptance or approval by States Parties.

4.   An amendment adopted in accordance with paragraph 1 of this article shall enter into force in respect of a State Party ninety days after the date of the deposit with the Secretary-General of the United Nations of an instrument of ratification, acceptance or approval of such amendment.

5.   When an amendment enters into force, it shall be binding on those States Parties which have expressed their consent to be bound by it. Other States Parties shall still be bound by the provisions of this Convention and any earlier amendments that they have ratified, accepted or approved.

### Article 70.   Denunciation

1.   A State Party may denounce this Convention by written notification to the Secretary-General of the United Nations. Such denunciation shall become effective one year after the date of receipt of the notification by the Secretary-General.

2.   A regional economic integration organization shall cease to be a Party to this Convention when all of its member States have denounced it.

### Article 71.   Depositary and languages

1.   The Secretary-General of the United Nations is designated depositary of this Convention.

2.   The original of this Convention, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations.

IN WITNESS WHEREOF, the undersigned plenipotentiaries, being duly authorized thereto by their respective Governments, have signed this Convention.

Appendix 004929

**Published with the financial support of the Government of Japan**

Appendix 004930


UNITED NATIONS
*Office on Drugs and Crime*

Vienna International Centre, PO Box 500, A 1400 Vienna, Austria
Tel: +(43) (1) 26060-0, Fax: +(43) (1) 26060-5866, www.unodc.org

Printed in Austria
V.04-56160—September 2004—2,000

Appendix 004931

# Exhibit 112

d on 09/27/18 in TXSD   Page 473 of 581

**UNITED NATIONS**
*Office on Drugs and Crime*

# UNITED NATIONS CONVENTION AGAINST TRANSNATIONAL ORGANIZED CRIME AND THE PROTOCOLS THERETO





**UNITED NATIONS**

Appendix 004933

Appendix 004934

UNITED NATIONS OFFICE ON DRUGS AND CRIME
Vienna

# UNITED NATIONS CONVENTION AGAINST TRANSNATIONAL ORGANIZED CRIME AND THE PROTOCOLS THERETO



UNITED NATIONS
New York, 2004

Appendix 004935

# Foreword

With the signing of the United Nations Convention against Transnational Organized Crime in Palermo, Italy, in December 2000, the international community demonstrated the political will to answer a global challenge with a global response. If crime crosses borders, so must law enforcement. If the rule of law is undermined not only in one country, but in many, then those who defend it cannot limit themselves to purely national means. If the enemies of progress and human rights seek to exploit the openness and opportunities of globalization for their purposes, then we must exploit those very same factors to defend human rights and defeat the forces of crime, corruption and trafficking in human beings.

One of the starkest contrasts in our world today is the gulf that exists between the civil and the uncivil. By "civil" I mean civilization: the accumulated centuries of learning that form our foundation for progress. By "civil" I also mean tolerance: the pluralism and respect with which we accept and draw strength from the world's diverse peoples. And finally, I mean civil society: the citizens' groups, businesses, unions, professors, journalists, political parties and others who have an essential role to play in the running of any society.

Arrayed against these constructive forces, however, in ever greater numbers and with ever stronger weapons, are the forces of what I call "uncivil society". They are terrorists, criminals, drug dealers, traffickers in people and others who undo the good works of civil society. They take advantage of the open borders, free markets and technological advances that bring so many benefits to the world's people. They thrive in countries with weak institutions, and they show no scruple about resorting to intimidation or violence. Their ruthlessness is the very antithesis of all we regard as civil. They are powerful, representing entrenched interests and the clout of a global enterprise worth billions of dollars, but they are not invincible.

The Millennium Declaration adopted by the Heads of State meeting at the United Nations in September 2000 reaffirmed the principles underlying our efforts and should serve to encourage all who struggle for the rule of law. The Declaration states that "men and women have the right to live their lives and raise their children in dignity, free from hunger and from the fear of violence, oppression or injustice".

At the Millennium Summit, world leaders proclaimed freedom—from fear and from want—as one of the essential values in the twenty-first century. Yet the right to live in dignity, free from fear and want, is still denied to millions

iii

of people around the world. It is denied to the child who is working as an indentured labourer in a sweatshop; to the father who must pay a bribe to get medical care for his son or daughter; to the woman who is condemned to a life of forced prostitution.

I believe the trafficking of persons, particularly women and children, for forced and exploitative labour, including for sexual exploitation, is one of the most egregious violations of human rights that the United Nations now confronts. It is widespread and growing. It is rooted in social and economic conditions in the countries from which the victims come, facilitated by practices that discriminate against women and driven by cruel indifference to human suffering on the part of those who exploit the services that the victims are forced to provide. The fate of these most vulnerable people in our world is an affront to human dignity and a challenge to every State, every people and every community. I therefore urge the Member States to ratify not only the United Nations Convention against Transnational Organized Crime, but also the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, which can make a real difference in the struggle to eliminate this reprehensible trade in human beings.

Criminal groups have wasted no time in embracing today's globalized economy and the sophisticated technology that goes with it. But our efforts to combat them have remained up to now very fragmented and our weapons almost obsolete. The Convention gives us a new tool to address the scourge of crime as a global problem. With enhanced international cooperation, we can have a real impact on the ability of international criminals to operate successfully and can help citizens everywhere in their often bitter struggle for safety and dignity in their homes and communities.

The signing of the Convention in Palermo in December 2000 was a watershed event in the reinforcement of our fight against organized crime. I urge all States to ratify the Convention and the Protocols thereto at the earliest possible date and to bring these instruments into force as a matter of urgency.

*Kofi A. Annan*
*Secretary-General*

Appendix 004938

# Contents

*Page*

General Assembly resolution 55/25 of 15 November 2000 . . . . . . . . . . . . . . . .    1

Annexes

    I.    United Nations Convention against Transnational Organized Crime .    5

   II.    Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime . . . . . . . . . . . . . .    41

  III.    Protocol against the Smuggling of Migrants by Land, Sea and Air, supplementing the United Nations Convention against Transnational Organized Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    53

General Assembly resolution 55/255 of 31 May 2001 . . . . . . . . . . . . . . . . . . . . .    69

    Annex.   Protocol against the Illicit Manufacturing of and Trafficking in Firearms, Their parts and Components and Ammunition, supplementing the United Nations Convention against Transnational Organized Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . .    71

Appendix 004939

## General Assembly resolution 55/25 of 15 November 2000

## United Nations Convention against Transnational Organized Crime

*The General Assembly*,

*Recalling* its resolution 53/111 of 9 December 1998, in which it decided to establish an open-ended intergovernmental ad hoc committee for the purpose of elaborating a comprehensive international convention against transnational organized crime and of discussing the elaboration, as appropriate, of international instruments addressing trafficking in women and children, combating the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition, and illegal trafficking in and transporting of migrants, including by sea,

*Recalling also* its resolution 54/126 of 17 December 1999, in which it requested the Ad Hoc Committee on the Elaboration of a Convention against Transnational Organized Crime to continue its work, in accordance with resolutions 53/111 and 53/114 of 9 December 1998, and to intensify that work in order to complete it in 2000,

*Recalling further* its resolution 54/129 of 17 December 1999, in which it accepted with appreciation the offer of the Government of Italy to host a high-level political signing conference in Palermo for the purpose of signing the United Nations Convention against Transnational Organized Crime (Palermo Convention) and the protocols thereto, and requested the Secretary-General to schedule the conference for a period of up to one week before the end of the Millennium Assembly in 2000,

*Expressing its appreciation* to the Government of Poland for submitting to it at its fifty-first session a first draft United Nations convention against transnational organized crime[1] and for hosting the meeting of the inter-sessional open-ended intergovernmental group of experts, established pursuant to resolution 52/85 of 12 December 1997, on the elaboration of a preliminary draft of

_____
[1]A/C.3/51/7, annex.

1

a possible comprehensive international convention against transnational organized crime, held in Warsaw from 2 to 6 February 1998,

*Expressing its appreciation* to the Government of Argentina for hosting the informal preparatory meeting of the Ad Hoc Committee, held in Buenos Aires from 31 August to 4 September 1998,

*Expressing its appreciation* to the Government of Thailand for hosting the Asia-Pacific Ministerial Seminar on Building Capacities for Fighting Transnational Organized Crime, held in Bangkok on 20 and 21 March 2000,

*Deeply concerned* by the negative economic and social implications related to organized criminal activities, and convinced of the urgent need to strengthen cooperation to prevent and combat such activities more effectively at the national, regional and international levels,

*Noting with deep concern* the growing links between transnational organized crime and terrorist crimes, taking into account the Charter of the United Nations and the relevant resolutions of the General Assembly,

*Determined* to deny safe havens to those who engage in transnational organized crime by prosecuting their crimes wherever they occur and by cooperating at the international level,

*Strongly convinced* that the United Nations Convention against Transnational Organized Crime will constitute an effective tool and the necessary legal framework for international cooperation in combating, inter alia, such criminal activities as money-laundering, corruption, illicit trafficking in endangered species of wild flora and fauna, offences against cultural heritage and the growing links between transnational organized crime and terrorist crimes,

1.    *Takes note* of the report of the Ad Hoc Committee on the Elaboration of a Convention against Transnational Organized Crime,[2] which carried out its work at the headquarters of the United Nations Office for Drug Control and Crime Prevention in Vienna, and commends the Ad Hoc Committee for its work;

2.    *Adopts* the United Nations Convention against Transnational Organized Crime and the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, and the Protocol against

---

[2]A/AC.254/34.

2

the Smuggling of Migrants by Land, Sea and Air, supplementing the United Nations Convention against Transnational Organized Crime annexed to the present resolution, and opens them for signature at the High-level Political Signing Conference to be held in Palermo, Italy, from 12 to 15 December 2000 in accordance with resolution 54/129;

3.   *Requests* the Secretary-General to prepare a comprehensive report on the High-level Political Signing Conference to be held in Palermo in accordance with resolution 54/129;

4.   *Notes* that the Ad Hoc Committee has not yet completed its work on the draft Protocol against the Illicit Manufacturing of and Trafficking in Firearms, Their Parts and Components and Ammunition, supplementing the United Nations Convention against Transnational Organized Crime;

5.   *Requests* the Ad Hoc Committee to continue its work in relation to this draft Protocol, in accordance with resolutions 53/111, 53/114 and 54/126, and to finalize such work as soon as possible;

6.   *Calls upon* all States to recognize the links between transnational organized criminal activities and acts of terrorism, taking into account the relevant General Assembly resolutions, and to apply the United Nations Convention against Transnational Organized Crime in combating all forms of criminal activity, as provided therein;

7.   *Recommends* that the Ad Hoc Committee established by the General Assembly in its resolution 51/210 of 17 December 1996, which is beginning its deliberations with a view to developing a comprehensive convention on international terrorism, pursuant to resolution 54/110 of 9 December 1999, should take into consideration the provisions of the United Nations Convention against Transnational Organized Crime;

8.   *Urges* all States and regional economic organizations to sign and ratify the United Nations Convention against Transnational Organized Crime and the protocols thereto as soon as possible in order to ensure the speedy entry into force of the Convention and the protocols thereto;

9.   *Decides* that, until the Conference of the Parties to the Convention established pursuant to the United Nations Convention against Transnational Organized Crime decides otherwise, the account referred to in article 30 of the Convention will be operated within the United Nations Crime Prevention and Criminal Justice Fund, and encourages Member States to begin making adequate voluntary contributions to the above-mentioned account for the

3

provision to developing countries and countries with economies in transition of the technical assistance that they might require for implementation of the Convention and the protocols thereto, including for the preparatory measures needed for that implementation;

10.   *Decides also* that the Ad Hoc Committee on the Elaboration of a Convention against Transnational Organized Crime will complete its tasks arising from the elaboration of the United Nations Convention against Transnational Organized Crime by holding a meeting well before the convening of the first session of the Conference of the Parties to the Convention, in order to prepare the draft text of the rules of procedure for the Conference of the Parties and other rules and mechanisms described in article 32 of the Convention, which will be communicated to the Conference of the Parties at its first session for consideration and action;

11.   *Requests* the Secretary-General to designate the Centre for International Crime Prevention of the United Nations Office for Drug Control and Crime Prevention to serve as the secretariat for the Conference of the Parties to the Convention in accordance with article 33 of the Convention;

12.   *Also requests* the Secretary-General to provide the Centre for International Crime Prevention with the resources necessary to enable it to promote in an effective manner the expeditious entry into force of the United Nations Convention against Transnational Organized Crime and to discharge the functions of secretariat of the Conference of the Parties to the Convention, and to support the Ad Hoc Committee in its work pursuant to paragraph 10 above.

*Annex I*

# United Nations Convention against Transnational Organized Crime

*Article 1.   Statement of purpose*

The purpose of this Convention is to promote cooperation to prevent and combat transnational organized crime more effectively.

*Article 2.   Use of terms*

For the purposes of this Convention:

*(a)*  "Organized criminal group" shall mean a structured group of three or more persons, existing for a period of time and acting in concert with the aim of committing one or more serious crimes or offences established in accordance with this Convention, in order to obtain, directly or indirectly, a financial or other material benefit;

*(b)*  "Serious crime" shall mean conduct constituting an offence punishable by a maximum deprivation of liberty of at least four years or a more serious penalty;

*(c)*  "Structured group" shall mean a group that is not randomly formed for the immediate commission of an offence and that does not need to have formally defined roles for its members, continuity of its membership or a developed structure;

*(d)*  "Property" shall mean assets of every kind, whether corporeal or incorporeal, movable or immovable, tangible or intangible, and legal documents or instruments evidencing title to, or interest in, such assets;

*(e)*  "Proceeds of crime" shall mean any property derived from or obtained, directly or indirectly, through the commission of an offence;

*(f)*  "Freezing" or "seizure" shall mean temporarily prohibiting the transfer, conversion, disposition or movement of property or temporarily assuming custody or control of property on the basis of an order issued by a court or other competent authority;

5

*(g)* "Confiscation", which includes forfeiture where applicable, shall mean the permanent deprivation of property by order of a court or other competent authority;

*(h)* "Predicate offence" shall mean any offence as a result of which proceeds have been generated that may become the subject of an offence as defined in article 6 of this Convention;

*(i)* "Controlled delivery" shall mean the technique of allowing illicit or suspect consignments to pass out of, through or into the territory of one or more States, with the knowledge and under the supervision of their competent authorities, with a view to the investigation of an offence and the identification of persons involved in the commission of the offence;

*(j)* "Regional economic integration organization" shall mean an organization constituted by sovereign States of a given region, to which its member States have transferred competence in respect of matters governed by this Convention and which has been duly authorized, in accordance with its internal procedures, to sign, ratify, accept, approve or accede to it; references to "States Parties" under this Convention shall apply to such organizations within the limits of their competence.

### Article 3.   Scope of application

1.   This Convention shall apply, except as otherwise stated herein, to the prevention, investigation and prosecution of:

*(a)* The offences established in accordance with articles 5, 6, 8 and 23 of this Convention; and

*(b)* Serious crime as defined in article 2 of this Convention;

where the offence is transnational in nature and involves an organized criminal group.

2.   For the purpose of paragraph 1 of this article, an offence is transnational in nature if:

*(a)* It is committed in more than one State;

*(b)* It is committed in one State but a substantial part of its preparation, planning, direction or control takes place in another State;

*(c)* It is committed in one State but involves an organized criminal group that engages in criminal activities in more than one State; or

*(d)* It is committed in one State but has substantial effects in another State.

### Article 4.   Protection of sovereignty

1.   States Parties shall carry out their obligations under this Convention in a manner consistent with the principles of sovereign equality and territorial integrity of States and that of non-intervention in the domestic affairs of other States.

2.   Nothing in this Convention entitles a State Party to undertake in the territory of another State the exercise of jurisdiction and performance of functions that are reserved exclusively for the authorities of that other State by its domestic law.

### Article 5.   Criminalization of participation in an organized criminal group

1.   Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally:

*(a)* Either or both of the following as criminal offences distinct from those involving the attempt or completion of the criminal activity:

  (i)  Agreeing with one or more other persons to commit a serious crime for a purpose relating directly or indirectly to the obtaining of a financial or other material benefit and, where required by domestic law, involving an act undertaken by one of the participants in furtherance of the agreement or involving an organized criminal group;

  (ii) Conduct by a person who, with knowledge of either the aim and general criminal activity of an organized criminal group or its intention to commit the crimes in question, takes an active part in:

    a.  Criminal activities of the organized criminal group;

    b.  Other activities of the organized criminal group in the knowledge that his or her participation will contribute to the achievement of the above-described criminal aim;

*(b)* Organizing, directing, aiding, abetting, facilitating or counselling the commission of serious crime involving an organized criminal group.

2.   The knowledge, intent, aim, purpose or agreement referred to in paragraph 1 of this article may be inferred from objective factual circumstances.

3.   States Parties whose domestic law requires involvement of an organized criminal group for purposes of the offences established in accordance with

7

paragraph 1 *(a)* (i) of this article shall ensure that their domestic law covers all serious crimes involving organized criminal groups. Such States Parties, as well as States Parties whose domestic law requires an act in furtherance of the agreement for purposes of the offences established in accordance with paragraph 1 *(a)* (i) of this article, shall so inform the Secretary-General of the United Nations at the time of their signature or of deposit of their instrument of ratification, acceptance or approval of or accession to this Convention.

### Article 6.   Criminalization of the laundering of proceeds of crime

1.   Each State Party shall adopt, in accordance with fundamental principles of its domestic law, such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally:

*(a)*   (i)   The conversion or transfer of property, knowing that such property is the proceeds of crime, for the purpose of concealing or disguising the illicit origin of the property or of helping any person who is involved in the commission of the predicate offence to evade the legal consequences of his or her action;

   (ii)   The concealment or disguise of the true nature, source, location, disposition, movement or ownership of or rights with respect to property, knowing that such property is the proceeds of crime;

*(b)*   Subject to the basic concepts of its legal system:

   (i)   The acquisition, possession or use of property, knowing, at the time of receipt, that such property is the proceeds of crime;

   (ii)   Participation in, association with or conspiracy to commit, attempts to commit and aiding, abetting, facilitating and counselling the commission of any of the offences established in accordance with this article.

2.   For purposes of implementing or applying paragraph 1 of this article:

(*a*)   Each State Party shall seek to apply paragraph 1 of this article to the widest range of predicate offences;

(*b*)   Each State Party shall include as predicate offences all serious crime as defined in article 2 of this Convention and the offences established in accordance with articles 5, 8 and 23 of this Convention. In the case of States Parties whose legislation sets out a list of specific predicate offences, they shall, at a minimum, include in such list a comprehensive range of offences associated with organized criminal groups;

(*c*)   For the purposes of subparagraph *(b),* predicate offences shall include offences committed both within and outside the jurisdiction of the State Party

in question. However, offences committed outside the jurisdiction of a State Party shall constitute predicate offences only when the relevant conduct is a criminal offence under the domestic law of the State where it is committed and would be a criminal offence under the domestic law of the State Party implementing or applying this article had it been committed there;

*(d)* Each State Party shall furnish copies of its laws that give effect to this article and of any subsequent changes to such laws or a description thereof to the Secretary-General of the United Nations;

*(e)* If required by fundamental principles of the domestic law of a State Party, it may be provided that the offences set forth in paragraph 1 of this article do not apply to the persons who committed the predicate offence;

*(f)* Knowledge, intent or purpose required as an element of an offence set forth in paragraph 1 of this article may be inferred from objective factual circumstances.

