UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| VANTAGE DEEPWATER COMPANY and VANTAGE DEEPWATER DRILLING, INC., | |
| *Petitioners,* | CIVIL ACTION NO. 18-cv-2246 |
| v. | |
| PETROBRAS AMERICA, INC., PETROBRAS VENEZUELA INVESTMENTS & SERVICES, BV, and PETROLEO BRASILEIRO S.A. – PETROBRAS, | |
| *Respondents.* | |

**PETITIONERS' OMNIBUS BRIEF
IN SUPPORT OF PETITION TO CONFIRM FINAL AWARD AND
IN OPPOSITION TO RESPONDENTS' MOTION TO VACATE MAJORITY AWARD**

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

I.     INTRODUCTION ...........................................................................................1

II.     BACKGROUND .........................................................................................5

    A.     Overview of the arbitration.............................................................5

    B.     The Final Award found that Petrobras wrongfully terminated the DSA ................7

    C.     The Final Award rejected Petrobras's corruption defense and counterclaims ....................................................................................7

        1.     Overview of the parties' dispute regarding alleged bribery scheme...........7

        2.     The Majority found that Petrobras failed to establish Vantage's knowledge of or participation in the alleged bribery scheme....................10

        3.     The Majority found that Petrobras ratified the DSA and was estopped from asserting its bribery defenses and claims ...........................10

        4.     The Majority found it unnecessary to decide whether bribery actually occurred ...................................................................12

    D.     The Final Award confirmed that the arbitration was properly conducted ............12

III.     LEGAL STANDARD...................................................................................13

    A.     Petrobras bears a heavy burden under the applicable legal standards ..................13

    B.     Standard for enforcement under Article V of the Panama Convention ................14

    C.     Standard for vacatur under § 10(a) of the FAA ....................................16

IV.     VANTAGE'S PETITION TO CONFIRM SHOULD BE GRANTED............................17

    A.     Enforcement would not violate public policy under Article V(2)(b) of the Panama Convention .......................................................................17

        1.     There is no public policy obstacle to enforcement ....................................17

        2.     The Final Award carefully considered the public policy issue.................20

        3.     There is no proper basis to revisit the factual record.................................21

        4.     Enforcement would not create a "windfall" for Vantage...........................22

    B.     The Final Award was rendered in accordance with the parties' agreement, in compliance with Article V(1)(d)....................................................22

    C.     The Court has jurisdiction over Petróleo Brasileiro ...............................23

V.     THERE IS NO BASIS TO VACATE THE FINAL AWARD.........................................24

    A.     The Final Award is not subject to vacatur for evident partiality under § 10(a)(2) ..................................................................................24

       1.      Judge Brower's fully disclosed connections to Quinn Emanuel do not establish actual bias ..........................................................25

       2.      Judge Brower's conduct at the hearing does not establish actual bias ........................................................................................27

       3.      Judge Brower does not have a "past record of partiality" .........37

       4.      Judge Brower did not improperly affect the Majority's view of Respondents ...............................................................................39

   B.     The Final Award is not subject to vacatur for refusal to hear pertinent evidence under § 10(a)(3) ....................................................................40

   C.     The Final Award is not subject to vacatur for refusal to issue a reasoned award under § 10(a)(4)........................................................................44

   D.     Mr. Gaitis's perfunctory dissent should be given no weight ................45

VI.     PRAYER FOR RELIEF ................................................................................49

**Cases**

*Abernathy v. Oklahoma ex rel. Goar*,
    31 F.2d 547 (8th Cir. 1929) ................................................................................. 18

*In re Application Pursuant to 28 USC § 1782 et al. v. Brower et al. (Vale v. BSGR)*,
    16-mc-2552,(D.D.C. Dec. 21, 2016) ..................................................................... 38

*Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*,
    783 F.3d 1010 (5th Cir. 2015) ................................................................. 14, 15, 16, 17

*Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*,
    230 F. Supp. 2d 362 (S.D.N.Y. 2002) ................................................................... 24

*BNSF R. Co. v. Alstom Transp., Ind.*,
    777 F.3d 785 (5th Cir. 2015) ................................................................................. 44

*Brabham v. A.G. Edwards & Sons Inc.*,
    376 F.3d 377 (5th Cir. 2004) ................................................................................. 17

*Carmody Bldg. Corp. v. Richter & Ratner Contracting Corp.*,
    2013 WL 4437213 (S.D.N.Y. 2013) ..................................................................... 45

*Carpenters Health & Welfare Fund v. Coca–Cola Co.*,
    2008 WL 9358563 (N.D. Ga. 2008) ..................................................................... 43

*Cat Charter, LLC v. Schlumberger*,
    646 F.3d 836 (11th Cir. 2011) .............................................................................. 45

*Chevron Corp. v. Republic of Ecuador*,
    949 F. Supp. 2d 57 (D.C. Cir. 2013) ............................................................... 15, 16

*Chic Int'l Ins. Co. v. Caja Nacional De Ahorro y Seguro*,
    293 F.3d 392 (7th Cir. 2002) ................................................................................. 24

*City of Findlay v. Pertz*,
    66 F. 427 (6th Cir. 1895) ................................................................................ 18, 19

*Commonwealth Coatings Corp. v. Continental Cas. Co.*,
    393 U.S. 145 (1968) ............................................................................................... 26

*Cooper v. WestEnd Capital Mgmt., L.L.C.*,
    832 F.3d 534 (5th Cir. 2016) ..................................................................... 14, 34, 44

*Delta Materials Handling, Inc. v. Prince*,
    1989 WL 40861 (Tenn. App. 1989) ...................................................................... 18

*Employers Ins. of Wausau v. Banco Seguros Del Estado*,
    34 F. Supp. 2d 1115 (E.D. Wis. 1999), *aff'd sub nom. Employers Ins. of
    Wausau v. Banco De Seguros Del Estado*, 199 F.3d 937 (7th Cir. 1999) .............. 24

*Eni US Operating Co. Inc. v. Transocean Offshore Deepwater Drilling Inc.*,
    4:13-cv-3354, Dkt. 112 (S.D. Tex. 2017) ............................................................... 5

*Enron Nigeria Power Holding, Ltd. v. Federal Republic of Nigeria*,
   844 F.3d 281 (D.C. Cir. 2016) ................................................................ 16

*Exxon Corp. v. Baton Rouge Oil*,
   77 F.3d 850 (5th Cir. 1996) .................................................................... 17

*Fairchild & Co. v. Richmond, Fredericksburg & Potomac R.R. Co.*,
   516 F. Supp. 1305 (D.D.C. 1981) ..................................................... 29, 30

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
   665 F.3d 384 (2d Cir. 2011) ..................................................................... 6

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) ......................................................................... 16, 40

*Flexuspine, Inc. v. Globus Med., Inc.*,
   2016 WL 9279999 (E.D. Tex. July 6, 2016) ........................................... 43

*Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co.*,
   866 F.3d 11 (1st Cir. 1989) ............................................................. 29, 39

*Garcia v. Beard,*
   2016 WL 1068522, at *21 (C.D. Cal. Jan. 6, 2016)*, report and recommendation*
   *adopted,* 2016 WL 1065800 (C.D. Cal. Mar. 16, 2016) ......................... 38

*Grynberg v. BP, P.L.C.*,
   527 F. App'x 278 (5th Cir. 2013) ........................................................... 21

*Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*,
   288 F. Supp. 2d 783 (N.D. Tex., 2003) ................................................... 6

*Hall Street Assocs., L.L.C. v. Mattel, Inc.*,
   552 U.S. 576 (2008) ......................................................................... 14, 17

*Hardy Exploration & Production (India), Inc. v. Government of India,*
   *Ministry of Petroleum & Natural Gas,*
   314 F. Supp. 3d 95 (D.D.C. 2018) ......................................................... 20

*Hawkins v. Byrn*,
   261 S.W. 980 (Tenn. 1924) .................................................................... 18

*Health Servs. Mgmt. Corp. v. Hughes*,
   975 F.2d 1253 (7th Cir. 1992) ............................................................... 32

*Holmes Group, Inc. v. RPS Products, Inc.*,
   2010 WL 7867756 (D. Mass. June 25, 2010) ........................................ 31

*Holodnak v. Avco Corp.*,
   381 F. Supp. 191 (D. Conn. 1974) ......................................................... 34

*Householder Grp. v. Caughran*,
   354 F. App'x 848 (5th Cir. 2009 ........................................... 25, 29, 31, 40

*Hurn v. Macy's, Inc.*,
   728 F. App'x 598 (7th Cir. 2018) ........................................................... 28

*In re Blech Sec. Litig.*,
   2003 WL 1610775 (S.D.N.Y. 2003) ........................................................ 43

*In re Martinez-Catala*,
   129 F.3d 213 (1st Cir. 1997) ................................................................. 27

*In re Meridian Bulk Carriers, Ltd.*,
   2003 WL 23181011 (E.D. La. 2003) ....................................................... 42

*InterChem Asia 2000 Pte. Ltd. v. Oceana Petrochems. AG*,
   373 F. Supp. 2d 340 (S.D.N.Y. 2005) .................................................... 30

*Karaha Bodas Co. v. Perusahaan Perambangan Minyak Dan Gas Bumi Negara*,
   364 F.3d 274 (5th Cir. 2004) ................................................................. 15

*Kincaid v. Black Angus Motel, Inc.*,
   983 P.2d 1016 (Okla. 1999) ................................................................... 18

*L.S. Cogswell Lumber Co. v. Manahan*,
   274 P. 871 (Okla. 1929) ......................................................................... 18

*Laws v. Morgan Stanley Dean Witter*,
   452 F.3d 398 (5th Cir. 2006) ................................................................. 40

*Lightcap v. Nicola*,
   34 Pa. Super. 189 (Pa. 1907) ................................................................. 18

*LLT Int'l Inc. v. MCI Telecommc'ns Corp.*,
   18 F. Supp. 2d 349 (S.D.N.Y. 1998) ...................................................... 30

*Louisiana Dep't of Natural Resources v. Fed. Emergency Mgmt. Agency*,
   710 F. App'x 211 (5th Cir. 2018) ........................................................... 40

*Lummus Global Amazonas S.A. v. Aguaytia Energy del Peru, S.R. LTDA.*,
   256 F. Supp. 2d 594 (S.D. Tex. 2002) ............................................. passim

*Lyondell Chem. Co. v. Occidental Chem. Corp.*,
   608 F.3d 284 (5th Cir. 2010) ................................................................. 43

*Med James, Inc. v. Ins. Mktg. Solutions, Inc.*,
   2006 WL 1360400 (D. Kan. 2006) ................................................... 18, 19

*Meyer v. John W. Corley Pub. & Promotion Co.*,
   162 S.W. 273 (Mo. App. 1913) .............................................................. 18

*Millboro Lumber Co. v. Augusta Wood Prods. Corp.*,
   125 S.E. 306 (Va. 1924) ......................................................................... 18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) ................................................................................ 14

*Nalco Co., Inc. v. Baker Hughes Inc.*,
   2017 WL 3033997 (S.D. Tex. 2017) ...................................................... 42

*National Iranian Oil Co. v. Crescent Petroleum Co.*,
   2016 WL 01032316 (Q.B. Comm. Ct. 2016) ......................................... 19

*New Jersey Tpk. Auth. v. PPG Indus., Inc.,*
   16 F. Supp. 2d 460 (D.N.J. 1998) ........................................................................ 43

*Oxford Health Plans LLC v. Sutter,*
   569 U.S. 564 (2013) ............................................................................. 14, 17, 44

*Parker v. JC Penney Corp.,*
   426 F. App'x 285 (5th Cir. 2011) ........................................................................ 40

*PDV v. Sweeny, Inc. v. ConocoPhillips Co.,*
   2015 WL 5144023 (S.D.N.Y. 2015) .................................................................... 14

*Perenco Ecuador Ltd. v. Republic of Ecuador & Empresa Estatal Pertoleos del Ecuador*
   ICSID Case No. ARB/08/6, Dec. 8, 2009) ........................................................... 37

*Positive Software Solutions, Inc. v. New Century Mort. Corp.,*
   476 F.3d 278 (5th Cir. 2007) ...................................................................... passim

*Rogers v. The First Nat'l Bank,*
   2006 WL 344759 (Tenn. App. 2006) ................................................................... 18

*S.E.L. Maduro (Fla.), Inc. v. M/V Santa Lucia,*
   116 F.R.D. 289 (D. Mass. 1987) ......................................................................... 19

*Santa Maria Del Oro Mines Co. v. Int'l Mining Corp.,*
   20 F. Supp. 316 (D. Del. 1937) ........................................................................... 18

*Sarofim v. Trust Co. of the West,*
   440 F.3d 213 (5th Cir. 2006) ......................................................................... 15, 44

*Siler v. Perkins,*
   149 S.W. 1060 (Tenn. 1912) ............................................................................... 18

*Sisti v. Merrill, Lynch, Pierce, Fenner & Smith,*
   1991 WL 575874 (E.D. Va. Apr. 22, 1991) ........................................................ 32

*State v. Engle,*
   82 N.W. 763 (Iowa 1900) ................................................................................... 18

*Sun Refining & Marketing Co. v. Statheros Shipping Corp.,*
   761 F. Supp. 293 (S.D.N.Y. 1991) ...................................................................... 49

*Superiority, Inc. d/b/a/ Just Bulbs v. Motherboards.com,*
   2003 WL 23354145 (UDRP–ARB 2003) ............................................................ 43

*Tamimi Global Co. v. Kellogg Brown & Root LLC,*
   2011 WL 1831719 (S.D. Tex. May 12, 2011) ..................................................... 22

*Tempo Shain Corp. v. Bertek, Inc.,*
   120 F.3d 16 (2d Cir. 1997) .................................................................................. 41

*Tanesco v. IPTL*
   ICSID Case No. ARB/98/8 .................................................................................. 38

*Terex Corp. v. Int'l Union,*
   177 F.3d 978, 1999 WL 197144 (5th Cir. 1999) ............................................ 16, 17

*Tully Construction Co. v. Canam Steel Corp.*,
684 F. App'x 24 (2d Cir. 2017) ........................................................... 44

*Uhl v. Komatsu Forklift Co.*,
512 F.3d 294 (6th Cir. 2008) ............................................................... 28

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
484 U.S. 29 (1987) ............................................................................. 15

*United States ex rel. Siewick v. Jamieson Science & Engineering, Inc.*,
214 F.3d 1372 (D.C. Cir. 2000) ........................................................... 18

*United States v. Grace Evangelical Church of S. Providence Ridge*,
132 F.2d 460 (7th Cir. 1942) ............................................................... 18

*United States v. Pan-Am. Petroleum Co.*,
55 F.2d 753 (9th Cir. 1932) ................................................................. 18

*Upjohn v. United States*,
449 U.S. 383 (1981) ........................................................................... 42

*Vanguard Grp., Inc. v. Emilio SA*,
2002 WL 636932 (UDRP–ARB 2002) .................................................... 43

*Velasco v. Beth Israel Medical Center*,
279 F. Supp. 2d 333 (S.D.N.Y. 2003) ................................................... 29

*Vigorito v. UBS PaineWebber, Inc.*,
477 F. Supp. 2d 481 (D. Conn. 2007) ................................................... 28

*Von Essen, Inc. v. Marnac, Inc.*,
2002 WL 35634037 (N.D. Tex. Jan. 2, 2002),
*aff'd*, 64 F. App'x 416 (5th Cir. 2003) ................................................. 28

*Waldron v. British Petroleum Co.*,
231 F. Supp. 72 (S.D.N.Y. 1964) ......................................................... 18

*Weber v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
455 F. Supp. 2d 545 (N.D. Tex. 2006) ....................................... 17, 25, 26

*Williams Electronics Games, Inc. v. Garrity*,
366 F.3d 569 (7th Cir. 2004) ............................................................... 18

*World Duty Free v. Kenya*,
ICSID Case No. ARB/00/7 .................................................................. 19

