# EXHIBIT G

# Dissent – But Only if You REALLY Feel You Must. Why Dissenting Opinions in International Commercial Arbitration Should Only Appear in Exceptional Circumstances

C Mark Baker[1] and Lucy Greenwood[2]

## Introduction

Why do judges and arbitrators dissent? Is it a means of 'letting off steam'?[3] Is it to be clever, like the possibly apocryphal story of the English jurist who reportedly said 'I am dissenting for the reasons so ably expressed in the majority opinion'?[4] Are dissenters trying to influence the application of the law or to change the law? Are they simply 'providing therapy for the losing party'?[5]

---

1 FCIArb, admitted to practise law in Texas, Executive Committee Member and Member of the Board of Directors of the American Arbitration Association and Chairman of its International Advisory Committee, co-head of the Fulbright & Jaworski International Arbitration Group.
2 FCIArb, Solicitor, England and Wales, accredited Foreign Legal Consultant in Texas, member of the Fulbright & Jaworski International Arbitration Group. All views expressed herein are the authors' own and do not necessarily reflect the views of Fulbright & Jaworski.
3 Alan Redfern, 'Dangerous Dissents' (16 March 2005), www.brownwelsh.com/Archive/2005_Master_Redfern.pdf last accessed 23 January 2013.
4 *Ibid*, at n 19.
5 Per Toby Landau, 'Taking on the "inner mafia"', (2012) 7(6) Global Arbitration Review, available at www.globalarbitrationreview.com/journal/article/30863/london-taking-inner-mafia, last accessed 1 April 2013.

Or are they providing therapy for the dissenter, such must have been the case for the judge in an Appellate Court who reportedly said in his dissent 'what these four judges have done here is to blindly announce a... rule which not only finds no support in history, precedent, experience, custom, practice, logic, reason, common sense or natural justice, but is in utter defiance of each and all of these standards'?[6] Is there ever a valid reason to dissent in international commercial arbitration?

In any discussion of dissenting opinions in international arbitration, it is important to make two important distinctions at the outset. First, arbitrators are not judges. They must be just, fair and impartial, but they are not lawmakers. Secondly, a distinction must be drawn between dissenting and disagreeing. It is perfectly possible to have a majority opinion without a written dissent. Those that disagree can simply indicate that they have not signed the award. Why, therefore, do arbitrators (as opposed to judges) publish dissents at all? In researching this article, we have concluded that dissents, certainly in international commercial arbitrations, should be a very rare creature indeed and we have sought to identify those truly exceptional circumstances in which an arbitrator may find him or herself compelled to dissent. Arbitrators may, of course, dissent, but only if they really, really feel they must.[7]

In reaching this conclusion, we found that we disagreed with the majority of attendees who participated in a Chartered Institute of Arbitrators' debate on the value of dissenting opinions in arbitration. Following the debate, three-quarters of the audience indicated that they thought that dissenting opinions had value.[8] Contrary to this, it is our view that far from adding value, dissents can often offer an easy way out for the party-appointed arbitrator, a way to stifle deliberations and a means to encourage a challenge to the award.

## A history of dissent

In common law court proceedings, dissents have a long and relatively noble history. The genesis of dissenting opinions in the common law tradition can be found in English parliamentary procedure. In England, the House of Lords treated its appellate judicial jurisdiction as 'any other committee of Parliament... Where [the participating Lords] disagreed, they would

---

6    Fuld, cited by Redfern, n 3 above at n 16.
7    We are, of course, paying homage to Arthur Marriott QC's 1995 Freshfields lecture 'Tell it to the judge, but only if you feel you must.'
8    Chartered Institute of Arbitrators, 'CIArb's Seminar – Dissenting Opinions in Arbitration – the debate', available at: www.ciarb.org/conferences/ciarb-seminar—dissenting-opinions last accessed 23 January 2013. The debate occurred in London on 22 November 2011.

