| | |
|---|---|
| VANTAGE DEEPWATER COMPANY and VANTAGE DEEPWATER DRILLING, INC., | |
| *Petitioners,* | CIVIL ACTION NO. 18-cv-2246 |
| v. | |
| PETROBRAS AMERICA, INC., PETROBRAS VENEZUELA INVESTMENTS & SERVICES, BV, and PETROLEO BRASILEIRO S.A. – PETROBRAS, | |
| *Respondents.* | |

**PETITIONERS' MOTION TO STRIKE**
**THE DECLARATION OF LAWRENCE W. NEWMAN**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

I. INTRODUCTION ........................................................................................................1

II. BACKGROUND ..........................................................................................................1

III. LEGAL STANDARD...................................................................................................2

IV. ARGUMENT ...............................................................................................................3

    A. The Declaration contains unreliable opinions..........................................................3

        1. Mr. Newman's opinions regarding Mr. Gaitis's state of mind are improper and unreliable. .............................................................................3

        2. Mr. Newman's opinions regarding Judge Brower's state of mind are also improper and unreliable........................................................................6

        3. Mr. Newman offers improper and unreliable opinions on the applicable legal standard. ............................................................................9

    B. Mr. Newman offers improper legal conclusions that the evident partiality standard has been met with respect to Judge Brower. ...........................................10

V. CONCLUSION...........................................................................................................14

**Cases**

*In re Air Crash Disaster at New Orleans, La.*,
795 F.2d 1230 (5th Cir. 1986) ........................................................ 13

*Askanase v. Fatjo*,
130 F.3d 657 (5th Cir. 1997) ..................................................... 3, 11

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*,
10-CV-02516-WJM-KLM, 2014 WL 4651643 (D. Colo. Sept. 18, 2014) ...................... 5

*Beauregard Par. Sch. Bd. v. Honeywell, Inc.*,
2:05 CV 1388, 2008 WL 821053 (W.D. La. Mar. 24, 2008) ........................................... 8

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ................................................................... 2

*First Interstate Bank of Tex., N.A. v. S.B.F.I., Inc.*,
830 S.W.2d 239 (Tex. App.—Dallas 1992, no writ) ........................................ 8

*Floyd v. Hefner*,
556 F. Supp. 2d 617 (S.D. Tex. 2008) .................................................. 2

*Highland Capital Mgmt. L.P. v. Bank of Am., Nat. Ass'n*,
3:10-CV-1632-L, 2013 WL 4502789 (N.D. Tex. Aug. 23, 2013) .................................... 13

*Holmes Group, Inc. v. RPS Products, Inc.*,
2010 WL 7867756 (D. Mass. June 25, 2010) .................................... 3

*In re Jackson*,
318 B.R. 5 (Bankr. D.N.H. 2004), *subsequently aff'd*, 459 F.3d 117 (1st Cir. 2006) ........ 8

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) .................................................................. 2

*Lewis v. Par. of Terrebonne*,
894 F.2d 142 (5th Cir. 1990) ........................................................ 2

*Little v. Tech. Specialty Products, LLC*,
940 F. Supp. 2d 460 (E.D. Tex. 2013) .......................................... 11

*Lummus Glob. Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*,
256 F. Supp. 2d 594 (S.D. Tex. 2002) (Rosenthal, J.). .............................. 12, 13

*McVay v. Halliburton Energy Services, Inc.*,
688 F. Supp. 2d 556 (N.D. Tex. 2010), *aff'd*, 608 Fed. Appx. 222 (5th Cir. 2015) .......... 9

*Owen v. Kerr-McGee Corp.,*
 698 F.2d 236 (5th Cir. 1983) ........................................................................ 11

*Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC,*
 437 S.W.3d 518 (Tex. 2014)............................................................................ 9

*Weber v. Merrill Lynch Pierce Fenner & Smith, Inc.,*
 455 F. Supp. 2d 545 (N.D. Tex. 2006) ...................................................... 9, 10

## **Rules and Regulations**

Fed. R. Evid. 702(a)-(b)................................................................................... 2

## **Other Authorities**

*The College of Commercial Arbitration Guide to Best Practice in International Arbitration*, 322
 (James M. Gaitis, Editor-in-Chief) (4th ed. Juris 2017) .................................... 6

Petitioners Vantage Deepwater Company and Vantage Deepwater Drilling, Inc. (together, "Vantage"), respectfully submit this Motion to Strike the Declaration of Lawrence W. Newman ("Declaration") that Respondents Petrobras America Inc., Petrobras Venezuela Investments & Services, BV, and Petróleo Brasileiro S.A. (together, "Petrobras") submitted in support of their Motion to Vacate Majority Award. Dkt. 53. For the reasons set forth below, Vantage respectfully requests that the Court strike the Declaration.

## I.    INTRODUCTION

The issues pending before the Court are relatively straightforward: Vantage has petitioned the Court to confirm the Final Award, and Petrobras seeks to have the Final Award vacated. The parties' respective positions are neither novel nor unique, are controlled by statutory and treaty authority, and cover issues for which there are abundant case citations. Nevertheless, Petrobras attached the declaration of Lawrence W. Newman to try and bolster its position. The problem, however, is that substantial aspects of the Declaration offer opinions that are either (1) improper legal conclusions, or (2) based solely on his subjective belief. Vantage respectfully requests that the Court strike the Declaration because its opinions are either improper or unreliable.

## II.    BACKGROUND

On June 29, 2018, the Arbitral Tribunal issued its Final Award.[1] On July 2, 2018, Vantage filed its Petition to Confirm Arbitration Award. Dkt. 1. On August 31, 2018, Petrobras filed its Motion to Vacate the Majority Award. Dkt. 53.[2] In support of that motion, Petrobras attached the Declaration of Lawrence W. Newman. *Id.* at 53-2.

---

[1]  Vantage hereby incorporates the Factual Background section from its Omnibus Brief in Support of Petition to Confirm and in Opposition to Motion to Vacate. Dkt. 69.

[2]  Petrobras initially filed its Motion to Vacate the Majority Award under seal. Dkt. 34. Petrobras then filed a publicly available version of that motion. Dkt. 53. For purposes of this brief, Vantage will refer to the public motion. Dkt. 53.

Armed with nothing more than his subjective beliefs, Mr. Newman engages in a robust "guessing game," filling the Declaration with speculation about what the arbitrators were thinking both during and after the hearing. Then, invading the province of the Court, Mr. Newman provides legal conclusions—in many instances inconsistent with controlling authority—about arbitrator conduct that he claims justifies vacatur. Mr. Newman then reaches for ultimate conclusions, opining that the legal standard for vacatur has been satisfied.