## Article 7.   Measures to combat money-laundering

1.   Each State Party:

*(a)* Shall institute a comprehensive domestic regulatory and supervisory regime for banks and non-bank financial institutions and, where appropriate, other bodies particularly susceptible to money-laundering, within its competence, in order to deter and detect all forms of money-laundering, which regime shall emphasize requirements for customer identification, record-keeping and the reporting of suspicious transactions;

*(b)* Shall, without prejudice to articles 18 and 27 of this Convention, ensure that administrative, regulatory, law enforcement and other authorities dedicated to combating money-laundering (including, where appropriate under domestic law, judicial authorities) have the ability to cooperate and exchange information at the national and international levels within the conditions prescribed by its domestic law and, to that end, shall consider the establishment of a financial intelligence unit to serve as a national centre for the collection, analysis and dissemination of information regarding potential money-laundering.

2.   States Parties shall consider implementing feasible measures to detect and monitor the movement of cash and appropriate negotiable instruments across their borders, subject to safeguards to ensure proper use of information and without impeding in any way the movement of legitimate capital. Such measures may include a requirement that individuals and businesses report the cross-border transfer of substantial quantities of cash and appropriate negotiable instruments.

3.   In establishing a domestic regulatory and supervisory regime under the terms of this article, and without prejudice to any other article of this Convention, States Parties are called upon to use as a guideline the relevant initiatives of regional, interregional and multilateral organizations against money-laundering.

4.   States Parties shall endeavour to develop and promote global, regional, subregional and bilateral cooperation among judicial, law enforcement and financial regulatory authorities in order to combat money-laundering.

## Article 8.   Criminalization of corruption

1.   Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally:

*(a)*   The promise, offering or giving to a public official, directly or indirectly, of an undue advantage, for the official himself or herself or another person or entity, in order that the official act or refrain from acting in the exercise of his or her official duties;

*(b)*   The solicitation or acceptance by a public official, directly or indirectly, of an undue advantage, for the official himself or herself or another person or entity, in order that the official act or refrain from acting in the exercise of his or her official duties.

2.   Each State Party shall consider adopting such legislative and other measures as may be necessary to establish as criminal offences conduct referred to in paragraph 1 of this article involving a foreign public official or international civil servant. Likewise, each State Party shall consider establishing as criminal offences other forms of corruption.

3.   Each State Party shall also adopt such measures as may be necessary to establish as a criminal offence participation as an accomplice in an offence established in accordance with this article.

4.   For the purposes of paragraph 1 of this article and article 9 of this Convention, "public official" shall mean a public official or a person who provides a public service as defined in the domestic law and as applied in the criminal law of the State Party in which the person in question performs that function.

## Article 9.   Measures against corruption

1.   In addition to the measures set forth in article 8 of this Convention, each State Party shall, to the extent appropriate and consistent with its legal

system, adopt legislative, administrative or other effective measures to promote integrity and to prevent, detect and punish the corruption of public officials.

2.    Each State Party shall take measures to ensure effective action by its authorities in the prevention, detection and punishment of the corruption of public officials, including providing such authorities with adequate independence to deter the exertion of inappropriate influence on their actions.

## Article 10.   Liability of legal persons

1.    Each State Party shall adopt such measures as may be necessary, consistent with its legal principles, to establish the liability of legal persons for participation in serious crimes involving an organized criminal group and for the offences established in accordance with articles 5, 6, 8 and 23 of this Convention.

2.    Subject to the legal principles of the State Party, the liability of legal persons may be criminal, civil or administrative.

3.    Such liability shall be without prejudice to the criminal liability of the natural persons who have committed the offences.

4.    Each State Party shall, in particular, ensure that legal persons held liable in accordance with this article are subject to effective, proportionate and dissuasive criminal or non-criminal sanctions, including monetary sanctions.

## Article 11.   Prosecution, adjudication and sanctions

1.    Each State Party shall make the commission of an offence established in accordance with articles 5, 6, 8 and 23 of this Convention liable to sanctions that take into account the gravity of that offence.

2.    Each State Party shall endeavour to ensure that any discretionary legal powers under its domestic law relating to the prosecution of persons for offences covered by this Convention are exercised to maximize the effectiveness of law enforcement measures in respect of those offences and with due regard to the need to deter the commission of such offences.

3.    In the case of offences established in accordance with articles 5, 6, 8 and 23 of this Convention, each State Party shall take appropriate measures, in accordance with its domestic law and with due regard to the rights of the defence, to seek to ensure that conditions imposed in connection with decisions on release pending trial or appeal take into consideration the need to ensure the presence of the defendant at subsequent criminal proceedings.

4.   Each State Party shall ensure that its courts or other competent authorities bear in mind the grave nature of the offences covered by this Convention when considering the eventuality of early release or parole of persons convicted of such offences.

5.   Each State Party shall, where appropriate, establish under its domestic law a long statute of limitations period in which to commence proceedings for any offence covered by this Convention and a longer period where the alleged offender has evaded the administration of justice.

6.   Nothing contained in this Convention shall affect the principle that the description of the offences established in accordance with this Convention and of the applicable legal defences or other legal principles controlling the lawfulness of conduct is reserved to the domestic law of a State Party and that such offences shall be prosecuted and punished in accordance with that law.

## Article 12.   Confiscation and seizure

1.   States Parties shall adopt, to the greatest extent possible within their domestic legal systems, such measures as may be necessary to enable confiscation of:

*(a)*   Proceeds of crime derived from offences covered by this Convention or property the value of which corresponds to that of such proceeds;

*(b)*   Property, equipment or other instrumentalities used in or destined for use in offences covered by this Convention.

2.   States Parties shall adopt such measures as may be necessary to enable the identification, tracing, freezing or seizure of any item referred to in paragraph 1 of this article for the purpose of eventual confiscation.

3.   If proceeds of crime have been transformed or converted, in part or in full, into other property, such property shall be liable to the measures referred to in this article instead of the proceeds.

4.   If proceeds of crime have been intermingled with property acquired from legitimate sources, such property shall, without prejudice to any powers relating to freezing or seizure, be liable to confiscation up to the assessed value of the intermingled proceeds.

5.   Income or other benefits derived from proceeds of crime, from property into which proceeds of crime have been transformed or converted or from property with which proceeds of crime have been intermingled shall also

12

be liable to the measures referred to in this article, in the same manner and to the same extent as proceeds of crime.

6. For the purposes of this article and article 13 of this Convention, each State Party shall empower its courts or other competent authorities to order that bank, financial or commercial records be made available or be seized. States Parties shall not decline to act under the provisions of this paragraph on the ground of bank secrecy.

7. States Parties may consider the possibility of requiring that an offender demonstrate the lawful origin of alleged proceeds of crime or other property liable to confiscation, to the extent that such a requirement is consistent with the principles of their domestic law and with the nature of the judicial and other proceedings.

8. The provisions of this article shall not be construed to prejudice the rights of bona fide third parties.

9. Nothing contained in this article shall affect the principle that the measures to which it refers shall be defined and implemented in accordance with and subject to the provisions of the domestic law of a State Party.

## Article 13. International cooperation for purposes of confiscation

1. A State Party that has received a request from another State Party having jurisdiction over an offence covered by this Convention for confiscation of proceeds of crime, property, equipment or other instrumentalities referred to in article 12, paragraph 1, of this Convention situated in its territory shall, to the greatest extent possible within its domestic legal system:

(a) Submit the request to its competent authorities for the purpose of obtaining an order of confiscation and, if such an order is granted, give effect to it; or

(b) Submit to its competent authorities, with a view to giving effect to it to the extent requested, an order of confiscation issued by a court in the territory of the requesting State Party in accordance with article 12, paragraph 1, of this Convention insofar as it relates to proceeds of crime, property, equipment or other instrumentalities referred to in article 12, paragraph 1, situated in the territory of the requested State Party.

2. Following a request made by another State Party having jurisdiction over an offence covered by this Convention, the requested State Party shall take measures to identify, trace and freeze or seize proceeds of crime, property,

13

equipment or other instrumentalities referred to in article 12, paragraph 1, of this Convention for the purpose of eventual confiscation to be ordered either by the requesting State Party or, pursuant to a request under paragraph 1 of this article, by the requested State Party.

3.   The provisions of article 18 of this Convention are applicable, mutatis mutandis, to this article. In addition to the information specified in article 18, paragraph 15, requests made pursuant to this article shall contain:

(a)   In the case of a request pertaining to paragraph 1 (a) of this article, a description of the property to be confiscated and a statement of the facts relied upon by the requesting State Party sufficient to enable the requested State Party to seek the order under its domestic law;

(b)   In the case of a request pertaining to paragraph 1 (b) of this article, a legally admissible copy of an order of confiscation upon which the request is based issued by the requesting State Party, a statement of the facts and information as to the extent to which execution of the order is requested;

(c)   In the case of a request pertaining to paragraph 2 of this article, a statement of the facts relied upon by the requesting State Party and a description of the actions requested.

4.   The decisions or actions provided for in paragraphs 1 and 2 of this article shall be taken by the requested State Party in accordance with and subject to the provisions of its domestic law and its procedural rules or any bilateral or multilateral treaty, agreement or arrangement to which it may be bound in relation to the requesting State Party.

5.   Each State Party shall furnish copies of its laws and regulations that give effect to this article and of any subsequent changes to such laws and regulations or a description thereof to the Secretary-General of the United Nations.

6.   If a State Party elects to make the taking of the measures referred to in paragraphs 1 and 2 of this article conditional on the existence of a relevant treaty, that State Party shall consider this Convention the necessary and sufficient treaty basis.

7.   Cooperation under this article may be refused by a State Party if the offence to which the request relates is not an offence covered by this Convention.

8.   The provisions of this article shall not be construed to prejudice the rights of bona fide third parties.

14

9.    States Parties shall consider concluding bilateral or multilateral treaties, agreements or arrangements to enhance the effectiveness of international cooperation undertaken pursuant to this article.

## Article 14.   Disposal of confiscated proceeds of crime or property

1.    Proceeds of crime or property confiscated by a State Party pursuant to articles 12 or 13, paragraph 1, of this Convention shall be disposed of by that State Party in accordance with its domestic law and administrative procedures.

2.    When acting on the request made by another State Party in accordance with article 13 of this Convention, States Parties shall, to the extent permitted by domestic law and if so requested, give priority consideration to returning the confiscated proceeds of crime or property to the requesting State Party so that it can give compensation to the victims of the crime or return such proceeds of crime or property to their legitimate owners.

3.    When acting on the request made by another State Party in accordance with articles 12 and 13 of this Convention, a State Party may give special consideration to concluding agreements or arrangements on:

*(a)*   Contributing the value of such proceeds of crime or property or funds derived from the sale of such proceeds of crime or property or a part thereof to the account designated in accordance with article 30, paragraph 2 *(c),* of this Convention and to intergovernmental bodies specializing in the fight against organized crime;

*(b)*   Sharing with other States Parties, on a regular or case-by-case basis, such proceeds of crime or property, or funds derived from the sale of such proceeds of crime or property, in accordance with its domestic law or administrative procedures.

## Article 15.   Jurisdiction

1.    Each State Party shall adopt such measures as may be necessary to establish its jurisdiction over the offences established in accordance with articles 5, 6, 8 and 23 of this Convention when:

*(a)*   The offence is committed in the territory of that State Party; or

*(b)*   The offence is committed on board a vessel that is flying the flag of that State Party or an aircraft that is registered under the laws of that State Party at the time that the offence is committed.

15

2.   Subject to article 4 of this Convention, a State Party may also establish its jurisdiction over any such offence when:

*(a)*   The offence is committed against a national of that State Party;

*(b)*   The offence is committed by a national of that State Party or a stateless person who has his or her habitual residence in its territory; or

*(c)*   The offence is:

   (i)   One of those established in accordance with article 5, paragraph 1, of this Convention and is committed outside its territory with a view to the commission of a serious crime within its territory;

   (ii)   One of those established in accordance with article 6, paragraph 1 *(b)* (ii), of this Convention and is committed outside its territory with a view to the commission of an offence established in accordance with article 6, paragraph 1 *(a)* (i) or (ii) or *(b)* (i), of this Convention within its territory.

3.   For the purposes of article 16, paragraph 10, of this Convention, each State Party shall adopt such measures as may be necessary to establish its jurisdiction over the offences covered by this Convention when the alleged offender is present in its territory and it does not extradite such person solely on the ground that he or she is one of its nationals.

4.   Each State Party may also adopt such measures as may be necessary to establish its jurisdiction over the offences covered by this Convention when the alleged offender is present in its territory and it does not extradite him or her.

5.   If a State Party exercising its jurisdiction under paragraph 1 or 2 of this article has been notified, or has otherwise learned, that one or more other States Parties are conducting an investigation, prosecution or judicial proceeding in respect of the same conduct, the competent authorities of those States Parties shall, as appropriate, consult one another with a view to coordinating their actions.

6.   Without prejudice to norms of general international law, this Convention does not exclude the exercise of any criminal jurisdiction established by a State Party in accordance with its domestic law.

### *Article 16.   Extradition*

1.   This article shall apply to the offences covered by this Convention or in cases where an offence referred to in article 3, paragraph 1 *(a)* or *(b),* involves

an organized criminal group and the person who is the subject of the request for extradition is located in the territory of the requested State Party, provided that the offence for which extradition is sought is punishable under the domestic law of both the requesting State Party and the requested State Party.

2.    If the request for extradition includes several separate serious crimes, some of which are not covered by this article, the requested State Party may apply this article also in respect of the latter offences.

3.    Each of the offences to which this article applies shall be deemed to be included as an extraditable offence in any extradition treaty existing between States Parties. States Parties undertake to include such offences as extraditable offences in every extradition treaty to be concluded between them.

4.    If a State Party that makes extradition conditional on the existence of a treaty receives a request for extradition from another State Party with which it has no extradition treaty, it may consider this Convention the legal basis for extradition in respect of any offence to which this article applies.

5.    States Parties that make extradition conditional on the existence of a treaty shall:

*(a)* At the time of deposit of their instrument of ratification, acceptance, approval of or accession to this Convention, inform the Secretary-General of the United Nations whether they will take this Convention as the legal basis for cooperation on extradition with other States Parties to this Convention; and

*(b)* If they do not take this Convention as the legal basis for cooperation on extradition, seek, where appropriate, to conclude treaties on extradition with other States Parties to this Convention in order to implement this article.

6.    States Parties that do not make extradition conditional on the existence of a treaty shall recognize offences to which this article applies as extraditable offences between themselves.

7.    Extradition shall be subject to the conditions provided for by the domestic law of the requested State Party or by applicable extradition treaties, including, inter alia, conditions in relation to the minimum penalty requirement for extradition and the grounds upon which the requested State Party may refuse extradition.

8.    States Parties shall, subject to their domestic law, endeavour to expedite extradition procedures and to simplify evidentiary requirements relating thereto in respect of any offence to which this article applies.

17

9.   Subject to the provisions of its domestic law and its extradition treaties, the requested State Party may, upon being satisfied that the circumstances so warrant and are urgent and at the request of the requesting State Party, take a person whose extradition is sought and who is present in its territory into custody or take other appropriate measures to ensure his or her presence at extradition proceedings.

10.   A State Party in whose territory an alleged offender is found, if it does not extradite such person in respect of an offence to which this article applies solely on the ground that he or she is one of its nationals, shall, at the request of the State Party seeking extradition, be obliged to submit the case without undue delay to its competent authorities for the purpose of prosecution. Those authorities shall take their decision and conduct their proceedings in the same manner as in the case of any other offence of a grave nature under the domestic law of that State Party. The States Parties concerned shall cooperate with each other, in particular on procedural and evidentiary aspects, to ensure the efficiency of such prosecution.

11.   Whenever a State Party is permitted under its domestic law to extradite or otherwise surrender one of its nationals only upon the condition that the person will be returned to that State Party to serve the sentence imposed as a result of the trial or proceedings for which the extradition or surrender of the person was sought and that State Party and the State Party seeking the extradition of the person agree with this option and other terms that they may deem appropriate, such conditional extradition or surrender shall be sufficient to discharge the obligation set forth in paragraph 10 of this article.

12.   If extradition, sought for purposes of enforcing a sentence, is refused because the person sought is a national of the requested State Party, the requested Party shall, if its domestic law so permits and in conformity with the requirements of such law, upon application of the requesting Party, consider the enforcement of the sentence that has been imposed under the domestic law of the requesting Party or the remainder thereof.

13.   Any person regarding whom proceedings are being carried out in connection with any of the offences to which this article applies shall be guaranteed fair treatment at all stages of the proceedings, including enjoyment of all the rights and guarantees provided by the domestic law of the State Party in the territory of which that person is present.

14.   Nothing in this Convention shall be interpreted as imposing an obligation to extradite if the requested State Party has substantial grounds for believing that the request has been made for the purpose of prosecuting or

18

punishing a person on account of that person's sex, race, religion, nationality, ethnic origin or political opinions or that compliance with the request would cause prejudice to that person's position for any one of these reasons.

15.   States Parties may not refuse a request for extradition on the sole ground that the offence is also considered to involve fiscal matters.

16.   Before refusing extradition, the requested State Party shall, where appropriate, consult with the requesting State Party to provide it with ample opportunity to present its opinions and to provide information relevant to its allegation.

17.   States Parties shall seek to conclude bilateral and multilateral agreements or arrangements to carry out or to enhance the effectiveness of extradition.

### Article 17.   Transfer of sentenced persons

States Parties may consider entering into bilateral or multilateral agreements or arrangements on the transfer to their territory of persons sentenced to imprisonment or other forms of deprivation of liberty for offences covered by this Convention, in order that they may complete their sentences there.

### Article 18.   Mutual legal assistance

1.   States Parties shall afford one another the widest measure of mutual legal assistance in investigations, prosecutions and judicial proceedings in relation to the offences covered by this Convention as provided for in article 3 and shall reciprocally extend to one another similar assistance where the requesting State Party has reasonable grounds to suspect that the offence referred to in article 3, paragraph 1 *(a)* or *(b),* is transnational in nature, including that victims, witnesses, proceeds, instrumentalities or evidence of such offences are located in the requested State Party and that the offence involves an organized criminal group.

2.   Mutual legal assistance shall be afforded to the fullest extent possible under relevant laws, treaties, agreements and arrangements of the requested State Party with respect to investigations, prosecutions and judicial proceedings in relation to the offences for which a legal person may be held liable in accordance with article 10 of this Convention in the requesting State Party.