## Statutes

28 U.S.C. § 1605(a) ............................................................................ 24

28 U.S.C. § 1605(a)(6) ........................................................................ 24

28 U.S.C. § 1605(a)(6)(B) .................................................................... 24

9 U.S.C. § 10(a) ................................................................. 14, 16, 40, 44

9 U.S.C. § 207 ................................................................................... 15

9 U.S.C. § 301 ............................................................................................... 13

9 U.S.C. § 302 ............................................................................................... 15

9 U.S.C. § 305 ............................................................................................... 14

9 U.S.C. § 307 ............................................................................................... 14

9 U.S.C. § 7 ................................................................................................... 41

Fed. R. Evid. 408(a) ...................................................................................... 42

Tex. R. Evid. 408(a) ...................................................................................... 42

### Other Authorities

AAA's *Code of Ethics for Arbitrators in Commercial Disputes* ..................................... 23, 31, 41

Inter-American Convention on International Commercial Arbitration of January 30, 1975 (the "Panama Convention"), 104 U.S.T. 448 (1990), *reprinted following* 9 U.S.C. § 301 *et seq.* ............................................................................. 13

Panama Convention, https://treaties.un.org/doc/Publication/UNTS/Volume%201438/volume-1438-I-24384-English.pdf ............................................................................. 13

Restatement (Second) of Contracts § 8 (1981) .......................................... 20

Restatement (Second) of Contracts § 164 (1981) ...................................... 20

Restatement (Third) U.S. Law of Int'l Comm. Arb. sec. 4-13, cmt. (f) ....................................... 38

## DEFINITIONS

### Parties

| | |
|---|---|
| **Vantage** (Petitioners/Claimants) | Vantage Deepwater Company and Vantage Deepwater Drilling, Inc., |
| **Petrobras** (Respondents) | Petrobras America, Inc., Petrobras Venezuela Investments & Services, BV, and Petróleo Brasileiro S.A.– Petrobras |
| **Petróleo Brasileiro** | Petróleo Brasileiro S.A.– Petrobras |

### Key Terms

| | |
|---|---|
| **AAA** | American Arbitration Association |
| **Arbitration** | *Vantage v. Petrobras*, ICDR Case No. 01-15-0004-8503 |
| **Derman Decl.** | Declaration of Andrew Derman, dated August 31, 2018, submitted in support of Motion to Vacate the Majority Award (Dkt. 53-1) |
| **Dissent** | Objection to, and Dissent from the Tribunal Majority's Final Award, dated June 28, 2018 (Dkt. 1-7, Stern Decl., Ex. E) |
| **DSA** | Agreement for the Provision of Drilling Services, dated February 4, 2009 (Dkt. 1-4, Stern Decl., Ex. B) |
| **FAA** | Federal Arbitration Act, § 9 U.S.C. § 1 *et seq.* |
| **Fellas Decl.** | Declaration of John Fellas, dated September 26, 2018, submitted in support of Vantage's Omnibus Brief |
| **Final Award** | Final Award of the Arbitral Tribunal, dated June 29, 2018 (Dkt. 1-3, Stern Decl., Ex. A) |
| **FSIA** | Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* |
| **Guaranty** | Form of Payment and Performance Guaranty, dated February 4, 2009 (Dkt. 1-5, Stern Decl., Ex. C) |
| **ICDR** | International Centre for Dispute Resolution |
| **Katz Decl.** | Declaration of William M. Katz, Jr., submitted in support of Motion to Vacate the Majority Award (Dkt. 53-3) |
| **Majority** | Professor William W. Park and the Honorable Charles N. Brower |
| **Newman Decl.** | Declaration of Lawrence W. Newman, submitted in support of Motion to Vacate the Majority Award (Dkt. 53-2) |
| **Panama Convention** | Inter-American Convention on International Commercial Arbitration, 104 U.S.T. 448 (1990), *reprinted following* 9 U.S.C. § 301 |
| **Shih Decl.** | Declaration of Kate Kaufmann Shih, dated October 3, 2018, submitted in support of Vantage's Omnibus Brief |
| **Third Novation** | Third Novation and Amendment Agreement to the DSA, dated October 27, 2014 (Dkt. 1-6, Stern Decl., Ex. D) |
| **Tribunal** | Professor William W. Park, the Honorable Charles N. Brower, and Mr. James Gaitis |

Petitioners Vantage Deepwater Company and Vantage Deepwater Drilling, Inc. (together, "Vantage") respectfully submit this Omnibus Brief in support of Vantage's Petition to Confirm Final Award (Dkt. 1) and in response to Respondents Petrobras America, Inc., Petrobras Venezuela Investments & Services, BV, and Petróleo Brasileiro S.A. – Petrobras (together, "Petrobras") Opposition to Petition to Confirm Majority Award (Dkt. 65) and Motion to Vacate the Majority Award (Dkt. 53).[1] For the reasons set forth below, Vantage respectfully requests that the Court grant Vantage's Petition to Confirm and deny Petrobras's Motion to Vacate.

## I.    INTRODUCTION

The arbitration underlying these proceedings involves a story that unfortunately has played out many times since the historic downturn in oil prices in 2014, where an unscrupulous party uses baseless pretexts to wrongfully terminate a long-term contract that became a burden after the downturn. In August 2015, less than three years into the DSA's eight-year term, Petrobras terminated its Agreement for Provision of Drilling Services with Vantage. *See* Dkt. 1-4, Stern Decl., Ex. B ("DSA"). As its excuse for termination, Petrobras asserted that Vantage failed to perform in accordance with the DSA's standards. After arbitration commenced, Petrobras also alleged that the DSA was procured by bribery and, therefore, was voidable or void. On June 30, 2018, two distinguished international arbitrators (the "Majority") rejected Petrobras's excuses and awarded Vantage more than $622 million in benefit-of-the-bargain damages in a 101-page, reasoned award. *See* Dkt. 1-3, Stern Decl., Ex. A ("Final Award").

In opposing enforcement and seeking to set aside the Final Award, Petrobras disregards its contractual obligation to accept the Final Award as binding and enforceable. It also ignores the

---

[1]    All references to the Opposition to Petition to Confirm and Motion to Vacate are to the versions filed in redacted form at Dkt. 65 and 53, respectively. The unredacted versions are filed under seal at Dkts. 46 and 34, respectively.

extremely narrow grounds under the Inter-American Convention on International Arbitration ("Panama Convention") and Federal Arbitration Act ("FAA") for refusing recognition of an arbitration award. Instead, Petrobras seeks to re-litigate the arbitrators' findings and conclusions, their evidentiary and procedural rulings, the weight they gave particular evidence, and the questions they asked of witnesses. But the law could not be more clear: federal courts are not permitted to engage in the second-guessing exercise that Petrobras invites.

Petrobras invokes "public policy" as an excuse to reexamine the Majority's holding that Petrobras ratified, waived, and is estopped from complaining about any alleged bribery in connection with the DSA. This holding was based on the Majority's detailed findings that (i) Petrobras became aware of the alleged bribery in October 2013; (ii) with that knowledge, Petrobras ratified the DSA by continuing to demand performance under the contract and entering into novations and amendments in which Petrobras affirmed that the DSA remained valid and binding; and (iii) these novations and amendments were "formed without any involvement of any actors alleged to have been involved in bribery." *Id.* ¶ 289. The Court may not second-guess these findings and conclusions.

Only a public policy that is "explicit," "well defined," and "dominant" may serve as a basis to refuse enforcement of an arbitral award. There is no public policy that would allow a party like Petrobras to ratify a contract and accept its benefits while reserving a right to terminate the contract years later when market conditions sour. Petrobras's brief is heavy on platitudes about the evils of bribery, but it does not cite a single authority—much less an explicit, well-defined, dominant policy—holding that a contract may be set aside on the facts present here. That is no accident: a contracting party cannot simply keep a bribery charge in its back pocket as an all-purpose "get out of jail free" card in the event that it ever desires to wrongfully terminate a long-term

contract. Because the Majority made extensive findings of ratification and estoppel, which are binding on this Court, Petrobras's public policy arguments fail.

Petrobras also disregards the Majority's determination that, as a factual matter, Petrobras's evidence did not support a finding that Vantage knew of or was otherwise complicit in the alleged bribery. Those findings cannot be relitigated here. Because no authority expressly holds that it would be against public policy to enforce a contract on behalf of a party not found to have been knowledgeable or complicit in bribery, Petrobras's public policy argument would fail even absent its ratification of the contract.

Petrobras also raises a scattershot challenge to the Final Award based on its assertion that Vantage's party-appointed arbitrator, the Honorable Charles N. Brower, was biased. *See* Dkt. 53 at 16–28. Judge Brower had no business relationship or financial interest of the type the courts have considered necessary to establish bias. Nor has Petrobras satisfied the heavy burden it bears to show that Judge Brower demonstrated actual bias at the hearing. The courts have repeatedly held that bias is not shown where an arbitrator asks hard questions; tests a witness's credibility; treats a witness sympathetically; expresses frustration with the pace of the proceeding, even to the point of rudeness; tries to move things along; or expresses views about the merits of the parties' positions—particularly where, as here, the arbitrator received and reviewed voluminous witness statements, exhibits, and briefing before the hearing and had the opportunity to form an educated view about the evidence. Petrobras does not allege any other conduct by Judge Brower. There is no authority that would support Petrobras's effort to avoid the award even assuming this alleged conduct occurred.

Petrobras's grab-bag of procedural objections to the arbitration are equally meritless. The streamlined, summary posture in which courts must review arbitral awards is not a license to

micromanage arbitration proceedings. Petrobras has not shown, and cannot possibly show, that these proceedings, which were conducted under standard norms of international arbitration, represent a flagrant denial of basic due process norms.

Petrobras also overstates the significance of the one-paragraph dissent issued by its party-appointed arbitrator, Mr. James Gaitis. *See* Dkt. 1-7, Stern Decl., Ex. E ("Dissent"). Unlike awards, dissents are entitled to no deference. Through its purported expert, Petrobras alleges that dissents are rare in international arbitrations and so should bear substantial weight. But that simply is not true. Dissents are common and are widely viewed as attempts by party-appointed arbitrators like Mr. Gaitis to placate the losing parties that appointed them. The Dissent is generic on its face, wholly lacking substance and support, and should be disregarded as a meaningless gesture.

This Court should closely consider the actions and conduct of Chair Park—whom Petrobras does not accuse of any impropriety or bias. As part of the Majority, Chair Park expressly affirmed that "the pre-hearing, hearing, and post-hearing processes leading to the issuance of this Final Award have been conducted with full respect for all Parties' rights to fundamental fairness and due process protections," and that he had not "noted any evidence that these proceedings denied the Parties fundamental fairness and due process protections." Final Award ¶ 529.

Petrobras is not entitled to a "redo" of the arbitration by this Court. To the contrary, the Fifth Circuit has confirmed that, to promote the emphatic, long-standing federal policy of promoting efficiency in dispute resolution by arbitration, courts will not sit in appeal of arbitration awards. The standards of review allowed under the Panama Convention and FAA, and as interpreted by long-standing Fifth Circuit precedent, are extremely narrow. When applied to the well-reasoned Final Award, which was rendered after a lengthy and detailed arbitral hearing, Vantage's Petition to Confirm should be granted and Petrobras's Motion to Vacate denied.

## II.  BACKGROUND

This case arises out of Petrobras's wrongful termination of the DSA.  Final Award ¶ 21.

Under the DSA, Vantage committed to provide to Petrobras (the operator) an ultra-deepwater

drillship known as the Titanium Explorer and related drilling services for an eight-year term that

commenced on December 7, 2012.[2]  *Id.* ¶ 23.  Vantage initiated the underlying arbitration after

Petrobras terminated the DSA on August 31, 2015, less than three years into its eight-year term.

*Id.* ¶ 24.  Vantage sought to recover its benefit-of-the-bargain damages—the day rate Petrobras

was required to pay through the full term of the contract.  *Id.* ¶¶ 439–442.

### A.  Overview of the arbitration

Under the Third Novation to the DSA, Dkt. 1-6, Stern Decl., Ex. D ("Third Novation),

the parties agreed to submit all disputes relating to the DSA to binding arbitration administered by the

International Centre for Dispute Resolution ("ICDR")—the international branch of the American

Arbitration Association ("AAA")—under the AAA's Commercial Arbitration Rules, with

guidance from the ICDR Guidelines for Arbitrators Concerning Exchanges of Information.[3]  Third

Novation §§ 8.1, 24.2; Final Award ¶ 44.  Arbitration was to be before three arbitrators, with each

party appointing one and those two party-appointed arbitrators selecting the Chairman.  Third

Novation §§ 8.1, 24.2.

---

[2] When the DSA's contract term commenced in December 2012, oil prices and drillship day-rates were at historic highs and drillships were in short supply.  Everything changed, however, after the collapse in oil prices at the end of 2014.  *See Eni US Operating Co. Inc. v. Transocean Offshore Deepwater Drilling Inc.*, 4:13-cv-3354, Dkt. 112 ¶ 76 (S.D. Tex. 2017) (Bennett, J.) ("By mid-2014, the offshore drilling market experienced a significant downturn in comparison to the initial 2008 market.  The market was dismal—commodity pricing decreased, and the number of idle offshore rigs increased.").

[3] The parties amended and novated the DSA several times.  At termination, the Third Novation was in effect.  While the DSA was governed by English law, the Third Novation was governed by federal maritime law.  Final Award ¶ 37.

The arbitral selection process resulted in appointment of the two distinguished arbitrators who ended up comprising the Majority:

- The tribunal's Chairman, Professor William Park, is an eminent, highly respected international arbitrator. He is the President of the London Court of International Arbitration, the General Editor of *Arbitration International*, and a Professor of Law at Boston University, where his teaching focuses on international financial and commercial transactions. He is a member of the Governing Board of the International Council for Commercial Arbitration of the Association Suisse de l'Arbitrage and the Board of the American Arbitration Association. He is the author of numerous treatises on international arbitration, including *Arbitration of International Business Disputes*, *International Forum Selection*, *ICC Arbitration*, *International Commercial Arbitration*, and *Tax Treaty Arbitration*.[4] Chair Park's treatises are regularly cited by courts on questions of arbitral procedure.[5] His list of selected arbitrations exceeds 100 matters.[6]

- Vantage's appointee, the Honorable Charles N. Brower, is also an eminent, highly respected international arbitrator. He served from 1983 to 2018 as a Judge of the Iran-U.S. Claims Tribunal in The Hague after appointment by the President of the United States. He is currently an ad hoc Judge on the International Court of Justice. Judge Brower has also served as Judge Ad Hoc of the Inter-American Court of Human Rights, as a member of the Register of Experts of the United Nations Compensation Commission in Geneva, and as a member of the Panels of Conciliators and Arbitrators of the International Centre for Settlement of Investment Disputes. He has represented governments before the International Court of Justice and has served as President of the American Society of International Law, Governor of the American Bar Association, Chair of the Institute for Transnational Arbitration, and on the Executive Council of the International Law Association.[7]

From commencement to Final Award, the arbitration took nearly three years. During that period, the Tribunal entered multiple procedural orders, denied a dispositive motion from

---

[4]  *See* Declaration of Kate Kaufmann Shih, dated October 3, 2018 ("Shih Decl."), Ex. A (Professor Park's Curriculum Vitae).

[5]  *See, e.g.*, *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 399 (2d Cir. 2011); *Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*, 288 F. Supp. 2d 783, 793 n.16 (N.D. Tex. 2003).

[6]  *See* Shih Decl., Ex. B (Professor Park's list of representative arbitrations).

[7]  *See* Shih Decl., Ex. C (Judge Brower's Curriculum Vitae). Vantage initially selected David Keltner as its party-appointed arbitrator. Mr. Keltner later recused himself due to a conflict that arose after he was initially seated, and Judge Brower was appointed to replace him. Final Award ¶¶ 48, 57.