express their disagreement [to] be recorded in the parliamentary record'.[9] Yet the Privy Council, an English institution tasked with advising the monarch and resolving judicial appeals from Commonwealth territories, took a different approach. Its 'judgments... were made in the form of advice to the monarch,' which required unanimity; for this reason, the Privy Council did not allow dissents.[10] The common law tradition permitting dissents that began in the House of Lords had spread to the lower courts in England and Wales by the late 18th century, and thereafter to other common law jurisdictions like the US and Australia. Civil law countries tend to be more reluctant to permit dissenting opinions.[11] This reluctance stems from the notion that dissenting opinions violate the secrecy of judicial deliberations. Today France, Italy, the Netherlands, Belgium and Austria, among others, do not allow dissents.[12] Other countries adopt a middle ground, restricting the right to dissent to judges on constitutional courts, or those performing constitutional review.[13]

In arbitration, the situation is very different. Although arbitration is an ancient form of dispute resolution, which can be traced back to the Greeks and the Ancient Near East civilisations, international commercial arbitration and investment treaty arbitration in the form in which we know it today is very much in its infancy.[14] Only 50 years have passed since the New York Convention was signed, 'the cornerstone of current international commercial arbitration', without which international arbitration would not exist in its present form.[15] The Convention's widespread adoption

---

9 Michael Kirby, 'Judicial dissent – common law and civil law traditions' (2007) 123 LQR 379, 385 (2007). He continues, 'Dissent, in English appellate practice, was thus an application of the oral tradition displayed in the proceedings in error in the relevant committee of the House of Lords.' 386.

10 *Ibid*, 386.

11 Directorate General for Internal Policies, 'Dissenting opinions in the Supreme Courts of Member States', available at: www.europarl.europa.eu/committees/fr/studiesdownload.html?languageDocument=EN&file=78915 (last visited 23 January 2013) at 1.3.1.

12 *Ibid*.

13 *Ibid*, 2.2.

14 Gary Born, *International Commercial Arbitration* (Kluwer Law International 2009) at 20–21: 'As in the state-to-state context, some of the earliest reports of commercial arbitration are from the Middle East. Archaeological research reports that clay tablets from contemporary Iraq recite a dispute between one Tulpunnaya and her neighbour, Killi, over water rights in a village near Kirkuk, which was resolved by arbitration (with Tulpunnaya being awarded ten silver shekels and an ox). Arbitration was also apparently well known in ancient Egypt, with convincing examples of agreements to arbitrate future disputes (used alongside what amount to forum selection clauses) included in funerary trust arrangements in 2,500 BC and 2,300 BC. Arbitration was no less common in ancient Greece for the resolution of commercial and other "private" disputes than for state-to-state disputes.'

15 Albert van den Berg, 'The New York Arbitration Convention of 1958 1' (1981), cited in Born, n 14 above at n 556.

is so exceptional; it is easy to forget that international arbitration is still developing and that unifying standards of behaviour are still emerging.

In a survey of 107 national arbitration laws, only 24 expressly permitted dissenting opinions; the remainder was silent on the subject, although none precluded dissents.[16] There is no reference to dissenting opinions either in the Model Law or in the UNCITRAL Arbitration Rules, including in the 2010 revisions. In practice, the ICC, LCIA and WIPO permit dissenting opinions, despite their rules being silent on the point. The earlier version of the Stockholm Chamber of Commerce Arbitration Institute Rules expressly provided for dissenting opinions, but the current rules, adopted in 2007, removed all mention of a dissenting opinion. The Netherlands Arbitration Institute allows the dissenter to write separately, but does not allow the document to form part of the award. The ICSID Convention expressly permits any member of the tribunal to attach a dissent to the award.[17] Thus, arbitral consensus with respect to dissenting opinions is still emerging.