For the reasons discussed below, the opinions contained within the Declaration fail to meet the standards for proper expert opinions and should be stricken from the record. For the convenience of the Court, <u>Appendix A</u> lists Mr. Newman's improper opinions regarding the arbitrators' states of mind, <u>Appendix B</u> lists Mr. Newman's improper opinions on legal standards and conclusions, and <u>Appendix C</u> lists Mr. Newman's conclusions that disregard the record and authorities.

### III. LEGAL STANDARD

The Federal Rules of Evidence govern the admissibility of expert testimony, with Rule 702 providing in relevant part that a qualified expert may offer an opinion if it "will help the trier of fact to understand the evidence or to determine a fact in issue," and if "the testimony is based on sufficient facts or data." FED. R. EVID. 702(a)-(b). When a party seeks to introduce an expert's opinion, the trial judge will determine whether the expert can offer the opinion he or she seeks to provide. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993). This applies to all expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). For an expert's opinion to be admissible, the "opinion must be preceded by facts in evidence and cannot be the basis of speculation or conjecture." *Lewis v. Par. of Terrebonne*, 894 F.2d 142, 146 (5th Cir. 1990). Additionally, "an expert witness may not offer testimony regarding legal conclusions." *Floyd v.*

*Hefner*, 556 F. Supp. 2d 617, 640 (S.D. Tex. 2008) (citing *Askanase v. Fatjo*, 130 F.3d 657, 672–73 (5th Cir. 1997)).

## IV.    ARGUMENT

### A.    The Declaration contains unreliable opinions.

As to admissibility of expert opinion, the law is well-settled:  "An expert witness may not testify to another person's intent.  ***No level of experience will make an expert witness a mind-reader***."  *Holmes Group, Inc. v. RPS Products, Inc.*, 2010 WL 7867756, at *5 (D. Mass. June 25, 2010).[3]  Nevertheless, Mr. Newman's supposed "mind-reading" abilities were on full display in the opinions he offered throughout the Declaration.  *See*, *e.g.*, Appendix A.

#### 1.    Mr. Newman's opinions regarding Mr. Gaitis's state of mind are improper and unreliable.

As the Declaration notes, Petrobras's party-appointed arbitrator, Mr. James Gaitis, dissented from the Final Award.  Decl., ¶ 24.  The dissent itself (the "Dissent") was brief—just two sentences in length, while making sweeping conclusory statements about the Arbitration without providing any basis for those statements.  In a footnote, Mr. Gaitis stated that the Dissent's purpose "is simply to generally advise the parties of the generic reasons why I cannot join in the Final Award."  Decl., ¶ 26.

Because Mr. Gaitis does not provide any basis for the Dissent's conclusory statements, Mr. Newman sets out to improperly opine on what Mr. Gaitis had in mind:

- Mr. Gaitis's "refusal to sign [the Final Award] is not only a remarkable repudiation of the Majority Award, but it also ***emphasizes the rejection by Arbitrator Gaitis*** of the process by which the Majority Award was made."  Decl., ¶ 25;

- "At the same time, ***it is likely that certain events*** constituting fundamental unfairness about which Arbitrator Gaitis complains

---

[3]   Unless otherwise noted, Vantage has added all emphases in this brief.

*arose out of occurrences outside the record available to me* . . . ." *Id.*, ¶ 28;

- "Therefore, the record *may well only partly reveal what led Arbitrator Gaitis to write* the unusual dissent that he did." *Id.*;

- "I discuss what I have found in the record that I consider . . . to be activities *that are indicative of the kinds of improper activity to which Arbitrator Gaitis alludes* in his dissent that *can be regarded as prejudicial* to the procedural rights of the Respondents." *Id.*, ¶ 29;

- "As noted earlier, behind the scenes conduct, *although not visible to the parties, may also reflect biased conduct* . . . ." *Id.*, ¶ 48;

- "These additional 'relevant facts' should be added to what is contained in, *or what may be inferred from*, the available records of the proceedings." *Id.*;

- "The 'equal treatment' issue to which Arbitrator Gaitis was referring *may have underlain* the 'intra-tribunal' objections . . . ." *Id.*, ¶ 86;

- "Arbitrator Gaitis *evidently expressed his concerns* about fundamental fairness to his fellow arbitrators. . . ." *Id.*, ¶ 88;

- *The accusations seem to have come to the fore* at or after the arbitrators deliberated together in Boston on October 4, 2017 . . . ." *Id.*, ¶ 89.

It is improper for Mr. Newman to opine on Mr. Gaitis's state of mind or matters he concedes to be outside the record. *Holmes Group*, 2010 WL 7867756, at *5. But even beyond this, Mr. Newman's conclusions are frequently based on a complete misreading of the actual record. For example, Mr. Newman concluded that the following excerpt from Mr. Gaitis's November 2016 time records indicates that Mr. Gaitis was concerned about issues of "fundamental fairness": "Analyze WP [Chairman William Park] interpretation of ICDR Guidelines/compare and contrast case law & authorities re <u>equal treatment of parties</u>." Decl., ¶¶ 85, 86, 88 (emphasis in original). In reality, these entries reflect the Tribunal's consideration at that time of *Vantage's argument* that principles of equal treatment required the Tribunal to order Petrobras to produce

4

communications with government agencies if Vantage was required to do so. Dkt. 53-3, Katz Decl., Ex. 50. It is absurd for Mr. Newman to characterize Mr. Gaitis's consideration of this argument as reflecting some larger concern about the proceedings as a whole—or affecting equal treatment as to Petrobras in particular—in his Dissent issued 19 months later. *See also* Appendix C.

Similarly, to suggest Mr. Gaitis was particularly passionate about his convictions by issuing his Dissent, Mr. Newman asserts that dissents in international arbitrations are "extraordinary" gestures that are rarely written. Decl., ¶¶ 24, 26. This assertion is belied by the many published authorities noting that dissents in international arbitration are quite common. *See* Shih Decl., Ex. N at 78 (ICDR Handbook on International Arbitration and ADR observing that dissents are "very common in international commercial arbitration."); Shih Decl., Ex. Q at 824 (van den Berg study in the international investment treaty context concluding dissents are filed 22% of the time); Shih Decl., Ex. V at 404-05 (Cremades article noting that "dissenting opinions are generally accepted within the framework of international arbitration . . . and ought rightly to affect neither the validity nor the recognition and enforcement of any arbitral award."). And yet, Mr. Newman supports his view by citing to a ***chatroom discussion*** with unnamed international arbitrators. *See* Decl., ¶ 23 ("In fact, I recently observed, from an online discussion engaged in by Fellows of the College of Commercial Arbitrators, that many highly experienced arbitrators stated that they had ***never*** had dissents in any of their cases."); (emphasis in original). Anonymous online chatroom comments are not the type of evidence that courts have found to be reliable. *See Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 10-CV-02516-WJM-KLM, 2014 WL 4651643, at *7 (D. Colo. Sept. 18, 2014) ("The Court finds it difficult to believe that a

qualified expert could credibly testify that anonymous online comments are the type of evidence that is typically relied upon by an expert in their field.").