3.   Mutual legal assistance to be afforded in accordance with this article may be requested for any of the following purposes:

*(a)* Taking evidence or statements from persons;

*(b)* Effecting service of judicial documents;

*(c)* Executing searches and seizures, and freezing;

*(d)* Examining objects and sites;

*(e)* Providing information, evidentiary items and expert evaluations;

*(f)* Providing originals or certified copies of relevant documents and records, including government, bank, financial, corporate or business records;

*(g)* Identifying or tracing proceeds of crime, property, instrumentalities or other things for evidentiary purposes;

*(h)* Facilitating the voluntary appearance of persons in the requesting State Party;

*(i)* Any other type of assistance that is not contrary to the domestic law of the requested State Party.

4.   Without prejudice to domestic law, the competent authorities of a State Party may, without prior request, transmit information relating to criminal matters to a competent authority in another State Party where they believe that such information could assist the authority in undertaking or successfully concluding inquiries and criminal proceedings or could result in a request formulated by the latter State Party pursuant to this Convention.

5.   The transmission of information pursuant to paragraph 4 of this article shall be without prejudice to inquiries and criminal proceedings in the State of the competent authorities providing the information. The competent authorities receiving the information shall comply with a request that said information remain confidential, even temporarily, or with restrictions on its use. However, this shall not prevent the receiving State Party from disclosing in its proceedings information that is exculpatory to an accused person. In such a case, the receiving State Party shall notify the transmitting State Party prior to the disclosure and, if so requested, consult with the transmitting State Party. If, in an exceptional case, advance notice is not possible, the receiving State Party shall inform the transmitting State Party of the disclosure without delay.

6.   The provisions of this article shall not affect the obligations under any other treaty, bilateral or multilateral, that governs or will govern, in whole or in part, mutual legal assistance.

7.   Paragraphs 9 to 29 of this article shall apply to requests made pursuant to this article if the States Parties in question are not bound by a treaty of mutual legal assistance. If those States Parties are bound by such a treaty, the

20

corresponding provisions of that treaty shall apply unless the States Parties agree to apply paragraphs 9 to 29 of this article in lieu thereof. States Parties are strongly encouraged to apply these paragraphs if they facilitate cooperation.

8.   States Parties shall not decline to render mutual legal assistance pursuant to this article on the ground of bank secrecy.

9.   States Parties may decline to render mutual legal assistance pursuant to this article on the ground of absence of dual criminality. However, the requested State Party may, when it deems appropriate, provide assistance, to the extent it decides at its discretion, irrespective of whether the conduct would constitute an offence under the domestic law of the requested State Party.

10.   A person who is being detained or is serving a sentence in the territory of one State Party whose presence in another State Party is requested for purposes of identification, testimony or otherwise providing assistance in obtaining evidence for investigations, prosecutions or judicial proceedings in relation to offences covered by this Convention may be transferred if the following conditions are met:

*(a)*  The person freely gives his or her informed consent;

*(b)*  The competent authorities of both States Parties agree, subject to such conditions as those States Parties may deem appropriate.

11.   For the purposes of paragraph 10 of this article:

*(a)*  The State Party to which the person is transferred shall have the authority and obligation to keep the person transferred in custody, unless otherwise requested or authorized by the State Party from which the person was transferred;

*(b)*  The State Party to which the person is transferred shall without delay implement its obligation to return the person to the custody of the State Party from which the person was transferred as agreed beforehand, or as otherwise agreed, by the competent authorities of both States Parties;

*(c)*  The State Party to which the person is transferred shall not require the State Party from which the person was transferred to initiate extradition proceedings for the return of the person;

*(d)*  The person transferred shall receive credit for service of the sentence being served in the State from which he or she was transferred for time spent in the custody of the State Party to which he or she was transferred.

12.   Unless the State Party from which a person is to be transferred in accordance with paragraphs 10 and 11 of this article so agrees, that person,

21

whatever his or her nationality, shall not be prosecuted, detained, punished or subjected to any other restriction of his or her personal liberty in the territory of the State to which that person is transferred in respect of acts, omissions or convictions prior to his or her departure from the territory of the State from which he or she was transferred.

13.   Each State Party shall designate a central authority that shall have the responsibility and power to receive requests for mutual legal assistance and either to execute them or to transmit them to the competent authorities for execution. Where a State Party has a special region or territory with a separate system of mutual legal assistance, it may designate a distinct central authority that shall have the same function for that region or territory. Central authorities shall ensure the speedy and proper execution or transmission of the requests received. Where the central authority transmits the request to a competent authority for execution, it shall encourage the speedy and proper execution of the request by the competent authority. The Secretary-General of the United Nations shall be notified of the central authority designated for this purpose at the time each State Party deposits its instrument of ratification, acceptance or approval of or accession to this Convention. Requests for mutual legal assistance and any communication related thereto shall be transmitted to the central authorities designated by the States Parties. This requirement shall be without prejudice to the right of a State Party to require that such requests and communications be addressed to it through diplomatic channels and, in urgent circumstances, where the States Parties agree, through the International Criminal Police Organization, if possible.

14.   Requests shall be made in writing or, where possible, by any means capable of producing a written record, in a language acceptable to the requested State Party, under conditions allowing that State Party to establish authenticity. The Secretary-General of the United Nations shall be notified of the language or languages acceptable to each State Party at the time it deposits its instrument of ratification, acceptance or approval of or accession to this Convention. In urgent circumstances and where agreed by the States Parties, requests may be made orally, but shall be confirmed in writing forthwith.

15.   A request for mutual legal assistance shall contain:

*(a)*   The identity of the authority making the request;

*(b)*   The subject matter and nature of the investigation, prosecution or judicial proceeding to which the request relates and the name and functions of the authority conducting the investigation, prosecution or judicial proceeding;

*(c)*   A summary of the relevant facts, except in relation to requests for the purpose of service of judicial documents;

22

*(d)* A description of the assistance sought and details of any particular procedure that the requesting State Party wishes to be followed;

*(e)* Where possible, the identity, location and nationality of any person concerned; and

*(f)* The purpose for which the evidence, information or action is sought.

16. The requested State Party may request additional information when it appears necessary for the execution of the request in accordance with its domestic law or when it can facilitate such execution.

17. A request shall be executed in accordance with the domestic law of the requested State Party and, to the extent not contrary to the domestic law of the requested State Party and where possible, in accordance with the procedures specified in the request.

18. Wherever possible and consistent with fundamental principles of domestic law, when an individual is in the territory of a State Party and has to be heard as a witness or expert by the judicial authorities of another State Party, the first State Party may, at the request of the other, permit the hearing to take place by video conference if it is not possible or desirable for the individual in question to appear in person in the territory of the requesting State Party. States Parties may agree that the hearing shall be conducted by a judicial authority of the requesting State Party and attended by a judicial authority of the requested State Party.

19. The requesting State Party shall not transmit or use information or evidence furnished by the requested State Party for investigations, prosecutions or judicial proceedings other than those stated in the request without the prior consent of the requested State Party. Nothing in this paragraph shall prevent the requesting State Party from disclosing in its proceedings information or evidence that is exculpatory to an accused person. In the latter case, the requesting State Party shall notify the requested State Party prior to the disclosure and, if so requested, consult with the requested State Party. If, in an exceptional case, advance notice is not possible, the requesting State Party shall inform the requested State Party of the disclosure without delay.

20. The requesting State Party may require that the requested State Party keep confidential the fact and substance of the request, except to the extent necessary to execute the request. If the requested State Party cannot comply with the requirement of confidentiality, it shall promptly inform the requesting State Party.

21. Mutual legal assistance may be refused:

23

*(a)* If the request is not made in conformity with the provisions of this article;

*(b)* If the requested State Party considers that execution of the request is likely to prejudice its sovereignty, security, *ordre public* or other essential interests;

*(c)* If the authorities of the requested State Party would be prohibited by its domestic law from carrying out the action requested with regard to any similar offence, had it been subject to investigation, prosecution or judicial proceedings under their own jurisdiction;

*(d)* If it would be contrary to the legal system of the requested State Party relating to mutual legal assistance for the request to be granted.

22.   States Parties may not refuse a request for mutual legal assistance on the sole ground that the offence is also considered to involve fiscal matters.

23.   Reasons shall be given for any refusal of mutual legal assistance.

24.   The requested State Party shall execute the request for mutual legal assistance as soon as possible and shall take as full account as possible of any deadlines suggested by the requesting State Party and for which reasons are given, preferably in the request. The requested State Party shall respond to reasonable requests by the requesting State Party on progress of its handling of the request. The requesting State Party shall promptly inform the requested State Party when the assistance sought is no longer required.

25.   Mutual legal assistance may be postponed by the requested State Party on the ground that it interferes with an ongoing investigation, prosecution or judicial proceeding.

26.   Before refusing a request pursuant to paragraph 21 of this article or postponing its execution pursuant to paragraph 25 of this article, the requested State Party shall consult with the requesting State Party to consider whether assistance may be granted subject to such terms and conditions as it deems necessary. If the requesting State Party accepts assistance subject to those conditions, it shall comply with the conditions.

27.   Without prejudice to the application of paragraph 12 of this article, a witness, expert or other person who, at the request of the requesting State Party, consents to give evidence in a proceeding or to assist in an investigation, prosecution or judicial proceeding in the territory of the requesting State Party shall not be prosecuted, detained, punished or subjected to any other restriction

24

of his or her personal liberty in that territory in respect of acts, omissions or convictions prior to his or her departure from the territory of the requested State Party. Such safe conduct shall cease when the witness, expert or other person having had, for a period of fifteen consecutive days or for any period agreed upon by the States Parties from the date on which he or she has been officially informed that his or her presence is no longer required by the judicial authorities, an opportunity of leaving, has nevertheless remained voluntarily in the territory of the requesting State Party or, having left it, has returned of his or her own free will.

28.   The ordinary costs of executing a request shall be borne by the requested State Party, unless otherwise agreed by the States Parties concerned. If expenses of a substantial or extraordinary nature are or will be required to fulfil the request, the States Parties shall consult to determine the terms and conditions under which the request will be executed, as well as the manner in which the costs shall be borne.

29.   The requested State Party:

*(a)* Shall provide to the requesting State Party copies of government records, documents or information in its possession that under its domestic law are available to the general public;

*(b)* May, at its discretion, provide to the requesting State Party in whole, in part or subject to such conditions as it deems appropriate, copies of any government records, documents or information in its possession that under its domestic law are not available to the general public.

30.   States Parties shall consider, as may be necessary, the possibility of concluding bilateral or multilateral agreements or arrangements that would serve the purposes of, give practical effect to or enhance the provisions of this article.

## *Article 19.   Joint investigations*

States Parties shall consider concluding bilateral or multilateral agreements or arrangements whereby, in relation to matters that are the subject of investigations, prosecutions or judicial proceedings in one or more States, the competent authorities concerned may establish joint investigative bodies. In the absence of such agreements or arrangements, joint investigations may be undertaken by agreement on a case-by-case basis. The States Parties involved shall ensure that the sovereignty of the State Party in whose territory such investigation is to take place is fully respected.

### Article 20.   Special investigative techniques

1.    If permitted by the basic principles of its domestic legal system, each State Party shall, within its possibilities and under the conditions prescribed by its domestic law, take the necessary measures to allow for the appropriate use of controlled delivery and, where it deems appropriate, for the use of other special investigative techniques, such as electronic or other forms of surveillance and undercover operations, by its competent authorities in its territory for the purpose of effectively combating organized crime.

2.    For the purpose of investigating the offences covered by this Convention, States Parties are encouraged to conclude, when necessary, appropriate bilateral or multilateral agreements or arrangements for using such special investigative techniques in the context of cooperation at the international level. Such agreements or arrangements shall be concluded and implemented in full compliance with the principle of sovereign equality of States and shall be carried out strictly in accordance with the terms of those agreements or arrangements.

3.    In the absence of an agreement or arrangement as set forth in paragraph 2 of this article, decisions to use such special investigative techniques at the international level shall be made on a case-by-case basis and may, when necessary, take into consideration financial arrangements and understandings with respect to the exercise of jurisdiction by the States Parties concerned.

4.    Decisions to use controlled delivery at the international level may, with the consent of the States Parties concerned, include methods such as intercepting and allowing the goods to continue intact or be removed or replaced in whole or in part.

### Article 21.   Transfer of criminal proceedings

States Parties shall consider the possibility of transferring to one another proceedings for the prosecution of an offence covered by this Convention in cases where such transfer is considered to be in the interests of the proper administration of justice, in particular in cases where several jurisdictions are involved, with a view to concentrating the prosecution.

### Article 22.   Establishment of criminal record

Each State Party may adopt such legislative or other measures as may be necessary to take into consideration, under such terms as and for the purpose

26

that it deems appropriate, any previous conviction in another State of an alleged offender for the purpose of using such information in criminal proceedings relating to an offence covered by this Convention.

### Article 23.   Criminalization of obstruction of justice

Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally:

*(a)* The use of physical force, threats or intimidation or the promise, offering or giving of an undue advantage to induce false testimony or to interfere in the giving of testimony or the production of evidence in a proceeding in relation to the commission of offences covered by this Convention;

*(b)* The use of physical force, threats or intimidation to interfere with the exercise of official duties by a justice or law enforcement official in relation to the commission of offences covered by this Convention. Nothing in this subparagraph shall prejudice the right of States Parties to have legislation that protects other categories of public officials.

### Article 24.   Protection of witnesses

1.   Each State Party shall take appropriate measures within its means to provide effective protection from potential retaliation or intimidation for witnesses in criminal proceedings who give testimony concerning offences covered by this Convention and, as appropriate, for their relatives and other persons close to them.

2.   The measures envisaged in paragraph 1 of this article may include, inter alia, without prejudice to the rights of the defendant, including the right to due process:

*(a)* Establishing procedures for the physical protection of such persons, such as, to the extent necessary and feasible, relocating them and permitting, where appropriate, non-disclosure or limitations on the disclosure of information concerning the identity and whereabouts of such persons;

*(b)* Providing evidentiary rules to permit witness testimony to be given in a manner that ensures the safety of the witness, such as permitting testimony to be given through the use of communications technology such as video links or other adequate means.

3.   States Parties shall consider entering into agreements or arrangements with other States for the relocation of persons referred to in paragraph 1 of this article.

4.    The provisions of this article shall also apply to victims insofar as they are witnesses.

### Article 25.    Assistance to and protection of victims

1.    Each State Party shall take appropriate measures within its means to provide assistance and protection to victims of offences covered by this Convention, in particular in cases of threat of retaliation or intimidation.

2.    Each State Party shall establish appropriate procedures to provide access to compensation and restitution for victims of offences covered by this Convention.

3.    Each State Party shall, subject to its domestic law, enable views and concerns of victims to be presented and considered at appropriate stages of criminal proceedings against offenders in a manner not prejudicial to the rights of the defence.

### Article 26.    Measures to enhance cooperation with law enforcement authorities

1.    Each State Party shall take appropriate measures to encourage persons who participate or who have participated in organized criminal groups:

*(a)* To supply information useful to competent authorities for investigative and evidentiary purposes on such matters as:

   (i)  The identity, nature, composition, structure, location or activities of organized criminal groups;

  (ii)  Links, including international links, with other organized criminal groups;

 (iii)  Offences that organized criminal groups have committed or may commit;

*(b)* To provide factual, concrete help to competent authorities that may contribute to depriving organized criminal groups of their resources or of the proceeds of crime.

2.    Each State Party shall consider providing for the possibility, in appropriate cases, of mitigating punishment of an accused person who provides substantial cooperation in the investigation or prosecution of an offence covered by this Convention.

3.    Each State Party shall consider providing for the possibility, in accordance with fundamental principles of its domestic law, of granting immunity

from prosecution to a person who provides substantial cooperation in the investigation or prosecution of an offence covered by this Convention.

4.   Protection of such persons shall be as provided for in article 24 of this Convention.

5.   Where a person referred to in paragraph 1 of this article located in one State Party can provide substantial cooperation to the competent authorities of another State Party, the States Parties concerned may consider entering into agreements or arrangements, in accordance with their domestic law, concerning the potential provision by the other State Party of the treatment set forth in paragraphs 2 and 3 of this article.

## Article 27.   Law enforcement cooperation

1.   States Parties shall cooperate closely with one another, consistent with their respective domestic legal and administrative systems, to enhance the effectiveness of law enforcement action to combat the offences covered by this Convention. Each State Party shall, in particular, adopt effective measures:

(a)   To enhance and, where necessary, to establish channels of communication between their competent authorities, agencies and services in order to facilitate the secure and rapid exchange of information concerning all aspects of the offences covered by this Convention, including, if the States Parties concerned deem it appropriate, links with other criminal activities;

(b)   To cooperate with other States Parties in conducting inquiries with respect to offences covered by this Convention concerning:

  (i)   The identity, whereabouts and activities of persons suspected of involvement in such offences or the location of other persons concerned;

  (ii)   The movement of proceeds of crime or property derived from the commission of such offences;

  (iii)   The movement of property, equipment or other instrumentalities used or intended for use in the commission of such offences;

(c)   To provide, when appropriate, necessary items or quantities of substances for analytical or investigative purposes;

(d)   To facilitate effective coordination between their competent authorities, agencies and services and to promote the exchange of personnel and other experts, including, subject to bilateral agreements or arrangements between the States Parties concerned, the posting of liaison officers;

*(e)* To exchange information with other States Parties on specific means and methods used by organized criminal groups, including, where applicable, routes and conveyances and the use of false identities, altered or false documents or other means of concealing their activities;

*(f)* To exchange information and coordinate administrative and other measures taken as appropriate for the purpose of early identification of the offences covered by this Convention.

2.    With a view to giving effect to this Convention, States Parties shall consider entering into bilateral or multilateral agreements or arrangements on direct cooperation between their law enforcement agencies and, where such agreements or arrangements already exist, amending them. In the absence of such agreements or arrangements between the States Parties concerned, the Parties may consider this Convention as the basis for mutual law enforcement cooperation in respect of the offences covered by this Convention. Whenever appropriate, States Parties shall make full use of agreements or arrangements, including international or regional organizations, to enhance the cooperation between their law enforcement agencies.

3.    States Parties shall endeavour to cooperate within their means to respond to transnational organized crime committed through the use of modern technology.

## Article 28.   Collection, exchange and analysis of information on the nature of organized crime

1.    Each State Party shall consider analysing, in consultation with the scientific and academic communities, trends in organized crime in its territory, the circumstances in which organized crime operates, as well as the professional groups and technologies involved.

2.    States Parties shall consider developing and sharing analytical expertise concerning organized criminal activities with each other and through international and regional organizations. For that purpose, common definitions, standards and methodologies should be developed and applied as appropriate.