Petrobras, received thousands of pages of pre-hearing and post-hearing briefing and tens of thousands of pages of exhibits, considered hundreds of pages of witness statements from six fact witnesses and seven experts, conducted a twelve-day hearing in which the witnesses were subject to live examination, and reopened the hearing to receive additional evidence offered by Petrobras.

### B. The Final Award found that Petrobras wrongfully terminated the DSA

In the Final Award, the Majority determined that the operational incidents upon which Petrobras based its termination "were principally caused by the actions of Respondents, rather than as violations of Good Oil and Gas Field Practices committed by Claimants." Final Award ¶ 246. The Majority found it significant "that neither Respondents nor the regulators viewed [the incidents] as serious at the time. Rather, they seemed to have become the focus of Respondents' complaints after the decision to terminate the Contract." *Id.* ¶ 249. Moreover, the Majority found that, contrary to its contractual obligations, "Respondents did not provide Claimants a meaningful opportunity to cure" and rejected Vantage's proposed cures "without good faith discussions." *Id.* ¶ 252. "Consequently, the Tribunal finds that Respondents committed a material breach under the Contract, through early termination and refusal to pay the day rate due Claimants for the remainder of the Contract's term without justification." *Id.* ¶ 254.

### C. The Final Award rejected Petrobras's corruption defense and counterclaims

#### 1. Overview of the parties' dispute regarding alleged bribery scheme

At the time the parties executed the DSA, a man named Nobu Su owned the Titanium Explorer and was a shareholder and board member of Vantage. To support its bribery defenses and counterclaims, Petrobras alleged that Nobu Su paid bribes to Petrobras and government officials through Vantage's agent in Brazil, Hamylton Padilha, and two intermediaries. *Id.* ¶ 279. Petrobras argued that Vantage knew of the alleged bribery because it was aware of certain interactions between Su, Padilha, and Petrobras. *Id.* Petrobras also elicited testimony from Padilha

at the arbitration hearing that certain Vantage officers may have known of the alleged bribes. In response, Vantage offered evidence of legitimate reasons unrelated to bribery as explanations for the Su interactions. *Id.* ¶¶ 255–256. As to Padilha, Vantage established that he entirely lacked credibility—he admitted that he lied about the DSA when it suited him,[8] that he had an incentive under a plea agreement to change his story and implicate Vantage,[9] and that his arbitration testimony contradicted prior testimony in which he unequivocally testified that Vantage did not have any knowledge of any bribery scheme.[10]

Vantage also submitted clear-cut evidence establishing that Petrobras had repeatedly ratified the DSA with knowledge of the alleged bribery. In October 2013, nearly two years before the termination, Petrobras became fully aware of the bribery allegations as the result of an internal audit. With that knowledge, Petrobras made the conscious decision—untainted by bribery—to continue to insist on Vantage's performance under the DSA and later reaffirmed on several occasions that the DSA was valid and binding. *Id.* ¶¶ 257–262. In doing so, Petrobras ratified the DSA, and waived and was estopped from asserting any argument that the contract should not be enforced due to the alleged bribery in its formation. *Id.*

Finally, Vantage argued that Petrobras had failed to satisfy its burden of proof to show that bribes were even paid at all.[11] Petrobras's only witness on bribery, Padilha, testified that the

---

[8] *See* Tr. 1404:3–4 ("At that point in time that [*i.e.*, to lie] was the obvious thing to do.")

[9] *See* Tr. 1356:2–5.

[10] *See* Tr. 1364:13–23.

[11] In its Motion to Vacate, Petrobras describes its bribery allegations as essentially undisputed. Dkt. 53 at 3–8. That is categorically untrue. Vantage vigorously disputed that Petrobras satisfied its burden of proof to show that bribery occurred, pointing to numerous infirmities with, and gaps in, Petrobras's evidence. Final Award ¶ 256.

money Su paid him was not used to pay bribes;[12] that Padilha had no personal knowledge of Su paying anyone else;[13] and that Padilha had no knowledge that bribes were actually paid to anyone.[14] Supporting adverse inferences against Petrobras, Vantage also established that Petrobras chose not to present as a witness one of the allegedly bribed Petrobras officials, even though it had the power to do so.[15] And although Petrobras claimed there was a tape recording of one of the intermediaries admitting to paying bribes, Petrobras did not offer the transcript of the tape as evidence. Instead, it hid the evidence, falsely representing to the Tribunal that it did not have the transcript when it actually did.[16] Although Petrobras relied heavily on a Brazilian court judgment convicting Padilha and other alleged participants in the alleged scheme, Vantage argued

---

[12] *See* Tr. 1393:17–1394:8 (Q: "You did not pay bribes. Is that correct?" A: "I did not pay bribes. That's correct."); *id.* 1420:2–3 (emphasizing that his own agreement with Nobu Su "was not part of any bribery scheme").

[13] *See* Tr. 1428:18–24 (Q: "But . . . you have no personal knowledge of any money paid to Mr. Nobu Su—to Mr. Henriques ever being paid to anyone else. You have no personal knowledge of that?" A: "I don't have any personal knowledge of that.").

[14] *See* Tr. 1401:13–18 (Q: "But you participated in a scheme involving payments, as you understood it, flowing from Mr. Su somehow to Mr. Henriques to Petrobras officials?" A: "I suspected, but that was it." Q: "But you didn't know for sure?" A: "I didn't know for sure."); *see also id.* (1428:15–24) (confirming that it was "possible" that "this was just a scheme to defraud Nobu Su into payment money").

[15] *See* Tr. 2839:16–2840:2 ("Mr. Musa is in the exact same position as Hamylton Padilha. He entered into a plea agreement, and this company has the exact same control over Mr. Musa that they had over Mr. Padilha to force Mr. Padilha to testify in this proceeding. They chose not to exercise that control and have Mr. Musa testify. Mr. Musa was the guy who apparently was interfacing with Vantage. If anybody could testify that there was taint and influence, it's Mr. Musa. But they chose not to bring him and have him testify in this case. Which I think is incredibly significant.").

[16] Petrobras's counsel's time records confirm that they had the transcript. *See* Shih Decl., Ex. D (May 30, 2017 (time entry for M. Mitzner): "[R]eview and analyze translation of recording of Henriques and Epoca reporter; compare same to Epoca article and report findings to team."). But at the hearing, Petrobras represented it did not: "Mr. Gaitis: Do we have the full transcript of that secret recording or just what the judge reads from. . . . Mr. Katz: . . . ***We don't have it***." Tr. 454:19–455:4 (emphasis added).

that the judgment was neither probative evidence nor binding since Vantage was not a party to the proceeding.[17]

### 2. The Majority found that Petrobras failed to establish Vantage's knowledge of or participation in the alleged bribery scheme

Petrobras devotes much of its Statement of Facts to asserting that Vantage knew of the alleged bribery. *See* Dkt. 65 at 6–9. But the Majority concluded the opposite, finding that Petrobras had "not established that Vantage knew of or participated in any bribery." Final Award ¶ 433; *see also id.* ¶ 362 ("[N]o convincing evidence shows Claimants were aware of the alleged bribery."); *id.* ¶¶ 393–394 ("[N]o evidence demonstrates Vantage itself substantially assisted in committing bribery. Such a finding would require Respondents to prove that Claimants had 'actual knowledge' of the alleged breach of fiduciary duty and that Claimants 'substantially assisted in its commission . . . . No such proof has been provided."); *id.* ¶ 407 ("Respondents have not met their burden to show that Vantage possessed 'knowledge' of the alleged bribery."); *id.* ¶ 357 ("Respondents have not provided sufficient evidence to show that [Vantage] violated the FCPA."). These factual findings are binding on this Court. *See infra* § III.

### 3. The Majority found that Petrobras ratified the DSA and was estopped from asserting its bribery defenses and claims

The Majority concluded as a legal matter that under both United States maritime law and English law, "[a] contract procured by bribery is not within the narrow category of contracts that are illegal *per se*, under relevant case law, but rather such a contract is merely voidable, but not void, and thus subject to ratification by an innocent party." *Id.* ¶ 372 (emphasis added).[18]

---

[17] *See* Dkt. 53-3 (Katz Decl.), Ex. 88 (Claimants' Response to Dispositive Motion) ¶¶ 8 10.

[18] The Second Novation was governed by English law, as was the original DSA. Final Award ¶¶ 191, 268. Accordingly, Vantage argued that English law governed the ratification issue because English law governed the contract at the time Petrobras first knowingly ratified it. *Id.*

Against this backdrop, the Final Award made extensive factual findings that Petrobras ratified the DSA with knowledge of the alleged bribery:

- "No illegal act was called for by [the DSA], which—even if it had been procured by bribery—was ratified by the 'non-bribing' party." *Id.* ¶ 375;

- "Respondents knowingly ratified the DSA in its current form, and now find themselves estopped from claiming the Contract is void or voidable." *Id.* ¶ 290;

- "The Second Novation and Third Amendment, occurring two months after Respondents completed a bribery audit in October 2013, shows Respondents were aware of bribery allegations, and yet continued with the Parties' Agreement." *Id.* ¶ 288.

- "Petrobras ratified the DSA when it entered into the Second Novation and the Third Novation." *Id.* ¶ 373;

- "Respondents waived this counterclaim [for civil conspiracy] by ratifying the DSA through the Second Novation and Third Novation." *Id.* ¶ 409;

- "Petrobras ratified the DSA and waived and is estopped from raising this counterclaim [for aiding and abetting breach of fiduciary duty]." *Id.* ¶ 395;

- "[C]onsidering that Petrobras had become aware of (and conducted internal investigations regarding) issues concerning alleged corruption by the time it novated the DSA through the Second Novation and Third Novation, Respondents are estopped from asserting an unjust enrichment theory because they ratified any acts that otherwise might have given rise to a claim." *Id.* ¶ 422;

- "Just as significantly, the Second Amendment and First Novation were formed without the involvement of any actors alleged to have been involved in bribery." *Id.* ¶ 289.

The Final Award squarely considered—and rejected—Petrobras's argument that enforcement of the DSA would violate United States public policy:

- "Respondents argue that the DSA is void because it was allegedly procured by commercial bribery, which is a criminal act under U.S. law (e.g., the FCPA), Texas law, and Louisiana law. Respondents refer to case law which they argue supports the view that a contract procured by commercial bribery cannot be enforced." Final Award ¶ 364;

---

¶¶ 269–269. However, the Tribunal recognized that whether decided under English law or the federal maritime law that governed the Third Novation in effect at the time Petrobras terminated the DSA, the result would be the same. *Id.* ¶ 291.

- "Claimants take the view that the DSA was not contrary to public policy, because the DSA did not call for the performance of an illegal act and, even if the DSA had been procured by bribery, a contract that has been ratified by the non-bribing party may still be enforced." *Id.* ¶ 370;

- "The Tribunal finds that Claimants have the more persuasive arguments with respect to whether the DSA was void, voidable, unconscionable or otherwise subject to rescission." *Id.* ¶ 371;

- "A contract procured by bribery is not within the narrow category of contracts that are illegal *per se*, under relevant case law, but rather such a contract is merely voidable, but not void, and thus subject to ratification by an innocent party." *Id.* ¶ 372;

- "[T]the DSA was neither unenforceable on public policy grounds nor grossly one-sided. ***Nor was the DSA contrary to public policy.*** No illegal act was called for by that Contract which—even if it had been procured by bribery—was ratified by the 'non-bribing' party." *Id.* ¶ 375 (emphasis added).

Based on its findings of ratification and estoppel, the Final Award rejected Petrobras's bribery defense and counterclaims.

### 4. The Majority found it unnecessary to decide whether bribery actually occurred

The Majority decided that it need not resolve the hotly contested issue of whether bribery had even occurred. *Id.* ¶ 287. Petrobras bore the burden of proof on that issue. As stated in the Final Award, even if bribery occurred, Petrobras's bribery defenses and counterclaims would fail as a matter of law because Petrobras knowingly ratified the DSA. *Id.* ¶¶ 287–291.

### D. The Final Award confirmed that the arbitration was properly conducted

Petrobras's party-appointed arbitrator, James Gaitis, issued a one-paragraph dissent stating "that the prehearing, hearing, and posthearing processes that led to the issuance of the Final Award have denied the Respondents in this proceeding the fundamental fairness and due process protections meant to be provided to arbitrating parties by Section 10(a)(1), 10(a)(2), 10(a)(3), 10(a)(4), and Chapters 2 and 3 of the Federal Arbitration Act." Dissent at 1 n.1. Mr. Gaitis did not provide ***any*** reasons to support his sweeping and conclusory assertions.

In response, the Majority confirmed that the proceedings were entirely proper and comported with the requirements of fundamental fairness and due process:

> The Chairman and Judge Brower each confirms that he has remained independent and impartial throughout the proceedings. The Chairman and Judge Brower each confirms that the pre-hearing, hearing, and post-hearing processes leading to the issuance of this Final Award have been conducted with full respect for all Parties' rights to fundamental fairness and due process protections meant to be provided to arbitrating parties by Chapters 1, 2, and 3 of the Federal Arbitration Act. Neither the Chairman nor Judge Brower has noted any evidence that these proceedings denied the Parties fundamental fairness and due process protections.

*Id.* ¶ 529.

## III.   LEGAL STANDARD

### A.   Petrobras bears a heavy burden under the applicable legal standards

These proceedings are governed by the Inter-American Convention on International Commercial Arbitration of January 30, 1975 (the "Panama Convention"), 104 U.S.T. 448 (1990), *reprinted following* 9 U.S.C. § 301 *et seq.*[19] The Panama Convention sets out the standards for confirmation of an international arbitral award where, as here, the majority of the parties to the arbitration agreement are citizens of a State or States that have ratified the Panama Convention. *See* 9 U.S.C. § 305. The Panama Convention incorporates by reference the provisions of the FAA to the extent they do not contradict the Panama Convention, including the FAA's provisions as to vacatur.[20]

Petrobras seeks to avoid confirmation of the Final Award under Articles V(1)(d) and V(2)(b) of the Panama Convention. *See* Dkt. 65. Petrobras also seeks to vacate the Final Award

---

[19]   The text of the Panama Convention is available at: https://treaties.un.org/doc/Publication/UNTS/Volume%201438/volume-1438-I-24384-English.pdf

[20]   *See* 9 U.S.C. § 307; *PDV v. Sweeny, Inc. v. ConocoPhillips Co.*, 2015 WL 5144023, at *6 (S.D.N.Y. 2015).

under § 10(a) of the FAA, 9 U.S.C. § 10(a). *See* Dkt. 53. Petrobras faces a heavy burden as to both, under which "any doubts or uncertainties must be resolved in favor of upholding" the Final Award.[21] "An emphatic federal policy favors arbitral dispute resolution," and this policy "applies with special force in the field of international commerce."[22] "Courts repeatedly admonish that 'severely limited' judicial review" of arbitral awards "is an essential, and inherent, feature of contractually agreed binding arbitration."[23] This exceedingly limited judicial review "maintain[s] arbitration's essential virtue of resolving disputes straightaway."[24] If parties could take "full-bore legal and evidentiary appeals," arbitration would become "merely a prelude to a more cumbersome and time-consuming judicial review process."[25] Consistent with this narrow and highly deferential standard review, under the DSA Vantage and Petrobras contractually "waive[d] irrevocably their right to any form of appeal, review or recourse to any court or other judicial authority, to the extent that such waiver may be validly made." Third Novation §§ 8.1, 24.2(I).

### B. Standard for enforcement under Article V of the Panama Convention

Under Article V of the Panama Convention, a court "shall confirm the award unless it finds one of the grounds for refusal . . . [of] enforcement of the award specified in" the Convention.[26] Petrobras relies on Article V(2)(b), which provides that a court may decline to enforce an arbitral

---

[21]   *Cooper v. WestEnd Capital Mgmt., L.L.C.*, 832 F.3d 534, 544 (5th Cir. 2016).