## The 'prevalence' of dissents

There has been limited empirical research into the publication of dissenting opinions in international arbitrations. The best known of this research is probably that carried out by Professor Albert Jan van den Berg into ICSID arbitration awards. In 2011, van den Berg wrote that, of 150 published investment awards, a party-appointed arbitrator dissented in 34 of those cases, or about 22 per cent.[18] The 'astonishing fact', in his view, 'is that nearly all of those 34 dissenting opinions were issued by the arbitrator appointed by the party that lost the case in whole or in part'.[19] This statistic, he concludes, 'raises concerns about neutrality'.[20] We have updated his statistics using the same methodology.[21] Since van den Berg concluded his study, there have been approximately 111 further awards, in which there

---

16 See Manuel Arroyo 'Dealing with Dissenting Opinions in the Award: Some Options for the Tribunal' (2008) ASA Bulletin Vol 26 No 3. These 24 countries are listed as Spain, Portugal, Norway, Romania, Poland, Lithuania, Estonia, Bulgaria, Turkey, Algeria, Israel, China, Indonesia, Brazil, Panama, Peru, Colombia, Ecuador, Venezuela, Bolivia, Guatemala, Costa Rica, El Salvador and Canada (Quebec).
17 ICSID Convention, Article 48(4).
18 Albert Van den Berg, 'Dissenting Opinions by Party-Appointed Arbitrators in Investment Arbitration', in Mahnoush Arsanjani et al (eds), *Looking to the Future: Essays on International Law in Honor of W Michael Reisman* (Koninklijke Brill nv) 824, available at: www.arbitration-icca.org/media/0/12970228026720/van_den_berg-dissenting_opinions.pdf, last accessed 1 April 2013.
19 *Ibid.*
20 *Ibid*, 825.
21 *Ibid*, 824 and 837. Our data is from 1 January 2009 to 18 January 2013.

were 16 dissents (ie, approximately 14.4 per cent). Our findings echo those of van den Berg: the dissenter in all 16 cases had been appointed by the party that lost the case in whole or in part.

There is even less available data in the international commercial arbitration field. In 2008, Rees and Rohn summarised the trends in ICC and LCIA arbitrations.[22] They identified 23 non-unanimous awards in 261 partial and final ICC awards, giving a rate of dissent of approximately 8.8 per cent.[23] The rate was lower for LCIA awards, with two dissents in over 76 awards (or approximately 2.6 per cent).

Thus, dissents are, as far as can be discerned from the limited data, rare in investment treaty arbitrations – but even rarer in international commercial arbitrations. However, in order to fully consider this issue, the substance of the dissent needs to be reviewed. A number of recent dissents concern the contested issue of the applicability of 'most-favoured nation' clauses to dispute resolution provisions, and would not, on their face, affect the dissenter's neutrality.[24] Moreover, others concern relatively minor issues, like allocation of costs.[25] Charles Brower and Charles Rosenberg provided a detailed analysis of the content of the dissenting opinions in van den Berg's research in their paper 'The Death of the Two-Headed Nightingale'. They concluded that their 'close examination' demonstrated that van den Berg's concerns about neutrality are essentially unwarranted. Brower and Rosenberg claimed 'a number of the dissents in van den Berg's survey… are benign or actually disfavor the party that appointed the dissenter.'[26]

## The downsides of dissents

Although dissents may not, necessarily, call the neutrality of the arbitrator into question, there are other very real downsides to their publication. The existence of dissenting opinions in international arbitrations has long been

---

22 Peter J Rees and Patrick Rohn, 'Dissenting Opinions: Can they Fulfil a Beneficial Role?' (2009) 25(3) Arbitration International 329.
23 *Ibid*, 329. Note that the ICC statistics were from awards rendered in 2006 and the LCIA statistics from awards rendered in 2008.
24 See, eg, 'UNCITRAL Tribunal Denies Application of MFN Clause to Dispute Resolution Provisions' (15 August 2012) 2012(2) Fulbright International Arbitration Report. Judge Charles N Brower, a critic of van den Berg's characterisation of dissenting opinions, below note 25, dissented on this issue in *Daimler v Argentina*, ICSID Case No ARB/05/1.
25 See Judge Charles Brower and Rosenberg, 'The Death of the Two-Headed Nightingale', 6(3) World Arbitration & Mediation Review 619, 654–656: 'A number of the dissents in van den Berg's survey… are benign… Van den Berg also lumps together in his survey dissenting opinions on incidental issues, such as interest and costs.' Available at www.globalarbitrationreview.com/cdn/files/gar/articles/Charles_Brower_The_Death_of_the_Two-Headed_Nightingale_Speech_2.pdf, last accessed 1 April 2013.
26 Brower and Rosenberg, note 25 above at 654.