Finally, Mr. Newman characterizes Mr. Gaitis's refusal to co-sign the Final Award as "a remarkable repudiation of the content of the Majority Award" and as "emphasiz[ing] the rejection by Arbitrator Gaitis of the process by which the Majority Award was made." Decl., ¶ 25. Yet this starkly disregards the fact that Mr. Gaitis was Editor-in-Chief of a book in which he states that it is his **routine practice** not to sign an award from which he dissents. *See The College of Commercial Arbitration Guide to Best Practice in International Arbitration*, 322 (James M. Gaitis, Editor-in-Chief) (4th ed. Juris 2017). Therefore, Mr. Newman not only impermissibly attempts to read Mr. Gaitis's mind, he ignores Mr. Gaitis's own express statement of his intent in this regard.

In the end, not only is Mr. Newman not qualified to offer opinions regarding Mr. Gaitis's state of mind, but in many instances, his conclusions are inconsistent with the record.

> 2. **Mr. Newman's opinions regarding Judge Brower's state of mind are also improper and unreliable.**

Mr. Newman's improper speculation did not stop with the Dissent. He opines at length on Judge Charles Brower's state of mind during the proceeding—and that his state of mind was biased. *See* Appendix A. To back up his overarching conclusion, Mr. Newman opines about Judge Brower's "true intent" behind various statements and actions during the Arbitration. But Mr. Newman's experience as an international arbitrator does not give him any special expertise regarding the assessment of bias or Judge Brower's state of mind.

As one example, Mr. Newman claims to have gleaned the following from Judge Brower's examination of witnesses Hamylton Padilha, Judge Schwebel, and Lance Labiche:

- "The cross-examination conducted by Arbitrator Brower . . . of Hamylton Padilha . . . **was more than an effort to obtain clarification** . . . ."; Decl., ¶ 61;

- "Rather, Arbitrator Brower focused much of his questioning on the credibility of the witness, ***perhaps hearkening back*** to his thirty years as an arbitrator at the Iran-U.S. Claims Tribunal . . . ." *Id.*;[4]

- "There was therefore little or nothing left for Arbitrator Brower to <u>clarify</u> as to the prior inconsistent statements by the witness. ***He simply availed himself of the opportunity to add some additional advocacy*** on behalf of the parties that appointed him. . . ." *Id.*, ¶ 63 (underscore emphasis in original);

- "This intervention by Arbitrator Brower ***was not an effort to clarify***." *Id.*, ¶ 65;

- "There are other indications in the record of ***manifestation of the bias*** of Arbitrator Brower beyond that which he displayed in his ***hostile questioning*** of Mr Padilha. Consider Arbitrator Brower's leading questions to Judge Schwebel, Claimants' expert on international law, on May 23, 2017." *Id*, ¶ 68;

- "The ***only purpose of this question*** was to permit the witness to repeat his testimony on the standard of proof of bribery . . . ." *Id.*, ¶ 70;

- "Arbitrator Brower asked questions ***the purpose of which*** was to establish that Mr. Labiche's testimony was influenced by ill feelings against the BSEE . . . ." *Id.*, ¶ 74;

- "This questioning ***was not intended*** to clarify anything. It was ***an attempt to show bias***, a task for an advocate, not an arbitrator." *Id.*, ¶ 75.

---

[4] Mr. Newman claims that the Iran-U.S. Claims Tribunal is a forum "where 'party arbitrators' were not neutral. . . ." Decl., ¶ 61. However, a simple review of the Iran-United States Claims Tribunal Rules of Procedures shows that this is clearly incorrect. *See* Article 9 ("A prospective arbitrator shall disclose to those who approach him in connection with his possible appointment any circumstances likely to give rise to justifiable doubts as to his ***impartiality or independence***."); *see also* Article 10 ("Any arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrator's ***impartiality or independence***."). Iran-United States Claims Tribunal, *Tribunal Rules of Procedure Dated May 3, 1983*, http://www.iusct.net/General%20Documents/5-TRIBUNAL%20RULES%20OF%20PROCEDURE.pdf (last visited October 3, 2018). Thus, Mr. Newman's representation to the Court on this issue is wrong.

To the narrow extent even allowed under the standard of review, this Court can read for itself the record and, in particular, Judge Brower's questions and comments. Mr. Newman has no special qualification to testify about the intent behind Judge Brower's questions to the parties or requests for information. As such, Mr. Newman's repeated efforts to opine on that intent should be rejected because "[c]ourts do not permit experts to testify on the parties' state of mind or subjective intentions." *Beauregard Par. Sch. Bd. v. Honeywell, Inc.,* 2:05 CV 1388, 2008 WL 821053, at *5 (W.D. La. Mar. 24, 2008).

Not only are such opinions patently improper, but in many instances, Mr. Newman draws hyperbolic inferences from the most routine conduct. For example, Mr. Newman concludes that Judge Brower's simple suggestion that the parties prepare lists of evidence a particular way as opposed to another way suggested by Mr. Gaitis supports a conclusion that "***it can be reasonably understood*** that Arbitrator Brower's request for a chronological listing of <u>all</u> evidence ***was an effort to dilute and distract*** from the more specific request by Arbitrator Gaitis." Decl., ¶ 79. (underscore emphasis in original). To twist a suggestion on how evidence should be listed into an "effort to dilute and distract" is nonsense and reflects the lengths to which Mr. Newman roams to find the most nefarious intent behind the most innocuous conduct.[5] Plainly, the Court should simply draw its own conclusion about the record in that regard.

---

[5] Automatically assigning nefarious intent to a neutral request cuts against well-settled legal principles. *See First Interstate Bank of Tex., N.A. v. S.B.F.I., Inc.*, 830 S.W.2d 239, 249 (Tex. App.—Dallas 1992, no writ) ("Although a conspiracy may be proved by circumstantial evidence, disconnected circumstances, any one of which, or all of which, are just as consistent with lawful purpose as with unlawful undertaking, are insufficient to establish conspiracy.") (internal citation omitted); *In re Jackson*, 318 B.R. 5, 25 (Bankr. D.N.H. 2004), *subsequently aff'd*, 459 F.3d 117 (1st Cir. 2006) (noting "general presumption that when an act could have been done with honest intent or dishonest intent, the Court will interpret it as if it was intended to be a lawful act unless evidence to the contrary is presented.").