3.    Each State Party shall consider monitoring its policies and actual measures to combat organized crime and making assessments of their effectiveness and efficiency.

## Article 29.   Training and technical assistance

1.    Each State Party shall, to the extent necessary, initiate, develop or improve specific training programmes for its law enforcement personnel,

including prosecutors, investigating magistrates and customs personnel, and other personnel charged with the prevention, detection and control of the offences covered by this Convention. Such programmes may include secondments and exchanges of staff. Such programmes shall deal, in particular and to the extent permitted by domestic law, with the following:

*(a)* Methods used in the prevention, detection and control of the offences covered by this Convention;

*(b)* Routes and techniques used by persons suspected of involvement in offences covered by this Convention, including in transit States, and appropriate countermeasures;

*(c)* Monitoring of the movement of contraband;

*(d)* Detection and monitoring of the movements of proceeds of crime, property, equipment or other instrumentalities and methods used for the transfer, concealment or disguise of such proceeds, property, equipment or other instrumentalities, as well as methods used in combating money-laundering and other financial crimes;

*(e)* Collection of evidence;

*(f)* Control techniques in free trade zones and free ports;

*(g)* Modern law enforcement equipment and techniques, including electronic surveillance, controlled deliveries and undercover operations;

*(h)* Methods used in combating transnational organized crime committed through the use of computers, telecommunications networks or other forms of modern technology; and

*(i)* Methods used in the protection of victims and witnesses.

2.   States Parties shall assist one another in planning and implementing research and training programmes designed to share expertise in the areas referred to in paragraph 1 of this article and to that end shall also, when appropriate, use regional and international conferences and seminars to promote cooperation and to stimulate discussion on problems of mutual concern, including the special problems and needs of transit States.

3.   States Parties shall promote training and technical assistance that will facilitate extradition and mutual legal assistance. Such training and technical assistance may include language training, secondments and exchanges between personnel in central authorities or agencies with relevant responsibilities.

4.   In the case of existing bilateral and multilateral agreements or arrangements, States Parties shall strengthen, to the extent necessary, efforts to maximize operational and training activities within international and regional organizations and within other relevant bilateral and multilateral agreements or arrangements.

31

### Article 30.   Other measures: implementation of the Convention through economic development and technical assistance

1.   States Parties shall take measures conducive to the optimal implementation of this Convention to the extent possible, through international cooperation, taking into account the negative effects of organized crime on society in general, in particular on sustainable development.

2.   States Parties shall make concrete efforts to the extent possible and in coordination with each other, as well as with international and regional organizations:

*(a)*   To enhance their cooperation at various levels with developing countries, with a view to strengthening the capacity of the latter to prevent and combat transnational organized crime;

*(b)*   To enhance financial and material assistance to support the efforts of developing countries to fight transnational organized crime effectively and to help them implement this Convention successfully;

*(c)*   To provide technical assistance to developing countries and countries with economies in transition to assist them in meeting their needs for the implementation of this Convention. To that end, States Parties shall endeavour to make adequate and regular voluntary contributions to an account specifically designated for that purpose in a United Nations funding mechanism. States Parties may also give special consideration, in accordance with their domestic law and the provisions of this Convention, to contributing to the aforementioned account a percentage of the money or of the corresponding value of proceeds of crime or property confiscated in accordance with the provisions of this Convention;

*(d)*   To encourage and persuade other States and financial institutions as appropriate to join them in efforts in accordance with this article, in particular by providing more training programmes and modern equipment to developing countries in order to assist them in achieving the objectives of this Convention.

3.   To the extent possible, these measures shall be without prejudice to existing foreign assistance commitments or to other financial cooperation arrangements at the bilateral, regional or international level.

4.   States Parties may conclude bilateral or multilateral agreements or arrangements on material and logistical assistance, taking into consideration the financial arrangements necessary for the means of international cooperation provided for by this Convention to be effective and for the prevention, detection and control of transnational organized crime.

*Article 31.   Prevention*

1.   States Parties shall endeavour to develop and evaluate national projects and to establish and promote best practices and policies aimed at the prevention of transnational organized crime.

2.   States Parties shall endeavour, in accordance with fundamental principles of their domestic law, to reduce existing or future opportunities for organized criminal groups to participate in lawful markets with proceeds of crime, through appropriate legislative, administrative or other measures. These measures should focus on:

*(a)*   The strengthening of cooperation between law enforcement agencies or prosecutors and relevant private entities, including industry;

*(b)*   The promotion of the development of standards and procedures designed to safeguard the integrity of public and relevant private entities, as well as codes of conduct for relevant professions, in particular lawyers, notaries public, tax consultants and accountants;

*(c)*   The prevention of the misuse by organized criminal groups of tender procedures conducted by public authorities and of subsidies and licences granted by public authorities for commercial activity;

*(d)*   The prevention of the misuse of legal persons by organized criminal groups; such measures could include:

   (i)   The establishment of public records on legal and natural persons involved in the establishment, management and funding of legal persons;

   (ii)   The introduction of the possibility of disqualifying by court order or any appropriate means for a reasonable period of time persons convicted of offences covered by this Convention from acting as directors of legal persons incorporated within their jurisdiction;

   (iii)   The establishment of national records of persons disqualified from acting as directors of legal persons; and

   (iv)   The exchange of information contained in the records referred to in subparagraphs *(d)* (i) and (iii) of this paragraph with the competent authorities of other States Parties.

3.   States Parties shall endeavour to promote the reintegration into society of persons convicted of offences covered by this Convention.

4.   States Parties shall endeavour to evaluate periodically existing relevant legal instruments and administrative practices with a view to detecting their vulnerability to misuse by organized criminal groups.

33

5.    States Parties shall endeavour to promote public awareness regarding the existence, causes and gravity of and the threat posed by transnational organized crime. Information may be disseminated where appropriate through the mass media and shall include measures to promote public participation in preventing and combating such crime.

6.    Each State Party shall inform the Secretary-General of the United Nations of the name and address of the authority or authorities that can assist other States Parties in developing measures to prevent transnational organized crime.

7.    States Parties shall, as appropriate, collaborate with each other and relevant international and regional organizations in promoting and developing the measures referred to in this article. This includes participation in international projects aimed at the prevention of transnational organized crime, for example by alleviating the circumstances that render socially marginalized groups vulnerable to the action of transnational organized crime.

### Article 32.   Conference of the Parties to the Convention

1.    A Conference of the Parties to the Convention is hereby established to improve the capacity of States Parties to combat transnational organized crime and to promote and review the implementation of this Convention.

2.    The Secretary-General of the United Nations shall convene the Conference of the Parties not later than one year following the entry into force of this Convention. The Conference of the Parties shall adopt rules of procedure and rules governing the activities set forth in paragraphs 3 and 4 of this article (including rules concerning payment of expenses incurred in carrying out those activities).

3.    The Conference of the Parties shall agree upon mechanisms for achieving the objectives mentioned in paragraph 1 of this article, including:

*(a)*  Facilitating activities by States Parties under articles 29, 30 and 31 of this Convention, including by encouraging the mobilization of voluntary contributions;

*(b)*  Facilitating the exchange of information among States Parties on patterns and trends in transnational organized crime and on successful practices for combating it;

*(c)*  Cooperating with relevant international and regional organizations and non-governmental organizations;

34

*(d)* Reviewing periodically the implementation of this Convention;

*(e)* Making recommendations to improve this Convention and its implementation.

4.  For the purpose of paragraphs 3 *(d)* and *(e)* of this article, the Conference of the Parties shall acquire the necessary knowledge of the measures taken by States Parties in implementing this Convention and the difficulties encountered by them in doing so through information provided by them and through such supplemental review mechanisms as may be established by the Conference of the Parties.

5.  Each State Party shall provide the Conference of the Parties with information on its programmes, plans and practices, as well as legislative and administrative measures to implement this Convention, as required by the Conference of the Parties.

### *Article 33.  Secretariat*

1.  The Secretary-General of the United Nations shall provide the necessary secretariat services to the Conference of the Parties to the Convention.

2.  The secretariat shall:

*(a)* Assist the Conference of the Parties in carrying out the activities set forth in article 32 of this Convention and make arrangements and provide the necessary services for the sessions of the Conference of the Parties;

*(b)* Upon request, assist States Parties in providing information to the Conference of the Parties as envisaged in article 32, paragraph 5, of this Convention; and

*(c)* Ensure the necessary coordination with the secretariats of relevant international and regional organizations.

### *Article 34.  Implementation of the Convention*

1.  Each State Party shall take the necessary measures, including legislative and administrative measures, in accordance with fundamental principles of its domestic law, to ensure the implementation of its obligations under this Convention.

2.  The offences established in accordance with articles 5, 6, 8 and 23 of this Convention shall be established in the domestic law of each State Party

35

independently of the transnational nature or the involvement of an organized criminal group as described in article 3, paragraph 1, of this Convention, except to the extent that article 5 of this Convention would require the involvement of an organized criminal group.

3.    Each State Party may adopt more strict or severe measures than those provided for by this Convention for preventing and combating transnational organized crime.

## Article 35.   Settlement of disputes

l.    States Parties shall endeavour to settle disputes concerning the interpretation or application of this Convention through negotiation.

2.    Any dispute between two or more States Parties concerning the interpretation or application of this Convention that cannot be settled through negotiation within a reasonable time shall, at the request of one of those States Parties, be submitted to arbitration. If, six months after the date of the request for arbitration, those States Parties are unable to agree on the organization of the arbitration, any one of those States Parties may refer the dispute to the International Court of Justice by request in accordance with the Statute of the Court.

3.    Each State Party may, at the time of signature, ratification, acceptance or approval of or accession to this Convention, declare that it does not consider itself bound by paragraph 2 of this article. The other States Parties shall not be bound by paragraph 2 of this article with respect to any State Party that has made such a reservation.

4.    Any State Party that has made a reservation in accordance with paragraph 3 of this article may at any time withdraw that reservation by notification to the Secretary-General of the United Nations.

## Article 36.   Signature, ratification, acceptance, approval and accession

1.    This Convention shall be open to all States for signature from 12 to 15 December 2000 in Palermo, Italy, and thereafter at United Nations Headquarters in New York until 12 December 2002.

2.    This Convention shall also be open for signature by regional economic integration organizations provided that at least one member State of such organization has signed this Convention in accordance with paragraph 1 of this article.

36

3.    This Convention is subject to ratification, acceptance or approval. Instruments of ratification, acceptance or approval shall be deposited with the Secretary-General of the United Nations. A regional economic integration organization may deposit its instrument of ratification, acceptance or approval if at least one of its member States has done likewise. In that instrument of ratification, acceptance or approval, such organization shall declare the extent of its competence with respect to the matters governed by this Convention. Such organization shall also inform the depositary of any relevant modification in the extent of its competence.

4.    This Convention is open for accession by any State or any regional economic integration organization of which at least one member State is a Party to this Convention. Instruments of accession shall be deposited with the Secretary-General of the United Nations. At the time of its accession, a regional economic integration organization shall declare the extent of its competence with respect to matters governed by this Convention. Such organization shall also inform the depositary of any relevant modification in the extent of its competence.

## Article 37.   Relation with protocols

1.    This Convention may be supplemented by one or more protocols.

2.    In order to become a Party to a protocol, a State or a regional economic integration organization must also be a Party to this Convention.

3.    A State Party to this Convention is not bound by a protocol unless it becomes a Party to the protocol in accordance with the provisions thereof.

4.    Any protocol to this Convention shall be interpreted together with this Convention, taking into account the purpose of that protocol.

## Article 38.   Entry into force

1.    This Convention shall enter into force on the ninetieth day after the date of deposit of the fortieth instrument of ratification, acceptance, approval or accession. For the purpose of this paragraph, any instrument deposited by a regional economic integration organization shall not be counted as additional to those deposited by member States of such organization.

2.    For each State or regional economic integration organization ratifying, accepting, approving or acceding to this Convention after the deposit of the

fortieth instrument of such action, this Convention shall enter into force on the thirtieth day after the date of deposit by such State or organization of the relevant instrument.

### Article 39.   Amendment

1.   After the expiry of five years from the entry into force of this Convention, a State Party may propose an amendment and file it with the Secretary-General of the United Nations, who shall thereupon communicate the proposed amendment to the States Parties and to the Conference of the Parties to the Convention for the purpose of considering and deciding on the proposal. The Conference of the Parties shall make every effort to achieve consensus on each amendment. If all efforts at consensus have been exhausted and no agreement has been reached, the amendment shall, as a last resort, require for its adoption a two-thirds majority vote of the States Parties present and voting at the meeting of the Conference of the Parties.

2.   Regional economic integration organizations, in matters within their competence, shall exercise their right to vote under this article with a number of votes equal to the number of their member States that are Parties to this Convention. Such organizations shall not exercise their right to vote if their member States exercise theirs and vice versa.

3.   An amendment adopted in accordance with paragraph 1 of this article is subject to ratification, acceptance or approval by States Parties.

4.   An amendment adopted in accordance with paragraph 1 of this article shall enter into force in respect of a State Party ninety days after the date of the deposit with the Secretary-General of the United Nations of an instrument of ratification, acceptance or approval of such amendment.

5.   When an amendment enters into force, it shall be binding on those States Parties which have expressed their consent to be bound by it. Other States Parties shall still be bound by the provisions of this Convention and any earlier amendments that they have ratified, accepted or approved.

### Article 40.   Denunciation

1.   A State Party may denounce this Convention by written notification to the Secretary-General of the United Nations. Such denunciation shall become effective one year after the date of receipt of the notification by the Secretary-General.

2.    A regional economic integration organization shall cease to be a Party to this Convention when all of its member States have denounced it.

3.    Denunciation of this Convention in accordance with paragraph 1 of this article shall entail the denunciation of any protocols thereto.

## *Article 41.   Depositary and languages*

1.    The Secretary-General of the United Nations is designated depositary of this Convention.

2.    The original of this Convention, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations.

IN WITNESS WHEREOF, the undersigned plenipotentiaries, being duly authorized thereto by their respective Governments, have signed this Convention.

## *Annex II*

# Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime

### Preamble

*The States Parties to this Protocol*,

*Declaring* that effective action to prevent and combat trafficking in persons, especially women and children, requires a comprehensive international approach in the countries of origin, transit and destination that includes measures to prevent such trafficking, to punish the traffickers and to protect the victims of such trafficking, including by protecting their internationally recognized human rights,

*Taking into account* the fact that, despite the existence of a variety of international instruments containing rules and practical measures to combat the exploitation of persons, especially women and children, there is no universal instrument that addresses all aspects of trafficking in persons,

*Concerned* that, in the absence of such an instrument, persons who are vulnerable to trafficking will not be sufficiently protected,

*Recalling* General Assembly resolution 53/111 of 9 December 1998, in which the Assembly decided to establish an open-ended intergovernmental ad hoc committee for the purpose of elaborating a comprehensive international convention against transnational organized crime and of discussing the elaboration of, inter alia, an international instrument addressing trafficking in women and children,

*Convinced* that supplementing the United Nations Convention against Transnational Organized Crime with an international instrument for the

prevention, suppression and punishment of trafficking in persons, especially women and children, will be useful in preventing and combating that crime,

*Have agreed as follows*:

## I.   General provisions

### Article 1.   Relation with the United Nations Convention against Transnational Organized Crime

1.   This Protocol supplements the United Nations Convention against Transnational Organized Crime. It shall be interpreted together with the Convention.

2.   The provisions of the Convention shall apply, mutatis mutandis, to this Protocol unless otherwise provided herein.

3.   The offences established in accordance with article 5 of this Protocol shall be regarded as offences established in accordance with the Convention.

### Article 2.   Statement of purpose

The purposes of this Protocol are:

*(a)*   To prevent and combat trafficking in persons, paying particular attention to women and children;

*(b)*   To protect and assist the victims of such trafficking, with full respect for their human rights; and

*(c)*   To promote cooperation among States Parties in order to meet those objectives.

### Article 3.   Use of terms

For the purposes of this Protocol:

*(a)*   "Trafficking in persons" shall mean the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs;

42

*(b)* The consent of a victim of trafficking in persons to the intended exploitation set forth in subparagraph *(a)* of this article shall be irrelevant where any of the means set forth in subparagraph *(a)* have been used;

*(c)* The recruitment, transportation, transfer, harbouring or receipt of a child for the purpose of exploitation shall be considered "trafficking in persons" even if this does not involve any of the means set forth in subparagraph *(a)* of this article;

*(d)* "Child" shall mean any person under eighteen years of age.

### Article 4.   Scope of application

This Protocol shall apply, except as otherwise stated herein, to the prevention, investigation and prosecution of the offences established in accordance with article 5 of this Protocol, where those offences are transnational in nature and involve an organized criminal group, as well as to the protection of victims of such offences.

### Article 5.   Criminalization

1.   Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences the conduct set forth in article 3 of this Protocol, when committed intentionally.

2.   Each State Party shall also adopt such legislative and other measures as may be necessary to establish as criminal offences:

*(a)* Subject to the basic concepts of its legal system, attempting to commit an offence established in accordance with paragraph 1 of this article;

*(b)* Participating as an accomplice in an offence established in accordance with paragraph 1 of this article; and

*(c)* Organizing or directing other persons to commit an offence established in accordance with paragraph 1 of this article.

## II.   Protection of victims of trafficking in persons

### Article 6.   Assistance to and protection of victims of trafficking in persons

1.   In appropriate cases and to the extent possible under its domestic law, each State Party shall protect the privacy and identity of victims of trafficking

in persons, including, inter alia, by making legal proceedings relating to such trafficking confidential.

2.    Each State Party shall ensure that its domestic legal or administrative system contains measures that provide to victims of trafficking in persons, in appropriate cases:

*(a)*   Information on relevant court and administrative proceedings;

*(b)*   Assistance to enable their views and concerns to be presented and considered at appropriate stages of criminal proceedings against offenders, in a manner not prejudicial to the rights of the defence.

3.    Each State Party shall consider implementing measures to provide for the physical, psychological and social recovery of victims of trafficking in persons, including, in appropriate cases, in cooperation with non-governmental organizations, other relevant organizations and other elements of civil society, and, in particular, the provision of:

*(a)*   Appropriate housing;

*(b)*   Counselling and information, in particular as regards their legal rights, in a language that the victims of trafficking in persons can understand;

*(c)*   Medical, psychological and material assistance; and

*(d)*   Employment, educational and training opportunities.

4.    Each State Party shall take into account, in applying the provisions of this article, the age, gender and special needs of victims of trafficking in persons, in particular the special needs of children, including appropriate housing, education and care.

5.    Each State Party shall endeavour to provide for the physical safety of victims of trafficking in persons while they are within its territory.

6.    Each State Party shall ensure that its domestic legal system contains measures that offer victims of trafficking in persons the possibility of obtaining compensation for damage suffered.

### *Article 7.   Status of victims of trafficking in persons in receiving States*

1.    In addition to taking measures pursuant to article 6 of this Protocol, each State Party shall consider adopting legislative or other appropriate measures that permit victims of trafficking in persons to remain in its territory, temporarily or permanently, in appropriate cases.