[22]   *Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1015 (5th Cir. 2015) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 615 (1985)).

[23]   *Lummus Global Amazonas S.A. v. Aguaytia Energy del Peru, S.R. LTDA*, 256 F. Supp. 2d 594, 605 (S.D. Tex. 2002) (Rosenthal, C.J.).

[24]   *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008).

[25]   *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568–69 (2013).

[26]   9 U.S.C. §§ 207, 302.

award if enforcement "would be contrary to the public policy of that State." Petrobras also relies on Article V(1)(d), which authorizes a court to decline to enforce where "the constitution of the arbitral tribunal or the arbitration procedure has not been carried out in accordance with the terms of the agreement signed by the parties."

The threshold for meeting this public policy exception under Article V(2)(b) is "extraordinarily high" and "extremely narrow," and "although this defense is frequently raised, it has rarely been successful."[27] The exception "applies only where enforcement would violate the forum state's most basic notions of morality and justice."[28] Public policy must be "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests," and only an "explicit," "well defined and dominant" policy may be invoked to decline enforcement.[29] "When reviewing whether the public policy exception applies, [a court] must defer to the arbitrator's fact findings."[30] Likewise, "considerable deference is to be afforded by the enforcing court to the arbitrator's interpretation and application of the parties' contract."[31]

---

[27] *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 69 (D.C. Cir. 2013). *Chevron* applied Article V of the New York Convention, which the parties agree is "substantially identical" to Article V of the Panama Convention. Dkt. 65 at 1 n.1. Vantage also agrees with Petrobras that "case law construing the New York Convention's Article V is applicable to proceedings under Article V of the Panama Convention." Like Petrobras, Vantage relies on cases arising under both treaties. *Id.*

[28] *Asignacion*, 783 F.3d at 1016; *see also Karaha Bodas Co. v. Perusahaan Perambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004).

[29] *Asignacion*, 783 F.3d at 1016 (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43 (1987)); *see also Sarofim v. Trust Co. of the West*, 440 F.3d 213, 219 (5th Cir. 2006) ("The policy advanced must reference laws and legal precedents, rather than general considerations of proposed public interests.").

[30] *Terex Corp. v. Int'l Union*, 177 F.3d 978, 1999 WL 197144, at *3 (5th Cir. 1999).

[31] *Enron Nigeria Power Holding, Ltd. v. Federal Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016).

The threshold regarding challenges to the constitution of an arbitral tribunal and its procedures under Article V(i)(d) is "extraordinarily narrow," and a court may not refuse enforcement "solely on the ground that the arbitrator may have made a mistake of law or fact."[32] The party opposing enforcement bears the burden of proof, and must "overcome a powerful presumption that the arbitral body acted within its powers."[33] The Court may "engage in only deferential review of the Tribunal's decision, granting considerable leeway to the arbitrator."[34]

## C.    Standard for vacatur under § 10(a) of the FAA

Section 10(a) of the FAA sets out four narrow bases for vacating an arbitral award. Petrobras seeks vacatur under three of these provisions:  § 10(a)(2), which permits vacatur "where the award was procured by corruption, fraud, or undue means"; § 10(a)(3), which permits vacatur "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy"; and § 10(a)(4), which permits vacatur "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a).

The Supreme Court has held that an arbitral award may only be vacated under § 10(a) under the "very unusual circumstances" set forth in the statute.[35]  The standard of review is "exceedingly deferential" and "narrowly restrict[ed]."[36]  "It has been described as among the narrowest known

---

[32]  *Asignacion*, 783 F.3d at 1015.

[33]  *Chevron*, 949 F. Supp. 2d at 67.

[34]  *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

[35]  *Oxford Health*, 569 U.S. 564 at 568.

[36]   *Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377, 380 (5th Cir. 2004); *Positive Software Solutions, Inc. v. New Century Mort. Corp.*, 476 F.3d 278, 280 (5th Cir. 2007) (en banc).

to the law."[37]  A reviewing court may "not reconsider an award based on alleged errors of fact or law or misinterpretation of the contract."[38]  Instead, "[a] district court must accept the arbitrator's factual findings and the arbitrator's interpretation of the contract even if it disagrees."[39]  This standard is so strict that the award must be enforced even if the arbitrators misapplied the law.[40]

## IV.    VANTAGE'S PETITION TO CONFIRM SHOULD BE GRANTED

### A.    Enforcement would not violate public policy under Article V(2)(b) of the Panama Convention

#### 1.    There is no public policy obstacle to enforcement

Enforcement of the Final Award will not contravene any "explicit," "well-defined and dominant" policy.[41]  No such policy is implicated in light of the Majority's detailed factual findings that, whether or not bribery actually occurred, "Respondents knowingly ratified the DSA . . . and now find themselves estopped from claiming the Contract is void or voidable."  Final Award ¶ 290; *see also supra* § II.B.4 (listing the Majority's extensive factual findings as to ratification).  Courts consistently hold that an otherwise lawful contract procured by bribery may be ratified by the non-bribing party, and that once ratified, there is no public policy obstacle to enforcement because the effect of ratification is to give the non-bribing party's consent to the original bargain.[42]

---

[37]  *Weber v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 455 F. Supp. 2d 545, 548 (N.D. Tex. 2006) (citations omitted).

[38]  *Terex*, 177 F.3d 978, 1999 WL 197144, at *2 (quoting *Exxon Corp. v. Baton Rouge Oil*, 77 F.3d 850, 853 (5th Cir. 1996)).

[39]  *Lummus*, 256 F. Supp. 2d at 605.

[40]  *See Hall Street Assocs.*, 552 U.S. at 585–86 (not even "manifest disregard" for the law is a proper basis for vacatur).

[41]  *Asignacion*, 783 F.3d at 1016.

[42]  *See Kincaid v. Black Angus Motel, Inc.*, 983 P.2d 1016, 1019 (Okla. 1999) ("[K]nowledge of the contract and acquiescence in it by the party injuriously affected removes the

The rule that an otherwise lawful contract procured by bribery may be ratified has long been articulated by numerous federal[43] and state[44] courts.  For example:

- In *United States ex rel. Siewick v. Jamieson Science & Engineering, Inc.*, 214 F.3d 1372, 1373, 1376–77 (D.C. Cir. 2000), the D.C. Circuit held that a contract procured in violation of a felony anti-corruption statute did not "self-destruct[] into voidness" but was instead merely voidable, giving the injured party "the *option* to treat the contract as fully in effect." (emphasis added).

- In *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 573, 576 (7th Cir. 2004), the Seventh Circuit observed that bribery is "garden variety fraud," and that contracts procured by bribery are voidable and subject to ratification.

- In *City of Findlay v. Pertz*, 66 F. 427, 437 (6th Cir. 1895), the Sixth Circuit found that a contract procured in violation of a federal bribery statute was voidable and subject to ratification:  "The contract was neither *malum in se* nor *malum prohibitum*," so "the city might repudiate or affirm the contract as it should elect."

- In *Med James, Inc. v. Marketing Solutions, Inc.*, 2006 WL 1360400, at *4 (D. Kan. 2006), the district court found that a contract induced by kickbacks was enforceable because the principal "ratified the contract after he became aware of the fraud."

---

invalidity."); *L.S. Cogswell Lumber Co. v. Manahan*, 274 P. 871, 872 (Okla. 1929) (contract induced by bribery was fully enforceable after ratification by innocent party because "courts will not relieve parties . . . from a contract, voluntarily entered into by them, which bears the seal of approval by the party whose interests may be thereby injuriously affected, and where the element of invalidity does not inhere in the contract itself"); *City of Findlay v. Pertz*, 66 F. 427, 437 (6th Cir. 1895) ("No question of public policy is involved by a ratification of [a] bargain" induced by bribery).

[43] *See, e.g.*, *United States v. Grace Evangelical Church of S. Providence Ridge*, 132 F.2d 460, 462 (7th Cir. 1942); *United States v. Pan-Am. Petroleum Co.*, 55 F.2d 753, 764 (9th Cir. 1932); *Abernathy v. Oklahoma ex rel. Goar*, 31 F.2d 547, 551 (8th Cir. 1929); *Med James, Inc. v. Ins. Mktg. Solutions, Inc.*, 2006 WL 1360400, at *4 (D. Kan. 2006); *Waldron v. British Petroleum Co.*, 231 F. Supp. 72, 90–91 (S.D.N.Y. 1964); *Santa Maria Del Oro Mines Co. v. Int'l Mining Corp.*, 20 F. Supp. 316, 327 (D. Del. 1937).

[44] *See, e.g.*, *Rogers v. The First Nat'l Bank*, 2006 WL 344759, at *14 (Tenn. App. 2006) (citing *Hawkins v. Byrn*, 261 S.W. 980, 982 (Tenn. 1924)); *Kincaid*, 983 P.2d at 1017; *Delta Materials Handling, Inc. v. Prince*, 1989 WL 40861, at *3 (Tenn. App. 1989); *L.S. Cogswell Lumber*, 274 P. at 872; *Millboro Lumber Co. v. Augusta Wood Prods. Corp.*, 125 S.E. 306, 415–17 (Va. 1924); *Meyer v. John W. Corley Pub. & Promotion Co.*, 162 S.W. 273, 275 (Mo. App. 1913); *Siler v. Perkins*, 149 S.W. 1060, 1063 (Tenn. 1912); *Lightcap v. Nicola*, 34 Pa. Super. 189, 203 (Pa. 1907); *State v. Engle*, 82 N.W. 763, 764 (Iowa 1900); *City of Findlay*, 66 F. at 437.

This rule is also consistently articulated in international law authorities.  In the Arbitration, Petrobras relied on *World Duty Free v. Kenya*.[45]  But the holding of *World Duty Free* fully supports Vantage's position:

> (a) [A contract procured by bribery] is not void ab initio, and remains valid unless and until steps are taken to set it aside. There is nothing wrong with it as a contract, the position being simply that the circumstances in which it was made require that the injured party should be given the opportunity to relieve himself from its burdens. . . .

> (b) Since the remedy of Party X takes the shape of an option to treat the contract as rescinded, it may, like any other option, be waived by words or conduct. *In particular, if Party X with knowledge of the relevant circumstances chooses to continue with its enforcement and performance, he may be held to have lost the right thereafter to have it set aside*. . . .

*World Duty Free, ICSID Case No. ARB/00/7* ¶ 164 (emphasis added).[46]

No policy—let alone one that is "explicit," "well defined," or "dominant"—holds that a supposed victim of bribery may repeatedly reaffirm the validity of a contract and insist on performance with knowledge of the alleged bribery and yet later avoid that same contract.  None of Petrobras's cited authorities, *see* Dkt. 65 at 9–11, contradict this fundamental point.  Petrobras cites *S.E.L. Maduro (Fla.), Inc. v. M/V Santa Lucia*, 116 F.R.D. 289, 295–96 (D. Mass. 1987), for the proposition that a contract procured by bribery is "unenforceable."  But this does not contradict the fact that a contract procured by bribery is merely voidable, and subject to ratification.  An "unenforceable" contract may be made "enforceable by all the usual remedies"—in other words, it may be ratified.  Restatement (Second) of Contracts § 8 (1981), cmt. a (noting that voidable

---

[45]  *See* Dkt. 53-3 (Katz Decl.), Ex. 42 at 10–11; Ex. 90 at 18; Ex. 98 at 10.

[46]  *See also* UNIDROIT Principles, Art. 3.3.1, Ill. 16 (stating that the innocent party has option to treat contract as effective); *National Iranian Oil Co. v. Crescent Petroleum Co.*, 2016 WL 01032316 ¶ 49 (Q.B. Comm. Ct. 2016) (although English law will not enforce "a contract to pay a bribe," "[t]here is no English public policy requiring a court to refuse to enforce a contract procured by bribery").

contracts are "one type of unenforceable contract").  In *Maduro*, ratification was not at issue, so the court did not have occasion to consider the effect that ratification would have on enforceability of the contract.[47]

Petrobras's public policy defense also fails for the independent reason that the Majority made factual findings, to which this Court must defer, that Petrobras failed to establish Vantage's knowledge of or participation in the alleged bribery.  *See* Final Award ¶ 433 ("Respondents have not established that Vantage knew of or participated in any bribery."); *see also supra* § II.B.3. There is no public policy, much less one that is well-defined and dominant, that prohibits enforcement of a contract by a party not implicated in the alleged bribery.  To the contrary, U.S. law recognizes that contracts induced by bribery, fraud, or other misrepresentation are *enforceable* by a counterparty who "in good faith and without reason to know of the misrepresentation either gives value or materially relies on the transaction."  *See* Restatement (Second) of Contracts § 164 (1981).  For this independent reason, too, Petrobras's public policy argument fails.

### 2.  The Final Award carefully considered the public policy issue

Petrobras's assertion that the Final Award "did not address U.S. public policy" is plainly incorrect.  *See* Dkt. 65 at 12.  The Final Award squarely considered the question and concluded that enforcement of the DSA would not violate United States public policy.  *See supra* § II.B.4.[48]

---

[47]    The only other case that Petrobras cites for the proposition that a contract obtained by bribery is "unenforceable" had nothing to do with bribery.  *See* Dkt. 65 at 4.  The policy question in *Hardy Exploration & Production (India), Inc. v. Government of India, Ministry of Petroleum & Natural Gas*, 314 F. Supp. 3d 95, 110 (D.D.C. 2018), was whether a U.S. court could enter an order requiring the Indian government's specific performance under a oil and gas contract that the Indian government had breached.  The court concluded that enforcing specific performance (in contrast to an award of compensatory damages) would impermissibly interfere "with India's complete control over its territory."  *Id.* at 113.  No such concerns are present here.

[48]    Petrobras also wrongly contends that the Final Award based its determination on an analysis of English, rather than United States, law.  Dkt. 65 at 12.  In fact, the Final Award applied

### 3.    There is no proper basis to revisit the factual record

Petrobras wrongly contends that this Court "cannot give legal effect to an arbitral award that upholds the contract while failing to resolve the question of whether bribery had occurred." Dkt. 65 at 12.  Petrobras relies on *Grynberg v. BP, P.L.C.*, 527 F. App'x 278, 281 (5th Cir. 2013), but the case states no such holding.  *Grynberg* described, in *dicta*, a dispute over a commission earned on the profits from the sale of an oil and gas interest.  The defendants claimed that a $175 million payment to the Kazakh government was a bona fide payment that should be deducted from proceeds in calculating profits; the plaintiffs claimed the payment was a bribe that should not be deducted.  The arbitrator accepted an auditor's deduction of the payment without determining whether it was a bribe.  A New York appellate court remanded to the arbitrator to determine the nature of the payment because it concluded that the question of deductibility hinged on whether the payment was a bribe.  Here, the outcome does not hinge on such a finding because, whether or not bribery occurred, the Final Award found that Vantage had no knowledge of the alleged bribery and that ratification defeated the claim.  *See supra* §§ II.B.3, II.B.4.

More analogous is Judge Atlas's decision in *Tamimi Global Co. v. Kellogg Brown & Root LLC*, 2011 WL 1831719 (S.D. Tex. May 12, 2011).  The respondent asserted that the claimant procured the at-issue contract by bribing respondent's mid-level managers, and that it would be against public policy to confirm an award on the contract because the court would be enforcing a contract allegedly procured by bribes.  *Id.* at *3.  Judge Atlas rejected this argument and declined

---

*both*, holding that it "need not decide whether the matter of bribery is governed by English law . . . or by federal maritime law . . . *given that the outcome would be the same under either system*." Final Award ¶ 291 (emphasis added).  Under both standards, "[a] contract procured by bribery is not within the narrow category of contracts that are illegal per se, under relevant case law, but rather such a contract is merely voidable, but not void, and thus subject to ratification by an innocent party."  *Id.* ¶ 372; *see also id.* n. 93 ("Under federal maritime law, a contract procured by bribery is voidable, not void, and is subject to ratification, waiver, and estoppel.").

to consider whether the kickbacks actually occurred. She emphasized that kickbacks, even "*if proven*," "would not support KBR's public policy defense" because respondents' upper-level management had known of the allegations yet not taken steps to avoid the contract. *Id.* (emphasis in original). Citing the "overriding strong federal policy favoring arbitration and enforcement or arbitration awards," Judge Atlas confirmed the award. *Id.* at *4. Likewise, this Court has no reason to revisit the underlying factual record, given the ultimate basis of the Final Award.