controversial and their use has been extensively debated and reluctantly accepted. Back in 1985, the ICC Commission on International Arbitration established a Working Party on Dissenting Opinions to propose regulations for how the ICC Court and Secretariat would address dissenting opinions issued in ICC proceedings. A Final Report on Dissenting and Separate Opinions was published in 1991. At the outset, the ICC Commission on International Arbitration communicated to the Working Party that it was 'neither practical nor desirable to attempt to suppress dissenting opinions in ICC arbitrations'.[27] More recently, it has been said that dissenting opinions in arbitrations are a 'fact of life'[28] and 'accepted practice'[29] and are 'here to stay'.[30] That is not to say that, in our view, published dissents should be promoted or encouraged in international commercial arbitrations. In this we are not suggesting that an arbitrator should not be permitted to disagree in deliberations, nor that such disagreement would not add to the rigour of the decision-making process, simply that caution should be exercised before the decision to publish the dissent to the co-arbitrators and parties is taken.

The ICC Commission considered that the main disadvantages of dissents were that: (a) dissenting opinions underscored the link between the arbitrator and the party who nominates him or her (which is supported by the van den Berg research); (b) the arbitrators may no longer feel obliged to seek to reach a consensus or a unanimous decision; and (c) a dissenting opinion might encourage a debate on the merits of the case before the Court of Arbitration.

Taking the last of these considerations and broadening it to a wider application than merely the ICC context, there is an argument that a dissent may provide a platform for challenge to the award. The English case of *F Ltd v M Ltd*[31] showed that, given a certain combination of circumstances, a dissenting opinion could provide such a platform. In this case, a detailed dissenting opinion was delivered to the parties along with the award because one of the tribunal members disagreed with the views of the majority on a number of points. The Court agreed to uphold an element of the challenge,

---

27 First Interim Report of the Working Party (1 October 1986), cited in the Commission's Final Report on Dissenting and Separate Opinions, International Court of Arbitration Bulletin (1991) Vol 2 No 1, Paragraph 2, available at: www.iccdrl.com, last accessed 1 April 2013.
28 Donovan, cited by Manual Arroyo, op cit, Francis Patrick Donovan, 'Dissenting Opinions' (1996) 7 ICC International Court of Arbitration Bulletin 76.
29 Van den Berg, note 18 above, 821.
30 Richard Mosk and Tom Ginsburg, 'Dissenting Opinions in International Arbitration', in Matti Tupamaki (ed), *Liber Amicorum Bengt Broms* (Helsinki 1999).
31 [2009] EWHC 275 (TCC).

which was brought under section 68 of the Arbitration Act 1996, on the basis of certain issues identified by the dissenting opinion. The judge hearing the challenge, Coulson J, confirmed that a 'serious irregularity' had been established.[32]

In another English case, Tomlinson J criticised the publication of dissenting opinions.[33] In that case, one party challenged an ICC majority award under Sections 67 and 68 of the Arbitration Act 1996.[34] Tomlinson J rejected the challenge as 'simply hopeless', and suggested that 'this challenge would not have been made had not the dissenting arbitrator put forward (i) the allegation of impropriety which B eschews, and (ii) the suggestion that the Award is illegal, as a matter of public order under Spanish law'.[35] Despite his condemnation of the dissent, Tomlinson J left the door open to such challenges by condoning the use of dissenting opinions to challenge awards where they may provide 'evidence in relation to procedural matters,' as in *F Ltd*, or 'where the proper law of the dispute is English law and there is an appeal on point of law' under Section 69 of the Arbitration Act 1996.[36] Tomlinson J's final point is an important one: the existence of a dissent may make a difference depending on the provisions of the law of the seat if the dissent deals with a point of law that the arbitrator considers has been incorrectly applied in those rare jurisdictions where an appeal on a point of law is permitted.[37]