### 3. Mr. Newman offers improper and unreliable opinions on the applicable legal standard.

Without citation to a single U.S court decision supporting his position, Mr. Newman holds forth at length on his view of the evident partiality standard warranting vacating an arbitration award. *See* Decl., ¶¶ 38-60. His legal conclusions are not only improper, but they are also wrong.[6] Indeed, he baldly asserts that "a showing of actual bias is not required." *Id.*, ¶ 44. Yet the authorities could not be more clear that, in cases that do not involve the sufficiency of arbitrator disclosure, *a showing of actual bias is required*. *See McVay v. Halliburton Energy Services, Inc.*, 688 F. Supp. 2d 556, 561 (N.D. Tex. 2010), aff'd, 608 Fed. Appx. 222 (5th Cir. 2015) (noting that the court "uses an objective standard to determine whether the arbitrator displayed actual bias at the arbitration proceeding," that "*a mere appearance of bias by the arbitrator is not enough*" and that the complaining party must produce "specific facts" showing that "'a reasonable person would have to conclude that the arbitrator was partial to one party.'"); *see also Weber v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 455 F. Supp. 2d 545, 549 (N.D. Tex. 2006) (parties "can establish evident partiality by demonstrating either that [an arbitrator] failed to disclose relevant facts *or that he displayed actual bias at the arbitration proceeding*").[7]

---

[6] *See* Appendix B.

[7] Mr. Newman also discusses *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC* to suggest that experts can be deposed in cases alleging evident partiality. 437 S.W.3d 518, 527-28 (Tex. 2014). Decl., ¶ 27. However, the deposition in *Tenaska* was of an arbitrator alleged to have had substantial, undisclosed relationships with the lawyers for one of the parties, including potential financial opportunities with the lawyers' law firm. *Id.* at 520. Thus, the discovery in *Tenaska* was directed at the arbitrator's undisclosed relationships. *Id.* at 521-23. It was not, however, directed at the Tribunal's confidential deliberations, which is what Petrobras seeks here. And unlike conflicts, which should be disclosed, tribunal deliberations are confidential. *See* Shih Decl., Ex. T (Born) §20.06 ("The confidentiality of the arbitral deliberations is central to the adjudicative character and integrity of the arbitral process."). Hence, Mr. Newman's reference to *Tenaska* is misplaced.

Similarly, with respect to the parties' arbitration agreement, Mr. Newman opines that by including the word "neutral" in addition to the words "impartial and independent," the agreement "imposed an additional standard of conduct on the arbitrators that is broader, and therefore stricter, than 'impartiality.'" Decl., ¶ 34.  This is simply wrong, as shown by Mr. Newman's own cite to the AAA Code of Ethics:

> The sponsors of this Code believe that it is preferable for all arbitrators including any party appointed arbitrators to be ***neutral***, ***that is, independent and impartial*** and to comply with the same ethical standards.  This exception generally is essential in arbitrations where the parties, the nature of the dispute, or the enforcement of any resulting award may have international aspects.

*Id.*, ¶ 33, n.6.  Stated differently, the AAA Code of Ethics treats "neutral" as meaning the exact same thing as "independent and impartial," which is precisely the language stated in the parties' arbitration agreement.  Because Mr. Newman's subjective opinion cuts directly against this code— that he himself cites to—his opinion on the this issue should not be viewed as reliable.

**B.      Mr. Newman offers improper legal conclusions that the evident partiality standard has been met with respect to Judge Brower.**

Using his formulation of the legal standard, Mr. Newman goes on to reach the legal conclusion that Mr. Brower's conduct and state of mind satisfied the evident partiality standard. Mr. Newman states that Mr. Brower's actions demonstrate "evident partiality, thereby laying a foundation for vacating the award under the Federal Arbitration Act and to deny enforcement of the award under the Inter-American Convention on International Commercial Arbitration (Panama Convention)."  Decl., ¶ 93.  Along the same lines, Mr. Newman opines:

- "Applying the objective test to the present case, we see ***that the appearance of bias by Arbitrator Brower manifested itself in***

*various ways that I have described* in this declaration, and that Arbitrator Brower's bias cannot be protected . . . ."[8] Decl., ¶ 46;

- Noting that "matters in the record *that can properly be regarded as reflecting untoward bias and improper conduct* in the course of the proceeding by Arbitrator Brower that violate both the agreement of the parties concerning the conduct of arbitrators and the applicable rules of the AAA . . . ." *Id.*, ¶ 47;

- "To be clear, however, *I already concluded based on the available record that Arbitrator Brower's conduct can and should be properly regarded as reflecting bias* and therefore constitute improper conduct in violation of the parties' arbitration agreement and otherwise applicable rules and norms of conduct for arbitrators." *Id.*, ¶ 49;

- "Apart from the effects that this behavior had on Respondents' counsel, *it was a clear manifestation of bias*, both the appearance and the reality." *Id.*, ¶ 77;

- "Thus far, I have discussed the evidence and significance of *the clear manifestation by Arbitrator Brower of evident partiality* . . . ." *Id.*, ¶ 93;

- "One of them, Arbitrator Brower, failed to comply with this requirement by *taking on the role of partisan supporter* of the Claimants." *Id.*, ¶ 99;

- "Thus, the <u>composition</u> or <u>constitution</u> of the tribunal *with one partisan arbitrator* is an additional basis for refusing conformation of the award." *Id.*, ¶ 101; (underscore emphasis in original);

- "The record contains compelling evidence that *Arbitrator Brower was, throughout the proceedings, biased against respondents*. . . . [He allowed] himself to *express his negative attitude* toward Respondents and their counsel." *Id.*, ¶ 103;

---

[8]   As noted just above, Mr. Newman applies the incorrect test because, when parties try to demonstrate bias during the arbitration itself, they must show *actual bias*; appearance of bias is reserved for disclosures prior to the arbitration. *See Weber*, 455 F. Supp. 2d at 549. This further demonstrates why the Court—and not Mr. Newman—should provide legal conclusions in this matter.

- "Thus the tribunal failed, because of its tolerance of the ***partisan behavior of Arbitrator Brower***, to comply with the obligation imposed on all members in the parties' agreement . . . ." *Id.*, ¶ 104.

These opinions must be stricken because "allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence ***both invades the court's province and is irrelevant***." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983); *see also Little v. Tech. Specialty Products, LLC*, 940 F. Supp. 2d 460, 468 (E.D. Tex. 2013) (after reviewing the expert's report, the court held that it mostly consisted "of legal analysis and conclusions. [The expert] reviews in detail statutes, case law, and facts relevant to his analysis to reach conclusions as to whether Defendants' policies violate the FLSA or not. This is not properly within the scope of expert testimony," and the court struck the entire report).