2.   In implementing the provision contained in paragraph 1 of this article, each State Party shall give appropriate consideration to humanitarian and compassionate factors.

### *Article 8.   Repatriation of victims of trafficking in persons*

1.   The State Party of which a victim of trafficking in persons is a national or in which the person had the right of permanent residence at the time of entry into the territory of the receiving State Party shall facilitate and accept, with due regard for the safety of that person, the return of that person without undue or unreasonable delay.

2.   When a State Party returns a victim of trafficking in persons to a State Party of which that person is a national or in which he or she had, at the time of entry into the territory of the receiving State Party, the right of permanent residence, such return shall be with due regard for the safety of that person and for the status of any legal proceedings related to the fact that the person is a victim of trafficking and shall preferably be voluntary.

3.   At the request of a receiving State Party, a requested State Party shall, without undue or unreasonable delay, verify whether a person who is a victim of trafficking in persons is its national or had the right of permanent residence in its territory at the time of entry into the territory of the receiving State Party.

4.   In order to facilitate the return of a victim of trafficking in persons who is without proper documentation, the State Party of which that person is a national or in which he or she had the right of permanent residence at the time of entry into the territory of the receiving State Party shall agree to issue, at the request of the receiving State Party, such travel documents or other authorization as may be necessary to enable the person to travel to and re-enter its territory.

5.   This article shall be without prejudice to any right afforded to victims of trafficking in persons by any domestic law of the receiving State Party.

6.   This article shall be without prejudice to any applicable bilateral or multilateral agreement or arrangement that governs, in whole or in part, the return of victims of trafficking in persons.

## III.   Prevention, cooperation and other measures

### *Article 9.   Prevention of trafficking in persons*

1.   States Parties shall establish comprehensive policies, programmes and other measures:

*(a)*  To prevent and combat trafficking in persons; and

*(b)*  To protect victims of trafficking in persons, especially women and children, from revictimization.

2.    States Parties shall endeavour to undertake measures such as research, information and mass media campaigns and social and economic initiatives to prevent and combat trafficking in persons.

3.    Policies, programmes and other measures established in accordance with this article shall, as appropriate, include cooperation with non-governmental organizations, other relevant organizations and other elements of civil society.

4.    States Parties shall take or strengthen measures, including through bilateral or multilateral cooperation, to alleviate the factors that make persons, especially women and children, vulnerable to trafficking, such as poverty, underdevelopment and lack of equal opportunity.

5.    States Parties shall adopt or strengthen legislative or other measures, such as educational, social or cultural measures, including through bilateral and multilateral cooperation, to discourage the demand that fosters all forms of exploitation of persons, especially women and children, that leads to trafficking.

## *Article 10.   Information exchange and training*

1.    Law enforcement, immigration or other relevant authorities of States Parties shall, as appropriate, cooperate with one another by exchanging information, in accordance with their domestic law, to enable them to determine:

*(a)*  Whether individuals crossing or attempting to cross an international border with travel documents belonging to other persons or without travel documents are perpetrators or victims of trafficking in persons;

*(b)*  The types of travel document that individuals have used or attempted to use to cross an international border for the purpose of trafficking in persons; and

*(c)*  The means and methods used by organized criminal groups for the purpose of trafficking in persons, including the recruitment and transportation of victims, routes and links between and among individuals and groups engaged in such trafficking, and possible measures for detecting them.

2.    States Parties shall provide or strengthen training for law enforcement, immigration and other relevant officials in the prevention of trafficking in

persons. The training should focus on methods used in preventing such trafficking, prosecuting the traffickers and protecting the rights of the victims, including protecting the victims from the traffickers. The training should also take into account the need to consider human rights and child- and gender-sensitive issues and it should encourage cooperation with non-governmental organizations, other relevant organizations and other elements of civil society.

3.    A State Party that receives information shall comply with any request by the State Party that transmitted the information that places restrictions on its use.

## Article 11.   Border measures

1.    Without prejudice to international commitments in relation to the free movement of people, States Parties shall strengthen, to the extent possible, such border controls as may be necessary to prevent and detect trafficking in persons.

2.    Each State Party shall adopt legislative or other appropriate measures to prevent, to the extent possible, means of transport operated by commercial carriers from being used in the commission of offences established in accordance with article 5 of this Protocol.

3.    Where appropriate, and without prejudice to applicable international conventions, such measures shall include establishing the obligation of commercial carriers, including any transportation company or the owner or operator of any means of transport, to ascertain that all passengers are in possession of the travel documents required for entry into the receiving State.

4.    Each State Party shall take the necessary measures, in accordance with its domestic law, to provide for sanctions in cases of violation of the obligation set forth in paragraph 3 of this article.

5.    Each State Party shall consider taking measures that permit, in accordance with its domestic law, the denial of entry or revocation of visas of persons implicated in the commission of offences established in accordance with this Protocol.

6.    Without prejudice to article 27 of the Convention, States Parties shall consider strengthening cooperation among border control agencies by, inter alia, establishing and maintaining direct channels of communication.

47

### Article 12.   Security and control of documents

Each State Party shall take such measures as may be necessary, within available means:

*(a)*  To ensure that travel or identity documents issued by it are of such quality that they cannot easily be misused and cannot readily be falsified or unlawfully altered, replicated or issued; and

*(b)*  To ensure the integrity and security of travel or identity documents issued by or on behalf of the State Party and to prevent their unlawful creation, issuance and use.

### Article 13.   Legitimacy and validity of documents

At the request of another State Party, a State Party shall, in accordance with its domestic law, verify within a reasonable time the legitimacy and validity of travel or identity documents issued or purported to have been issued in its name and suspected of being used for trafficking in persons.

## IV.   Final provisions

### Article 14.   Saving clause

1.   Nothing in this Protocol shall affect the rights, obligations and responsibilities of States and individuals under international law, including international humanitarian law and international human rights law and, in particular, where applicable, the 1951 Convention[1] and the 1967 Protocol[2] relating to the Status of Refugees and the principle of non-refoulement as contained therein.

2.   The measures set forth in this Protocol shall be interpreted and applied in a way that is not discriminatory to persons on the ground that they are victims of trafficking in persons. The interpretation and application of those measures shall be consistent with internationally recognized principles of non-discrimination.

### Article 15.   Settlement of disputes

l.   States Parties shall endeavour to settle disputes concerning the interpretation or application of this Protocol through negotiation.

--------

[1]United Nations, *Treaty Series,* vol. 189, No. 2545.

[2]Ibid., vol. 606, No. 8791.

48

2.    Any dispute between two or more States Parties concerning the interpretation or application of this Protocol that cannot be settled through negotiation within a reasonable time shall, at the request of one of those States Parties, be submitted to arbitration. If, six months after the date of the request for arbitration, those States Parties are unable to agree on the organization of the arbitration, any one of those States Parties may refer the dispute to the International Court of Justice by request in accordance with the Statute of the Court.

3.    Each State Party may, at the time of signature, ratification, acceptance or approval of or accession to this Protocol, declare that it does not consider itself bound by paragraph 2 of this article. The other States Parties shall not be bound by paragraph 2 of this article with respect to any State Party that has made such a reservation.

4.    Any State Party that has made a reservation in accordance with paragraph 3 of this article may at any time withdraw that reservation by notification to the Secretary-General of the United Nations.

### *Article 16.   Signature, ratification, acceptance, approval and accession*

1.    This Protocol shall be open to all States for signature from 12 to 15 December 2000 in Palermo, Italy, and thereafter at United Nations Headquarters in New York until 12 December 2002.

2.    This Protocol shall also be open for signature by regional economic integration organizations provided that at least one member State of such organization has signed this Protocol in accordance with paragraph 1 of this article.

3.    This Protocol is subject to ratification, acceptance or approval. Instruments of ratification, acceptance or approval shall be deposited with the Secretary-General of the United Nations. A regional economic integration organization may deposit its instrument of ratification, acceptance or approval if at least one of its member States has done likewise. In that instrument of ratification, acceptance or approval, such organization shall declare the extent of its competence with respect to the matters governed by this Protocol. Such organization shall also inform the depositary of any relevant modification in the extent of its competence.

4.    This Protocol is open for accession by any State or any regional economic integration organization of which at least one member State is a Party

49

to this Protocol. Instruments of accession shall be deposited with the Secretary-General of the United Nations. At the time of its accession, a regional economic integration organization shall declare the extent of its competence with respect to matters governed by this Protocol. Such organization shall also inform the depositary of any relevant modification in the extent of its competence.

## Article 17.   Entry into force

1.    This Protocol shall enter into force on the ninetieth day after the date of deposit of the fortieth instrument of ratification, acceptance, approval or accession, except that it shall not enter into force before the entry into force of the Convention. For the purpose of this paragraph, any instrument deposited by a regional economic integration organization shall not be counted as additional to those deposited by member States of such organization.

2.    For each State or regional economic integration organization ratifying, accepting, approving or acceding to this Protocol after the deposit of the fortieth instrument of such action, this Protocol shall enter into force on the thirtieth day after the date of deposit by such State or organization of the relevant instrument or on the date this Protocol enters into force pursuant to paragraph 1 of this article, whichever is the later.

## Article 18.   Amendment

1.    After the expiry of five years from the entry into force of this Protocol, a State Party to the Protocol may propose an amendment and file it with the Secretary-General of the United Nations, who shall thereupon communicate the proposed amendment to the States Parties and to the Conference of the Parties to the Convention for the purpose of considering and deciding on the proposal. The States Parties to this Protocol meeting at the Conference of the Parties shall make every effort to achieve consensus on each amendment. If all efforts at consensus have been exhausted and no agreement has been reached, the amendment shall, as a last resort, require for its adoption a two-thirds majority vote of the States Parties to this Protocol present and voting at the meeting of the Conference of the Parties.

2.    Regional economic integration organizations, in matters within their competence, shall exercise their right to vote under this article with a number of votes equal to the number of their member States that are Parties to this Protocol. Such organizations shall not exercise their right to vote if their member States exercise theirs and vice versa.

3.     An amendment adopted in accordance with paragraph 1 of this article is subject to ratification, acceptance or approval by States Parties.

4.     An amendment adopted in accordance with paragraph 1 of this article shall enter into force in respect of a State Party ninety days after the date of the deposit with the Secretary-General of the United Nations of an instrument of ratification, acceptance or approval of such amendment.

5.     When an amendment enters into force, it shall be binding on those States Parties which have expressed their consent to be bound by it. Other States Parties shall still be bound by the provisions of this Protocol and any earlier amendments that they have ratified, accepted or approved.

## Article 19.   Denunciation

1.     A State Party may denounce this Protocol by written notification to the Secretary-General of the United Nations. Such denunciation shall become effective one year after the date of receipt of the notification by the Secretary-General.

2.     A regional economic integration organization shall cease to be a Party to this Protocol when all of its member States have denounced it.

## Article 20.   Depositary and languages

1.     The Secretary-General of the United Nations is designated depositary of this Protocol.

2.     The original of this Protocol, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations.

IN WITNESS WHEREOF, the undersigned plenipotentiaries, being duly authorized thereto by their respective Governments, have signed this Protocol.

Appendix 004991

Appendix 004992

*Annex III*

# Protocol against the Smuggling of Migrants by Land, Sea and Air, supplementing the United Nations Convention against Transnational Organized Crime

## Preamble

*The States Parties to this Protocol*,

*Declaring* that effective action to prevent and combat the smuggling of migrants by land, sea and air requires a comprehensive international approach, including cooperation, the exchange of information and other appropriate measures, including socio-economic measures, at the national, regional and international levels,

*Recalling* General Assembly resolution 54/212 of 22 December 1999, in which the Assembly urged Member States and the United Nations system to strengthen international cooperation in the area of international migration and development in order to address the root causes of migration, especially those related to poverty, and to maximize the benefits of international migration to those concerned, and encouraged, where relevant, interregional, regional and subregional mechanisms to continue to address the question of migration and development,

*Convinced* of the need to provide migrants with humane treatment and full protection of their rights,

*Taking into account* the fact that, despite work undertaken in other international forums, there is no universal instrument that addresses all aspects of smuggling of migrants and other related issues,

*Concerned* at the significant increase in the activities of organized criminal groups in smuggling of migrants and other related criminal activities set forth in this Protocol, which bring great harm to the States concerned,

*Also concerned* that the smuggling of migrants can endanger the lives or security of the migrants involved,

*Recalling* General Assembly resolution 53/111 of 9 December 1998, in which the Assembly decided to establish an open-ended intergovernmental ad hoc committee for the purpose of elaborating a comprehensive international convention against transnational organized crime and of discussing the elaboration of, inter alia, an international instrument addressing illegal trafficking in and transporting of migrants, including by sea,

*Convinced* that supplementing the United Nations Convention against Transnational Organized Crime with an international instrument against the smuggling of migrants by land, sea and air will be useful in preventing and combating that crime,

*Have agreed as follows*:

## I.  General provisions

### Article 1.   Relation with the United Nations Convention against Transnational Organized Crime

1.    This Protocol supplements the United Nations Convention against Transnational Organized Crime. It shall be interpreted together with the Convention.

2.    The provisions of the Convention shall apply, mutatis mutandis, to this Protocol unless otherwise provided herein.

3.    The offences established in accordance with article 6 of this Protocol shall be regarded as offences established in accordance with the Convention.

### Article 2.   Statement of purpose

The purpose of this Protocol is to prevent and combat the smuggling of migrants, as well as to promote cooperation among States Parties to that end, while protecting the rights of smuggled migrants.

### Article 3.   Use of terms

For the purposes of this Protocol:

*(a)* "Smuggling of migrants" shall mean the procurement, in order to obtain, directly or indirectly, a financial or other material benefit, of the illegal

entry of a person into a State Party of which the person is not a national or a permanent resident;

*(b)* "Illegal entry" shall mean crossing borders without complying with the necessary requirements for legal entry into the receiving State;

*(c)* "Fraudulent travel or identity document" shall mean any travel or identity document:

> (i) That has been falsely made or altered in some material way by anyone other than a person or agency lawfully authorized to make or issue the travel or identity document on behalf of a State; or

> (ii) That has been improperly issued or obtained through misrepresentation, corruption or duress or in any other unlawful manner; or

> (iii) That is being used by a person other than the rightful holder;

*(d)* "Vessel" shall mean any type of water craft, including non-displacement craft and seaplanes, used or capable of being used as a means of transportation on water, except a warship, naval auxiliary or other vessel owned or operated by a Government and used, for the time being, only on government non-commercial service.

## Article 4.   Scope of application

This Protocol shall apply, except as otherwise stated herein, to the prevention, investigation and prosecution of the offences established in accordance with article 6 of this Protocol, where the offences are transnational in nature and involve an organized criminal group, as well as to the protection of the rights of persons who have been the object of such offences.

## Article 5.   Criminal liability of migrants

Migrants shall not become liable to criminal prosecution under this Protocol for the fact of having been the object of conduct set forth in article 6 of this Protocol.

## Article 6.   Criminalization

1.   Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally and in order to obtain, directly or indirectly, a financial or other material benefit:

*(a)* The smuggling of migrants;

55

(b)  When committed for the purpose of enabling the smuggling of migrants:

      (i)  Producing a fraudulent travel or identity document;

     (ii)  Procuring, providing or possessing such a document;

(c)  Enabling a person who is not a national or a permanent resident to remain in the State concerned without complying with the necessary requirements for legally remaining in the State by the means mentioned in subparagraph (b) of this paragraph or any other illegal means.

2.  Each State Party shall also adopt such legislative and other measures as may be necessary to establish as criminal offences:

(a)  Subject to the basic concepts of its legal system, attempting to commit an offence established in accordance with paragraph 1 of this article;

(b)  Participating as an accomplice in an offence established in accordance with paragraph 1 (a), (b) (i) or (c) of this article and, subject to the basic concepts of its legal system, participating as an accomplice in an offence established in accordance with paragraph 1 (b) (ii) of this article;

(c)  Organizing or directing other persons to commit an offence established in accordance with paragraph 1 of this article.

3.  Each State Party shall adopt such legislative and other measures as may be necessary to establish as aggravating circumstances to the offences established in accordance with paragraph 1 (a), (b) (i) and (c) of this article and, subject to the basic concepts of its legal system, to the offences established in accordance with paragraph 2 (b) and (c) of this article, circumstances:

(a)  That endanger, or are likely to endanger, the lives or safety of the migrants concerned; or

(b)  That entail inhuman or degrading treatment, including for exploitation, of such migrants.

4.  Nothing in this Protocol shall prevent a State Party from taking measures against a person whose conduct constitutes an offence under its domestic law.

## II.  Smuggling of migrants by sea

### Article 7.   Cooperation

States Parties shall cooperate to the fullest extent possible to prevent and suppress the smuggling of migrants by sea, in accordance with the international law of the sea.

*Article 8.   Measures against the smuggling of migrants by sea*

1.   A State Party that has reasonable grounds to suspect that a vessel that is flying its flag or claiming its registry, that is without nationality or that, though flying a foreign flag or refusing to show a flag, is in reality of the nationality of the State Party concerned is engaged in the smuggling of migrants by sea may request the assistance of other States Parties in suppressing the use of the vessel for that purpose. The States Parties so requested shall render such assistance to the extent possible within their means.

2.   A State Party that has reasonable grounds to suspect that a vessel exercising freedom of navigation in accordance with international law and flying the flag or displaying the marks of registry of another State Party is engaged in the smuggling of migrants by sea may so notify the flag State, request confirmation of registry and, if confirmed, request authorization from the flag State to take appropriate measures with regard to that vessel. The flag State may authorize the requesting State, inter alia:

*(a)*   To board the vessel;

*(b)*   To search the vessel; and

*(c)*   If evidence is found that the vessel is engaged in the smuggling of migrants by sea, to take appropriate measures with respect to the vessel and persons and cargo on board, as authorized by the flag State.

3.   A State Party that has taken any measure in accordance with paragraph 2 of this article shall promptly inform the flag State concerned of the results of that measure.

4.   A State Party shall respond expeditiously to a request from another State Party to determine whether a vessel that is claiming its registry or flying its flag is entitled to do so and to a request for authorization made in accordance with paragraph 2 of this article.

5.   A flag State may, consistent with article 7 of this Protocol, subject its authorization to conditions to be agreed by it and the requesting State, including conditions relating to responsibility and the extent of effective measures to be taken. A State Party shall take no additional measures without the express authorization of the flag State, except those necessary to relieve imminent danger to the lives of persons or those which derive from relevant bilateral or multilateral agreements.

6.   Each State Party shall designate an authority or, where necessary, authorities to receive and respond to requests for assistance, for confirmation of

57

registry or of the right of a vessel to fly its flag and for authorization to take appropriate measures. Such designation shall be notified through the Secretary-General to all other States Parties within one month of the designation.