### 4. Enforcement would not create a "windfall" for Vantage

Equally without merit is Petrobras's contention that "enforcement of the Majority Award would result in a windfall" because much of it relates to services not yet rendered for the more than five years left under the DSA when Petrobras wrongfully terminated. Dkt. 65 at 13. Petrobras offers no authority that an award of benefit-of-the-bargain damages violates public policy. Petrobras's assertion that Vantage would somehow be receiving an undeserved "windfall" has no basis in fact or law, particularly since Petrobras's breach of the DSA drove Vantage into bankruptcy. Final Award ¶¶ 419, 422.

### B. The Final Award was rendered in accordance with the parties' agreement, in compliance with Article V(1)(d)

Article V(1)(d) of the Panama Convention permits a court to decline enforcement where "the arbitration procedure has not been carried out in accordance with" the parties' agreement to arbitrate. Petrobras invokes this to contend that Judge Brower allegedly "failed to comply with the requirement in the parties' arbitration agreement that he remain 'neutral, impartial and independent.'" Dkt. 65 at 14. Petrobras is wrong on the law and the facts.

As a threshold matter, it is not significant that the Final Award failed to include the word "neutral" in its confirmation that the Majority had "remained independent and impartial throughout the proceedings." Final Award ¶ 529. Under the AAA's *Code of Ethics for Arbitrators in*

*Commercial Disputes*, "neutral" is synonymous with "independent and impartial." Its introductory comments note: "The sponsors of this Code believe that it is preferable for all arbitrators including any party-appointed arbitrators to be ***neutral, that is, independent and impartial***, and to comply with the same ethical standards.") (emphasis added).[49] Petrobras's own purported expert admits the AAA Code applied in these proceedings. *See* Dkt. 53-2 ("Newman Decl.") ¶ 30. Petrobras's and Newman's lengthy speculation regarding the significance of the word "neutral" with respect to the Final Award should be disregarded as contrary to law. *See id.* ¶¶ 31–36.

Beyond this, and as set out in the below discussion regarding Petrobras's allegations of evident partiality, there is no merit to Petrobras's suggestion that the Majority performed their duties in anything other than a neutral—i.e., independent and impartial—way. *See infra* § V.A.

### C.     The Court has jurisdiction over Petróleo Brasileiro

This Court has subject-matter jurisdiction over Respondent Petróleo Brasileiro pursuant to the Foreign Sovereign Immunities Act ("FSIA"), which expressly provides that a foreign state is not immune to suits to enforce an arbitral award where the confirmation proceedings are governed by treaty.[50] Petrobras readily admits that this confirmation proceeding is governed by the Panama Convention, and Petrobras does not dispute that the Panama Convention is a treaty that calls for

---

[49]     *See* Shih Decl. Ex. E, AAA CODE OF ETHICS FOR ARBITRATORS IN COMMERCIAL DISPUTES at 2; *see also* Declaration of John Fellas, dated September 26, 2018 ("Fellas Decl") ¶ 89 ("[T]he Code of Ethics equates the requirement that an arbitrator be 'neutral' with the requirement that he or she be 'independent and impartial.'").

[50]     In relevant part, the FSIA provides: "A foreign state shall not be immune from the jurisdiction of courts of the United States in any case . . . in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship . . . or to confirm an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a), (a)(6), & (a)(6)(B).

the recognition and enforcement of arbitral awards.[51]  Petrobras's objections as to subject-matter

jurisdiction should be rejected entirely.  *See* Dkt. 65 at 16–17.

## V.     THERE IS NO BASIS TO VACATE THE FINAL AWARD

### A.     The Final Award is not subject to vacatur for evident partiality under § 10(a)(2)

Petrobras seeks vacatur under § 10(a)(2) due to alleged "evident partiality" by Judge

Brower.  *See* Dkt. 53 at 16–28.  As noted above, Judge Brower is one of the world's most eminent

international arbitrators.  In addition to his stellar arbitral and academic background, he served as

an arbitrator at the Iran–U.S. Claims Tribunal in The Hague for thirty-five years and currently

serves as an ad hoc Judge on the International Court of Justice.  *See also supra* § II.B.1.

"On its face, 'evident partiality' conveys a stern standard."[52]  "Partiality means bias, while

'evident' is defined as 'clear to the vision or understanding' and is synonymous with manifest,

obvious, and apparent."[53]  To establish evident partiality on the part of an arbitrator, the

challenging party must establish one of two things:  either "that [the arbitrator] failed to disclose

relevant facts" or "that he displayed actual bias at the arbitration proceeding."[54]  The party arguing

to set aside an award due to "actual bias" has "an onerous burden."[55]  Speculation, supposition, or

inference is not enough.  Rather, "the party urging vacatur must produce specific facts from which

---

[51]  *See* Dkt. 65, *passim*; *see also Chic Int'l Ins. Co. v. Caja Nacional De Ahorro y Seguro*, 293 F.3d 392, 397 (7th Cir. 2002) (finding jurisdiction under FSIA and Panama Convention over Argentinian state-owned reinsurer in proceeding to confirm arbitral award); *Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, 230 F. Supp. 2d 362, 367 (S.D.N.Y. 2002) (same, as to Uruguayan state-owned reinsurer); *Employers Ins. of Wausau v. Banco Seguros Del Estado*, 34 F. Supp. 2d 1115, 1119 (E.D. Wis. 1999), *aff'd sub nom. Employers Ins. of Wausau v. Banco De Seguros Del Estado*, 199 F.3d 937 (7th Cir. 1999) (same, as to Uruguayan state-owned bank).

[52]  *Positive Software*, 476 F.3d at 281 (citations omitted).

[53]  *Id.*

[54]  *Weber*, 455 F. Supp. 2d at 549 (citations omitted).

[55]  *Householder Grp. v. Caughran*, 354 F. App'x 848, 852 (5th Cir. 2009).

a reasonable person would have to conclude that the arbitrator was partial to one party."[56] The party urging vacatur "must demonstrate that the alleged partiality is direct, definite, and capable of demonstration rather than remote, uncertain or speculative."[57]

Petrobras comes nowhere close to meeting this onerous burden. In fact, it has no objective evidence of partiality at all. Instead, Petrobras liberally speculates as to Judge Brower's state of mind, draws negative inferences from the most innocuous conduct, and complains about arbitral rulings that courts have repeatedly held are not subject to being second-guessed by a federal court.

### 1. Judge Brower's fully disclosed connections to Quinn Emanuel do not establish actual bias

Judge Brower's disclosed connections to Vantage's counsel do not provide any basis for vacatur. *See* Dkt. 53 at 22. Upon his appointment to the Tribunal, Judge Brower disclosed that (1) he had served in prior arbitrations where Quinn Emanuel was counsel; (2) a partner in Quinn Emanuel's London office with no involvement in this arbitration served as his law clerk from 2010 to 2011; and (3) he had various "professional and social associations" with partners at Vantage's law firm, including "meeting at professional conferences and gatherings" and "conversing on professional matters."[58] After considering written submissions from both parties, the AAA/ICDR

---

[56]  *Id.* (quoting *Weber*, 455 F. Supp. 2d at 550).

[57]  *Id.*

[58]  *See* Shih Decl., Ex. H (Judge Brower's disclosures, dated August 29, 2016). Petrobras now contends that Judge Brower failed to disclose that he and his former clerk appeared together at an international law program and served together on the editorial board of an international arbitration review during the arbitration proceedings. *See* Dkt. 53 at 23. This contention ignores Judge Brower's general disclosure of associations with Quinn Emanuel partners at "professional conferences and gatherings." *Id.* at 3 (Brower disclosure). Moreover, these types of professional connections do not require disclosure under the applicable rules. *See* Shih Decl., Ex. J at 3 (Vantage's response to Petrobras's challenge to Judge Brower). "[A]n arbitrator 'cannot be expected to provide the parties with his complete and unexpurgated business biography.'" *Lummus*, 256 F. Supp. 2d at 622 (quoting *Commonwealth Coatings Corp. v. Continental Cas. Co.*,

rejected Petrobras's challenge to Judge Brower's appointment on these bases because none were disqualifying under the applicable rules governing arbitrator conflicts.[59]

Because Judge Brower fully disclosed these relationships upon his appointment, Petrobras must show that they establish actual bias, not the mere appearance of bias. *See Weber*, 455 F. Supp. 2d at 549. They clearly do not. As noted, courts typically address relationship and affiliation issues in a context where arbitrators have *failed* to disclose something and the appearance of bias standard applies. Even in those cases, courts will not find evident partiality absent an arbitrator's "significant compromising connection to the parties."[60] A "significant compromising connection" is found in a business relationship or other close connection with the party itself (not its counsel), or some other undisclosed financial, direct, or personal interest in the proceedings. *See id.* at 284. No such connections are alleged here.[61]

---

393 U.S. 145, 151 (1968) (White, J., concurring)). There was nothing deficient about Judge Brower's disclosures.

[59] *See* Shih Decl., Ex. I (Petrobras's challenge to Judge Brower); Ex. J (Vantage opposition) (noting, *inter alia*, that Judge Brower had ruled against Quinn Emanuel's client in one of the prior arbitrations noted in Judge Brower's disclosure letter); Ex. K (ICDR's decision reaffirming appointment of Judge Brower).

[60] *Positive Software*, 476 F.3d at 286; *see also id.* at 283–84.

[61] In *Positive Software*, the Fifth Circuit collected citations and listed the following types of relationships that courts have found *insufficient* to warrant vacatur: (1) arbitrator as general counsel of company with attorney-client relationship with one party's law firm; (2) arbitrator's law firm represented company that indirectly caused the dispute at issue in the arbitration; (3) arbitrator's former law firm represented party to arbitration in an unrelated matter; (4) arbitrator had become "of counsel" to a firm the prevailing party had interviewed for the arbitration and had reviewed the contract at issue; (5) arbitrator had worked in the same office with one of the parties twenty years ago; (6) arbitrator had worked directly under the president and principal stockholder of one of the parties for three years, ending fourteen years prior to the arbitration; and (7) arbitrator and arbitration counsel had clients in common. *See* 476 F.3d at 284.

The Fifth Circuit has squarely held that no rule establishes "that arbitrators are held to a *higher* standard than Article III judges."[62] None of the connections alleged here would require a court to recuse. A court is not required to recuse when a party is represented by a former law clerk (much less when a former clerk merely works at a law firm appearing before it).[63] Nor must a court recuse merely because it has interacted with counsel in bar or academic activities. The attenuated connections of which Petrobras complains do not create even the appearance of bias— let alone the type of actual, "significant compromising relationship" that could provide a basis for vacatur.

### 2. Judge Brower's conduct at the hearing does not establish actual bias

In arguing that Judge Brower displayed actual bias in the arbitration proceeding, Petrobras relies on its counsel's characterizations of unspecified off-the-record comments allegedly made by Judge Brower and speculates as to his state of mind in asking certain questions of witnesses during the hearing. None of this speculation and inference is "evidence" that comes close to satisfying the heavy and objective burden Petrobras bears in order to prove actual bias.

#### (a) Characterizations by Petrobras's counsel of Judge Brower's alleged comments at the hearing do not establish actual bias

A declaration submitted by Petrobras's counsel, Andrew Derman, generally alleges that Judge Brower expressed skepticism about the content of Petrobras's counsel's questions and frustration with their repetitive nature (*e.g.*, questions were "asked and answered" or had "already

---

[62] *Id.* at 285 (emphasis in original).

[63] *See*, *e.g.*, *In re Martinez-Catala*, 129 F.3d 213, 221 (1st Cir. 1997) ("It is common knowledge in the profession that former law clerks regularly practice before judges for whom they once clerked."); Advisory Committee on Judicial Conduct in the District of Columbia Courts, Advisory Opinion No. 13, July 9, 2014, at 1 (advising "a general rule of thumb that law clerks should not appear before the judges for whom they clerked within a year after the end of the clerkship").

[been] talked about").  *See* Dkt. 53-1 ("Derman Decl.") ¶¶ 7–8.  Petrobras did not make any

contemporaneous objections to these comments, so it is now impossible to now know what (if

anything) was actually said, when it was said, or in what context it was said.[64]  This leaves

Petrobras to rely on Derman's bald and subjective characterizations, along with similarly

subjective, general, non-contemporaneous characterizations by Petrobras's lead counsel towards

the end of the hearing.  *See* Tr. 1871:7–19.[65]  These after-the-fact characterizations are the type of

"remote, uncertain [and] speculative" evidence the courts have consistently found insufficient to

establish actual bias.[66]

---

[64]  Petrobras also never objected during the hearing that Judge Brower "appeared to be asleep or disengaged" during portions of Petrobras's presentation of its case, as it now suggests in passing.  *See id.* at 19 n.17 (*citing* Derman Decl. ¶ 10).  In addition to being completely at odds with the engaged and allegedly impatient behavior by Judge Brower that Petrobras otherwise alleges, the point is waived because it was not preserved.  *See Von Essen, Inc. v. Marnac, Inc.*, 2002 WL 35634037, at *3 (N.D. Tex. Jan. 2, 2002), *aff'd*, 64 F. App'x 416 (5th Cir. 2003) (challenge waived because "during the arbitration, [party] did not object that the arbitrator was asleep"); *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 300 (6th Cir. 2008) (waiver where party did not object that arbitrator "closed his eyes during [the party]'s arguments and did not pay attention to its attorneys").  Even if Petrobras had timely objected, vacatur would be inappropriate.  *See Hurn v. Macy's, Inc.*, 728 F. App'x 598, 599 (7th Cir. 2018) (no vacatur where "the arbitrator fell asleep during the hearing" because "even if the arbitrator missed something, [the objecting party] does not say what that was"); *Vigorito v. UBS PaineWebber, Inc.*, 477 F. Supp. 2d 481, 485 n.6 (D. Conn. 2007) (allegation that arbitrator "fell asleep during [party's] closing argument" not relevant to evident partiality" inquiry); *Velasco v. Beth Israel Medical Center*, 279 F. Supp. 2d 333, 337 (S.D.N.Y. 2003) ("not paying attention to the arbitration proceeding," would not establish bias).

[65]  Petrobras attached the full, consecutively paginated transcript of these arbitration proceedings to its Motion to Vacate, Dkt. 53-3 (Katz Decl.), Exs. 1-12.  Throughout this Omnibus Brief, the transcript is referred to as "Tr."

[66]  *Householder Grp. v. Caughran*, 354 F. App'x 348, 852 (5th Cir. 2009); *see also Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co.*, 866 F.3d 11, 14 (1st Cir. 1989) ("[C]onclusory allegations as to [the arbitrator's] interruptions, comments, manifestations of opinion, and 'evident partiality' were insufficient to create any genuine issue of material fact."); *Fairchild & Co. v. Richmond, Fredericksburg & Potomac R.R. Co.*, 516 F. Supp. 1305, 1313 (D.D.C. 1981) ("[A] disappointed party's perception of rudeness on the part of an arbitrator is not the sort of 'evident partiality' contemplated by the Act as grounds for vacating an award.").