An additional argument against dissenting opinions is that they may disclose the tribunal's deliberations. However, it seems to us that this is not of major concern. The risk that an arbitrator may breach the secrecy

---

32 He cited the decision in *London Underground Limited v Citylink Telecommunications Limited* [2007] EWHC 1749 (TCC) in which Ramsay J stated, 'it will generally be the duty of a tribunal to determine an arbitration on the basis of the cases which have been advanced by each party, and of which each has notice. To decide a case on the basis of a point which was not raised as an issue or argued, without giving the parties the opportunity to deal with it, will be a procedural irregularity'.
33 *B v A* [2010] EWHC 1626 (Comm).
34 *Ibid*, para 2.
35 *Ibid*, para 30.
36 *Ibid*, para 21.
37 England is unusual in that it allows an appeal on a point of English law in certain defined circumstances (section 69 of the Arbitration Act 1996). Born, note 14 above, at 2646-2647: 'A few other developed legal systems provide grounds for limited substantive review of arbitral decisions. Under Chinese law, an arbitral award may be annulled if the court concludes that the evidence was insufficient or the application of law was truly incorrect. That resembles similar standards in Australia, Ireland and (where the parties have so agreed) New Zealand. At least in verbal formulation, these various provisions contemplate only a limited appellate review of the legal (not factual) conclusions of the arbitrators, permitting annulment only in cases involving serious errors.' Also note the US doctrine purporting to enable courts to review awards for alleged 'manifest disregard' of the law. See also 2645.

of deliberations always exists: a dissent may give him or her an additional platform to achieve this, but the dissent itself should not be blamed for the actions of the arbitrator in this regard. A more significant problem in practice, which is caused by the publication of dissents, is that they may in fact stifle open debate by the tribunal in its deliberations. As the ICC Working Party recognised over 20 years ago, the ability to publish a dissenting opinion may make the minority arbitrator less likely to seek to convince the other members of the tribunal of the mistakes that the minority arbitrator feels they are making.

## Do dissents result in 'better' awards

It has been asserted that a written dissent 'safeguards the integrity of the judicial decision-making process by keeping the majority accountable for the rationale and consequences of its decision'[38] and that 'genuine and well-reasoned dissenting opinions can do a great deal of good'.[39] So, can it be said that the publication of a dissents results in a 'better' arbitration award?

In our view, it is not the fact of a written dissent that ensures quality resolution of the dispute, but the disagreement with the majority view that will cause the majority to work harder to justify its decision. Open and reasoned debate during deliberations must not be stifled; a published dissenting opinion should not be necessary to make sure that the tribunal has adequately considered all arguments and that the award is complete, coherent and legally correct. Rohn and Rees reached a similar conclusion when they proposed that a separate dissenting opinion should not be issued if the arguments of the minority are identified and analysed in the award.[40] In their view, a separate dissenting opinion would not further enhance the quality and legitimacy of an award that already takes into consideration, and responds to, the dissenter's arguments.[41]

There is some argument that the fear of a dissent being published may focus the tribunal members on the need to produce their very best work in an award; a sort of quality control, otherwise provided by an appellate court review. The counter argument is also true, namely that the ability to publish a dissenting opinion may make an arbitrator less likely to engage in constructive deliberations with the tribunal members with whom he or

---

38  William J Brennan, Jr, 'In Defense of Dissents' (1986) 37 Hastings LJ 427, 430.
39  Domenico di Pietro, 'The Controversial Role of Dissenting Opinions In International Arbitral Awards', available at: http://blogs.law.nyu.edu/transnational/2011/10/the-controversial-role-of-dissenting-opinions-in-international-arbitral-awards, last accessed 23 January 2013.
40  Rohn and Rees, note 23 above, at 340.
41  *Ibid*, 335.

she disagrees. It has also been said that a dissent provides some kind of therapy for the losing party. We believe that major commercial parties who are involved in international arbitration (unlike, perhaps, individuals in smaller court cases) do not require therapy. It is more likely that the dissent offers comfort to the arbitrator who did not manage to persuade his co-arbitrators to agree with him.