In *Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997), the appellant claimed that the district court improperly excluded his expert evidence regarding director misconduct. *Id.* at 672. The Fifth Circuit noted that the report submitted by the appellant stated that the expert would opine on "[w]hether LivingWell's officers and directors fulfilled their fiduciary duties to the Company, its creditors, and shareholders. If not, how and to what extent did [they] breach their fiduciary duties." *Id.* at 673. The Fifth Circuit held that "[s]uch testimony is a legal opinion and inadmissible. Whether the officers and directors breached their fiduciary duties is an issue for the trier of fact to decide. ***It is not for [the expert] to tell the trier of fact what to decide***." *Id.* Those opinions are conceptually no different than what Petrobras offered here through Mr. Newman.

Not only are these opinions improper legal conclusions, they are contrary to the legal authorities. In essence, Mr. Newman concludes that the evident partiality test was met by his characterization of Judge Brower's conduct as alleged aggressive questioning of Petrobras's witnesses, rehabilitative questioning of a Vantage witness, expressions of skepticism about

Petrobras's lawyers' questions and positions, and expressions of frustration with Petrobras's lawyers' repetitive questions of witnesses. *See generally* Decl. ¶¶ 46-60. Even assuming Mr. Newman has accurately characterized Judge Brower's conduct (and Mr. Newman most definitely has not), the courts have held that such conduct does not meet the evident partiality standard. For instance, Chief Judge Rosenthal concluded that evidence that an arbitrator interrupted witnesses, usurped the role of the chair, influenced other panel members, and advocated for one party over the other did not establish evident partiality.[9] *See Lummus Glob. Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*, 256 F. Supp. 2d 594, 628-29 (S.D. Tex. 2002) (Rosenthal, J.); *see also* Dkt. 69, Sections V.A.2.(a)-(b).

This shows, in particular, that Mr. Newman is purporting to reach ultimate conclusions. The Court is itself able to review the record as needed and consult pertinent legal authority. Indeed, that is (or was) the obligation of Petrobras's counsel—to do that work itself and argue the facts and record to the Court, not hire another lawyer to burnish its reading as one of supposed "expertise." *See Highland Capital Mgmt. L.P. v. Bank of Am., Nat. Ass'n*, 3:10-CV-1632-L, 2013 WL 4502789, at \*5 (N.D. Tex. Aug. 23, 2013) ("The Fifth Circuit has held that if an expert's opinion offers no more than what a lawyer could offer in argument, it should be excluded.") (citing *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986)).

---

[9] Mr. Newman himself cites a treatise that cuts squarely against his theory on bias in relation to questioning witnesses, noting that "a leading treatise on international arbitration contains the statement '***Most authorities have also rejected claims that aggressive questioning of witnesses during hearings evidenced bias.***'" Decl., ¶ 59. Mr. Newman tries to avoid this reality by arguing that "the cases cited in support of this statement do not deal with improper arbitrator questioning of witnesses to which the affected party objected during the arbitral proceedings." *Id.* That is simply a distinction without a difference, and *Lummus*, as well as the treatise he cites to, forecloses any argument that aggressive questioning somehow constitutes bias.

Mr. Newman's opinion that Mr. Brower's actions were biased and met the evident partiality standard should be stricken, as conclusions on that issue should be left to the Court.

## V.   CONCLUSION

Accordingly, Vantage respectfully requests that the Court strike the Declaration of Lawrence W. Newman.

Dated:  October 3, 2018.                    Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Karl Stern
Texas Bar No. 19175665
karlstern@quinnemanuel.com
Charles Eskridge
Texas Bar No. 06666350
charleseskridge@quinnemanuel.com
Christopher Porter
chrisporter@quinnemanuel.com
Texas Bar No. 24070437
Kate Kaufmann Shih
Texas Bar No. 24066065
kateshih@quinnemanuel.com
711 Louisiana, Suite 500
Houston, Texas  77002
Telephone: (713) 221–7000
Fax: (713) 221–7200

Tai–Heng Cheng
taihengcheng@quinnemanuel.com
*Admitted Pro Hac Vice*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone :  (212) 849–7000
Fax :  (212) 849–7100

Edward F. Fernandes
Texas Bar No. 06932700
efernandes@HuntonAK.com
HUNTON ANDREWS KURTH
700 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-5721
Fax: 713-229-5750

Paul J. Dobrowski
Texas Bar No. 05927100
pjd@doblaw.com
Danielle N. Andrasek
Texas Bar No. 24045410
dna@doblaw.com
DOBROWSKI LARKIN & JOHNSON LLP
4601 Washington Ave. #300
Houston, Texas 77007

**ATTORNEYS FOR PETITIONERS
VANTAGE DEEPWATER COMPANY AND
VANTAGE DEEPWATER DRILLING, INC.**

## CERTIFICATE OF SERVICE

A copy of the foregoing motion was served on all counsel of record for the parties via ECF on October 3, 2018.

*/s/ Kate Kaufmann Shih*
Kate Kaufmann Shih

| Mr. Newman Improperly Speculates on Intent/State of Mind | |
|---|---|
| **Paragraph of Declaration** | **Newman Opinion** |
| 28 | Stating that "Arbitrator Gaitis ***does not say*** in what way the 'prehearing, hearing and post hearing' processes denied Respondents 'fundamental fairness and due process.'. . . ***I have reviewed*** the record that is available ***in an attempt to understand*** the events that ***could have led Arbitrator Gaitis to reach the conclusions he did***." |
| 28 | "At the same time, ***it is likely*** that certain of the ***events*** constituting fundamental unfairness ***about which Arbitrator Gaitis complains arose*** out of occurrences ***outside the records*** available to me." |
| 29 | "I discuss what I have found in the record ***that I consider***, based on my experience . . . to be activities that are ***indicative of the kinds of improper activity which Arbitrator Gaitis alludes in his dissent that can be regarded*** as prejudicial to the procedural rights of Respondents." |
| 29 | Noting that it would be best to obtain evidence "directly from Arbitrator Gaitis regarding matters from the prehearing, hearing, and post hearing process ***that clearly concerned him*** but that ***do not appear in the written record of the arbitration***." |
| 46 | "Applying the objective test to the present case, ***we see that the appearance of bias by Arbitrator Brower manifested itself*** in various ways that I have described in this declaration . . . ." |
| 47 | Noting that matters in the record can be "regarded as ***reflecting untoward bias*** and improper conduct in the course of the proceeding by Arbitrator Brower that violates both the agreement of the parties concerning the conduct of arbitrators and the applicable rules of the AAA, as well as the norms of expected and customary behavior for arbitrators in international arbitration." |
| 48 | "As noted earlier, ***behind the scenes conduct, although not visible*** to the parties, ***may also reflect biased conduct . . .*** ." |
| 48 | Noting that additional facts should come from Mr. Gaitis and that the "additional 'relevant facts' should be added to what is contained in, ***or that may be inferred from***, the available record of the proceedings." |