7.    A State Party that has reasonable grounds to suspect that a vessel is engaged in the smuggling of migrants by sea and is without nationality or may be assimilated to a vessel without nationality may board and search the vessel. If evidence confirming the suspicion is found, that State Party shall take appropriate measures in accordance with relevant domestic and international law.

## Article 9.   Safeguard clauses

1.    Where a State Party takes measures against a vessel in accordance with article 8 of this Protocol, it shall:

*(a)*  Ensure the safety and humane treatment of the persons on board;

*(b)*  Take due account of the need not to endanger the security of the vessel or its cargo;

*(c)*  Take due account of the need not to prejudice the commercial or legal interests of the flag State or any other interested State;

*(d)*  Ensure, within available means, that any measure taken with regard to the vessel is environmentally sound.

2.    Where the grounds for measures taken pursuant to article 8 of this Protocol prove to be unfounded, the vessel shall be compensated for any loss or damage that may have been sustained, provided that the vessel has not committed any act justifying the measures taken.

3.    Any measure taken, adopted or implemented in accordance with this chapter shall take due account of the need not to interfere with or to affect:

*(a)*  The rights and obligations and the exercise of jurisdiction of coastal States in accordance with the international law of the sea; or

*(b)*  The authority of the flag State to exercise jurisdiction and control in administrative, technical and social matters involving the vessel.

4.    Any measure taken at sea pursuant to this chapter shall be carried out only by warships or military aircraft, or by other ships or aircraft clearly marked and identifiable as being on government service and authorized to that effect.

### III.   Prevention, cooperation and other measures

*Article 10.   Information*

1.    Without prejudice to articles 27 and 28 of the Convention, States Parties, in particular those with common borders or located on routes along which migrants are smuggled, shall, for the purpose of achieving the objectives of this Protocol, exchange among themselves, consistent with their respective domestic legal and administrative systems, relevant information on matters such as:

*(a)*   Embarkation and destination points, as well as routes, carriers and means of transportation, known to be or suspected of being used by an organized criminal group engaged in conduct set forth in article 6 of this Protocol;

*(b)*   The identity and methods of organizations or organized criminal groups known to be or suspected of being engaged in conduct set forth in article 6 of this Protocol;

*(c)*   The authenticity and proper form of travel documents issued by a State Party and the theft or related misuse of blank travel or identity documents;

*(d)*   Means and methods of concealment and transportation of persons, the unlawful alteration, reproduction or acquisition or other misuse of travel or identity documents used in conduct set forth in article 6 of this Protocol and ways of detecting them;

*(e)*   Legislative experiences and practices and measures to prevent and combat the conduct set forth in article 6 of this Protocol; and

*(f)*   Scientific and technological information useful to law enforcement, so as to enhance each other's ability to prevent, detect and investigate the conduct set forth in article 6 of this Protocol and to prosecute those involved.

2.    A State Party that receives information shall comply with any request by the State Party that transmitted the information that places restrictions on its use.

*Article 11.   Border measures*

1.    Without prejudice to international commitments in relation to the free movement of people, States Parties shall strengthen, to the extent possible, such border controls as may be necessary to prevent and detect the smuggling of migrants.

2.    Each State Party shall adopt legislative or other appropriate measures to prevent, to the extent possible, means of transport operated by commercial

59

carriers from being used in the commission of the offence established in accordance with article 6, paragraph 1 *(a),* of this Protocol.

3.    Where appropriate, and without prejudice to applicable international conventions, such measures shall include establishing the obligation of commercial carriers, including any transportation company or the owner or operator of any means of transport, to ascertain that all passengers are in possession of the travel documents required for entry into the receiving State.

4.    Each State Party shall take the necessary measures, in accordance with its domestic law, to provide for sanctions in cases of violation of the obligation set forth in paragraph 3 of this article.

5.    Each State Party shall consider taking measures that permit, in accordance with its domestic law, the denial of entry or revocation of visas of persons implicated in the commission of offences established in accordance with this Protocol.

6.    Without prejudice to article 27 of the Convention, States Parties shall consider strengthening cooperation among border control agencies by, inter alia, establishing and maintaining direct channels of communication.

### *Article 12.    Security and control of documents*

Each State Party shall take such measures as may be necessary, within available means:

*(a)*  To ensure that travel or identity documents issued by it are of such quality that they cannot easily be misused and cannot readily be falsified or unlawfully altered, replicated or issued; and

*(b)*  To ensure the integrity and security of travel or identity documents issued by or on behalf of the State Party and to prevent their unlawful creation, issuance and use.

### *Article 13.    Legitimacy and validity of documents*

At the request of another State Party, a State Party shall, in accordance with its domestic law, verify within a reasonable time the legitimacy and validity of travel or identity documents issued or purported to have been issued in its name and suspected of being used for purposes of conduct set forth in article 6 of this Protocol.

60

*Article 14.   Training and technical cooperation*

1.    States Parties shall provide or strengthen specialized training for immigration and other relevant officials in preventing the conduct set forth in article 6 of this Protocol and in the humane treatment of migrants who have been the object of such conduct, while respecting their rights as set forth in this Protocol.

2.    States Parties shall cooperate with each other and with competent international organizations, non-governmental organizations, other relevant organizations and other elements of civil society as appropriate to ensure that there is adequate personnel training in their territories to prevent, combat and eradicate the conduct set forth in article 6 of this Protocol and to protect the rights of migrants who have been the object of such conduct. Such training shall include:

*(a)*   Improving the security and quality of travel documents;

*(b)*   Recognizing and detecting fraudulent travel or identity documents;

*(c)*   Gathering criminal intelligence, relating in particular to the identification of organized criminal groups known to be or suspected of being engaged in conduct set forth in article 6 of this Protocol, the methods used to transport smuggled migrants, the misuse of travel or identity documents for purposes of conduct set forth in article 6 and the means of concealment used in the smuggling of migrants;

*(d)*   Improving procedures for detecting smuggled persons at conventional and non-conventional points of entry and exit; and

*(e)*   The humane treatment of migrants and the protection of their rights as set forth in this Protocol.

3.    States Parties with relevant expertise shall consider providing technical assistance to States that are frequently countries of origin or transit for persons who have been the object of conduct set forth in article 6 of this Protocol. States Parties shall make every effort to provide the necessary resources, such as vehicles, computer systems and document readers, to combat the conduct set forth in article 6.

*Article 15.   Other prevention measures*

1.    Each State Party shall take measures to ensure that it provides or strengthens information programmes to increase public awareness of the fact that the conduct set forth in article 6 of this Protocol is a criminal activity frequently perpetrated by organized criminal groups for profit and that it poses serious risks to the migrants concerned.

61

2.    In accordance with article 31 of the Convention, States Parties shall cooperate in the field of public information for the purpose of preventing potential migrants from falling victim to organized criminal groups.

3.    Each State Party shall promote or strengthen, as appropriate, development programmes and cooperation at the national, regional and international levels, taking into account the socio-economic realities of migration and paying special attention to economically and socially depressed areas, in order to combat the root socio-economic causes of the smuggling of migrants, such as poverty and underdevelopment.

## Article 16.   Protection and assistance measures

1.    In implementing this Protocol, each State Party shall take, consistent with its obligations under international law, all appropriate measures, including legislation if necessary, to preserve and protect the rights of persons who have been the object of conduct set forth in article 6 of this Protocol as accorded under applicable international law, in particular the right to life and the right not to be subjected to torture or other cruel, inhuman or degrading treatment or punishment.

2.    Each State Party shall take appropriate measures to afford migrants appropriate protection against violence that may be inflicted upon them, whether by individuals or groups, by reason of being the object of conduct set forth in article 6 of this Protocol.

3.    Each State Party shall afford appropriate assistance to migrants whose lives or safety are endangered by reason of being the object of conduct set forth in article 6 of this Protocol.

4.    In applying the provisions of this article, States Parties shall take into account the special needs of women and children.

5.    In the case of the detention of a person who has been the object of conduct set forth in article 6 of this Protocol, each State Party shall comply with its obligations under the Vienna Convention on Consular Relations,[1] where applicable, including that of informing the person concerned without delay about the provisions concerning notification to and communication with consular officers.

---

[1]United Nations, *Treaty Series,* vol. 596, Nos. 8638-8640.

### *Article 17.   Agreements and arrangements*

States Parties shall consider the conclusion of bilateral or regional agreements or operational arrangements or understandings aimed at:

*(a)* Establishing the most appropriate and effective measures to prevent and combat the conduct set forth in article 6 of this Protocol; or

*(b)* Enhancing the provisions of this Protocol among themselves.

### *Article 18.   Return of smuggled migrants*

1.   Each State Party agrees to facilitate and accept, without undue or unreasonable delay, the return of a person who has been the object of conduct set forth in article 6 of this Protocol and who is its national or who has the right of permanent residence in its territory at the time of return.

2.   Each State Party shall consider the possibility of facilitating and accepting the return of a person who has been the object of conduct set forth in article 6 of this Protocol and who had the right of permanent residence in its territory at the time of entry into the receiving State in accordance with its domestic law.

3.   At the request of the receiving State Party, a requested State Party shall, without undue or unreasonable delay, verify whether a person who has been the object of conduct set forth in article 6 of this Protocol is its national or has the right of permanent residence in its territory.

4.   In order to facilitate the return of a person who has been the object of conduct set forth in article 6 of this Protocol and is without proper documentation, the State Party of which that person is a national or in which he or she has the right of permanent residence shall agree to issue, at the request of the receiving State Party, such travel documents or other authorization as may be necessary to enable the person to travel to and re-enter its territory.

5.   Each State Party involved with the return of a person who has been the object of conduct set forth in article 6 of this Protocol shall take all appropriate measures to carry out the return in an orderly manner and with due regard for the safety and dignity of the person.

6.   States Parties may cooperate with relevant international organizations in the implementation of this article.

7.   This article shall be without prejudice to any right afforded to persons who have been the object of conduct set forth in article 6 of this Protocol by any domestic law of the receiving State Party.

63

8.    This article shall not affect the obligations entered into under any other applicable treaty, bilateral or multilateral, or any other applicable operational agreement or arrangement that governs, in whole or in part, the return of persons who have been the object of conduct set forth in article 6 of this Protocol.

## IV.   Final provisions

### Article 19.   Saving clause

1.    Nothing in this Protocol shall affect the other rights, obligations and responsibilities of States and individuals under international law, including international humanitarian law and international human rights law and, in particular, where applicable, the 1951 Convention[2] and the 1967 Protocol[3] relating to the Status of Refugees and the principle of non-refoulement as contained therein.

2.    The measures set forth in this Protocol shall be interpreted and applied in a way that is not discriminatory to persons on the ground that they are the object of conduct set forth in article 6 of this Protocol. The interpretation and application of those measures shall be consistent with internationally recognized principles of non-discrimination.

### Article 20.   Settlement of disputes

l.    States Parties shall endeavour to settle disputes concerning the interpretation or application of this Protocol through negotiation.

2.    Any dispute between two or more States Parties concerning the interpretation or application of this Protocol that cannot be settled through negotiation within a reasonable time shall, at the request of one of those States Parties, be submitted to arbitration. If, six months after the date of the request for arbitration, those States Parties are unable to agree on the organization of the arbitration, any one of those States Parties may refer the dispute to the International Court of Justice by request in accordance with the Statute of the Court.

3.    Each State Party may, at the time of signature, ratification, acceptance or approval of or accession to this Protocol, declare that it does not consider

---

[2]United Nations, *Treaty Series,* vol. 189, No. 2545.

[3]Ibid., vol. 606, Nos. 8791.

itself bound by paragraph 2 of this article. The other States Parties shall not be bound by paragraph 2 of this article with respect to any State Party that has made such a reservation.

4.    Any State Party that has made a reservation in accordance with paragraph 3 of this article may at any time withdraw that reservation by notification to the Secretary-General of the United Nations.

### Article 21.   Signature, ratification, acceptance, approval and accession

1.    This Protocol shall be open to all States for signature from 12 to 15 December 2000 in Palermo, Italy, and thereafter at United Nations Headquarters in New York until 12 December 2002.

2.    This Protocol shall also be open for signature by regional economic integration organizations provided that at least one member State of such organization has signed this Protocol in accordance with paragraph 1 of this article.

3.    This Protocol is subject to ratification, acceptance or approval. Instruments of ratification, acceptance or approval shall be deposited with the Secretary-General of the United Nations. A regional economic integration organization may deposit its instrument of ratification, acceptance or approval if at least one of its member States has done likewise. In that instrument of ratification, acceptance or approval, such organization shall declare the extent of its competence with respect to the matters governed by this Protocol. Such organization shall also inform the depositary of any relevant modification in the extent of its competence.

4.    This Protocol is open for accession by any State or any regional economic integration organization of which at least one member State is a Party to this Protocol. Instruments of accession shall be deposited with the Secretary-General of the United Nations. At the time of its accession, a regional economic integration organization shall declare the extent of its competence with respect to matters governed by this Protocol. Such organization shall also inform the depositary of any relevant modification in the extent of its competence.

### Article 22.   Entry into force

1.    This Protocol shall enter into force on the ninetieth day after the date of deposit of the fortieth instrument of ratification, acceptance, approval or

accession, except that it shall not enter into force before the entry into force of the Convention. For the purpose of this paragraph, any instrument deposited by a regional economic integration organization shall not be counted as additional to those deposited by member States of such organization.

2.    For each State or regional economic integration organization ratifying, accepting, approving or acceding to this Protocol after the deposit of the fortieth instrument of such action, this Protocol shall enter into force on the thirtieth day after the date of deposit by such State or organization of the relevant instrument or on the date this Protocol enters into force pursuant to paragraph 1 of this article, whichever is the later.

## Article 23.   Amendment

1.    After the expiry of five years from the entry into force of this Protocol, a State Party to the Protocol may propose an amendment and file it with the Secretary-General of the United Nations, who shall thereupon communicate the proposed amendment to the States Parties and to the Conference of the Parties to the Convention for the purpose of considering and deciding on the proposal. The States Parties to this Protocol meeting at the Conference of the Parties shall make every effort to achieve consensus on each amendment. If all efforts at consensus have been exhausted and no agreement has been reached, the amendment shall, as a last resort, require for its adoption a two-thirds majority vote of the States Parties to this Protocol present and voting at the meeting of the Conference of the Parties.

2.    Regional economic integration organizations, in matters within their competence, shall exercise their right to vote under this article with a number of votes equal to the number of their member States that are Parties to this Protocol. Such organizations shall not exercise their right to vote if their member States exercise theirs and vice versa.

3.    An amendment adopted in accordance with paragraph 1 of this article is subject to ratification, acceptance or approval by States Parties.

4.    An amendment adopted in accordance with paragraph 1 of this article shall enter into force in respect of a State Party ninety days after the date of the deposit with the Secretary-General of the United Nations of an instrument of ratification, acceptance or approval of such amendment.

5.    When an amendment enters into force, it shall be binding on those States Parties which have expressed their consent to be bound by it. Other States

Parties shall still be bound by the provisions of this Protocol and any earlier amendments that they have ratified, accepted or approved.

### Article 24.   Denunciation

1.   A State Party may denounce this Protocol by written notification to the Secretary-General of the United Nations. Such denunciation shall become effective one year after the date of receipt of the notification by the Secretary-General.

2.   A regional economic integration organization shall cease to be a Party to this Protocol when all of its member States have denounced it.

### Article 25.   Depositary and languages

1.   The Secretary-General of the United Nations is designated depositary of this Protocol.

2.   The original of this Protocol, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations.

IN WITNESS WHEREOF, the undersigned plenipotentiaries, being duly authorized thereto by their respective Governments, have signed this Protocol.

Appendix 005007

# General Assembly resolution 55/255
# of 31 May 2001

# Protocol against the Illicit Manufacturing of and Trafficking in Firearms, Their Parts and Components and Ammunition, supplementing the United Nations Convention against Transnational Organized Crime

*The General Assembly*,

*Recalling* its resolution 53/111 of 9 December 1998, in which it decided to establish an open-ended intergovernmental ad hoc committee for the purpose of elaborating a comprehensive international convention against transnational organized crime and of discussing the elaboration, as appropriate, of international instruments addressing trafficking in women and children, combating the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition, and illegal trafficking in and transporting of migrants, including by sea,

*Recalling also* its resolution 54/126 of 17 December 1999, in which it requested the Ad Hoc Committee on the Elaboration of a Convention against Transnational Organized Crime to continue its work, in accordance with resolutions 53/111 and 53/114 of 9 December 1998, and to intensify that work in order to complete it in 2000,

*Recalling further* its resolution 55/25 of 15 November 2000, by which it adopted the United Nations Convention against Transnational Organized Crime, the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, and the Protocol against the Smuggling of Migrants by Land, Sea and Air, supplementing the United Nations Convention against Transnational Organized Crime,

*Reaffirming* the inherent right to individual or collective self-defence recognized in Article 51 of the Charter of the United Nations, which implies that

69

States also have the right to acquire arms with which to defend themselves, as well as the right of self-determination of all peoples, in particular peoples under colonial or other forms of alien domination or foreign occupation, and the importance of the effective realization of that right,

1.    *Takes note* of the report of the Ad Hoc Committee on the Elaboration of a Convention against Transnational Organized Crime on its twelfth session,[1] and commends the Ad Hoc Committee for its work;

2.    *Adopts* the Protocol against the Illicit Manufacturing of and Trafficking in Firearms, Their Parts and Components and Ammunition, supplementing the United Nations Convention against Transnational Organized Crime, annexed to the present resolution, and opens it for signature at United Nations Headquarters in New York;

3.    *Urges* all States and regional economic organizations to sign and ratify the United Nations Convention against Transnational Organized Crime and the protocols thereto as soon as possible in order to ensure the speedy entry into force of the Convention and the protocols thereto.

---

[1] A/55/383/Add.2.

70

## *Annex*

# Protocol against the Illicit Manufacturing of and Trafficking in Firearms, Their Parts and Components and Ammunition, supplementing the United Nations Convention against Transnational Organized Crime

### Preamble

*The States Parties to this Protocol,*

*Aware* of the urgent need to prevent, combat and eradicate the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition, owing to the harmful effects of those activities on the security of each State, region and the world as a whole, endangering the well-being of peoples, their social and economic development and their right to live in peace,

*Convinced*, therefore, of the necessity for all States to take all appropriate measures to this end, including international cooperation and other measures at the regional and global levels,

*Recalling* General Assembly resolution 53/111 of 9 December 1998, in which the Assembly decided to establish an open-ended intergovernmental ad hoc committee for the purpose of elaborating a comprehensive international convention against transnational organized crime and of discussing the elaboration of, inter alia, an international instrument combating the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition,

*Bearing in mind* the principle of equal rights and self-determination of peoples, as enshrined in the Charter of the United Nations and the Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations,[1]

_____

[1]Resolution 2625 (XXV) annex.