Even if accepted as accurate, however, these alleged comments would not establish bias. Judge Brower entered the hearing with the benefit of having reviewed reams of briefing, witness statements, and exhibits. He was very familiar with the parties' respective positions. *See supra* § II.B.1. As Chief Judge Rosenthal recognized in *Lummus*, where "the panel received and reviewed volumes of evidence from the parties before the hearings began," it is not bias for an arbitrator to have indicated "his tentative views to counsel" or to have "favored one party's position."[67] In fact, "[i]t is to be *expected* that after a judge or an arbitrator has heard considerable testimony, he will have some view of the case. As long as that view is one which arises from the evidence and the conduct of the parties it cannot be fairly claimed that some expression of that view amounts to bias."[68]

There also is nothing wrong with an arbitrator expressing concerns about the pace of a proceeding. In fact, "an arbitrator should act affirmatively to simplify and expedite the proceedings before him, since among the virtues of arbitration which presumably have moved the parties to agree upon it are speed and informality."[69] Although "[a]n arbitrator's legitimate efforts to move the proceedings along expeditiously may be viewed as abrasive or disruptive to a disappointed party," this conduct "does not constitute grounds for vacating an award."[70] Put

---

[67] *Lummus*, 256 F. Supp. 2d at 629 (internal quotations omitted).

[68] *Id*. at 629 (emphasis added) (internal quotations omitted).

[69] *Id.*

[70] *Id.*; *see also Fairchild*, 516 F. Supp. at 1313 ("[A]n arbitrator's legitimate efforts to move the proceedings along expeditiously may be viewed as abrasive or disruptive to a disappointed party. Nevertheless, such displeasure does not constitute grounds for vacating an arbitration award.").

simply, there was nothing improper about the alleged comments.  Indeed, Courts have declined to find bias where arbitrators' behavior was far less polite and, unlike here, overtly partisan.[71]

To the extent Petrobras's "expert" purports to draw contrary conclusions from Derman's declaration, *see* Newman Decl. ¶¶ 76–77, Newman's opinions should be stricken or disregarded as contrary to the law applicable to these proceedings, including Chief Judge Rosenthal's comprehensive opinion in *Lummus*.[72]

> (b)  Judge Brower's examination of witnesses is not evidence of actual bias

Petrobras's accusation that Judge Brower's questioning of witnesses was partisan is without basis.  *See* Dkt. 53 at 19–22.  Petrobras cites repeatedly—and exclusively—its expert's speculation about Judge Brower's intent in asking certain questions.  Petrobras urges, for example, that the "transparent purpose" of Judge Brower's questions was to undermine Petrobras's witnesses; that these questions were "not intended to clarify anything;" and that the questions were "an attempt to show bias, a task for an advocate."  Dkt. 53 at 21, 34.  But "[n]o level of experience will make an expert witness a mind-reader."  *Holmes Group, Inc. v. RPS Products, Inc.*, 2010 WL

---

[71]  As Judge Rosenthal stated in *Lummus*, "Bias is not shown where the arbitrator engaged in 'partisan behavior' during arbitration proceedings by interrupting witnesses, usurping the role of the panel chair; influencing other members of the panel and advocating one side's position." 256 F. Supp. 2d at 629; *see also InterChem Asia 2000 Pte. Ltd. v. Oceana Petrochems. AG,* 373 F. Supp. 2d 340, 348 (S.D.N.Y. 2005) (holding there was no showing of evident partiality despite arbitrator's commenting on party's "bad behavior" and referring to party's attorney as "bitter and irresponsible"); *LLT Int'l Inc. v. MCI Telecommc'ns Corp.*, 18 F. Supp. 2d 349, 354 (S.D.N.Y. 1998) ("Acrimony or negative feelings between the arbitrators and a party's attorneys do not indicate an 'appearance of bias,' much less the 'evident partiality' required to vacate an award.").

[72]  Vantage has moved to strike Newman's Declaration as it improperly states legal conclusions, is frequently at odds with controlling precedent, and draws improper and unsupported conclusions from the evidence.  For these and other reasons stated in the accompanying Motion to Strike, it should be disregarded. In addition and in rebuttal, Vantage submits the Declaration of John Fellas, which does not suffer from these infirmities, in support of this Omnibus Brief.

7867756, at *5 (D. Mass. June 25, 2010). Petrobras's speculation about what Judge Brower must have intended is far too "remote, uncertain [and] speculative" to support a finding of actual bias. *See Householder Grp. v. Caughran*, 354 F. App'x 348, 852 (5th Cir. 2009).

To bolster this entirely speculative argument, Petrobras's expert manufactures a new standard for arbitrator conduct. Newman asserts that Judge Brower should have limited himself to questions that did no more than clarify testimony already given, and contends that it was partisan behavior for him to put a witness's credibility to the test. *See* Newman Decl. ¶¶ 54–58. Of course, no authority so limits an arbitrator's ability to question witnesses.[73] To the contrary, the AAA Rules that governed the arbitration give the arbitrators broad discretion to question witnesses.[74] *See* AAA Code of Ethics for Commercial Arbitrators, Canon 4(e) ("When the arbitrator determines that more information than has been presented by the parties is required to decide the case, it is not improper for the arbitrator to ask questions, call witnesses, and request documents or other evidence, including expert testimony.").[75] As Judge Rosenthal noted in *Lummus*, an arbitrator can engage in "questions and comments" aimed at "understanding the issues and effecting an efficient

---

[73] *See* Fellas Decl. ¶ 106 ("The notion that an arbitrator is confined to considering only the information submitted by the parties flies in the face of the broad fact-finding authority possessed by arbitrators."); *see also id.* ¶¶ 104–113.

[74] Indeed, the hearing transcript reflects that for no less than twelve witnesses, upon conclusion of examination by counsel, the proceedings shifted expressly to "Questions by the Arbitral Tribunal." *See* Tr. 542 & 634 (Halkett), 1049 (Bozeman), 1319 & 1873 (Gama); 1522 (Padilha), 1693 & 2032 (Meyer), 1807 (Schwebel), 1900 & 1988 (Van Oort), 2126 (Negrao), 2523 (Jacobs and Maness jointly), 2770 (Labiche).

[75] Shih Decl., Ex. E.

and fair resolution." *Lummus*, 256 F. Supp. 2d at 629.[76] And "there is nothing apparently prejudicial about an arbitrator wanting to get to the essence of an issue before the panel."[77]

Petrobras's criticism of Judge Brower's questioning is particularly ironic in light of Petrobras's counsel's repeated insistence throughout opening argument that the arbitrators should vigorously exercise their right to probe witness credibility:

- "Their proof of the validity of their claims is based upon trying to poke holes in the evidence. Right? The evidence from Padilha, who you are going to hear from, and I encourage you to ask him a bunch of questions. You can **ask him about inconsistencies that they've identified**." Tr. 116:12–18 (Katz) (emphasis added).

- "I encourage you to ask a bunch of questions, reach your own conclusion, **see what you think about his credibility**." *Id.* at 131:2–4 (Katz) (emphasis added).

- "We can have a discussion in which you can **ask Mr. Padilha**, what did Paul Bragg know? What did he talk to Paul Bragg about? It's going to be interesting when you ask him, what was meant by shipyard commissions, right?" *Id.* at 165:14–18 (Katz) (emphasis added).[78]

Particularly in the face of these express invitations, it is absurd for Petrobras to argue there was anything improper about Judge Brower asking probing questions to witnesses, including questions

---

[76] *See also* Fellas Decl. ¶ 116 ("It is common practice in international arbitration proceedings for arbitrators to explore the issues raised by the pre-hearing submissions through comments and questions of counsel, witnesses or experts. As one commentator has noted about international arbitration proceedings, active questioning of witnesses and expressions of opinion regarding the relative merits of the parties' case are more acceptable in an arbitration than they would be in a U.S. courtroom." (internal quotations omitted)).

[77] *Health Servs. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1265 (7th Cir. 1992); *see also Sisti v. Merrill, Lynch, Pierce, Fenner & Smith*, 1991 WL 575874, at *3 (E.D. Va. Apr. 22, 1991) ("An arbitration panel is obligated to determine the facts at issue, and directly asking a witness questions is a method of seeking those facts.").

[78] Katz encouraged such questioning throughout his opening. *See* Tr. 117:17–20, 122:19–23; 123:11–13; 128:12–16.

as to credibility.[79]  Petrobras also ignores that much of time Judge Brower took to question Padilha was devoted to open-ended questions that Padilha answered expansively.[80]  Padilha was Petrobras's sole witness as to bribery, and all of the arbitrators questioned him at length and in detail.[81]

The foregoing, well-established principles should end the inquiry about Judge Brower's questioning of witnesses.  But it should be noted that Petrobras and its expert's assertions about Judge Brower's state of mind are wildly speculative, misrepresent the record and ignore the highly relevant subjects Mr. Brower was exploring.  For example:

**Hamylton Padilha:**  Petrobras misstates the record in accusing Judge Brower of provoking Padilha's attorney to complain about being "embarrassed."  *See* Dkt. 53 at 20.  Padilha's attorney made the comment after she was caught coaching Padilha off camera during his testimony (which was via videoconference from Brazil), and Chair Park asked her to stop and to sit within the frame of the camera to ensure the integrity of the proceeding.[82]  The comment had nothing to do with questioning by Judge Brower.

_____

[79]  *See also* Fellas Decl. ¶ 120 ("An arbitrator can legitimately have genuine concerns about the truthfulness of a witness's testimony, and there is nothing inherently improper in an arbitrator asking questions that test the credibility of a witness.").

[80]  Judge Brower's questioning permitted frequent, expansive response from Padilha. *See*, *e.g.*, Tr. 1528:13–1529:19; 1549:10–1551:1, 1551:9–1553:4.  For example, Judge Brower invited Padilha to provide a lengthy narrative response about why he supposedly chose in only two instances to be involved in a bribery scheme, where he was otherwise adamant in his sterling professional reputation.  Judge Brower allowed him to respond for well over two pages of uninterrupted testimony, at the conclusion of which Judge Brower offered his thanks. *See id.* at 1523:12–1526:11.

[81]  In particular, Chair Park and Mr. Gaitis also questioned Padilha extensively.  Chair Park asked questions on 27 pages of the transcript. *See* Tr. 1369:13–1370:22; 1405:16–1406:1; 1435:9–1436:15; 1465:15–1467:2; 1486:13–1487:19; 1499:14–1502:6; 1505:2–1506:5; 1540:2–6; 1572:6–14 (Park).  Mr. Gaitis's questions appear on 16 pages of the transcript. *Id.* 1503:25–1505:1; 1506:6–14; 1575:20–1586:15 (Gaitis).

[82]  *See* Tr. 1536:1–1538:15.

Petrobras's assertion that Judge Brower sought to embarrass Padilha by asking questions about his "personal wealth" and "the reasons for his inability to testify in person in Houston" ignores the context of the questions. *See* Dkt. 53 at 20. Padilha's wealth was relevant to his credibility because questions had been raised about whether his sentence in Brazil, including the payment of substantial fines, could be considered lenient. *See* Tr. 80:11–22; 2829:10–24. Judge Brower appropriately inquired whether the fines Padilha paid under his sentence, though substantial, had any material impact on his wealth. As to Padilha's inability to testify in person, Judge Brower was following up on Padilha's admission that he had traveled to the United States to meet with the U.S. Department of Justice ("DOJ") regarding the DSA. *See* Tr. 1535:17–25; 1358:3–17. Padilha clarified that he traveled here on a parole visa. Padilha's cooperation with the DOJ—and the resulting non-prosecution agreement—were also relevant to his credibility.[83]

**Lance Labiche:** There was nothing improper about Judge Brower questioning Petrobras's regulatory expert, Labiche, about possible animus toward his former employer and Vantage's regulator, the Bureau of Safety and Environmental Enforcement ("BSEE"). *See* Dkt. 53 at 12, 21. Labiche had previously worked at BSEE, and he speculated in his testimony that BSEE did not issue citations to Vantage for the operational incidents on which Petrobras purported to terminate the DSA because BSEE was simply lax in enforcing federal regulations.[84] Understanding whether

---

[83] This does not approach the nature of the comments Petrobras cites in *Holodnak v. Avco Corp.*, 381 F. Supp. 191, 198 (D. Conn. 1974). *See* Dkt. 53 at 19. In *Holodnak*, the plaintiff sued his former employer and union for wrongful termination after writing an article critical of company and union practices. Although it was irrelevant to the proceeding, the arbitrator apparently tried to taint the plaintiff as a communist with questions about the "books [plaintiff] read, his political views, and his personal background," including "a trip to Cuba in 1960 and his views on Castroism." *Id.* *Cooper*, 832 F.3d at 545, the other case Petrobras cites, was a nondisclosure case that had nothing to do with allegedly biased questioning—and in that case, the court denied vacatur.

[84] *See* Tr. 2727:19–2728:21 (direct); 2761:16–2762:23; 2763:11–18; 2764:21–2766:25 (cross).

Labiche had any animus toward BSEE was relevant to his credibility on this issue. Chair Park also followed up with further questions about Labiche's views on the subject. *See* Tr. 2777:11–2778:7. Petrobras had an opportunity to ask Labiche further questions on this topic if it had any concerns about Judge Brower's inquiry, but did not do so. Tr. 2778:9–12.

**Alvaro Negrao:** Petrobras's only expert on operational issues, Dr. Negrao, confessed on cross-examination that he had plagiarized key sections of his expert report from Petrobras's attorney-driven internal investigation of the operational incidents.[85] He flatly admitted he would have been denied his Ph.D. had he engaged in such conduct before his dissertation review panel. *See* Tr. 2085:10–2086:2. Judge Brower's questioning of Dr. Negrao covered only three transcript pages, and actually reads as one of surprise, seeking to understand why Dr. Negrao resorted to plagiarism in the first place. *See* Tr. 2126:11–2129:13. Chair Park was likewise very interested in this topic of plagiarism, seeking to establish that Petrobras's counsel was not itself involved.[86]

**Judge Stephen Schwebel:** Petrobras's complaints about Judge Brower's questions of Vantage's international law expert, the former President of the International Court of Justice, Judge Stephen Schwebel, ignore relevant context. *See* Dkt. 53 at 21–22. Judge Brower asked his questions after Petrobras's counsel questioned Judge Schwebel for more than three hours, almost exclusively on contract topics that had nothing to do with Judge Schwebel's expert reports on

---

[85] *See* Tr. 2070:5–2074:12, 2078:4–82:23; *cf. id.* 2064:16–65:17 (prior assertion of reaching own conclusions and writing own witness statement).

[86] *See* Tr. 2084:7–25 (asking Dr. Negrao whether he believed Petrobras's counsel was "surprised" or not to learn that he had "cut and paste" sections of his report from other sources). Dr. Negrao confirmed that he had not personally reviewed the documents and conflicting witness statements produced in the case—which he believed would take too much time—but instead chose to accept whole-sale a Petrobras-supplied summary. *See* Tr. 2064:1–15 (testifying that he was retained less than three weeks before his report was due); Tr. 2128:9–2129:12 (testifying that he did not review witness statements and used attorney summary).

international law.[87]  Given that Petrobras's cross-examination largely ignored Judge Schwebel's actual expert statement, it is hardly surprising (or improper) that Judge Brower briefly posed questions to clarify the actual opinions in Judge Schwebel's statements.[88]  As with Labiche, Petrobras had full opportunity to question Judge Schwebel further after the Tribunal's questions were complete and chose not to.  *See* Tr. 1823:6–8.

(c)  Judge Brower's administrative requests are not evidence of bias

Consistent with the baseless attribution of partisan motives to Judge Brower's proper questioning of witnesses, Petrobras and its expert go to remarkable lengths to attribute nefarious motives to other innocuous conduct by Judge Brower at the hearing.  For example, Newman asserts that when Judge Brower suggested that the parties supply a chronological list of all exhibits— instead of a more limited list of bribery-related evidence that Mr. Gaitis had suggested—Judge Brower was trying "to dilute and distract from the more specific request by Mr. Gaitis."  Newman Decl. ¶ 79.  Twisting an arbitrator's different view on what type of list would be most helpful into an effort to "dilute and distract" is typical of the extreme conclusions Petrobras ascribes to the most objectively neutral conduct.