## Dissents fulfil different roles in investment arbitrations and commercial arbitrations

Although on the increase, investment treaty arbitrations remain a rare and unusual creature. In 2011 and 2012, there were 38 and 50 cases registered by ICSID, respectively.[42] The most active year between 1972 and 1976 saw only four cases registered by ICSID; frequently none were registered at all in a given year during this period.[43] Investment treaty cases are unusual because awards are routinely published and cited in subsequent arbitrations, although technically they do not have precedential effect. There is, therefore, a nascent body of jurisprudence that has grown and developed as investment treaty arbitrations become more common. There may accordingly be some merit in the argument that dissents on a point of legal principle in investment treaty arbitrations can help to develop that jurisprudence. Brower and Rosenberg cite three awards that have embraced dissenting views expressed in earlier investment treaty cases. The oldest dissent cited by van den Berg dates from 1983: it takes time for jurisprudence to evolve and for dissents to contribute to that body of jurisprudence.[44]

At the outset of this article, we emphasised that arbitrators are not lawmakers. This remains true, even in the case of investment treaty arbitrations; although we concede that the lines are more blurred and agree that, in certain circumstances, a dissent can play a role in the development of jurisprudence in investment arbitrations. In their paper, Brower and Rosenberg opined that dissenting opinions played a 'critical role in fostering the legitimacy of international arbitration, particularly investment arbitration.'[45] Yet they did not go into details in their paper as to the nature of the 'critical' role dissents play in international commercial arbitration, rather than investment treaty arbitration. In our view, dissents should not play a 'critical role' in international commercial arbitration. The confidentiality

---

42  ICSID Caseload – Statistics (Issue 2013-1), available at: https://icsid.worldbank.org/ICSID/FrontServlet?requestType=ICSIDDocRH&actionVal=CaseLoadStatistics (last accessed 31 January 2013).
43  *Ibid.*
44  Brower and Rosenberg, note 25 above, 667.
45  *Ibid*, 651.

obligations imposed on the majority of commercial arbitrations mean that the only audience for an award and any accompanying dissent is the parties. Dissents may be justified in certain cases in investment arbitration but with respect to international commercial arbitration, unanimity or silence ought almost always to prevail. Dissents in international commercial arbitrations risk both collegiality and unanimity and do not provide the jurisprudential reward that can be found in investment arbitrations.[46]

## Dissent – but only if you feel you must

The arbitrator's fundamental right to hold a dissenting opinion should not be confused with a right or indeed a responsibility to publish that dissenting opinion. It would be invidious to seek to prohibit dissents as noone would wish to be seen as stifling an arbitrator's right of expression, but their use should both be exceptional and published in such a way as to minimise as far as possible the negative impacts such a dissent could have.

What, then, are the exceptional circumstances in which an arbitrator could, and should dissent in writing? We believe that this is a matter of conscience for the arbitrator; namely in the extremely rare situation in which an arbitrator, acting fairly and impartially between the parties, simply cannot stay silent and does not feel that he or she could address the issue by refusing to sign the award. In 20 years of acting as an arbitrator in commercial arbitrations, one of the authors has only felt compelled to issue a written dissent in one case: on a dispositive legal issue, which, in the author's view, the majority simply preferred to ignore in the interests of achieving a 'just' result.

There is no shame in a majority opinion without a dissent. There will always be panels where agreement cannot be reached. The question is whether or not the disagreement should be publicised as a dissent in the majority of international commercial cases. Our view is that the answer to this should be no, unless the arbitrator really feels they must.

---

46  See, in particular, the discussion in Laurence Shore and Kenneth Figueroa, 'Dissents, Concurrences and a Necessary Divide Between Investment and Commercial Arbitration' (2008) 3(6) Global Arbitration Review 18.