| | |
|---|---|
| 49 | "To be clear, however, ***I already conclude*** based on the available record ***that Arbitrator Brower's conduct can and should be properly regarded as reflecting bias*** and therefor constitute ***improper conduct*** in violation of the parties' arbitration agreement and otherwise applicable rules and norms of conduct for arbitrators." |
| 61, n.23 | Regarding a determination by the Tribunal that time consumed by an arbitrator questioning witnesses that went beyond 5 minutes would be split on a 50/50 basis between parties, Mr. Newman stated that "***I consider this procedural order to reflect the expectation that arbitrator questioning would be of a clarifying nature*** of use to both sides, consistent with the parties neutrality requirement." |
| 61 | "The cross-examination conducted by Arbitrator Brower on May 22, 2017 of Hamylton Padilha . . . ***was more than an effort to obtain clarification*** . . . ." |
| 61 | "Rather, Arbitrator Brower focused much of his questioning on the credibility of the witness, ***perhaps hearkening to his thirty years as an arbitrator at the Iran-U.S. Claims Tribunal*** . . . ." |
| 62 | "Thus, Arbitrator Brower ***spent time trying to make credibility points*** . . . ." |
| 63 | "[Arbitrator Brower] ***simply availed himself of the opportunity to add some additional advocacy*** on behalf of the parties that appointed him . . . ." |
| 64 | "Therefore, ***the transparent purpose of the lengthy cross-examination*** of Arbitrator Brower was to help undermine the witness's testimony regarding his assertions concerning the knowledge of Paul Bragg . . . .The majority made several different statements characterizing their assessment of the evidence . . . ***undoubtedly a conclusion reflecting a negative view of the credibility of Mr. Padilha***, whose evidence, Arbitrator Brower said on the record . . . was the only 'direct evidence of what's referred to as the bribery or corruption issue in this case.'" |
| 65 | "This intervention by Arbitrator Brower ***was not an effort to clarify*** . . . ." But it "***showed that the arbitrator was not behaving as a neutral, but rather as a partisan***, contrary to his obligation to be neutral and impartial. He manifestly and aggressively took sides with respect to the testimony of this critically important witness, leading anyone present |

| | |
|---|---|
| | *or reading the transcript to be under no illusion as to his position* with respect to important issues in the case." |
| 67 | Stating, in reference to the questioning of Padilha, that "*its principal purpose was to discredit* one party's witness *and not to clarify* testimony." |
| 68 | "There are other indications in the record of *manifestation of the bias of Arbitrator Brower* beyond which he displayed in his hostile questioning of Mr. Padilha." |
| 68 | Noting that "Arbitrator Brower posed questions to Judge Schwebel *that invited him*, through leading questions, *to bolster his written testimony*." |
| 70 | "*The only purpose of this question* was to permit the witness to repeat his testimony on the standard of proof of bribery . . . ." |
| 73 | Stating "in contrast to his *soft and encouraging questioning* of Claimants' international law expert, [Mr. Brower] challenged Mr. Labiche's credibility as a witness *by trying to have him admit some sort of animus* . . . ." |
| 74 | "Arbitrator Brower asked questions *the purpose of which* was to establish that Mr. Labiche's testimony was influenced by ill feelings against the BSEE . . . ." |
| 75 | "This questioning *was not intended to clarify anything. It was an attempt to show bias*, a task for an advocate, not an arbitrator." |
| 76 | "A curious, and overt, *expression by Arbitrator Brower of his hostility to the Respondents' case* can be seen in the complaint by Respondents' counsel that Arbitrator Brower had been making negative comments 'under his breath' . . . ." |
| 77 | "Apart from the effects that this behavior had on Respondents' counsel, *it was a clear manifestation of bias, both the appearances and the reality*." |
| 78 | "The hearing record shows that Arbitrator Gaitis *expressed his concern with the attitude* toward the *parties that Arbitrator Bower was manifesting in the hearings*." |
| 79 | Regarding Arbitrator Brower's request for evidence, stating that "*it can reasonably be understood that Arbitrator Brower's request* for a chronological listing of <u>all</u> evidence *was an effort to dilute and distract* from the |

| | |
|---|---|
| | more specific request by Arbitrator Gaitis." (Emphasis of "all" in original). |
| 80 | Noting that due to Arbitrator Brower's alleged "partisan conduct," rulings from the Tribunal were "***possibly affected by bias*** . . . in the form of a negative attitude toward the Respondents and positions taken by them." |
| 81 | Regarding the Tribunal allowing the parties to schedule depositions on their own, "***[i]t did tepidly say*** that the parties could make arrangements of their own for such depositions***, effectively discouraging the taking of any of the depositions***, which in fact never took place." |
| 84 | "What went on in the hearing ***undoubtedly had an effect*** on the arbitrators, as ***did probably other interactions between them***." |
| 84 | Stating that the time records "***reflect attitudes*** and activities that would cause a disinterested observer to have justifiable doubts as to the fundamental fairness of the proceedings." |
| 85 | Noting that in one particular time entry, Mr. Gaitis "***expresses his concern*** about the 'equal treatment of the parties.'" |
| 86 | "The 'equal treatment' issue to which Arbitrator Gaitis was referring ***may have underlain*** the 'intra-tribunal' issue to which Chairman Park referred . . . ." |
| 88 | "These ***time entries indicate that*** both prior to and after the hearings, ***Arbitrator Gaitis was concerned*** about issues of 'fundamental fairness' . . . ." |
| 88 | "Arbitrator Gaitis ***evidently expressed his concerns*** about fundamental fairness to his fellow arbitrators . . . ." |
| 89 | ***The accusations seem to have come to the fore*** at or after the arbitrators deliberated together in Boston on October 4, 2017 . . . ." |
| 90 | "Arbitrator Brower's time entries for January 27 and 28, 2018 state: 'Reviewing Gaitis's accusations against the record.' These accusations ***seem to have been taken seriously***. . . ." |
| 91 | "The accusations by Arbitrator Gaitis ***were serious enough to lead the AAA to investigate*** these issues . . . . The ***AAA was probably determining*** whether the record reflected a basis for disqualifications under the AAA Commercial Arbitration Rules and Mediation Procedures . . . ." |