71

*Convinced* that supplementing the United Nations Convention against Transnational Organized Crime with an international instrument against the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition will be useful in preventing and combating those crimes,

*Have agreed as follows*:

## I.   General provisions

### Article 1.   Relation with the United Nations Convention against Transnational Organized Crime

1.   This Protocol supplements the United Nations Convention against Transnational Organized Crime. It shall be interpreted together with the Convention.

2.   The provisions of the Convention shall apply, mutatis mutandis, to this Protocol unless otherwise provided herein.

3.   The offences established in accordance with article 5 of this Protocol shall be regarded as offences established in accordance with the Convention.

### Article 2.   Statement of purpose

The purpose of this Protocol is to promote, facilitate and strengthen cooperation among States Parties in order to prevent, combat and eradicate the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition.

### Article 3.   Use of terms

For the purposes of this Protocol:

*(a)* "Firearm" shall mean any portable barrelled weapon that expels, is designed to expel or may be readily converted to expel a shot, bullet or projectile by the action of an explosive, excluding antique firearms or their replicas. Antique firearms and their replicas shall be defined in accordance with domestic law. In no case, however, shall antique firearms include firearms manufactured after 1899;

*(b)* "Parts and components" shall mean any element or replacement element specifically designed for a firearm and essential to its operation, including

72

a barrel, frame or receiver, slide or cylinder, bolt or breech block, and any device designed or adapted to diminish the sound caused by firing a firearm;

*(c)* "Ammunition" shall mean the complete round or its components, including cartridge cases, primers, propellant powder, bullets or projectiles, that are used in a firearm, provided that those components are themselves subject to authorization in the respective State Party;

*(d)* "Illicit manufacturing" shall mean the manufacturing or assembly of firearms, their parts and components or ammunition:

    (i)   From parts and components illicitly trafficked;

    (ii)   Without a licence or authorization from a competent authority of the State Party where the manufacture or assembly takes place; or

    (iii)   Without marking the firearms at the time of manufacture, in accordance with article 8 of this Protocol;

Licensing or authorization of the manufacture of parts and components shall be in accordance with domestic law;

*(e)* "Illicit trafficking" shall mean the import, export, acquisition, sale, delivery, movement or transfer of firearms, their parts and components and ammunition from or across the territory of one State Party to that of another State Party if any one of the States Parties concerned does not authorize it in accordance with the terms of this Protocol or if the firearms are not marked in accordance with article 8 of this Protocol;

*(f)* "Tracing" shall mean the systematic tracking of firearms and, where possible, their parts and components and ammunition from manufacturer to purchaser for the purpose of assisting the competent authorities of States Parties in detecting, investigating and analysing illicit manufacturing and illicit trafficking.

### *Article 4.  Scope of application*

1.    This Protocol shall apply, except as otherwise stated herein, to the prevention of illicit manufacturing of and trafficking in firearms, their parts and components and ammunition and to the investigation and prosecution of offences established in accordance with article 5 of this Protocol where those offences are transnational in nature and involve an organized criminal group.

2.    This Protocol shall not apply to state-to-state transactions or to state transfers in cases where the application of the Protocol would prejudice the right of a State Party to take action in the interest of national security consistent with the Charter of the United Nations.

### Article 5.   Criminalization

1.    Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences the following conduct, when committed intentionally:

*(a)* Illicit manufacturing of firearms, their parts and components and ammunition;

*(b)* Illicit trafficking in firearms, their parts and components and ammunition;

*(c)* Falsifying or illicitly obliterating, removing or altering the marking(s) on firearms required by article 8 of this Protocol.

2.    Each State Party shall also adopt such legislative and other measures as may be necessary to establish as criminal offences the following conduct:

*(a)* Subject to the basic concepts of its legal system, attempting to commit or participating as an accomplice in an offence established in accordance with paragraph 1 of this article; and

*(b)* Organizing, directing, aiding, abetting, facilitating or counselling the commission of an offence established in accordance with paragraph 1 of this article.

### Article 6.   Confiscation, seizure and disposal

1.    Without prejudice to article 12 of the Convention, States Parties shall adopt, to the greatest extent possible within their domestic legal systems, such measures as may be necessary to enable confiscation of firearms, their parts and components and ammunition that have been illicitly manufactured or trafficked.

2.    States Parties shall adopt, within their domestic legal systems, such measures as may be necessary to prevent illicitly manufactured and trafficked firearms, parts and components and ammunition from falling into the hands of unauthorized persons by seizing and destroying such firearms, their parts and components and ammunition unless other disposal has been officially authorized, provided that the firearms have been marked and the methods of disposal of those firearms and ammunition have been recorded.

## II.   Prevention

### Article 7.   Record-keeping

Each State Party shall ensure the maintenance, for not less than ten years, of information in relation to firearms and, where appropriate and feasible, their

parts and components and ammunition that is necessary to trace and identify those firearms and, where appropriate and feasible, their parts and components and ammunition which are illicitly manufactured or trafficked and to prevent and detect such activities. Such information shall include:

*(a)* The appropriate markings required by article 8 of this Protocol;

*(b)* In cases involving international transactions in firearms, their parts and components and ammunition, the issuance and expiration dates of the appropriate licences or authorizations, the country of export, the country of import, the transit countries, where appropriate, and the final recipient and the description and quantity of the articles.

## Article 8.   Marking of firearms

1.   For the purpose of identifying and tracing each firearm, States Parties shall:

*(a)* At the time of manufacture of each firearm, either require unique marking providing the name of the manufacturer, the country or place of manufacture and the serial number, or maintain any alternative unique user-friendly marking with simple geometric symbols in combination with a numeric and/or alphanumeric code, permitting ready identification by all States of the country of manufacture;

*(b)* Require appropriate simple marking on each imported firearm, permitting identification of the country of import and, where possible, the year of import and enabling the competent authorities of that country to trace the firearm, and a unique marking, if the firearm does not bear such a marking. The requirements of this subparagraph need not be applied to temporary imports of firearms for verifiable lawful purposes;

*(c)* Ensure, at the time of transfer of a firearm from government stocks to permanent civilian use, the appropriate unique marking permitting identification by all States Parties of the transferring country.

2.   States Parties shall encourage the firearms manufacturing industry to develop measures against the removal or alteration of markings.

## Article 9.   Deactivation of firearms

A State Party that does not recognize a deactivated firearm as a firearm in accordance with its domestic law shall take the necessary measures, including the establishment of specific offences if appropriate, to prevent the illicit reactivation of deactivated firearms, consistent with the following general principles of deactivation:

75

*(a)* All essential parts of a deactivated firearm are to be rendered permanently inoperable and incapable of removal, replacement or modification in a manner that would permit the firearm to be reactivated in any way;

*(b)* Arrangements are to be made for deactivation measures to be verified, where appropriate, by a competent authority to ensure that the modifications made to a firearm render it permanently inoperable;

*(c)* Verification by a competent authority is to include a certificate or record attesting to the deactivation of the firearm or a clearly visible mark to that effect stamped on the firearm.

### Article 10.   General requirements for export, import and transit licensing or authorization systems

1.   Each State Party shall establish or maintain an effective system of export and import licensing or authorization, as well as of measures on international transit, for the transfer of firearms, their parts and components and ammunition.

2.   Before issuing export licences or authorizations for shipments of firearms, their parts and components and ammunition, each State Party shall verify:

*(a)* That the importing States have issued import licences or authorizations; and

*(b)* That, without prejudice to bilateral or multilateral agreements or arrangements favouring landlocked States, the transit States have, at a minimum, given notice in writing, prior to shipment, that they have no objection to the transit.

3.   The export and import licence or authorization and accompanying documentation together shall contain information that, at a minimum, shall include the place and the date of issuance, the date of expiration, the country of export, the country of import, the final recipient, a description and the quantity of the firearms, their parts and components and ammunition and, whenever there is transit, the countries of transit. The information contained in the import licence must be provided in advance to the transit States.

4.   The importing State Party shall, upon request, inform the exporting State Party of the receipt of the dispatched shipment of firearms, their parts and components or ammunition.

5.   Each State Party shall, within available means, take such measures as maybe necessary to ensure that licensing or authorization procedures are secure

and that the authenticity of licensing or authorization documents can be verified or validated.

6.    States Parties may adopt simplified procedures for the temporary import and export and the transit of firearms, their parts and components and ammunition for verifiable lawful purposes such as hunting, sport shooting, evaluation, exhibitions or repairs.

### Article 11.   Security and preventive measures

In an effort to detect, prevent and eliminate the theft, loss or diversion of, as well as the illicit manufacturing of and trafficking in, firearms, their parts and components and ammunition, each State Party shall take appropriate measures:

(a)   To require the security of firearms, their parts and components and ammunition at the time of manufacture, import, export and transit through its territory; and

(b)   To increase the effectiveness of import, export and transit controls, including, where appropriate, border controls, and of police and customs transborder cooperation.

### Article 12.   Information

1.    Without prejudice to articles 27 and 28 of the Convention, States Parties shall exchange among themselves, consistent with their respective domestic legal and administrative systems, relevant case-specific information on matters such as authorized producers, dealers, importers, exporters and, whenever possible, carriers of firearms, their parts and components and ammunition.

2.    Without prejudice to articles 27 and 28 of the Convention, States Parties shall exchange among themselves, consistent with their respective domestic legal and administrative systems, relevant information on matters such as:

(a)   Organized criminal groups known to take part or suspected of taking part in the illicit manufacturing of or trafficking in firearms, their parts and components and ammunition;

(b)   The means of concealment used in the illicit manufacturing of or trafficking in firearms, their parts and components and ammunition and ways of detecting them;

(c)   Methods and means, points of dispatch and destination and routes customarily used by organized criminal groups engaged in illicit trafficking in firearms, their parts and components and ammunition; and

77

*(d)* Legislative experiences and practices and measures to prevent, combat and eradicate the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition.

3.    States Parties shall provide to or share with each other, as appropriate, relevant scientific and technological information useful to law enforcement authorities in order to enhance each other's abilities to prevent, detect and investigate the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition and to prosecute the persons involved in those illicit activities.

4.    States Parties shall cooperate in the tracing of firearms, their parts and components and ammunition that may have been illicitly manufactured or trafficked. Such cooperation shall include the provision of prompt responses to requests for assistance in tracing such firearms, their parts and components and ammunition, within available means.

5.    Subject to the basic concepts of its legal system or any international agreements, each State Party shall guarantee the confidentiality of and comply with any restrictions on the use of information that it receives from another State Party pursuant to this article, including proprietary information pertaining to commercial transactions, if requested to do so by the State Party providing the information. If such confidentiality cannot be maintained, the State Party that provided the information shall be notified prior to its disclosure.

## *Article 13.   Cooperation*

1.    States Parties shall cooperate at the bilateral, regional and international levels to prevent, combat and eradicate the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition.

2.    Without prejudice to article 18, paragraph 13, of the Convention, each State Party shall identify a national body or a single point of contact to act as liaison between it and other States Parties on matters relating to this Protocol.

3.    States Parties shall seek the support and cooperation of manufacturers, dealers, importers, exporters, brokers and commercial carriers of firearms, their parts and components and ammunition to prevent and detect the illicit activities referred to in paragraph 1 of this article.

### Article 14.   Training and technical assistance

States Parties shall cooperate with each other and with relevant international organizations, as appropriate, so that States Parties may receive, upon request, the training and technical assistance necessary to enhance their ability to prevent, combat and eradicate the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition, including technical, financial and material assistance in those matters identified in articles 29 and 30 of the Convention.

### Article 15.   Brokers and brokering

1.   With a view to preventing and combating illicit manufacturing of and trafficking in firearms, their parts and components and ammunition, States Parties that have not yet done so shall consider establishing a system for regulating the activities of those who engage in brokering. Such a system could include one or more measures such as:

(a)   Requiring registration of brokers operating within their territory;

(b)   Requiring licensing or authorization of brokering; or

(c)   Requiring disclosure on import and export licences or authorizations, or accompanying documents, of the names and locations of brokers involved in the transaction.

2.   States Parties that have established a system of authorization regarding brokering as set forth in paragraph 1 of this article are encouraged to include information on brokers and brokering in their exchanges of information under article 12 of this Protocol and to retain records regarding brokers and brokering in accordance with article 7 of this Protocol.

## III.   Final provisions

### Article 16.   Settlement of disputes

l.   States Parties shall endeavour to settle disputes concerning the interpretation or application of this Protocol through negotiation.

2.   Any dispute between two or more States Parties concerning the interpretation or application of this Protocol that cannot be settled through negotiation within a reasonable time shall, at the request of one of those States Parties, be submitted to arbitration. If, six months after the date of the request

for arbitration, those States Parties are unable to agree on the organization of the arbitration, any one of those States Parties may refer the dispute to the International Court of Justice by request in accordance with the Statute of the Court.

3.    Each State Party may, at the time of signature, ratification, acceptance or approval of or accession to this Protocol, declare that it does not consider itself bound by paragraph 2 of this article. The other States Parties shall not be bound by paragraph 2 of this article with respect to any State Party that has made such a reservation.

4.    Any State Party that has made a reservation in accordance with paragraph 3 of this article may at any time withdraw that reservation by notification to the Secretary-General of the United Nations.

### Article 17.   *Signature, ratification, acceptance, approval and accession*

1.    This Protocol shall be open to all States for signature at United Nations Headquarters in New York from the thirtieth day after its adoption by the General Assembly until 12 December 2002.

2.    This Protocol shall also be open for signature by regional economic integration organizations provided that at least one member State of such organization has signed this Protocol in accordance with paragraph 1 of this article.

3.    This Protocol is subject to ratification, acceptance or approval. Instruments of ratification, acceptance or approval shall be deposited with the Secretary-General of the United Nations. A regional economic integration organization may deposit its instrument of ratification, acceptance or approval if at least one of its member States has done likewise. In that instrument of ratification, acceptance or approval, such organization shall declare the extent of its competence with respect to the matters governed by this Protocol. Such organization shall also inform the depositary of any relevant modification in the extent of its competence.

4.    This Protocol is open for accession by any State or any regional economic integration organization of which at least one member State is a Party to this Protocol. Instruments of accession shall be deposited with the Secretary-General of the United Nations. At the time of its accession, a regional economic integration organization shall declare the extent of its competence with respect

80

to matters governed by this Protocol. Such organization shall also inform the depositary of any relevant modification in the extent of its competence.

## Article 18.   Entry into force

1.    This Protocol shall enter into force on the ninetieth day after the date of deposit of the fortieth instrument of ratification, acceptance, approval or accession, except that it shall not enter into force before the entry into force of the Convention. For the purpose of this paragraph, any instrument deposited by a regional economic integration organization shall not be counted as additional to those deposited by member States of such organization.

2.    For each State or regional economic integration organization ratifying, accepting, approving or acceding to this Protocol after the deposit of the fortieth instrument of such action, this Protocol shall enter into force on the thirtieth day after the date of deposit by such State or organization of the relevant instrument or on the date this Protocol enters into force pursuant to paragraph 1 of this article, whichever is the later.

## Article 19.   Amendment

1.    After the expiry of five years from the entry into force of this Protocol, a State Party to the Protocol may propose an amendment and file it with the Secretary-General of the United Nations, who shall thereupon communicate the proposed amendment to the States Parties and to the Conference of the Parties to the Convention for the purpose of considering and deciding on the proposal. The States Parties to this Protocol meeting at the Conference of the Parties shall make every effort to achieve consensus on each amendment. If all efforts at consensus have been exhausted and no agreement has been reached, the amendment shall, as a last resort, require for its adoption a two-thirds majority vote of the States Parties to this Protocol present and voting at the meeting of the Conference of the Parties.

2.    Regional economic integration organizations, in matters within their competence, shall exercise their right to vote under this article with a number of votes equal to the number of their member States that are Parties to this Protocol. Such organizations shall not exercise their right to vote if their member States exercise theirs and vice versa.

3.    An amendment adopted in accordance with paragraph 1 of this article is subject to ratification, acceptance or approval by States Parties.

4.   An amendment adopted in accordance with paragraph 1 of this article shall enter into force in respect of a State Party ninety days after the date of the deposit with the Secretary-General of the United Nations of an instrument of ratification, acceptance or approval of such amendment.

5.   When an amendment enters into force, it shall be binding on those States Parties which have expressed their consent to be bound by it. Other States Parties shall still be bound by the provisions of this Protocol and any earlier amendments that they have ratified, accepted or approved.

### Article 20.   Denunciation

1.   A State Party may denounce this Protocol by written notification to the Secretary-General of the United Nations. Such denunciation shall become effective one year after the date of receipt of the notification by the Secretary-General.

2.   A regional economic integration organization shall cease to be a Party to this Protocol when all of its member States have denounced it.

### Article 21.   Depositary and languages

1.   The Secretary-General of the United Nations is designated depositary of this Protocol.

2.   The original of this Protocol, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations.

IN WITNESS WHEREOF, the undersigned plenipotentiaries, being duly authorized thereto by their respective Governments, have signed this Protocol.

Appendix 005022

**Published with the financial support of the Government of Japan**

# UNITED NATIONS
## Office on Drugs and Crime

**Vienna International Centre, P.O. Box 500, 1400 Vienna, Austria**
**Tel: (+43-1) 26060-0, Fax: (+43-1) 26060-5866, www.unodc.org**

Printed in Austria
V.04-56153—September 2004—1,900
V.05-90366—December 2005—1,200

Appendix 005024

# Exhibit 113

Appendix 005025

**2000**

**Greco (99) 1**



COUNCIL   CONSEIL
OF EUROPE   DE L'EUROPE

# AGREEMENT ESTABLISHING THE GROUP OF STATES AGAINST CORRUPTION - GRECO -

**Document prepared by the
Directorate of legal Affairs**

**Strasbourg 1999**

Appendix 005026

Appendix 005027

# Agreement Establishing The Group of States Against Corruption - GRECO -

Document prepared by the
Directorate of Legal Affairs

**Strasbourg, 12 May 1999**

Appendix 005028

COUNCIL OF EUROPE
COMMITTEE OF MINISTERS

**RESOLUTION (98) 7**

**AUTHORISING THE PARTIAL AND ENLARGED AGREEMENT ESTABLISHING
THE "GROUP OF STATES AGAINST CORRUPTION - GRECO"**
(Adopted by the Committee of Ministers on 5 May 1998, at its 102nd Session)

The Committee of Ministers of the Council of Europe,

Having regard to the recommendations of the XIXth and XXIst Conferences of European Ministers of Justice (Valletta, 1994 and Prague, 1997 respectively);

Having regard to the Programme of Action against corruption adopted by the Committee of Ministers in 1996;

Pursuant to the Final Declaration and the Action Plan adopted by the Heads of State and Government of the Council of Europe at their Second Summit, held in Strasbourg on 10-11 October 1997;

Taking into account Resolution (97) 24 on the 20 Guiding Principles for the Fight against Corruption adopted by the Committee of Ministers on 6 November 1997;

Bearing in mind the opinions expressed by the European Committee on Legal Co-operation (CDCJ) and by the European Committee on Crime Problems (CDPC);

In the light of Statutory Resolution (93) 28, on partial and enlarged agreements as well as of Resolution (96) 36, establishing the criteria for partial and enlarged agreements of the Council of Europe,

TAKES NOTE of the draft Resolution on the Partial and Enlarged Agreement establishing the "Group of States Against Corruption - GRECO" (hereafter "The Agreement establishing the GRECO"), approved by the Multidisciplinary Group on Corruption (GMC) as it appears in document CM (98) 54 revised dated 29 April 1998;

AUTHORISES the adoption of the Agreement Establishing the GRECO, in the form of a partial and enlarged agreement,

INVITES Member States to notify to the Secretary General their intention to participate in the adoption of the Agreement Establishing the GRECO, it being understood that this Agreement will be considered as having been adopted on the first day of the month following the date on which the Secretary General receives the 14th notification from a Member States of its wish to participate in it,

INVITES non-Member States having participated in the elaboration of the Agreement establishing the GRECO, to notify to the Secretary General their intention to participate in it,

EXPRESSES the wish that soon all Member States of the Council of Europe and the non-Member States referred to above will participate in the Agreement establishing the GRECO.