---

[87]  *See* Tr. 1717:11–17; 1723:12–1724:6; 1727:14–23; 1733:19–1734:15; 1762:25– 1763:14; 1774:19–1775:7; 1777:1–5.

[88]  That Judge Brower would be considerate to Judge Schwebel is also not surprising. Judge Schwebel, who is 88 years old, suffered a fall the day before he testified.  He injured his rotator cuff and head and was in considerable pain during his testimony.  Based on Derman's representation that he needed no more than an hour for cross-examination, Judge Schwebel was scheduled to testify out of order to allow him to catch a return flight to Vermont to see his doctor. Unfortunately, as a result of Derman's taking three hours to pose repetitive questions about subjects that were not the topic of Judge Schwebel's expert statement, Judge Schwebel missed his flight and was forced to spend another night in Houston.  *See* Tr. 1596:3–1597:14; 1723:12–1724:6; 1727:14–23; 1733:19–1734:15; 1738:13–1739:21; 1774:19–1775:7; 1777:1–5; 1786:2–18; 1787:22–1788:6; 1789:17–24.

As the above discussion makes clear, Judge Brower's conduct at the hearing was entirely proper and provides no basis for vacatur.

### 3. Judge Brower does not have a "past record of partiality"

Petrobras's suggestion that Judge Brower has a "past record of partiality" is offensive. *See* Dkt. 53 at 24. As noted above, Judge Brower has been an arbitrator for over 35 years and has been involved in numerous high-stakes arbitrations. Challenges to arbitrators are quite common, and disqualifications or resignations at times occur.[89]

Petrobras cites to three prior challenges to Judge Brower that resulted in his removal from a panel. *See* Dkt. 53 at 24. These challenges did not involve facts, legal issues, or persons that are in any way related to the present arbitration. Each applied an *appearance* of bias standard that institutions administering arbitrations apply while proceedings are ongoing—not the *actual* bias standard that governs post-hearing proceedings in the Fifth Circuit.[90] None has any relevance to or bearing on these proceedings:

- *Perenco v. Ecuador* was an arbitral proceeding under the ICSID convention, a multilateral treaty. After proceedings commenced, but before the hearing, the respondent, Ecuador, renounced the ICSID. Judge Brower later gave a magazine interview in which he described nations renouncing the ICSID as "recalcitrant." In disqualifying Judge Brower, the Permanent Court of Arbitration emphasized that it had not found that Judge Brower had *actually* prejudged the issue, but rather that his comments gave rise to an *appearance* that he might have.[91]

---

[89] Disqualification motions are frequently made for tactical reasons and to disrupt arbitral proceedings. *See* Shih Decl., Ex. P, Robert Pfeiffer & Stephan Wilske, *Chapter 1: An Etymological and Historical Overview*, GUERILLA TACTICS IN INTERNATIONAL ARBITRATION (2013) § 1.02(6) (noting that challenges of arbitrators are increasingly employed as "guerilla tactics" to delay or derail arbitral proceedings).

[90] *See Positive Software*, 476 F.3d at 281

[91] Newman Decl, Ex. 2 (*Perenco Ecuador Ltd. v. Republic of Ecuador & Empresa Estatal Pertoleos del Ecuador* (Decision on Challenge to Arbitrator, ICSID Case No. ARB/08/6, Dec. 8, 2009)) at 1, ¶ 27. The decision itself specifically noted: "The above interpretation is of course not the only interpretation of Judge Brower's comments, and it is not in fact what Judge Brower

- *Vale v. BSGR* concerned "remarks [Judge Brower] had made at a conference in which he incidentally described published facts of the Arbitration." Although the LCIA disqualified Judge Brower for the appearance of bias, it emphasized its conclusion that he was not, in fact, biased. *Id.*[92]

- *Tanesco v. IPTL* involved blog posts not by Judge Brower, but by his law clerk, regarding "the seldom-used, but academically-interesting, ICSID process of interpretation of earlier awards."[93] The at-issue arbitration involved a dispute over the interpretation of an earlier-rendered arbitral award. Although the statements were made by Judge Brower's clerk and not himself, Judge Brower voluntarily withdrew from the proceedings to avoid even the appearance of bias.[94]

Petrobras has not cited any case where the prior disqualification of an arbitrator in an unrelated matter, particularly for a mere appearance of bias, had any bearing on the arbitrator's fitness to hear subsequent matters.[95] Where similar arguments have been raised against a sitting judge, courts have found prior disqualification in unrelated prior matters to be irrelevant to any present matters.[96] The two prior disqualifications and one withdrawal have no bearing on Judge Brower's impartiality to hear the present case, and provide no basis for vacatur on grounds of bias.

---

subjectively intended by his comments, as he explained in his Statement. But it is a reasonable interpretation of Judge Brower's comments and, applying the IBA Guidelines, would give rise to justifiable doubts about his impartiality." *Id.* ¶¶ 53, 58.

[92] *See In re Application Pursuant to 28 USC § 1782 et al. v. Brower et al. (Vale v. BSGR)*, 16-mc-2552,(D.D.C. Dec. 21, 2016), Dkt. 35-2 at 2.

[93] *See* Dkt. 53-3 (Katz Decl.), Ex. 120.

[94] *Tanesco v. IPTL*—ICSID Case No. ARB/98/8. *See* Dkt. 53-3 (Katz Decl.), Ex. 120.

[95] Petrobras cites no authority pertaining to unrelated disqualifications. Its only case, *Positive Software*, 476 F.3d at 281, is discussed above, and concerns only inquiry into nondisclosure of relationships between an arbitrator and one of the parties. To the extent Petrobras also cites Restatement (Third) U.S. Law of Int'l Comm. Arb. sec. 4-13, cmt. (f), the comment on its face requires a finding that the arbitrator "had an unfair predisposition toward a particular outcome" or "an improper bias in favor of one party"—which calls only for, and is limited to, a case-specific inquiry.

[96] *See, e.g.*, *Garcia v. Beard*, 2016 WL 1068522, at *21 (C.D. Cal. Jan. 6, 2016), *report and recommendation adopted*, 2016 WL 1065800 (C.D. Cal. Mar. 16, 2016) (rejecting charges that judge's removal in prior action justified removal in later action because "grounds for removal were unrelated and immaterial to the issues being decided in petitioner's case"). The Fifth Circuit in *Positive Software* made clear that disqualification of an arbitrator is not called for in situations

### 4. Judge Brower did not improperly affect the Majority's view of Respondents

Petrobras's contention that bias is evident in the Final Award because the arbitrators made evidentiary rulings and reached legal conclusions with which Petrobras disagrees should be rejected out of hand. *See* Dkt. 53 at 25–28. In urging vacatur on this bases, Petrobras calls on this Court to second guess the Majority's findings, conclusions, and evidentiary rulings. As discussed above, the Court must defer to these even if it disagrees with them. *See supra* § III.C. Courts frequently consider—and reject—this type of argument by the losing party in an arbitration.[97] In *Fort Hill Builders,* which Chief Judge Rosenthal cited with approval in *Lummus*, the First Circuit rejected argument that an arbitrator's "comments were so strong and frequent that they must have influenced the other arbitrators." It reasoned: "That the other panel members were ultimately persuaded by [the arbitrator's] reasoning rather than counsel's does not constitute bias."[98]

None of Petrobras's kitchen-sink challenges come close to meeting its "onerous burden" of establishing evident partiality under § 10(a)(2). *Householder Grp.*, 354 F. App'x at 852.

---

which would not call for recusal or removal of an Article III judge. *Positive Software*, 476 F.3d at 283–84.

[97] Moreover, although the Court is not allowed to revisit these decisions, Petrobras's various complaints about these decisions misstate the facts. The Majority did not "ignore" or "bury" evidence that Vantage's witness "had a financial interest in the arbitration." Dkt. 53 at 25. When Vantage's COO testified that he was not aware of an incentive plan that, as Petrobras contended, gave him an interest in the arbitration, Petrobras made no effort to impeach him with its supposed evidence that such a plan existed, Dkt. 53 at 26 n.24, and offered no evidence that the witness actually knew of such a plan. *See* Tr. 343:24–344:11. Nor did the majority rely exclusively on an English case in concluding that a contract allegedly procured by bribery can be ratified. *See* Dkt. 53 at 27–28. The Tribunal relied on United States law, and made fulsome rulings in this regard. *See supra* § II.B.4. The other points Petrobras raises concern evidentiary rulings on Petrobras's request for depositions of third parties and the weight to be given to Vantage's offer to settle with the SEC, *see* Dkt. 53 at 27–28. As discussed below, these were also reasonable and appropriate. *See infra* § V.B.

[98] *Fort Hill Builders*, 866 F.2d at 14.

## B.  The Final Award is not subject to vacatur for refusal to hear pertinent evidence under § 10(a)(3)

Petrobras's argument under § 10(a)(3), which permits vacatur where arbitrators "refus[e] to hear evidence pertinent and material to the controversy," fares no better.  9 U.S.C. § 10(a)(3). The party seeking vacatur must show that the "panel refused to hear material evidence" and that the claimant "was prejudiced as a result."[99]  The party must further explain how the evidence "might have altered the outcome of the arbitration."[100]  "Arbitrators have broad discretion to make evidentiary decisions," and courts generally do "not review the adequacy of an arbitrator's evidentiary rulings."[101]  Vacatur is not appropriate if there is "any reasonable basis" for the panel's decision.  *Id.*  Accordingly, vacatur is permitted under § 10(a)(3) only in "very unusual circumstances."[102]

Petrobras complains that (i) the Tribunal *unanimously* refused to authorize depositions of Vantage's former CEO, Paul Bragg, and a former director, John O'Leary; (ii) the Tribunal *unanimously* sustained privilege objections to Petrobras questions about Vantage's Chief Operating Officer's confidential communications with the company's white collar counsel; and (iii) the Majority gave no weight in the Final Award to evidence that Vantage had offered to settle an SEC investigation.  *See* Dkt. 53 at 28–38.  Petrobras has not shown how these decisions altered the outcome of the arbitration.  Petrobras urges that this evidence was relevant to whether bribery occurred and Vantage was complicit.  *See id.* at 29.  But the Final Award found that whether or

---

[99]  *Louisiana Dep't of Natural Resources v. Fed. Emergency Mgmt. Agency*, 710 F. App'x 211, 213 (5th Cir. 2018).

[100]  *Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 400 (5th Cir. 2006).

[101]  *Parker v. JC Penney Corp.*, 426 F. App'x 285, 289 (5th Cir. 2011).

[102]  *Louisiana Dep't of Natural Resources*, 710 F. App'x at 213 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1955)).

not bribery had actually occurred, Petrobras had ratified the DSA and was estopped to assert its bribery defenses and claims. *See supra* § II.B.4. The outcome would not have been different even if the Tribunal's evidentiary rulings went the other way on these points.

Petrobras's post-award argument is also belied by its conduct during the arbitration. While Petrobras now claims that Bragg's testimony was critical to its case, Petrobras made no effort to subpoena him to testify at the hearing under the procedures readily available for doing so. 9 U.S.C. § 7; *see also* AAA Rule 34(d) ("An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.").[103] In fact, during closing, Petrobras's counsel criticized Vantage for not subpoenaing Bragg to attend the hearing: "Paul Bragg lives less than 5 miles away from where we are sitting right now" and "[c]ould have been subpoenaed." *See* Tr. 2973:11–14. Petrobras cannot credibly argue it was prejudiced by its inability to present testimony of third-party witnesses when it chose not to subpoena them to testify at the hearing.[104]

Regardless, even though the Tribunal's decisions on these matters may not be second-guessed in this proceeding, its decisions were entirely appropriate:

- The Tribunal's refusal to authorize depositions is consistent with arbitration rules providing that depositions *even of parties* are allowed only in "exceptional circumstances."[105] Indeed, significant authority holds that deposition subpoenas issued

---

[103] Shih Decl., Ex. F (excerpts from AAA Commercial Arbitration Rules and Mediation Procedures ("AAA Rules").

[104] *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20–21 (2d Cir. 1997), on which Petrobras relies, Dkt. 53 at 32, involved exclusion of testimony from an arbitral *hearing*. *See* 120 F.3d at 21. There, respondents specifically requested that the tribunal continue the hearing to permit the testimony. *Id.*

[105] *See* Shih Decl., Ex. F (AAA Rule L-3(f)) ("In exceptional cases, at the discretion of the arbitrator, upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator may order depositions."); *see also* Fellas Decl. ¶ 148 ("[D]epositions in international arbitrations are exceedingly rare.").

in arbitrations are not enforceable against third parties like former executives Bragg and O'Leary.[106]

- The Tribunal's refusal to permit Petrobras to question Vantage's COO about his privileged communications with Weil, Vantage's white collar counsel, is consistent with well-established rules of evidence.[107] Nothing "preclud[ed] Petrobras from eliciting testimony to rebut the assertions in the Weil reports," as Petrobras complains. Dkt. 53 at 37. The Tribunal permitted questions about the contents of the reports,[108] and Petrobras freely asked those questions.[109]

- The Majority's refusal to ascribe any significance to Vantage's announced offer to settle with the SEC is consistent with the rule in virtually every court in the United States that evidence of settlement or an offer of settlement is not admissible on the merits of a disputed claim.[110] Rule 408 has been applied consistently to settlements

---

[106]   *See In re Meridian Bulk Carriers, Ltd.*, 2003 WL 23181011, at *1 (E.D. La. 2003) (declining to enforce deposition subpoenas issued by arbitral tribunal; citing line of cases for the proposition that "[t]here is some question as to whether an arbitration panel has a right under the FAA to compel discovery of a non-party prior to the hearing").

[107]   The attorney-client privilege "applies in the corporate setting when an employee, on instructions from a superior, communicates with counsel that which is necessary to supply the basis for legal advice," and "presumptively protects from discovery the specific *communications* between client and counsel." *Nalco Co., Inc. v. Baker Hughes Inc.*, 2017 WL 3033997, at *2 (S.D. Tex. 2017) (citing *Upjohn v. United States*, 449 U.S. 383, 394–95 (1981)).

[108]   "The Tribunal rules that the respondent can ask the witnesses very specific questions about the content of the report. You can point to a particular section of the report and ask about the facts in that report, but you cannot ask the witness what did you say to the lawyer, what did the lawyer say to you." Tr. 294:24–295:5.

[109]   *See, e.g.*, Tr. 304:22–311:14 (questioning Halkett on conversations with Bragg); *id.* at 321:13–331:6 (questioning Halkett on Vantage's FCPA compliance efforts); *id.* 331:5–339:24 (questioning Halkett about Vantage's relationship with Nobu Su); *id.* 348:4–357:6 (questioning Halkett about Vantage's founders); *id.* 360:2–368:1 (questioning Halkett about Vantage's negotiations with Petrobras).

[110]   *See* Tex. R. Evid. 408(a); Fed. R. Evid. 408(a). "First, the relevancy of the settlement communications is thought to be suspect because they may have been an attempt to purchase peace rather than an admission of liability. Second, . . . the rule's exclusion of settlement evidence furthers public policy by promoting the voluntary settlement of disputes, which would be discouraged if evidence of compromise were later used in court." *Flexuspine, Inc. v. Globus Med., Inc.,* 2016 WL 9279999, at *2 (E.D. Tex. July 6, 2016); *see also Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284 (5th Cir. 2010) ("[T]he relevancy of settlement communications is thought to be suspect because they may have been an attempt to purchase peace rather than an admission of liability.").

with the SEC.[111]  The rule is also routinely cited by arbitral tribunals as a rationale for according no effect or weight to evidence of settlement negotiations.[112]

Petrobras's complaints also ring hollow because it did not raise them with the Tribunal when it had the opportunity to do so.  On the eleventh day of the twelve-day hearing, Chair Park gave the parties 24 hours to inform the Tribunal whether either had "any objection or complaint of a nature that [the Tribunal] could remedy?"  Tr. 2786:8–10.  Chair Park explained, "Is there anything that either side right now thinks we could have done differently which we can still remedy?  Something that we can fix right now."  Tr. 2786:11–16. Despite the litany of complaints it now raises, Petrobras raised only a single ruling in response—the denial of its motion to compel certain documents it claimed related to Vantage's damages expert's calculations.  *See* Tr. 2794:24–2799:15.[113]  While Chair Park made it clear that he was not asking the parties "to waive any right to challenge the award in court or waive any right to complain to the AAA if you think we've done something wrong," *see* Tr. 2786:10–13, Petrobras had the opportunity to ask the Tribunal to remedy the many rulings Petrobras now claims constituted improper, one-sided treatment.  Having made no effort to do so, Petrobras cannot credibly complain about those rulings now.