| | |
|---|---|
| 92 | "Under the circumstances, given the unusual language of Arbitrator Gaitis's dissent, the fact that he clearly believed that the Tribunal had acted improperly for reasons not fully reflected in the record, and ***the gravity of potential findings of multiple breaches of duty*** by a member of the arbitral panel such as to justify and demand *vacatur* . . . ." |
| 93 | "Thus far, I have discussed the evidence and significance of the ***clear manifestation by Arbitrator Brower of evident partiality***, thereby ***laying a foundation for vacating the award under the Federal Arbitration Act*** and to deny enforcement of the award under the . . . [Panama Convention]." |
| 96 | "All three of these expressions of the purport of a provision that is applicable to the petition that is pending before the Court concern a material difference between what the parties agreed to as to the way in which the arbitral tribunal ***that they envisioned would be composed*** . . . ." |
| 99 | "Thus, all three arbitrators assumed the obligation to be 'neutral, impartial and independent' throughout the proceedings. One of them, Arbitrator Brower, failed to comply with this requirement by ***taking on the role of partisan supporter*** of the Claimants." |
| 100 | "The conduct of the other two members of the tribunal ***is inevitably affected*** by one arbitrator's partisan conduct." |
| 100 | The remaining two arbitrators can try to ignore the misconduct of the errant arbitrator, but one of the other arbitrators ***might feel pressure*** to counteract the effect of the partisan conduct." |
| 101 | "It is ***not conceivable that the parties*** . . . ***intended*** that one of the members of the tribunal would be permitted to take on the role of a partisan advocate for one of the parties." |
| 103 | "The record contains compelling evidence that ***Arbitrator Brower was, throughout the proceedings, biased against respondents***. . . . [He allowed] himself to ***express his negative attitude*** toward Respondents and their counsel." |
| 104 | "Thus the tribunal failed, because of its tolerance of the ***partisan behavior of Arbitrator Brower***, to comply with the obligation imposed on all members in the parties' agreement . . . ." |
| 106 | "The contemporaneous records kept by the arbitrators concerning their activities outside the hearings ***disclosed*** |

| | |
|---|---|
| | ***serious discord*** among them resulting from accusations by Arbitrator Gaitis of fundamental unfairness." |

| Mr. Newman's Improper Opinions on Legal Standards and Conclusions | |
| --- | --- |
| **Paragraph of Declaration** | **Newman Opinion** |
| *See generally* 38-46 | Providing the incorrect standard for evident partiality in a scenario where the party is challenging actions that occurred at the arbitration itself by arguing that it is an "appearance of bias" standard as opposed to the "actual bias" standard. |
| 34 | "I regard as significant **the inclusion in the parties' arbitration agreement of the word 'neutral'** . . . . I believe that in including this term, the parties **imposed an additional standard of conduct on the arbitrators** that is broader, and therefore stricter, than 'impartiality.'" |
| 35 | "***I believe*** that the word 'neutral' **was used to add a behavioral component** to the usual standards of keeping an open mind and being and remaining independent. **The intended impact of this combination of words is to emphasize the already-existing responsibility of all AAA arbitrators**." |
| 46 | "Applying the objective test to the present case, **we see that the appearance of bias by Arbitrator Brower manifested itself** in various ways that I have described in this declaration . . . ." |
| 47 | Noting that matters in the record can be "regarded as **reflecting untoward bias** and improper conduct in the course of the proceeding by Arbitrator Brower that violates both the agreement of the parties concerning the conduct of arbitrators and the applicable rules of the AAA, as well as the norms of expected and customary behavior for arbitrators in international arbitration." |
| 49 | "To be clear, however, ***I already conclude*** based on the available record ***that Arbitrator Brower's conduct can and should be properly regarded as reflecting bias*** and therefor constitute **improper conduct** in violation of the parties' arbitration agreement and otherwise applicable rules and norms of conduct for arbitrators." |
| *See generally,* 46-79 | (Complaints regarding Arbitrator Brower's alleged improper conduct and aggressive/improper questioning with reference to Canons and guidelines while ignoring caselaw that cuts directly against his position). |
| 67 | "Rather, the point is that the examination was not one that any arbitrator should have undertaken, particularly **when** |

| | |
|---|---|
| | *its principal purpose was to discredit one party's witness* and not to clarify testimony." |
| 68 | "There are other indications in the record of *manifestation of the bias of Arbitrator Brower* beyond which he displayed in his hostile questioning of Mr. Padilha." |
| 77 | "Apart from the effects this behavior had on Respondents' counsel, it was a *clear manifestation of bias*, both the appearance and the reality." |
| 80 | "In addition to arousing concerns on the part of counsel for Respondents, who protested in various ways, there were rulings by the tribunal that can be regarded as *insufficiently supported by the reasoning on which they were purportedly based* and therefore *possibly affected by bias in the tribunal* in the form of a negative attitude toward the Respondents and positions taken by them." |
| 82 | "The only authority offered in support of its ruling that a contract to be void had to be 'illegal *per se*' *is an inapposite case involving the federal False Claims Act* (*U.S. ex rel. Siewick v. Jamieson*, 214 F.3d 1372, 1377 (D.C. Cir. 2000)), which, in fact, *provided no support* for the award's important conclusion." |
| 83 | "The tribunal did not explain how this publicly filed admission by a party would be rendered unworthy of consideration *because a non-mandatory evidentiary standard somehow embodied an expression of a fundamental public policy*." |
| 92 | "Under the circumstances, given the unusual language of Arbitrator Gaitis's dissen*t, the fact that he clearly believed that the Tribunal had acted improperly* for reasons not fully reflected in the record, and the gravity of potential findings of multiple breaches of duty by a member of the arbitral tribunal such as to *justify and demand vacatur* . . . ." |
| *See generally*, 93-100 | (Providing improper legal interpretation of the parties' agreement, Section 4-15 of the Restatement, and the Panama Convention). |
| 93 | "Thus far, I have discussed the evidence and significance of the *clear manifestation by Arbitrator Brower of evident partiality*, thereby *laying a foundation for vacating the award under the Federal Arbitration Act* and to deny the award under the . . . (Panama Convention)." |

| 93 | "There is **another basis on which the award may be denied recognition** – the constitution of the tribunal in the proceedings **in violation of the agreement of the parties**, as described in Section 4-15 of the Restatement as follows . . . ." |
|---|---|
| 99 | "Thus, all three arbitrators assumed the obligation to be 'neutral, impartial and independent' throughout the proceedings. One of them, Arbitrator Brower, failed to comply with this requirement by **taking on the role of partisan supporter** of the Claimants." |
| 100 | "The remaining two arbitrators can try to ignore the **misconduct of the errant arbitrato**r, but one of the other arbitrators **might feel pressure to counteract the effect of the partisan conduct**. The Chairman **may feel isolated because of the polarizing effect of the partisan conduct** of one of the arbitrators. . . . These results . . . can fairly be said to be the inevitable or undesirable consequence **of partisan or biased** conduct by an arbitrator in a three-person tribunal." |
| *See generally,* 101-102 | (Improperly using the Panama Convention and other authorities to suggest that the panel here was no longer properly constituted due to alleged biased conduct of Mr. Brower). |
| 103 | "The record contains compelling evidence that **Arbitrator Brower was, throughout the proceedings, biased against Respondents**." |
| 104 | "Thus the tribunal failed, because of the **partisan behavior of Arbitrator Brower**, to comply with the obligation imposed on all members in the parties' agreement . . . ." |