### RESOLUTION (99) 5
### ESTABLISHING THE GROUP OF STATES AGAINST CORRUPTION (GRECO)
### adopted on 1st May 1999

The representatives on the Committee of Ministers of Belgium, Bulgaria, Cyprus, Estonia, Finland, France, Germany, Greece, Iceland, Ireland, Lithuania, Luxembourg, Romania, Slovakia, Slovenia, Spain, Sweden,

Convinced that corruption represents a major threat to the rule of law, democracy, human rights, fairness and social justice, hinders economic development, and endangers the stability of democratic institutions and the moral foundations of society;

Conscious of the need to promote co-operation between States in the fight against corruption, including its links with organised crime and money laundering;

Emphasising that a successful strategy to combat corruption requires a firm commitment by States to join their efforts, share experience and take common actions;

Recognising that raising public awareness and promoting ethical values are effective means of preventing corruption;

Having regard to the recommendations of the 19th Conference of the European Ministers of Justice (Malta, 1994);

Taking into account the Programme of Action against Corruption, adopted by the Committee of Ministers of the Council of Europe in 1996 and the work undertaken by the Multidisciplinary Group on Corruption (GMC) in pursuance thereof;

Taking into account the results of the Joint project between the European Commission (Phare Programme) and the Council of Europe on the fight against corruption and organised crime in States in transition ("Octopus Project");

Having regard to Resolution No. 1 on the links between corruption and organised crime, adopted at the 21st Conference of the European Ministers of Justice (Prague, 1997);

Having regard to the Final Declaration adopted at the Second Summit of Heads of State and Government of the Member States of the Council of Europe (Strasbourg, 10-11 October 1997) by which the Heads of State and Government decided to seek common responses to the challenges posed by the growth of corruption and organised crime;

In accordance with the Action Plan adopted at the Second Summit of Heads of State and Government of the Member States of the Council of Europe (Strasbourg, 10-11 October 1997) in which the Heads of State and Government, with a view to promoting co-operation in the fight against corruption, including its links with organised crime and money laundering, instructed the Committee of Ministers, inter alia, to adopt guiding principles to be applied in the development of domestic legislation and practice and to establish without delay an appropriate and efficient mechanism for monitoring observance of the guiding principles and the implementation of the other international instruments which will be adopted in pursuance of the Programme of Action against Corruption;

Having regard to the 20 Guiding Principles for the Fight against Corruption, adopted by the Committee of Ministers at its 101st meeting on 6 November 1997 (hereinafter referred to as the "Guiding Principles");

Convinced that the establishment of the GRECO, where Member States and non-Member States of the Council of Europe participate on an equal footing, would make a significant contribution to the promotion of a dynamic process towards effectively preventing and combating corruption;

Persuaded that by means of mutual evaluation and peer pressure, the GRECO shall be able to monitor in a flexible and efficient manner the observance of the Guiding Principles and the implementation of the international instruments adopted by the Council of Europe to fight against corruption;

Convinced that full membership of the GRECO should therefore be reserved to those which participate without restrictions in mutual evaluation procedures and accept to be evaluated through them;

Having regard to Resolution (98) 7 adopted by the Committee of Ministers on 5 May 1998, on the occasion of its 102nd session at ministerial level, authorising the adoption of the present agreement;

HEREBY,

RESOLVE to establish the Group of States against Corruption (GRECO) by means of this Enlarged Partial Agreement, governed by the Statute appended thereto;

AGREE that the GRECO is established for an initial period of three years;

AGREE to review the functioning of the GRECO by the end of the initial period of three years;

EXPRESS the wish that all Member States of the Council of Europe become members of the GRECO in the near future.

Appendix 005032

8

Appendix to Resolution (99) 5

STATUTE OF THE GROUP OF STATES AGAINST CORRUPTION (GRECO)

Article 1 - Aim of the GRECO

The aim of the Group of States against Corruption (hereinafter referred to as the "GRECO") is to improve the capacity of its members to fight corruption by following up, through a dynamic process of mutual evaluation and peer pressure, compliance with their undertakings in this field.

Article 2 - Functions of the GRECO

In order to achieve the aim laid down in Article 1, the GRECO shall:

i.      monitor the observance of the Guiding Principles for the Fight against Corruption as adopted by the Committee of Ministers of the Council of Europe on 6 November 1997;

ii.     monitor the implementation of international legal instruments to be adopted in pursuance of the Programme of Action against Corruption, in conformity with the provisions contained in such instruments;

Article 3 - Seat

The GRECO's seat shall be in Strasbourg.

Article 4 - Procedure for membership of the GRECO

1.      Any Member States of the Council of Europe, other than those mentioned in the Resolution establishing the GRECO, may join the GRECO at any time by so notifying the Secretary General of the Council of Europe.

2.      Any non-Member States having participated in the elaboration of this Enlarged Partial Agreement[1] may join the GRECO at any time by so notifying the Secretary General of the Council of Europe. The notification shall be accompanied by a declaration to the effect that the non-Member States undertakes to apply the Guiding Principles for the Fight against Corruption, adopted by the Committee of Ministers of the Council of Europe on 6 November 1997.

3.      States which become Parties to international legal instruments adopted by the Committee of Ministers of the Council of Europe in pursuance of the Programme of Action against Corruption providing for compulsory membership of the GRECO shall become members of the GRECO *ipso facto* in conformity with the provisions contained in these instruments.

4.      The Committee of Ministers of the Council of Europe in its composition restricted to the States members of the Enlarged Partial Agreement, following consultation of the non-Member States already participating, may invite non-Member States, other than those covered by paragraph 2 above, to join the GRECO.  The non-Member States

---

[1]     These States are the following: Belarus (10), Canada (11), Holy See (10), Japan (10), Mexico (10) and United States of America (11). Bosnia and Herzegovina has participated twice in GMC meetings.

having received such an invitation, shall notify to the Secretary General its intention to join the GRECO, accompanied by a declaration to the effect that it undertakes to apply the Guiding Principles for the Fight against Corruption.

Article 5 - Participation of the European Community

The European Community may be invited by the Committee of Ministers to participate in the work of the GRECO. The modalities of its participation shall be determined in the resolution inviting it to participate.

Article 6 - Composition of the GRECO

1.      Each member shall appoint a delegation to the GRECO consisting of not more than two representatives. One representative shall be appointed as head of the delegation.

2.      The budget of the Enlarged Partial Agreement shall bear the travel and subsistence expenses of one of the representatives of the delegation.

3.      The representatives appointed to the GRECO shall enjoy the privileges and immunities applicable under Article 2 of the Protocol to the General Agreement on Privileges and Immunities of the Council of Europe.

Article 7 - Other Representatives

1.      The European Committee on Legal Co-operation (CDCJ) and the European Committee on Crime Problems (CDPC) shall each appoint a representative to the GRECO.

2.      The Committee of Ministers may invite other Council of Europe bodies to appoint a representative to the GRECO after consulting the latter.

3.      The Statutory Committee, set up under Article 18 below, shall appoint a representative to the GRECO.

4.      Representatives appointed under paragraphs 1 to 3 above shall participate in plenary meetings of the GRECO without the right to vote. Their travel and subsistence expenses shall not be borne by the budget of the Enlarged Partial Agreement.

Article 8 - Operation of the GRECO

1.      The GRECO shall take the necessary decisions for its operation. In particular, it shall:

      i. adopt evaluation reports in accordance with Article 15;

      ii.      approve its draft annual programme of activities and submit, in conformity with the Financial Regulations, proposals to the Secretary General of the Council of Europe relating to the elaboration of the draft annual budget, prior to its transmission to the Statutory Committee set up under Article 18 below;

      iii.      approve its annual activity report, including its annual accounts, prior to its submission to the Statutory Committee and to the Committee of Ministers;

2.      The GRECO shall hold at least two plenary meetings a year and may decide to set up working parties whenever necessary and in accordance with its Rules of Procedure.

3.      The GRECO will publish every year its annual report of activities including its annual accounts, once approved by the relevant bodies pursuant to Article 18 below.

4.      The GRECO shall draw up its own Rules of Procedure. Any State or the European Community, when becoming a member of the GRECO, shall be deemed to have accepted the Statute and the Rules of Procedures of the GRECO.

5.      The GRECO shall hold its meetings in camera.

6.      Members of the GRECO participating in the mutual evaluation shall have the right to vote. Each of them shall be entitled to cast one vote. However, unless otherwise decided by the Statutory Committee, a member which has failed to pay all or a substantial part of its compulsory contribution to the budget of the enlarged partial agreement for a period of two years, shall no longer take part in the decision-making process.

7.      Decisions of the GRECO shall be taken by two-thirds of the votes cast[2] and the majority of those entitled to vote. However, procedural decisions shall be taken by a majority of the votes cast.

8.      The GRECO shall elect its President and Vice-President among the representatives of the members entitled to vote.

Article 9 - Bureau

1.      There shall be a Bureau composed of the President and the Vice-President referred to in Article 8 paragraph 8 above and five other persons elected by the GRECO, among the representatives of the members entitled to vote which are, as far as possible, Parties to at least one of the international legal instruments adopted in pursuance of the Programme of action against corruption.

2.      The Bureau shall carry out the following functions:

        -      prepare the preliminary draft annual programme of activities and the draft annual activity report;

        -      make proposals to the GRECO concerning the preliminary draft budget;

        -      organise country visits on the basis of the decisions taken by the GRECO;

        -      make proposals to the GRECO on the composition of the ad hoc evaluation teams;

        -      prepare the agenda for the meetings of the GRECO including those at which evaluation reports will be discussed;

---

[2]      Only votes "in favour" or "against" are taken into account when counting the number of votes cast (Article 10 paragraph 5 of the Rules of Procedure of the Ministers' Deputies).

    -    make proposals to the GRECO as regards the provisions to be selected for evaluation procedures in pursuance of Article 10 paragraph 3 below;

    -    make proposals to the GRECO concerning the appointment of scientific experts and consultants.

3.        The Bureau shall carry out any other function assigned to it by the GRECO.

4.        The Bureau shall exercise its functions under the general supervision of the GRECO.

Article 10 - Evaluation procedure

1.        The GRECO shall conduct evaluation procedures in respect of each of its members in pursuance of Article 2.

2.        The evaluation shall be divided in rounds. An evaluation round is a period of time determined by the GRECO, during which an evaluation procedure shall be conducted to assess the compliance of members with selected provisions contained in the Guiding Principles and in other international legal instruments adopted in pursuance of the Programme of Action against Corruption.

3.        At the beginning of each round the GRECO shall select the specific provisions on which the evaluation procedure shall be based.

4.        Each member shall identify a maximum of 5 experts who would be able to undertake the tasks set out in Articles 12-14.

5.        Each member shall ensure that its authorities co-operate, to the fullest possible extent, in the evaluation procedure, within the limits of its national legislation.

Article 11 - Questionnaire

1.        The GRECO shall adopt a questionnaire for each evaluation round, which shall be addressed to all members concerned by the evaluation.

2.        The questionnaire shall provide the framework of the evaluation procedure.

3.        Members shall address their replies to the Secretariat within the time limits fixed by the GRECO.

Article 12 - Evaluation teams

1.        The GRECO shall appoint, from the experts referred to in paragraph 4 of Article 10, a team for the evaluation of each member (hereinafter referred to as "the team"). When the evaluation concerns the implementation of one of the international legal instruments adopted in pursuance of the Programme of Action against Corruption, the GRECO shall appoint teams composed exclusively of experts proposed by members who are Parties to the instrument concerned.

2.        The team shall examine the replies given to the questionnaire and may request, where appropriate, additional information from the member undergoing the evaluation, to be submitted either orally or in writing.

3.      The budget of the Enlarged and Partial Agreement shall bear the travel and subsistence expenses of the experts participating in the teams.

Article 13 - Country visits

1.      The GRECO may instruct the team to visit a member, for the purpose of seeking additional information concerning its law or practice, which is useful for the evaluation.

2.      The GRECO shall give a minimum of two months notice to the member concerned of its intention to carry out the visit.

3.      The visit shall be carried out in accordance with a programme arranged by the member concerned, taking into account the wishes expressed by the team.

4.      The members of the team shall enjoy the privileges and immunities applicable under Article 2 of the Protocol to the General Agreement on Privileges and Immunities of the Council of Europe.

5.      The budget of the Enlarged Partial Agreement shall bear the travel and subsistence expenses necessary for the carrying out country visits.

Article 14 - Evaluation reports

1.      On the basis of the information gathered, the team shall prepare a preliminary draft evaluation report on the state of the law and the practice in relation to the provisions selected for the evaluation round.

2.      The preliminary draft report shall be transmitted to the member undergoing the evaluation for comments. These comments shall be taken into account by the team when finalising the draft report.

3.      The draft report shall be submitted to the GRECO.

Article 15 - Discussion and adoption of reports

1.      The GRECO shall debate in Plenary the draft report submitted by the team.

2.      The member undergoing the evaluation shall be entitled to submit observations orally and/or in writing to the Plenary.

3.      At the close of the debate, the GRECO shall adopt, with or without amendments, the report in respect of the member undergoing the evaluation.

4.      All members shall be entitled to participate in the vote leading to the adoption of evaluation reports relating to the application of the Guiding Principles. Only members which are Parties to an international legal instrument adopted in pursuance of the Programme of Action against Corruption shall be entitled to participate in the vote leading to the adoption of evaluation reports on the implementation of the instrument concerned.

5.      Evaluation reports shall be confidential. Unless otherwise decided, access to these reports shall be restricted to members of the team which has carried out the evaluation, in addition to members of the GRECO, of the Statutory Committee and of the Secretariat of these bodies.

14

6.      The GRECO's report may contain recommendations addressed to the member undergoing the evaluation in order to improve its domestic laws and practices to combat corruption. The GRECO shall invite the member to report on the measures taken to follow these recommendations.

Article 16 - Public Statements

1.      The Statutory Committee may issue a public statement when it believes that a member remains passive or takes insufficient action in respect of the recommendations addressed to it as regards the application of the Guiding Principles.

2.      The Statutory Committee, in its composition restricted to the members who are parties to the instruments concerned, may issue a public statement when it believes that a member remains passive or takes insufficient action in respect of the recommendations addressed to it as regards the implementation of an instrument adopted in pursuance of the Programme of Action against Corruption.

3.      The Statutory Committee shall inform the member concerned and provide an opportunity for the member to submit further comments before confirming its decision to issue a public statement referred to in paragraphs 1 and/or 2 above.

Article 17 - The GRECO's financial resources

1.      The budget of the GRECO shall be financed through the annual compulsory contributions of its members;

2.      The GRECO may receive additional voluntary contributions from its members;

3.      The GRECO may also receive voluntary contributions from interested international institutions;

4.      Financial resources covered by paragraph 3 above shall be subject to the authorisation of the Statutory Committee prior to their acceptance.

3.      The GRECO's assets shall be acquired and held on behalf of the Council of Europe and shall benefit as such from the privileges and immunities applicable to the Council's assets under existing agreements.

Article 18 - Statutory Committee

1.      The Statutory Committee shall be composed of the representatives on the Committee of Ministers of the Member States of the Council of Europe which are also members of the GRECO and of representatives specifically designated to that effect by the other members of the GRECO.

2.      The Statutory Committee shall determine every year the members' compulsory contributions to the GRECO. The scale according to which the contributions of non-members of the Council of Europe are calculated shall be decided in agreement with the latter; as a general rule, that scale shall conform to the criteria for the determination of the scale of contributions to the general budget of the Council of Europe.

3.      The Statutory Committee shall adopt every year the GRECO's budget on expenditure relating to the implementation of the programme of activities and common secretariat expenditure.

4.      The Statutory Committee shall approve every year the GRECO's annual accounts which shall be drawn up by the Secretary General of the Council of Europe in accordance with the Financial Regulations of the Council of Europe and submitted to the Statutory Committee accompanied by the report of the Board of Auditors. In order to discharge the Secretary General from responsibility for the management of the financial year in question, the Statutory Committee shall transmit to the Committee of Ministers the annual accounts, together with its approval or any comments, and the report drawn up by the Board of Auditors.

5.      The Financial Regulations of the Council of Europe shall apply, *mutatis mutandis*, to the adoption and management of the budget.

Article 19 - Secretariat

1.      The GRECO shall be assisted by a Secretariat provided by the Secretary General of the Council of Europe.

2.      The GRECO's Secretariat shall be headed by an Executive Secretary appointed by the Secretary General of the Council of Europe.

Article 20 - Amendments

1.      The GRECO or any of its members may propose amendments to this Statute to the Statutory Committee.

2.      This Statute may be amended by Statutory Committee by unanimous decision. If the amendment has not been proposed by the GRECO, the latter shall be consulted by the Statutory Committee.

Article 21 - Withdrawal

1.      Subject to the applicable provisions of international legal instruments mentioned in Article 2, paragraph 2 above, any member may withdraw from the GRECO by means of a declaration addressed to the Secretary General of the Council of Europe by the Minister for Foreign Affairs or a diplomatic representative who shall be given specific powers to this effect.

2.      The Secretary General shall acknowledge receipt of the declaration and inform the member concerned that it will be submitted to the Statutory Committee.

3.      By analogy with Article 7 of the Statute of the Council of Europe, the withdrawal shall take effect:

-       at the end of the financial year in which it is notified, if the notification is given during the first nine months of that financial year;

-       at the end of the next financial year, if the notification is given in the last three months of the financial year.

Appendix 005040
16

4.      In accordance with Article 18 of the Financial Regulations of the Council of Europe, the Statutory Committee shall examine the financial consequences of the withdrawal and make the appropriate arrangements.

5.      The Secretary General shall immediately inform the member concerned of the consequences for it of its withdrawal and keep the Statutory Committee informed of the outcome.