---

[111]  *See, e.g., Carpenters Health & Welfare Fund v. Coca–Cola Co.,* 2008 WL 9358563 (N.D. Ga. 2008); *In re Blech Sec. Litig.*, 2003 WL 1610775, at *11 (S.D.N.Y. 2003); *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 473 (D.N.J. 1998).

[112]  *Superiority, Inc. d/b/a/ Just Bulbs v. Motherboards.com*, 2003 WL 23354145, at *7 (UDRP–ARB 2003) ("[H]ere the rule and policy encouraging private settlements between parties appears to be appropriate in its application"); *see also Vanguard Grp., Inc. v. Emilio SA*, 2002 WL 636932, at *12, 14 (UDRP–ARB 2002) ("Rule 408 covers an enormous range of situations, and reflects a policy judgment that, on average, an offer to compromise is not reliable evidence of responsibility or intent.").

[113]  Denying the motion was appropriate because Vantage had already produced everything that its damages expert had relied upon and had access to in connection with his calculations. *See Id*. at 2798:16–2799:3.

In the end, Petrobras's litany of complaints about the manner in which the Tribunal conducted the hearing provide no basis for vacating the Final Award.

### C. The Final Award is not subject to vacatur for refusal to issue a reasoned award under § 10(a)(4)

Petrobras's argument that the award is subject to vacatur under § 10(a)(4) because the Majority failed to provide a "reasoned award" as to Petróleo Brasileiro's liability under the Guaranty fares no better. *See* Dkt. 53 at 38–40. Section 10(a)(4) permits vacatur "[w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). "An arbitrator has not exceeded his powers unless he has utterly contorted the evident purpose and intent of the parties—the 'essence' of the contract."[114] And "the party challenging an arbitrator's award under § 10(a)(4) must carry a 'heavy burden.'"[115]

A "reasoned award" is "something short of findings and conclusions but more than a simple result."[116] "The arbitrator need not delve into every argument made by the parties in order to issue a reasoned award. Any award that sets forth the key factual findings supporting its conclusions is a reasoned award."[117] "A reasoned award requirement does not obligate the arbitrator to discuss

---

[114]   *Cooper*, 832 F.3d at 545.

[115]   *BNSF R. Co. v. Alstom Transp., Ind.*, 777 F.3d 785, 788 (5th Cir. 2015) (quoting *Oxford Health*, 569 U.S. at 569).

[116]   *Sarofim v. Tr. Co. of the West*, 440 F.3d 213, 215 n.1 (5th Cir. 2006).

[117]   *Tully Construction Co. v. Canam Steel Corp.*, 684 F. App'x 24, 28 (2d Cir. 2017) (internal quotation marks omitted).

every piece of evidence or to show how every single proposition he adopted could be derived from first principles."[118]

Here, the Majority plainly made a reasoned award. It concluded that Petróleo Brasileiro was a "primary obligor under the DSA and the Guaranty," and reasoned from that factual finding that Petróleo Brasileiro "remains responsible for the breaches of that Contract." Final Award ¶ 530. This holding is substantially more detailed than required.[119] Because the Final Award's finding of liability followed from its conclusion that Petróleo Brasileiro was a "primary obligor," there is no basis to vacate under § 10(a)(4).

### D. Mr. Gaitis's perfunctory dissent should be given no weight

Petrobras has cited nothing in the arbitration record that would come close to satisfying its heavy burden to show arbitrator bias or that it was deprived of due process or fundamental fairness. Instead, it relies on its speculative assertions and mischaracterizations of the record. To bolster its speculative and misleading version of events, Petrobras places heavy reliance on Mr. Gaitis's Dissent. However, the Dissent bears no weight and should be disregarded in this proceeding.

A dissent is not an arbitration award and is not entitled to the strong deference accorded awards.[120] Yet, without any legal support, Newman asserts that the Dissent should be given great weight here. According to Newman, the Dissent is particularly meaningful because dissents are

---

[118]    *Carmody Bldg. Corp. v. Richter & Ratner Contracting Corp.*, 2013 WL 4437213, at *3 (S.D.N.Y. 2013).

[119]    *See Cat Charter, LLC v. Schlumberger*, 646 F.3d 836, 844–85 (11th Cir. 2011) (tribunal's statement that the claimant had "proven its claim . . . by the greater weight of the evidence" was a reasoned award, because this conclusion was not "devoid of any statements offered as a justification; the reason for the Plaintiff's victory is plainly provided").

[120]    *See* Shih Decl., Ex. V, Bernardo Cremades, *The Arbitral Award*, THE LEADING ARBITRATORS' GUIDE TO INTERNATIONAL ARBITRATION (2004 Hill ed.) at 404–05.

"not commonly seen in international arbitration, except in unusual circumstances."  Newman Decl.

¶ 23.  This is demonstrably wrong.  The ICDR Handbook on International Arbitration and ADR,

published by the AAA, observes that dissents are "very common in international commercial

arbitration."[121]  The ICDR's statement is supported by actual data regarding the frequency of

dissents in international arbitrations.[122]  Mr. Gaitis's issuance of a dissent is neither unusual nor

extraordinary.

Newman further departs further from reality when he states that Mr. Gaitis's refusal to sign

the Final Award "is not only a remarkable repudiation of the content of the Majority Award, but it

also emphasizes the rejection by Mr. Gaitis of the process by which the Majority Award was

made."  Newman Decl. ¶ 25.  Had Newman bothered to read Mr. Gaitis published writings, he

would have learned that as a matter of practice, Mr. Gaitis never signs an award when he disagrees

with it.[123]  The AAA Rules themselves provide that only a majority of the tribunal need sign an

arbitration award.[124]

---

[121]    *See* Shih Decl., Ex. N, International Center for Dispute Resolution, HANDBOOK ON INTERNATIONAL ARBITRATION AND ADR (3d ed) at 62.

[122]    *See* Shih Decl., Ex. Q, Albert Jan van den Berg, *Dissenting Opinions by Party-Appointed Arbitrators in Investment Arbitration*, Looking to the Future:  Essays on International Law in Honor of W. Michael Reisman, 821, 824 (Martinus Nijhoff 2010); *see also* Fellas Decl. ¶¶ 20–24.

[123]    Shih Decl., Ex. O, College of Commercial Arbitrators, GUIDE TO BEST PRACTICES IN COMMERCIAL ARBITRATION (4th ed., Gaitis ed.) at 322.

[124]    *See* Shih Decl., Ex. F (AAA Rule 46) ("Any award shall be in writing and signed by a majority of the arbitrators); *see also* Fellas Decl. ¶ 27 ("When it comes to complete dissents, since there is nothing in the award with which the dissenting arbitrator agrees, in my experience, there is nothing unusual if a dissenter does not sign the majority award.").

The only thing extraordinary about Mr. Gaitis's Dissent is that he made his sweeping, conclusory assertions without providing explanation or basis for them.[125]  While international arbitration scholars view dissents as having limited utility, dissents are recognized as potentially useful when they give the majority the opportunity to address the dissenter's arguments and possibly change a substantive ruling.  In situations involving disagreements regarding process, dissents can give the majority a chance to actually take steps to remedy the procedural concerns.[126]  To serve that purpose, a dissent must state reasons that are shared with the majority prior to finalization of the award.[127]  Here, by submitting a dissent that was not reasoned at all, much less well reasoned, Mr. Gaitis deprived the majority of the opportunity to address his issues.[128]

---

[125]  *See* Fellas Decl. ¶ 38 ("While arbitrators may reasonably differ over the amount of detail in which they may explain their reasons for disagreeing with their co-arbitrators, it is very unusual to see a dissent so devoid of any explanatory meaning."); *id.* ¶ 33 ("[W]here, as here, the parties require the arbitrators to provide a reasoned award, a dissenting arbitrator will typically issue a 'reasoned' dissent—one in which he or she explains in the dissenting opinion the reasons for his or her disagreement with the majority.").

[126]  *See* Shih Decl., Ex. S, Richard M. Mosk & Tom Ginsburg, *Dissenting Opinions in International Arbitration*, 15-4 MEALEY'S INT'L ARB. REP. 16 (2000) at 23 ("By pointing out problems with the reasoning of the majority, a well-reasoned dissent can help ensure that the majority opinion deals with the most difficult issues confronting it. . . . In some cases dissenting opinions may be able to expose a fatal procedural irregularity or substantive flaw, and this is the most important instance for a dissenting opinion.").

[127]  *See id.* ("To play this role of ensuring a quality award by the majority, it is important that wherever possible, dissenters circulate their opinions to the majority before the issuance of the majority award, as is done in the American appellate system and at the International Court of Justice.").

[128]  *See* Fellas Decl. ¶ 35 ("There is good reason for the practices of a dissenter providing a 'well-reasoned' dissent and circulating it to the majority before the award is issued.  A well-reasoned dissent can improve the quality of the arbitration process and result in a more robust award, which in turn promotes the losing party's confidence that its arguments were taken seriously and addressed.").

Available data indicates that virtually all dissents in international arbitrations are issued by the arbitrator appointed by the losing party, as happened in this case.[129] At best, such dissents are viewed as efforts by arbitrators appointed by a losing party to placate the disappointed party that appointed them. At worst, there are concerns that party-appointed arbitrators try to concoct grounds for protracted litigation over the enforcement of awards where none would otherwise exist.[130] This is of particular concern where a dissent is based on supposed procedural infirmities that the dissenting arbitrator does not disclose, thereby depriving the majority of the opportunity to address them, as Mr. Gaitis did here.[131]

Finding no specific grounds stated in the Dissent that would support vacatur, Petrobras and Newman resort to speculating about what Mr. Gaitis was thinking, using bits and pieces of the record without any regard to context. For example:

- Newman concludes that the following excerpt from Mr. Gaitis's November 2016 time records indicates that Mr. Gaitis was concerned about issues of fundamental fairness early in the proceeding: "Analyze WP [Chairman William Park] interpretation of ICDR Guidelines/compare and contrast case law & authorities re equal treatment of parties." Newman Decl. ¶¶ 86, 85, 88 (emphasis added by Newman); Dkt. 53 at 10. In reality, this time entry reflects the Tribunal's consideration of *Vantage's* argument that principles of equal treatment required the Tribunal to order Petrobras to produce communications with government agencies if Vantage was required to do so.[132]

- Petrobras cites the following single, brief exchange between Chair Park and Judge Brower as evidence that "the arbitral process had broken down": "Judge Brower: He has to go. [Chair Park]: Charlie, I'm aware of this, but we need to have one—I

---

[129] *See* Shih Decl., Ex. Q, van den Berg at 824; Ex. R, C. Mark Baker & Lucy Greenwood, *Dissent—But Only if You REALLY Feel You Must*, 7 Dispute Resolution Int'l 31 (2013) at 34-35; *see also* Fellas Decl. ¶¶ 45–47.

[130] *See* Shih Decl., Ex. R, Baker & Greenwood at 32 ("[D]issents can offer an easy way out for the party-appointed arbitrator, a way to stifle deliberations and a means to encourage a challenge to the award.").

[131] *See* Shih Decl., Ex. S, Mosk at 23.

[132] *See* Dkt. 53-3 (Katz Decl.), Ex. 50 (Nov. 17, 2016 Procedural Order) at 3 (noting the parties' dispute over "reciprocity" and "equality of treatment").

say this to both, we need to have one Chair." Dkt. 53 at 13 (citing Tr. 2216:24–2217:2). The record reflects this witness had previously stated he would have to leave the proceedings at a given time and that questioning by Chair Park was approaching that time. The notion that this exchange indicates a breakdown in the arbitral process is nonsense.

- Petrobras also asserts that Chair Park and Mr. Gaitis expressed "concern" about Judge Brower's "tone during his examination of witnesses," and cites Chair Park's suggestion that Judge Brower ask a more open ended question. Dkt. 53 at 13. Far from criticizing "tone," the record shows that the Brazilian witness was having trouble understanding questions from both Chair Park and Judge Brower, and Chair Park was simply suggesting the question be rephrased. Tr. 1566:4–1569:7.

These fabrications cannot convert Mr. Gaitis's empty gesture into something meaningful. In the end, the Court should disregard Mr. Gaitis's conclusory assertions and instead give requisite deference to the Final Award and its affirmation that the "pre-hearing, hearing, and post-hearing process leading to the issuance of the Final Award have been conducted with full respect for all Parties' rights to fundamental fairness and due process protections" under the FAA, and that the Majority has not "noted any evidence that these proceedings denied the Parties fundamental fairness and due process protections."[133] Final Award ¶ 529.

## VI. PRAYER FOR RELIEF

Vantage respectfully requests that this Court grant its Petition to Confirm the Final Award and deny Petrobras's Petition to Vacate.

---

[133] Petrobras argues that this affirmation in the Final Award should be disregarded as a self-serving statement. Dkt. 53 at 17 n.14. Petrobras relies on *Sun Refining & Marketing Co. v. Statheros Shipping Corp.*, 761 F. Supp. 293 (S.D.N.Y. 1991), where the challenged arbitrator failed to disclose that he was the president of a company that was adverse to the arbitration claimant in a pending arbitration. In deciding whether this relationship created an *appearance* of bias, the court disregarded the arbitrator's statement that he could be impartial. *See id.* at 302. Here, there is no such undisclosed relationship, and the issue is whether there is objective evidence of *actual* bias. Moreover, the affirmation here was made by Chair Park, against whom Petrobras levels no accusations of bias.

DATED:  October 3, 2018                    Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By: _____
        Karl Stern
        Texas Bar No. 19175665
        karlstern@quinnemanuel.com
        Charles Eskridge
        Texas Bar No. 06666350
        charleseskridge@quinnemanuel.com
        Christopher D. Porter
        Texas Bar No. 24070437
        chrisporter@quinnemanuel.com
        Kate Kaufmann Shih
        Texas Bar No. 24066065
        kateshih@quinnemanuel.com
        711 Louisiana, Suite 500
        Houston, Texas  77002
        Telephone: (713) 221–7000
        Fax: (713) 221–7200

        Tai–Heng Cheng
        taihengcheng@quinnemanuel.com
        *Admitted Pro Hac Vice*
        51 Madison Avenue, 22nd Floor
        New York, New York 10010
        Telephone :  (212) 849–7000
        Fax :  (212) 849–7100

        Edward F. Fernandes
        Texas Bar No. 06932700
        efernandes@HuntonAK.com
        HUNTON ANDREWS KURTH
        700 Louisiana Street
        Houston, Texas 77002
        Telephone: (713) 229-5721
        Fax: (713) 229-5750

Paul J. Dobrowski
Texas Bar No. 05927100
pjd@doblaw.com
Danielle N. Andrasek
Texas Bar No. 24045410
dna@doblaw.com
DOBROWSKI LARKIN & JOHNSON LLP
4601 Washington Ave. #300
Houston, Texas 77007

ATTORNEYS FOR PETITIONERS
VANTAGE DEEPWATER COMPANY AND
VANTAGE DEEPWATER DRILLING, INC.

## CERTIFICATE OF SERVICE

A copy of the foregoing motion was served on all counsel of record for the parties via ECF on October 3, 2018.

/s/ *Kate Kaufmann Shih*
Kate Kaufmann Shih