| | Mr. Newman's Conclusions are Inherently Unreliable | |
|---|---|---|
| **Paragraph of Declaration** | **Newman's conclusion and basis (if any)** | **Newman ignores events and authorities confirming his conclusions are wrong** |
| 23 | "Dissents are not commonly seen in international arbitrations." Basis: an online discussion with unnamed members of the Fellows of the College of Commercial Arbitrators. *Id.* | Authoritative sources confirm that dissents in fact common in international arbitrations. *See* Shih Decl., Ex. Q. (Albert Jan van den Berg, *Dissenting Opinions by Party-Appointed Arbitrators in Investment Arbitration in* Mahnoush Arsanjani, *et al.*, (Eds.) (based on a study in the international investment treaty context, dissents were filed 22% of the time); Shih Decl., Ex. V (Bernardo Cremades, *The Arbitral Award*, in <u>Newman and Hill</u>, at 404-405)(noting that "dissenting opinions are generally accepted within the framework of international arbitration . . . and ought rightly to affect neither the validity nor the recognition and enforcement of any arbitral award."); Shih Decl., Ex. N (ICDR Handbook on International Arbitration and ADR, at 78)(observing that dissents are "very common in international commercial arbitration." |
| 25 | Mr. Gaitis's refusal to sign the award "is not only a remarkable repudiation of the content of the Majority Award, but it also emphasizes the rejection by Arbitrator Gaitis of the process by which the Majority Award was made." | In his published writings, Mr. Gaitis states that never signs an award when he disagrees with the decision. *See* Shih Decl., Ex. O (<u>The College of Commercial Arbitration Guide to Best Practice in International Arbitration</u> at 322, (4th ed. Juris 2017) (James Gaitis, Editor-in-Chief) ("A dissenting opinion is not part of the final award, which should be signed only by those arbitrators who agree |

| | | to the reasoning and findings contained in the award."). |
|---|---|---|
| 28 | "[I]t is likely that certain of the events constituting fundamental unfairness about which Arbitrator Gaitis complains arose out of occurrences outside the record available to me." | This is rank speculation. |
| 34-35 | "I regard as significant the inclusion in the parties' arbitration agreement of the word 'neutral' in addition to the more common (as generally used, including by the AAA) formulation of 'impartial and independent.' I believe that, in including this additional term, the parties imposed an additional standard of conduct on the arbitrators that is broader, and therefore stricter, than 'impartiality.' . . . I believe that the word 'neutral' was used to add a behavioral component to the usual standards of keeping an open mind and being and remaining independent." | According to the AAA Code of Ethics, the term "neutral" is synonymous with "impartial and independent." Shih Decl., Ex. E; *see also* Newman Decl. at 11, n. 5 (citing to same). |
| 66 | To support his opinion that Judge Brower aggressively questioned Mr. Padilha, Mr. Newman cites Mr. Padilha's attorney stating, "I am saying this is embarrassing, sir. We are not whispering nothing. This is embarrassing. He has been talking for a few hours, for more than six hours right now. This is embarrassing." | Mr. Padilha's lawyer's statement was in response to Chair Park's admonition that she not speak to the witness off-camera while he was being questioned. Tr. 1536:1-1537:25. |
| 81 | In its order denying Petrobras's application to depose third party witnesses, the Tribunal "effectively discourag[ed] the taking of any of the depositions . . . ." | The Tribunal's order expressly provided, "the Tribunal declines to order depositions, without prejudice to the Parties' right to agree with any or all of the three above-named individuals on a process for depositions on a voluntary basis under agreed |

| | | |
|---|---|---|
| | | procedures." [Procedural Order of 16 February 2017] Petrobras made no effort to obtain the depositions on a voluntary basis. |
| 85-87 (emphasis in Decl.) | The following "time entries indicate that both prior to and after the hearings, Arbitrator Gaitis was concerned about issues of 'fundamental fairness'": <br><br> • "Analyze [Chair Park] interpretation of [authorities] re *equal treatment of parties*." (Gaitis entry) <br> • "scheduling difficulties for internal objections to 'chairman only' conference. . .*intra-tribunal objections to process*." (Park entry) <br> • "*continued attempts to accommodate intra-tribunal objections to process*;" (Park entry) <br> • "Draft analysis for panel re *fund fairness issues*." (Gaitis Entry | These entries relate to consideration of Vantage arguments regarding document production and a chair-only hearing to address document issues: <br><br> • Vantage objected to the scope of discovery, voicing concern that "*equality of treatment* does not require the Panel to compel production in response to Petrobras's *broad* requests. In fact, *doing so would constitute improper, unequal treatment of [Vantage.]*" Dkt. 53-3, Katz Decl., Ex. 50 at 3 <br> • "*With the agreement of both sides*, on 25 October 2016 the Parties participated in a "chairman only" telephone conference with Professor Park, with a transcript provided to Messrs. Brower and Gaitis to permit them to review the points raised during the conference." *Id.* <br> • Mr. Gaitis clearly did not object to this process. In response to an email from Chair Park suggesting the process, Mr. Gaitis wrote: "Without having seen Professor Park's email (below), I just drafted and transmitted to Professor Park and Judge Brower an email suggesting that, under the circumstances, |

| | | |
|---|---|---|
| | | the best approach might be to grant Professor Park, as the chairperson, substantial authority to resolve the parties' 'discovery' disputes on his own. Otherwise, I am not sure how or when the tribunal as a whole is going to be able to do so." Shih Decl., Ex. L (10/17/16 email from Mr. Gaits) |
| 90-92 | "[I]t is clear that no action was taken" by the AAA in connection with "Gaitis's accusations and stance of AAA review of hearing transcript undertaken as well as consideration as to whether disclosures ordered by the AAA would be consistent with secrecy of deliberations" referenced in a February 13, 2018 Brower time record. | The AAA acted by requesting additional disclosures, specifically "the extent of any relationship between Arbitrator William Park and the law firm Weil Gotshal is an issue that needs to be disclosed to the parties." To which Chair Park responded on March 1, 2018: "No relationship of any sort has ever existed between Weil Gotshal and me." Shih Decl. Ex. M Neither party raised any objection following this disclosure. |